UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JUN 0 9 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff | Civ. No. 03C 3904 |
| v. | Judge Norgle<br>Magistrate Judge Bobrick |
| KEVIN TRUDEAU, SHOP AMERICA (USA), LLC, ROBERT BAREFOOT, and DEONNA ENTERPRISES | |
| Defendants. | |

DOCKETED

JUN 2 3 2003

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER WITH APPOINTMENT OF A TEMPORARY RECEIVER, ASSET FREEZE, ACCOUNTING AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AS TO DEFENDANTS**

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  DEFENDANTS' DECEPTIVE BUSINESS PRACTICES . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Defendants' Advertising and Marketing of Coral Calcium Supreme . . . . . . . . . . 3

    B.    Defendants' Advertising Claims for Coral Calcium Supreme are Not Supported By Competent and Reliable Scientific Evidence . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    Defendants' Make the Claims Challenged in the Complaint . . . . . . . . . . 5

        2.    The Challenged Claims Are Not Supported by Competent and Reliable Scientific Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            a.    Health Claims and Clinical Research Claims . . . . . . . . . . . . . . . 10

      •    There is no competent and reliable scientific evidence to support the claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for any, much less all forms of cancer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      •    There is no competent and reliable scientific evidence to support the claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for multiple sclerosis, lupus and other autoimmune diseases . . . . . . . . . . . . . . . 11

      •    There is no competent and reliable scientific evidence to support the claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for heart disease and/or chronic high blood pressure . . . . . . . . . . . . . . . . . . . . . 12

      •    Scientific research published in the Journal of the American Medical Association (JAMA), the New England Journal of Medicine, and other reputable medical journals does not prove that calcium supplements are able to reverse and/or cure all forms of cancer in the human body . . . . . . . . . . 12

i

         b.      Superiority/Bioavailability Claims . . . . . . . . . . . . . . . . . . . . . . . . 13

•     A daily serving size of Coral Calcium Supreme does not provide the same amount of bioavailable calcium as two gallons of milk. . . . . . . . . . . . . . . . . . . 13

•     The body does not absorb significantly more, and in some cases as much as 100 times more, of the calcium contained in Coral Calcium Supreme, and at a rate significantly faster, than the calcium contained in other commonly available calcium supplements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.    LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    Section 13(b) of the FTC Act Authorizes this Court to Grant the Requested Relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    This Case Meets the Standard for the Issuance of a TRO and Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.    The Evidence Demonstrates a Likelihood that the Commission will Prevail on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            a.      The Individual Defendants are Liable for Injunctive and Monetary Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.    The Equities Weigh in Favor of Granting Injunctive Relief . . . . . . . . . . 20

    C.    An Immediate Asset Transfer Restriction and Asset Freeze, Appointment of a Temporary Receiver, Order for Preservation of Records, Repatriation of Assets, and An Accounting Are Necessary for Effective Final Relief . . . . . . . . . . . . . . 22

        1.    Appointment of a Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.    Asset Transfer Restriction and Repatriation . . . . . . . . . . . . . . . . . . . . 24

        3.    Accounting and Preservation of Records . . . . . . . . . . . . . . . . . . . . . . 25

        4.    Expedited Discovery is also Necessary for Effective Final Relief . . . . . 25

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## CASES

*Budget Rent A Car Corp. v. Harvey Kidd Automotive*, 249 F. Supp. 2d 1048
(N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*FSLIC v. Sahni*, 868 F.2d 1096 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . 25

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989) . . . . . . . . . . . . 15, 18-19

*FTC v. Arlington Press, Inc.*, No. 98 CV9620, 1999 WL 3356 2452
(C.D. Cal. Jan. 18, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*FTC v. Austin Galleries of Illinois, Inc.*, No. 88 C 3845, 1988 WL 118863
(N.D. Ill. Nov. 2. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

*FTC v. Beatrice Foods Co.*, 587 F.2d 1225 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . 16

*FTC v. Febre*, No. 94 C 3625, 1996 WL 396117 (N.D. Ill. July 3, 1996) . . . . . . . . 6, 19

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 S.D.N.Y. 2000) . . . . . . . . . . . . 22

*FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) . . . . . . . . . . . . . . . . 15

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FTC v. Growth Plus International Marketing, Inc.*, 2001 WL 128139
(N.D. Ill. Jan. 9, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,19, 24

*FTC v. Med Resorts Int'l, Inc.*, No. 00 C 4893, 2000 WL 1889635
(N.D. Ill. Dec. 27, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*FTC v. National Consulting Group, Inc.*, No. 98 C 0144
(N.D. Ill. Jan. 12, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*FTC v. Pharmtech Research, Inc.*, 576 F. Supp. 294 (D.D.C. 1983) . . . . . . . . . . . . . . 14

*FTC v. Pantron I Corp.*, 331 F.3d 1088 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . 16, 17, 18

*FTC v. Sabal*, 32 F. Supp. 2d 1004 (N.D. Ill. 1998) . . . . . . . . . . . . . . 15, 18, 20, 21, 25

*FTC v. SlimAmerica, Inc.*, 77 F.Supp. 2d 1263 (S.D. Fla. 1999) . . . . . . . . . . 17, 18, 21

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) . . . . . . . . . . . . . . 15, 22

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) . . . . . . . . . . . . . . . 21

*FTC v. Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715
   (N.D. Ill. Aug. 5, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 24

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020
   (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 24

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) . . . . . . . . . . . . . . . . 22

*FTC v. Worldwide Wallcoverings & Blinds, Inc.*, No. 96 C 6138
   (N.D. Ill. Sept. 23, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Koch v. FTC*, 206 F.2d 311 (6th Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984) . . . . . . . . . . . . . . . . . . . . 17, 18

*In re Nat'l Credit Management Group*, 21 F. Supp. 2d 424 (D.N.J. 1998) . . . . . . . . 23

*Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. Bankers Alliance Corp.*, 881 F. Supp. 673 (D.D.C. 1995) . . . . . . . . . . . . . . . 25

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) . . . . . . . . . . . . . . 21

*Simeon Management Corp. v. FTC*, 579 F.2d 1137 (9th Cir. 1978) . . . . . . . . . . . . . 17

*The Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725
   (N.D. Ill. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Thompson Med. Co.*, 104 F.T.C. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

*United States v. Raymond*, 228 F.3d 804 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 6

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) . . . . . . . . . . . . . . . . 6

## FEDERAL STATUTES

15 U.S.C. §§ 41-58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

15 U.S.C. § 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. §§ 45(a) and 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff | Civ. No. |
| v. | |
| KEVIN TRUDEAU, SHOP AMERICA (USA), LLC, ROBERT BAREFOOT, and DEONNA ENTERPRISES, INC., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER WITH APPOINTMENT OF A TEMPORARY RECEIVER, ASSET FREEZE, ACCOUNTING AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AS TO DEFENDANTS**

## I. INTRODUCTION

This action involves blatantly false health and disease claims made for "Coral Calcium Supreme," a dietary supplement. In one of the most widely-aired 30-minute commercials ("infomercials") in the United States, defendants Kevin Trudeau, Shop America (USA), LLC, Robert Barefoot, and Deonna Enterprises, Inc., are falsely claiming that their product Coral Calcium Supreme cures cancer, heart disease, multiple sclerosis, lupus, and other serious diseases. The defendants's fraudulent conduct is causing serious harm to the public health and defendants are reaping millions of dollars by deceiving vulnerable consumers with their patently false advertisements.

The defendants' false representations that Coral Calcium Supreme cures cancer and other serious diseases constitute deceptive acts or practices and false advertising in violation of Sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 52. Defendants bolster these fraudulent health claims by also falsely, and without substantiation,

representing that Coral Calcium Supreme is a substantially better source of calcium than other much less expensive calcium sources. Defendants' present violations of the FTC Act are especially flagrant, given that, according to Trudeau's and Barefoot's counsel, the defendants were advised that a different infomercial making nearly identical claims, in which both defendants previously participated, likely violated the FTC Act.

Accordingly, the FTC brings this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and seeks a noticed temporary restraining order enjoining defendants from engaging in the deceptive sale of Coral Calcium Supreme and ordering ancillary equitable relief, including: (1) appointing a temporary receiver for defendant Shop America; (2) restricting corporate asset transfers and freezing individual defendants' assets; (3) requiring defendants to preserve sales and financial records; (4) requiring defendants to provide an accounting and other financial disclosures; (5) expediting discovery with respect to financial issues and defendants' assets; (6) an order to show cause why a preliminary injunction should not issue; and (7) other related equitable relief.[1]

The temporary relief requested is needed to prevent further consumer injury and to provide the Commission with the financial information necessary to evaluate the precise extent of consumer injury, and allow for ultimate redress to consumers. Similarly, the Commission's request for a show cause order for a preliminary injunction seeks relief necessary to protect consumers and should be granted.

## II. PARTIES

### A. Plaintiff

The FTC is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. §§ 41-58. The Commission is charged, among other things, with enforcement of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which respectively prohibit deceptive acts or practices in or affecting commerce, and false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce. Section 13(b) of the FTC Act, 15

---

[1] As set forth in the accompanying Notice of Motion and Declaration of Counsel, the Commission will provide notice of this motion to defendants once the Complaint and motion papers are filed.

2

U.S.C. § 53(b), authorizes the Commission to initiate federal district court proceedings to enjoin violations of the FTC Act and to secure such equitable relief, including consumer redress, as may be appropriate.

### B. Defendants

Defendant Kevin Trudeau is the Manager of defendant Shop America (USA), LLC, an Illinois limited liability company with its principal place of business at 1462 Elmhurst Road, Elk Grove Village, IL, 60007. Declaration of Christina E. Turner (PX A ¶ 10, Att.1-3).[2] Defendant Robert Barefoot is the President of defendant Deonna Enterprises, a Nevada corporation with its principal place of business at P.O. Box 21389, Wickenburg, AZ, 85358. (PX A ¶ 12, Att.6). Defendants, acting alone and in concert with others, have transacted business in this District and throughout the United States, through the sale and distribution of the product Coral Calcium Supreme. (PX A ¶¶ 5, 14, Att. 5).

## III. DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

### A. Defendants' Advertising and Marketing of Coral Calcium Supreme

Since at least September 2002, defendants have manufactured, labeled, advertised, offered for sale, sold, and distributed Coral Calcium Supreme to the public. (PX A, Att. 4, 5). Defendants have advertised the product primarily through a 30-minute, nationally-disseminated television infomercial that features both Trudeau and Barefoot. (Transcript and videotape attached as Exhibits A and B of Complaint). Defendants began disseminating this infomercial after they severed relations with the producer of a virtually identical product and infomercial in which both Trudeau and Barefoot appeared. That infomercial has aired since January 2002. Trudeau and Barefoot's attorney wrote to the FTC, stating that their clients were concerned that some claims in the earlier infomercial likely violated the FTC Act. However, apparently neither

---

[2]Concurrent with the filing of this complaint and motion, the Commission also has filed a separate motion for an order to show cause alleging that Trudeau's marketing of Coral Calcium Supreme and another unrelated pain-relief product violates the Stipulated Order for Permanent Injunction and Final Judgment Against Kevin Trudeau ("Order") entered by Hon. Robert W. Gettleman on January 14, 1998. (PX A, Att. 14). Because both actions relate to the same product and marketing and thereby raise many similar issues, the instant action was filed as a related action.

Trudeau nor Barefoot had qualms launching their own advertising campaign for a competing product, making very similar claims. *See Section IV.B.1.a , infra.*

During the infomercial for Coral Calcium Supreme, Trudeau and Barefoot provide consumers with a toll-free number to call to purchase the product. When consumers call the telephone number to order Coral Calcium Supreme, a large portion of the credit card transactions are routed through an off-shore merchant bank located in Germany. (PX A ¶ 15). Shop America, directly or indirectly, fill orders for Coral Calcium Supreme. (PX A ¶¶ 5, 14, Att. 4, 5). Shop America also is the company reported to be the purchaser of the advertising space for the infomercial. (PX A, Att. 5). Barefoot's company, Deonna Enterprises, however, is the owner of the registered trademark for Coral Calcium Supreme.[3] (PX A, Att. 7)

For the past few months, the Coral Calcium Supreme infomercial has been one of the most widely-disseminated infomercials in the United States. Indeed, for 18 of the past 26 weeks (from Nov. 2, 2002- May 2, 2003), the infomercial was one of the five most widely-disseminated infomercial in the United States. (PX A, Att. 4). Since November 2002, there have been over 2000 disseminations of the infomercial throughout the country. (PX A ¶ 13, Att. 4).

A one-month supply of Coral Calcium Supreme – a 90-capsule bottle – costs $19.95, plus shipping. Coral Calcium Supreme costs substantially more than other calcium supplements. A $19.95/bottle, Coral Calcium Supreme costs 19.3 cents per 100 mg of calcium. In contrast, the following calcium supplements cost significantly less: OS CAL Ultra (2.2 cents/100mg); CVS Calcium 600 + Vitamin D (0.42 cents); and Caltrate (1.4 cents). (PX A ¶ 16).

According to a May 20, 2003 article in *The Washington Post*, Barefoot and the infomercial have "helped boost monthly sales from 200,000 to 5 million bottles." *Id.*, Att. 20. At $20 per bottle, this suggests that sales of Coral Calcium Supreme could exceed $100 million per month.

---

[3]Deonna Enterprises appears to have entered into agreements with parties other than Trudeau and Shop America concerning the distribution of coral calcium supplements. (PX A, Att. 8).

**B.    Defendants' Advertising Claims for Coral Calcium Supreme Are Not Supported By Competent and Reliable Scientific Evidence**

**1.    Defendants Make the Claims Challenged in the Complaint**

In the Coral Calcium Supreme infomercial and product packaging, defendants make outrageous claims about the ability of coral calcium to cure or treat serious diseases and medical conditions. Trudeau sets the tone at the very outset, stating that the upcoming show is for people "concerned about . . . cancer, heart disease" and other health conditions. (Compl., Ex. B at 3). Throughout the infomercial, both Trudeau and Barefoot, while promoting their product, Coral Calcium Supreme, repeatedly tout calcium and coral calcium as essentially magical substances that can cure cancer, heart disease and even autoimmune diseases such as lupus and multiple sclerosis. *See* Compl., Ex. B at 12-13; 15-18. A particularly strong emphasis is made that Coral Calcium Supreme can cure or treat cancer; indeed, the word "cancer" is spoken 33 times in the infomercial.[4]

The Commission alleges in its Complaint that the following claims are false or unsubstantiated, and violate the FTC Act:

- ■ Coral Calcium Supreme Disease Claims (Count I)

  - • The calcium in Coral Calcium Supreme is an effective treatment or cure for all forms of cancer.

  - • The calcium in Coral Calcium Supreme is an effective treatment or cure for multiple sclerosis, lupus and other autoimmune diseases.

  - • The calcium in Coral Calcium Supreme is an effective treatment or cure for heart disease and/or chronic high blood pressure.

- ■ Coral Calcium Supreme Clinical Research Claims (Count III)

  - • Scientific research published in the Journal of the American Medical Association, the New England Journal of Medicine, and other reputable medical journals proves that calcium supplements are able to reverse and/or cure all

---

[4]The egregiousness of defendants' Coral Calcium Supreme claims prompted the Council for Responsible Nutrition – one of the leading dietary supplement trade associations – to send a May 15, 2003 letter to the Commission and FDA requesting that the agencies take enforcement action against the Coral Calcium Supreme infomercial. (PX A, Att. 19).

forms of cancer in the human body.

- ■ Coral Calcium Supreme Superiority/Bioavailability Claims (Count II)

  - A daily serving size of Coral Calcium Supreme provides the same amount of bioavailable calcium as two gallons of milk.

  - The body absorbs significantly more, and in some cases as much as 100 times more, of the calcium contained in Coral Calcium Supreme, and at a rate significantly faster, than the calcium contained in other commonly available calcium supplements.

The following excerpts from the infomercial and product brochures [5] fully demonstrate that defendants are making the above challenged claims.[6]

- KEVIN TRUDEAU: [T]here's a connection you believe to be [sic] between specifically cancer and the lack of calcium in someone's diet?

---

[5] The FTC is not challenging claims made in Barefoot's books regarding coral calcium. Rather, the FTC is challenging claims made in the infomercial and brochures that relate to the sale of Coral Calcium Supreme. Accordingly, the challenged speech is commercial speech. *See United States v. Raymond*, 228 F.3d 804, 815 (7th Cir. 2000) ("It is permissible for the government to prevent the dissemination of false or misleading commercial speech."); *FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *7 (N.D. Ill. July 3, 1996) (magistrate judge recommendation), *adopted by* 1996 WL 556957 (N.D. Ill. Sept. 27, 1996), *aff'd*, 128 F.3d 530 (7th Cir. 1997) ("Although the 'product' which defendants sold in some instances included books containing ideas or knowledge, which may have had some value to someone, it remains undisputed that defendants, by deceptive means, sold a product or business opportunity that was not what they represented it to be and, therefore, had little or no value to those who purchased it.").

[6] The claims are made either expressly or are implied strong enough as to be "virtually synonymous with an express claim." *See Thompson Medical*, 104 F.T.C. 648, 789 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986). Paragraph X of the Order covers representations made "expressly or by implication." Trial courts, as finders of fact, may draw reasonable inferences and make factual determinations as to both the express claims and the implied claims that are conveyed by the face of an advertisement. *See FTC v. Febre*, 1996 WL 396117 at *4. *See also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652 (1985); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999), *aff'd*, 265 F. 3d 944 (9th Cir. 2001); *FTC v. Arlington Press, Inc.*, No. 98 CV9620, 1999 WL 3356 2452, *11 (C.D. Cal. Jan. 18, 1999).

6

ROBERT BAREFOOT: It's not just cancer. It's all degenerative diseases, lupus * * * MS, cancer. The link is the calcium factor.

Compl., Ex. B at 5.

- ROBERT BAREFOOT: * * * So, [Okinawans] dug [coral sand] up, put it on their crops, and they recorded 400 percent increase in rice crops as soon as they started putting it on. So, they started eating it. And it took a while before they realized what was happening because, you see, all of a sudden, all diseases disappeared.

* * *

KEVIN TRUDEAU: All right. Now, let's go back to this because this is important. You're saying that of the healthiest people on the planet, your investigation, your research, the people who live the longest --

ROBERT BAREFOOT: Yes.

KEVIN TRUDEAU: -- live over 100 years old --

ROBERT BAREFOOT: Yes.

KEVIN TRUDEAU: -- the people that are the most disease-free --

ROBERT BAREFOOT: Yes.

KEVIN TRUDEAU: -- no cancer --

ROBERT BAREFOOT: That's right.

KEVIN TRUDEAU: -- no heart disease --

ROBERT BAREFOOT: Well, they do have cancer, but the rate is so phenomenally low --

KEVIN TRUDEAU: Okay.

ROBERT BAREFOOT: Virtually no cancer.

KEVIN TRUDEAU: Virtually no cancer, virtually no disease.

ROBERT BAREFOOT: That's right.

7

*Id.* at 9-13.

- ROBERT BAREFOOT: We've had people in a few weeks get out of wheelchairs, MS patients get out of wheelchairs for -- there are remarkable results. And, yes, we have people who are documented as terminal cancer patients that now say the oncologist says the cancer is gone away. I mean, it's remarkable --

  FEMALE HOST: Wow.

  ROBERT BAREFOOT: -- what's happening.

  KEVIN TRUDEAU: Is -- big question, and every medical doctor is glued right now to the television watching, waiting for your answer. Is calcium -- taking calcium a cure for cancer?

  ROBERT BAREFOOT: According to the Journal of the AMA, yes, they said it reverses cancer and makes it go back to normal. But I also say –

  KEVIN TRUDEAU: Hold on, hold on, back up. This is not you?

  ROBERT BAREFOOT: No, I'm telling you --

  KEVIN TRUDEAU: You're quoting somebody?

  ROBERT BAREFOOT: I'm quoting the Journal of the AMA and they're --

  KEVIN TRUDEAU: American Medical Association.

  ROBERT BAREFOOT: Yes.

  KEVIN TRUDEAU: They said this?

  ROBERT BAREFOOT: The Journal of the AMA and the New England Journal of Medicine were quoting the [Strang] cancer research, University of New York, who found that calcium supplements reverse cancer and there's not a doctor that read his own journal to find that out. But it does say it –

  *Id.* at 16-17.

- FEMALE HOST: How long have you been using it, Barbara?

  CALLER: Since -- well, since the 10th of June.

8

KEVIN TRUDEAU: Two weeks.

ROBERT BAREFOOT: Okay.

\* \* \*

KEVIN TRUDEAU: Now, what's happened?

\* \* \*

ON SCREEN: Individual results will vary
1-800-392-1155

CALLER: My high blood pressure is no longer high.

*Id.* at 33-34.

- KEVIN TRUDEAU: Now, but first I want us to get to coral calcium because you say of all the calciums out there, that's the -- in your opinion, the best to take?

ROBERT BAREFOOT: Well, yes. And the reason is because of the incredible absorption rate of coral. See, calcium is the hardest -- although it's the most important mineral for the human body, it's also the hardest for the human body to absorb. When you take a Tums, for example, you get 1 percent absorption rate.

FEMALE HOST: Yeah. I take that, yeah.

ROBERT BAREFOOT: That means 20 hours after you take your Tums, you get four milligrams of calcium. But if you take the coral, you get 400 in 10 minutes.

FEMALE HOST: Yeah.

ROBERT BAREFOOT: Okay, now hold -- because I want to tell people how to get this.

\* \* \*

KEVIN TRUDEAU: And so, this is your formula?

ROBERT BAREFOOT: Right, yes.

KEVIN TRUDEAU: All right. Now –

9

ROBERT BAREFOOT: It also has Vitamin D, which allows you to absorb 10 times as much calcium.

KEVIN TRUDEAU: All right.

ON SCREEN: 1-800-392-1155

KEVIN TRUDEAU: [I]f you're interested in getting more information on the coral calcium, any of Bob's books, call the number on your screen, we'll give you information on the books. If you want to get his formula, coral calcium, I'm going to give you a special offer that's only available on the Debbie and Kevin Show if you call today. Only $19.95 for a one-month supply, and that's an introductory offer to get you to try this and see the results yourself. You don't have to pay $40 for a low grade coral that you may find on the Internet or at a health food store. You can get the exclusive Bob Barefoot formulation.

*Id.* at 20-23.

- But, why take "**Coral Calcium Supreme**"? For one thing, if you're over 35 years of age, your system is losing more calcium on a daily basis than you're taking in. Mineral depleted soils in the US and all over the world also means that you are not receiving the correct quality and quantity of calcium in your daily diet. In fact, you would have to drink upwards of two gallons of milk per day or eat 23 pounds of spinach to receive the same benefits of this amazing supplement.

Compl., Ex. C at 3 (product brochure).

2.      **The Challenged Claims Are Not Supported by Competent and Reliable Scientific Evidence.**

a.      **Health Claims and Clinical Research Claims**

To assist the Court in assessing the veracity of defendants' health and clinical research claims for Coral Calcium Supreme, the Commission provides the declarations of two different experts: MaryFran Sowers, Ph.D, Director of the Center for Integrated Approaches to Complex Diseases and Professor of Nutritional Epidemiology at the University of Michigan's School of Public Health (PX B) and Nancy Davis, M.D., Chief Fellow at the University of Chicago Medical Center, Department of Hematology/Oncology (PX C). Dr. Sowers is an expert in the area of nutrition epidemiology and, particularly, calcium's relationship to disease; Dr. Davis is an expert in the diagnosis and treatment of a variety of forms of cancer.

10

- **There is no competent and reliable scientific evidence to support the claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for any, much less all forms of cancer.**

Drs. Davis and Sowers both reviewed the challenged cancer claims and attest that the claims are not supported by reliable science. Defendants are making efficacy claims that far exceed what science has shown thus far – falsely claiming that calcium supplementation can treat or cure cancer. (PX B ¶ 9; PX C ¶ 7). As set forth in their respective declarations, the most recent science on the interplay between calcium supplementation and cancer suggests that – at most – calcium may slightly decrease the risk of the formation of additional polyps for a small portion of the population – people who previously had non-cancerous colorectal polyps. (PX B ¶¶ 9-18; PX C ¶¶ 21-33). Scientific research suggesting a substance may have a modest preventive effect with regards to one type of cancer is not reliable scientific evidence that the substance cures or treats all cancers. (PX C ¶ 19).[7]

In order to claim that a product cures or treats a particular cancer, a reasonable scientist or physician would expect that product to have been the subject of at least one rigorous clinical trial, in which the product was compared to the current standard of care with respect to numerous efficacy endpoints, such as survival rates. (PX C ¶¶ 13-14). Additionally, because various cancers respond to treatments differently, studies only provide evidence with respect to the particular type of cancer investigated. (PX C ¶ 12). There is no such scientific evidence showing that coral calcium, or any form of calcium, cures or treats any cancer. (PX B ¶ 6; PX C ¶ 7).

- **There is no competent and reliable scientific evidence to support the claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for multiple sclerosis, lupus and other autoimmune diseases.**

The infomercial makes dramatic claims that taking coral calcium enables people with autoimmune diseases, such as multiple sclerosis and lupus, to "get out of wheelchairs." (Compl., Ex. B at 16). As Dr. Sowers explains, there is simply no reliable scientific evidence suggesting that calcium or coral calcium is a treatment or cure for multiple sclerosis, lupus or other

---

[7]During the 30-minute infomercial, the word "cancer" is spoken 33 times (11 times by Trudeau), while the word "prevent" is mentioned only once.

11

autoimmune diseases. (PX B ¶ 33). Indeed, whereas for some of the other challenged claims, there is at least a small kernel of support, none exists for calcium's purported association with autoimmune diseases. Dr. Sowers – who has a great deal of expertise in calcium and related research – conducted numerous MEDLINE searches and was unable to locate any studies supporting a claim that calcium intake is associated with autoimmune diseases. *Id.* Accordingly, defendants' claim that the calcium in Coral Calcium Supreme cures or treats multiple sclerosis, lupus or other autoimmune disease is false and unsubstantiated.

- **There is no competent and reliable scientific evidence to support the claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for heart disease and/or chronic high blood pressure.**

Defendants' claim that the calcium in Coral Calcium Supreme is an effective treatment or cure for heart disease and/or chronic high blood pressure is false and unsubstantiated. First, there is no scientific evidence suggesting that calcium treats or cures heart disease. (PX B ¶ 6). Second, although there is some scientific evidence suggesting that increased calcium consumption may be associated with marginally lowered blood pressure, the scientific evidence does not support defendants' extreme heart disease and hypertension cure claims. *Id.* Once again, defendants have taken a piece of scientific evidence and blown it out of proportion in order to sell their product. At best, there is some scientific evidence suggesting that some populations of people who are deficient in calcium may be more prone to high blood pressure than people with adequate calcium intake. (PX B ¶¶ 27-30). This scientific evidence does not support a claim that calcium cures or treats chronic high blood pressure, let alone heart disease, for which high blood pressure is only one risk factor.

- **Scientific research published in the Journal of the American Medical Association (JAMA), the New England Journal of Medicine, and other reputable medical journals does not prove that calcium supplements are able to reverse and/or cure all forms of cancer in the human body.**

According to the infomercial, articles published in JAMA and the New England Journal of Medicine prove that calcium supplements reverse cancer. This statement is false. The Declarations of Drs. Sowers and Davis describe a 1998 study published in JAMA and a 1999 study from the New England Journal of Medicine that involve calcium supplementation and its

12

potential role in the prevention of the recurrence of colorectal cancer. Neither study supports the proposition that calcium supplements reverse any form of cancer. (PX B ¶¶ 10-13; PX C ¶¶ 22-26). At most, the JAMA study suggests that for a small portion of the population – people who had non-cancerous polyps in the colon – calcium supplementation may modestly decrease the risk of the formation of additional polyps. (PX B ¶¶ 10-11; PX C ¶¶ 22-24). The study in no way suggests that increased calcium intake can reverse cancer, and does not provide any support for claims involving cancers other than colon cancer. (PX B ¶ 11; PX C ¶ 24). In the New England Journal of Medicine study, one group of test subjects received calcium supplementation, and the other group received a placebo. (PX B ¶ 12; PX C ¶ 25). All test subjects had a history of non-cancerous colorectal polyps. *Id.* After four years, 31% of the calcium group and 38% of the placebo group had recurrent colorectal polyps. Although the study suggests a very modest preventative effect for the calcium group, it in no way supports a claim that calcium supplementation treats or cures any cancer. (PX B ¶ 13; PX C ¶ 26).

### b.   Superiority/Bioavailability Claims

- **A daily serving size of Coral Calcium Supreme does not provide the same amount of bioavailable calcium as two gallons of milk.**

- **The body does not absorb significantly more, and in some cases as much as 100 times more, of the calcium contained in Coral Calcium Supreme, and at a rate significantly faster, than the calcium contained in other commonly available calcium supplements.**

The Commission has submitted a declaration from Dr. Richard Wood, the Director of the Mineral Bioavailability at the USDA Human Nutrition Center on Aging at Tufts University (PX D) to shed light on whether Coral Calcium Supreme supplies calcium that is more absorbable, and absorbable at a faster rate, as compared to other calcium sources.

Neither superiority claim is supported by competent and reliable scientific evidence. Although multiple factors cause the body to absorb varying amounts of calcium from different types of calcium sources, there is no competent and reliable scientific evidence for the extreme absorption claims made by Trudeau. (PX D ¶¶ 5, 8) On average, two gallons of milk contain 9300 mg of calcium. (PX D ¶ 15). Because it is well established that at least 20% of the calcium

13

in milk is absorbed by the human body, two gallons of milk provides at least 1860 mg of bioavailable calcium. (PX D ¶¶ 13-15). One daily dose of Coral Calcium Supreme (three tablets) contains only 345 mg of calcium. (PX D ¶ 15). Even if we assume that 100% of the calcium in Coral Calcium Supreme is absorbed by the body – which is very unlikely – it is still much less than the amount of calcium the body would absorb from two gallons of milk. *Id.* Similarly, there is no science suggesting that the body absorbs 100 times as much calcium from coral calcium as opposed to other forms of calcium. (PX D ¶¶ 19-20). At most, there is only one small study, published in a Japanese journal, that compares the bioavailability of coral-derived calcium and calcium carbonate. While the study suggests a relative increase in bioavailablity, it does not support defendants' extreme bioavailability claims. (PX D ¶¶ 10-12).

## IV. LEGAL ANALYSIS

For well over 50 years, the Commission has brought actions to halt bogus cancer-cure schemes. Indeed, defendants' scheme to prey on vulnerable consumers is quite similar to earlier cancer-cure cases brought by the Commission. *See Koch v. FTC*, 206 F.2d 311 (6th Cir. 1953) (upholding Commission findings with respect to substance that purportedly cured cancer and other diseases); *see also FTC v. Pharmtech Research, Inc.,* 576 F. Supp. 294 (D.D.C. 1983) (preliminary injunction issued in connection with sale of dietary supplement promoted for cancer risk-reduction).

### A. Section 13(b) of the FTC Act Authorizes this Court to Grant the Requested Relief.

The Commission seeks a temporary restraining order and preliminary injunction: (1) prohibiting defendants from making the challenged representations in connection with the advertising, marketing, promotion, offering for sale, distribution, or sale of Coral Calcium Supreme or any similar product containing calcium; (2) appointing a temporary receiver to oversee the affairs of Shop America; (3) restricting corporate defendants' asset transfers, except for transfers for actual, ordinary, and necessary business expenses, and freezing the assets of the individual defendants; (4) requiring defendants to preserve their sales and financial records and other related evidence; (5) requiring defendants to provide an accounting, a statement of all recent transfers and assignments of assets and property worth $1,000 or more, and in some cases, a completed financial disclosure form and profit-and-loss statement; and (6) requiring defendants

14

to show cause, if there is any, why this Court should not enter a preliminary injunction, pending final ruling on the Complaint. The relief requested is authorized by Section 13(b) of the FTC Act in conjunction with Fed. R. Civ. P. 65, and is necessary and appropriate in this case.

"Section 13(b) of the [FTC Act, 15 U.S.C. § 53(b)] authorizes the FTC to seek, and the district courts to grant, preliminary and permanent injunctions against practices that violate any of the laws enforced by the Commission." *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1989) ("We have no reason to disagree with the conclusions of our colleagues of the Ninth and Eleventh Circuits that the authority to grant permanent injunctive relief also includes the authority to grant interlocutory relief"). This "unqualified grant of statutory authority . . . carries with it the full range of equitable remedies." *Gem Merchandising*, 87 F.3d at 468.[8]

### B. This Case Meets the Standard for the Issuance of a TRO and a Preliminary Injunction.

The evidence submitted by the Commission meets, and exceeds, the standard for issuance of a TRO and a preliminary injunction.[9] In cases where, as here, the government moves for preliminary relief to enforce a federal statute, the court is not required to consider the same factors as it would in a motion for injunctive relief among private litigants. To grant preliminary injunctive relief in a case brought under the FTC Act, the district court must "'(1) determine the

---

[8]*See also FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1433 (11th Cir. 1984); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir 1989.) ("All other circuits that have dealt with the issue have found that section 13(b) grants the authority to issue other necessary equitable relief"); *FTC v. Growth Plus Int'l Marketing, Inc.*, No. 00 C 7886, 2001 WL 128139 (N.D. Ill. Jan. 9, 2001) (Aspen, Chief J.) (TRO, order to show cause, and asset freeze issued in connection with sale of Canadian lottery tickets); *FTC v. Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715 (N.D. Ill. Aug. 5, 1999) (Marovich, J.) (TRO and asset freeze issued in connection with sale of Canadian lottery tickets); *FTC v. Sabal*, 32 F. Supp. 2d 1004 (N.D. Ill. 1998) (Lindberg, J.) (preliminary injunction and asset freeze issued in connection with sale of a hair growth product).

[9]Because the Commission is seeking a noticed TRO, the same standards apply for the TRO and for the preliminary injunction. *Budget Rent A Car Corp. v. Harvey Kidd Automotive*, 249 F. Supp. 2d 1048, 1049 (N.D. Ill. 2003); *The Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 726-27 (N.D. Ill. 1989).

likelihood that the Commission will ultimately succeed on the merits and (2) balance the equities.'" *World Travel,* 861 F.2d at 1029 (citation omitted). Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury." *Id.* Moreover, unlike a private litigant, who generally must show a strong or substantial likelihood of success on the merits, the Commission need only make the statutory showing of a likelihood of ultimate success. *Id.* And when the Court balances the equities, the public interest "must receive far greater weight" than any private concerns. *Id.* Preliminary injunctive relief is therefore proper if the Commission shows a likelihood of success on the merits and that a balancing of the equities, giving greater weight to the public interest, favors such relief.

In this case, the Commission has demonstrated both a likelihood of success on the merits and that the equities are in its favor. First, the evidence submitted herewith demonstrates not just that the Commission has a likelihood of success, but that defendants have affirmatively violated and continue to violate the FTC Act. Second, the public interest in ceasing the dissemination of false and/or unsubstantiated advertising claims relating to serious health conditions is substantial.

### 1. The Evidence Demonstrates a Likelihood that the Commission will Prevail on the Merits.

Generally, the Commission "'meets its burden on the likelihood of success issue if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits.'" *FTC v. Beatrice Foods Co.,* 587 F.2d 1225, 1229 (D.C. Cir. 1978) (citation omitted). As discussed herein, the Commission easily meets this burden.

Section 5(a) of the FTC Act prohibits deceptive acts and practices in or affecting commerce. Section 12 prohibits the dissemination of any false advertisement in order to induce the purchase of foods, drugs, devices, or cosmetics.[10] To prevail under Sections 5(a) and 12, the FTC must demonstrate that "first, there is a representation, omission or practice, that second, it is likely to mislead consumers acting reasonably under the circumstances, and third, the representation,

---

[10]Coral Calcium Supreme is either a food or a drug for purposes of the FTC Act. Section 15(c) of the Act defines a drug, in part, as any article, other than a food, "intended to affect the structure or function" of the human body and Section 15(a) defines food as an article used as a food. For purposes of this action, it is not necessary to determine whether Coral Calcium Supreme is a food or a drug because Section 12 applies equally to both.

16

omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), *citing In re Cliffdale Associates, Inc.*, 103 F.T.C. 110, 164-65 (1984); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). As set forth below, the FTC has established all three of these sufficiently for the Court to grant a temporary restraining order and preliminary injunction.

First, as discussed above and detailed in the declarations of Drs. Sowers, Davis and Wood, defendants have made several misrepresentations in their advertisements. They have falsely and without adequate substantiation stated that:[11]

- the calcium in Coral Calcium Supreme is an effective treatment or cure for: 1) all forms of cancer; 2) multiple sclerosis, lupus and other autoimmune diseases; and 3) heart disease and chronic high blood pressure;

- a daily serving of Coral Calcium Supreme provides the same amount of bioavailable calcium as two gallons of milk and the body absorbs significantly more of the calcium in coral calcium, and in some cases as much as 100 times more, and at a rate significantly faster, than the calcium contained in other commonly available calcium supplements; and

- scientific research published in the Journal of the American Medical Association, the New England Journal of Medicine, and other reputable medical journals prove that calcium supplements are able to reverse and/or cure all forms of cancer in the human body.

Second, defendants' misrepresentations are likely to mislead reasonable consumers. Reasonable consumers have no obligation to doubt the veracity of express claims, and false or unsubstantiated claims are inherently "likely to mislead." *In re Thompson Med. Co.*, 104 F.T.C. 648, 788, 818-19 (1984) (discussing with approval FTC's Policy Statement on Deception (Oct. 14, 1983)), *aff'd* 791 F.2d 189 (D.C. Cir. 1986).

---

[11]Mere anecdotal evidence or testimonials are insufficient to support claims that a product cures a disease. (PX C ¶ 13). *See also Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1143 (9th Cir. 1978) ("Anecdotal evidence, such as testimonials by satisfied patients or statements by doctors that, based on their experience, they 'believe' a drug is effective do not constitute adequate and well-controlled investigations and cannot, therefore, provide substantial evidence of effectiveness."); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1273 (S.D. Fla. 1999) (Anecdotal evidence of eight consumer witnesses "does not constitute meaningful proof of their weight loss claims.") Accordingly, defendants' claim that Coral Calcium Supreme cures or treats cancer is false and unsubstantiated.

17

Third, given the express nature of the defendants' misrepresentations, the importance of the challenged claims, and the fact that they go to the core reasons why consumers would buy Coral Calcium Supreme, they are presumed to be material. It is well-established that "[e]xpress claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material." *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (*citing FTC v. Pantron I Corp.*, 33 F.3d at 1096.) Indeed, consumers likely would purchase less expensive forms of calcium supplementation if defendants had not misrepresented that their product was superior to other forms of calcium. *See FTC v. Sabal*, 32 F. Supp. 2d 1004, 1009 (N.D. Ill. 1998) ("The court agrees that [defendant] would have been unable to command such high prices for her hair farming products but for her representations that they were able to restore lost hair, were superior to Rogaine and Minoxidil, and were supported by scientific evidence.").[12]

There is substantial evidence, therefore, that defendants have made false and unsubstantiated claims, that those claims are likely to mislead, and that such claims are material to consumers. Accordingly, the Commission has demonstrated a likelihood of success on the merits.

### a. The Individual Defendants are Liable for Injunctive and Monetary Relief.

Trudeau and Barefoot are the principals behind the sale and marketing of Coral Calcium Supreme and are liable for the violations of the FTC Act described above, both in their individual capacity and as officers of the defendant corporations. An individual corporate officer may be held jointly and severally liable for violations of the FTC Act if the court finds that the individual: (1) actively participated in or had authority to control the deceptive practices, and (2) had or should have had knowledge or awareness of the practices. *See FTC v. Amy Travel*

---

[12]Further, because the claims have involved "health, safety, or other areas with which the reasonable consumer would be concerned, [such as] . . . the purpose, safety, efficacy, or cost of the product . . . [or] its durability, performance, warranties or quality," they are presumed material as a matter of law. *In re Cliffdale Assocs.*, 103 F.T.C. at 176-84 (FTC's Policy Statement on Deception); *see also Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000), *citing Cliffdale Assocs.; Pantron I Corp.*, 33 F.3d at 1095-96 (same); *see also Sabal*, 32 F. Supp. 2d at 1007 ("A misrepresentation is material if it contains information that is important to consumers and is likely to affect their decision about whether to purchase a product.").

*Services, Inc.* 875 F.2d 564, 573-74 (7th Cir. 1989); *Febre*, 1996 WL 396117, at \*8. Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573. In addition, the defendants' "degree of participation in business affairs is probative of [their] knowledge." *Id.* at 574.

Trudeau and Barefoot are liable because as individuals making the challenged claims, they actively participated in the deceptive practices. Additionally, both have authority to control the acts and practices of their respective defendant companies and are or should be aware of the deceptive practices at issue. Trudeau is the Manager of Shop America – the company that is primarily marketing Coral Calcium Supreme, and Barefoot is the President of Deonna Enterprises, the company that owns the trademark to Coral Calcium Supreme. As a result of their close involvement and respective positions of authority within their companies, and the egregiousness of the challenged claims, each had reason to know of the companies' deceptive practices. *See, e.g., Growth Plus Int'l Marketing*, 2001 WL 128139, at \*3 (defendants' corporate roles demonstrated knowledge); *Windermere Big Win Int'l*, 1999 WL 608715, at \*5-6 (officer and director positions with companies provided "ample evidence" that individuals had authority to control the purported practices and acts at issue and had some knowledge of the deceptive practices); *FTC v. Austin Galleries of Illinois, Inc.*, No. 88 C 3845, 1988 WL 118862, \* 2 (N.D. Ill. Nov. 2. 1988) ("Circumstantial evidence can be sufficient to establish a defendant's knowledge of facts and corporate activities.").

Moreover, defendants' shared attorney admitted that an early coral calcium infomercial containing almost identical claims made claims that were probably in violation of the FTC Act. Prior to airing the infomercial that is the subject of this motion, Trudeau and Barefoot appeared in a very similar infomercial for Direct Marketing Concepts, Inc., touting a similar product, Coral Calcium Daily. (PX A ¶ 17, Att. 18) (Direct Marketing infomercial transcript). On April 24, 2002, Trudeau and Barefoot's attorney, Daniel J. Hurtado of Jenner & Block, sent a letter to an FTC attorney that discussed this Direct Marketing infomercial. (PX A, Att. 21). In this letter, Mr. Hurtado explained that although both men appeared in this Direct Marketing infomercial, they were trying to halt its dissemination. As the letter explained, "[i]t subsequently has been

19

determined that the [Direct Marketing infomercial], as currently being aired, is very likely not FTC compliant." *Id.*. Indeed, on April 1, 2002, Mr. Hurtado sent a letter to counsel for Direct Marketing stating that the Direct Marketing infomercial "does not meet FTC requirements in the absence of factual and clinical substantiation for certain claims made therein." (PX A, Att. 21).

Tellingly, a comparison of the transcript for the Direct Marketing infomercial and the Trudeau infomercial that is the subject of this order to show cause ("Trudeau infomercial") reveals that many of the same outrageous claims are made in both infomercials, in a very similar fashion. For example, both infomercials refer to multiple sclerosis patients getting out of wheelchairs after using coral calcium. *Compare* Direct Marketing Transcript PX A, Att. 18 at 20 with Compl., Ex. B at 16. Both infomercials state that the Journal of the American Medical Association published an article claiming that calcium cures or reverses cancer. *Compare* PX A Att 18 at 20 with Compl., Ex. B at 6, 17. Both infomercials make very strong claims about the body's ability to absorb substantially more of the calcium from coral calcium than other calcium sources. *Compare* PX A, Att. 18 at 13-14 with Compl., Ex. B at 20. Indeed, the claims made in the Trudeau infomercial are sometimes stronger than in the Direct Marketing infomercial. While the Direct Marketing infomercial generally discusses the connection between "mineral deficiencies" and "degenerative diseases" such as cancer and heart disease (PX A, Att. 18 at 3, 6), the Trudeau infomercial more directly states that "the link between cancer is simply a lack of calcium in the diet." Compl., Ex. B at 6. *See also* Compl., Ex. B at 5 (discussing connection between the "lack of calcium in someone's diet" and "all degenerative diseases, lupus, diabetes, MS, cancer.").

Accordingly, both individual defendants are jointly and severally liable for the FTC Act violations.

### 2.    The Equities Weigh in Favor of Granting Injunctive Relief

The public interest would be strongly served by the injunctive relief requested by the FTC. In deciding whether to grant injunctive relief, the Court must balance the equities, assigning greater weight to the public interest advanced by the FTC than to any of defendants' private concerns. *World Travel*, 861 F.2d at 1029. Indeed, "[t]he Seventh Circuit has explained that . . . the 'greater the plaintiff's likelihood of success . . . the less harm from denial of the preliminary

20

injunction the plaintiff need show in relation to the harm that defendant will suffer if the preliminary injunction is granted.'" *Sabal*, 32 F. Supp. 2d at 1007 (citation omitted).

In weighing the equities, the Court should consider that the Commission brought this action to prevent violations of federal law and to protect the public interest. In such statutory enforcement cases, the government proceeds "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the . . . laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) (securities laws context).[13] The balance of equities tips strongly in the FTC's favor here.

In this case, immediate injunctive relief is necessary to protect the public from the future financial and physical harm that will inevitably result from defendants' deceptive practices.[14] *See, e.g., Sabal*, 33 F. Supp. 2d at 1009 (balance of equities favors FTC in case involving hair growth product). First, there is the direct economic injury that arises from purchasing these expensive products, and one of the remedies the FTC is seeking in connection with this Order to Show Cause is redress for consumers.[15] Second, consumers are injured to the extent that they purchase these products as a substitute for other treatments that may offer them real health benefits. Third, calcium supplementation is particularly inadvisable for a significant percentage of cancer patients, and could exacerbate health problems. It is estimated that 10-20% of cancer patients suffer from a condition called hypercalcemia – excessive calcium in the blood; such

---

[13]*See also FTC v. University Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (in antitrust context, holding "[T]he principal equity weighing in favor of issuance of the injunction is the public's interest in effective enforcement of the antitrust laws. These laws, as we have discussed, are intended to safeguard competition and, hence, consumers.").

[14]Even if defendants immediately pull the infomercials and argue that temporary or preliminary relief is therefore unnecessary, injunctive relief is still appropriate where, as here, there is a risk that harm will recur. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. . . . The purpose of an injunction is to prevent future violations") (citations omitted).

[15]The Commission frequently obtains consumer redress when courts find that individuals or companies made false or unsubstantiated claims for their products. *See, e.g., FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) (affirming consumer redress of more than $16 million); *SlimAmerica*, 77 F. Supp. 2d at 1276 (awarding consumer redress of $8.3 million).

patients should not take calcium supplements. (PX C ¶ 9).

In contrast, defendants have no legitimate interest that would be infringed by the requested injunction. *Id.* The FTC's proposed temporary restraining order is narrowly drafted to restrain defendants from committing the specific acts that they have committed and continue to commit in violation of the FTC Act. "[T]here is no oppressive hardship to defendant in requiring him to comply with the FTC Act, [or] refrain from fraudulent representation[s].'" *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). Because the injunction will preclude only harmful, illegal behavior, the public equities supporting the proposed injunctive relief outweigh any burden imposed by such relief on the defendants. Accordingly, the evidence establishes that the injunctive relief requested herein is strongly in the public interest.

### C. An Immediate Asset Transfer Restriction and Asset Freeze, Appointment of a Temporary Receiver, Order for Preservation of Records, Repatriation of Assets, and An Accounting Are Necessary for Effective Final Relief.

As part of the final recovery in this case, the FTC seeks redress for consumers who have incurred financial injury due to defendants' deceptive practices. To preserve the possibility of restitution for defrauded consumers, and to ascertain the extent of public injury caused by the deceptive representations, the Commission requests that this Court temporarily restrict the transfer of the corporate defendants' assets, appoint a receiver for Shop America, freeze the individual defendants' assets and require defendants to repatriate foreign assets and produce an accounting of the revenue, profits and other information regarding product sales and assets.

### 1. Appointment of a Receiver

The appointment of a receiver is a well-established equitable remedy available to the Commission in civil enforcement proceedings for injunctive relief. *See, e.g., FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984); *see also FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 533-34 (S.D.N.Y. 2000) (permanent injunction, ordering receiver to wind up the business affairs of corporate defendants). Appointing a temporary receiver over Shop America is necessary to preserve the potential for a complete remedy in this case and will serve to maintain the status quo, thereby preventing the destruction of documents and the secretion of assets while

the case is pending.[16] Such an appointment is particularly appropriate in a case such as this where defendants' pervasive fraud presents the likelihood of continued misconduct. *See In re Nat'l Credit Management Group*, 21 F. Supp. 2d 424, 463 (D.N.J. 1998) (granting FTC's request for receiver, stating that "[a] temporary receiver can preserve records and make an accounting that will assist in (1) identifying the assets of the Defendants, (2) determining the size and the extent of the fraud, and (3) identifying the individuals injured.")

A substantial portion of Shop America's revenues are derived from fraudulent activities.[17] Further, the company is currently being run by a twice-convicted felon, recidivist and likely contemnor.[18] At its essence, the company is marketing a bogus cancer cure. If any defendants are permitted to remain in control of that business, it is likely that evidence of their fraud will be destroyed and the fruits of their illegal activity will be misappropriated. The appointment of a temporary receiver would eliminate those risks without disrupting any legitimate business activity. At the same time, a temporary receiver would be helpful to the Court in determining the extent of defendants' fraud, tracing the proceeds of the fraud, preparing an accounting, and making an independent report of defendants' activities to the Court. Courts in this district have consistently made such appointments in FTC cases like this involving businesses permeated by

---

[16]The Commission also has submitted a memorandum naming Proposed Receivers, in which we recommend a receiver, and two alternate candidates, for the Court's consideration.

[17]To the extent that Shop America is selling products and/or services that are not fraudulent, the proposed TRO would allow the receiver to continue selling such products or services. *See* Proposed TRO, Section IX.N.

[18]Press reports and additional documents indicate that in 1990, Trudeau pled guilty to larceny in a Massachusetts state court in connection with "$80,000 in worthless checks he deposited at a bank." In 1991, he pled guilty to two counts of credit-card fraud in Boston federal district court and was sentenced to two years in prison. In 1996, Trudeau settled charges brought by the Illinois Attorney General regarding an illegal pyramid scheme. In 2000, the Department of Fair Trading of Australia and Shop America (Australasia) entered into a consent agreement after authorities had alleged that some of Trudeau's infomercials violated advertising laws. In 2001, the New Zealand Commerce Commission warned Trudeau that some of his infomercials breached the Fair Trading Act. Finally, concurrent with filing this motion, the Commission is filing a motion alleging that Trudeau has violated the terms of the Order entered by Hon. Robert W. Gettleman on January 14, 1998. (PX A, ¶ 11, Att. 10-14).

fraud.[19]

## 2. Asset Transfer Restriction and Repatriation

A district court's authority to enter orders to preserve defendants' assets is ancillary to its equitable authority to order consumer redress. An order restricting defendants' transfer of their assets is appropriate once the court determines that the Commission is likely to prevail on the merits and that restitution would be an appropriate remedy at the conclusion of the proceedings. *See World Travel,* 861 F.2d at 1031 & n.9. The district court at that juncture has "a duty to ensure that the assets of the corporate defendants [are] available to make restitution to injured consumers." *Id.* at 1031. *See also Growth Plus Int'l Marketing,* 2001 WL 128139; *Med Resorts Int'l, Inc.,* 2000 WL 1889635 at * 3. In a case such as this, moreover, where the Commission is likely to succeed in showing that an individual is also jointly and severally liable for the payment of redress, the restriction should extend to individual assets as well. *Id.* (affirming freeze on individual assets); *Austin Galleries of Illinois,* 1988 WL 118862 at *2 (asset freeze against corporate officer centrally involved in fraudulent business).

Because the corporate defendants may participate in some business activities that may not violate the FTC Act, and because the Commission is seeking a receiver in connection with Shop America, the FTC proposes a modest asset restriction provision that restricts transfers of the corporate defendants' assets to those in the ordinary course of business. For the individual defendants, however, the Commission is seeking a temporary asset freeze that would preserve the status quo for the benefit of consumers while the FTC determines the scope of defendants' assets and potential consumer injury. Trudeau and Barefoot are the two individuals behind this scheme, and their assets should be frozen until they can prove to the Court that they have sufficient assets to provide redress to all consumers who purchased Coral Calcium Supreme.[20]

---

[19] *See, e.g., FTC v. Med Resorts Int'l, Inc.,* No. 00 C 4893, 2000 WL 1889635 * 2 (N.D. Ill. Dec. 27, 2000) (Castillo, J.); *Windermere Big Win,* 1999 WL 608715 (Marovich, J.); *FTC v. National Consulting Group, Inc.,* No. 98 C 0144 (N.D. Ill. Jan. 12, 1998); *FTC v. Worldwide Wallcoverings & Blinds, Inc.,* No. 96 C 6138 (N.D. Ill. Sept. 23, 1996).

[20] An asset freeze is particularly appropriate for Trudeau, a twice-convicted felon and recidivist with a history of engaging in fraudulent activities both in the United States and abroad. *See* note 18, *supra.*

24

These restrictions are appropriate, here, to preserve the status quo and ensure that funds are not dissipated during the course of this litigation. Moreover, a court may impose an asset freeze based on the mere possibility of dissipation of assets. *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989). Indeed, in *Sabal*, the Court found that defendant's unsubstantiated claims about a purported baldness treatment warranted the issuance of a preliminary injunction barring her from marketing the product as well as freezing her assets. The court noted that the public had a strong interest "in preventing the dissipation of assets that may be necessary to provide restitution." 32 F. Supp.2d at 1009.

An order requiring defendants to repatriate any foreign assets is also appropriate. The evidence gathered by the Commission demonstrates that they might destroy or conceal assets and documents. Moreover, there is substantial evidence indicating that revenues from the sale of Coral Calcium Supreme are being collected overseas in Germany. (PX A ¶ 15). Further, Trudeau and a related company, Shop America (Australasia), Ltd have previously conducted questionable business in Australia and New Zealand. *Id.*, Att. 12, 13. This pattern of behavior suggests that the defendants may have assets overseas that should be repatriated. *See, e.g., FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) (affirming district court finding holding defendants in contempt for failing to repatriate offshore assets).

### 3. Accounting and Preservation of Records

The Commission also seeks provisions prohibiting defendants from destroying business and financial records and other evidence and requiring defendants to provide an immediate accounting of their assets. The accounting would include completed and sworn financial disclosure forms, profit-and-loss statements, and statements of any transfers of assets worth $1,000 or more by defendants since January 2002. Such provisions, combined with an asset transfer restriction, will increase the likelihood of preserving existing assets pending final determination of this matter. *See, e.g., SEC v. Bankers Alliance Corp.*, 881 F. Supp. 673, 677 (D.D.C. 1995) (ordering accounting).

### 4. Expedited Discovery is also Necessary for Effective Final Relief.

Finally, the Commission also seeks to engage in expedited discovery so that it may quickly and efficiently locate assets defendants have wrongfully taken from consumers, identify

possible additional defendants, and locate documents pertaining to defendants' businesses. Federal Rules of Civil Procedure 26(d), 33(a), and 34(b) authorize this Court to alter the standard discovery provisions, including the applicable time frames, that govern depositions and the production of documents. Expedited discovery is particularly appropriate where, as in this case, a party seeks preliminary relief in a matter which impacts the public interest.

## V. CONCLUSION

Defendants have caused and are likely to continue to cause substantial consumer injury because of their violations of the FTC Act. To prevent ongoing consumer harm and to help ensure the possibility of effective final relief, including monetary redress, the FTC respectfully requests that the Court issue the requested injunctive relief.

Respectfully Submitted,

WILLIAM E. KOVACIC
General Counsel

DANIEL KAUFMAN
LAURA M. SULLIVAN
Federal Trade Commission
600 Pennsylvania Avenue, NW,
NJ-3212
Washington, DC  20580
(202) 326-2675, -3327 (voice)
(202) 326-3259 (fax)
dkaufman@ftc.gov or lsullivan@ftc.gov

TODD KOSSOW
KAREN D. DODGE
FEDERAL TRADE COMMISSION
55 E. Monroe Street, Suite 1860
Chicago, IL 60603-5173
(312) 960-5616, -5608 (voice)
(312) 960-5600 (fax)
tkossow@ftc.gov
ATTORNEYS FOR PLAINTIFF

Dated: June 9, 2003