# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION,      )
                               )
          Plaintiff,           )
                               ) No. 03 C 3904
     vs.                       ) Chicago, Illinois
                               ) September 2, 2004
KEVIN TRUDEAU, SHOP AMERICA    ) 2:00 o'clock p.m.
(USA) LLC,                     )
                               )
          Defendants.          )
                               )

TRANSCRIPT OF PROCEEDINGS - MOTION

BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiff:          FEDERAL TRADE COMMISSION
                            600 Pennsylvania Avenue, NW, NJ-3212
                            Washington, DC 20580
                            BY:  MR. DANIEL KAUFMAN
                                 MS. HEATHER HIPPSLEY


For Defendant Trudeau and   JENNER & BLOCK, LLC
Shop America:               One IBM Plaza
                            Chicago, Illinois 60611
                            BY:  MR. DAVID J. BRADFORD
                                 MR. DANIEL J. HURTADO

ALSO PRESENT:

                            Mr. Kevin Trudeau






Official Court Reporter:    JENNIFER S. COSTALES, CRR, RMR
                            219 South Dearborn Street
                            Room 1706
                            Chicago, Illinois 60604
                            (312) 427-5351

2

(Proceedings in open court.)

THE CLERK: 03 C 3904, FTC versus Trudeau.

MR. BRADFORD: Good afternoon, Your Honor.

David Bradford on behalf of the defendants.

MS. HIPPSLEY: Good afternoon.

Heather Hippsley on behalf of the Federal Trade Commission.

THE COURT: I left my file in there, but go ahead.

MS. HIPPSLEY: Okay. Well, we're happy to report today that we have a final order that we've worked hard to come to an agreement on. And we are pleased that we were able to get the cooperation of Mr. Trudeau to come to a final resolution. And the commission, the five commissioners, have approved the settlement, and that's now authorized and ready for entry by Your Honor.

We thought and the purpose of the status conference rather than just providing it to your office for signature is that we thought it would be beneficial for both us and for Mr. Trudeau to sort of hear an outline of what is required by the order and a few of the narrow exceptions to the very broad injunctive provisions that are there that have been worked out amongst the parties.

I'm going to just, if it's all right with Your Honor, quickly go through the broad injunctive provisions and explain the narrow exception, and then Mr. Bradford would like to

3

elaborate on a few points that we want to make sure are all right with the Court and meet with your approval.

MR. BRADFORD: I was going to talk about the broad exceptions to the narrow injunction.

MS. HIPPSLEY: No, no, no. We really do have a meeting of the minds actually. No. It's an order that we worked hard to achieve. Mr. Trudeau has agreed to two bans that we realize are going to have a large impact on his ability to do business in the future and sort of form what he's able to do going forward.

The first is a ban on producing or participating making or assisting others in making infomercials, and that term is defined in the order as two minutes or longer type of advertisement on any type of television or radio media.

And there is an exception to this which is for what we both have agreed is an area where he has more First Amendment protections in his interest in putting forward advertisements that deal with basically fully protected speech, which would be his ability to have a book or other informational materials that are not related in a commercial setting to the sale of a product or program or service, but merely provides his views and opinions on various topics.

THE COURT: So if he writes a book about coral calcium --

MS. HIPPSLEY: That's correct.

THE COURT: -- that would be an infomercial.

4

MS. HIPPSLEY: If he writes a book about coral calcium, but it's not linked to the product sales or a branded product, then he would be able to do that.

THE COURT: So if he writes a book about his coral calcium, it would be an infomercial.

MS. HIPPSLEY: Right.

MR. BRADFORD: If he's promoting coral calcium at that time.

THE COURT: In the book?

MS. HIPPSLEY: Right, right.

MR. BRADFORD: Or independent of the book.

THE COURT: Or independent of the book, I see. Okay.

MS. HIPPSLEY: And the same basically holds with the second part and the second ban, which is that Mr. Trudeau and the other defendants have agreed not to promote in any kind of medium direct response mailers that we had that were the subject of our concerns a few weeks ago, any kind of direct news letters or mailers, print media, in any of those forms of advertising he's agreed not to make a health benefit or disease claim. And then the same exception applies for purely informational materials.

The third ban picks up on the order that Your Honor entered a few weeks ago dealing with the problem we had with the mailer that Mr. Trudeau was sending that you found in contempt, and that picks up the provision which bans him from the coral calcium business altogether.

5

There is an exception, that he can continue to ship calcium to consumers that were on these continuity plans.

And there is also another issue that we wanted to touch on in this, if you want to explain?

MR. BRADFORD: Certainly. There was an inventory of coral calcium at the time of the order that Your Honor entered which we've been working to dispose of in an appropriate way. And we have an agreement between ourselves and the FTC, subject to Your Honor's approval, that that can be disposed of on a wholesale basis such that it would ultimately be sold in retail stores. And we have provided the particulars to the FTC.

There is an individual by the name of Blane Athorn who has a company that is willing to purchase the coral at wholesale, and then he will endeavor to resell it to various stores so that that can be disposed of.

THE COURT: Is that covered in this?

MR. BRADFORD: That is not covered in here. It is one of several side agreements, if you will, in an appropriate sense, but we wanted to disclose all of those kind of collateral agreements where they are temporary in nature and perhaps don't belong in a permanent injunctive order but were part of the understanding we worked out.

THE COURT: Okay.

MS. HIPPSLEY: And then finally, there is two injunctive provisions that are relatively standard that are for any of the

6

products he would sell, he has to have substantiation. And if he has any products that he's selling where he claims there is specific tests or studies behind them, that these tests and studies are not misrepresented.

The other sections, as you can see, what we have done with the 1998 order, which was the subject of our initial contempt proceeding here, we have folded the 1998 order into this order so that there is only one operative order going forward, and we don't have to try to cross-reference back and forth between the two orders, and so those sections have been picked up here.

And then finally, the other main provisions are we have worked out an agreement on the use of Mr. Trudeau's customer lists. He is going to destroy the customer lists that resulted in the sales that were the subject of our contempt a few weeks ago. And he's also going to maintain just for his use the customer lists that were generated from the original infomercials for coral calcium. Those lists cannot be sold or transferred to anyone outside his organization.

And he's also destroying the list of people that you were concerned about previously that their private information was gathered off the infomercials but were not sold anything in this dry testing, if you will, area. He's going to delete those customer lists with their private information.

And finally, the monetary relief that's contained in the

7

order is there is a $2 million judgment against the defendants. It will be satisfied by real property being turned over that's owned by one of the corporations out in California, by 500,000 in cash being turned over that was the bond under his 1998 order, and by the turnover of a luxury vehicle that's located also in California. The titles to the vehicle and property are already in the possession of Jenner & Block, and that's going smoothly.

THE COURT: Are you driving it?

MR. BRADFORD: I'm sorry, Your Honor?

THE COURT: I said are you driving it?

MR. BRADFORD: No. I understand it's in a garage.

MS. HIPPSLEY: He doesn't have the car --

MR. BRADFORD: I don't want to go anywhere.

MS. HIPPSLEY: -- just the title.

MR. BRADFORD: Right.

MS. HIPPSLEY: And that's basically the broad outlines of the order that we've worked out.

MR. BRADFORD: Thank you. We too want to thank the Court --

THE COURT: First of all, I'm going to break this up into two pieces.

MR. BRADFORD: Sure.

THE COURT: Mr. Trudeau, why don't you step up, please. Do you have any questions, concerns, anything unclear to you about what was just said here?

8

THE DEFENDANT: No. Everything is very clear.

THE COURT: Okay. Obviously, you had a personal hand in the provisions of this agreement?

THE DEFENDANT: Yes.

THE COURT: Okay.

All right. Mr. Bradford.

MR. BRADFORD: Thank you. First I wanted to thank Your Honor for your patience and involvement in helping us bring about this agreement, and I want to thank the FTC for its cooperation. I'm happy that we were able to resolve the differences.

There are a number of understandings that for good reason were not reflected in the order but which we agreed we wanted to make of record just in case we have different people involved in this somewhere down the road. I wanted to avoid all potential for misunderstanding to the extent we could. Some of these are really housekeeping matters, but I appreciate Your Honor's indulgence in letting me reflect these for the record.

One is with respect to the mailings that were subject of the contempt motion. There was a promise that the book would be sent as part of those mailings. Because those customers are getting refunds from the FTC, they have agreed that Mr. Trudeau has no obligation to send the book to those customers. In fact, they prefer that he not send the book to those customers, and they will be taking care of refunding those customers their money.

9

There is an August 5, 2004 letter between ourselves and the FTC which deals with a variety of other topics on which we have reached agreement, one of which references the disposition of the coral at wholesale. Another indicates that there is an affiliated company that has golf programs in the U.K.

To the extent that they from time to time need to film, for example, a U.S. golf tournament or there is some incidental involvement in the United States in the production of a golf show or other kind of nondeceptive programming that's going to appear over there, albeit in an infomercial format that the FTC does not intend to contend that that's a violation of the infomercial ban, we're not talking about programs that are going to be produced or developed in the United States, but there may be some production work that's incidental to those programs that would be permitted in the United States, and they will exercise reasonable discretion in terms of the "in commerce" clause, particularly if this is a nondeceptive type of program.

There were also two infomercials, one for Megamemory and one for Fresh Start, which we agreed they would not pursue as long as they were disseminated only outside of North America.

And we have a general understanding that while there is no release in this agreement, that to the extent the FTC is aware of conduct that has occurred up to the present date, that this is the full extent of relief that they're intending to seek for that, that we're not going to have another lawsuit next week for

10

anything that's already been put on the table. And this really does resolve differences that we've had based on everything that's been disclosed to the FTC to the present date.

And finally, there is an understanding that infomercials have been provided to third parties at various points in the past, and as long as Mr. Trudeau has no direct or indirect financial interest in those parties and no ability to control their dissemination and otherwise complies with the order, that he will not be liable for what third parties will do with those infomercials.

MS. HIPPSLEY: And along the point with the third parties, there is an obligation which Mr. Trudeau recognizes to notify the third parties that he did do production for in the past of the presence of the order, which we hope will have a deterrent effect on the third parties.

THE COURT: Okay.

MR. BRADFORD: Then a further understanding was Mr. Trudeau did complete what's referred to as "The Natural Cures Book." He has developed an infomercial for that Natural Cures book. This has been provided to the FTC. And they have no objection to the dissemination of the book or the infomercial in its current format.

This I think falls within the book exception that we had talked about previously. So we have the first tangible example of something that is acceptable under that provision.

11

It is generally Mr. Trudeau's intention and consistent with the order that he intends to get out of the business of selling product and focus on becoming an author, which is permitted under the order; a potentially producer of television talk show format or otherwise hosting talk shows; and/or that he can engage as a profession in being a consumer critic or advocate.

And as we've talked through those particular fields, we've tried to focus on practical situations that may come up that may create issues under the order.

With respect to the talk show, we have specifically defined here what is an infomercial and what is a talk show, and I think we have some very good objective criteria. But to the extent we ever have disagreements in the future, it would be our intention to submit anything that is questionable to the FTC and try to work out those differences with them. But that is one area where there is potential for disagreement down the road.

In that connection, I would reference a February 18, 2004 letter which was provided to Your Honor as one of the exhibits in connection with a contempt motion which laid out some of the principles in terms of talk shows and books and talk show appearances that would be permitted under the then contemplated order. And we have agreed that the examples and exceptions as articulated in that February 18, 2004 letter are consistent with the final order.

12

So to the extent that there is ever a question about what is or isn't permitted under the final order, that February 18, 2004 letter serves as a little bit of almost legislative history, if you would, as to the examples of what it was that was permitted.

And in particular, as the order reflects, he is permitted to author books and to produce infomercials for the books, but there are at least three limitations on that, one, that the book can't reference a branded or trademarked product, program, or service that the defendants are promoting.

So if he's talking in general terms about vitamins cure cancer, that's not an issue. If he mentions a branded product, then we get into the question of is he promoting that product or is he editorializing or commenting on that product. And that word "promoting" will become a critical word, because obviously he's free from a First Amendment standpoint to say certain things about branded products. To the point it becomes an advertisement or a promotion, we step over the line, and we get into an area where it is prohibited by the order.

Similarly, where the product, any product or program that's related to the content of the book is being sold in conjunction with it, that becomes a problem under the order, that is, he's free to sell the book, if the book is on, let's say, meditation, he could sell a golf club with it; but if he sells some product that's related to the infomercial, then we're

13

getting back into the proscriptions of the order.

And finally, it obviously can't be directly or indirectly an advertisement for the product, that is, to the extent the book is an artifice, and it's really an advertisement, we have an issue there.

So those are the lines of demarcation. And I think we would agree the key word is "promoting." We tried to be more specific than that, but I think ultimately this is going to be a question of facts and circumstances as any particular publication arises.

And it is really our hope and desire not to be back here further, but we have agreed not to try to surprise each other. We will make an effort to submit to the FTC anything that we think is even close to the line. We are hoping that if they have issues with anything, they will bring it to our attention.

And we have a high degree of confidence that we can resolve those differences, and obviously if we haven't, we may, and I know Your Honor doesn't want to hear this, be back for some kind of declaratory relief with respect to the proscriptions of the order. But hopefully we'll never be in a position where there is something that has occurred that could be deemed a violation of the order. I think everybody on our side understands that and hopefully won't be back here in that position.

THE COURT: Okay. I guess my only comment is, I read

14

the decree, anybody who has the ability to sit down and work out a decree such as the one you have presented me should be able to work out any differences that arise during the performance of the proscriptions and other activities that are covered by the decree.

But I think you just said something that's very important. That assumes that any activities in the future are prescreened, I guess, my word, before they happen, not like the last time you were here.

Mr. Trudeau, I hope you are listening really carefully. You are a very clever man. You've got a good future ahead of you, I'm sure. You're creative. And sometimes that creativity may get ahead of your obligations and the restrictions placed on you by this order.

And my advice to you, sir, is that when you have any brainstorms like that, you should run them by Mr. Bradford. You have an excellent lawyer, as good as they come. And he's done a great job for you. So you should run them by him so that if there is any problem, he can go through the channels he has to go through before you're in a position where you can be in contempt of the Court, because I was very unhappy, as you know, the last time that this was brought to me, and I don't want to have that happen again, not after all the work you've put into it.

So I think this is a fair and just resolution to the case. I'm very pleased, as you are, that you were able to do it.

15

Do you have an original, or did you file the original with --

MR. KAUFMAN: I do.

THE COURT: Okay. And this is the same one you gave me before, no changes, right?

MR. KAUFMAN: Yes. The only change is the date was put on the second page of today's hearing.

THE COURT: Okay, good. All right. I'll put it in on the last page then.

MR. BRADFORD: And if I might, Your Honor, just looking through my notes, I've got one other clarification I did want to put on the record.

THE COURT: Okay. Go ahead.

MR. BRADFORD: And that is, in the February 18, 2004 letter, there is a reference that the word "books," and I think we've used the word "informational publications" is intended to include books, books on tape, CDs, DVDs, news letters, that there are now a variety of formats in which books can be published, there may be new formats such as disks in the future, but that all of that falls within the contemplation of books.

THE COURT: Any medium or publication.

MR. BRADFORD: Yes. The word now is "informational publication." So regardless if it's a, you know, traditional magazine or news letter or book, whatever it might be, that that's all within the contemplation of the exception.

16

THE COURT: You can get them totally on the Internet these days, right, I'm told?

MR. BRADFORD: Correct.

THE COURT: Not that I would ever want to read one like that. I'm told that's the newest thing. All right.

MR. BRADFORD: If I might just have one moment to consult with my client to make sure I have not missed anything.

THE COURT: Sure.

(Discussion off the record.)

MR. BRADFORD: Thank you very much, Your Honor.

THE COURT: All right. Well, thank you.

I'm going to assume that this case is terminated, hopefully not have to see you back on it, so we can get rid of some of the voluminous material that we have in our office.

So good luck.

MR. BRADFORD: Thank you so much.

MS. HIPPSLEY: Thank you.

THE COURT: Thank you.

(Proceedings concluded.)

C E R T I F I C A T E

I, Jennifer S. Costales, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable ROBERT W. GETTLEMAN, one of the judges of said Court, at Chicago, Illinois, on September 2, 2004.

_____
Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division