

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 03-C-3904** |
| | : | |
| **KEVIN TRUDEAU,** | : | |
| **Defendant.** | : | |

## PLAINTIFF'S APPENDIX OF UNPUBLISHED CASES

# FILED

MAR 7 - 2008

**Mar 7 2008**

Judge Robert W. Gettleman
United States District Court

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

LEXSEE 2004 US DIST LEXIS 6192

**FEDERAL TRADE COMMISSION, Plaintiff, v. BAY AREA BUSINESS COUNCIL, INC., a Florida corporation, et al., Defendants.**

**No: 02 C 5762**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 6192; 2004-1 Trade Cas. (CCH) P74,381*

**April 8, 2004, Decided**
**April 9, 2004, Docketed**

**PRIOR HISTORY:** *FTC v. Bay Area Bus. Council, Inc.*, 2003 U.S. Dist. LEXIS 7261 (N.D. Ill., Apr. 30, 2003)

**DISPOSITION:** [*1] Plaintiff's Motion for Summary Judgment was granted. Judgment was entered.

**LexisNexis(R) Headnotes** ·

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a

rational jury could return a verdict in the non-moving party's favor. Disputed facts are material when they might affect the outcome of the suit.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
[HN3] When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. However, a metaphysical doubt will not suffice. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN4] A non-movant's failure to comply with U.S. Dist. Ct., N.D. Ill., E. Div., R. 56.1(b) results in accepting as true all facts set out in a Rule 56.1(a) statement. Even where the non-movant fails to respond to the movant's statement of material facts and such facts are deemed admitted, the movant's motion for summary judgment will only be granted if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

Page 2

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

*Antitrust & Trade Law > Federal Trade Commission Act > Coverage*
*Antitrust & Trade Law > U.S. Federal Trade Commission Actions > General Overview*
*Banking Law > Federal Acts > Federal Trade Commission Act > Unfair Competition & Practices*
[HN5] The Federal Trade Commission (FTC) is an independent agency of the United States created by statute, 15 U.S.C.S. § 41-58. The FTC is charged with enforcement of § 5(a) of the Federal Trade Commission Act (FTC Act), *15 U.S.C.S. § 45(a)*, which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Sales Rule, 16 C.F.R. pt. 310, which prohibits deceptive or abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Sales Rule, and secure equitable relief as may be appropriate in each case, including restitution for injured consumers, pursuant to *15 U.S.C.S. §§ 53(b), 57b, 6102(c),* and *6105(b).*

*Antitrust & Trade Law > Federal Trade Commission Act > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > Federal Trade Commission Act*
*Banking Law > Federal Acts > Federal Trade Commission Act > Unfair Competition & Practices*
[HN6] To establish that defendants engaged in deceptive acts or practices in violation of § 5 (*15 U.S.C.S. § 45*) of the Federal Trade Commission Act, the Federal Trade Commission (FTC) must demonstrate that the defendants made material misrepresentations or omissions that were likely to mislead consumers acting reasonably under the circumstances. A statement or practice is material if it is likely to affect a consumer's decision to buy a product or service. After the FTC establishes a particular claim has been "widely disseminated," the burden shifts to the defendants to show that consumers did not rely on that claim.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > Federal Trade Commission Act*
*Antitrust & Trade Law > Federal Trade Commission Act > General Overview*
[HN7] Under § 5(a) (*15 U.S.C.S. § 45(a)*) of the Federal Trade Commission Act, omissions of material fact are deceptive. Courts look to the "overall net impression" of consumers when deciding whether particular statements or omissions are deceptive. Deception may be made by innuendo rather than outright false statements, and

statements can create deceptive impressions on purchasers even though they may be technically interpreted as true or partially true.

*Antitrust & Trade Law > Consumer Protection > Telemarketing*
*Communications Law > Privacy > Telemarketing & Consumer Fraud & Abuse Prevention Act*
[HN8] See 16 C.F.R. § 310(a)(1)(ii).

*Antitrust & Trade Law > Consumer Protection > Telemarketing*
*Contracts Law > Sales of Goods > Performance > General Overview*
[HN9] Sellers and telemarketers may not make any false or misleading statements to induce any person to pay for goods or services. *16 C.F.R. § 310.3(a)(4)* . Sellers and telemarketers also may not request or receive payment of any fee in advance of obtaining or arranging a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit. *16 C.F.R. § 310.4(a)(4).*

*Antitrust & Trade Law > Consumer Protection > Telemarketing*
*Antitrust & Trade Law > Federal Trade Commission Act > General Overview*
*Banking Law > Federal Acts > Federal Trade Commission Act > Unfair Competition & Practices*
[HN10] Under § 3(c) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, *15 U.S.C.S. § 6102(c)*, and *§ 18(d)(3)* of the Federal Trade Commission Act (FTC Act), *15 U.S.C.S. § 57a(d)(3)*, violations of the Telemarketing Service Rule constitute unfair or deceptive acts or practices in violation of § 5(a) of the FTC Act, *15 U.S.C.S. § 45(a).*

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Business & Corporate Law > Corporations > General Overview*
[HN11] Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the others. To determine whether corporate entities constitute a common enterprise, courts look to see if the entities: (1) are under common control, (2) share common office space and offices, (3) transact business through a "maze of interrelated companies," and (4) commingle funds.

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > Federal Trade Commission Act*
*Banking Law > Federal Acts > Federal Trade Commission Act > Unfair Competition & Practices*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*

[HN12] Individuals may be liable for corporate violations of the Federal Trade Commission Act if the Federal Trade Commission can show that the individual defendants: (1) actively participated in or had authority to control a corporation's deceptive practices, and (2) knew or should have known about the deceptive practices. Authority to control a company can be established by demonstrating that an individual assumed the duties of a corporate officer. Whether an individual knew or should have known about a company's practices may be shown by that individual's degree of participation in business affairs. Moreover, the "knowledge" requirement does not require that an individual subjectively intend to defraud consumers but, rather, only requires that a defendant knew or was aware of a misrepresentation.

*Antitrust & Trade Law > Federal Trade Commission Act > Remedies > General Overview*
*Antitrust & Trade Law > U.S. Federal Trade Commission Actions > Remedial Powers > Federal Trade Commission Act*

[HN13] Pursuant to § 13(b) of the Federal Trade Commission Act, *15 U.S.C.S. § 53(b)*, consumer redress is an appropriate remedy. A district court is permitted to grant ancillary equitable relief such as restitution under § 13(b). To obtain redress, the Federal Trade Commission is not required to prove individual reliance on the defendants' material misrepresentations and omissions.

*Antitrust & Trade Law > Federal Trade Commission Act > General Overview*
*Antitrust & Trade Law > U.S. Federal Trade Commission Actions > Remedial Powers > General Overview*
*Torts > Business Torts > General Overview*

[HN14] Consumer redress is appropriate under § 19(b) of the Federal Trade Commission Act, *15 U.S.C.S. § 57b(b)*. This section authorizes relief necessary to redress injury resulting from violations of a Federal Trade Commission rule affecting unfair or deceptive business practices, such as the Telemarketing Service Rule. Congress has provided that such relief may include, but is

not limited to, recession or reformation of contracts, the refund of money or return of property and the payment of damages. *15 U.S.C.S. § 57b(b)*. Even if the defendants' product was of some minimal value, damages are properly measured as the total net sales to consumers when the deceptive sales practices were widespread. Absent the deceptive business practices, the amount spent on a product for which consumers otherwise would not have paid is the proper measure of damages.

*Antitrust & Trade Law > Federal Trade Commission Act > Remedies > General Overview*

[HN15] To determine the proper amount of consumer redress under the Federal Trade Commission Act, the Federal Trade Commission is required to show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figure were inaccurate. To the extent that either the defendants' records create uncertainty in determining the amount of redress or the defendants' failure to produce relevant evidence makes it impossible to accurately determine the proper amount, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.

COUNSEL: For FEDERAL TRADE COMMISSION, plaintiff: David A. O'Toole, Guy G. Ward, Federal Trade Commission, Assistant Regional Director, Chicago, IL. Thomas C Little, Thomas C. Little, P.A., Clearwater, FL.

For BAY AREA BUSINESS COUNCIL, INC, a Florida corporation, BAY AREA BUSINESS COUNCIL CUSTOMER SERVICE CORP, a Florida Corporation, AMERICAN LEISURE CARD CORP, a Florida corporation, defendants: Nicole d'Arcambal Meinertzhagen, Securities & Exchange Commission, Chicago, IL. Meghan Mary Hubbard, Seyfarth Shaw LLP, Chicago, IL. Stephen Todd Bobo, Sachnoff & Weaver, Ltd., Chicago, IL. Steven L. Baron, Mandell, Menkes & Surdyk, LLC, Chicago, IL. Thomas C Little, Thomas C. Little, P.A., Clearwater, FL.

For PETER J PORCELLI, II, individually and as an officer or director of the corporate defendants, BONNIE A HARRIS, individually and as an officer or director of the corporate defendants, BAY MEMBERSHIPS INC, a Florida corporation, BAY VACATIONS INC, a Florida corporation, SR. MARKETING CONSULTANTS, INC., a Florida corporation, defendants: Thomas C Little, Thomas C. Little, P.A., Clearwater, FL.

For STEPHEN T BOBO, as Temporary Equity Receiver, [*2] receiver: Nicole d'Arcambal Meinertzhagen,

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Securities & Exchange Commission, Chicago, IL. Meghan Mary Hubbard, Seyfarth Shaw LLP, Chicago, IL. Stephen Todd Bobo, Sachnoff & Weaver, Ltd., Chicago, IL. Steven L. Baron, Mandell, Menkes & Surdyk, LLC, Chicago, IL.

For BAY AREA BUSINESS COUNCIL, INC, BAY AREA BUSINESS COUNCIL CUSTOMER SERVICE CORP, AMERICAN LEISURE CARD CORP, counter-claimants: Nicole d'Arcambal Meinertzhagen, Securities & Exchange Commission, Chicago, IL. Meghan Mary Hubbard, Seyfarth Shaw LLP, Chicago, IL. Stephen Todd Bobo, Sachnoff & Weaver, Ltd., Chicago, IL. Steven L. Baron, Mandell, Menkes & Surdyk, LLC, Chicago, IL.

For FEDERAL TRADE COMMISSION, counter-defendant: David A. O'Toole, Guy G. Ward, Federal Trade Commission, Assistant Regional Director, Chicago, IL.

**JUDGES:** JOHN W. DARRAH, United States District Judge.

**OPINION BY:** JOHN W. DARRAH

**OPINION**

### MEMORANDUM OPINION AND ORDER

Plaintiff, the Federal Trade Commission (the "FTC"), filed suit against Defendants, Bay Area Business Council, Inc.; Bay Area Business Council Customer Service Corporation; American Leisure Card Corporation; Bay Memberships, Inc.; Sr. Marketing Consultants, Inc.; Special Technologies, [*3] Inc.; Peter J. Porcelli, II; and Bonnie Harris. The FTC alleged Defendants violated the *Federal Trade Commission Act*, *15 U.S.C. § 45(a)*, and the Telemarketing Sales Rule, *16 C.F.R. § 310.3(a)(4)*. Presently before the Court is the FTC's motion for summary judgment against the above-named Defendants. For the following reasons, that motion is granted.

### LEGAL STANDARD

[HN1] Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc., 40 F.3d 146, 150 (7th Cir. 1994)*. [HN2] "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (Celotex)*.

Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, [*4] depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex, 477 U.S. at 322-27; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (Anderson); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (Matsushita); Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 923 (7th Cir. 1994)*.

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker, 957 F.2d 506, 507-08 (7th Cir. 1992)*. [HN3] When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson, 477 U.S. at 247-48; Popovits v. Circuit City Stores, Inc., 185 F.3d 726, 731 (7th Cir. 1999)*. However, a metaphysical doubt will not suffice. *Matsushita, 475 U.S. at 586*. If the evidence is merely colorable or [*5] is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson, 477 U.S. at 249-250*.

### BACKGROUND

Defendants failed to respond to the FTC's motion for summary judgment Rule 56.1(a) Statement of Facts. Instead, Defendants submitted a three-page response brief asking for "an evidentiary presentation at trial" with "affidavits" stating unsupported and irrelevant conclusions. [HN4] Defendants' failure to comply with Rule 56.1(b) results in accepting as true all facts set out in a Rule 56.1(a) statement. *See Smith v. Lamz, 321 F.3d 680, 682-83 (7th Cir. 2003)*. Even though Defendants failed to respond to the FTC's statement of material facts and such facts are deemed admitted, the FTC's motion for summary judgment will only be granted if it can demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *See Johnson v. Gudmundsson, 35 F.3d 1104, 1112 (7th Cir. 1994)*. Accordingly, the undisputed facts, for the purposes of this motion, taken from the FTC's Local Rule 56.1(a) statement of material facts (referred to herein as "Pl.'s 56.1") [*6] and exhibits, are as follows.

[HN5] The FTC is an independent agency of the United States created by statute, *15 U.S.C. § 41-58*. The FTC is charged with enforcement of *Section 5(a) of the*

Case: 1:03-cv-03904 Document #: 110 Filed: 03/07/08 Page 6 of 103 PageID #:1680

Page 5

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

*Federal Trade Commission Act* (the "FTC Act"), *15 U.S.C. § 45(a)*, which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Sales Rule, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Sales Rule, and secure equitable relief as may be appropriate in each case, including restitution for injured consumers, pursuant to *15 U.S.C. §§ 53(b),57b,6102(c),* and*6105(b).* Pl.'s 56.1 P3.

Defendants, Bay Area Business Council, Bay Area Customer Service, American Leisure Card, Bay Memberships, Sr. Marketing Consultants, and Special Technologies, are Florida corporations, with their principal place of business at 801 West Bay Drive, Largo, Florida 33770. Collectively, these Defendants are known as the "Corporate [*7] Defendants." Pl.'s 56.1 P4.

Defendant Porcelli is the owner and Chief Executive Officer of the Corporate Defendants, and he actively participated in the Corporate Defendants' operations. Pl.'s 56.1 P5. Defendant Harris is the corporate Secretary and Treasurer of Defendants Bay Area Business Council and Sr. Marketing Consultants, and she also held herself out as the corporate Secretary and Treasurer of American Leisure Card. Harris actively participated in the Corporate Defendants' operations. Pl.'s 56.1 P6.

Bay Area Business Corporation and American Leisure Card, through telemarketers, made sales to consumers all over the United States, including Illinois. Pl.'s 56.1 P7. Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as those terms are defined in the Telemarketing Sales Rule, *16 C.F.R. §§ 310.2(r), (t), and (u).* Pl.'s 56.1 P8. American Leisure Card did business as "First American Leisure Card" or "1st American Leisure Card." Pl.'s 56.1 P9.

Bay Area Business Council sold "MasterCards" to at least 90,000 consumers from about June or August 2001 through about July 2002. Pl.'s 56.1 P10. American Leisure Card sold "MasterCards" to at least [*8] 32,000 consumers between June 1, 2003 and August 15, 2002. Pl.'s 56.1 P11.

Bay Area Business Council and American Leisure Card entered into contracts with Assail, Inc., a company located in St. George, Utah. Under these contracts, Assail performed or hired others to perform telemarketing for Bay Area Business Council and American Leisure Card. Pl.'s 56.1 P12. Telemarketers representing Bay Area Business Council and American Leisure Card told consumers or led consumers to believe they would receive credit cards with substantial credit limits for an advance fee. Pl.'s 56.1 P13.

On January 30, 2002, a Bay Area Business Council telemarketer called a consumer, identified herself as "Jacky" from Bay Area Business Council in Largo, Florida, and offered the consumer a MasterCard with a fixed interest rate of 6.5% and a limit of $ 20,000.00 for an advance fee of $ 399.00. "Jacky" gave the consumer Bay Area Business Council's customer service number, 1-800-339-1392. The conversation was tape recorded. Pl.'s 56.1 P14.

Bay Area Business Council and American Leisure Card provided their telemarketers with Training Manuals that included telemarketing scripts. Pl.'s 56.1 P15. Bay Area Business [*9] Council's telemarketing scripts open by saying, "Hello, is (Customer Name) home? My name is (Rep Name) and I'm calling from Florida's Bay Area Business Council. Our records indicate that within the past 12 months, you filed an application for a credit card and you are now eligible to receive your MasterCard." Pl.'s 56.1 P16. American Leisure Card's telemarketing scripts open by saying, "Hello, is (Customer Name) home? My name is (Rep Name) and I'm calling from Florida's American Leisure. Our records indicate that within the past 12 months, you filed an application for a credit card and you are now eligible to receive your MasterCard." Pl.'s 56.1 P17.

Both scripts then ask a series of questions to "verify" personal information about consumers, then state, "Mr./Mrs. (Customer Name) based on your information you are guaranteed to receive a MasterCard that does not require a security deposit with an initial pay as you go limit of $ 2000." Pl.'s 56.1 P18. The scripts further state, "And nothing Mr. ___ looks better on your **Equifax credit report than a MasterCard.** Pl.'s 56.1 P19 (emphasis in original). The scripts identify Bay Area Business Council and American Leisure Card as "credit [*10] card reseller[s]." Pl.'s 56.1 P20.

Bay Area Business Council and American Leisure Card charged consumers a "one-time processing" fee, typically $ 174.95 or more, plus up to $ 24.95 for "shipping and handling." Pl.'s 56.1 P21. Some Bay Area Business Council customers were charged an advance fee of $ 399.00. Pl.'s 56.1 P22. The scripts state that the advance fee "covers the cost of processing the MasterCard order" and "once your fee clears your card is mailed guaranteed." Pl.'s 56.1 P23. Bay Area Business Council and American Leisure Card also charged consumers an additional $ 10.00 or more per month. Pl.'s 56.1 P24.

Bay Area Business Council and American Leisure

Case: 1:03-cv-03904 Document #: 110 Filed: 03/07/08 Page 7 of 103 PageID #:1681

Page 6

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Card received payments from consumers by having funds debited from consumers' bank accounts. Pl.'s 56.1 P25. From about July 2001 through November 2001, Bay Area Business Council collected payments from consumers by using checks created by Bay Area Business Council or its agents in Bay Area Business Council's bank account, number 01113599449, at Huntington National Bank. Pl.'s 56.1 P26. From about September 2001 through August 12, 2002, Bay Area Business Council and, subsequently, American Leisure Card and Bay Memberships [*11] collected payments from consumers by withdrawing funds directly from consumers' bank accounts through automated clearing house processing. The automated clearing house processor was Global eTelecom, located in Destin, Florida. Pl.'s 56.1 P27.

After debiting consumers' bank accounts, Bay Area Business Council and American Leisure Card sent out packages to consumers. Both companies' packages were substantially the same except for company logos and letterhead. Pl.'s 56.1 P28. These packages sent to consumers did not contain a MasterCard credit card or any other functional card. Pl.'s 56.1 P29. The only "card" in the packages sent to consumers was a non-functional "facsimile card" with a MaseterCard logo and the name "Bay Area Business Council" or "1st American Leisure Card" on the front and a painted-on, non-magnetic black strip on the back. Pl.'s 56.1 P30.

The packages Bay Area Business Council and American Leisure Card sent to consumers also contained an application for a "stored value" card. Pl.'s 56.1 P31. A "stored value" card is a type of debit card that cannot be used until the consumer "loads" funds onto the card by depositing those funds in a bank account. The consumer can [*12] only spend the amount of funds that the consumer already had deposited in the account. No credit was extended by use of the card. Pl.'s 56.1 P32.

In order to receive a stored value card, Bay Area Business Council and American Leisure Card customers had to send additional funds, typically $ 15.00, $ 25.00, or more, to Bay Area Business Council or Sr. Marketing Consultants. Pl.'s 56.1 P33. Most or all of the Bay Area Business Council customers who sent the additional funds to Bay Area Business Council prior to December 2001 did not receive stored value cards, which were supposed to be provided through Mark Filipo of Apex Bank Card Services ("Apex"). Pl.'s 56.1 P34.

From about December 2001 onwards, the only stored value card available to Bay Area Business Card and American Leisure Card customers was the "ChexCard" issued by Merchant Bankcard Services Corporation, 724 Bank of America Tower, 6300 Ridglea

Place, Fort Worth, Texas 76116 and Stonebridge Bank. Pl.'s 56.1 P35. To obtain a ChexCard, Bay Area Business Council, and American Leisure Card customers had to fill out and send to Sr. Marketing Consultants a "MasterCard Acceptance Form" that was included in their packages, along with [*13] $ 15.00 in "certified funds," such as a money order or cashier's check. Pl.'s 56.1 P36.

Bay Area Business Council and American Leisure Card customers were not told about this $ 15.00 fee during the telemarketing sales calls. They also were not told about the additional amounts they would have to pay to load their own money onto the ChexCard or to use the ChexCard in a transaction. Pl.'s 56.1 P37. Acceptance forms submitted to Sr. Marketing Consultants without the $ 15.00 fee in certified funds were rejected. Pl.'s 56.1 P38.

Sr. Marketing Consultants received a total of about $ 34,283.25 in these $ 15.00 fees, which corresponds to about 2,286 customers. Pl.'s 56.1 P39. Fewer than 2,000 customers of Bay Area Business Council and American Leisure Card received ChexCards, and only about 18 of these customers actually used the ChexCard. Pl.'s 56.1 PP40-41. Moreover, Defendants did not report information about Bay Area Business Council or American Leisure Card customers to credit reporting agencies; and ChexCards do not appear on credit reports. Pl.'s 56.1 P42. Throughout 2001 and 2002, there was no limit on the amount of money that a cardholder was permitted to load onto a ChexCard. The [*14] amount loaded onto the card was left to the discretion of the cardholder. Pl.'s 56.1 P43.

Between November 2001 and July 2002, Bay Area Business Council received over nine-hundred written consumer complaints forwarded by the Better Business Bureau, state attorneys general's offices, other governmental officials, and private lawyers. Pl.'s 56.1 P44. Bay Area Business Council had a customer service department located on the sixth floor at 801 West Bay Drive in Largo, Florida, until about February 2002, when it moved into Suite 203 in the same building. Suite 203 was next door to Suite 201, where Porcelli and Harris had their offices. The toll-free numbers for Bay Area Business Council, American Leisure Card, Sr. Marketing Consultants, and Bay Memberships all were for phones in Suite 203. Pl.'s 56.1 P45.

Kristen Davis was the Customer Service Manager. She was responsible for hiring, firing, and training customer service representatives and handling complaints that came in by telephone. She supervised a staff of about 30 representatives, each of whom handled an average of fifty or more customer calls per day. She was assisted by

Page 7

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Christopher Tomasulo. Pl.'s 56.1 P46. On a daily basis, [*15] Davis and her staff received hundreds of calls from customers who complained that the package Bay Area Business Council or American Leisure Card sent them did not contain a credit card, and the telemarketers had promised them credit cards. These calls continued through August 15, 2002, when the business was closed. Pl.'s 56.1 P47. From about June 6, 2002 to August 14, 2002, Davis compiled and faxed to Assail lists identifying over 4,000 Bay Area Business Council and American Leisure Card customers who called customer service and complained that the telemarketers had promised them credit cards. Pl.'s 56.1 P48.

The customer service representatives were trained to "rebuttal" customer complaints and try to "save deals." The representatives were given scripted responses to the most common customer complaints, including "I thought this was a credit card" and "Why is my card not in the package?" The representatives were also given scripted responses to "frequently asked questions" from customers, including "Why are there so many negative things about the company on the internet and with the BBB [Better Business Bureau]?" Representatives were required to "rebuttal" customers at least three [*16] times before releasing customers from future $ 10.00 monthly payments or initiating the refund process. Pl.'s 56.1 P49.

The customer service representatives had access to recordings made during the telemarketing calls, which they were able to play for customers over the phone. Only a portion of each telemarketing call was taped. Before taping started, the telemarketer delivered a sales pitch, obtained the customer's bank account information, and told the customer the billing date for their "MasterCard." Then a "verifier" would come on the line, begin recording the call, ask the customer certain questions, and play a pre-recorded "disclosure." The resulting tapes were known as "verification tapes." Pl.'s 56.1 P50. The representatives often played verification tapes for complaining customers. Some customers responded by pointing out that the sales pitch was not on the tape. Some said they could not hear the "disclosure" or that it was too fast to understand. Often the tapes supported customers' complaints. Pl.'s 56.1 P51.

In January 2002, Porcelli and Tomasulo set up a shift of "quality control" employees to listen to verification tapes after telemarketing calls. The "quality control" [*17] employees rejected some sales and flagged other sales as "weak" or "damaged" if certain types of misrepresentations were found on tape, based on criteria devised by Porcelli. The "quality control" employees routinely found tapes on which consumers

were told the product was a credit card. Pl.'s 56.1 P52. On or about January 11, 2002, Tomasulo asked the taping contractor, Voicelog L.L.C., to increase the speed of the disclosure played for Bay Area Business Council customers. Pl.'s 56.1 P53.

In May 2002, the State of Montana warned Bay Area Business Council that its telemarketing script indicated the product being offered was a credit card and prohibited sales to Montana residents. Pl.'s 56.1 P54. American Leisure Card began making sales to consumers in June 2002; and, at the same time, Bay Area Business Council started winding up its affairs. Bay Area Business Council stopped making sales in July 2002. Pl.'s 56.1 P55.

American Leisure Card had only one employee, Alan Aronson, who worked in an office in Sunrise, Florida, about two-hundred and fifty miles from Largo, Florida. American Leisure Card's bookkeeping, customer service, shipping of packages to customers, and some of its telemarketing [*18] sales were handled by employees of the other Corporate Defendants in Largo. Pl.'s 56.1 P56. Harris handled American Leisure Card's finances. American Leisure Card's revenues were transferred on a daily basis by Harris and her staff from American Leisure Card's bank account to other corporate accounts to pay for, among other things, Bay Area Business Council's payroll, customer service payroll, vendor payments, and the payroll of Special Technologies. Pl.'s 56.1 P57.

Bay Area Business Council Customer Service served as the customer service arm of Bay Area Business Council. Its employees answered incoming telephone calls on Bay Area Business Council's customer service line and reported to Kristen Davis, the Customer Service Manager. Pl.'s 56.1 P58. Bay Area Business Council Customer Service, doing business as "Bay Area Business Council," filed telemarketing registrations required by law in ceratin states. Pl.'s 56.1 P59.

Sr. Marketing Consultants, although a separate corporation, was identified as a "d/b/a" of Bay Area Business Council. Pl.'s 56.1 P60. Sr. Marketing Consultants entered into contracts to obtain the stored value "ChexCard" provided to certain Bay Area Business Council [*19] and American Leisure Card customers. Pl.'s 56.1 P61. Sr. Marketing Consultants charged Bay Area Business Council or American Leisure Card about $ 9.00 for each "MasterCard Acceptance Form," otherwise known as a "certificate," that was included in a Bay Area Business Council or American Leisure Card package. Sr. Marketing Consultants also charged Bay Area Business Council or American Leisure Card customers who submitted the acceptance form a $ 15.00 fee. Pl.'s 56.1 P62. Between 90 to 100 percent of Sr. Marketing

Page 8

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Consultants sales of certificates were made to Bay Area Business Council and American Leisure Card. Pl.'s 56.1 P63.

Sr. Marketing Consultants had about four employees, including Porcelli's mother-in-law, sister-in-law, and brother-in-law, who processed the certificates and the $ 15.00 money orders or cashier's checks received from Bay Area Business Council and American Leisure Card customers. Porcelli's in-laws lived and worked at his mother-in-law's house in Dunedin, Florida. The fourth Sr. Marketing Consultant employee, Paul Walford, worked both at the house in Dunedin and at 801 West Bay Drive in Largo, "updating data and taking inventory of the certificates." Pl.'s 56.1 [*20] P64.

From late January to April of 2002, about $ 74,727.00 in checks drawn on a Bay Area Business Council account and signed by Porcelli or stamped with his signature were deposited into Sr. Marketing Consultants' account, number 36201801, at People's Bank. From early February to April of 2002, about $ 69,500.00 was withdrawn from the same Sr. Marketing Consultants' account via a series of checks written to a Bay Area Business Council employee named Tammy Walsh, who brought the money back to 801 West Bay Drive in the form of cash and gave it to Harris. Pl.'s 56.1 P65.

Bay Memberships was a corporation Porcelli created on July 25, 2002, for the purpose of billing customers of Bay Area Business Council. Bay Memberships never had any employees. Porcelli created Bay Memberships because of the "detrimental press and criticism" directed at Bay Area Business Council as a result of its "complaint backlog" and because the bank processing customer payments for Bay Area Business Council refused to continue processing these payments. Pl.'s 56.1 P66. Bay Memberships started debiting consumers' bank accounts on the day it was formed, July 25, 2002, just one day after Bay Area Business Council [*21] stopped debiting accounts. In the weeks prior to August 15, 2002, Bay Memberships debited the bank accounts of thousands of Bay Area Business Council customers without giving those customers notice that Bay Memberships would debit their accounts. Bay Memberships collected about $ 200,000.00 from Bay Area Business Council customers during the three weeks Bay Memberships operated but never provided those customers with anything. Pl.'s 56.1 P67.

Bay Memberships was obliged to pay commissions in perpetuity to Bay Area Business Council and Assail. Pl.'s 56.1 P68. Bay Memberships' revenues were transferred on a daily basis by Harris or her staff from Bay Memberships' bank account to other corporate accounts to pay for, among other things, Bay Area Business Council's vendor payments, acquisitions, refunds, payroll, and customer service payroll, and Special Technologies' payroll. Pl.'s 56.1 P69.

Special Technologies began operations in June or July of 2002, and became the employer of certain customer service representatives, Kristen Davis, the customer service manager, and Anita Coorey, the Compliance Officer, all of whom were previously employed by Bay Area Business Council. Special Technologies [*22] employees continued to perform the same duties they had performed as Bay Area Business Council employees. Pl.'s 56.1 P70. Special Technologies handled order processing, customer service and fulfillment for American Leisure Card, using the same facilities as Bay Area Business Council Customer Service. Special Technologies' only "client" was American Leisure Card. Pl.'s 56.1 P71. In July 2002, Harris or her staff transferred funds from a Bay Area Business Council bank account to Special Technologies to cover Special Technologies' payroll and vendor payments. Pl.'s 56.1 P72.

Porcelli decided that Bay Area Business Council would sell "MasterCards" through telemarketing. Pl.'s 56.1 P73. Porcelli negotiated and signed the contracts between Bay Area Business Council and Assail and between American Leisure Card and Assail. He authorized Assail to retain call centers to market the "MasterCards." Pl.'s 56.1 P74. Porcelli reviewed the telemarketing scripts. Pl.'s 56.1 P75.

Porcelli knew Bay Area Business Council and American Leisure Card customers were complaining that they had been promised credit cards. Porcelli had his own personal list of hundreds of consumers who complained to Bay Area [*23] Business Council that its telemarketers had promised them credit cards. Pl.'s 56.1 P76. Porcelli knew offering a card with a $ 2,000.00 "limit" could easily lead consumers to believe that they were being offered credit cards. Pl.'s 56.1 P77. Porcelli and Anita Coorey, who reported to Porcelli, handled legal compliance and customer complaints and made decisions on refund requests. Porcelli personally designed the list of customer complaints, known as the "complaint grid," and also designed the refund request forms. Pl.'s 56.1 P78. Porcelli signed contracts on behalf of Bay Area Business Council and Sr. Marketing Consultants with vendors of stored value cards. Pl.'s 56.1 P79. When Porcelli was out of the country, he received daily written reports from Harris on quality control, bookkeeping, cash flow, inventory, and customer complaints, including the "complaint grid," which he reviewed in order to "keep an idea of what was going

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Page 9

on." Pl.'s 56.1 P80.

In March 2002, Porcelli, with the assistance of Anita Coorey and Wade Cloud, his regulatory consultant, discussed an effort to convince the Better Business Bureau to improve its negative report on Bay Area Business Council. Porcelli drafted [*24] a letter to the Better Business Bureau addressing: (1) misrepresentation by the sales entities, (2) billing disputes, and (3) requests for funds. The effort was not successful. Pl.'s 56.1 P81. Porcelli knew that Bay Area Business Council and American Leisure Card customers who had received the stored value ChexCard were complaining about the card. On or about May 13, 2002, Kristen Davis warned Porcelli that Merchant Bankcard Service Corp., the issuer, with Stonebridge Bank, of the ChexCard, was receiving complaints that Bay Area Business Council was leading customers to believe they would receive credit cards. Porcelli set up a special refund request procedure for these customers so the bank would not have to act as a "MASH Unit." Pl.'s 56.1 P82.

On or about June 24, 2002, the State of North Carolina sued Porcelli, individually, for fraudulent telemarketing of advance fee credit cards; and the court entered a temporary restraining order ("TRO") against Porcelli and his co-defendant, Bay Area Business Council, barring sales to North Carolina residents. A consent order extended the TRO indefinitely. After being sued, Porcelli instructed the customer service department not to "rebuttal" [*25] customers from North Carolina. Pl.'s 56.1 P83.

On or about July 23, 2002, Porcelli proposed to Alan Aronson, the sole American Leisure Card employee, that American Leisure Card would make sales for about six months, until about January 2003. Thereafter, a new sales entity would be formed, with Aronson as officer and Porcelli as signatory on checks and stockholder, to be followed by successor entities. Porcelli predicted complaints against American Leisure Card would "cause inquiries from regulators;" but "the turndown of sales will make it disappear from the radar screen to pursue." Pl.'s 56.1 P84. On or about August 6, 2002, Porcelli explained to Aronson that the different entities, including American Leisure Card, that were handling sales, complaints, order processing, customer service, and fulfillment "both of the package and the card" were involved in a "collaborative effort" and were "interdependent." Pl.'s 56.1 P85. On or about August 12, 2002, Porcelli received a copy of the Better Business Bureau's report on American Leisure Card finding a pattern of complaints from American Leisure Card customers who had been offered an unsecured MasterCard with a credit line of $ 2,000.00 [*26] or more for a one-time fee of $ 199.00. Pl.'s 56.1 P86.

Harris was responsible for hiring, training, supervising and firing employees; paying the telemarketers and stored value card vendors; moving funds among the various accounts of the Corporate Defendants on a daily basis; and bookkeeping. Pl.'s 56.1 P87. Harris had signing authority on the corporate bank accounts for all of the Corporate Defendants. Harris was also authorized to use Porcelli's signature stamp. Pl.'s 56.1 P88. Harris periodically served as Bay Area Business Council's "Compliance Manager" or "Compliance Officer" and assumed responsibility for responding to consumer complaints and ensuring compliance with the law. Pl.'s 56.1 P89. Harris had knowledge regarding "MasterCard" sales, returns, customer complaints, and telemarketing scripts. Pl.'s 56.1 P90.

Both Porcelli and Harris knew that only a small percentage of Bay Area Business Council and American Leisure Card customers received stored value cards. Pl.'s 56.1 P91. Defendants claim they received payment from approximately 90,000 consumers and paid refunds to approximately two percent of them. Pl.'s 56.1 P92.

From August 1, 2001 through March 4, 2002, the total [*27] amount of money that Bay Area Business Council received from consumers through unsigned "telephone checks" deposited at Huntington National Bank, minus the dollar amount of returned items, was at least $ 838,599.45. Pl.'s 56.1 P93. From September 4, 2001 through August 15, 2002, the total amount of money that Bay Area Business Council, American Leisure Card, and Bay Memberships received from consumers through automated clearing house processing performed by Global eTelecom, after rejects, returns, and refunds, was at least $ 11,886,317.19. Pl.'s 56.1 P94. The total of these two amounts the FTC discovered at Huntington National Bank and Global eTelecom is $ 12,724,916.24. From August 1, 2001 through August 30, 2002, the total amount of refunds paid from the Defendants' refund account at First National Bank of Florida was $ 160,954.30 or less. Pl.'s 56.1 P95. Subtracting this amount from the total amount which Defendants received from customers leaves a total of $ 12,563,962.34.

## ANALYSIS

The FTC brought a four-count Amended Complaint against Defendants. Count IV alleges Defendants sold credit cards for an advance fee in violation of the FTC Act and the Telemarketing Service [*28] Rule. Counts I and III allege that Defendants sold a product and failed to deliver that product in violation of the FTC Act and the

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Page 10

Telemarketing Service Rule. Finally, Counts I and II allege that Defendants sold a product or service and then demanded payment of undisclosed fees in violation of the FTC Act and the Telemarketing Service Rule.

[HN6] To establish that Defendants engaged in deceptive acts or practices in violation of *Section 5 of the FTC Act*, the FTC must demonstrate that Defendants made material misrepresentations or omissions that were likely to mislead consumers acting reasonably under the circumstances. *E.g., Kraft, Inc. v. FTC, 970 F.2d 311, 314 (7th Cir. 1992) (Kraft)*. A statement or practice is material if it is likely to affect a consumer's decision to buy a product or service. *FTC v. World Media Brokers, Inc., No. 02 C 6985, 2004 U.S. Dist LEXIS 3227, at \*20-21 (N.D. Ill. Mar. 2, 2004)*. After the FTC establishes a particular claim has been "widely disseminated," the burden shifts to Defendants to show that consumers did not rely on that claim. *FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)* [*29] *(World Travel)*.

[HN7] Under *Section 5(a) of the FTC Act*, omissions of material fact are deceptive. *See World Travel, 861 F.2d at 1029*. Courts look to the "overall net impression" of consumers when deciding whether particular statements or omissions are deceptive. *Kraft, 970 F.2d at 315*. "Deception may be made by innuendo rather than outright false statements," *National Bankers Services, Inc. v. FTC, 329 F.2d 365, 367 (7th Cir. 1964)*; and statements can "create deceptive impression on purchasers even though they may be technically interpreted as true or partially true." *L.G. Balfour Co. v. FTC, 442 F.2d 1, 17 (7th Cir. 1971)*.

Under the Telemarketing Sales Rule, [HN8] "before a customer pays for goods or services offered," a seller or telemarketer must "disclose, in a clear and conspicuous manner . . . all material restrictions, limitations, or conditions to purchase, receive, or use goods or services that are the subject of the sales offer." *16 C.F.R. § 310.3(a)(1)(ii)*. [HN9] Sellers and telemarketers may not make any "false or misleading statement[s] to induce any person to pay for goods or services." *16 C.F.R. § 310.3(a)(4)* [*30] . Sellers and telemarketers also may not request or receive payment of any fee in advance of obtaining or arranging a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit. *16 C.F.R. 310.4(a)(4)*. [HN10] Under Section 3(c) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, *15 U.S.C. § 6102(c)*, and Section 18(d)(3) of the FTC Act, *15 U.S.C. § 57a(d)(3)*, violations of the Telemarketing Service Rule constitute

unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, *15 U.S.C. § 45(a)*.

Here, no genuine issue of material fact exists as to whether Defendants sold credit cards for an advance fee in violation of the FTC Act and Telemarketing Service Rule. From approximately August 2001 until August 2002, Defendants, through their telemarketers, widely disseminated their claims by calling consumers throughout the United States claiming to sell "MasterCards." Defendants then requested payment of fees in advance of consumers' receiving credit [*31] by telling and leading consumers to believe that for advanced fees of $ 199.00, which were debited from the consumers' bank accounts, they would receive credit cards with substantial credit limits.

No genuine issue of material fact exists as to whether Defendants sold a product and failed to deliver that product, in violation of the FTC Act and the Telemarketing Service Rule. Defendants made material misrepresentations to mislead consumers who would have reasonably otherwise acted under the circumstances. Although Defendants represented that consumers would obtain credit cards, Defendants never provided, nor intended to provide, actual credit cards to consumers. Instead, consumers received a package of materials consisting of promotional literature and a membership compact disc which promised free benefits. This package also included a card with the MasterCard logo and either the name "Bay Area Business Counsel" or "1st American Leisure Card" on the front. On the back of the cards was a non-magnetic black strip. Thus, the cards looked like a credit card but did not function as a credit card.

Defendants, though, scripted their sales pitches to mislead consumers by insinuating that [*32] consumers would improve their credit ratings by obtaining these cards. Defendants' telemarketers were instructed to begin their sales by referencing the consumer's recent application for a credit card and then telling the consumer that he or she was now eligible to receive a MasterCard. After guaranteeing consumers that they would receive a MasterCard, the telemarketers emphasized that MasterCards would be favorably reflected on Equifax credit reports.

As a result of these statements, Defendants received numerous calls each day from complaining consumers. Defendants received hundreds of complaints from the Better Business Bureau and state attorneys general, as well. Customer Service Representatives employed by Defendants, however, were instructed to "rebuttal" any consumer complaints, and scripted responses were provided for the most common customer complaints; these acts further misled consumers by making material

misrepresentations.

The overall net impression of consumers demonstrates that the failure to disclose information about the stored value card was deceptive. Only about two percent of Defendants' customers, who had previously paid $ 199.00 for this so-called "credit card, [*33] " filled out the stored value card application and paid the additional required fee. Of that group, almost none of the customers used the card because they were led to believe they were going to receive a credit card, or they learned that it cost additional money just to use the card.

No genuine issue of material fact exists as to whether Defendants sold a product and then demanded payment of undisclosed fees in violation of the FTC Act and the Telemarketing Service Rule. The information in the packet also included an offer to purchase a "stored value card" for an additional $ 15.00. This card functioned as a debit card that could only be used to withdraw funds previously deposited with the issuer by the cardholder. During the telemarketing sales pitch, neither Defendants nor their telemarketers disclosed to consumers that customers would have to pay an additional fee simply to use the debit card. In addition, as mentioned above, the subsequent conduct of customers demonstrates that the failure to disclose these fees was deceptive; customers who had obtained the card, upon learning it would cost additional money to use the card, chose, instead, not to use the card.

[HN11] "Where one or more [*34] corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Think Achievement Corp., 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), rev'd in part on other grounds, 312 F.3d 259 (7th Cir. 2002) (Think Achievement).* To determine whether corporate entities constitute a common enterprise, courts look to see if the entities: (1) are under common control, (2) share common office space and offices, (3) transact business through a "maze of interrelated companies," and (4) commingle funds. *Think Achievement, 144 F. Supp. 2d at 1011* (citations omitted).

In this case, no genuine issue of material fact exists as to whether all the Defendants operated in a common enterprise. Each of the Corporate Defendants was owned by Porcelli and was ran by the same people. The Corporate Defendants often times shared the same offices. These Defendants did business under each other's names and accessed the same customer bases. Finally, the proceeds of these dealings were shared and transferred, as needed, between the Corporate Defendants. As Porcelli admitted, this enterprise was a "collaborative

[*35] effort."

[HN12] Individuals may also be liable for corporate violations of the FTC Act if the FTC can show that the individual Defendants: (1) actively participated in or had authority to control a corporation's deceptive practices, and (2) the individuals knew or should have known about the deceptive practices. *FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 573-74 (7th Cir. 1989) (Amy Travel).* Authority to control a company can be established by demonstrating that an individual assumed the duties of a corporate officer. *Amy Travel, 875 F.2d at 573.* Whether an individual knew or should have known about a company's practices may be shown by that individual's degree of participation in business affairs. *Amy Travel, 875 F.2d at 574.* Moreover, the "knowledge" requirement does not require that an individual subjectively intend to defraud consumers but, rather, only requires that a defendant knew or was aware of a misrepresentation. *Amy Travel, 875 F.2d at 574.*

Porcelli owned all of the Corporate Defendants; and he formed, directed, controlled, and participated in their acts and practices. Therefore, no genuine issue of material [*36] fact exists as to whether Porcelli had authority to control the Corporate Defendants.

Furthermore, no genuine issue of material fact exists as to whether Porcelli knew about the Corporate Defendants' deceptive practices. Porcelli was intimately involved with all of the Corporate Defendants' operations. He decided to sell these "MasterCards," and personally negotiated and signed the contract with the Assail telemarketing firm that called consumers on behalf of the Corporate Defendants. Porcelli also reviewed these Corporate Defendants' telemarketing scripts and was intimately involved in the refund process. Porcelli was also aware of the customer and law enforcement complaints made against the Corporate Defendants. He knew that only a small percentage of their customers eventually received some version of a functional card.

Porcelli, after he was personally sued by the State of North Carolina, devised and implemented the plan to set up a series of new corporations without obvious ties to himself or Bay Area Business Council. American Leisure Card was to continue selling these cards for about six months, and then a new sales entity was formed. This entity would use one of Porcelli's [*37] employees as an officer, but Porcelli would still sign the checks and be the stockholder. Other successor entities would then follow. This plan was designed to reduce the number of complaints against American Leisure Card and insulate new companies from actions against Bay Area Business Council.

Page 12

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Harris, the other individual Defendant, was an officer of Bay Area Business Council and held herself out as an officer of American Leisure Card. Accordingly, no genuine issue of material fact exists as to whether Harris had authority to control the relevant Corporate Defendants.

Moreover, no genuine issue of material fact exists as to whether Harris knew about the relevant Corporate Defendants' deceptive practices. She was intimately involved with both the sales and financial operations of the Corporate Defendants. Harris participated in the hiring, training, and firing of employees. She kept the books for the Corporate Defendants, paid the telemarketers; and she personally arranged and signed off on moving funds among the various bank accounts of the Corporate Defendants on a daily basis. Harris also acted as a compliance manager for the Corporate Defendants, had personal knowledge of the [*38] information in the telemarketing scripts, and knew about the customer complaints received by the Corporate Defendants.

The FTC seeks both injunctive relief and damages for Defendants' business practices. On October 2, 2002, a preliminary injunction was entered against Defendants, enjoining Defendants from continuing these sales practices. Defendants have failed to present any facts or reasons for why their deceptive business practices should not be permanently enjoined. Accordingly, the permanent injunction sought by the FTC is granted.

[HN13] Pursuant to § 13(b) of the FTC Act, *15 U.S.C. § 53(b)*, consumer redress is also an appropriate remedy. *FTC v. Security Rare Coin & Buillon Corp., 931 F.2d 1312, 1315 (8th Cir. 1991)*; *see also Amy Travel, 875 F.2d at 571-72* (permitting a district court to grant ancillary equitable relief such as restitution under *§ 13(b)*). To obtain redress, the FTC is not required to prove individual reliance on Defendants' material misrepresentations and omissions. *E.g., FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993) (Figgie)*.

[HN14] Consumer redress is also appropriate under § [*39] 19(b) of the FTC Act, *15 U.S.C. § 57b(b)*. This section authorized relief necessary to redress injury resulting from violations of an FTC rule affecting unfair or deceptive business practices, such as the Telemarketing Service Rule. Congress has provided that such relief may include, but is not limited to, "recession or reformation of contracts, the refund of money or return of property [and] the payment of damages. *15 U.S.C. § 57b(b)*. Even if Defendants' product was of some minimal value, damages are properly measured as the total net sales to consumers when the deceptive sales practices were widespread. *See Figgie, 994 F.2d at 606-07* (stating that, absent the deceptive business practices, the amount spent on a product for which consumers otherwise would not have paid is the proper measure of damages);.

[HN15] To determine the proper amount of redress, the FTC is required to "show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figure were inaccurate." *FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997) (Febre [*40] )*. To the extent that either the Defendants' records create uncertainty in determining the amount of redress or the Defendants' failure to produce relevant evidence makes it impossible to accurately determine the proper amount, the "risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Febre, 128 F.3d at 535.*

Here, Defendants' inconsistent and sometimes contradictory admissions regarding their total net sales have created uncertainty in determining the proper amount of redress for consumers. In responding to the FTC's motion for a preliminary injunction, Defendants claimed to have over "225,000 customers in [their] database, with well over 35,000 continuing customers." In their answer to the FTC's Amended Complaint, Defendants claimed to have at least 122,000 customers in their database, with 18,228 "active" customers and only 3,500 "rejected" sales. At the time their business was shut down, Defendants claimed that more than 1,500 of these "active" customers had debited a monthly fee for six months, more than 2,800 for seven months, and more than 1,200 for eleven months. According to the FTC, if these assertions are true, [*41] their total net sales would have been, at a minimum, at least $ 25 million.

Defendants' records also create uncertainty in determining the proper amount or redress for consumers. The FTC, however, did obtain banking and other financial records from third parties suggesting that Defendants' total net sales may have been less than what Defendants claimed. While it appears Defendants may have booked sales and attempted to debit more than $ 40 million from customers' bank accounts, the vast majority of these charges were rejected by the customers' banks. The FTC has only verified net sales of $ 12,563,962.34, after all rejects, returns, and refunds have been calculated.

Defendants have failed to submit any material in a Rule 56.1(b) statement and have not otherwise met their burden to show this figure was inaccurate. Thus, no genuine issue of material fact exists that the total net sales to consumers and the proper amount of redress is $ 12,563,962.34.

2004 U.S. Dist. LEXIS 6192, *; 2004-1 Trade Cas. (CCH) P74,381

Page 13

## CONCLUSION

For the foregoing reasons, the FTC's Motion for Summary Judgment is granted. Judgment shall be entered against all Defendants, jointly and severally, in the amount of $ 12,563,962.34; and a permanent injunction shall [*42] issue against the Defendants as set out by separate order.

Dated: April 8, 2004

JOHN W. DARRAH

United States District Judge

## JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that for the reasons stated in the Court's memorandum opinion and order of 4/8/04, FTC's motion for summary judgment is granted. Judgment shall be entered against all defendants, jointly and severally, in the amount of $ 12,563.962.34; and a permanent injunction shall issue against the defendants as set out by a separate order.

Date: 4/8/2004

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 929696 (N.D.Ga.), 1997-2 Trade Cases P 71,948
(Cite as: Not Reported in F.Supp.)

Page 1

**C**F.T.C. v. Career Assistance Planning, Inc.
N.D.Ga.,1996.

United States District Court, N.D. Georgia.
Federal Trade Commission
v.
CAREER ASSISTANCE PLANNING, INC., et al.
**No. 1:96-CV-2187-MHS.**

Sept. 19, 1996.

Federal Trade Commission Act

*1 FTC Enforcement-Misrepresentation-College Scholarship Service.-A scholarship search service violated Section 5(a) of the FTC Act where the company failed to deliver promised college scholarship information, misrepresented the success rate of its customers, and used customer credit card and bank account information without authorization. In ancillary relief, the defendants were required (1) to post a & 6,000,000 performance bond before engaging in telemarketing sales in the future, (2) to affirmatively disclose that they cannot predict whether their customers will obtain scholarships through their services, in the event the defendants reenter the college scholarship search business, and (3) to allow the FTC to monitor their compliance with all terms of the court order.

See ¶ 7592.

FTC Enforcement-Misrepresentation-Individual Liability.-The chief executive of defendant corporation and another individual had the necessary knowledge and control over misrepresentations made by the corporations's telemarketer employees for each to be held personally liable for the corporation's deceptive acts. The evidence demonstrated that the chief executive made misprepresentations to the telemarketer employees. The other individual, who had no official position with the corporation, made representations to third parties that he was a "director" of the corporation and he also drafted some of the deceptive scripts used by the telemarketer employees.

See ¶ 9715.

ORDER

SHOOB, D.J.
This action is before the Court on plaintiff's motion for summary judgment against defendants Donna and David Levy. For the reasons stated below, the Court grants the motion.

*Factual Background*

This action arises under § 5(a) of the FTC Act, 15 U.S.C. § 45 (FTC Act), which prohibits unfair or deceptive practices in or affecting commerce. Plaintiff Federal Trade Commission (FTC) alleges that defendants David and Donna Levy operated a scam college scholarship search service-defendant Career Assistance Planning, Inc. d.b.a. College Assistance Planning, College Assistance Program, and C.A.P. (collectively CAP) FN1-through which they duped thousands of students and their parents into paying for services CAP failed to provide.

FN1. Donna Levy was the founder, owner, chief executive, registered agent, and sole incorporator of CAP. Plaintiff alleges that David Levy, along

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 929696 (N.D.Ga.), 1997-2 Trade Cases P 71,948
(Cite as: Not Reported in F.Supp.)

Page 2

with Donna Levy, controlled CAP and made final decisions on crucial matters in the business.

CAP operated as follows: Each week, CAP mailed out thousands of postcards indicating that recipients who called a toll-free number printed on the cards would receive information on free college scholarships. In response to consumers who called, CAP telemarketers explained that, for a fee of up to $299 per student, CAP would provide scholarship information tailored to each student's individual qualifications and interests. CAP further represented that past CAP customers had a 60% to 80% success rate [FN2] and promised that CAP would refund its full fee to any consumer who canceled within 72 hours of placing an order or who did not obtain at least $1,000 or $2,000 in scholarships, within one or two years,[FN3] as a result of CAP's services.

> FN2. The only basis for this claim was the fact that between 20% and 40% of past CAP customers complained or asked for refunds.

> FN3. The requirements changed from time to time.

*2 Plaintiff alleges that CAP often convinced customers to read aloud their credit card or bank account numbers over the telephone. Plaintiff claims that despite having assured customers that it would not use the account information without the customer's "final authorization," CAP routinely charged or withdrew its fee from the accounts without ever receiving such approval.

Instead of providing the individualized scholarship information promised, plaintiff contends, CAP delivered generalized and often out-of-date lists of scholarships not at all tailored to customers' particular qualifications and interests.[FN4] Moreover, plaintiff alleges that CAP routinely refused to honor its refund policy.

> FN4. For instance, to one CAP customer who indicated an interest in psychology and computer science, CAP provided information on scholarships restricted to students majoring in journalism, communications, and environmental science. CAP also provided a customer from Louisiana with information about scholarships for which only residents of states other than Louisiana were eligible.

Between 1994 and August 1996, CAP received over 2500 written customer complaints, many of which were addressed to defendant Donna Levy. Over 1700 of these complaints alleged that CAP's services were useless to them because information provided did not match customers' qualifications, the listed scholarships' application deadlines had passed, or the customers received no information from CAP at all. Over 400 of the complaints alleged that CAP failed to comply with its refund policy, and over 160 of the complaints alleged that CAP withdrew money from consumers' checking accounts, or charged their credit cards, without authorization.

The Levys' main defense is that they cannot be held accountable, under the FTC Act, for CAP's deceptive representations because they did not exercise the requisite level of control over CAP's affairs and had no knowledge of CAP's fraudulent conduct. The Levys claim that they had entrusted defendant Becky Settles,[FN5] president of CAP, and CAP's sales manager, Arther Iannelli, with exclusive authority to manage and control CAP, and that Settles and Iannelli defrauded *them* by engaging in the conduct alleged by FTC.

> FN5. Settles was dismissed as a defendant from this action after having entered a settlement agreement with FTC.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1996 WL 929696 (N.D.Ga.), 1997-2 Trade Cases P 71,948
(Cite as: Not Reported in F.Supp.)

*Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." *Id.* at 325. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Id.* at 324.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. *WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Discussion*

*3 The Court finds, as a matter of law, that the Levy defendants violated § 59(a) of the FTC Act. The evidence submitted in support of plaintiff's motion is so overwhelming that no reasonable person could conclude from the record that a genuine issue exists as to the Levys' liability. Therefore, plaintiff is entitled to summary judgment.

A practice is deceptive under § 5(a) if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. World Travel Vacation Brokers, Inc.* [1988-2 TRADE CASES ¶ 68,333], 861 F.2d 1020, 1029 (7th Cir.1988). To prevail, FTC must demonstrate that defendants made misrepresentations that are (1) the type of representations upon which a reasonable person would rely, (2) widely disseminated, and (3) the cause of actual consumer injury. *FTC v. International Diamond Corp.*, [1983-2 TRADE CASES ¶ 65,725], at 69,709 (N.D.Cal.1983). The overwhelming evidence establishes that CAP's representations meet all of these requirements,[FN6] and defendants' countervailing arguments are meritless.

> FN6. CAP's representations about its service were the type of claims on which a reasonable person would rely; CAP made those representations to thousands of consumers; and consumers were injured by paying for CAP's worthless information.

First, CAP erroneously contends that it was not "deceptive" for CAP to refuse to give refunds when the company was financially unable to do so. This argument ignores the undisputed fact that CAP continued to guarantee its services and to promise refunds even after it knew that it would be unable to fulfill those promises. *See FTC v. Security Rare Coin & Bullion Corp.*, [[1989-2 TRADE CASES ¶ 68,807], at 62,218-19 (D.Minn. Sept. 11, 1989) (holding that defendant engaged in deceptive conduct by continuing to guarantee its refund policy without maintaining a reserve of funds to satisfy requests).

Second, defendants contend that CAP did in fact adhere to its refund policy. However, defendants offer no supporting evidence for their assertions to this effect. The Court finds that, because CAP's alleged practice of refunding money in accordance with its stated refund policy is the type of claim for which supporting documentary evidence would be readily available, and in light of FTC's overwhelming evidence to the contrary,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1996 WL 929696 (N.D.Ga.), 1997-2 Trade Cases P 71,948
(Cite as: Not Reported in F.Supp.)

defendants' self-serving statements alone cannot create a genuine issue of fact on this issue.

Third, the Levys claim that, even if CAP were found to have engaged in deceptive practices, they cannot be held individually liable for the equitable monetary relief sought by plaintiff. In order to find the Levys liable for equitable monetary relief under the FTC Act, the FTC must demonstrate that the Levys 1) had control over CAP and 2) had some degree of knowledge about CAP's material misrepresentations. *FTC v. Gem Merchandising Corp.*[1996-2 TRADE CASES ¶ 71,467], 87 F.3d 466, 470 (11th Cir.1996).

The Court finds that FTC has established both requirements. Donna Levy was the founder, owner, and chief executive of CAP. Although David Levy had no official position in the company, the uncontroverted evidence nevertheless demonstrates that he was a figure of authority at CAP for much of its existence.[FN7] In addition to establishing the control element, this evidence also demonstrates that the Levys' alleged unawareness of CAP's profuse deceptive conduct is unworthy of credence. Furthermore, the record includes substantial evidence that the Levys themselves orchestrated and engaged in at least some of CAP's fraudulent conduct-which clearly proves their "knowledge" that such conduct had occurred.[FN8] Therefore, the Court finds the Levys personally liable for CAP's deceptive practices.

FN7. For instance, in contacts with the Georgia Governor's Office of Consumer Affairs and the Better Business Bureau of South Florida, and in a television news story about CAP, David Levy claimed to be in charge of CAP; in correspondence with a CAP vendor, David Levy identified himself as a "director" of CAP; and David Levy's name appears as the originator of memoranda to CAP sales representatives about their commission structure and CAP's office policies.

FN8. Donna Levy's undisputed participation in fraudulent conduct includes telling CAP telemarketers that CAP's success rate was between 60% and 80%, without any legitimate basis for these figures. David Levy also admits to having helped draft some of the deceptive scripts used by CAP's telemarketers.

*4 In addition to equitable monetary relief against the Levy defendants, plaintiff also seeks injunctive relief regulating and restraining their conduct. In order to secure an injunction against an individual based on false representations, FTC must show either direct participation in the deceptive acts or authority to control those acts. *FTC v. American Standard Credit Systems, Inc.*[1994-2 TRADE CASES ¶ 70,696], 874 F.Supp. 1080, 1089 (C.D.Cal.1994). As stated above, the Court finds as a matter of law that the Levys had both direct participation in and authority to control CAP's fraudulent conduct. Therefore, plaintiff is entitled to the permanent injunctive relief requested.

Finally, the Court concludes that plaintiff is entitled to all ancillary relief sought, in order to protect consumers and to ensure that the Levy defendants do not perpetrate new frauds. Section 13(b) of the FTC Act authorizes the Court to grant any ancillary equitable relief necessary to accomplish complete justice. *FTC v. Singer* [1982-1 TRADE CASES ¶ 64,569], 668 F.2d 1107, 1113 (9th Cir.1982). The Court agrees with plaintiff that, in light of the Levys' proven propensity to engage in fraud and to refuse cooperation with law enforcement authorities,[FN9] three ancillary remedies are appropriate here: 1) requiring the Levys to post a $6,000,000 performance bond before engaging in telemarketing sales in the future; 2) requiring the Levys to affirmatively disclose that they cannot predict whether their customers will obtain scholarships through their services, in the event they reenter the college scholarship search business; and 3) allowing the FTC to monitor the Levys' compliance with all terms of this order.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 929696 (N.D.Ga.), 1997-2 Trade Cases P 71,948
(Cite as: Not Reported in F.Supp.)

FN9. Before moving CAP to Georgia, the Levys were arrested in Florida for felony unlicensed telemarketing. CAP also refused to cooperate with a civil investigative demand from the Attorney General of Idaho.

*Summary*

For the foregoing reasons, the Court GRANTS plaintiff's motion for summary judgment [# 36-1]. DENIES AS MOOT plaintiff's motion for default judgment [[[# 36-2], and DIRECTS the Clerk to enter final judgment as reflected in plaintiff's proposed final order for permanent injunction against defendants David Levy and Donna Levy [# 36-3].

IT IS SO ORDERED.

N.D.Ga.,1996.
F.T.C. v. Career Assistance Planning, Inc.
Not Reported in F.Supp., 1996 WL 929696 (N.D.Ga.),
1997-2 Trade Cases P 71,948

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

Page 1

LEXSEE 2006 US DIST LEXIS 27630

**FEDERAL TRADE COMMISSION, Plaintiff, v. FINANCIAL RESOURCES UNLIMITED, INC., SUPREME MAILING SERVICES, INC., MARK E. SHELTON, individually and as an officer of the corporate defendants, d/b/a L. Lewis & Associates, A. Joseph & Associates, Defendants.**

**Case No. 03 C 8864**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 27630; 2006-1 Trade Cas. (CCH) P75,257*

**April 25, 2006, Decided**

**COUNSEL:** [*1] For Federal Trade Commission, Plaintiff: John Campbell Hallerud, Karen D. Dodge, Federal Trade Commission, Chicago, IL; Laura Schneider, Victor Frank DeFrancis, The Federal Trade Commission, Washington, DC US.

For Financial Resources Unlimited Inc, Supreme Mailing Services inc, Mark E Shelton, individually and as an officer of the corporate defendants, Defendants: Daniel Richard Formeller, Katherine Louise Haennicke, Thomas Kevin Hanekamp, Tressler, Soderstrom, Maloney & Priess, Chicago, IL.

**JUDGES:** MARTIN C. ASHMAN, United States Magistrate Judge.

**OPINION BY:** MARTIN C. ASHMAN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

On February 2, 2006, this Court entered a stipulated order that held Defendant, Mark E. Shelton, in civil contempt for violating the November 24, 2004 Stipulated Permanent Injunction and Final Judgment Order ("November 2004 Final Order") and held Defendant liable for consumer redress to compensate the injury caused by his conduct. Plaintiff, the Federal Trade Commission ("FTC"), then moved this Court for an order entering judgment for consumer redress in the amount of $ 1,493,793.69 against Defendant, Mark E. Shelton, and for an order modifying the Final Order in this matter. [*2] Defendant objected to the size of the proposed judgment and to the proposed modifications of the Final Order. This matter comes before this Court pursuant to *28 U.S.C. § 636(b)(1)(A)* and *Local Rule 72.1.*

After conducting an evidentiary hearing on March 14, 2006, the Court has carefully considered the testimony of witnesses who appeared at the hearing, the exhibits introduced into evidence, the written submissions of the parties and the arguments of counsel. The following are the Court's findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a)*. To the extent certain findings of fact may be deemed to be conclusions of law, they shall so be considered the Court's conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered the Court's factual findings.

**I. Findings of Fact**

**A. Claims of the Parties**

1. On February 2, 2006. the FTC and Defendant stipulated to the entry of the Stipulated Order Holding Mark E. Shelton in Civil Contempt ("Stipulated Contempt Order"). In the Stipulated Contempt [*3] Order, Defendant admitted to multiple violations of this Court's November 2004 Final Order and conceded that (a) he is liable for consumer redress to compensate the injury caused by his contumacious activities and (b) modification of the November 2004 Final Order is appropriate. The FTC claims that Defendant engaged in a pattern or practice of contemptuous conduct and is liable for consumer redress in the amount of $ 1,493,793.69 (calculated using gross receipts of the entities Defendant allegedly controlled). The FTC also seeks modification of the November 2004 Final Order pursuant to *Federal Rule of Civil Procedure 60(b)*.

2. Defendant claims that he did not have control over any of the companies used to violate this Court's

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

Page 2

November 2004 Final Order and only violated the Final Order on a few isolated occasions when he assisted others in starting and running their companies. Because his violations of the November 2004 Final Order were so insignificant, Defendant argues that his liability should be limited to the $ 117,452.82 that he received in exchange for his consulting services and any modifications to the November 2004 Final Order should [*4] be minimal. Defendant also argues that the FTC's proposed judgment of $ 1,493,793.69 for consumer redress is improperly computed, punitive in nature, and does not take Defendant's financial hardship into account.

## B. The Parties

3. Plaintiff FTC is an independent agency of the United States Government created by statute. *15 U.S.C. §§ 41-58.* The FTC is charged, inter alia, with enforcement of Section 5(a) of the FTC Act, *15 U.S.C. § 45(a),* which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC is authorized to initiate federal district court proceedings, enjoin violations of the FTC Act, and secure such equitable relief as may be appropriate in each case, including restitution for injured consumers. *15 U.S.C. § 53(b).*

4. Defendant Mark E. Shelton is an Illinois resident who owns residential property in Darien, Illinois. Defendant also owned residential property in Hinsdale, Illinois from December 2004 until he transferred the deed to the property into a land trust in February 2005.

## C. The Relevant Court Orders and Procedural History

5. On November 24, 2004, Defendant [*5] stipulated to the November 2004 Final Order, which included, among other things, the following restrictions:

I. BAN ON SALE OF WORK-AT-HOME OPPORTUNITIES

IT IS THEREFORE ORDERED that Defendants are hereby permanently restrained and enjoined from engaging, participating, or assisting others in any manner or in any capacity whatsoever, whether directly or indirectly, in concert with others, or through any intermediary, third party, business entity, or device, in the marketing, advertising, promotion, offering for sale, or sale of work-at-home opportunities.

II. PROHIBITIONS AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Defendants . . . are hereby permanently restrained and enjoined from making, or assisting others in making, any express or implied representation or omission of material fact that is false or misleading, in any manner, to any consumer or entity, including but not limited to, any false or misleading statement:

A. That consumers are likely to earn a substantial amount of money;

B. Concerning the amount of earnings, income, sales volume, or profits that a consumer is likely to achieve;

C. Concerning the amount of earnings, income, sales [*6] volume, or profits that consumers have achieved in the past;

D. That Defendants will pay consumers for each envelope that they stuff and mail in any envelope stuffing, work-at-home opportunity;

E. Concerning the length of time that it may or will take to recoup the purchase price or investment;

F. That Defendants will reimburse consumers any expenses of purchasing or participating in Defendants' offered goods or services;

G. Concerning the nature of any work-at-home opportunity, product, or service offered or sold; and

H. Concerning any material term, condition, or

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

Page 3

limitation of the transaction or about the use of any offered good or service.

6. On November 15, 2005, the FTC filed its Motion for Order to Show Cause Why Defendant Mark E. Shelton Should Not Be Held in Contempt for Violating the Stipulated Permanent Injunction and Final Judgment Order. (Docket No. 28.) In its Motion to Show Cause, the FTC argued that Defendant was violating the November 2004 Final Order by operating business entities engaged in work-at-home opportunities, namely Pure Home Air Profits Co. ("PHAP") and Wholesale Marketing Group ("WMG"). The FTC submitted evidence in support of this claim. [1] [*7]

1 Evidence submitted in support of the FTC's Motion to Show Cause contains the notation "FTC Mot. Show Cause."

7. On February 2, 2006, Defendant stipulated and agreed that (1) he violated Sections I, II.A, II.B, II.D, and II.G of this Court's November 2004 Final Order, (2) through his violations of Sections I and II he is in civil contempt of this Court, and (3) he is liable for consumer redress to compensate the injury caused by his contumacious conduct. (Stipulated Contempt Order, p. 2.) This Court accepted Defendant's stipulations and set an evidentiary hearing for March 14, 2006, to determine the size of the judgment to be entered against Defendant and what modifications, if any, to make to the November 2004 Final Order.

8. At the evidentiary hearing, the FTC presented evidence of harm to consumers caused by Defendant through PHAP and WMG, as well as Cardona Consulting, Inc. ("Cardona") (another business entity engaged in work-at-home opportunities that the FTC learned about only after filing its Motion [*8] to Show Cause), and moved the Court to enter a judgment for $ 1,493,793.69 against Defendant. [2]

2 Evidence submitted at the March 14, 2006 evidentiary hearing contains the notation "Evid. Hearing."

**D. The Business Entities Investigated**

9. Cardona was a business entity created by Louis Aviles. (Evid. Hearing: Aviles Testimony, Tr. at 17-18.) Aviles, who had worked with Defendant in late 2003 at Financial Resources Unlimited (one of Defendant's work-

at-home businesses that was targeted by this Court's November 2004 Final Order and shut down by the FTC for violations of Section 5 of the FTC Act), was listed as the principal, president, and officer of Cardona. (Evid. Hearing: Aviles Testimony, Tr. at 15-17.)

10. WMG is a single business entity that was created as a limited liability company in New York and was incorporated in Nevada. WMG, LLC was created in December 2004 and Aviles was listed as the "filer." WMG, LLC was organized under the laws of New York and its address was listed as 130 Church Street, [*9] #125, New York, NY 10007. WMG was also incorporated under the laws of Nevada, as WMG, Inc. Defendant's father, Carl Shelton, was initially listed as the officer and director of WMG, Inc., but, in June 2005, Robert Gomez amended the articles of incorporation and listed himself as director and sole officer of the company. [3] Gomez opened a WMG mail drop in Nevada, signing the contract on behalf of WMG and listing himself as a WMG officer. (FTC Mot. Show Cause: PX #1 (Lewis Decl., Nov. 9, 2005) PP6-8 & Attachs. H-J.)

3 Aviles testified that Defendant wanted more than one WMG to exist because, if one of them needed to be shut down, materials baring the WMG letter head could be used by the second company. (Evid. Hearing; Aviles Testimony, Tr. at 29-30.)

11. PHAP was created by Jeremy T. Wilson in mid-2004. (Evid. Hearing: Aviles Testimony, Tr. at 21-22; FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P24.) At least two bank accounts list PHAP as a sole proprietorship in the name of "Jeremy Wilson d/b/a Pure [*10] Home Air Profits," with a mailing address at a UPS Store located in Hillside, Illinois. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P9, PX # 2 (Aron Decl.) P2.)

**E. Cardona, PHAP and WMG Marketed, Advertised, Promoted and Sold Work-At-Home Opportunities.**

12. Cardona, PHAP and WMG solicit consumers through classified advertisements seeking people to mail promotional advertising brochures from home. (Evid. Hearing: Aviles Testimony, Tr. at 18, 23-24, 26; FTC Mot. Show Cause: PX # 5 (Beyers Decl.) P2.)

13. PHAP and WMG advertisements appear across the country and promise substantial steady earnings and that no selling will be involved. (FTC Mot. Show Cause: PX # 7 (Daniels Decl.) PP2-4 & Attachs. A-B, PX # 9 (Ianello Decl.) P2 & Attach. A.) Cardona used advertising language that was nearly identical to the advertisements for WMG and PHAP and promised

Page 4

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

consumers substantial income for stuffing envelopes or mailing brochures. (Lewis Decl. (Feb. 23, 2006) PP3-4 & Attachs. A, L.)

14. The advertisements used by PHAP and WMG encourage potential customers to call the listed telephone numbers or visit the listed websites on the internet. (FTC Mot. Show Cause: PX # 7 (Daniels [*11] Decl.) PP2-4 & Attachs. A-B, PX # 9 (Ianello Decl.) P2 & Attach. A.)

15. A recorded message instructs consumers who call the listed telephone numbers to leave their name and address. (Evid. Hearing: PX # 2.) The recorded message also promises "a large weekly income [in exchange for] mailing sales materials from home," with no sales required. (Id.; FTC Mot. Show Cause: PX # 7 (Daniels Decl.) P3, PX # 9 (Ianello Decl.) P3.) PHAP and WMG send a package of introductory materials, including a welcome letter and order form, to consumers who leave their name and address. Like the recorded message, the welcome letters also promise substantial income with no sales required. (FTC Mot. Show Cause: PX # 9 (Ianello Decl.) PP2-4, PX # 11 (Russo Decl.) P4 & Attach. B.)

16. WMG operated the following websites: (1) www.asseenontvmailers.com; (b) www.dundalkeagle.com; (3) www.boulderweekly.com. WMG's internet sites contained introductory letters nearly identical to the PHAP and WMG introductory letters sent by mail that promised consumers substantial income for mailing out brochures and stressed that no selling or advertising was required. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) [*12] PP15-17 & Attachs. P-R.)

17. PHAP advertised on the internet, including on the website www.auroradailysun.com, which is operated by a local Aurora, Colorado newspaper. PHAP promised consumers $ 600 per week for mailing postcards from home. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P18 & Attach. S.)

18. WMG and PHAP work-at-home opportunities included stuffing envelopes with gift certificates for merchandise, movie tickets, and vacation discounts, as well as mailing advertising circulars, (FTC Mot. Show Cause: PX # 5 (Beyers Decl.) P5 & Attach. C. PX # 10 (Nelson Decl.) P5 & Attach. B), and brochures that advertise and solicit sales of products, such as "Little Giant" Ladders. (FTC Mot. Show Cause; PX # 6 (Connelly Decl.) PP4, 7, PX # 10 (Nelson Decl.) P8 & Attach. E.) Cardona work-at-home opportunities included, among other things, providing consumers with information on air purifiers and penis enlargement devices, which consumers would then sell from home. (Evid. Hearing: Aviles Testimony, Tr. at 18-19.)

19. PHAP and WMG purported to allow consumers to choose the level of earnings they would like to receive from the work-at-home opportunity by registering for one [*13] of four earning groups. Each earning group had a different amount of mailers to be sent out and thus a different earning potential and corresponding fee. (FTC Mot. Show Cause: PX # 9 (Ianello Decl.) PP6-7 & Attach. D.)

20. PHAP and WMG consumers paid anywhere between $ 60 and $ 180 to receive the work-at-home materials and were led to believe that they would earn substantial money and be paid a specific amount for each envelope or brochure they mailed. (FTC Mot. Show Cause: PX # 6 (Connelly Decl.) PP4, 7-9, PX # 9 (Ianello Decl.) PP6-7 & Attachs. C-D.)

21. In many cases, after sending their money to PHAP or WMG, consumers never received the mailing supplies, (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P24, PX # 3 (Anger Decl.) PP5-8), or received mailings with new instructions that reneged on earlier promises of guaranteed payments and informed consumers that they would only be paid a commission based on the number of orders for products generated by their mailings. (FTC Mot. Show Cause: PX# 1 (Lewis Decl., Nov. 9, 2005) P24, PX# 5 (Beyers Decl.) PP8-10, 15, 17, PX # 6 (Connelly Decl.) PP6-7.)

22. To enroll in Cardona work-at-home business opportunities consumers were [*14] required to pay between $ 60 and $ 180. After paying this fee, consumers learned for the first time that instead of being paid for each envelope mailed (as originally promised), they would only earn a commission if their mailings resulted in sales. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attach. L.)

23. PHAP and WMG consumers who decided against sending out the mailings or tried to contact the companies for a refund were not successful. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P24, PX# 6 (Connelly Decl.) PP7-9, PX # 9 (Ianello Decl.) P10, PX # 10 (Nelson Decl.) PP10-11.) Consumers who invested money in postage for the mailings discovered that PHAP and WMG would not reimburse them for those expenses. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P24, PX # 7 (Daniels Decl.) PP10-13 & Attach. G, PX # 8 (Deitrick Decl.) P15.) Consumers who attempted to mail out the brochures often found that a large potion of the mailers were returned as undeliverable because the addresses supplied by PHAP and WMG were wrong. (FTC Mot. Show Cause: PX # 5 (Beyers Decl.) P11.)

24. The FTC is not aware of any consumers who

have actually received any payment [*15] from PHAP or WMG. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P25.) And few consumers, if any, earned any money, much less substantial income, from Cardona work-at-home opportunities. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attach. L.)

25. Between the Better Business Bureau and the FTC consumer complaint database, there are approximately 150 registered complaints for PHAP and WMG. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P24.)

### F. Cardona, PHAP and WMG Made Money Off the Work-At-Home Schemes.

26. From November 2004 until June 2005, $ 243,260.85 (minus chargebacks) was deposited in Cardona's Charter One Bank account. (Evid. Hearing: PX # 11; Lewis Decl. (Feb. 23, 2006) P6 & Attach. B.) Most of the deposits were postal money orders and checks from consumers across the country. (Id.)

27. Wilson opened two business checking accounts under the name Jeremy T. Wilson d/b/a Pure Home Air Profits. (Evid. Hearing: PX # 5, 6; Lewis Decl. (Feb. 23, 2006) P7 & Attach. C.) From November 2004 until May 2005, $ 117,988.33 was deposited into PHAP's First Personal Bank account. (Evid. Hearing: PX # 12.) From April 2005 until September 2005, [*16] $ 110,767.00 was deposited into PHAP's Hinsbrook Bank and Trust account. (Id.) Most of the deposits into PHAP's accounts were postal money orders and checks from consumers across the country. (Evid. Hearing: PX # 5, 6; Lewis Decl. (Feb. 23, 2006) P7 & Attach. C.)

28. WMG business accounts exist at Bank of America, Washington Mutual Bank, and Oxford Bank & Trust. (Evid. Hearing: PX # 7, 8, 9, 21; Lewis Decl. (Feb. 23, 2006) P8 & Attachs. D-E.) From January 2005 until November 2005, $ 827,422.79 was deposited into WMG LLC's Bank of America account. (Id.) From April 2005 until November 2005, $ 206,063.35 was deposited into WMG, Inc.'s Washington Mutual Bank account. (Id.) From June 2005 until November 2005, $ 13,027.50 was deposited in WMG LLC's Oxford Bank and Trust account. (Id.) Most of these deposits were postal money orders and checks from consumers across the country. (Id.)

### G. Defendant's Role At Cardona, PHAP and WMG

1. Cardona, PHAP, and WMG operated out of the Justina Property.

29. Cardona, PHAP and WMG used the exact same

staff, namely Defendant, Louis Aviles, Jeremy Wilson, Joseph Mizzi, Rosalie Johnson, Wendy Rivera, Bob Gomez, Ruben Lopez, and a man named "Larry, [*17] " (Evid. Hearing: Aviles Testimony, Tr. at 18, 33-38), and operated out of the exact same location, namely 828 Justina Street in Hinsdale, Illinois. (Evid. Hearing: Aviles Testimony, Tr. at 21; FTC Mot. Show Cause: PX # 2 (Aron Decl.) PP2-8.)

30. A U.S. Postal Inspector observed Defendant's actions at the Justina Street property on several occasions, including his interaction with the alleged principals of WMG and PHAP. Specifically, Postal Inspectors observing the Justina Property witnessed Gomez and another male load Priority Mail boxes and envelopes into a mini-van and drop them off at the post office. These boxes and envelopes were stamped with return addresses from either PHAP or WMG and were addressed to individuals across the country. Postal inspectors also witnessed Gomez drive from PHAP's private mailbox location to the Justina Property, and saw Defendant talk with Wilson, Aviles, and Gomez and go in and out of the Justina Property, and drive his car into the garage at the Justina Property. (FTC Mot. Show Cause: PX # 2 (Aron Decl.) PP2-6.)

31. Postal Inspectors recovered several consumer complaint letters addressed to WMG's New York address from the garbage at the Justina [*18] Property. (FTC Mot. Show Cause: PX # 2 (Aron Decl.) P8 & Attach. A, PX # 5 (Beyers Decl.) P15 & Attachs. I-H, PX # 13 (Simmons Decl.) P11.)

32. During a November 2005 raid, FTC investigators found the following documents at the Justina Street Property: (1) an April 18, 2005 printing invoice listing WMG as a customer and Defendant as the WMG contact person, (Evid. Hearing: PX # 15); (2) an April 27, 2005 bill of lading for "Little Giant Ladder" Brochures that lists Defendant and the 828 Justina Street address as the destination, (Evid. Hearing: PX # 16); (3) several customer complaints regarding Cardona, (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) P14 & Attach. L); (4) multiple WMG bank statements and copies of WMG cashier's checks, (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) P12 & Attach. J); and (5) bank books from three different WMG accounts. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) P18 & Attach. P.) During the raid, FTC investigators found other evidence that multiple businesses were headquartered in the 828 Justina Street property, such as packaging and mailing equipment and materials with various company letter [*19] head. (Evid. Hearing: Lewis Testimony, Tr. at 45-50; Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005)

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

Page 6

P20 & Attach. R.)

2. Defendant owns and operates the Justina Property.

33. Defendant owned the Justina property from December 2004 until February 2005. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P10.) In February 2005, Defendant transferred the deed to the Justina property into the name of Western Springs National Bank and Trust, which acts as a trustee for land trust agreements. (Id.) According to Western Springs, a land trust is executed for the sole purpose of holding title to real estate. (Id.) The person placing it in the trust is the beneficiary of the trust and retains complete control over the management of the trust property. (Id.) Under a land trust, the real identity of the owner is not disclosed to the public. (Id.)

34. Defendant paid telephone, cable and water bills for the Justina Property (Evid. Hearing: PX # 17-19.)

35. During the November 2005 raid on the Justina Property, investigators found pictures and personal items of Defendant and his family. (Evid. Hearing: PX # 17-19, Lewis Testimony, Tr. at 79.)

H. Defendant Not Only [*20] Housed the Cardona, PHAP, and WMG Operations, But Exercised Control Over Their Business Operations.

1. Cardona

36. Though he was not listed as an officer, director, or shareholder, Defendant maintained control over all Cardona business documents, handled all of Cardona's business dealings, including advertising and marketing, hired Cardona's employees, and paid Cardona's bills and employees, including Aviles's salary. (Evid. Hearing: Aviles Testimony. Tr. at 17-21.)

37. Defendant asked Aviles to create Cardona and to maintain the business in Aviles's name. (Id.) Although Aviles was the principal, president, and officer of Cardona, he did not control Cardona. Rather, Aviles received daily work assignments from Defendant, such as picking up mail, typing up orders, and making deliveries. Occasionally, Defendant would have Aviles sign documents or contracts on behalf of Cardona. (Id.)

38. Defendant handled all of Cardona's communications with the U.S. Postal Inspector. Defendant decided to dissolve Cardona when he received complaints from the U.S. Postal Inspector. (Id.)

2. Pure Home Air Profits Co.

39. In 2004, Defendant asked Wilson to create

PHAP. Wilson was paid by [*21] Defendant to sign documents on behalf of PHAP but Wilson did no work for PHAP. (Evid. Hearing: Aviles Testimony, Tr. at 21-22.) Defendant signed PHAP checks when Wilson did not sign. [4] (Evid. Hearing: Aviles Testimony, Tr. at 24-25.)

> 4 According to Aviles, Wilson only signed the first ten checks issued by PHAP. (Evid. Hearing: Aviles Testimony, Tr. at 25.)

40. Though he was not listed as an officer, director, or shareholder, Defendant controlled all of PHAP's business operations, including advertising, marketing, payroll, and hiring. (Evid. Hearing: Aviles Testimony, Tr. at 21-25.) Additionally, Defendant bought CDs containing lists of potential customers to whom PHAP mailed work-at-home solicitations. (Evid. Hearing: Aviles Testimony, Tr. at 24), and used printed ads and consumer mailings that were extremely similar to those used by Defendant in the underlying case (i.e., the case that culminated in the November 2004 Final Order). (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) P24.)

41. At PHAP, [*22] Aviles received daily work assignments from Defendant. Aviles's responsibilities with PHAP included running errands, packaging supplies, typing up orders, listening to company voicemail, and depositing checks. (Evid. Hearing: Aviles Testimony, Tr. at 21-25.)

42. Defendant received numerous payments from PHAP. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attach. BB.)

43. Defendant shut down PHAP in 2005 after a local district attorney began asking Wilson questions about the business. (Evid. Hearing: Aviles Testimony, Tr. at 24.)

3. WMG

44. Though he was not listed as an officer, director, or shareholder, Defendant controlled WMG's business operations, marketing and advertising, and payroll, while Aviles was responsible for running errands, depositing checks, typing up orders and sending out mailings. (Evid. Hearing: Aviles Testimony, Tr. at 26-31.)

45. In November 2004, Aviles opened a mailbox for WMG at Postnet Business Centers, 130 Church Street, New York, NY 10007. WMG paid for the mailbox using two different credit cards: a Mastercard belonging to Aviles and an American Express card belonging to Defendant. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) [*23] PP3-5 & Attachs. E-G.)

Page 7

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

46. In December 2004, Defendant paid for and registered two websites through Jenntech, Inc. Jenntech, Inc. set up and hosted the website listed in WMG's ads-- the same website that contained WMG's introductory letter and order form. Until mid-2005, Defendant was Jenntech, Inc.'s contact person at WMG. (FTC Mot. Show Cause; PX # 4 (Berger) PP2-3; Suppl. FTC Mot. Show Cause: PX # 1 (Jennison Decl.) PP1-3.)

47. Defendant's wife is the subscriber for at least two of the WMG telephone numbers listed in WMG advertisements. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) PP18-21 & Attachs. T-U.)

48. Defendant, his wife, and his parents received numerous payments from WMG. (Evid. Hearing: PX # 10; Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attachs. AA, DD, EE.) [5]

> 5 Aviles also testified that Defendant transferred WMG funds to himself by forging Aviles's signature on WMG checks. (Evid. Hearing: Aviles Testimony, Tr. at 27-28.)

4. Additional evidence of Defendant's [*24] involvement with, and control over, Cardona, PHAP and WMG.

49. During the November 2005 raid on the Justina Property, FTC investigators seized the following documents from Defendant's briefcase: (1) the script of the recorded message on the WMG answering machine, (Evid. Hearing: PX # 3); (2) business check cards for WMG's Washington Mutual Bank account, (Evid. Hearing: PX # 4); (3) a letter from the U.S. Post Office's Law Department addressed to Aviles and dated October 3, 2005, setting out a settlement agreement under which Cardona would be shut down and Aviles would cease and desist from all similar business dealings, [6] (Evid. Hearing: PX # 13); (4) an unsigned piece of paper containing text for an ad promoting work-at-home opportunities and instructions for placing the ad in publications in Alabama, Arizona, California, Michigan, New Jersey, Oklahoma, Texas and Virginia, (Evid. Hearing: PX # 14); and (5) handwritten notes with the phone numbers and mailing address for WMG in Nevada, a letter to an advertising company from WMG, and advertising copy. (Suppl. Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) PP5-6 & Attachs. C-D.)

> 6 In the settlement agreement with the U.S. Post Office, Aviles agrees to "refrain from making materially false representations . . . in the future under any name or names, or through any corporate or other device." (Lewis Decl. (Feb. 23,

2006) P5.)

[*25] 1. Defendant's Deposition Testimony

50. Defendant was deposed by FTC attorneys on December 13, 2005. (Evid. Hearing: PX # 1.) In response to the following questions, Defendant invoked the *Fifth Amendment of the United States Constitution* and refused to answer:

> Q. And isn't it true that over that course of time Pure Home Air Profits was paying money to different companies on your behalf?
>
> A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 44.)
>
> Q. Pure Home Air Profits was paying credit card bills and car payments on your behalf, isn't that true?
>
> A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 50.)
>
> Q. Isn't it true that Wholesale Marketing Group has paid money to third parties on your behalf?
>
> A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 51.)
>
> Q. Isn't it true that you paid money to Jenntech to set up Web sites for your companies?
>
> A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 60.)
>
> Q. Isn't it true that you received money from Wholesale Marketing Group and Pure Home Air Profits because you controlled and directed the business?
>
> A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. P. 64.)
>
> Q. And that you kept [*26] all the records for Wholesale Marketing Group and Pure Home Air Profits?
>
> A. I plead the Fifth. (Id.)
>
> Q. Isn't it true that there are also other documents for other companies maintained at the Justina Street address including documents for Cardona Consulting?
>
> A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. P. 76.)

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

Page 8

Q. Isn't it true that you coordinated all of those efforts in opening the [Wholesale Marketing Group] mailboxes?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 90-91.)

Q. Mr. Shelton, isn't it true that you assisted in setting up the operations of Pure Home Air Profits?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 92.)

Q. Isn't it true that you assisted in setting up the operations of Wholesale Marketing Group?

A. I plead the Fifth. (Id.)

Q. Mr. Shelton, let's talk about the Pure Home Air Profits and Wholesale Marketing Group operations. Isn't it true they both market and sell work at home opportunities?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 96.)

Q. And isn't it true that you directed or assisted in those [Pure Home Air Profits and Wholesale Marketing Group] operations?

A. I plead the Fifth. (Id. [*27] )

Q. In fact, the welcome letters sent to consumers for Pure Home Air Profits and Wholesale Marketing Group were the same except for some minor differences in earnings amounts, isn't that true?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 106.)

Q. Isn't it true that you directed or assisted in the creation of this welcome letter and attached form?

A. I plead the Fifth. (Id.)

Q. Isn't it true that you used your old [Financial Resources Unlimited] ads and mailers to formulate or help formulate the new ones for Wholesale Marketing Group and Pure Home Air Profits?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 118-19.)

Q. And these [Master Instruction

Sheet] instructions, isn't it true that these instructions reneged on the earlier promises from the initial welcome letter?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 120.)

Q. Isn't it true that in these instructions, these new instructions, that both Wholesale Marketing Group and Pure Home Air Profits break their promise to pay a set amount, whether it was five, six or ten dollars for each circular that a consumer mails out?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s [*28] Dep. p. 121.)

Q. Mr. Shelton, aside from Wholesale Marketing Group and Pure Home Air Profits, isn't it true that you have directed or assisted in the operations of other work-at-home businesses out of the 828 Justina Street address?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 139.)

Q. Isn't it true that you have directed or assisted in the operations of Cardona Consulting, Inc.?

A. I plead the Fifth. (Id.)

Q. Isn't it true that Cardona Consulting was pretty much the exact type of business that Wholesale Marketing Group and Pure Home Air Profits is?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 139-40.)

Q. And isn't it true that you earned money from the business of Cardona Consulting, Inc.?

A. I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 140.)

## J. Defendant's Financial Resources

51. Although Defendant's brief includes a chart that purports to list Defendant's assets, including bank accounts, automobiles, and real property, Defendant presents no evidence to substantiate the chart. (Def.'s Br. at 6-7.)

Page 9

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

52. Although Defendant claims that he and his wife have considerable debt and a daughter with serious medical problems, [*29] Defendant presents no evidence in support of his claims. (Def.'s Br. at 7.)

## II. Conclusions of Law

### A. Jurisdiction

1. This Court has jurisdiction over the subject matter of this case and over all parties hereto.

2. The FTC's complaint states a claim upon which relief may be granted against the Defendant under Sections 5 and 13(b) of the FTC Act, *15 U.S.C. §§ 45* and *53(b)*.

3. Venue is proper as to all parties in the Northern District of Illinois pursuant to *15 U.S.C. § 53(b)* and *28 U.S.C. §1391(b)* and *(c)*.

4. The parties stipulated that his Court shall retain jurisdiction over this matter for purposes of construction and modification of their Stipulated Contempt Order and the November 2004 Final Order. (Stipulated Contempt Order, p. 1.)

### B. Defendant Is In Civil Contempt of This Court

1. Defendant is in civil contempt.

5. Defendant agreed and stipulated that (1) he violated Sections I, II.A. II.B, II.D, and II.G of this Court's November 2004 Final Order, (2) through his violations of Sections I and II he is in civil contempt of this Court, and (3) he is liable for [*30] consumer redress to compensate the injury caused by his contumacious conduct. (Stipulated Contempt Order, p. 2.)

6. Defendant's actions, as described above, establish that he knowingly violated Sections I, II.A, II.B, II.D, and II.G of this Court's November 2004 Final Order when he operated and controlled business entities engaging in work-at-home opportunities.

7. In light of Defendant's stipulations and actions, Defendant is in civil contempt of this Court.

8. Once the Court finds civil contempt, it may impose a fine to coerce Defendant into compliance with the Court's order and remedial sanctions to redress consumer injury. *United States v. United Mine Workers of Am., 330 U.S. 258, 303-05, 67 S. Ct. 677, 91 L. Ed. 884 (1947)*; *FTC v. Think Achievement Corp., 144 F. Supp. 2d 1029, 1033 (N.D. Ind. 2001), aff'd 312 F.3d 259 (7th Cir. 2002)*. Furthermore, in a civil contempt

action to compensate injured consumers, the Court may enter sanctions in an amount reflecting the complainants' actual loss. *United Mine Workers of Am., 330 U.S. at 304.*

9. *Section 13(b) of the FTC Act* specifically provides for injunctive relief for consumers harmed by unfair [*31] or deceptive acts or practices in or affecting commerce. *15 U.S.C. § 53(b)*. Thus, in a contempt action for violations of an order in an underlying *Section 13(b)* fraud case, the Court has the equitable authority to order payment of consumer redress for injury caused by the violation. *FTC v. Kuykendall, 371 F.3d 745, 764 (10th Cir. 2004)*; *McGregor v. Chierico, 206 F.3d 1378, 1387-88 (11th Cir. 2000)*; *FTC v. Febre, 128 F.3d 530, 534-37 (7th Cir. 1997)*.

10. If the FTC shows through clear and convincing evidence that Defendant was engaged in a pattern or practice of contemptuous conduct, the Court may use the Defendant's gross receipts as a starting point for assessing sanctions. *Kuykendall, 371 F.3d at 764* (finding that *Section 5 of the FTC Act* does not require the FTC to prove individual consumer reliance in a case involving a pattern or practice of misleading consumers over an extended period of time).

2. The FTC has established, by clear and convincing evidence, that Defendant violated the Court order.

11. Defendant's stipulation to knowing violations of Sections I, II.A, II.B, II.D, and [*32] II.G of the November 2004 Final Order constitutes clear and convincing evidence that Defendant engaged in a pattern or practice of contemptuous conduct.

12. Defendant's multiple violations of Sections I, II.A, II.B, II.D, and II.G of the November 2004 Final Order, as described in the Court's findings of fact above, constitute clear and convincing evidence that Defendant engaged in a pattern or practice of contemptuous conduct.

13. An individual may be held liable under the FTC Act for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. *FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 573-74 (7th Cir. 1989)* (internal citations omitted). Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them. *Id.* Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. *Id.*

Page 10

2006 U.S. Dist. LEXIS 27630, *; 2006-1 Trade Cas. (CCH) P75,257

The FTC must then demonstrate [*33] that the individual had some knowledge of the practices. *Id.*

14. The facts set out above demonstrate that Cardona, PHAP and WMG violated the FTC Act and caused harm to consumers by engaging in unfair and deceptive acts or practices in or affecting commerce. *See 15 U.S.C. § 45(a).*

15. Although he was not listed as a principal, director, or officer of Cardona. PHAP, or WMG, the evidence establishes that Defendant (1) participated directly in the practices and acts of those companies, (2) held himself out as a representative of those companies, (3) was authorized to conduct business with third party vendors on behalf of those companies, and (4) controlled, operated, promoted, and benefitted from multiple work-at-home businesses throughout the twelve months immediately following the entry of the November 2004 Final Order.

16. Furthermore, in a civil contempt action, invoking the *Fifth Amendment* "invites an inference that the witness' testimony would be adverse to his interests." *Cent. States. SE & SW Areas Pension Fund. v. Wintz Props., Inc.,* 155 F.3d 868, 872 (7th Cir. 1998) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)). [*34]

17. Based on Defendant's invocation of the *Fifth Amendment* in response to specific questions during his deposition, the Court infers that Defendant set up the business operations for Cardona, PHAP and WMG, received payments from PHAP and WMG, maintained records for PHAP and WMG, operated PHAP and WMG from his Justina Street property, and was directly involved in the management of Cardona, PHAP and WMG.

18. Defendant is personally liable for the practices of Cardona, PHAP and WMG and for the actual losses sustained by complainants in this case.

3. Consumer redress for $ 1,493,793.69 is appropriate.

19. The $ 1,493,793.69 in gross income recorded by Cardona, PHAP and WMG was generated by unfair or deceptive acts, in violation of the FTC Act and this Court's November 2004 Final Order, so $ 1,493,793.69 is the amount necessary to redress injuries caused to consumers by those entities. It follows that Defendant is liable for $ 1,493,793.69 for consumer redress.

20. Defendant notes that the Court should avoid punitive sanctions when finding civil contempt. *United States v. Dowell,* 257 F.3d 694, 699 (7th Cir. 2001).

21. Ordering payment of consumer redress for injury [*35] caused by Defendant's violations of this Court's Order does not constitute a punitive action. *Id.*

22. Defendant notes that the Court may take Defendant's financial situation into account when awarding sanctions. *United Mine Workers of Am., 330 U.S. at 304.*

23. Defendant has presented no evidence of financial hardship and cannot be considered a legitimate candidate for leniency on those grounds.

4. Modification of the November 2004 Final Order is appropriate.

24. The Court has the power to modify the terms of its injunctions in the event that changed circumstances require it. *United States v. United Shoe Much. Corp.,* 391 U.S. 244, 249, 88 S. Ct. 1496, 20 L. Ed. 2d 562 (1968); *SEC v. Advance Growth Capital Corp.,* 539 F.2d 649, 651 (7th Cir. 1976). This power to modify in light of changed circumstances extends to the modification of consent decrees. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 383-84, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992); *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S. Ct. 460, 76 L. Ed. 999 (1932).

25. In light of Defendant's contemptuous behavior and direct violations of the November 2004 Final Order, the circumstances in this case have changed such [*36] that modification of the November 2004 consent decree as to Defendant is necessary.

26. In light of the changed circumstances, the FTC's proposed Order Awarding Damages for Contempt and the FTC's proposed Modified Permanent Injunction and Final Judgment Order as to Mark E. Shelton are reasonable and appropriate and the Court enters them at this time.

**III. Conclusion**

For the reasons stated above, the FTC's proposed Order Awarding Damages for Contempt and the FTC's proposed Modified Permanent Injunction and Final Judgment Order as to Mark E. Shelton are entered. It follows that judgment is entered against Defendant for $ 1,493,793.69 and this Court's November 2004 Final Order is modified.

Dated: April 25, 2006.

**MARTIN C. ASHMAN**

United States Magistrate Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

F I L E D

JUL 1 2 2007

U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

FEDERAL TRADE COMMISSION, )
)
)
Plaintiff, )
)
v. )  Case No. 1:97-cv-01114-AVB
)
INTERNATIONAL PRODUCT DESIGN, INC.; THE )
INNOVATION CENTER, INC.; NATIONAL IDEA )
CENTER; AMERICAN INVENTION ASSOCIATES, )
INC.; INVENTION CONSULTANTS, USA, INC.; NEW )
PRODUCTS OF AMERICA, INC.; AZURE )
COMMUNICATIONS, INC. dba LONDON )
COMMUNICATIONS, INC.; INTERNATIONAL )
LICENSING CORPORATION, INC.; ROBERT N. )
WAXMAN; PETER DORAN; DARRELL MORMANDO; )
JULIAN GUMPEL; AND GREG WILSON, )
)
Defendants. )
)

## SUPPLEMENTAL ORDER FOR PERMANENT INJUNCTION REGARDING DEFENDANTS JULIAN GUMPEL, DARRELL MORMANDO, AND GREG WILSON

**Premises of this Supplemental Order**

On July 14, 1997, the Federal Trade Commission ("Commission" or "FTC"), commenced this action by filing a complaint against, among others, defendants Julian Gumpel, Darrell Mormando, and Greg Wilson ("Gumpel," "Mormando," and "Wilson," respectively). The complaint alleged that defendants engaged in unfair or deceptive practices in operating an invention promotion business in violation of Section 5 of the Federal Trade Commission Act, 15

1

183

U.S.C. § 45.

On November 18, 1998, this Court entered a Stipulated Order for Permanent Injunction and Final Relief ("Stipulated Order"). The Commission has filed Motions to Modify the Final Order to Ban Gumpel, Mormando, and Wilson from participating in invention promotion services and for new compliance monitoring provisions. After considering the record of these proceedings, including any hearing on the Commission's Motions to Modify, the Court finds:

1.      This Court has jurisdiction in this action, including jurisdiction over all parties as noted in its express reservation of jurisdiction in the Stipulated Order.

2.      The Stipulated Order prohibits Gumpel, Mormando, and Wilson from falsely representing: a) the likelihood that the invention promotion services offered by them or any business under their control will result in profits for customers; and b) that they or any business under their control evaluates the market potential or merit of invention ideas. The Stipulated Order also requires Gumpel, Mormando, and Wilson to make written affirmative disclosures to consumers explaining that their business does not perform evaluations of invention ideas and divulging the number of their clients that receive more money in profits than they paid for the invention promotion services.

3.      Since entry of the Stipulated Order, Gumpel, Mormando, and Wilson have failed to comply with any of the above provisions.

4.      As signed parties to the Stipulated Order, Gumpel, Mormando, and Wilson have notice of its provisions.

5.      The defendants' contumacious conduct constitutes changed circumstances that justifies modification of the Stipulated Order pursuant to Federal Rule of Civil Procedure 60(b).

2

6. All provisions of the Stipulated Order remain in full force and effect, except as otherwise stated in this Supplemental Order.

7. Entry of this Supplemental Order is in the public interest.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** as follows:

### DEFINITION

For purposes of this Supplemental Order, the following definition shall apply:

(A) The term "invention promotion services" shall refer to any business activity that purports to assist inventors in promoting, marketing, commercializing, evaluating, or patenting their invention ideas.

### I. BAN ON PARTICIPATING IN INVENTION PROMOTION SERVICES

**IT IS HEREBY ORDERED** that defendants Gumpel, Mormando, and Wilson are permanently restrained and enjoined from participating in any manner or capacity whatsoever, directly or indirectly, in concert with others, individually, or through any business entity or other device, in advertising, promoting, offering for sale, or selling invention promotion services.

*Provided, however,* that nothing in the Stipulated Order shall be read to limit the applicability of this section.

### II. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring and investigating compliance with any provision of this Supplemental Order,

(A) Within ten (10) days of receipt of written notice from a representative of the Commission, Gumpel, Mormando, and Wilson shall each submit additional written reports,

3

sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and/or provide entry during normal business hours to any business location in their possession or direct or indirect control to inspect the business operation;

(B)     In addition, the Commission is authorized to monitor compliance with this Order by all other lawful means, including, but not limited to, the following:

(1)     obtaining discovery from any person, without further leave of court, using the procedures prescribed by Fed. R. Civ. P. 30, 31, 33, 34, 36, and 45;

(2)     posing as consumers and suppliers to Gumpel, Mormando, and Wilson, their employees, or any other entity managed or controlled in whole or in part by them, without the necessity of identification or prior notice;

(C)     Gumpel, Mormando, and Wilson shall each permit representatives of the Commission to interview any employer, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Order. The person interviewed may have counsel present.

*Provided, however,* that nothing in this Supplemental Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

### III.     COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that, in order that compliance with the provisions of this Supplemental Order may be monitored:

4

(A)     For a period of seven (7) years from the date of entry of this Order,

(1)     Gumpel, Mormando, and Wilson shall each notify the Commission of the following:

(a)     Any changes in their residence, mailing addresses, and telephone numbers within ten (10) days of the date of such change;

(b)     Any changes in their employment status (including self-employment) and any change in the ownership, management, direct or indirect, or other involvement of Gumpel, Mormando, and Wilson in any business entity within ten (10) days of the date of such change. Such notice shall include the name and address of each business that Gumpel, Mormando, and Wilson are affiliated with, employed by, create or form, perform services for, serve as an officer of, or directly or indirectly manage or control; a statement of the nature of the business; and a statement of their duties and responsibilities in connection with the business or employment; and

(c)     Any changes in Gumpel, Mormando, and Wilson's name or use of any aliases or fictitious names;

(2)     Gumpel, Mormando, and Wilson shall each notify the Commission of any changes in the corporate structure of any business entity that they directly or indirectly control, serve as an officer of, or have an ownership interest in, that may affect compliance obligations arising under this Order,

5

including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor entity; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the filing of a bankruptcy petition; or a change in the corporate name or address, at least thirty (30) days prior to such change, *provided* that, with respect to any proposed change in the corporation about which Gumpel, Mormando, or Wilson learns less than thirty (30) days prior to the date such action is to take place, they shall notify the Commission as soon as is practicable after obtaining such knowledge.

(B)     One hundred eighty (180) days after the date of entry of this Order, and annually on such date for eight (8) years thereafter, Gumpel, Mormando, and Wilson shall each provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which they have complied and are complying with this Order. This report shall include, but not be limited to:

> (1)     Their then-current residence address, mailing addresses, and telephone numbers;
>
> (2)     Their then-current employment and business addresses and telephone numbers, a description of the business activities of any employer or business, and their title and responsibilities for each such employer or business;
>
> (3)     Any other changes required to be reported under subparagraph A of this

6

Section; and

(4)     A copy of each acknowledgment of receipt of this Order, obtained

pursuant to Paragraph V.

(C)     For the purposes of this Supplemental Order, Gumpel, Mormando, and Wilson

shall, unless otherwise directed by the Commission's authorized representatives, mail all written

notifications to the Commission to:

> Associate Director for Enforcement
> Federal Trade Commission
> 600 Pennsylvania Avenue, N.W.
> NJ-2122
> Washington, D.C. 20580
> Re: **FTC v. International Product Design**, Civil Action No. 97-1114-A.

(D)     For purposes of the compliance reporting and monitoring required by this Order,

the Commission is authorized to communicate directly with Gumpel, Mormando, and Wilson.

## IV.     RECORD KEEPING PROVISIONS

**IT IS FURTHER ORDERED** that, for a period of ten (10) years from the date of entry

of this Supplemental Order, any business of which Gumpel, Mormando, or Wilson is the

majority owner or which they directly or indirectly manage or control, its agents, employees,

corporations, successors, and assigns are hereby restrained and enjoined from failing to create

and retain the following records:

(A)     Accounting records that reflect the cost of goods or services sold, revenues

generated, and the disbursement of such revenues;

(B)     Personnel records accurately reflecting: the name, address, and telephone number

of each person employed in any capacity by such business, including as an independent

7

contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable;

(C)     Customer files containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, to the extent such information is obtained in the ordinary course of business;

(D)     Complaints and refund requests (whether received directly, indirectly or through any third party) and any responses to those complaints or requests;

(E)     Copies of all sales scripts, training materials, advertisements, or other marketing materials; and

(F)     All records and documents necessary to demonstrate full compliance with each provision of this Supplemental Order, including but not limited to, copies of acknowledgments of receipt of this Order, required by Paragraph V, and all reports submitted to the FTC pursuant to Paragraph III.B.

## V.     DISTRIBUTION OF ORDER BY DEFENDANT

**IT IS FURTHER ORDERED** that, for a period of seven (7) years from the date of entry of this Supplemental Order, Gumpel, Mormando, and Wilson shall each deliver copies of the Order to all principals, officers, directors, and managers of any business that they control or manage, directly or indirectly, serve as an officer of, or have a majority ownership interest in. Gumpel, Mormando, and Wilson must also deliver copies of this Supplemental Order to all employees, agents, and representatives of that business who engage in conduct related to the subject matter of the Order. For current personnel, delivery shall be within five (5) days of service of this Order upon Gumpel, Mormando, and Wilson. For new personnel, delivery shall

8

occur prior to them assuming their responsibilities. Gumpel, Mormando, and Wilson must each secure a signed and dated statement acknowledging receipt of the Order, within thirty (30) days of delivery, from all persons receiving a copy of the Order pursuant to this Paragraph.

## VI. ACKNOWLEDGMENT OF RECEIPT OF ORDER BY DEFENDANT(S)

IT IS FURTHER ORDERED that Gumpel, Mormando, and Wilson, within five (5) business days of receipt of this Supplemental Order as entered by the Court, must each submit to the Commission a truthful sworn statement acknowledging receipt of the Order.

## VII. RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for purposes of construction, modification and enforcement of this Supplemental Order.

**IT IS SO ORDERED**

Dated: 3/12, 2007

The Hon. Gerald Bruce Lee
United States District Judge

9

Westlaw.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 1

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
STATE OF NEW YORK, et al., Plaintiffs,
v.
MICROSOFT CORPORATION, Defendant.
Civil Action No. 98-1233 (CKK).

Jan. 29, 2008.

Alan R. Kusinitz, Richard L. Schwartz, New York State Attorney General's Office, Jay L. Himes, New York Department of Law, New York, NY, Kevin J. O'Connor, Office of the Attorney General, Of Wisconsin, Madison, WI, Steven R. Kuney, Brendan V. Sullivan, Jr., Williams & Connolly LLP, Washington, DC, Kathleen Foote, Office of the Attorney General of California, San Francisco, CA, Douglas Lee Davis, Office of Attorney General, State of West Virginia, Charleston, WV, for Plaintiffs.

Bradley Paul Smith, John L. Warden, Richard J. Uroksky, Steven L. Holley, Sullivan & Cromwell LLP, New York, NY, William H. Neukom, Microsoft Corporation, Redmond, WA, Charles F. Rule, Cadwalader, Wickersham & Taft LLP, Washington, DC, for Defendants.

### MEMORANDUM OPINION [FN1]

FN1. An Executive Summary of this Memorandum Opinion, which does not represent the official and complete Court findings of fact or conclusions of law, is available on the public docket for this case.

COLLEEN KOLLAR-KOTELLY, District Judge.

*1 Currently pending before the Court are the motions to extend the Final Judgments in this action filed by the California Movants and the New York Movants (collectively, the "Moving States"). [FN2] The Final Judgments arise out of a single civil complaint filed by a group of state plaintiffs on May 18, 1998, alleging antitrust violations by Defendant Microsoft Corporation and asserting claims pursuant to federal and state law. [FN3] The two Final Judgments are premised upon the same liability finding affirmed by the United States Court of Appeals for the District of Columbia Circuit, and are virtually identical in their substantive provisions. Nevertheless, the two Final Judgments were reached via different paths: the New York Movants' Final Judgment was the result of a negotiated consent decree settling the remedy portion of this case as to certain state plaintiffs, while the California Movants' Final Judgment was entered by the Court following a thirty-two day remedy-specific evidentiary hearing.

FN2. The California Movants include the States of California, Connecticut, Iowa, Kansas, Minnesota, the Commonwealth of Massachusetts, and the District of Columbia. See Plaintiff States' Memorandum of Points and Authorities in Support of their Motion to Extend the Final Judgment Until November 12, 2012 (hereinafter "CA Mem.") at 1. The New York Movants include the States of New York, Maryland, Louisiana and Florida. See Joinder of Plaintiff States of New York, Maryland, Louisiana and Florida in Moving to Extend the Final Judgments (hereinafter "NY Mem.") at 1. As detailed below, the California Movants and New York Movants each belong to larger groups of state plaintiffs in this action, respectively the "California Group" or "Litigating States" and "New York Group" or "Settling States."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 2

FN3. A number of states who were Plaintiffs in this action have not moved to extend the Final Judgments. According to the New York Movants, "Plaintiff States Illinois, Kentucky, and Ohio do not object to extending the Final Judgments. Plaintiff States Michigan, North Carolina, and Utah take no position on the decree extension. Plaintiff State Wisconsin does not join in the motion." NY Mem. at 1 n. 2.

The Moving States' motions seek the same objective: the extension of the relevant Final Judgment until November 12, 2012. The Court has conducted a searching and dedicated review of the Moving States' motions, Microsoft's Opposition, the Moving States' Reply, and the exhibits attached to those memoranda. In addition, the Court has requested further targeted briefing from the Moving States and Microsoft, and has reviewed each party's filings carefully. The Court has also given due consideration to the *amicus curiae* brief filed by the United States of America, Plaintiff in the related action, *United States v. Microsoft Corporation,* Civil Action No. 98-1232. [FN4] Upon a thorough review of all of the foregoing, the relevant statutes and case law, and the entire record herein, the Court shall GRANT-IN-PART and DENY-IN-PART the Moving States' motions to extend the Final Judgments.

FN4. By separate Order, the Court shall grant the Motion of the United States for Leave to Participate as Amicus Curiae. The Court shall also grant the Motion of Visa, Inc. and Weyerhaeuser Company for Leave to File Brief as Amici Curiae. The Court has reviewed the Visa/Weyerhaeuser *amicus* brief and notes that it raises an argument also asserted by Microsoft and the United States, which is thoroughly considered below.

### Overview of Court Findings

The Court's decision in this matter is based upon the extreme and unforeseen delay in the availability of complete, accurate, and useable technical documentation relating to the Communications Protocols that Microsoft is required to make available to licensees under Section III.E of the Final Judgments. The Court concludes that the Moving States have met their burden of establishing that this delay constitutes changed circumstances, which have prevented the Final Judgments from achieving their principal objectives. As such, the Court shall extend until November 12, 2009 those provisions of the Final Judgments that have not yet been extended until that date (collectively the "Expiring Provisions"), [FN5] thus making all provisions of the Final Judgments coterminous. The Court declines the Moving States' invitation to extend the entirety of the Final Judgments through 2012 at this point in time, concluding that it is premature to do so.

FN5. The Court's extension of the Expiring Provisions does not include § III.B, which neither the California Movants nor the New York Movants seek to extend. *See* CA Mem. at 1; NY Mem. at 8 n. 14.

The Court's extension should not be viewed as a sanction against Microsoft; to the contrary, the Court commends Microsoft for its willingness to cooperate with the Plaintiffs in this action and in *United States v. Microsoft* in negotiating solutions to issues as they have arisen throughout the past five years. Indeed, because the parties have negotiated solutions to each of the myriad issues that have arisen regarding the technical documentation, the Court has never been asked to find Microsoft out of compliance with the Final Judgments, and has not deemed a *sua sponte* finding of non-compliance necessary or fruitful in achieving compliance. Nevertheless, the fact remains that more than five years after the Final Judgments were entered, the technical documentation required by Section III.E is still not available to licensees in a certifiably complete, accurate, and useable form. Further, as a result of the delay, the various provisions of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 3

the Final Judgments have not yet been given the opportunity to operate together as the comprehensive remedy the Court and the parties envisioned when the Final Judgments were entered. The Court's extension should thus be viewed as a means to allow the comprehensive remedial scheme embodied in the Final Judgments the chance to maximize Section III.E's procompetitive potential.

*2 The Court cannot know what impact the technical documentation required by Section III.E will have on the market once it is finally available in a complete, accurate, and useable form. The Moving States, however, proffer realistic examples of ways in which the Expiring Provisions of the Final Judgments can yet play a significant role in helping Section III.E achieve its full potential. In the face of these examples, the Court concludes that allowing the Expiring Provisions of the Final Judgments to lapse before Section III.E has even been given a chance to succeed might threaten the ability of the Final Judgments to achieve their full procompetitive impact. The Court therefore concludes that the limited extension it is approving is consonant with the policies of encouraging consent decrees, as well as the Court's authority to modify court-ordered judgments.

### I: BACKGROUND
*A. Proceedings Leading to the Remedial Final Judgments*

On May 18, 1998, simultaneous with the filing of the complaint in *United States v. Microsoft,* a group of state plaintiffs filed a civil complaint alleging antitrust violations by Microsoft and seeking preliminary and permanent injunctions barring the company's allegedly unlawful conduct. *New York v. Microsoft Corporation,* 224 F.Supp.2d 76, 86 (D.D.C.2002) (hereinafter *"Remedy Opinion"* ). [FN6] The instant action asserted claims pursuant to federal and state law, and was consolidated with the United States' action, which asserted only federal law claims. *Id.* Following a bench trial in the consolidated cases, Judge Thomas Penfield Jackson found Microsoft

liable for violating §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and ordered the division of Microsoft into two separate corporations to remedy those findings of liability. *Id.* (citing *United States v. Microsoft Corp.,* 87 F.Supp.2d 30, 35 (D.D.C.2000) and *United States v. Microsoft Corp.,* 97 F.Supp.2d 59, 64 (D.D.C.2000)).

> FN6. The "Plaintiffs" for purposes of the Court's *Remedy Opinion* included the States of California, Connecticut, Florida, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, New York, North Carolina, Ohio, Utah, West Virginia, and Wisconsin, the Commonwealth of Massachusetts, and the District of Columbia. *See* 224 F.Supp.2d at 86 n. 3. As discussed below, a number of states (the "Settling States" or the "New York Group") litigated their claims through liability and settled as to the issue of remedy, while other states and the District of Columbia (the "Litigating States" or the "California Group") participated in the remedy-specific evidentiary hearing. *Id.* at n. 3, n. 4.

On Microsoft's appeal of those rulings, the D.C. Circuit deferred to Judge Jackson's factual findings, affirmed-in-part and reversed-in-part his findings of liability, and vacated the remedy decree. *Id.* (citing *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C.Cir.2001) (hereinafter *"Microsoft"* )). Specifically, the D.C. Circuit affirmed only limited violations based on § 2 of the Sherman Act for illegal monopoly maintenance, and reversed all other grounds for liability. Soon thereafter, the consolidated cases were randomly reassigned to this Court, with instructions to hold a " 'remedies-specific evidentiary hearing,' and to 'fashion an appropriate remedy' in light of the revised liability findings." *Id.* at 87 (citing *Microsoft,* 253 F.3d at 103, 105). As the remedies crafted on remand were thus cabined by the D.C. Circuit's findings and instructions in its liability opinion, the Court briefly discusses the key portions of that opinion.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 4

*1. Appellate Findings and Instructions*

**\*3** The D.C. Circuit's opinion began by affirming the district court's definition of the relevant market as "the licensing of all Intel-compatible PC operating systems worldwide." [FN7]*Microsoft*, 253 F.3d at 52. The D.C. Circuit also adopted the district court's determination that "circumstantial evidence proves that Microsoft possesses monopoly power," and noted that Microsoft's behavior "may well be sufficient to show the existence of monopoly power," if direct proof were required. *Id.* at 56-57. The D.C. Circuit's adoption of the market definition was premised on its simultaneous acceptance of Plaintiffs' theory of Microsoft's market dominance. The district court and appellate court both noted that Microsoft's lawfully-acquired monopoly was naturally protected by a "structural barrier" known as the "applications barrier to entry." *Id.* at 55. The applications barrier to entry arises because: "(1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base." *Id.* The applications barrier to entry creates a network effects situation, which perpetuates Microsoft's operating system dominance. *Remedy Opinion*, 224 F.Supp.2d at 89-90. This is because "[e]very operating system has different APIs," such that "applications written for one operating system will not function on another unless the developer undertakes the 'time consuming and expensive' process" of "porting" the application to an alternative operating system. *Id.* (quoting *Microsoft*, 253 F.3d at 53, 55).

> FN7. "PC" is short for "personal computer." *Remedy Opinion*, 224 F.Supp.2d at 89 n. 10 (citing *United States v. Microsoft*, 84 F.Supp.2d 9, ¶ 1 (D.D.C.1999) (hereinafter *"Findings of Fact"* )). The D.C. Circuit explained the functions of a PC operating system ("OS"):
> Operating systems perform many functions, including allocating computer memory and controlling peripherals such as printers and keyboards. Operating systems also function as platforms for software applications. They do this by "exposing"—i.e., making available to software developers— routines or protocols that perform certain widely-used functions. These are known as Application Programming Interfaces, or "APIs."
> *Microsoft*, 253 F.3d at 53 (citations omitted). Software developers wanting to include a function enabled by a particular API in their applications need not duplicate it in their own code, but rather can "call" or use the API included in Microsoft's "Windows" operating system. *Id.* "Microsoft began shipping a software package for the PC called Windows" in 1985, and introduced updated versions in 1995 and 1998, known as Windows 95 and Windows 98, respectively. *Remedy Opinion*, 224 F.Supp.2d at 90 n. 12 (citing *Findings of Fact* ¶ 7-8). At the time of this Court's remedy proceeding, the most current version of Windows was Windows XP. *Id.* Microsoft has since released another update, known as Windows Vista, which was made available to the general public in January 2007.

During the liability phase of this case, Plaintiffs proceeded on the theory that certain kinds of software products, known as "middleware," could weaken the applications barrier to entry "by serving as platforms for applications, taking over some of the platform functions provided by Windows." *Id.* at 90. Middleware has the ability to expose its own APIs, and Plaintiffs posited that "[u]ltimately, by writing to the middleware API set, applications developers could write applications which would run on any operating system on which the middleware was preset." *Id.* [FN8] In accepting the district court's definition of the relevant market and Plaintiffs' theory of Microsoft's market dominance, the D.C. Circuit concluded that the district court had properly excluded middleware products from the relevant market. *Id.*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 5

FN8. Plaintiffs focused their attention on "two such middleware threats to Microsoft's operating system dominance--Netscape Navigator and the Java technologies." *Remedy Opinion,* 224 F.Supp.2d at 90 (citing *Microsoft,* 253 F.3d at 53).

The majority of the D.C. Circuit's opinion focused on Microsoft's challenges to the district court's findings of liability under § 2 of the Sherman Act. [FN9] The D.C. Circuit addressed each in turn, and ultimately sustained the district court's findings of liability with respect to the following specific conduct: (1) the license restrictions Microsoft imposed upon manufacturers of PCs, known as OEMs, *Microsoft,* 253 F.3d at 59-64; (2) Microsoft's agreements with IAPs, by which Microsoft agreed "to provide easy access to IAPs' services from the Windows desktop in return for the IAPs' agreement to promote [Microsoft's Internet Explorer ("IE") web browser] exclusively and to keep shipments of internet access software using [the competing Navigator] browser under a specific percentage," *id. at 67-71;* (3) Microsoft's agreements with ISVs, which required ISVs "to distribute, promote, and rely on IE rather than Navigator," *id. at 71-72;* (4) Microsoft's exclusive agreement with Apple Computer, "both an OEM and a software developer," which required Apple to privilege IE over Navigator, *id. at 71-74;* (5) Microsoft's conduct with respect to the "Java" technologies, [FN10] including its agreements requiring major ISVs to promote Microsoft's Java Virtual Machine exclusively, and its deception of Java developers about the Windows-specific nature of the tools it distributed to them, *id. at 74-77;* and (6) Microsoft's "threat" to Intel regarding its efforts to develop a "high performance, Windows-compatible" and "Sun compliant" Java Virtual Machine, *id. at 77-78.* [FN11]

FN9. For the sake of clarity, the Court defines a number of acronyms that are used throughout the previous opinions of this Court and the D.C. Circuit, as well as in the Final Judgments: "OEMs" are "original equipment manufacturers;"

"IAPs" are Internet access providers; "ISVs" are independent software vendors; "IHVs" are independent hardware vendors; and "ICPs" are internet content providers. *See* Final Judgments, §§ VI.F-I; VI.O.

FN10. The "Java" technologies are "a set of technologies developed by Sun Microsystems," which the D.C. Circuit described as "another type of middleware posing a potential threat to Windows' platforms." *Microsoft,* 253 F.3d at 74.

FN11. "Intel is a firm engaged principally in the design and manufacture of microprocessors," and a "segment of Intel's business develops software." *Remedy Opinion,* 224 F.Supp.2d at 95 (quoting *Findings of Fact* ¶ 95).

*4 The D.C. Circuit also imposed liability upon Microsoft for the "state law counterparts of" Plaintiffs' claims pursuant to § 2 of the Sherman Act. *Id.* at 46. Beyond these findings, however, the D.C. Circuit did not find Microsoft liable for any additional antitrust violations. In particular, the D.C. Circuit reversed the district court's conclusion that Microsoft's "course of conduct" as a whole constituted a separate violation of § 2 of the Sherman Act. *Id.* at 78. The D.C. Circuit also rejected the district court's finding of attempted monopolization and remanded Plaintiffs' § 1 tying claim for further proceedings at the district court level. *Remedy Opinion,* 224 F.Supp.2d at 95. [FN12] Plaintiffs opted not to pursue their tying claim on remand. *Id.*

FN12. In addition to the claims described above, Plaintiffs' complaint originally included a separate claim for "monopoly leveraging" under § 2 of the Sherman Act, on which Judge Jackson granted summary judgment in favor of Microsoft because the claim ran "contrary to both economic theory and the Sherman Act's plain

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 6

language." *Remedy Opinion,* 224 F.Supp.2d at 95 n. 21 (quoting *United States v. Microsoft,* Civil Action No. 98-1233, 1998 WL 614485, at *27 (D.D.C. Sept. 14, 1998)).

After reviewing the district court's conclusions with respect to liability, the D.C. Circuit turned to considering the district court's choice of remedy, which mandated the divestiture of Microsoft Corporation into two separate entities and included a number of "interim restrictions on Microsoft's conduct." *Id.* at 95-96 (quoting *Microsoft,* 253 F.3d at 100). The D.C. Circuit "found three fundamental flaws in the district court's order of remedy, each of which alone justified vacating the remedial decree." *Id.* at 96. First, the D.C. Circuit focused on the district court's failure to hold an evidentiary hearing in the face of disputed facts concerning the remedy. *Microsoft,* 253 F.3d at 101-03. Next, the D.C. Circuit concluded that the district court "failed to provide an adequate explanation for the relief it ordered," by not "explain[ing] how its remedies decree would accomplish [the] objectives" of a remedial decree in an antitrust case. *Id.* at 103. The D.C. Circuit reiterated that "a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' to 'terminate the illegal monopoly, [FN13] deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.' " *Id.* (quoting *Ford Motor Co. v. United States,* 405 U.S. 562, 577, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) and *United States v. United Shoe Mach. Corp.,* 391 U.S. 244, 250, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (hereinafter *"United Shoe"*)). Finally, the D.C. Circuit concluded that its substantial modifications to the liability imposed by the district court merited a new determination of the remedy for the surviving antitrust violations. *Id.* at 103-05.

FN13. As noted in this Court's various remedy-related opinions, "the objective of 'terminating the illegal monopoly,' is incompatible with the facts of this case [because] [n]either the district court, nor the appellate court

concluded that Microsoft had illegally obtained its monopoly," but only found that Microsoft had illegally maintained its monopoly. *New York v. Microsoft Corp.,* 231 F.Supp.2d 203, 211 n. 4 (2002) (hereinafter *"Settling States Opinion"* ) (internal citations omitted). As a result, the Court's remedy focused on terminating Microsoft's illegal maintenance of its monopoly, rather than on terminating the monopoly itself. *Id.; see also Remedy Opinion,* 224 F.Supp.2d at 101 (stating that "the proper objective of the remedy in this case is termination of the exclusionary acts and practices related thereto which served to illegally maintain [Microsoft's] monopoly.").

The D.C. Circuit therefore remanded the case to this Court, with instructions to resolve any factual disputes surrounding a remedy and exercise the Court's "broad discretion" in imposing the "relief it calculates will best remedy the conduct ... found to be unlawful." *Id.* at 105. In so doing, the D.C. Circuit "offered specific guidance to this Court regarding the inquiry to be undertaken following remand." *Remedy Opinion,* 224 F.Supp.2d at 97. Of particular significance, the D.C. Circuit instructed this Court to consider the quantum of proof presented by Plaintiffs as to the "causal connection between Microsoft's anticompetitive conduct and its dominant position in the OS market" in determining what remedy to impose. *Microsoft,* 253 F.3d at 106. The D.C. Circuit specifically noted that it had "found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market only through inference," and that the district court "expressly did not adopt the position that Microsoft would have lost its position in the OS market but for its anticompetitive behavior." *Id.* at 106-07. The D.C. Circuit also stressed that it had "drastically altered the scope of Microsoft's liability," and advised this Court to "consider which of the [original] decree's conduct restrictions remain viable in light of [the] modification of the original liability decision," *id.* at 105. While the D.C. Circuit did not "undertake to dictate to [this] Court the precise form that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 7

relief should take on remand," it noted that the relief "should be tailored to fit the wrong creating the occasion for the remedy." *Id. at 107.*

### 2. Remedy Proceedings Before This Court

*5 "Following remand, pursuant to Court Order, the parties in the two consolidated cases entered into intensive settlement negotiations." *Remedy Opinion, 224 F.Supp.2d at 87.* These negotiations resulted in the United States and Microsoft reaching a resolution in *United States v. Microsoft,* in the form of a proposed consent decree. *Id.* In the instant case, the settlement negotiations were partially successful; the New York Group joined the settlement between the United States and Microsoft, electing not to proceed to a remedies-specific hearing. *Id.* [FN14] The States that opted not to join the settlement—those in the California Group—proposed a remedy distinct from that presented in the proposed consent decree. *Id.* [FN15] Following expedited discovery, an evidentiary hearing on the issue of the remedy commenced on March 18, 2002. *Id.* The parties submitted direct testimony in written format, and cross-examination and re-direct testimony were offered in open court. *Id.* "Over thirty-two trial days, the Court reviewed the written direct testimony and heard the live testimony of fifteen witnesses proffered by Plaintiffs and nineteen witnesses proffered by Microsoft." *Id.*

> FN14. The Settling States, or New York Group, include the States of New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin. *Remedy Opinion,* 224 F.Supp.2d at 87 n. 5.

> FN15. The Litigating States, or California Group, include the States of California, Connecticut, Florida, Iowa, Kansas, Minnesota, Utah, and West Virginia, the Commonwealth of Massachusetts, and the District of Columbia.

*Remedy Opinion, 224 F.Supp.2d at 86 n. 3.*

On November 1, 2002, the Court issued three Memorandum Opinions and related Orders. [FN16] The first Memorandum Opinion and accompanying Order, issued in *United States v. Microsoft,* involved the Court's determination, pursuant to the Antitrust Procedures and Penalties Act ("Tunney Act"), 15 U.S.C. § 16(b)-(h), that, with the exception of the provisions relating to the Court's retention of jurisdiction—which the Court revised to be both more specific and more broadly drawn [FN17]—the consent decree proposed by the United States and Microsoft was in the public interest. *See generally United States v. Microsoft Corp.,* 231 F.Supp.2d 144 (D.D.C.2002) (hereinafter *"Tunney Act Opinion"* ). [FN18] The second Memorandum Opinion and Order, issued in the instant case, similarly concluded that, with the exception of the retention of jurisdiction provision, the consent decree proposed by the Settling States and Microsoft resolved the controversy in a manner consistent with the public interest. *See generally New York v. Microsoft Corp.,* 231 F.Supp.2d 203 (D.D.C.2002) (hereinafter *"Settling States Opinion"*). The *Settling States Opinion* incorporated by reference the Court's *Tunney Act Opinion* . The final Memorandum Opinion and accompanying Final Judgment addressed the dueling remedy proposals presented to this Court by Microsoft and the California Group, which formed the basis for the remedy-specific evidentiary hearing. *See generally Remedy Opinion, 224 F.Supp.2d 76.*

> FN16. The Court entered three Final Judgments in November 2002; two in the instant case, and one in *United States v. Microsoft.* Because the United States does not seek to extend the Final Judgment in *United States v. Microsoft,* however, this opinion addresses only the two "Final Judgments" entered in this case.

> FN17. As discussed in greater detail below, the Court deemed it "imperative, in this unusually

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 8

complex case, for the Court's retention of jurisdiction to be clearly articulated and broadly drawn," and therefore suggested that the parties amend the proposed consent decree to reserve for the Court "the power to *sua sponte* issue orders or directions regarding [ ] the final judgment, including, but not limited to orders regarding the construction or carrying out of the final judgment, the enforcement of compliance therewith, and the punishment of any violation thereof." *Tunney Act Opinion,* 231 F.Supp.2d at 201. The Court concluded such a provision would "ensure that the Court retain[ ] the power intended by the parties and which the Court deem[ed] necessary to ensure effective implementation of the final judgment in this case." *Id .*

FN18. In a previous Memorandum Opinion, the Court had reviewed the pertinent procedural history and determined that the parties had satisfied the other requirements of the Tunney Act. *See generally United States v. Microsoft Corp.,* 215 F.Supp.2d 1 (D.D.C.2002).

The Final Judgments approved as to the Settling States and the Litigating States are substantively quite similar. This similarity is not surprising because both the Settling States' consent decree and the Court-ordered remedy followed upon, and were constrained by, the D.C. Circuit's specific liability findings, as well as its guidance as to the nature of an appropriate remedy in light of those findings. Each Final Judgment, in keeping with the goals of antitrust remedies described by the D.C. Circuit in its liability opinion and relevant Supreme Court precedent, addresses not only those specific acts for which the D.C. Circuit imposed liability, but also includes forward-looking remedies designed to "effectively pry open to competition a market that has been closed by defendants' illegal restraints." *Remedy Opinion,* 224 F.Supp.2d at 100, 108 (quoting *International Salt Co. v. United States,* 332U.S. 392, 401, 68 S.Ct. 12, 92 L.Ed. 20

(1947)). Significantly, in the *Settling States Opinion,* the Court noted that the Settling States' proposed consent decree "takes account of the theory of liability advanced by Plaintiffs, the actual liability imposed by the appellate court, the concerns of the Plaintiffs with regard to future technologies, and the relevant policy considerations." *Settling States Opinion,* 231 F.Supp.2d at 259 (incorporating *Tunney Act Opinion* ). These are the same factors that the Court weighed in the remedy proceeding. *See generally Remedy Opinion,* 224 F.Supp.2d 76.

*B. The Final Judgments*

*6 The following description highlights the key provisions that are common to both Final Judgments, and notes the few instances in which the Final Judgments differ. At the outset, the Court notes the following definitions, which are important to understanding the parameters of the Final Judgments:

• The term "Non-Microsoft Middleware" incorporates the middleware threats that were the focus of the liability phase, and includes "a non-Microsoft software product running on a Windows Operating System Product that exposes a range of functionality to ISVs through published APIs, and that could, if ported to or made interoperable with, a non-Microsoft Operating System, thereby make it easier for applications that rely in whole or in part on the functionality supplied by that software product to be ported to or run on that non-Microsoft Operating System." Final Judgments, § VI .M.

• A "Non-Microsoft Middleware Product" is similar to "Non-Microsoft Middleware," but adds the requirement that "at least one million copies" of the product "were distributed in the United States within the previous year." *Id.,* § VI.N.

• The term "Microsoft Middleware Product" is defined according to a specific set of Microsoft functionalities existing at the time of the Final Judgments, as well as future Microsoft functionality. The existing set of functionalities are those provided by "Internet Explorer, Microsoft's Java Virtual Machine, Windows Media

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Player, Windows Messenger, Outlook Express and their successors in a Windows Operating System Product." The future technologies include software included in Windows that provides the functionality of internet browsers, email client software, networked audio/video client software, or instant messaging software. Also included in the definition of "Microsoft Middleware Product" are future functionalities that are both distributed as part of Windows and separately from Windows by Microsoft, trademarked by Microsoft, and which compete with Non-Microsoft Middleware Products. *Id.*, § VI.K.

• The term "Microsoft Middleware" is similar to "Microsoft Middleware Product," but is limited to the software code that is separately distributed and trademarked or marketed as a major version of a Microsoft Middleware Product. *Id.*, § VI.J.

*1. Substantive Provisions Contained in Section III*

The substantive proscriptions of each Final Judgment are included within Section III, which is entitled "Prohibited Conduct." Subsections A through C of § III focus on Microsoft's dealing with OEMs. Section III.A bars Microsoft from retaliating against OEMs for (i) "developing, distributing, promoting, using, selling, or licensing" software or Non-Microsoft Middleware, (ii) shipping a Personal Computer that includes a non-Microsoft Operating System, or (iii) exercising options or alternatives provided by the Final Judgment. *Id.* at § III.A. [FN19] Section III.A also requires Microsoft to provide Covered OEMs with written notice before terminating their licenses for Windows Operating Systems Products. *Id.* [FN20] In the *Remedy Opinion,* the Court described § III.A as "provid[ing] substantial freedom to OEMs in their configuration of Microsoft's Windows operating system by lifting Microsoft's illegal license restrictions." 224 F.Supp.2d at 152. Under § III.B, Microsoft is required to provide Windows Operating System Products to Covered OEMs "pursuant to uniform license agreements with uniform terms and conditions." Final Judgments, § III.B. To this end, § III.B requires the

royalties Microsoft charges to be set forth in a uniform schedule published on a website accessible to the Plaintiffs and the Covered OEMs. *Id.* [FN21]

FN19. Section III.A of the Litigating States' Final Judgment also prohibits Microsoft from threatening retaliation against OEMs for the same conduct. Litigating States Final Judgment, § III.A.

FN20. "Covered OEMs" are "the 20 OEMs with the highest worldwide volume of licenses of Windows Operating System Products reported to Microsoft in Microsoft's fiscal year preceding the effective date of the Final Judgment[s]." Final Judgments, § VI.D.

FN21. As noted above, the Moving States do not seek to extend § III.B.

*7 Section III.C "secure[s] for OEMs the general ability to install and display icons, shortcuts and menu entries for middleware ... on the Windows desktop or in the Start menu," while reflecting "the care with which the appellate court separated anticompetitive restrictions from legitimate license restrictions." *Remedy Opinion,* 224 F.Supp.2d at 153. As such, § III.C generally prohibits Microsoft from restricting by agreement any OEM licensee from: (1) installing and displaying icons, shortcuts, or menu entries for any Non-Microsoft Middleware or any product or service that distributes, uses, promotes or supports any Non-Microsoft Middleware, where such applications are generally displayed; (2) distributing or promoting Non-Microsoft Middleware by installing and displaying on the desktop shortcuts of any size or shape so long as they do not interfere with the functionality of the user interface; (3) launching automatically any Non-Microsoft Middleware; [FN22] (4) offering users the option of launching other Operating Systems; (5) presenting in the initial boot

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                Page 10
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

sequence its own IAP offer; [FN23] or (6) exercising any of the options provided in § III.H of the Final Judgments. Final Judgments, § III.C.

FN22. The Settling States' Final Judgment provides that Microsoft may not impede an OEM's ability to automatically launch Non-Microsoft Middleware "if a Microsoft Middleware Product that provides similar functionality would otherwise be launched automatically." Settling States Final Judgment, § III.C.3. In contrast, the Litigating States' Final Judgment narrows further the situations in which Microsoft may impede an OEM's ability to automatically launch Non-Microsoft Middleware, limiting Microsoft's ability to do so to those circumstances where the Non-Microsoft Middleware "replaces or drastically alters the Windows Operating System Product user interface." Litigating States Final Judgment, § III.C.3.

FN23. The Settling States' Final Judgment prevents Microsoft from impeding by agreement an OEM's ability to present its own IAP offer during the initial boot sequence, "provided that the OEM complies with reasonable technical specifications established by Microsoft." Settling States Final Judgment, § III.C.5. In contrast, the Litigating States' Final Judgment contains no such requirement or restriction, Litigating States Final Judgment, § III.C.5.

The Court's *Remedy Opinion* described Sections III.D and III.E of the Final Judgments as "explicitly forward-looking remedies," which "reflect an agreement that effective interoperation between software running on two or more devices will play an integral role in the successful emergence of new software products and platforms." *Remedy Opinion,* 224 F.Supp.2d at 171. Elsewhere in the *Remedy Opinion,* the Court acknowledged that the

"interoperability disclosures" contained in §§ III.D and III.E were not "directly related to the imposition of liability," but rather "aimed at the broader goals of unfettering the market and restoring competition." *Id,* at 226;*see also Settling States Opinion,* 231 F.Supp.2d at 244-45 (incorporating the *Tunney Act Opinion,* and stating that "while the rationale for this type of disclosure rests, in part, upon the finding of liability for conditioning the provision of technical information on illegal, exclusive agreements, it can be viewed more broadly to relate to the United States' theory of the case as a whole.").

Section III.D requires Microsoft to disclose to ISVs, IHVs, IAPs, ICPs, and OEMs the APIs and related documentation that are used by Microsoft Middleware to interoperate with a Windows Operating System Product. Final Judgments, § III.D. Section III.E requires Microsoft--starting nine months after the submission of the Settling States' Final Judgment to the Court and three months after the entry of the Litigating States' Final Judgment--to make available for use by third parties "on reasonable and non-discriminatory terms (consistent with Section III.I) any Communications Protocol that is, on or after the date [the] Final Judgment is submitted to the Court, (i) implemented in a Windows Operating System Product installed on a client computer, and (ii) used to interoperate, or communicate, natively ... with a Microsoft server operating system product." Final Judgments, § III.E. Section III.E describes "native" communications as "without the addition of software code to the client operating system product." *Id.*

*8 The Court's *Remedy Opinion* described § III.E as "[i]n all likelihood" "the *most* forward-looking provision in the Court's remedy." *Remedy Opinion,* 224 F.Supp.2d at 173. Section III.E was included in the Settling States' consent decree based on the United States' belief that the Final Judgment's "effectiveness would be undercut unless it addressed the rapidly growing server segment of the market." *Settling States Opinion,* 231 F.Supp.2d at 249 (incorporating the *Tunney Act Opinion* ). Section III.E represented an effort to "obtain protection which is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                            Page 11
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

prospective in its focus" despite "the rapid pace of change in the software industry," so that the "core of the decree would [not] prove prematurely obsolete." *Id.* Similarly, § III.E was included in the Court-imposed Litigating States' remedy based on the Court's conclusions that:

> server operating systems can perform a function akin to that performed by traditional middleware because they provide a platform for applications running 'for' use on a PC. The mandatory disclosure of the communications protocols relied upon by Microsoft's PC operating system to interoperate with its server operating systems will advance the ability of non-Microsoft operating systems to interoperate, or communicate, with the ubiquitous Windows PC client. Advancement of the communication between non-Microsoft server operating systems and Windows clients will further the ability of these non-Microsoft server operating systems to provide a platform which competes with Windows itself.

*Remedy Opinion,* 224 F.Supp.2d at 172-73.

Sections III.F, III.G, and III.H of the Final Judgments relate to "other participants in the ecosystem," namely ISVs, IHVs, IAPs, ICPs, and end users. *See Remedy Opinion,* 224 F.Supp.2d at 166. Section III.F bars Microsoft from retaliating against ISVs or IHVs for "developing, using, promoting or supporting any [competing software] or any software that runs on any [competing software]." Final Judgments, § III.F. [FN24] In addition, § III.F prohibits Microsoft from entering into any agreement relating to a Windows Operating System Product that conditions the grant of any consideration on an ISV's refraining from developing, using, distributing or promoting any competing software, unless the condition is related to a bona fide contractual obligation of the ISV regarding Microsoft software. *Id.* Section III.G, in turn, generally precludes Microsoft from entering into any agreement with any IAP, ICP, ISV, IHV or OEM that requires any such entity to distribute, promote, use or support, "exclusively or in a fixed percentage, any Microsoft Platform Software." Final Judgments, § III.G. Section III.G also prohibits Microsoft from entering agreements with IAPs or ICPs that grant placement in any Windows Operating System Product "on condition that the

IAP or ICP refrain from distributing, promoting or using any software that competes with Microsoft Middleware." *Id.*

> FN24. Like § III.A, § III.F of the Litigating States' Final Judgment also prohibits Microsoft from threatening retaliation against ISVs and IHVs. Settling States Final Judgment, § III.F.

*9 Section III.H requires Microsoft to allow end users and OEMs to enable or remove access to each Microsoft Middleware Product or Non-Microsoft Middleware Product, by designating a Non-Microsoft Middleware Product to be invoked in place of a Microsoft Middleware Product, i.e., as a default, in certain situations. Final Judgments, § III.H. Section III.H also prohibits Microsoft from designing its Windows Operating System Products so as to induce reconfiguration of an OEM's or consumer's formatting of icons, shortcuts, and menu items less than 14 days after the initial boot up of a new PC, or without first seeking confirmation from the user. *Id.*

Section III.I is closely related to the disclosures mandated by §§ III.D and III.E, *see Settling States Opinion,* 231 F.Supp.2d at 249, and obligates Microsoft to "license to ISVs, IHVs, IAPs, ICPs, and OEMs any intellectual property rights owned or licensable by Microsoft that are required to exercise any of the options or alternatives expressly provided to them under [the Final Judgments]" on "reasonable and non-discriminatory terms" that are limited in scope so as to be "no broader than is necessary." Final Judgments, § III.I. Finally, § III.J limits Microsoft's disclosures under the Final Judgments to ensure that the mandated disclosures do not result in the release of information that "would compromise the security of a particular installation ... of anti-piracy, anti-virus, software licensing, digital rights management, encryption or authentication systems," and limits Microsoft's disclosure obligations with respect to a specific subset of security-related APIs and communications protocols. Final Judgments, § III.J. Section III.J also provides that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 12

Microsoft is not required to disclose any API, interface, or other information if Microsoft is "lawfully directed not to do so by a governmental agency of competent jurisdiction." *Id.*

*2. Compliance, Enforcement, and Termination*

While each Final Judgment provides that the relevant "Plaintiffs shall have exclusive responsibility for enforcing this Final Judgment," Final Judgments, § IV.A, the Final Judgments differ significantly in their compliance and enforcement provisions. The Settling States' Final Judgment provides for the creation of "a three-person Technical Committee ("TC") to assist in enforcement of and compliance with" that Final Judgment. Settling States Final Judgment, § IV.B.1. The members of the TC are "experts in software design and programming," who meet requirements demonstrating their independence from Microsoft, and who are selected by a detailed procedure. *Id.*, § IV.B.2. The TC is broadly empowered to "monitor Microsoft's compliance with its obligations under [the] Final Judgment," and is answerable to the United States and the Settling States, rather than to the public or to the Court. *Id.*, § IV.B.8.a., § IV.B.8.e. Although the TC serves the United States and the Settling States, "Microsoft is responsible for the cost and expense of the service of the committee." *Settling States Opinion,* 231 F.Supp.2d at 253-54 (incorporating *Tunney Act Opinion* ).

*10 The Settling States' Final Judgment also provides for a Microsoft Internal Compliance Officer, who "is far more closely aligned with Microsoft." *Id.* at 254. The Compliance Officer is a Microsoft employee responsible for administering Microsoft's antitrust compliance program and "helping to ensure compliance" with the Final Judgment. Settling States Final Judgment, § IV.C. The TC and the Compliance Officer both may receive complaints from the United States, the Settling States, and third parties, as well as each other, regarding Microsoft's compliance with the terms of the Final Judgment. *Id.*, § IV.D. The Final Judgment includes specific provisions as

to actions the TC and the Compliance Officer are obliged to take in conjunction with complaints received. *Id.*

As the Court explained in the *Settling States Opinion,* "ultimately the power to enforce the terms of the decree rests with the government," i.e., the United States and the Settling States, and the TC was "not intended as a substitute for the enforcement authority of the United States" and the Settling States. *Settling States Opinion,* 231 F.Supp.2d at 255-56 (incorporating *Tunney Act Opinion* ). Rather, the TC was intended as a "mechanism for the provision of impartial and expert compliance assessment to the parties charged with enforcement." *Id.* at 256.

Unlike the Settling States, during the remedy hearing before this Court, the Litigating States were "unwaveringly critical of Microsoft's proposal for a technical committee," and the Court therefore declined to impose a technical committee upon the Litigating States in their remedy. *Remedy Opinion,* 224F.Supp.2d at 182. Instead, the Litigating States' Final Judgment provides for the creation of a Compliance Committee made up of at least three non-employee members of the Microsoft Board of Directors. Litigating States Final Judgment, § IV.B.1. The Compliance Committee, in turn, hires a Compliance Officer, who is "responsible for development and supervision of Microsoft's internal programs to ensure compliance with the antitrust law and [the] Final Judgment." *Id.*, § IV.B.2.

In addition to vesting the respective plaintiff states with enforcement authority and creating mechanisms to support those efforts, the Final Judgments include two paragraphs regarding the Court's retention of jurisdiction. First, the Final Judgments provide:

Jurisdiction is retained by this Court over this action such that the Court may act *sua sponte* to issue further orders or directions, including but not limited to orders or directions relating to the construction or carrying out of this Final Judgment, the enforcement of compliance

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 13

therewith, the modification thereof, and the punishment of any violation thereof.
Final Judgments, § VII. The Court's *Tunney Act Opinion* and *Settling States Opinion* each specifically conditioned approval of the relevant consent decree on the parties amending their respective consent decrees to include this reservation of jurisdiction. *Settling States Opinion,* 231 F.Supp.2d at 258- 59;*see also Tunney Act Opinion,* 231 F.Supp.2d at 201-02. The Court did so out of concern that, without such a provision, the language of the Final Judgments might not "clearly vest the Court with the authority to act *sua sponte* to order certifications of compliance and other actions by the parties." *See Settling States Opinion,* 231 F.Supp.2d at 258;*Tunney Act Opinion,* 231 F.Supp.2d at 200-01. The Court deemed it "imperative, in this unusually complex case, for the Court's retention of jurisdiction to be clearly articulated and broadly drawn." *Settling States Opinion,* 231 F.Supp.2d at 258;*Tunney Act Opinion,* 231 F.Supp.2d at 200-01. The Court therefore included the same retention of jurisdiction in the Litigating States' Final Judgment.

**\*11** In addition to providing for the retention of *sua sponte* jurisdiction, the Final Judgments provide that:

Jurisdiction is retained by this Court over this action and the parties thereto for the purpose of enabling either of the parties thereto to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, to enforce compliance, and to punish violations of its provisions.

Final Judgments, § VII. It is this provision of the Final Judgments that the Moving States invoke in their motions.

As to the term of the Final Judgments, each provides "[u]nless [the] Court grants an extension, this Final Judgment will expire on the fifth anniversary of the date it is entered by the Court." Final Judgments, § VI.A. In discussing the appropriate term for the Final Judgment in the remedy proceeding, the Court noted that there was "little dispute that many of the acts which gave rise to the imposition of liability in [the] case ha[d] long since

ceased." 224 F.Supp.2d at 184. The Court further observed that there was "no dispute that the industry at issue in [the] case is remarkable for its constant and rapid change," and noted the D.C. Circuit's concern in its liability opinion as to the difficulties inherent in crafting conduct remedies in quickly shifting markets. *Id.* (quoting *Microsoft,* 253 F.3d at 49). In that vein, the Court acknowledged that "it is beyond the capacity of this Court, counsel, or any witness, to craft a remedy in 2002, for antitrust violations which commenced in the mid-1990s, which will be appropriately tailored to the needs of a rapidly changing industry in 2012." *Id.* Cognizant of the fact that an "antitrust decree should endure only so long as is necessary to ensure competition," the Court concluded that a five-year term was appropriate. *Id.* For similar reasons, the Court's *Tunney Act Opinion,* and thus the *Settling States Opinion,* concluded that the consent decree's five-year term was in the public interest, notwithstanding the fact that prior cases (not involving this technology) brought by the Antitrust Division of the United States Department of Justice had resulted in ten-year decrees. *Settling States Opinion,* 231 F.Supp.2d at252 (incorporating *Tunney Act Opinion* ).

Finally, each Final Judgment describes one specific scenario in which the Final Judgments might be extended by the Court, allowing the Plaintiffs to "apply to the Court for a one-time extension of this Final Judgment of up to two years ... [i]n any enforcement proceeding in which the Court has found that Microsoft has engaged in a pattern of willful and systematic violations." *Id.,* § VI.B. The Final Judgments do not, however, indicate that § VI.B represents the sole scenario in which the Final Judgments might be extended, and the Moving States do not purport to invoke that provision in their motions.

**\*12** The Commonwealth of Massachusetts alone appealed the Litigating States' Final Judgment, challenging many of the substantive provisions described above. The D.C. Circuit's opinion on appeal addressed each challenged provision and "affirm[ed] [this Court's] remedial decree in its entirety," finding that the Court's "reasoning was based

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 14

upon evidence in the record, was sound, and involved no abuse of discretion." *Massachusetts v. Microsoft Corp. .. 373 F.3d 1199, 1204, 1234 (D.C.Cir.2004)* (hereinafter *"Massachusetts v. Microsoft"* ). In the same opinion, the D.C. Circuit addressed arguments raised by third-parties who sought to intervene in the Court's public-interest determination under the Tunney Act, and upheld this Court's "approval of the consent decree as being in the public interest." *Id.* at 1204. In affirming this Court's opinions, the D.C. Circuit reiterated that, "key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar nascent threats in the future, and restore the competitive conditions created by similar middleware threats." *Massachusetts v. Microsoft Corp., 373 F.3d at 1243.*

*C. Implementation of the Final Judgments*

The Court entered the Litigating States' Final Judgment on November 1, 2002, and entered the Settling States' Final Judgment Pursuant to Rule 54(b) on November 12, 2002. On May 14, 2003, the Court issued an Order requiring the parties to file joint status reports with the Court every six months regarding Microsoft's compliance with the Final Judgments and Plaintiffs' enforcement efforts. That Order provided that status conferences would be scheduled within one month of the Court's receipt of each status report. Over time, however, in response to various issues, the Court's practice evolved to include a Joint Status Report (hereinafter "JSR")--filed jointly by the United States, the New York Group, the California Group, and Microsoft, in both this action and *United States v. Microsoft*--and a corresponding status conference approximately every three months. In addition, for reasons described below, in January 2006 Microsoft began filing monthly Supplemental Status Reports regarding its compliance efforts in connection with § III.E of the Final Judgments.

The Court has kept abreast of the Plaintiffs' enforcement

efforts and Microsoft's compliance efforts through the myriad Status Reports filed and status conferences held over the past five years. In order to place the Moving States' motions in context, the Court briefly summarizes the major developments over the past five years. The Court first addresses those related to provisions of the Final Judgments other than § III.E, before turning to those connected with § III.E. As detailed below, Section III.E has, over time, become the focus of the parties' and the Court's attention, as well as the source of the most ongoing compliance issues.

*13 At the outset, the Court commends the members of the TC as well as the California Group's technical expert, Mr. Craig Hunt, who has worked alongside the TC in many of its compliance efforts related to Section III.E. In the Court's view, the TC has truly become one of the most successful aspects of the Final Judgments, because it has been invaluable in facilitating the Plaintiffs' enforcement efforts. [FN25] As the Court noted when the Final Judgments were entered, the instant case is an "unusually complex" one, *Settling States Opinion, 231 F.Supp.2d at 258* (incorporating *Tunney Act Opinion* ), and the TC has provided the Plaintiffs with crucial technical expertise by providing advice and evaluating Microsoft's compliance with the Final Judgments. The TC has gone far beyond the simple "monitoring" with which it was tasked in the Settling States' Final Judgment, *see* Settling States' Final Judgment, § IV.B.8.a, to providing testing, feedback, and critiques that have proved critical to the Plaintiffs' efforts to maximize the full potential of the Final Judgments' remedies.

> FN25. As noted above, because the Litigating States opposed the creation of a technical committee, their Final Judgment included only a Compliance Officer. Over time, however, the Litigating States recognized the beneficial role the TC played in the Settling States' enforcement efforts. *See* 9/11/07 Status Conference Hrg. Tr. at 38:14-39:7. In addition, as Section III.E emerged as the main area of compliance-related

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                              Page 15
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

issues, the Litigating States retained their own expert on communications protocols and technical documentation standards, Mr. Craig Hunt. *See* 7/9/04 Joint Status Report. Mr. Hunt has since worked alongside the TC, and participated in its activities on behalf of the Litigating States. Practically speaking, then, the TC's activities have redounded to the benefit of all of the Plaintiffs, not only the Settling States. Moreover, when the Court refers to the TC henceforth, it intends that term to include Mr. Hunt.

The TC's expertise has allowed Plaintiffs to reap another, undoubtedly significant benefit from the Final Judgments: beginning in the Summer of 2004, "Plaintiffs, with the assistance of the TC, [began] discussions with Microsoft concerning the successor operating system to Windows XP," which was eventually released as Windows Vista. 7/9/04 JSR at 7. Plaintiffs focused on changes in Vista that might implicate Sections III.C and III.H of the Final Judgments, reviewed materials supplied by Microsoft, discussed their concerns with Microsoft, and were actually able to effect changes to Vista in advance of its release, particularly with respect to the methods for setting default middleware. *See generally id.;* 10/8/04 JSR; 10/19/05 JSR at 8-9. Throughout that process, the TC developed a number of testing tools that middleware ISVs used to ensure "Vista-readiness" prior to the shipment of Windows Vista. 10/19/05 JSR at 9-10; 11/21/06 JSR at 5-6; 3/6/07 JSR at 6-7. In addition to their oversight efforts related to Vista, Plaintiffs were also able to "stud[y] the new search feature in Internet Explorer 7 and discuss[ ] its implications with Microsoft months before it was included in the beta versions released to consumers." 5/12/06 JSR at 13.

The Court also notes that the enforcement and voluntary dispute resolution mechanisms of the Final Judgments have been a resounding success. Over the past five years, a variety of complaints have been brought to the parties' attention by third parties, and the parties themselves have also identified areas of concern. Through discussions with Microsoft and the TC, the Plaintiffs have determined which issues fall within the scope of the Final Judgments and whether those issues raise concerns as to Microsoft's compliance. Where Plaintiffs have identified a compliance-related concern, they have engaged in constructive negotiations with Microsoft and have--based largely upon the TC's ability to evaluate the technical significance of issues and advise the Plaintiffs and Microsoft as to potential solutions--been able to resolve them through cooperation rather than litigation. The Court has always encouraged the parties to negotiate solutions and avoid litigation, and continues to do so. Indeed, the Court commends Microsoft for being open to concerns raised by the TC and third parties, being willing to negotiate workable solutions rather than becoming intransigent, and thus seeking to avoid costly and complex litigation.

*14 Nevertheless, the Court would be remiss in suggesting that the compliance and enforcement road has been altogether smooth, even outside the context of Section III.E's implementation. It is certainly true that, as Microsoft stresses, it has never been found to be out of compliance with the Expiring Provisions of the Final Judgments. *See* Memorandum of Points and Authorities of Microsoft Corporation in Opposition to Certain Plaintiff States' Motions to Extend the Final Judgments (hereinafter "MS Opp'n") at 11. However, it is also true that, over the years, compliance-related issues have arisen regarding virtually every aspect of Section III that the Plaintiffs have determined merited further investigation and warranted concern with Microsoft's compliance efforts. *See* 7/3/03 JSR at 4-6 (describing ongoing questions related to § III.B compliance); 2/8/06 JSR at 10 (describing complaint under § III.C regarding OEM ability to customize first-boot experience); 6/19/07 JSR at 7-8 (describing reports alleging failure to disclose APIs as required by § III.D); 10/8/04 JSR at 7-8, 11 (describing concern pursuant to § III.F regarding Microsoft contracts for .NET Framework); 10/19/05 JSR (describing issue under § III.G regarding draft specification for promotional CD that included exclusivity requirement); 10/17/03 JSR at 5-6

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 16

(describing § III.H issue relating to automatic invocation of IE). In each instance, the parties have-- with the assistance of the TC--been able to negotiate a solution that has been acceptable to the parties and the Court. These negotiated solutions have obviated the need for compliance-related litigation and have precluded any possible Court findings of non-compliance.

### D. The Section III.E Saga

By far, the most significant focus of attention and criticism by the parties and the Court over the past five years has been Section III.E of the Final Judgments, which the Court once described as "the *most* forward-looking provision in [its] remedy." *Remedy Opinion,* 224 F.Supp.2d at 173. Despite its originally forward-looking nature, no one involved--including the United States--disputes that more than five years after the entry of the Final Judgments, Section III.E still has yet to be fully implemented. The Court briefly recounts the tortured history that has led to this point.

Section III.E of the Final Judgments requires Microsoft to license "on reasonable and non-discriminatory terms (consistent with Section III.I) any Communications Protocol" that is "(i) implemented in a Windows Operating System Product installed on a client computer, and (ii) used to interoperate, or communicate, natively ... with a Microsoft server operating system product." Final Judgments, § III.E. As the California Movants stress, Microsoft was aware that it would be required to produce Communications Protocols and corresponding technical documentation at least as early as November 2001, when it entered into the consent decree with the United States and the Settling States. CA Mem. at 6. That consent decree obligated Microsoft to make Communications Protocols available starting nine months after the consent decree was submitted to the Court, or in August 2002, while the Litigating States' Final Judgment required Microsoft to make Communications Protocols available three months after entry of that Final Judgment, or in

February 2003. Final Judgments, § III.E.

*15 When the Court held its first compliance-related Status Conference in this case on July 24, 2003, Microsoft represented that it had "identified more than 100 Communications Protocols encompassed by Section III.E" and developed a program, known as the Microsoft Communications Protocol Program ("MCPP"), under which third parties could license all of the Communications Protocols or a subset thereof. 7/3/03 JSR at 21. Microsoft also advised the Court that it had developed more than 5,000 pages of technical documentation, "produced by approximately ten technical writers working full-time for nine months." *Id.* Microsoft began offering licenses under the MCPP in August 2002 and, as of July 2003, four ISVs had signed license agreements with Microsoft. *Id.* at 22.

Plaintiffs' initial § III.E enforcement efforts focused on ensuring that MCPP licenses were offered on reasonable and non-discriminatory terms, as required by §§ III.E and III.I of the Final Judgments. *See id.* at 6-10. Plaintiffs continued to investigate issues relating to the terms, royalty rates, and structure of the licenses offered under the MCPP into early 2004. *See generally* 10/17/03 JSR. Throughout that period, Plaintiffs--including the United States, the New York Group, and the California Group--stressed that the delay in Section III.E's implementation might undermine its "forward-looking" nature. *See* 7/3/03 JSR at 9. In response, in October 2003 Microsoft reported that it had decided to allow licensees to extend the term of their licenses for an additional five years at any point during the license period. 10/17/03 JSR at 8-9. Still, in January 2004, Plaintiffs jointly advised the Court that, after conducting interviews with most of the then-current MCPP licensees as well as a number of prospective licensees, they were "concerned that the current licensing program has thus far fallen short of satisfying fully the goals of Section III.E." 1/16/04 JSR at 2-3.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 17

Also in January 2004, Plaintiffs reported to the Court that they had received a complaint regarding the sufficiency and completeness of the technical documentation provided by Microsoft to MCPP licensees, which the TC was investigating. *Id.* at 9. Plaintiffs reported a second complaint in this vein in April 2004, and informed the Court that the TC had "begun an investigation into this issue." 4/14/04 JSR at 4-5. "As a result of this investigation and other work performed by the Plaintiffs, [Plaintiffs] concluded that the technical documentation nee[ded] substantial revision in order to ensure that it [would be] usable by licensees across a broad range of implementations as envisioned by Section III.E." *Id.* at 5. Thus began the saga of the technical documentation, which continues unresolved to this day.

During the rest of 2004, the parties worked towards collectively developing a standard for completeness to which the technical documentation would be held, with the expectation that the project would be completed by the fall of 2004. 7/9/04 JSR at 5-6. All Plaintiffs--the state plaintiffs as well as the United States--continued to voice their concern that the delayed implementation of Section III.E should not be allowed to "reduce the useful life of the licensed technology to current and potential licensees." 4/14/04 JSR at 5. In response, Microsoft revised the MCPP license to provide for a two-year extension for the availability of the MCPP (until November 2009), and committed to allowing licensees to use the licensed protocols to develop products in perpetuity. 7/9/04 JSR at 4-5.

*16 Microsoft released its first major revision of the technical documentation in early December 2004. 1/25/05 JSR at 3. While Plaintiffs believed that it represented a "significant improvement" over the previous documentation, they all remained concerned that further work was needed to ensure its completeness, usability, and accuracy. *Id.* To that end, the parties agreed to a comprehensive plan designed to remedy the deficiencies, which they expected to be completed in one year, i.e., by early 2006. *Id.* at 3-5. That plan involved two efforts, one

to be undertaken by the TC, the other by Microsoft. *Id.* The TC's portion of the plan soon began to make extensive progress, 6/1/05 JSR at 2-3, while Microsoft's portion of the plan--dubbed "Troika"--became mired in difficulties, *see generally id.* By October 2005, the parties reported that under a "best-case" scenario, the Troika project would be completed in October 2006, ten months later than originally projected, and Microsoft admitted "[q]uite frankly," that it "did not fully appreciate the scale, complexity, cost, and duration of the project," and "overestimated the capability of existing technologies to meet the requirements of the effort." 10/19/05 JSR at 5-6, 14.

As the Troika-related problems emerged, the Plaintiffs--particularly those within the California Group--began to question whether Microsoft was devoting the resources necessary to ensure that Section III.E resulted in complete, accurate, and useable technical documentation. *See* 10/26/05 Status Hrg. Tr. at 20:7-26:19 (expressing the California Group's opinion that "[e]ssentially, Microsoft hasn't done what it promised to do" and stressing the significance of the technical documentation within the Final Judgments' overall remedial scheme). The Court likewise stressed the significance of accurate and complete technical documentation during various status conferences, admonishing Microsoft that "if there is an issue of resources, then put them in, whatever it takes to make this work." *Id.* at 33:11-14.

In the Fall of 2005, the parties and the Court focused their attention on the Troika project, and the parties developed another four-part plan to address the project delays. 11/18/05 JSR at 2. The parties' plan called upon the TC to assume responsibility for an increasingly significant portion of the work that Microsoft had previously committed to completing, while Microsoft agreed to "increase the resources dedicated to responding to the TC and to making resulting changes to the technical documentation" in response to Technical Documentation Issues ("TDIs") identified by the TC. *Id.* at 2-8. Under the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                     Page 18
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

parties' plan, Microsoft was to respond to TDIs within certain time frames, depending upon their severity, but by January 2006, Plaintiffs reported that Microsoft had fallen significantly behind in meeting those guidelines and that the number of outstanding TDIs was mounting. Pls' 1/23/06 Resp. to Microsoft Suppl. Status Report. All Plaintiffs jointly condemned this slippage, advising the Court that "Microsoft need[ed] to dramatically increase the resources devoted to responding to technical documentation issues in order to get its performance under the [guidelines] back on track." *Id.* at 2.

**\*17** Based on all Plaintiffs' sharp criticism of Microsoft, "the frequent delays with the Troika project, [and] Microsoft's newfound disregard for the [TDI guidelines]," during its opening comments at the February 8, 2006 status conference, the Court voiced its "concern[ ] that Microsoft was neglecting a portion of its compliance obligations and promises." 2/8/06 Status Conf. Tr. at 6:5-10. Throughout that status conference, the Court stressed the need "to make sure that ... Microsoft [was] still carrying their end ... in terms of making sure this actually works," particularly given the TC's continued assumption of responsibilities originally undertaken by Microsoft. 2/14/06 Status Hrg. Tr. at 17:11-18 (noting that "if [the TC's] been able to do it, I don't understand why Microsoft hasn't been able to"). In addition, the Plaintiffs--again led by the California Group--denounced what they viewed as a "lack of commitment and seriousness with which Microsoft takes its obligations here." *Id.* at 35:14- 41:15. At that point in time, however, the Court's concerns were assuaged in part by Microsoft's announcement of a "new significant step to facilitate its communications protocol licensing, namely Microsoft's plan to license the Windows source code at no extra cost to the licensees and to provide them with training." *Id.* at 6:22-7:5. As a result of this development, the Plaintiffs determined that rather than address TDIs to Microsoft, the TC would attempt to resolve them itself using the Windows source code, and would only bring concerns to Microsoft's attention if it found itself unable to do so. 2/8/06 JSR at 4-7

Unfortunately, what had seemed so promising in February 2006 again proved ineffective. Rather than declining, the number of outstanding TDIs continued to rise, and Microsoft remained unable to promptly resolve open TDIs identified by the TC. 5/12/06 JSR at 3-5. By May 2006, the parties' efforts towards implementing Section III.E reached a crisis point, as the delays stretched on and it became increasingly obvious that the available technical documentation was far from the type of quality product envisioned by Section III.E. *Id.* In response to mounting pressure from the Court and all of the Plaintiffs, Microsoft finally acknowledged that a new approach to the technical documentation was necessary, along with more resources. *Id.* at 4. As a result, Microsoft brought in a high-level executive, Robert Muglia, Senior Vice President of Microsoft's Server and Tools Business, to analyze the lack of success in implementing Section III.E and to "determine the most efficient method for producing technical documentation that is of a sufficiently high quality to assure Plaintiffs and the TC that Microsoft is meeting its obligations to licensees." *Id.* at 6. Mr. Muglia "and his team ultimately concluded that the current process of trying to fix issues identified by the TC one at a time was unlikely, in the foreseeable future, to result in [satisfactory] documentation." *Id.*

**\*18** Microsoft therefore determined that "a broader 'reset' would be much more effective and efficient, meaning that Microsoft [would] rewrite substantial portions of the documentation," *id.,* in order to "describe the protocols in a context in which they [would] be implemented by people [with] limited knowledge of Windows," 5/17/06 Status Hrg. Tr. at 39:9-18. At the May 17, 2006 status conference, which focused on the RESET plan, Microsoft admitted that prior to the RESET plan, it "didn't have the exact right resources, [and] didn't have the right process in place." *Id.* at 39:3-8. Microsoft also acknowledged that it added significant resources to the technical documentation project in early 2006. *Id.* Indeed, while Microsoft originally devoted only ten employees to the technical documentation project, *see* 7/3/03 JSR at 22, by May 2006, over 210 employees were involved in Microsoft's technical documentation efforts, including 150 product

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 19

team engineers and program managers. 5/12/06 JSR at 19-20. [FN26]

> FN26. The insufficiency of the resources Microsoft originally devoted to technical documentation project is clear from Microsoft's latest Supplemental Status Report, which states that "[a]pproximately 630 Microsoft employees and contingent staff are involved in work on the MCPP technical documentation," along with Microsoft's protocol documentation efforts for the European Commission, and that "approximately 320 product team engineers and program managers are actively involved in the creation and review of the technical content of the [MCPP] documentation." 1/15/08 MS Suppl. Report at 6.

The RESET plan undertaken in May 2006 was accompanied by the parties' joint request that the Court extend Section III.E of the Final Judgment and certain related sections until November 12, 2009 to "ensure that all necessary work on the documentation [could] be completed and that current and future MCPP licensees [would] have a substantial period of time to make use of the revised documentation." *Id.* at 10-13; *see also* Joint Motions to Modify the Final Judgments. The parties' agreed-upon extension, which the Court approved in September 2006, extended Sections I, II, III.E, III.F.1, III.F.3, III.I, III.J, IV, V, VI, VII, and VIII of the Final Judgments until November 12, 2009, and incorporated an agreement between Plaintiffs and Microsoft "that Plaintiffs have the right in their sole discretion to request an additional three-year extension of the extended portions of the decree until November 12, 2012, and that Microsoft will not oppose any such request." NY/MS Joint Mot. to Modify the Final Judgment at 2-3. Along with the extension, Microsoft agreed that "even if the Final Judgments expire[d] completely in November 2009, it [would] continue, through November 11, 2012, to make the protocols included in the MCPP available for license on reasonable and non-discriminatory terms with a term of

at least five years," such that "industry members [would] effectively have the ability to license protocols through at least November 11, 2017." 5/12/06 JSR at 10.

Since May 2006, the parties have diligently worked toward implementing the RESET plan. The TC has found the rewritten documentation emerging as a result of the RESET plan to be a vast improvement over the previous two forms of technical documentation created by Microsoft, and the Plaintiffs have reported that they are encouraged by this progress. *See generally* 8/30/06 JSR and 11/21/06 JSR. In addition, as of the parties' last Joint Status Report, a total of 41 companies were licensing Communications Protocols pursuant to § III.E of the Final Judgments and 13 licensees were shipping products under the MCPP. 8/31/07 JSR at 6. However, even the RESET plan's path has not been completely without pitfalls. Most significantly, in February 2007, Microsoft reported that it had conducted an internal audit and "determined that there [were] a number of protocols that [had to] be documented in addition to those [Microsoft] originally planned" to document. 3/5/07 JSR at 5. Microsoft projected that the overall time line for the RESET plan would have to be delayed by two months to allow for documentation of those protocols. *Id.*

*19 Again, Plaintiffs--the United States along with the state plaintiffs-- voiced their concern about the delay in Section III.E's full implementation. At the March 12, 2007 Status Conference, the parties reported another agreement designed to address Plaintiffs' continuing problems with the delay. *See generally id.;* 3/12/07 Status Hrg. Tr. This plan involved two "audits" of Microsoft's internal audit: one third-party consulting firm would review Microsoft's audit process, while a second consulting firm would attempt to develop programmatic methods for searching the Windows source code to identify additional communications protocols that should have been considered for inclusion in the MCPP. *See generally* 3/5/07 JSR; 3/12/07 Status Hrg. Tr. Finally, the parties negotiated a possible extension of the royalty holiday in place for MCPP licenses until the Plaintiffs deemed the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

technical documentation "substantially complete." *See generally* 3/5/07 JSR; 3/12/07 Status Hrg. Tr.

As of the last status conference held in this case on September 11, 2007, Microsoft had released all initial versions of the rewritten technical documentation to the TC for testing, but the TC and Plaintiffs were far from concluding that the documentation was "substantially complete." 8/31/07 JSR. The parties and the TC continue to conduct intensive testing of the technical documentation, and to review the corresponding overview/reference materials that Microsoft makes available to licensees. *Id.* In addition, while the first consulting firm's audit of Microsoft's internal audit is complete, the second consulting firm's efforts are ongoing. *Id.* at 4. Further, in its January 15, 2008 Supplemental Status Report, Microsoft reported that it is still in discussions with the TC regarding the overview/reference materials, and that testing of the rewritten documentation continues, with over 900 TDIs outstanding against the new documentation. 1/15/08 MS Suppl. Report at 2-5.

Based on the foregoing history, it is abundantly clear that more than five years after the Communications Protocols and related technical documentation were required to be available to licensees under § III.E, the documentation envisioned by that Section is still not available to licensees in a complete, useable, and certifiably accurate form. Although the technical documentation project is complex and novel, it is clear, at least to the Court, that Microsoft is culpable for this inexcusable delay. To be sure, the delay has developed in stages, and at each step Microsoft commendably has been willing to work with the Plaintiffs and the TC to address their issues and identify a means of resolving them. The parties' negotiations, in turn, have achieved a worthy goal by obviating the need for compliance-related litigation. [FN27] Quite simply, because the parties have negotiated solutions to each of the myriad issues arising under Section III.E, the Court has never been asked to find Microsoft out of compliance with Section III.E, and has not deemed a *sua sponte* finding of non-compliance necessary or fruitful in

achieving compliance.

FN27. Of course, if the parties had not been able to negotiate the RESET plan when the Section III.E issues reached a crisis point, Plaintiffs would have been entitled--pursuant to Section V.B of the Final Judgments-- to commence an enforcement proceeding and, in the event that "the Court found that Microsoft ha[d] engaged in a pattern of willful and systematic violations," to "apply to the Court for a one-time extension of th[e] Final Judgment[s] of up to two years," i.e., until November 12, 2009. *See* Final Judgments, § V.B.

*20 Nevertheless, practically speaking, Microsoft has never complied with Section III.E. Furthermore, Microsoft did not proactively bring the problems with its technical documentation to the Court's attention. Instead, the majority of the issues relating to Section III.E that have arisen over the years have been identified by the Plaintiffs, through the efforts of the TC. While Microsoft eventually proposed the RESET plan, and has since cooperated in carrying it out, it did so in the face of mounting pressure from all Plaintiffs and the Court. In addition, there is no reason why the type of documentation finally being created under the RESET plan could not have been created from the outset if the necessary resources had been devoted. Clearly, the documentation finally emerging from the RESET plan is not the result of any changes in the relevant market or technological advances over the past five years; rather, it might have been developed earlier with the right resources and approach. Microsoft essentially admitted as much during the May 17, 2006 status conference when it acknowledged that it "didn't have the exact right resources [or] the right process in place" prior to the RESET plan. 5/17/06 Status Hrg. Tr. at 39:3-8; *see also id.* at 29:19-30:13 (California Group comment that the "essence of the problem seems to be ... insufficient planning at the outset of the [technical documentation] project."). [FN28] While the Court is cognizant that Section III.E required Microsoft to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                              Page 21
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

document protocols that had never before been documented (as opposed to § III.D, which only required Microsoft to expand its documentation of APIs), *see id.* at 37:6-38:19, Microsoft should have recognized the problems with its documentation attempts earlier, and directed the appropriate resources towards creating the necessary documentation.

> FN28. Again, the Court notes that while Microsoft now reports that "[a]pproximately 630 Microsoft employees and contingent staff are involved in work on the MCPP technical documentation," with "approximately 320 product team engineers and program managers [ ] actively involved in the creation and review of the technical content of the documentation," 1/15/08 MS Suppl. Report at 6, it originally devoted only ten employees to the project of creating the necessary technical documentation. *See* 7/3/03 JSR at 22. Even as of Microsoft's March 15, 2006 Supplemental Status Report-- filed more than three years after the technical documentation was originally anticipated to be released--a total of approximately 83 Microsoft employees worked either full- or part-time on the documentation effort. 3/15/06 MS Suppl. Report at 9-10.

In considering the Moving States' motions to extend the Final Judgments, the Court must evaluate the facts as they are at this point in time. To that end, while the Court certainly commends Microsoft for its willingness to cooperate with Plaintiffs and negotiate solutions throughout the past five years, the fact remains that when the Final Judgments were entered, the parties and the Court anticipated that the documentation required under Section III.E would be available, at the latest, by February 2003. Instead, almost five years later, Section III.E, which was meant to be "the *most* forward-looking provision" of the Final Judgment, *Remedy Opinion,* 224 F.Supp.2d at 173, has yet to be fully implemented. At least as significantly, because of the delay, the various provisions

of the Final Judgments have never been given an opportunity to operate together as the Court and the parties envisioned when the Final Judgments were entered. *See Settling States Opinion,* 231 F.Supp.2d at 259 ("Far from an amalgam of scattered rules and regulations pieced and patched together to restrict Microsoft's anticompetitive business conduct, the [Final Judgment] adopts a clear and consistent philosophy such that the provisions form a tightly woven fabric.") (incorporating *Tunney Act Opinion); see also* United States' Resp. to Public Comments, Docket No. [699], at 205 ¶ 413 ("it is the overall impact of the various decree provisions working together over the course of the five-year term that will restore competitive conditions in the market.").

*E. The Moving States' Motions*

*21 At the March 13, 2007 status conference in the consolidated cases, the California Group reported to the Court that it intended to undertake an effort to survey MCPP licensees regarding their experiences with, and the impact of, the Final Judgments. 3/13/07 Status Hrg. Tr. at 31:3-32:17. Also during that status conference, the Court requested that all of the Plaintiffs begin to review the various sections of the Final Judgments and raise at the next status conference any issues that might need attention before the Final Judgments' then-impending expiration in November 2007. *Id.* at 67:10-68:21. The California Group presented an interim report on the results of its survey in the June 19, 2007 Joint Status Report, and during the June 26, 2007 status conference, the parties expressed their intent to provide the Court with reports reflecting their respective positions on the overall effectiveness of the Final Judgments. *See* 6/19/07 JSR at 11-15. On August 30, 2007, the Court received three such reports: the California Group filed a Report on Remedial Effectiveness; the New York Group and the United States filed a Joint Review of the Final Judgments; and Microsoft filed a Report Concerning the Final Judgments.

During the September 11, 2007 status conference, the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 22

California Group announced its intent to file a motion asking the Court to extend all provisions of its Final Judgment, other than § III.B, through November 2012. *See generally* 9/11/07 Status Hrg. Tr. at 27:3-29:10; 36:22-56:13. At that same status conference, the Court indicated that it was reserving all comments on the effectiveness of the Final Judgments until the expected November 2007 expiration of many provisions, but made some observations regarding the "background against which the final judgment was entered," and indicated that any request to extend the Final Judgments would have to be "for an identifiable purpose." *Id.* at 31:5-36:21.

The California Movants filed their Motion to Extend on October 16, 2007, and on October 18, 2007, the New York Movants filed their Motion to Alter Judgment, joining the California Movants' request for an extension. On October 19, 2007, the United States filed a Report indicating that they would not move to extend the Final Judgment in *United States v. Microsoft.* Accordingly, the Final Judgment in *United States v. Microsoft* lapsed on November 12, 2007. On October 23, 2007, the Court held a telephone conference on the record with all parties regarding the need for thorough briefing on the Moving States' motions. On October 30, 2007, the New York Group, the California Group, and Microsoft filed--and the Court granted--a Joint Motion to extend the Expiring Provisions of the Final Judgments "only for so long as necessary (but no longer than January, 31, 2008) to allow" the Court to properly consider the pending motions to extend. Pursuant to a schedule agreed upon by the parties and the Court, Microsoft filed its Opposition to the Moving States' motions on November 6, 2007, the United States filed a Motion for Leave to Participate as *Amicus Curiae* and a proposed *amicus* brief on November 9, 2007, and the Moving States filed a joint Reply on November 16, 2007.

*22 Having reviewed all of the foregoing filings, on December 10, 2007, the Court issued an Order directing the Moving States and Microsoft to file additional briefing on a "very targeted" issue regarding the relation between Section III.E and the other provisions of the Final Judgments. As ordered, the Moving States filed their additional Memorandum on December 18, 2007, and Microsoft filed its Opposition thereto on December 28, 2007. Finally, on January 8, 2008, the Court ordered the Moving States to file a Reply to Microsoft's Opposition, addressing a list of pointed questions. The Moving States did so on January 11, 2008. As such, the Moving States' motions to extend finally are fully ripe for review.

## II: LEGAL STANDARD

The Moving States and Microsoft disagree over the appropriate legal standard to apply to the Moving States' motions to extend. Before turning to that issue, however, the Court addresses a more fundamental one: the source of the Court's authority to modify the Final Judgments as the Moving States request. The Court concludes that its authority to make such a modification derives from two independent sources: (1) the Court's retained jurisdiction under the Final Judgments; and (2) the Court's authority to modify the terms of a decree, which is largely embodied in Federal Rule of Civil Procedure 60(b).

As this Court noted in the *Settling States Opinion:*

The D.C. Circuit [has] made clear that "district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order." *Pigford v. Veneman,* 292 F.3d 918, 924 (D.C.Cir.2002). The *Pigford [v. Veneman]* court further explained that the district court's power over a consent decree, reflecting the hybrid between judicial order and contract, is limited to two sources. A district court may interpret and enforce a decree to the extent authorized by the decree itself or by the related order. *Id.* at 923. Additionally, a district court may modify a decree pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure. *Id.*

*Settling States Opinion,* 231 F.Supp.2d at 257-58 (incorporating *Tunney Act Opinion* ). It was for precisely this reason that the Court conditioned its approval of the consent decrees upon the "Court's retention of jurisdiction

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 23
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

[being] clearly articulated and broadly drawn." *Id.* at 258.

The resulting "broadly drawn" retention of jurisdiction clause vests the Court with authority to modify any provision of the Final Judgments upon application by any party. Final Judgments, § VII. [FN29] Indeed, the retention of jurisdiction provisions of the Final Judgments are strikingly different from the provision in *Pigford v. Veneman,* which was "limited by its plain language ... to situations involving decree violations." 292 F.3d at 924. Significantly, the Final Judgments specifically provide that the Final Judgments will expire *unless* the Court grants an extension, and thus clearly contemplates the Court's authority to do so. Final Judgments, § V.A; *Cf. Stewart v. O'Neill,* 225 F.Supp.2d 6, 8-9 (D.D.C.2002) (clause provided for court to retain jurisdiction over an action for a set period of time for enforcement purposes, with the agreement to expire after that period of time). Above and beyond that authority, the Final Judgments also vest the Court with jurisdiction to "act *sua sponte* to issue further orders or directions, including but not limited to orders or directions relating to the construction or carrying out of this Final Judgment, the enforcement of compliance therewith, the modification thereof, and the punishment of any violation thereof." Final Judgments, § VII.

FN29. Each Final Judgment states that it will expire five years after being entered by the Court "[u]nless this Court grants an extension," Final Judgments, § V.A., and provides that the Court retains jurisdiction to "act *sua sponte* to issue further orders or directions, including but not limited to orders or directions relating to the construction or carrying out of this Final Judgment, the enforcement of compliance therewith, the modification thereof, and the punishment of any violation thereof," as well as "for the purpose of enabling either of the parties ... to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe [the] Final

Judgment, to modify or terminate any of its provisions, to enforce compliance, and to punish violations of its provisions," *id.,* § VII.

*23 Furthermore, the Court notes Microsoft's implicit suggestion that the Court's authority to extend the Final Judgments arises exclusively from § V.B, which allows the Plaintiffs to apply to the Court for a one-time extension of up to two years "[i]n any enforcement proceeding in which the Court has found that Microsoft has engaged in a pattern of willful and systematic violations." *Id.,* § V.B. Plaintiffs do not invoke § V.B in seeking to extend the Final Judgments, nor does the Court. Nevertheless, Microsoft proffers no evidence that § V.B represents the sole avenue for an extension of the Final Judgments, and the Court finds no such limitation in the broad retention of jurisdiction and termination provisions of the Final Judgments. The Court thus concludes that it has the power to modify the Final Judgments pursuant to its express authority retained under the Final Judgments.

The Court may also modify the Final Judgments under its power in "equity to modify a decree of injunctive relief," which the D.C. Circuit has described as "long-established, broad, and flexible." *United States v. Western Electric Co.,* 46 F.3d 1198, 1202 (D.C.Cir.1995) (hereinafter *"Western Electric"* ) (quoting *New York States Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967 (2d Cir.)). The parties agree that it is irrelevant to the exercise of this power whether the decree in question is the result of litigation or consent. *See United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent.... The result is all one whether the decree has been entered after litigation or by consent."); *see also Western Electric,* 46 F.3d at 1205 ("A consent decree, in other words, is subject to modification to the same extent as if it had been entered as a final judgment after a full trial."). The Moving States and Microsoft do, however, disagree as to the standard the Court should apply in exercising this power.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                          Page 24
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

The Moving States argue that the Court "is granted broad discretion to modify a decree in order to accomplish its intended result." CA Mem. at 7. In so arguing, they rely upon *Western Electric,* in which the D.C. Circuit stated that "[a]t the request of the party who sought the equitable relief, a court may tighten the decree in order to accomplish its intended result," 46 F.3d at 1202 (citing *United Shoe,* 391 U.S. at 252), as well as *United Shoe* itself, in which the Supreme Court concluded that an antitrust decree could be modified at the request of a government enforcer where it had not "after 10 years, achieved its 'principal objects,' " 391 U.S. at 251-52. The Moving States also cite to *Chrysler Corporation v. United States,* 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942), in which the Supreme Court affirmed the extension of an antitrust consent decree and stated that the relevant "test to be applied ... is whether the change served to effectuate or to thwart the basic purpose of the original consent decree." *Id.* at 562. According to the Moving States, the extension they seek is necessary to give the Final Judgments "an opportunity to achieve the objectives that were endorsed by the Court of Appeals but have not yet been realized." CA Mem. at 3. In contrast, Microsoft argues that, even if the Court applies a standard derived from *United Shoe,* the Moving States fail to carry their burden because they cannot demonstrate that the Final Judgments have not achieved their "principal objects." MS Opp'n at 7-8.

*24 For its part, Microsoft asserts that the "relevant standard for modifying decrees was articulated by the United States Supreme Court in *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), and subsequently applied by the D.C. Circuit in *Pigford v. Veneman.* "MS Opp'n at 6. Under that standard, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo,* 502 U.S. at 383. "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous,"

"when a decree proves to be unworkable because of unforeseen obstacles," "or when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384-85 (citations omitted). For purposes of determining whether "unforeseen obstacles" amount to "changed circumstances," *"Rufo's* modification standard does not require absolute unforseeability. It is enough that the parties did not actually contemplate the changed circumstances." *Evans v. Williams,* 206 F.3d 1292, 1298 (D.C.Cir.2000). Furthermore, "[i]f the moving party meets [the changed circumstances] standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances." *Rufo,* 502 U.S. at 383.

To be sure, *Rufo* is binding law, which the D.C. Circuit applied to motions to modify consent decrees in *Western Electric* and *Pigford v. Veneman, see generally* 46 F.3d 1198 and 292 F.3d 918, and which the Supreme Court has indicated is equally applicable to a motion to modify an injunction, *see Agostini v. Felton,* 521 U.S. 203, 215, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). Still, as Judge Gladys Kessler recognized in *Cook v. Billington,* it is not entirely clear whether *Rufo* actually applies to the situation at issue in the instant case. *Cook v. Billington,* No. Civ. A. 82-0400(GK), 2003 WL 24868169, at *2 (D.D.C. Sept.8, 2003). Significantly, in *Western Electric,* the D.C. Circuit differentiated between requests made by "the party who sought the equitable relief," which it suggested are governed by the *United Shoe* standard, and requests made by the "enjoined party," which it stated "now come within Rule 60(b)(5)" and are governed by the *Rufo* standard. *Western Electric,* 46 F.3d at 1202; *Cook,* 2003 WL 24868169, at * 2; *see also Holland v. New Jersey Dep't of Corrections,* 246 F.3d 267, 284 (3d Cir.2001) ("*Rufo,* however, set the standard for cases in which the defendant seeks to have a decree modified, while in the case at bar it is the plaintiffs seeking modification. The Supreme Court has set a more rigorous standard for defendants seeking modification ....") (citing *United Shoe,* 391 U.S. at 249); *United States v. Local 560,* 974 F.2d 315, 331-32 & n. 9 (3d Cir.1992) (same). Focusing on this distinction, the Moving States maintain that *United Shoe* provides the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

proper standard where, as here "the government enforcers, as proponents of injunctive relief--rather than the enjoined defendant--seek modification to protect an antitrust judgment's effectiveness in restoring competition." Moving States' Reply at 11.

**\*25** The Moving States are correct that the instant situation is qualitatively different from one in which an enjoined party seeks relief from a judgment, and that the Supreme Court cases discussed above suggest that a government enforcer may move to modify a consent decree in order to "accomplish its intended result." _United Shoe_, 391 U.S. at 252. Moreover, Federal Rule of Civil Procedure 60(b)(5), which permits the Court on "just terms," to "relieve a party or its legal representative from a final judgment, order or proceeding ... [if] applying it prospectively is no longer equitable," Fed.R.Civ.P. 60(b)(5), does not inherently seem to apply when the beneficiary of a decree seeks to extend the decree, rather than relieve itself of obligations.

Nevertheless, the Court is cognizant of the _Western Electric_ court's acknowledgment that Rule 60(b)(5) "has been described as 'little more than a codification of the universally recognized principle that a court has continuing power to modify or vacate a final decree.' " 46 F.3d at 1202 (quoting 11 Charles A. Wright, et al., _Federal Practice and Procedure_ § 2961 (1994)). Similarly, in _Pigford v. Johanns_, the D.C. Circuit explained that "[a]s a practical matter, it makes little difference whether the district court [resolves a motion to modify a consent order] under Rule 60 or under its equitable authority as the standard for each is substantially the same." _Pigford v. Johanns_, 416 F.3d 12, 16 (D.C.Cir.2005). Significantly, although _Rufo_ involved institutional reform litigation, the D.C. Circuit extended its application to antitrust actions in _Western Electric. See_ 46 F.3d at 1202- 03;_see also United States v. Eastman Kodak Co._, 63 F.3d 95, 101-02 (2d Cir.1995) (concluding that _Rufo_ and _United Shoe_ both bear upon a motion to terminate an antitrust decree). And, subsequent to _Western Electric_, the D.C. Circuit applied the _Rufo_ standard in

affirming a district court's ability to extend consent decree deadlines upon a plaintiff's request. _See Pigford v. Veneman_, 292 F.3d at 925;_see also Cook_, 2003 WL 24868169, at \*2.

In addition, courts in other circuits have recently applied _Rufo_ to cases in which the beneficiary of a consent decree sought to extend the decree's term or sought other modifications to consent decrees. See _Thompson v. U.S. Dep't of Hous. & Urban Dev._, 404 F.3d 821, 827-29 (4th Cir.2005) (defendant's gross failure to fulfill its obligations under a consent decree constituted a "change of circumstance" sufficient to warrant an extension of the district court's jurisdiction over the decree); _David C. v. Leavitt_, 242 F.3d 1206, 1212-13 (10th Cir.2001) (district court acted appropriately in granting "relief from the four-year Termination Provision by extending the term of the Agreement" "to allow [the defendant] to fulfill the very obligations it voluntarily undertook when it entered into the Agreement"); _see also United States v. Sec. of Hous. and Urban Dev._, 239 F.3d 211, 217-18 (2d Cir.2001) (affirming district court's modification of a consent decree where the defendant's non-compliance rendered the decree "unworkable because of unforseen [sic] obstacles," as well as "detrimental to the public interest."); _Vanguards of Cleveland v. Cleveland_, 23 F.3d 1013, 1019-20 (6th Cir.1994) (affirming extension of consent decree where the expectations underlying the decree had failed to materialize).

**\*26** In light of the foregoing, Microsoft may well be correct in arguing that _Rufo_ applies to the instant case. Ultimately, however, the Court need not resolve this "thorny issue," _Cook_, 2003 WL 24868169, at \*3, because the Court concludes below that the Moving States have met their burden under either _United Shoe_ or _Rufo_. In this regard, the Court notes Microsoft's emphasis that "[m]odification of a decree or judicial order is an 'extraordinary' remedy that is appropriate only 'in very specific circumstances.' " MS Opp'n at 5 (quoting _Cook_, 2003 WL 2486869, at \*3 and _Stewart_, 225 F.Supp.2d at 9). Microsoft is certainly correct that modification

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy

Page 26

Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

requests must be approached "with caution." *Id.* (quoting *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C.Cir.2000)). Microsoft is likewise correct--and the Court is aware--that modification of a judgment is particularly significant where it "allows a party ... to escape commitments voluntarily made and solemnized by a court decree." MS Opp'n at 6 (quoting *Harris Teeter*, 215 F.3d at 35). The parties should be assured that the Court does not undertake its decision regarding the Moving States' motions to extend lightly. To the contrary, the Court has rigorously scrutinized the Moving States' arguments and only concludes that an extension of the Final Judgments is appropriate upon determining that they have carried their burden under both *United Shoe* and *Rufo*.

### III: DISCUSSION

The Moving States' motions seek to extend the Final Judgments until November 12, 2012--five years beyond their original terms--and proffer a variety of arguments that such a lengthy extension is warranted pursuant to either *United Shoe* or *Rufo*. Having carefully reviewed each of the Moving States' arguments in favor of extension, as well as Microsoft's Opposition thereto and the United States' *amicus* brief, the Court concludes that it is appropriate to extend the Expiring Provisions of the Final Judgments until November 12, 2009 due to the unforeseen delay in the implementation of Section III.E of the Final Judgments.

The Court therefore addresses the parties' arguments regarding the Section III.E delay first, before turning to the Moving States' other arguments in favor of extension. Ultimately, the Court rejects the Moving States' other grounds, finding that their arguments are either foreclosed by the previous opinions of the trial court and the appellate court, or that they require premature speculation that does not meet the Moving States' burden under *United Shoe* and/or *Rufo*.

*A. Extension of the Expiring Provisions Through 2009 is*

*Appropriate Due to the Unforeseen Delay in the Implementation of Section III.E*

As detailed above, at the time that the Court entered the Final Judgments, all parties involved anticipated that the technical documentation required under Section III.E would be released, at the latest, by February 2003. Instead, five years later, the rewrite of the technical documentation has only recently been completed, the corresponding overview/reference materials are not available to licensees, and the testing of the revised technical documentation is far from finished. As such, no one can deny that licensees do not yet have access to a set of usable, accurate, and certifiably complete technical documentation, as contemplated by Section III.E and by the Court's various remedy-related opinions.

*27 Nor can it be denied that, as a result of the delay in Section III.E's implementation, the provisions of the Final Judgments have not yet had the chance to operate together as a comprehensive remedy. As the Moving States repeatedly stress, the Final Judgments were constructed as a unitary framework, with the various provisions intended to complement and reinforce each other. *See* CA Mem. at 13-15; NY Mem. at 6 (quoting United States' Resp. to Public Comments ¶ 413 ("it is the overall impact of the various decree provisions working together over the course of the five-year term that will restore competitive conditions in the market.")). Indeed, the Court's *Settling States Opinion* described the proposed consent decree as "[f]ar from an amalgam of scattered rules and regulations pieced and patched together to restrict Microsoft's anticompetitive business conduct," but rather a judgment that "adopts a clear and consistent philosophy such that the provisions form a tightly woven fabric." *Settling States Opinion*, 231 F.Supp.2d at 259 (incorporating *Tunney Act Opinion* ). The Court also clearly acknowledged that Section III.E would not work in a vacuum when it stated that "in the absence of [Section III. E] *and the other prospective provisions* in the [Final Judgment], it is quite possible that the core of the decree would prove prematurely obsolete." *Settling States Opinion*, 231

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

F.Supp.2d at 249 (incorporating *Tunney Act Opinion* ) (emphasis added).

The delay in Section III.E's implementation, which has deprived the provisions of the Final Judgments the chance to operate together as intended, is entirely incongruous with the original expectations of the parties and the Court. As such, the delay, and the resulting impact on the Final Judgments' operation, constitute a "significant change in circumstances" that warrants extending the Expiring Provisions under the *Rufo* standard. *Rufo*, 502 U.S. at 383;*see also Thompson*, 404 F.3d at 827-29 (affirming extension of consent decree because "[g]iven that the [defendants] are so far behind in fulfilling their obligations under the Consent Decree and that many of the obligations of the parties are interrelated, the district court properly recognized the utility of retaining jurisdiction over [a defendant], so as to ensure that the Decree can be efficiently enforced."); *David C.*, 242 F.3d at 1211-12 (granting relief from termination provision of consent decree in order to allow defendant "to fulfill the very obligations it voluntarily undertook when it entered into the [decree]"); *Vanguards of Cleveland*, 23 F.3d at 1019-20 (affirming extension of consent decree where the expectations underlying the decree had failed to materialize).

*Rufo* explains that "[m]odification is [ ] appropriate when a decree proves to be unworkable because of unforeseen obstacles," *id.* at 384, and it is clear that the dramatic delay in the implementation of § III.E was entirely unforeseen by either the Court or the parties when the Final Judgments were entered. *Cf. Sierra Club v. Meiburg*, 296 F.3d 1021, 1033-34 (11th Cir.2002) (reversing district court modification of consent decree where the defendant's failure to carry out its responsibilities was the very reason litigation was instituted in the first place). Indeed, Microsoft does not argue that anyone involved foresaw the delay at the outset, least of all Microsoft, and because the § III.E delay evolved gradually over time it could not have been foreseen at any particular point along the way. As a result of the delay, it also appears that

"enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384. To be sure, a "public interest" test does not apply when parties disagree over a proposed modification to a consent decree. *See* MS Opp'n at 3, U.S. *Amicus* Br. at 7; *see also United States v. Baroid Corp.*, 130 F.Supp.2d 101, 103-04 (D.D.C.2001). However, the D.C. Circuit has concluded that *Rufo's* flexible standard is appropriately applied in antitrust actions precisely because they may implicate the public interest. *Western Electric*, 46 F.3d at 1203. The Court's *Tunney Act Opinion* makes clear that the instant action, in fact, implicates the public interest, and that Section III.E's forward-looking nature is key to protecting that public interest. *See Tunney Act Opinion*, 231 F.Supp.2d at 191-92.

*28 The Court cannot know what impact the technical documentation required by Section III.E will have on the market once it is finally available in a complete, accurate, and useable form. Nevertheless, the Moving States highlight scenarios in which the Expiring Provisions of the Final Judgments might yet play a significant role in helping § III.E achieve its full potential. The Moving States focus on the possibility that an MCPP licensee who writes an application using software hosted on a server will also wish to add "software to the client to take advantage of the functionality that the server provides." Moving States' Resp. to the Court's December 10, 2007 Order (hereinafter "Moving States' Dec. 10 Resp.") at 2-3. The Moving States note, and Microsoft agrees, that certain companies, including Apple, Yahoo!, and Google, are already making use of a product approach that involves both server-side and client-side components, albeit via internet standard protocols rather than Microsoft's proprietary protocols. *Id.* at 3-4; MS Opp'n to Moving States' Dec. 10 Resp. at 2-3, 6-8.

The Moving States specifically suggest that in the future an MCPP licensee could "creat[e] a media server that uses the [MCPP] media protocols to support Microsoft media formats, while also supporting competing formats." Moving States' Dec. 10 Resp. at 4. However, because the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 28
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

"licensee cannot rely on Microsoft's media player to read all of the formats," it "must develop its own player for the Windows client, or find third parties to develop compatible players." *Id.* The Moving States continue to explain how, in that scenario, the Expiring Provisions would support each other in maximizing the procompetitive impact of the server-side application developed using MCPP protocols: § III.A would prevent Microsoft from retaliating against an OEM for distributing the licensee's media player; § III.C would guarantee OEMs the freedom to place the media player on the Windows desktop and in menus; § III.D would give the licensee access to the APIs needed to create the media player; § III .F would protect the licensee if it sought to have a third-party ISV create the media player; § III.G would prevent Microsoft from entering into agreements aimed at excluding the competing media player; and § III.H would allow the end user to set the competing media player as a default. *Id.* at 4-5.

Microsoft correctly points out that the development of the client-side product in the Moving States' examples is "well beyond the scope of Section III. E, ... [and] beyond the scope of the MCPP license itself" because "[o]nce software is added to the client, the server and the application can communicate directly without the need for the proprietary protocols supported in the Windows client." MS Opp'n to Moving States' Dec. 10 Resp. at 5-6 & n. 4. Indeed, because Section III.E only requires the disclosure of Communications Protocols that are "used to interoperate, or communicate, natively (i.e., without the addition of software code to the client operating system product) with a Microsoft server operating system product," the client-side product in the Moving States' examples could not make use of protocols disclosed under Section III.E. *See* Final Judgments, § III.E. But it is nevertheless true that an MCPP licensee could use such protocols to develop a server product, and then seek to maximize the potential of that server product in ways that require the protections of the remaining provisions of Section III. In the face of the Moving States' realistic examples, allowing the other provisions of the Final Judgments to lapse before Section III.E has even been

given a chance to succeed might threaten the ability of the Final Judgments to achieve their full procompetitive impact. Such an outcome would certainly be detrimental to the public interest.

*29 The foregoing discussion also demonstrates that the Section III.E delay has impeded the Final Judgments from "accomplish[ing their] intended result" and "achiev[ing their] principal objects." *United Shoe,* 391 U.S. at 251-52. The D.C. Circuit identified the objectives of the Final Judgments as, *inter alia,* "unfetter[ing] a market from anticompetitive conduct," and "ensur[ing] that there remain no practices likely to result in monopolization in the future." *Microsoft,* 253 F.3d at 103 (quoting *Ford Motor Co.,* 405 U.S. at 577 (1972) and *United Shoe,* 391 U.S. at 250). To that list, this Court's *Remedy Opinion* added "eliminat[ing] the consequences of Microsoft's illegal conduct." 224 F.Supp.2d at 173 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 698, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). This Court further explained that it expected Section III.E would serve the Final Judgments' forward-looking goals by "advancing the ability of non-Microsoft server operating systems to interoperate, or communicate, with the ubiquitous Windows PC client," in order to "further the ability of these non-Microsoft server operating systems to provide a platform which competes with Windows itself." *Id.* at 172-73. As a result of the delay in the availability of technical documentation under Section III.E, it is obvious that the aims of that Section have yet to be completely realized.

Furthermore, the Court's *Remedy Opinion* makes clear that § III.E represents only one avenue towards achieving the Final Judgments' overall goals. Microsoft attempts to obscure this fact, arguing that the § III.E delay does not warrant an extension of the other provisions of Section III because "whereas Sections III.A, C, D, F, G, and H all deal with the treatment of middleware products *running on Windows,* Section III.E was designed to encourage development of platform alternatives *running on servers (i.e.,* not running on Windows)." MS Opp'n at 16. While

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 29

Microsoft is correct that Section III.E focused on servers while the other provisions of Section III focused on client-side applications, its argument demonstrates only that Section III.E took a different approach to achieving the Final Judgments' overall goals. Microsoft's argument thus does not negate the fact that the parties and the Court have always viewed Section III.E as just one means to the Final Judgments' overall ends. *See Settling States Opinion,* 231 F.Supp.2d at 249 ("the protections in § III.E ... not only redress[ ] the specific conduct found to violate the antitrust laws, but [ ] obtain protection which is prospective in its focus ... In the absence of [§ III.E] *and the other prospective provisions* in the [Final Judgment], it is quite possible the core of the decree would prove prematurely obsolete.") (emphasis added); *see also Remedy Opinion,* 224 F.Supp.2d at 173 ("the Court's remedy extends to the most apparent frontier in 'platform' threats to Microsoft's PC operating system monopoly ... [§ III.E] *contributes* to the elimination of the consequences of Microsoft's illegal conduct.") (internal citations omitted, emphasis added).

*30 To the extent that Microsoft's argument suggests that Section III .E was forward-looking in nature, while the other provisions of Section III were solely retroactive, that inference is unsupported by either the text of the Court's remedy-related opinions, or the realities of the Final Judgments. It is certainly the case that the other provisions of Section III aimed to "end Microsoft's restrictions on potentially threatening middleware," but those provisions also sought to "prevent it from hampering similar nascent threats in the future, and restore the competitive conditions created by similar middleware threats." *Massachusetts v. Microsoft,* 373 F.3d at 1243. As such, they were intended to provide necessary protection to programs developed as a result of Section III.E, in the event that such protections became necessary. With the technical documentation still not fully complete, accurate, and usable, it is too early to say whether the other provisions of Section III will yet prove necessary in maximizing the potential of products developed under Section III.E. Based on the Moving States' examples, however, the Court is convinced that this option needs to

be preserved.

Microsoft also argues that the Moving States have not carried their burden of demonstrating that the Section III.E delay necessitates an extension of the other provisions of Section III because they "make no effort to prove why the success of *each* specific provision of the Final Judgments is contingent on the continued operation of *every other* provision." MS Opp'n at 14. According to Microsoft, the Moving States cannot make such a showing because they agreed in the fall of 2006 to extend only Sections I, II, III.F.1, III.F.3, III.I, III.J, IV, V, VI, VII, and VII of the Final Judgments along with Section III.E. *Id.* at 14-15. The United States agrees with Microsoft on this point. *See* U.S. *Amicus* Br. at 9-10. In contrast, the Court agrees with the Moving States that they did not waive their rights to seek additional relief under the Final Judgments by agreeing to extend only certain provisions until November 2009. As the Moving States accurately describe the RESET plan and the corresponding extension of Section III.E, it was a negotiated compromise designed to avoid litigation, without prejudice to any future requests for modification. *See* Moving States' Reply at 20-22. Indeed, the parties' August 2006 motions in support of the extension do not hint at any waiver of Plaintiffs' rights under the Final Judgments. *Id.; see generally* NY/MS Joint Mot. to Modify and CA/MS Joint Mot. to Modify. Instead, the California Group's motion to modify expresses a "hope that the additional time provided Section III.E. under the Modified Final Judgment will result in technical documentation that will better effectuate the remedy." CA/MS Joint Mot. to Modify at 4. In reality, of course, more than a year has passed since the extension of Section III.E, and the technical documentation contemplated by that Section is not yet certified as usable, complete, and accurate. Under such circumstances, the Court concludes that the Moving States are well within their rights to seek a further extension of the Final Judgments.

*31 In any event, the Court rejects Microsoft's suggestion that the other provisions of Section III should not be

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 30

extended unless Section III.E would be doomed to fail in their absence. MS Opp'n at 14. The Moving States' Response to the Court's December 10, 2007 Order concedes that the provisions of Section III are "complementary, not interdependent," but nevertheless argues that "the Final Judgment would be much less likely to achieve the as yet unfulfilled remedial goals ... if the only provision that remains in effect is § III.E." Moving States' Resp. to Dec. 10 Order at 10. For its part, Microsoft does not point to language in any of the Court's remedy-related opinions suggesting that each of the Final Judgments' provisions were expected to work in isolation, and the Court is not aware of any such language. To the contrary, the Court's remedy-related opinions affirm, and the Court continues to agree, that the various provisions of the Final Judgment were expected to work in tandem towards achieving the Final Judgments' overall goals. It is therefore sufficient that the other provisions support Section III.E, even if Section III.E is not actually fully dependent upon them.

Finally, Microsoft suggests that it is not necessary to extend the Expiring Provisions of the Final Judgments in order to support Section III.E because the "proliferation of Web-based computing has, in effect, accomplished what Section III.E was designed to do, although not exactly in the way that was anticipated in 2001 when Section III.E was created." MS Opp'n at 16-17. Without drawing conclusions as to the accuracy of Microsoft's statement, the Court notes only that it does not establish that Section III.E has become irrelevant. The Court recognizes that the goals have been thwarted by the time that has been lost as a result of the delays, attributed solely to Microsoft, in Section III.E's implementation, and understands that it cannot recreate the opportunities that existed when the Final Judgments were entered. Nevertheless, the Court shares the Moving States' expectation that the MCPP will continue to attract licensees, see CA Mem. at 12, and that once certifiably complete, accurate, and useable technical documentation is available to those licensees they will develop products that "further the ability of [ ] non-Microsoft server operating systems to provide a platform which competes with Windows itself," *Remedy*

*Opinion*, 224 F.Supp.2d at 173. When such development occurs, it will presumably amplify whatever progress the proliferation of Web-based computing has made towards "eliminat[ing] the consequences of Microsoft's illegal conduct." *Id.* at 173.

Microsoft's arguments thus fail to alter this Court's decision that an extension of the Expiring Provisions is warranted due to the delay in Section III.E's implementation and the inexorable conclusion that, as a result, the Final Judgments have yet to operate as a comprehensive whole. The Moving States' request would be viewed in a different light if certifiably complete, accurate, and useable technical documentation was already available to and in use by licensees. In that case, the Court would be in a position to evaluate the relevance of the Expiring Provisions to those licensees' efforts. Due to the delay, of course, that is not the current situation. Instead, Microsoft seeks to let the majority of Section III's protections lapse despite the fact that Section III.E--once described as the *"most* forward-looking provision" of the Final Judgments, *Remedy Opinion*, 224 F.Supp.2d at 173--has yet to come to fruition. The Court, the parties, and the marketplace should not be deprived of the opportunity to realize the benefits that the Expiring Provisions can still play in effectuating the Final Judgments' goals. Based on the Moving States' examples of client-side applications that could be developed in connection with server products, the Court finds that the other provisions of Section III can yet serve to substantially increase the eventual procompetitive impact of Section III.E.

B. *The Moving States' Other Arguments In Favor of Extension Lack Merit*

*32 In light of the Court's conclusion that the Section III.E delay and its repercussions on the Final Judgments' implementation warrant an extension of the Expiring Provisions under either *Rufo* or *United Shoe,* the Court need not tarry long over the Moving States' remaining,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                Page 31
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

meritless, arguments for extensions. The Court therefore addresses each very briefly below, albeit not in the order presented by the Moving States.

First, the Moving States highlight the fact that no licensee has, as of yet, developed a general server product under the MCPP, arguing that it constitutes a "changed circumstance" for purposes of the *Rufo* standard. *See* Moving States Reply at 14-15; CA Mem. at 12. In particular, the Moving States note that, according to the results of the California Group's survey, "MCPP licensees tend to develop products that complement, rather than compete with, Windows features." *Id.* (citing CA Group Rep. on Remedial Effectiveness; 6/19/07 JSR at 14). The Moving States are correct that the Court concluded that the remedy in this case should encompass server/network computing due to the potential for "non-Microsoft operating systems to provide a platform which competes with Windows itself." *Remedy Opinion,* 224 F.Supp.2d at 129-30, 172- 73. The Court's *Remedy Opinion,* however, also stressed that "it is particularly difficult in this case to predict what effect the present remedy will have [in the future]." *Id.* at 183-84. As the Court's remedy was clearly aspirational, rather than premised upon certain benchmarks, the fact that no licensee has yet developed a general server product cannot represent a changed condition. Nor does the lack of a general server product developed under the MCPP, in and of itself, demonstrate that the Final Judgment has not achieved its "principal objectives" under *United Shoe.* Moreover, it is premature to draw any conclusions at this time as to the overall impact of the MCPP on the general server market. As the California Group's Report on Remedial Effectiveness acknowledges, six companies have signed general server licenses. CA Group Rep. on Remedial Effectiveness at 11 n. 30. Those companies may yet develop general server products, and more licensees may still execute general server licenses, before Section III.E expires in November 2009.

The Moving States similarly find a "changed circumstance" in the fact that no major OEM has

pre-installed a rival browser to Microsoft's IE on its new PC systems. CA Mem. at 16-18; Moving States' Reply at 16-18. The Moving States are correct that this Court and the D.C. Circuit's remedy opinions projected that allowing "OEMs to disable end-user access to IE, and thereby to avoid the costs of having to support both IE and a rival browser," would make OEMs "more likely to install a rival browser based upon market determinants, such as consumer demand," and "that OEMs' new freedom to respond to market demand would enhance competition between Microsoft and other manufacturers of middleware." *Massachusetts v. Microsoft,* 373 F.3d at 1238-39;*see also Remedy Opinion,* 224 F.Supp.2d at 158-59. However, the Final Judgments ensured OEMs' ability to load competing web browsers, as well as other types of middleware, based on Plaintiffs' theory that the proliferation of non-Microsoft middleware might reduce the applications barrier to entry. Guaranteeing OEMs the freedom to install rival web browsers was thus a means towards achieving the Final Judgments' overall goals, rather than an end in and of itself. Thus, the fact that no OEM currently pre-installs a competing web browser does not demonstrate that the Final Judgments principal objectives have not been met. [FN30] Moreover, the Moving States do not dispute Microsoft's assertion that OEMs are currently pre-installing non-Microsoft middleware (other than web browsers), *see* MS Opp'n at 21-22, and in fact describe this development as a "positive sign," Moving States' Reply at 17.

> FN30. In addition, as the United States points out, the Moving States "make no showing ... that any conduct by Microsoft (either in violation of the decree or otherwise) has foreclosed the OEM channel to third-party browsers." US *Amicus* Br. at 4.

*33 The Moving States' focus on the web browser market is also inappropriate for the even more fundamental reason that the web browser market was not the relevant market for purposes of the liability findings. To the contrary, the D.C. Circuit concluded that the Plaintiffs failed, in the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 254126 (D.D.C.)

(Cite as: 2008 WL 254126 (D.D.C.))

·Page 32

liability phase, to establish the existence of a properly defined market for web browsers. *See Microsoft,* 253 F.3d at 81-82. As such, the Moving States' emphasis on the web browser market appears to be an attempt at the proverbial second bite at the apple. But, because the web browser market was not, in and of itself, the focus of the liability findings, the Court need not resolve the factual dispute between the Moving States and Microsoft as to Microsoft's alleged dominance of the web browser market. *Compare* CA Mem. at 4-6 and N.Y. Mem. at 2-3 with MS Opp'n at 22 n. 22. Similarly, the Court need not address Microsoft's factual challenge to the Moving States' assertion that Microsoft has "consolidated its hold on the server market" during the five years that the Final Judgments have been effect. *See* CA Mem. at 3; MS Opp'n at 18 n. 16. Regardless of Microsoft's current share in the so-called "server market," as Microsoft correctly notes, "no such market was ever defined or addressed in the underlying theory of liability." MS Opp'n at 18 n. 16.

The Moving States attempt to gloss over the fact that neither web browsers nor servers were the relevant market for purposes of the liability findings in this case by asserting that Microsoft's alleged dominance of those markets nevertheless matters because emerging web-centric technologies are "dependent on web browsers and servers for access to consumers," and "require computer equipment running a client or server operating system." CA Mem. at 6, 20-22. According to the Moving States, the continuing dominance of IE and Windows offers Microsoft the ability "to use the browser as a chokepoint," *id.* at 5, so as "to impede the development of emerging middleware threats with the potential to erode the applications barrier to entry protecting its Windows monopoly," Moving States' Reply at 25. The Court notes that the Moving States' claims in this respect are not undisputed, as one of the expert reports submitted in support of Microsoft's Opposition argues that Microsoft would have neither the power nor the incentive to limit consumer access to internet technologies. *See* MS Opp'n, Ex. A (11/6/07 Suppl. Expert Rep. of Marco Iansiti).

In any event, the Court need not resolve this largely hypothetical factual dispute. As Microsoft acknowledges, if it were to use its alleged dominance in the web browser market in order to stifle competing middleware, "such conduct would [likely] violate § 2 of the Sherman Act, and Microsoft would remain subject to penalty under that statute." MS Opp'n at 19. [FN31] This Court's *Remedy Opinion* previously recognized as much when it stated that "although Plaintiffs *assume* that Microsoft will engage in anticompetitive conduct in the future in conjunction with its participation in this emerging area of technology, this case cannot be used as a vehicle by which to fight every potential future violation of the antitrust laws by Microsoft...." *Remedy Opinion,* 224 F.Supp.2d at 133. Instead, the specters of hypothetical threats that the Moving States raise "are more appropriately addressed as separate claims, in a separate suit, should Microsoft engage in such conduct and should Plaintiffs deem it appropriate to file one." *Id.* at 134. [FN32]

FN31. The Moving States' argument that Microsoft may threaten emerging technologies through its alleged dominance of the web browser market also appears quite similar to an argument raised during the remedy proceeding that certain protections should be included in the remedy to "ensure that Microsoft does not use its control over the browser market to control other technology markets." *Remedy Opinion,* 224 F.Supp.2d at 241. n. 118. That argument was rejected in the *Remedy Opinion,* however, because it "reflect[ed] an attempt to argue either a new attempted monopolization claim or the previously court-rejected 'monopoly leveraging' theory of liability by extending that 'leveraging' argument to emerging areas of technology." *Id.* (quoting *United States v. Microsoft Corp.,* 1998 WL 614485, *26-28 (D.D.C. Sept.14. 1998)). Furthermore, in affirming this Court's remedy, the D.C. Circuit rejected an argument that "Microsoft 'advantage[d] its own middleware by using the browser to limit the functionality of competing products,' " concluding that this

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 33

Court's remedy "properly focused ... upon opening the channels of distribution to ... rivals," rather than eliminating "harm to specific competitors." *Massachusetts v. Microsoft, 373 F.3d at 1229.*

FN32. To the extent that the Moving States suggest that the key to protecting emerging web-based middleware threats is to ensure that Microsoft "maintains IE as a standards-compliant browser," *see* CA Mem. at 20-21, that argument is foreclosed by this Court's *Remedy Opinion.* As Microsoft correctly notes, the Court considered and rejected a "requirement that Microsoft maintain support for industry standards where it has made proprietary modifications to the standards," because that conduct "was found ... to have competitive benefits which outweigh the anticompetitive effect of the conduct," because the proposed requirement was "likely to have only a modest effect on competition, if at all," and because it "impose[d] unworkable conditions." *Remedy Opinion, 224 F.Supp.2d at 190-91.* Significantly, the D.C. Circuit specifically affirmed this Court's conclusion in that respect, holding that "the district court permissibly refused to require that Microsoft continue to support a standard after making a proprietary modification to it, even if the modification makes the standard incompatible with the original." *Massachusetts v. Microsoft, 373 F.3d at 1215.*

*34 Finally, the Court addresses the Moving States' claim that the Expiring Provisions should be extended because "in the relevant market, Intel-compatible PC operating systems, the rapid pace of change [anticipated by the Court during the remedy phase] has clearly not manifested itself." Moving States' Reply at 12, 28-31; CA Mem. at 19-20; NY Mem. at 2-4. Microsoft vehemently disputes this assertion, insisting that "major developments and innovation [have] taken place in connection with

Windows," and that, more importantly, "[a] proper examination of the [software] industry since the Final Judgments reveals that innovation has been widespread, competition has been dynamic, and growth and innovation have outpaced the rest of the economy by a wide margin." MS Opp'n at 25, 27.

Again, the Court concludes that resolution of this factual dispute is unnecessary, and indeed inappropriate. As an initial matter, insofar as the Moving States' argument is premised on their assertion that "Microsoft's share of the PC operating system market has been greater than 90% for at least the past 15 years," CA Mem. at 4, it is entirely misplaced. The Court's *Remedy Opinion* reiterated that "the monopoly in this case was not found to have been illegally acquired, but only to have been illegally maintained." *224 F.Supp.2d at 100-01* (quoting *Microsoft, 253 F.3d at 46, 107).* As such, the Court concluded, and the parties conceded, that it was not "a valid objective for the remedy in this case to actually 'terminate' Microsoft's monopoly. Rather, the proper objective of the remedy in this case [was] termination of the exclusionary acts and practices related thereto which served to illegally maintain the monopoly." *Id. at 101;see also Settling States Opinion, 231 F.Supp.2d at 211 n. 4* (incorporating *Tunney Act Opinion* ) (internal citations omitted). Viewed in the proper context, then, Microsoft's alleged current share of the PC operating system market is simply not the measure used to determine whether the Final Judgments have achieved their principal objectives.

The Moving States' focus on the "pace of change" in the relevant market likewise cannot support an extension of the Expiring Provisions of the Final Judgments. It is correct that this Court's selection of a five-year term for the Litigating States' remedy and approval of the same term in the Settling States' consent decree turned on an understanding that "the industry at issue in this case is remarkable for its constant and rapid change." *Remedy Opinion, 224 F.Supp.2d at 184;Settling States Opinion, 231 F.Supp.2d at252-53.* However, the Court did not set any benchmark expectations for the industry and, to the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 254126 (D.D.C.)

(Cite as: 2008 WL 254126 (D.D.C.))

Page 34

contrary, noted the "substantial uncertainty as to the future demands of the software industry." *Remedy Opinion,* 224 F.Supp.2d at 183. The Court thus did not predicate the success of the Final Judgments on the anticipated developments in the relevant market. Nor should such changes provide the measure for determining whether an extension is appropriate, as that measuring stick is subject to unpredictable pressures and influences that would open the door to potentially endless extensions. Such an outcome would indeed be contrary to the policy favoring eventual finality in court oversight of judgments.

*C. Microsoft's Additional Arguments Against Extension*

*35 Having addressed the Moving States' main arguments for extending the Expiring Provisions, the Court now considers the arguments raised by Microsoft against that outcome, to the extent they are not addressed above.

Microsoft asserts that its "compliance with the expiring provisions of the Final Judgment, its history of going beyond its obligations to resolve issues raised by the Plaintiffs and the [TC], and its commitment to adhere to Final Judgment principles on a going-forward basis" are grounds for denying the Moving States' motions and relieving Microsoft of the burden of "operating under the shadow of a judicial decree." MS Opp'n at 11 (citing Windows Principles: Empowering Choice, Opportunity, and Interoperablity, *available at* http://www.microsoft.com /about/corporatecitizenship/ citizenship/businesspractices/windowsprinciples.mspx (published Aug. 24, 2007)). The Moving States attempt to downplay Microsoft's claim by asserting that "Microsoft itself should hardly be heard to object to extending the decree" because it "professes to be 'committed to running its Windows business in accordance' with [the Windows Principles]" and because it "conceded, in the case brought by the European Commission, that the settlement in this litigation has not 'had any negative impact on its incentives to innovate.' " N.Y. Mem. at 7; CA Mem. at 22 & n. 22.

The Moving States arguments in this regard are not well-taken. Microsoft's commitment to the Windows Principles is admirable, and certainly should not be held against Microsoft. Furthermore, the Court is well aware that operating under a judicial decree has negative connotations. *See* MS Opp'n at 11. The Court nevertheless concludes, for the reasons detailed above, that an extension of the Expiring Provisions is warranted due to the delay in Section III.E's implementation and the impact of that delay on the Final Judgments' operation.

Microsoft next argues that the New York Movants are on shaky ground because their August 30, 2007 Review of the Final Judgments, filed jointly with the United States, concluded that the Final Judgments had achieved their goals. US *Amicus* Br. at 5-7; MS Opp'n at 8. The New York Movants address any apparent inconsistency by explaining that their earlier filing was not a "mission accomplished" pronouncement. Moving States' Reply at 23. According to the New York Movants, while they believe the Final Judgments are "accomplishing their stated goal of fostering competitive conditions ... [t]here is still much work for the Court's Final Judgments to do." *Id.* (quoting N.Y. Group Review of Final Judgments at 6, 8). The Court agrees with the New York Movants that their positions are not inherently inconsistent and that, in any event, their Review of the Final Judgments in no way waived their right under their Final Judgment to seek the additional relief they now believe is warranted.

Microsoft further asserts that, as a party to a negotiated consent decree, the New York Movants should not be able to escape the five-year term of that decree, because the decree should be accorded the weight of a binding contract. MS Opp'n at 8. The United States echoes Microsoft's argument in its *amicus* brief. US *Amicus* Br. at 5-7. The Court certainly recognizes that modification of a consent decree is an "extraordinary remedy." *See Harris Teeter Supermarkets,* 215 F.3d at 35). However, it must also be acknowledged that the consent decree in this

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy

Page 35

Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

instance is unusual in that it was not reached as an alternative to a finding of liability. Rather, the consent decree addressed only the remedy phase of this case, and was negotiated based on the D.C. Circuit's findings of liability and guidance as to the parameters of an appropriate remedy. Further, the consent decree shared the same purpose, and reflects the same goals, as the court-ordered Litigated States' remedy. This fact is reflected by the Court's conclusion in the *Tunney Act Opinion* that the proposed consent decree "takes account of the theory of liability advanced by Plaintiffs, the actual liability imposed by the appellate court, the concerns of the Plaintiffs with regard to future technologies, and the relevant policy considerations." *Settling States Opinion,* 231 F.Supp.2d at 259 (incorporating *Tunney Act Opinion* ).

\*36 Just as the consent decree and court-ordered remedy had the same goals, so did their identical Sections III.E play the same role within the two Final Judgments. And, as noted above, the Court's power to modify an injunction or grant relief from a judgment is the same regardless of whether a consent decree or litigated decree is at issue. *Agostini,* 521 U.S. at 215;*Swift,* 286 U.S. at 114;*Western Electric,* 46 F.3d at 1205. As a result, the Court's conclusions regarding the unforeseen nature of the Section III.E delay and its impact on the implementation of the Final Judgments are of equal import with respect to each Final Judgment. Moreover, the New York Movants convincingly argue that, even if the Court regards their consent decree as a binding contract, they "have yet to realize the benefit of their 'bargain' because Microsoft still has not fulfilled its § III.E disclosure obligations, an important inducement to settle the litigation." Moving States' Reply at 26.

Finally, continuing with its argument that the New York consent decree is a binding contract, Microsoft argues that it "should not be forced to endure more than [it] bargained for," given its overall compliance with the Expiring Provisions and its cooperation with the Plaintiffs and TC over the past five years. MS Opp'n at 11. According to

Microsoft, if the New York Movants are allowed to unilaterally extend the expiring provisions, it will deter parties from negotiating consent decrees and from going "beyond the letter of their decree obligations." *Id.* at 11-12. The United States and Visa and Weyerhaeuser echo Microsoft's concern in their respective *amici* briefs. US *Amicus* Br. at 7; *see generally* Visa/Weyerhaeuser *Amici* Br. In that regard, the Court notes that *Rufo* considered and rejected an argument that its flexible standard "would deter parties to litigation ... from negotiating settlements." 502 U.S. at 382-83. In so doing, the Supreme Court reasoned--and this Court agrees--that parties who negotiate consent decrees do so with the knowledge that "the prospective effect of such a judgment or decree will be open to modification where deemed equitable under Rule 60(b)" and that "[w]hether or not [parties] bargain for more than they might get after trial, they will be in no worse position if they settle and have the consent decree entered." That point is demonstrated clearly here by the overwhelming similarity between the Settling States' and Litigating States' Final Judgments.

The Court is nevertheless sensitive to the policy argument made by Microsoft and *amici,* and therefore stresses that its decision to extend the Expiring Provisions of the Final Judgment must be viewed in the proper, extremely unique, context. Not only is this case unique, in that it involves a highly complex and rapidly evolving market, but the posture in which this Court undertook the remedy phase (and the Settling States negotiated their consent decree) was also unique because the D.C. Circuit's liability opinion strictly cabined the parameters of an appropriate remedy. The actual remedy encompassed by the Settling States' consent decree and the Litigating States' judgment was similarly unique, including innovative approaches such as the TC and the technical documentation requirements. Even within that unique remedy, Section III.E represented the *"most* forward-looking" and most innovative provision. *Remedy Opinion,* 224 F.Supp.2d at 173. The Court's conclusion that the Expiring Provisions of the Final Judgments should be extended is thus based on Section III.E's paramount significance in the Final Judgments' scheme. Section III.E was the cornerstone of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy

Page 36

Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

the Court-ordered and Court-approved remedies and, as the Final Judgments' most forward-looking provision, was the basis on which the parties and the Court aspired to have the applications barrier to entry broken down over time.

*37 The Court does not dispute that Microsoft has been overwhelmingly cooperative with the Plaintiffs and the TC over the past five years. To the contrary, the Court commends Microsoft for its willingness to address issues as they arose and to negotiate solutions rather than force litigation. In many respects, Microsoft's conduct has been a model for parties engaged in complex and protracted litigation. But Microsoft's good citizenship does not erase the fact that, more than five years after the Final Judgments called for the Section III.E Communications Protocols to be available, licensees do not yet have the benefit of a certifiably complete, accurate, and useable set of technical documentation. Nor can the fact that Microsoft has never been found to be out of compliance with the Final Judgments obscure the obvious conclusions that, practically speaking, Microsoft has failed to comply with Section III.E, and that its non-compliance is highly material. Indeed, Microsoft admitted as much when, in May of 2006, it admitted that it "didn't have the exact right resources [or] the right process in place," and suggested a massive overhauling of the previous attempts at generating the technical documentation required under Section III.E. 5/17/06 Status Hrg. Tr. at 39:3-8.

As discussed above, neither the parties nor the Court will ever know how the relevant market might have developed if the Section III .E technical documentation had been available five years ago. Nor can the Court project what use may be made of the technical documentation in the future. But the Moving States have proffered realistic examples of ways in which the Expiring Provisions of the Final Judgments can yet play a role in maximizing the impact of products to be developed under Section III.E. In light of Microsoft's admitted culpability in the Section III.E delay, the Court concludes that it is not inequitable to extend the Expiring Provisions in order to allow the

provisions of the Final Judgments to operate together as originally envisioned.

*D. The Appropriate Length of the Extension*

The sole remaining issue, then, is the length of time for which the California Group and New York Group Final Judgments should be extended. The Moving States seek to extend the entire Final Judgments--the Expiring Provisions as well as Section III.E--until November 12, 2012. Although the Moving States raise a number of arguments in support of this request, the Court ultimately agrees with Microsoft and the United States that it is premature at this time to consider extending Section III.E, and the Expiring Provisions, beyond November 12, 2009, given that Section III.E has already been extended until that date.

The Moving States first attempt to rehash the Litigating States' argument that "ten years is the standard term for antitrust consent decrees entered into by the Antitrust Division of the United States Department of Justice." *Remedy Opinion,* 224 F.Supp.2d at 184; CA Mem. at 18. According to the Moving States, it is now appropriate for the Court to revert to the "standard" term, by adding another five years to the Final Judgments' current five-year terms, because the pace of change in the relevant market has not materialized as the Court envisioned during the remedy proceedings. The Court is no more convinced by this argument now than it was then, and declines to accept the Moving States' disputed representations as to the "pace of change." As discussed above, because the Court's expectations of change in the relevant market were not tied to any particular benchmarks, but rather recognized the "substantial uncertainty as to the future demands of the software industry," *Remedy Opinion,* 224 F.Supp.2d at 183, the Court cannot conclude that its expectations in that respect have not been realized. Furthermore, using the pace of change in the market for Intel-compatible PC operating systems, with its unpredictability and susceptibility to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

various forces, as the measure of whether to extend the Final Judgments would inappropriately open the door to potentially limitless extensions of the Court's oversight.

*38 The Moving States present a far more compelling argument when they assert that "continued oversight by plaintiffs, the TC, and the Court, is essential to assure the integrity of the MCPP," as well as "to give prospective licensees the confidence that the [technical documentation] they will get, if they take a license, is complete and accurate." CA Mem. at 12. [FN33] The Court is certainly concerned with maximizing the procompetitive impact of the Final Judgments and encouraging continued innovation that serves to eliminate the applications barrier to entry. The Court also recognizes that developing a product under an MCPP license "requires considerable advance planning, capital investment and other expenditure[s]," id., and appreciates the significant role the TC plays in ensuring that the technical documentation produced pursuant to Section III.E is of a nature and quality that is attractive and useful to current and prospective licensees. Nevertheless, the Court agrees with Microsoft and the United States that it is premature at this point to extend the Final Judgments through 2012 based on the Moving States' speculation that the delays in the implementation of Section III.E will persist. See CA Mem. at 11. From all reports, it appears that Microsoft has finally committed the resources necessary, and adopted an approach likely to produce technical documentation that is complete, accurate, and usable to licensees. In light of the current RESET plan schedule and the parties' most recent reports, the Court is unaware of any reason that the technical documentation required by Section III.E should not be complete, accurate, and usable to licensees long before Section III.E expires. [FN34]

FN33. To this end, the Moving States assert that "there are continuing questions not just about the accuracy of the [technical documentation], but whether the [technical documentation] is complete," citing the results of the first audit triggered by Microsoft's conclusion in early 2007 that additional protocols should be added to the MCPP. CA Mem. at 10-11. As Microsoft notes, however, "Microsoft and the TC recently adopted a set of modest recommendations following the TC's analysis of the [consulting firm's report] that were substantially different from the [firm's] recommendations." MS Opp'n at 14 n. 7. Microsoft further asserts that, to the best of its knowledge, "the agreement between Microsoft and the TC resolved the few issues raised by the [consulting firm's] report that the TC deemed necessary to address." Id. It therefore appears that any outstanding issues relating to the completeness of the technical documentation are being addressed in an appropriate manner.

FN34. Indeed, in the unlikely event that the proceedings to this point have not provided Microsoft with sufficient incentive to speedily produce certifiably complete, accurate, and useable technical documentation, this extension of the Expiring Provisions of the Final Judgment should certainly spur Microsoft to do so.

Moreover, for the time being at least, the oversight of the TC, the Plaintiffs, and the Court is assured, because Section III.E and the other extended provisions do not expire until November 2009. Parties considering licenses should therefore take comfort in the fact that the TC, the Plaintiffs, and the Court's oversight will continue while the technical documentation is tested and finalized. In addition, as the Moving States note, because "present and future client/server [Communications Protocols] are available for license through November 11, 2012," Microsoft "will be required to document" any "new [Communications Protocols] in its next major Windows client and server releases." CA Mem. at 11. Thus, the current oversight period of the Plaintiffs, the TC, and the Court also encompasses the launch of Microsoft's Windows Server 2008, which is reportedly scheduled for release in February 2008. Id.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Finally, the Moving States argue that "a five-year extension of the existing decree does no more than was originally intended by the parties and by the Court ... [but rather allows] the decree [to] be in effect, together as intended, for five years." Moving States' Reply at 18. This argument certainly has appeal, given the Court's conclusion that an extension of the Expiring Provisions is warranted because the unforeseen Section III.E delay has prevented the provisions of the Final Judgments from working in tandem. Indeed, the *United Shoe* standard suggests that the Court would be justified in extending the entire Final Judgments until November 12, 2012 in order to "accomplish [their] intended result." *See Western Electric,* 46 F.3d at 1202;*United Shoe,* 391 U.S. at 251-52. *Rufo,* however, counsels a more measured approach, requiring that any modification to a consent decree be "suitably tailored to the changed circumstances" that warrant the modification. *Rufo,* 502 U.S. at 383. In that regard, it is significant that Section V.B of the Final Judgments--which was negotiated as part of the Settling States' consent decree and included in the Court-imposed Litigating States' remedy--only contemplates a one-time extension of up to two years upon a finding of "a pattern of willful and systematic violations." *See* Final Judgments, Section V.B. Although Section V.B does not govern the Moving States' request, it nevertheless suggests that a five-year extension of the Final Judgments absent a finding of non-compliance is not "suitably tailored."

*39 The Court thus concludes that the most appropriate approach is to assess the need for continued Court oversight in reasonable incremental periods. Section III.E and the other extended provisions are currently set to expire on November 12, 2009. *See* Modified Final Judgments, Section V.A. That extension was sought jointly by the Plaintiffs and Microsoft in order to ensure that Section III.E be given a full opportunity to succeed. *See* NY/MS Joint Mot. to Modify the Final Judgment at 2. As discussed extensively above, the Final Judgments were always intended to operate as a comprehensive remedy, and the Moving States have presented realistic examples

of ways in which the Expiring Provisions may yet be necessary to support, and maximize the impact of, Section III.E. On that basis, the Court concludes that an extension of the Expiring Provisions until November 12, 2009 is likewise appropriate to "ensur[e] that the remedies included in the Final Judgment will have their full intended effect." *Id.* at 1. However, the extension of the Expiring Provisions is only warranted due to the change in circumstances brought about by the extreme delay in the implementation of Section III.E, and that provision currently remains in effect until November 12, 2009. As such, the Moving States' request for a five-year extension appears premature, and rather than speculate as to the possible state of the technical documentation at that point in time, the Court shall make the Expiring Provisions coterminous with Section III.E.

Nevertheless, the Court's decision not to extend the Final Judgments beyond November 12, 2009 now does not foreclose the possibility of doing so in the future. Indeed, the mechanisms are already in place to reexamine Section III.E's implementation and the Final Judgments' termination in the Fall of 2009. At present, the Final Judgments give Plaintiffs the right "in their sole discretion to request an additional three-year extension of [Sections I, II, III.F.1, III.F.3, III.E, III.I, III.J, IV, V, VI, VII, and VIII] of the decree until November 12, 2012," with the understanding that "Microsoft will not oppose any such request." NY/MS Joint Mot. to Modify the Final Judgment at 2-3. [FN35] Similarly, the door remains open for the Court to reassess the need for continued oversight as the expiration of the Final Judgments in November 2009 approaches. At that point, certifiably complete, accurate, and useable technical documentation will, presumably, be available to licensees, and the Court will be in a far better position to evaluate Section III.E's implementation, as well as the role that the other provisions of the Final Judgments play in supporting Section III.E.

FN35. In addition, as noted above, Microsoft has agreed that "even if the Final Judgments expire completely in November 2009, it will continue,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 254126 (D.D.C.)
(Cite as: 2008 WL 254126 (D.D.C.))

Page 39

through November 11, 2012, to make the protocols included in the MCPP available for license on reasonable and non-discriminatory terms with a term of at least five years." 5/12/06 JSR at 10. As a result of this commitment, "industry members will effectively have the ability to license protocols through at least November 11, 2017." *Id.*

Based on the showing made by Moving States, [FN36] the Court concludes that they have met their burden of establishing that the unforeseen delay in Section III.E's implementation constitutes changed circumstances. The Moving States have further established that the repercussions from the delay have impacted the Final Judgments' procompetitive potential and prevented them from achieving their principal objectives. As such, the Court shall extend the Expiring Provisions until November 12, 2009, to coincide with the current termination of the provisions that have already been extended, and to allow the Expiring Provisions the opportunity to help maximize Section III.E's potential. In so doing, however, the Court reiterates that, as stated in its *Remedy Opinion*, "[a]n antitrust decree should endure only so long as necessary to ensure competition." *Remedy Opinion*, 224 F.Supp.2d at 184. The Court certainly anticipates that there will, and must, be finality to its oversight of the Final Judgments.

> FN36. The Court is aware that in *Hughes v. United States*, 342 U.S.353, 72 S.Ct. 306. 96 L.Ed. 394 (1952), the Supreme Court concluded that a District Court was within its power to modify a consent decree "after a proper hearing." *Id.* at 357-58. The Court notes, however, that its resolution of the Moving States' motions does not depend upon any disputed facts that might require an evidentiary hearing. Furthermore, the parties were provided a complete hearing on the issues raised in the Moving States' motions through their pleadings and, where the Court identified additional areas requiring consideration, it sought further briefing from the

Moving States and allowed Microsoft sufficient time to respond to that briefing. In light of the parties' thorough handling of the relevant issues in their pleadings, the Court concluded that oral argument would be redundant, and was therefore not warranted given the tight schedule for resolution of the Moving States' motions imposed by the parties and the Court.

## IV: CONCLUSION

*40 For the foregoing reasons, the Court shall GRANT-IN-PART and DENY-IN-PART the Moving States' motions to extend the Final Judgments, and shall extend the Expiring Provisions of the Final Judgments, with the exception of Section III.B, until November 12, 2009.

Slip Copy, 2008 WL 254126 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 4:96-cv-02225-SNL     Document 123     Filed 04/23/2007     Page 1 of 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| FEDERAL TRADE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>RICHARD C. NEISWONGER, *et al.*, )<br><br>Defendants. ) | Case No. 4:96CV02225 SNL<br><br>Judge Limbaugh |

SECOND PERMANENT INJUNCTION
MODIFYING PERMANENT INJUNCTION
AS TO DEFENDANT NEISWONGER

WHEREAS, on February 28, 1997, this Court entered a Stipulated Final Judgment and

Order for Permanent Injunction and Other Equitable Relief ("Permanent Injunction") containing,

among other things, injunctions proscribing misrepresentations and omissions of material fact in

the advertising, marketing, and sale of programs by Defendants and all other persons or entities

acting in concert or in participation with them with actual notice of the Permanent Injunction, as

well as certain reporting and other requirements applicable to individual Defendants under

specific circumstances, as set forth in Paragraphs I, II, V, and XI of that Order, and

WHEREAS Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), in

conjunction with a motion for a civil contempt order, has filed a motion to modify the Court's

prior Permanent Injunction with respect to Defendant Richard C. Neiswonger ("Neiswonger")

EXHIBIT 2

premised on his violations of Paragraphs I and XI of Permanent Injunction, and the expiration of the compliance-monitoring provisions in Paragraph XI, and the Court has fully considered the contentions of the parties, the record, and the applicable law; and

WHEREAS the Court has concluded that the Permanent Injunction should be modified with respect to Defendant Neiswonger, and remain in full force and effect except as specifically modified below, the Court now issues this Second Permanent Injunction, and finds as follows:

1. Defendant Neiswonger received actual notice of this Court's Final Judgment and Order for Permanent Injunction and Other Equitable Relief ("Permanent Injunction" or "Order").

2. Defendant Neiswonger has engaged in the advertising, marketing, promotion, and/or sale of a program as defined in the Permanent Injunction and herein, and has done so through means of telemarketing, as that term is defined below.

3. The evidence indicates that Defendant Neiswonger's acts and practices in connection with the advertising, marketing, promotion, and/or sale of a program violated Paragraphs I and I.A and other Paragraphs of the Permanent Injunction.

4. The evidence indicates that Defendant Neiswonger violated Paragraph XI of the Permanent Injunction, prior to its expiration, by failing to provide, and promptly provide, the Commission with written notice of his new business affiliation with APG program.

5. Defendant Neiswonger's violations of the Permanent Injunction constitute changed circumstances warranting revisions to the provisions of the Permanent Injunction, specifically, the provisions relating to the advertising, marketing, promotion, and/or sale of a program, and the compliance-monitoring provisions.

6. Entry of this Order is in the public interest.

2

7.    This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

### DEFINITIONS

For the purposes of this Order, the following definitions apply:

A.    "Document" is equal in scope and synonymous in meaning to the usage of the term in Federal Rule Civil Procedure 34(a), and includes writings, drawings, charts, graphs, photographs, audio and video recordings, computer records, electronic records and images, and any other data compilations from which information can be obtained (or translated, if necessary, through detection devices into reasonably usable form). A draft or non-identical copy is a separate document within the meaning of the term.

B.    "Permanent Injunction" means this Court's original Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief, entered on February 28, 1997.

C.    "Program" means any training session, course of instruction, class material, computer software, affiliation, association, newsletter, period of support, joint venture opportunity or combination thereof advertised, marketed, offered or sold by Defendant Neiswonger, whether acting directly or through any entity, corporation, subsidiary, division, or other device.

D.    "Promotional Material" means any written or oral statement, advertisement, illustration, or depiction that is designed to effect a sale or create an interest in the purchasing of goods or services, whether it appears in a brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public

3

transit card, point of purchase material (including, but not limited to, a display or an item worn by salespeople), package insert, package label, film, slide, radio, broadcast or cable television, audio program transmitted over a telephone system, script used to make oral solicitations to consumers, program-length commercial ("infomercial"), infomercial script, the Internet, or any other medium.

E.    "Relate to" means refer to, concern, regard, reflect, discuss, constitute, mention, pertain to, allude to, or associate with. "Relating to" means referring to, concerning, regarding, reflecting, discussing, constituting, mentioning, pertaining to, alluding to, or associated with.

F.    "Telemarketing" means any plan, program or campaign (whether or not covered by the Telemarketing Sales Rule, 16 C.F.R. Part 310) that is conducted to induce the purchase of goods or services by means of the use of one or more telephones.

## I.
## BAN ON ADVERTISING, MARKETING, PROMOTION, OR SALE OF PROGRAMS BY DEFENDANT RICHARD C. NEISWONGER

IT IS FURTHER ORDERED that, pursuant to Paragraph VII of the Court's Stipulated Permanent Injunction, FED. R. CIV. P. 60(b), and the Court's inherent jurisdiction in the exercise of its equitable discretion, Defendant Richard C. Neiswonger is hereby permanently banned from advertising, marketing, promoting, offering for sale, selling, or otherwise inducing participation in any program, or assisting others to do so, either directly or through any agent, employee, successor, assign, corporation, subsidiary, division, or other device.

Any provisions of the original Permanent Injunction in conflict with this provision are superceded by this Paragraph.

4

## II.
## BAN ON TELEMARKETING

IT IS FURTHER ORDERED that, pursuant to FED. R. CIV. P. 60(b) and the Court's inherent jurisdiction in the exercise of its equitable discretion, Defendant Richard C. Neiswonger is permanently restrained and enjoined from engaging or participating in telemarketing, directly or through an intermediary.

## III.
## COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring and investigating compliance with any provision of this Order and the Court's original Permanent Injunction,

(A)    Within ten (10) days of receipt of written notice from a representative of the Commission, Defendant Neiswonger shall submit additional written reports, sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and/or provide entry during normal business hours to any business location in his possession or direct or indirect control to inspect the business operation;

(B)    In addition, the Commission is authorized to monitor compliance with this Order and the Court's original Permanent Injunction by all other lawful means, including but not limited to the following:

(1)    obtaining discovery from any person, without further leave of court, using the procedures prescribed by Fed. R. Civ. P. 30, 31, 33, 34, 36, and 45;

(2)    posing as consumers and suppliers to Defendant Neiswonger's employees, or any other entity managed or controlled in whole or in part by Defendant Neiswonger, without the necessity of identification or prior notice; and

5

(C)    Defendant Neiswonger shall permit representatives of the Commission to interview any employer, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Order or the Court's original Permanent Injunction. The person interviewed may have counsel present.

*Provided, however,* that nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

## IV.
## COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that, in order that compliance with the provisions of this Order and the Court's original Permanent Injunction may be monitored:

(A)    For a period of five (5) years from the date of entry of this Order,

    (1)    Defendant Neiswonger shall notify the Commission of the following:

        (a)    Any changes in residence, mailing addresses, and telephone numbers of Defendant Neiswonger within ten (10) days of the date of such change;

        (b)    Any changes in employment status (including self-employment) of Defendant Neiswonger, and any change in the ownership of Defendant Neiswonger in any business entity, within ten (10) days of the date of such change. Such notice shall include the name and address of each business that Defendant Neiswonger is affiliated

6

with, employed by, creates or forms, or performs services for; a statement of the nature of the business; and a statement of Defendant Neiswonger's duties and responsibilities in connection with the business or employment; and

(c)    Any changes in Defendant Neiswonger's name or use of any aliases or fictitious names; and

(2)    Defendant Neiswonger shall notify the Commission of any changes in corporate structure of any business entity that Defendant Neiswonger directly or indirectly control(s), or has an ownership interest in, that may affect compliance obligations arising under this Order or the Court's original Permanent Injunction, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor entity; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the filing of a bankruptcy petition; or a change in the corporate name or address, at least thirty (30) days prior to such change, *provided* that, with respect to any proposed change in the corporation about which Defendant Neiswonger less than thirty (30) days prior to the date such action is to take place, Defendant Neiswonger shall notify the Commission as soon as is practicable after obtaining such knowledge.

(B)    One hundred eighty (180) days after the date of entry of this Order, Defendant Neiswonger shall provide a true and accurate written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which they have complied and are complying with this Order. This report shall include, but not be limited to:

7

(1)     The then-current residence address, mailing addresses, and telephone numbers of Defendant Neiswonger;

(2)     The then-current employment and business addresses and telephone numbers of Defendant Neiswonger, a description of the business activities of each such employer or business, and the title and responsibilities of Defendant Neiswonger for each such employer or business; and

(3)     A copy of each acknowledgment of receipt of this Order, obtained pursuant to Paragraph V.

(4)     Any other changes required to be reported under subparagraph. A of this Paragraph III.

(C)     For the purposes of this Order, Defendant Neiswonger shall, unless otherwise directed by the Commission's authorized representatives, mail all written notifications to the Commission to:

> Associate Director of Enforcement
> Federal Trade Commission
> 600 Pennsylvania Ave., N.W.
> Washington, D.C. 20580
> Re: *FTC v. Neiswonger*, No. 4:96CV2225 SNL.

(D)     For purposes of the compliance reporting and monitoring required by this Order, the Commission is authorized to communicate directly with Defendant Neiswonger.

## V.
## RECORD KEEPING PROVISIONS

IT IS FURTHER ORDERED that, for a period of eight (8) years from the date of entry of this Order, Defendant Neiswonger and his agents, employees, officers, corporations,

8

successors, and assigns, and those persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product or service, are hereby restrained and enjoined from failing to create and retain the following records:

(A)    Accounting records that reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;·

(B)    Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable;

(C)    Customer files containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, to the extent such information is obtained in the ordinary course of business;

(D)    Complaints and refund requests (whether received directly, indirectly or through any third party) and any responses to those complaints or requests; and

(E)    Copies of all sales scripts, training materials, advertisements, or other promotional materials.

(F)    All records and documents necessary to demonstrate full compliance with each provision of this Order, including but not limited to, copies of acknowledgments of receipt of this Order, required by Paragraph VI of this Order, and all reports

9

submitted to the FTC pursuant to Paragraph III of this Order.

## VI.
## DISTRIBUTION OF ORDER BY DEFENDANT

**IT IS FURTHER ORDERED** that, for a period of five (5) years from the date of entry of this Order, Defendant Neiswonger shall deliver copies of the Order as directed below:

(A) For any business that Defendant Neiswonger controls, directly or indirectly, or in which Defendant Neiswonger has a majority ownership interest, Defendant Neiswonger must deliver a copy of this Order to all principals, officers, directors, and managers of that business. For current personnel, delivery shall be within (5) days of service of this Order upon Defendant. For new personnel, delivery shall occur prior to them assuming their responsibilities.

(B) For any business where Defendant Neiswonger is not a controlling person of a business but otherwise engages in conduct related to the subject matter of this Order, Defendant Neiswonger must deliver a copy of this Order to all principals and managers of such business before engaging in such conduct.

(C) Defendant Neiswonger must secure a signed and dated statement acknowledging receipt of the Order, within thirty days of delivery, from all persons receiving a copy of the Order pursuant to this Paragraph.

## VII.
## ACKNOWLEDGMENT OF RECEIPT OF ORDER

**IT IS FURTHER ORDERED** that Defendant Neiswonger, within five (5) business days

10

of receipt of this Order as entered by the Court, must submit to the Commission a truthful sworn statement ackowledging receipt of this Order.

## VIII.
## ORIGINAL PERMANENT INJUNCTION

IT IS FURTHER ORDERED that the Court's original Permanent Injunction in this matter remains in full force and effect, except as specifically modified and superceded by this Order.

## IX.
## ORDER ENTRY

IT IS FURTHER ORDERED that there is no just reason for delay of entry of this Order, and, pursuant to Fed.R.Civ.P. 54(b), the Clerk shall enter this Order immediately.

## X.
## RETENTION OF JURISDICTION

IT IS FURTHER ORDERED the Court shall continue to retain jurisdiction of this matter for all purposes.

Dated this __23rd__ day of April, 2007.

SENIOR UNITED STATES DISTRICT JUDGE

11

Page 1

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

LEXSEE 2006 US DIST LEXIS 82308

**FEDERAL TRADE COMMISSION, Plaintiff, v. VOCATIONAL GUIDES, INC., a
Tennessee corporation, and TIMOTHY SCOTT JACKSON, Defendants.**

No. 3:01-0170

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
TENNESSEE, NASHVILLE DIVISION**

*2006 U.S. Dist. LEXIS 82308; 2006-2 Trade Cas. (CCH) P75,520*

**November 9, 2006, Filed**

**COUNSEL:** [*1] For Federal Trade Commission, Plaintiff: Chris M. Couillou, Federal Trade Commission, Atlanta, GA; Shibani Baksi, Federal Trade Commission, Atlanta, GA; Jessica D. Gray, Federal Trade Commission, Atlanta, GA; Robin L. Rock, Federal Trade Commission, Atlanta, GA.

For Timothy Scott Jackson, Defendant: Brigid M. Carpenter, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, TN.

For Dora Helena Ortegon, Respondent: Brigid M. Carpenter, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, TN.

For John C. McLemore, Receiver: John Clayborne McLemore, Garfinkle, McLemore & Walker, PLLC, Nashville, TN.

**JUDGES:** ROBERT L. ECHOLS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ROBERT L. ECHOLS

**OPINION**

**MEMORANDUM**

Pending before the Court is Plaintiff's Motion for Order to Show Cause Why Defendant Timothy Scott Jackson, GIS, Inc., and Dora Helena Ortegon Should Not Be Held in Contempt for Violating the Stipulated Final Judgment and Order for Permanent Injunction and in Support of Motion to Modify the Stipulated Final Judgment and Order for Permanent Injunction (Docket Entry No. 45), to which Timothy Scott Jackson ("Jackson") and Dora Helena Ortegon ("Ortegon") responded [*2] in opposition. (Docket Entry Nos. 61 & 69.)

The Court held a show cause hearing on September 12 and 13, 2006. Plaintiff, the Federal Trade Commission ("FTC"), called nine witnesses to testify, including three former employees of GIS, three customers of GIS, two FTC employees and the former program manager of Grants.gov. Jackson and Ortegon also testified. At the conclusion of Plaintiff's case and again at the close of the evidence, the Court denied Ortegon's oral motions for judgment as a matter of law under *Federal Rule of Civil Procedure 50*. (Show Cause Hr'g Tr. at 270-277, 372-373, hereinafter "Tr."). Following the hearing, the parties submitted proposed findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

**A. Background**

Plaintiff FTC commenced this action on February 20, 2001, when it filed its Complaint for Injunctive and Other Equitable Relief (Docket Entry No. 1) pursuant to Sections 5 (a) and 13 (b) of the Federal Trade Commission Act ("FTC Act"), *15 U.S.C. §§ 45 (a), 53 (b)*. The Complaint alleged that Defendants Vocational Guides, Inc. ("VGI") and Jackson had engaged [*3] in deceptive acts in violation of *Section 5(a) of the FTC Act* in connection with the selling of employment goods and services related to the United States Postal Service. VGI was Defendant Jackson's company. (Tr. at 328; Pl. Exs. 251, 254 '.) The Complaint further alleged that Defendants VGI and Jackson had misrepresented (1) that they were affiliated with the U.S. Postal Service, (2) the availability of postal jobs, (3) that consumers who used VGI's materials were likely to score 90 or above on a Postal Service job application test, and (4) that consumers who used VGI's materials were likely to obtain jobs with the Postal Service.

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

1  Unless otherwise noted, all exhibit numbers refer to Plaintiff FTC's exhibits admitted at the show-cause hearing.

Ortegon is the former wife of Defendant Jackson. She was married to Defendant Jackson in 1998 shortly after her arrival in the United States from Columbia. (Tr. at 278-79.) They divorced on January 14, 2004. (Tr. at 279; Ex. 214.)

VGI closed its operation as a result [*4] of the FTC's lawsuit. (Tr. at 297.) At the time, it was the sole source of employment for Ortegon and Defendant Jackson. Ortegon was employed by Defendant VGI from 1998 until its closure after the filing of the FTC's lawsuit in 2001. (Id.)

During the litigation, Ortegon was deposed by Plaintiff's counsel. To attend her deposition, Ortegon traveled from Nashville, Tennessee, to Washington, D.C. She was represented by counsel at the deposition and met with her counsel before being deposed. (Tr. at 297-298.)

### B. Provisions of the Permanent Injunction

Plaintiff FTC and Defendants Jackson and VGI agreed to the Permanent Injunction, which the Court entered on July 27, 2001. (Docket Entry No. 36.) The Permanent Injunction included requirements pertaining to (1) engaging in a prohibited business activity, (2) misrepresentation of goods and services, (3) payment of a monetary judgment of $ 191,600.00 plus any residue from a receivership estate, and (4) monitoring compliance. The provisions of the Permanent Injunction were definite and specific.

As part of the prohibitions on misrepresentation, Paragraph II.A of the Permanent Injunction stated, in pertinent part, the following: [*5]

> IT IS FURTHER ORDERED that Defendants, in connection with the marketing, offering for sale, or sale of any good or service are hereby permanently restrained and enjoined from:
>
> > A. Misrepresenting the benefit of using the good or service[.]

(Docket Entry No. 36 at 4.) The Permanent Injunction defined "Defendants" as "Vocational Guides, Inc., and Timothy Scott Jackson, whether acting directly or through any corporation, subsidiary, division, agent, employee, consultant, independent contractor or other device." (Id.)

The Permanent Injunction also required Jackson to provide copies of the Permanent Injunction to others in defined circumstances. On this subject, Paragraph XI.A of the Permanent Injunction stated the following:

> IT IS FURTHER ORDERED that, for a period of five (5) years from the date of entry of this Order, Defendants shall:
>
> > A. Provide a copy of this Order to, and obtain a signed and dated acknowledgment of receipt of same from, each officer or director, each individual serving in a management capacity, all personnel involved in responding to consumer complaints or inquiries, and all sales personnel, whether designated [*6] as employees, consultants, independent contractors or otherwise, immediately upon employing or retaining any such persons, for any business where such defendant is an officer, director, partner, or majority owner[.]

(Docket Entry No. 36 at 12.) Paragraph XI. B of the Permanent Injunction required Jackson to make the signed acknowledgments available to representatives of Plaintiff upon reasonable notice. (Id.)

Paragraph XII.A of the Permanent Injunction required:

> For a period of five (5) years from the date of entry of this Order, Defendant Jackson shall notify the Commission of the following: . . . (2) any changes in his employment status (including self-employment) within ten (10) calendar days of such change. Such notice shall include the name and address of each business that he is employed by, a statement of the nature of the business, and a statement of his duties and responsibilities in connection with the business or employment; and (3) any proposed change in the structure of any business entity owned or controlled by him, such as creation, incorporation, dissolution, assignment, sale, merger, creation or dissolution of subsidiaries,

Page 3

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

proposed filing of bankruptcy [*7] petition, or change in the corporate name or address, or any change that may affect compliance obligations arising out of this Order, thirty (30) days prior to the effective date of any proposed change[.]

(Docket Entry No. 36 at 13.)

The Permanent Injunction also stated in Paragraph XII.C:

For a period of five (5) years from the date of entry of this Order, upon written request by a representative of the Commission, Defendant Jackson shall submit written reports (under oath, if requested) and produce documents on fifteen calendar days' notice with respect to any conduct subject to this Order[.]

(Docket Entry No. 36 at 14.)

**C. Jackson Had Actual Notice of the Permanent Injunction**

On July 31, 2001, Jackson acknowledged in an affidavit that he had been served with the Permanent Injunction. (Ex. 211.)

**D. Jackson Operated and Controlled GIS**

Grant Information Service Corporation was incorporated on January 20, 2004, in Tennessee by James O. Jackson, father of Timothy Scott Jackson. (Ex. 217 at 131.) On March 29, 2004, Timothy Jackson became the registered agent of the corporation. (Id.) On July 21, 2004, Grant Information Service Corporation [*8] changed its name to GIS, Inc. ("GIS"). [2] (Ex. 217 at 134-135.) At this point, Helena Ortegon was president and registered agent of the corporation. (Id.) GIS sold information by telephone about obtaining personal grants from the federal government. (Tr. at 184, 207, 245.)

2 For simplicity, the Court will use "GIS," even though at times exhibits or testimony referred to Grant Information Service Corporation.

Jackson was an officer of GIS. He held himself out as such before and after the incorporation of GIS, signing as an officer on at least five occasions during a seven-month period from November 2003 to June 2004. On November 11, 2003, he signed the office lease for GIS as its president. (Tr. at 337; Ex. 223 at 718.) Next, on November 14, 2003, he signed an application for a new business tax license from Davidson County, Tennessee, as vice president of GIS. (Tr. at 337; Ex. 218.) Later, on January 16, 2004, he signed the signature card for the checking account of GIS at SunTrust Bank as its vice president. [*9] (Ex. 230.) After GIS's incorporation on January 20, 2004, Jackson signed numerous checks on the GIS checking account at SunTrust Bank to pay for advertising, rent, payroll and assorted business expenses of GIS. (Exs. 236, 238.) On March 29, 2004, Jackson signed a filing with the Tennessee Secretary of State as the president of GIS for the purposes of changing the registered agent of the company from his father to himself. (Ex. 217 at 133.) Jackson also wrote a letter to the landlord of GIS on June 17, 2004, signing as president of GIS. (Tr. at 339-340; Ex. 224.)

Jackson controlled GIS at all times. (Tr. at 184-187, 338.) He composed the advertisements of GIS, and he authored and revised the sales script used by GIS telemarketers. (Tr. at 247-250, 367.) Amanda McDaniel, who worked for GIS from February or March 2004 through June 2004, testified that she was hired by Jackson. According to McDaniel, who was the customer service manager, Jackson used the title of "president" and was the boss at GIS. (Tr. at 244-245.) Tim Clay, the office manager at GIS, also reported to Jackson. (Tr. at 186, 246.) In addition, Ortegon, who was the president of GIS from July 21, 2004, until its closing, [*10] followed Jackson's orders. On 49 occasions, at Jackson's direction, she wrote checks to "Cash," withdrew funds from the account of GIS, and provided Jackson with the proceeds. (Tr. at 284-286, 290-291, 326-327; Ex. 257.) Even after July 2004, when Ortegon became president, Jackson continued to direct employees, and even ordered the closure of GIS in February 2005. (Tr. at 188, 286, 292, 321.) GIS salesmen Michael Graham and Sean Cornett recognized Jackson as the ultimate authority at GIS during their combined periods of employment at GIS from March 2004 through January 2005. (Tr. at 184-187, 207-208.)

Jackson was also an owner of GIS. In March 2005, he signed two release of liability forms where he identified himself as a previous owner of GIS. (Ex. 227 at 730-731.) GIS telemarketer Sean Cornett testified that during his employment at GIS in the late 2004 and early 2005 he observed Jackson in the office of GIS and was told by Tim Clay, the office manager, that Jackson was the owner. (Tr. at 208.)

**E. Through GIS, Jackson Misrepresented the Benefits of the GIS Grant Information Package**

GIS advertised through classified advertisements in

Case: 1:03-cv-03904 Document #: 110 Filed: 03/07/08 Page 92 of 103 PageID #:1766

Page 4

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

newspapers. Advertisements were placed [*11] through Community Newspaper Holding, Inc. ("CNHI") of Birmingham, Alabama. (Ex. 239.) Jackson wrote the advertisements. (Tr. at 367.) For instance, GIS advertisements stated:

> $ 25,000 FREE Cash Grants! 2004! For Personal Bills, School, Business, Etc. Never Repay! Live Operators! $ 47 Billion Left Unclaimed 2003. 1-800-420-8344 Ext. 26, 7 days.

> $$ FREE MONEY $$ for 2004! Private-Government Grants for personal bills, school, new business, etc. Never Repay. Live Operators. $ 47 billion unclaimed 2003. 1-800-420-8344 ext. 01.

> AS SEEN ON TV, $ 25,000 FREE Cash Grants! GUARANTEED! 2004! For Personal bills, school, business, etc. $ 47 billion dollars unclaimed 2003. Live Operators. 1-800-420-8331 ext. 02.

(Ex. 239 at 743-744; Ex. 241.) Jackson also wrote checks to pay for advertisements placed through CNHI. (Ex. 239 at 756, 773.) The GIS advertisements were widely distributed and appeared in newspapers in Texas, Ohio, California, New York, Missouri and Illinois, but advertisements were not placed in Tennessee. (Tr. at 56, 68, 79, 134-138; Ex. 239 at 739, 740, 743-746, 757-762, 774-782, 795, 824). Customers testified that they were attracted [*12] to the GIS advertisements because they needed money to pay bills, for college or to start a new business. (Tr. at 56-57, 69, 79.)

Consumers who called the telephone numbers in the advertisements of GIS were connected with telemarketers. The calls came from all states in the nation except Tennessee. (Tr. at 184.) The telemarketers used the sales script written by Jackson and were directed to follow it word for word by Jackson and his office manager, Tim Clay. (Tr. at 192, 367.) The sales script stayed virtually the same during the operation of GIS with occasional small changes made by Jackson or Clay. (Tr. at 192-193.)

FTC employees, posing as consumers, called GIS and recorded two sales presentations. (Tr. at 46-49, 149-152.) The sales pitch in each call was similar. (Exs. 201-202, 242-243.) One of the FTC employees was first connected to a pre-recorded message, which stated: "Every year in cities across America, the government is giving away over $ 360 billion in free cash grants" and "people just like you will be receiving free cash grants

from the government." (Ex. 202 at 688-689.)

Once connected, the GIS telemarketers began by stating they had some questions to see if "you [the [*13] caller] qualify." (Ex. 202 at 689; Ex. 243 at 1352.) The telemarketers then asked if the caller was a taxpayer and U.S. citizen with a credit card or checking account. (Ex. 202 at 689; Ex. 243 at 1352.) When the caller affirmatively answered these questions, the telemarketers said that, when the caller received an "application package," GIS would show the caller exactly how to apply for free government and private grants for housing, rent, personal bills, school, a new business, or "pretty much for any good cause." (Ex. 202 at 690; Ex. 243 at 1353.) The telemarketers also told the callers that because they were U.S. citizens and taxpayers, they were "automatically entitled" to the money. (Ex. 202 at 692; Ex. 243 at 1354.)

In addition, the telemarketers explained that GIS would show the consumers how to submit applications and proposals to the proper government agencies. (Ex. 202 at 691; Ex. 243 at 1354.) After stating the price of the grant package ($ 169.90 in one call and $ 139.90 in the second), the telemarketers said that if the caller did not receive "at least $ 25,000" in grant money within 90 days a refund would be given. (Ex. 202 at 694; Ex. 243 at 1354-1355.) To close the [*14] deal the telemarketers asked whether the callers would "like to register today" by check or credit or debit card. (Ex. 202 at 696; Ex. 243 at 1357.)

Customers of GIS from Texas and Ohio testified that the sales script used by GIS telemarketers guaranteed that, if customers did not receive a grant of $ 25,000 within 90 days with the GIS grant package, they would receive a refund. (Tr. at 190-191, 210, 251; Exs. 202 at 694, 206, 243 at 1354.) Potential customers were also told that they were automatically entitled to receive grants by being citizens and taxpayers. (Ex. 202 at 692; Ex. 243 at 1354; Tr. at 193-194.) The script also stated that grants could be used to pay bills and for any good cause. (Tr. at 57, 194, 210.)

These customers also testified that GIS represented in writing they were guaranteed to receive a grant of $ 25,000 if they used the grant materials. (Tr. at 57, 60-61, 63-64, 69, 72, 77.) The form cover letter and the written guarantee included in the GIS grant information package sent to customers stated the following: "As stated to you when you ordered, we guarantee that if you use our program you will qualify for at least $ 25,000 within the 90-day trial period [*15] or we will refund to you the cost of the package." (Tr. at 190-191, 252; Exs. 246-247, 204, 206-207.)

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

Rebecca Spitzgo, the former program manager of Grants.gov, testified about the availability of grants through agencies of the United States government. (Tr. at 214-215.) Grants.gov is a website that is operated by the U.S. Department of Health and Human Services, providing information about all federal government grants. (Tr. at 216-217.) The website features over 26 federal grant-making agencies which award $ 400 billion a year. (Tr. at 217.) Grants.gov includes information regarding the eligibility requirements for grants listed there. (Tr. at 219.) Spitzgo was the program manager of Grants.gov from April 2004 to May 2006 and led the initiative to operate the website. (Tr. at 215.) Prior to that, she was the deputy program manager from June 2002 to April 2004. In addition to working at Grants.gov, Spitzgo has over twenty-five years of experience working with government grants at the Department of Education and the Health Resources and Services Administration. (Tr. at 217-218.)

According to Spitzgo, the vast majority of federal grants are available to states, academic institutions, [*16] local governments, school districts, non-profit organizations, and tribal organizations as opposed to individuals. (Tr. at 220.) Typically, individuals unaffiliated with such organizations are not eligible for grants. (Tr. at 220-222.) For example, in August 2006, about three percent of the approximately 1700 currently available grants (about 51) listed on Grants.gov were available to individuals. (Tr. at 219-220, 239.)

Spitzgo also testified that government grants are awarded through a competitive application process, and applications for grants are often substantial written submissions. (Tr. at 227, 229.) As a result, not everyone who applies for a specific grant receives the grant because applicants may not be eligible for the grant, or there may not be sufficient funds for all applicants who are eligible. (Tr. at 227-228.)

Spitzgo further testified that being a United States citizen and taxpayer did not automatically entitle a person to receive a grant from the United States government. (Tr. at 230-231.) She also testified that there are restrictions on the uses that can be made of government grants, which are spelled out in the legislation and regulations which create and regulate [*17] the grant programs. (Tr. at 226.) Such restrictions limit who can qualify for grants. (Id.) In addition, Spitzgo testified there were no federal grant programs for starting most ordinary businesses or for paying personal bills. (Tr. at 224-225, 231.) Spitzgo's testimony regarding the nature and availability of government grants and specifically their availability to individuals was credible and authoritative.

Jackson testified that the Eligibility Index of the Catalog of Federal Domestic Assistance ("CFDA") identified 643 grants for individuals. (Tr. at 326.) A copy of the Eligibility Index of the CFDA was part of the GIS grant materials. (Tr. at 326; Ex. 249 at 520-545.) The CFDA includes fifteen types of federal assistance including grants. (Tr. at 229-230.) While the Eligibility Index of the CFDA does include approximately 643 programs designated as available to individuals, many of those assistance programs are forms of assistance other than grants as clearly indicated by a lettered code, the legend for which is in the paragraph of the first page of the Eligibility Index. (Ex. 249 at 520-545.) In addition, the CFDA includes current as well as closed grants for which there [*18] are no remaining funds. (Tr. at 230; 253-254.) As a result, it is not apparent what portion of the grants listed in the CFDA were current and thus available to applicants. During his testimony, Jackson did not identify any grants available to customers to pay their personal bills or to use for a new business as had been represented by GIS, nor did he identify any grants which were automatically available to customers because they were citizens and taxpayers as was also represented by GIS. In comparison, Spitzgo testified such grants did not exist.

The three GIS customers who testified at the hearing about their purchases and use of the GIS grant materials were unable to find grants for which they would qualify even though they made diligent efforts to use the materials. (Tr. at 62-63, 74-75, 81-82.)

Amanda McDaniel, former customer service manager of GIS, testified that the GIS grant package requested that customers contact GIS to relate their success stories about obtaining government grants. (Tr. at 253; Ex. 205 at Step 8.) Although McDaniel spoke to at least fifty customers each day, she never received a call from a customer who received a grant. (Tr. at 252-253.) McDaniel was [*19] also not aware from any source that customers of GIS received grants. (Id.) Similarly, while Sean Cornett, a GIS salesman, spoke with customers who were seeking help in using the GIS grant materials, he never spoke with a customer who had received a grant. (Tr. at 211.)

Rather than reporting success, calls to GIS customer service included calls from customers who could not find a grant for which to apply. (Tr. at 252.) The nature of calls to GIS customer service was discussed at office meetings and was known by GIS office staff including Jackson. (Tr. at 249, 252-253.)

Jackson testified that he had financial difficulties and filed a bankruptcy petition in October 2005. Despite this,

Page 6

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

he did not apply for a grant, even though he represented through GIS that government grants were available to pay personal bills, and that citizens and taxpayers were automatically entitled to the grants. (Tr. at 367-368.) Likewise, telemarketer Michael Graham, who worked for GIS for nine months and repeated the sales script approximately one hundred times daily, did not apply for a government grant. (Tr. at 185, 193, 197.) The failure of these insiders to apply for grants being touted as automatically [*20] available to citizens and taxpayers shows they did not believe the claim.

Through GIS, Jackson represented that (a) customers of GIS who used the grant information package were highly likely to receive a grant of at least $ 25,000 within 90 days, (b) U.S. taxpayers and citizens were automatically entitled to receive grants from the government, and (c) government grants were available to pay personal bills and for ordinary businesses. These representations grossly misrepresented the availability of government grants to individuals and the benefit of using the GIS grant information materials to apply for such grants. Through the widely distributed advertisements of GIS and its nationwide telemarketing, Jackson made these misrepresentations as a consistent practice during his operation of GIS from February 2004 through February 2005. These representations were material and central to the benefit of using the GIS grant materials.

Another misrepresentation related to the nature of the money-back guarantee. GIS telemarketers orally represented to customers that if they did not receive a grant of at least $ 25,000 within 90 days, they would receive a full refund by returning the grant information [*21] package. (Ex. 202 at 694; Ex. 243 at 1354.) No other conditions were stated. In contrast, the written form guarantee sent with the GIS grant package indicated that a customer must submit one to three letters of denial from grant agencies before receiving a refund. (Tr. at 324, 364; Exs. 204, 247.) Fulfilling the requirements of the written guarantee of GIS required a substantial investment of time by customers. (Tr. at 366-367.) The condition of requiring denial letters for a refund was not previously disclosed to customers. It created a substantial impediment to seeking a refund under the written guarantee. As customers testified, they were stymied in applying for grants because they could not locate any grants for which they qualified, and if they did not apply for grants, they could not satisfy the conditions for a refund under the written guarantee. (Tr. at 67, 82-83.)

In addition, the refund offered by GIS in writing was not a full refund. It was a refund less $ 10 for shipping and handling. (Tr. at 210, 366; Exs. 204, 247.)

GIS ceased operation in February 2005 after selling grant packages to 27,000 customers. (Tr. at 286, 331, 365; Ex. 226.) In 2004, GIS had gross sales of [*22] $ 2,667,861.07, refunds of $ 304,129.49, and net sales of $ 2,363,731.58. (Ex. 253 at 2.) In 2005, when GIS operated for approximately six weeks, GIS had gross sales of $ 460,335.95, refunds of $ 42,716.27, and net sales of $ 417,619.68. (Tr. at 357-358; Ex. 265 at 1.) Thus, in 2004 and 2005, GIS had total gross sales of $ 3,128,197.02.

By July 21, 2004, when Ortegon became president, GIS already had gross sales of $ 650,000 (Tr. at 102; Ex. 219 at 2), which was 20.8 percent of the total gross sales during the entire operation of GIS. Over the course of its operation, GIS refunded about eleven percent of its gross sales, resulting in total net sales of $ 2,781,351.26. GIS had profits of at least $ 367,000 in 2004 and $ 32,845.01 in 2005. (Tr. at 320; Ex. 265 at 2.) Jackson admits that he withdrew the 2004 profits from GIS. (Tr. at 358.)

### F. Ortegon Acted in Concert With Jackson and GIS

A Colombian native, Ortegon entered the United States in 1998 and married Jackson shortly thereafter. They divorced on January 14, 2004, but they were living together again in July 2004. (Tr. at 280-281.) On July 8, 2004, Ortegon legally changed her married name, Dora Helena Jackson, to her [*23] maiden name, Dora Helena Ortegon. (Ex. 215.) Although she may not have been able to speak English fluently in mid-2004, she could read, speak and understand English well by that time. Ortegon learned to speak English fluently by the summer of 2005.

After her name change, Ortegon became the president and owner of GIS on July 21, 2004, at Jackson's request. (Tr. at 284, 294; Ex. 217 at 134-137.) Ortegon did not pay any money to become the owner of GIS. (Id. at 294.) Instead, Jackson promised to pay Ortegon's $ 2,900 credit card debt if she would allow transfer of the company into her name. (Id.) This was not a bona fide sale of the company. In addition to assuming the title of "president" at GIS, Ortegon's duties included data entry, filing and compiling grant information packages for mailing. (Tr. at 282-283, 330.)

According to Ortegon, Jackson requested that she become the president and owner of the company because the Better Business Bureau was reporting that Jackson was the owner of GIS and also reporting that VGI, his former company, had problems. Jackson explained to her that he did not want customers to know about the problems he had at VGI because, if customers knew, [*24] they would not buy grant information packages. (Id. at 283-284, 295-296.) As a result, he wanted to hide his involvement in GIS from the Better Business Bureau and the public. (Id. at 283-284, 295-296, 356.)

Page 7

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

After becoming president, Ortegon signed documents on behalf of GIS and allowed Jackson to retreat into the shadows. On July 21, 2004, Ortegon signed an amendment to the charter of GIS as president that was filed with the Tennessee Secretary of State changing the name of GIS. (Ex. 217 at 134-135.) Attached to this amendment to the GIS charter was a document signed by Ortegon as president of GIS, identifying herself as the sole shareholder and director of GIS. (Ex. 217 at 136-137.) Although Ortegon signed these documents, Jackson retained control of GIS. (Tr. at 283, 331.)

Also on July 21, 2004, Ortegon signed an application for a new business tax license in the new name of the corporation, GIS, Inc., that was submitted to the Clerk's Office of Davidson County, Tennessee. (Ex. 220.) On July 22, 2004, Ortegon became the sole signatory on the checking account of GIS at SunTrust Bank. (Ex. 230 at 148.) Subsequently, she signed numerous checks on the account for various purposes, [*25] including to pay for rent, advertising, payroll, telephone service, payroll taxes, and copies. (Exs. 235, 237.) Ortegon also wrote 49 checks on the GIS bank account at SunTrust Bank payable to "Cash," which ranged in date from July 23, 2004, through February 22, 2005, and which totaled $ 318,898. (Ex. 257.) Ortegon obtained currency from SunTrust and gave it to Jackson at his direction. (Tr. at 285-286, 290-291, 326.) Although Jackson was no longer a signatory on the GIS account at SunTrust, he continued to control its funds through Ortegon.

Ortegon worked in the GIS office from July 2004 to February 2005 and received a salary of $ 3,000 per month, paid in cash, from Jackson (which amounted to approximately $ 21,000 for the seven-month period). (Tr. at 291-292.) After the closure of GIS, Ortegon also received a $ 20,000 refund from Intelephones that was deposited into her personal bank account. (Tr. at 288-289.) Intelephones had held this amount of GIS funds for six months as a reserve against customer refunds. (Id.) With Jackson's permission, Ortegon used $ 15,494 of the $ 20,000 to pay off indebtedness on her automobile. She gave $ 4,506, the remainder of the $ 20,000, to Jackson. [*26] (Id. at 289.)

**G. Ortegon Had Knowledge of the Permanent Injunction**

While Ortegon denies personally receiving the Permanent Injunction (Tr. at 282), she had knowledge of it. As detailed above, Ortegon was familiar with the FTC's litigation with her husband and Defendant VGI, her employer at the time.

During 2001, Jackson told Ortegon of the entry of the Permanent Injunction. (Tr. at 298, 300.) She was also aware that, in order to pay a money judgment imposed by the Court, her husband obtained a mortgage upon their home. (Id. at 299.)

From July 2004 through February 2005, Ortegon was at the office of GIS virtually every workday. (Tr. at 304-305.) During that time, approximately 100 employees of GIS signed acknowledgments that they had been informed of Jackson's litigation with the FTC and of the fact that the Permanent Injunction was posted on two bulletin boards in the office for their review. (Ex. 251). Copies of the Permanent Injunction were posted on two bulletin boards in the office of GIS. (Tr. at 194-195, 314.) Ortegon saw the Permanent Injunction posted on the wall in the GIS office. (Tr. at 304.) She understood that the Permanent Injunction required its [*27] posting in the GIS office. (Id. at 303.) She also knew the Permanent Injunction made it necessary for employees of GIS to sign acknowledgments of receipt of the Permanent Injunction. (Id. at 303-304.) Despite this understanding, Ortegon did not sign such an acknowledgment. (Id. at 304.) Ortegon admits that as president of GIS it was her duty to ensure that the company operated lawfully. (Tr. at 305-306.)

Ortegon had ample reasons and opportunities to examine the Permanent Injunction, although she denies she ever did. (Tr. at 282.) Her denial is self-serving and not credible, especially in light of the suspicious circumstances under which she agreed to become president of GIS. Based on a multitude of facts including Ortegon's employment at GIS and Defendant VGI, her marriage and close alignment with Jackson, and her admissions that she knew of the entry of the Permanent Injunction, knew some of its terms, and even saw it posted in the office at GIS, there is clear and convincing evidence from which the Court finds she had knowledge of the Permanent Injunction and its prohibitions.

**H. Jackson Failed to Obtain Signed Acknowledgments of Receipt Before April 21, 2004**

[*28] Jackson was an officer of GIS from its initiation until he installed Ortegon as president of GIS during July 2004. GIS opened for business on November 15, 2003, according to its application for a new business tax license with Davidson County, Tennessee, and was running newspaper advertisements regarding grants as of February 22, 2004. (Exs. 218, 239 at 739-741.) GIS was selling grant information catalogs by March 2004. (Tr. at 70, 175-176.) Bank records for the GIS checking account at SunTrust show deposits of over 150 checks from the sale of grant information catalogs into the account of GIS

Page 8

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

during March 2004. (Tr. at 125; Exs. 231-234.)

In a letter dated April 25, 2005, counsel for the FTC requested that Jackson make available to the FTC all original signed acknowledgments of receipt as required by Paragraph XI of the Permanent Injunction. The letter quoted Paragraph XI in its entirety and enclosed a copy of the Permanent Injunction. (Ex. 250.)

In his letter dated May 24, 2005, Jackson acknowledged receipt of the FTC's letter of April 25, 2005, and stated that in response to the request for all acknowledgments of receipt he was enclosing the original acknowledgments as requested. [*29] (Ex. 251.) There were over 100 acknowledgments enclosed with his letter, and their dates ranged from June 1, 2004, through February 2005. (Tr. at 165, 171.) After receiving these acknowledgments, the FTC asked Jackson to confirm that he had provided all acknowledgments as requested. (Ex. 252.) In his response, dated June 16, 2005, Jackson confirmed that he had provided all the signed acknowledgments of receipt. (Ex. 253.)

After the filing of the Plaintiff's motion to show cause, on December 21, 2005, Jackson through his counsel provided the FTC with copies of additional acknowledgments of receipt of the Permanent Injunction that were dated April 21, 2004, through May 26, 2004. (Ex. 254.) Because Jackson did not provide the FTC with any acknowledgments of receipt of the Permanent Injunction for the period prior to April 21, 2004, Jackson apparently did not obtain signed acknowledgments from employees before that date.

## I. Jackson Failed to Report His Employment With GIS

According to the records of Plaintiff, Jackson reported his employment to Plaintiff on only two occasions, and he did not disclose any connection to GIS prior to May 2005. (Tr. at 88-90; Exs. 212-213.) Jackson [*30] became employed by GIS in November 2003 when he applied for a business tax license and signed a lease on its behalf. (Exs. 218, 223.) Jackson did not report his employment with GIS to Plaintiff within ten days of becoming employed as required by Paragraph XII.A of the Permanent Injunction.

Jackson testified that he wrote a letter, dated June 15, 2004, to Plaintiff reporting that he was the registered agent of GIS. (Tr. at 312; Def. Ex. 1.) He also claimed that a U.S. Postal Service Domestic Return Receipt received by him confirmed his claim that his letter of June 15, 2004, was received by Plaintiff. (Tr. at 346-348; Ex. 263 at 2.)

Jackson had previously submitted the domestic

return receipt in question as an exhibit to a sworn affidavit to this Court where he made the same assertion. (Tr. at 346-348.) In the exhibit to his affidavit, Jackson wrote beside the image of the domestic return receipt the following: "This is the certified card that supports my compliance." (Id. at 347; Ex. 263 at 2.) The domestic return receipt in question was addressed to Plaintiff in Washington, D.C., but it did not show a recipient's signature. (Ex. 263 at 3.) On the reverse side of the domestic [*31] return receipt, the sender's return address appeared as follows: "GIS, 5543 Edmondson Pike, Ste. 184, Nashville, TN 37211." (Ex. 263 at 3.)

This address was a mailbox at a UPS Store located at 5543 Edmondson Pike in Nashville, Tennessee, that was applied for on July 13, 2004. (Ex. 240 at 1308.) Because GIS did not apply for this mailbox until July 13, 2004, the domestic return receipt in question could not have been sent with the letter as Jackson claimed. (Tr. at 349-351.) The return address of GIS that Jackson wrote on the domestic return receipt did not exist until nearly a month later. Because Plaintiff has no record of receiving Jackson's letter of June 15, 2004 and in light of the falsity of Jackson's testimony regarding the domestic return receipt, Jackson's claim that he sent the letter to Plaintiff is not credible.

## J. Jackson Failed to Truthfully Report the Nature of His Relationship with GIS when the FTC Asked Him To Do So

By letter dated June 7, 2005, counsel for the FTC requested pursuant to Paragraph XII.C of the Permanent Injunction that Jackson prepare a written report under oath explaining his relationship with GIS. (Ex. 252.) Acknowledging receipt of the [*32] letter, Jackson replied in an unsworn letter, dated June 16, 2005, that, other than being a registered agent from March 21, 2004 to July 31, 2004, he "was not a Officer, Director, Partner or Majority Owner" of GIS. (Ex. 253.) His denial that he was an officer was false.

Jackson attempted to hide the extent of his involvement with GIS on other occasions. For example, on March 30, 2004, Jackson wrote to the Better Business Bureau ("BBB") to introduce GIS and submit a completed business questionnaire. (Tr. at 353; Ex. 264.) Jackson signed the letter as "Tim Scott" and did not reveal his last name. (Tr. at 354; Ex. 264.) The attached questionnaire identified his father, James O. Jackson, as president of GIS. (Ex. 264.) In contrast, on the preceding day, Jackson had signed a change of registered agent notice that was filed with the Tennessee Secretary of State as president of GIS. (Ex. 217 at 133; Tr. at 355-356.) After the BBB began reporting that Jackson was

Page 9

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

associated with GIS, Jackson recruited Ortegon to take on the role of president and owner of GIS in order to hide his involvement with GIS.

Jackson also did not disclose his relationship with GIS when he filed a petition for relief [*33] under Chapter 7 of the U.S. Bankruptcy Code. As a supporting document to his petition, Jackson submitted a statement of financial affairs, which required disclosure of "all businesses in which the debtor was an officer" or owner of five percent or more of the business within the prior six years. (Ex. 262 at 5.) Jackson did not disclose his relationship with GIS even though the statement of financial affairs was submitted under penalty of perjury. (Tr. at 344-345; Ex. 262 at 7.) Jackson's false denial to Plaintiff that he was an officer of GIS was simply part of his plan to conceal his commanding role at GIS.

## II. CONCLUSIONS OF LAW

There is no dispute that the Court has subject matter jurisdiction of this case, as well as jurisdiction over the parties, along with Ortegon and GIS, Inc. Venue is proper in the Middle District of Tennessee pursuant to *28 U.S.C. § 1391(b)* and *(c)*.

### A. Legal Standard for Civil Contempt:

A decision on a motion for contempt lies within the sound discretion of the Court. See *Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv. Co., 340 F.3d 373, 378 (6th Cir. 2003)*. While [*34] the contempt power should not be used lightly, the power "'is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed'" by law. Id. (quoting *Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 450, 31 S. Ct. 492, 55 L. Ed. 797 (1911))*; *Shillitani v. United States, 384 U.S. 364, 370, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966)*. Contempt proceedings are used to "enforce the message that court orders and judgments are to be complied with in a prompt manner." Id.

To establish civil contempt, a movant must show by clear and convincing evidence that (1) a party failed to comply with a definite and specific court order, and (2) the party had knowledge of the court order. *Gary's Electric Service Co., 340 F. 3d at 379*; *Rolex Watch USA v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996)*; *N.L.R.B. v. Cincinnati Bronze, Inc., 829 F.2d 585, 591 (6th Cir. 1987)*. To prevail on a civil contempt claim, the movant is not required to establish intent or willfulness. *Rolex Watch USA, 74 F.3d at 720*. Once this prima facie showing of a violation is made, the burden then shifts to the alleged [*35] contemnor who must "'categorically and in detail' show why he or she is unable to comply

with the court's order." *Rolex Watch USA, 74 F.3d at 720*.

### B. Jackson Failed to Comply with a Definite and Specific Order of This Court of which He Had Actual Notice

The Permanent Injunction was a definite and specific court order entered on July 27, 2001. Jackson had actual notice of it because he signed it and he acknowledged service of a finalized copy of it upon him on July 31, 2001.

Despite Jackson's stipulation to the terms of the Permanent Injunction and his acknowledgment of service, Jackson failed to comply with four provisions of the Permanent Injunction, Paragraphs II.A., XI.A, XII.A, and XII.C. Plaintiff has established Jackson's contempt of these four provisions of the Permanent Injunction through clear and convincing evidence.

*1. Jackson Violated Paragraph II.A of the Permanent Injunction by Misrepresenting the Benefit of the Grant Package Sold through GIS*

Paragraph II.A. of the Permanent Injunction prohibited Jackson from misrepresenting the benefit of using any good or service when marketing, offering for sale, or selling such good or service. [*36] The prohibition also extended to Jackson making misrepresentations through a corporation, employee or agent.

Jackson violated Paragraph II.A of the Permanent Injunction through his operation of GIS by misrepresenting to customers the benefits of using the GIS grant information package. Newspaper advertisements written by Jackson and placed by GIS across the country enticed consumers to contact GIS telemarketers by guaranteeing free grant money that would not have to be repaid. These advertisements failed to include any reference to a refund that GIS would pay to the consumer in the event a grant was not obtained by using GIS's grant package.

The GIS telemarketer script written by Jackson and used word for word by GIS telemarketers represented that (1) customers who used the GIS grant information package were highly likely to receive a grant of at least $ 25,000 within 90 days, (2) taxpayers and citizens of the United States were automatically entitled to receive grants from the government, and (3) government grants were available to pay personal bills, to start businesses, and for any other "good purpose."

These statements grossly misrepresented the availability of government grants [*37] to individuals

Page 10

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

and the benefit of using the GIS grant information materials to apply for such grants. (Id.) From February 2004 to February 2005, Jackson made these misrepresentations through GIS as a consistent practice. (Id.)

The misrepresentations made by GIS are attributable to Jackson because he controlled all aspects of the operation of GIS. He wrote its telemarketing sales script, wrote its print advertisements, controlled its finances, installed Ortegon as its president, supervised its office manager, and was the ultimate authority at GIS.

Jackson contends that GIS did not misrepresent the benefit of using its product because there are government grants available to individuals and GIS customers who called in response to print advertisements were told before they purchased a grant information package that they were guaranteed to receive a grant of at least $ 25,000 within 90 days or they were entitled to a full refund of the purchase price of the grant information package, minus shipping and handling. Thus, Jackson contends that GIS guaranteed a refund, not the receipt of a grant, and he points to evidence showing that GIS granted refunds to all consumers who asked [*38] for them, including $ 304,129.49 in refunds in 2004 alone.

The Court rejects these contentions. Paragraph II.A of the Permanent Injunction prohibited Jackson from misrepresenting the benefit of goods or service he marketed, offered for sale or sold through any corporation or agent. The Permanent Injunction did not include an exception that allowed Jackson to misrepresent goods simply because they were sold with a money-back guarantee.

In addition, the argument that offering a money-back guarantee somehow makes the falsity of an advertisement irrelevant "has been repeatedly rejected," and the Court rejects it here. FTC v. Think Achievement Corp., 312 F.3d 259, 261 (7th Cir. 2002)(citing Montgomery Ward & Co. v. FTC, 379 F.2d 666, 671 (7th Cir. 1967); FTC v. Pantron I Corp., 33 F.3d 1088, 1103 (9th Cir. 1994); FTC v. SlimAmerica, Inc., 77 F.Supp.2d 1263, 1273 (S.D. Fla. 1999)). As Judge Posner has observed, "[n]o one would buy something knowing that it was worthless and that therefore he would have to get a refund of the purchase price." Think Achievement Corp., 312 F.3d at 261 (emphasis in original). [*39]

Seeking a refund is bothersome, and it requires time and effort. See id. "[T]here are many circumstances in which consumers who have been materially misled by deceptive advertising may, upon discovering the deception, be unable to obtain any effective redress whatsoever through the money-back guarantee." In the

Matter of Sears, Roebuck and Co., 95 F.T.C. 406, 518 (1980), aff'd, 676 F.2d 385 (9th Cir. 1982).

In this case, the written conditions of the GIS money-back guarantee required the consumer to return the grant information package along with one to three denial letters from grant agencies. In order to obtain a denial letter, the customer was required to apply for a grant, and the evidence shows grant applications often require substantial written submissions. Jackson conceded that complying with the written guarantee would require a substantial investment of time, and he testified that GIS policy was to provide refunds to consumers who requested them even if the consumers did not provide denial letters. GIS advertisements, sales scripts, and written materials, however, did not apprize consumers of this policy and inform them that they [*40] could obtain a full refund even without submitting denial letters.

Jackson also points to evidence that there were few complaints about GIS made to the BBB. (Tr. at 331.) This evidence does not rebut the clear and convincing evidence presented by the FTC that Jackson, through GIS, misrepresented the grant information package. The meaning of a lack of complaints to the BBB is indeterminate. Cf. United States v. Lasseter, 2005 U.S. Dist. LEXIS 23426, 2005 WL 1638735 at *4 (M.D. Tenn. 2005)("[F]ailure by consumer victims to file a complaint with the FTC does not indicate that the Defendant has complied with the [FTC] Act.") Even so, the BBB received a total of 60 complaints about GIS.

Also, Defendant Jackson's emphasis on BBB complaints is misplaced. GIS had a customer service number that received fifty or more calls a day, many of them from consumers seeking refunds. GIS refunded $ 346,845.76 in 2004 and 2005, or eleven percent of its total gross sales. Jackson admits GIS sold grant information packages to approximately 27,000 customers; if refunds were provided to eleven percent of customers, then 2,970 customers received refunds. These figures do not account for consumers who were dissatisfied [*41] with their purchases, but who did not attempt to request refunds, like the consumers who testified at the show cause hearing.

*2. Jackson Violated XI.A of the Permanent Injunction by Failing to Obtain Signed Acknowledgments*

Paragraph XI.A of the Permanent Injunction required Jackson to obtain signed acknowledgments of receipt of the Permanent Injunction from all officers, directors, consumer service staff, sales personnel and consultants at any business where he was an officer,

Page 11

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

director or majority owner. Because Jackson was an officer of GIS prior to April 21, 2004, and GIS was selling its grant materials in March 2004, Jackson violated Paragraph XI.A. by not obtaining acknowledgments of receipt prior to April 21, 2004.

### 3. Jackson Violated XII.A of the Permanent Injunction by Failing to Truthfully Report the Nature of His Employment at GIS

Paragraph XII.A of the Permanent Injunction required Jackson to notify the FTC of any changes in his employment status within ten days. Jackson violated Paragraph XII.A by not notifying the FTC that he was employed by GIS within ten days of his employment, or for that matter at any time during the operation of GIS. Jackson's first notice [*42] to Plaintiff that he had been employed by GIS occurred after the company had already stopped operating when he reported in June 2005 that he had been the registered agent of GIS from March 21, 2004, to July 31, 2004.

Jackson testified at the show cause hearing that he sent a letter to the FTC, dated June 15, 2004, notifying the FTC that he was the registered agent of GIS. The Court has found his testimony to be not credible. The FTC had no record of receiving Jackson's letter.

Even if the Court were to assume that Jackson sent the letter in question to the FTC, Jackson still would not have been in compliance with Paragraph II.A of the Permanent Injunction. Paragraph XII.A required Jackson to provide Plaintiff with a statement of his duties and responsibilities at GIS. Jackson knew he was the driving force behind GIS, yet he did not reveal this information to the FTC. Just two days after June 15, 2004, the date he claims to have sent the letter to the FTC, Jackson sent a letter to GIS's landlord and signed it as the president of GIS. Other evidence clearly demonstrated Jackson's extensive control over GIS. As a result, the letter of June 15th did not accurately describe the extent [*43] of Jackson's duties and responsibilities at GIS.

### 4. Jackson Violated Paragraph XII.C of the Permanent Injunction by Failing to Report Truthfully the Nature of His Relationship with GIS When Asked to Do So by Plaintiff

Paragraph XII.C of the Permanent Injunction required Jackson to submit written reports (under oath, if requested) to the FTC upon request relating to conduct subject to the Permanent Injunction. Pursuant to this paragraph, the FTC requested by letter that Jackson prepare a written report under oath explaining his relationship with GIS.

In his unsworn reply, Jackson stated that he had been the registered agent of GIS from March 21, 2004 to July 31, 2004, but he denied having been an officer, director or majority owner of the company. In fact, Jackson had been an officer of GIS. His false denial of that fact in his unsworn reply to the FTC's request constitutes a violation of the reporting requirement of Paragraph XII.C of the Permanent Injunction.

### C. Respondents Ortegon and GIS Acted in Concert with Jackson

Under Federal Rule of Civil Procedure 65 (d), injunctions are binding on named parties and on "their officers, [*44] agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." To establish actual notice, knowledge of the Permanent Injunction suffices. See Polo Fashions, Inc. v. Stock Buyers Int'l, Inc., 760 F.2d 698, 700 (6th Cir. 1985). Knowledge, like any other fact, can be proved through circumstantial evidence. Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001); Adcor Indus. v. Bevcorp, LLC, 411 F.Supp.2d 778, 800 (N.D. Ohio 2005)("[a]lthough the [respondents] may not have seen or read the Consent Decree, they certainly knew about it and its prohibition. . . . Overwhelming circumstantial evidence shows that they could not possibly have been ignorant of it.")

The FTC established through clear and convincing evidence that Ortegon, upon receiving actual notice of the existence and many of the terms of the Permanent Injunction, acted in concert and participation with Jackson in violating Paragraph II.A of the Permanent Injunction. Further, Ortegon served as an agent, servant, or employee of Jackson and/or GIS.

[*45] Defendant VGI employed Ortegon, who was at that time married to Jackson, and Ortegon knew the FTC sued Jackson and VGI for deceptive practices in 2001. During the initial litigation about VGI, the FTC deposed Ortegon. As a result of the litigation, VGI closed, causing the loss of Ortegon's job and Jackson's job. Thus, involvement with VGI was a substantial event in Ortegon's life. Although the FTC did not formally serve Ortegon with a copy of the Permanent Injunction because she was not a party to the litigation, she nonetheless had knowledge of it. She was aware of the entry of the Permanent Injunction, and she now admits she knew at least some of its terms.

Even after their divorce and at Jackson's request, Ortegon resumed her maiden name and became the president and owner of GIS in July 2004 in order to hide Jackson's involvement in GIS. She admitted she knew Jackson asked her to do so because the BBB had posted

Page 12

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

on its website information about the VGI Permanent Injunction and information linking Jackson to GIS.

After becoming the president and owner of GIS, Ortegon was the public face of GIS. She conceded it was her job to insure that GIS operated lawfully. She signed documents [*46] for filings with state and local governments, and she signed banking documents and checks. Ortegon also acted as the conduit for thousands of dollars in cash taken from the GIS bank account and given to Jackson. Ortegon received a salary and paid off her car with GIS funds.

While serving as president of GIS and while employed in its offices from July 2004 until February 2005, over 100 employees of GIS signed receipts acknowledging the presence of the Permanent Injunction posted on the bulletin boards in the office. Ortegon admits she saw the Permanent Injunction posted on the bulletin boards, yet she did not sign a receipt acknowledging that she had seen it. Although Ortegon denies that she personally received a copy of the Permanent Injunction or read it, it is not reasonable for the Court to rely on her denial in the face of overwhelming evidence to the contrary. See *Adcor Industries, 411 F. Supp.2d at 800.* Having found that Ortegon had actual knowledge of the Permanent Injunction and its provisions based on the clear and convincing evidence presented, the Court concludes that Ortegon participated in active concert with Jackson and GIS and that she served as an [*47] agent, servant, or employee of Jackson and/or GIS.

GIS was the corporate vehicle controlled by Jackson throughout its operation and through which Jackson misrepresented to consumers the benefits of the grant information packages sold. Thus, GIS conducted itself in active concert with Jackson. GIS had actual notice of the Permanent Injunction through Jackson and Ortegon as its officers and agents and through the posting of the Permanent Injunction on its premises. See *City of Monroe Employees Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 688 (6th Cir. 2005)*(observing in securities fraud case that knowledge of corporate officer or agent acting within scope of his authority is attributable to corporation); *Holt v. Southern Railway Co., 51 F.R.D. 296, 299 (E.D. Tenn. 1969)*("the knowledge of all [the corporation's] officers and agents was the knowledge of the corporation"). Cf. *FTC v. Bay Area Business Council, Inc., 423 F.3d 627, 636-637 (7th Cir. 2005)*(corporate owner and chief executive officer was liable for deceptive acts practiced against consumers in telemarketing scheme where owner and officer clearly had knowledge of corporation's [*48] deceptive acts).

### D. Civil Contempt Remedies

#### 1. Restitution and Disgorgement

"District courts are afforded wide discretion in fashioning an equitable remedy for civil contempt." *McGregor v. Chierico, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000).* Judicial sanctions may be imposed for either or both of two purposes: to coerce the defendant into compliance with the Court's order and to compensate the movant for the losses sustained. *Gary's Elec. Serv., 340 F.3d at 379* (citing *United States v. United Mine Workers of Am., 330 U.S. 258, 303-04, 67 S. Ct. 677, 91 L. Ed. 884 (1947)*).

"Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers. See, e.g., *FTC v. Gem Merchandising Corp., 87 F.3d 466 (11th Cir. 1996)*(affirming an award of damages as calculated by consumers' losses and an order of disgorgement to the Treasury); *FTC v. Amy Travel Service, Inc., 875 F.2d [564] at 570 [(7th Cir. 1989)]* (affirming restitution award of $ 6,629,100, the amount consumers paid for travel certificates)." *F.T.C. v. Febre, 128 F.3d 530, 536 (7th Cir. 1997).* In exercising its broad [*49] discretion in fashioning a remedy for civil contempt, the Court may order restitution to victims or disgorgement of profits to deprive the wrongdoer of his ill-gotten gain. *Gem Merchandising Corp., 87 F.3d at 470.* "Further, because it is not always possible to distribute the money to the victims of defendant's wrongdoing, a court may order the funds paid to the United States Treasury." Id. Individuals and corporate entities may be held jointly and severally liable for the total amount of consumer injury. *FTC v. Think Achievement Corp., 144 F.Supp.2d 1013, 1019 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002).*

"Proof of individual reliance by each purchasing customer is not a prerequisite to the provision of equitable relief needed to redress fraud." *McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000)*(citing *FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993)*). "'A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.'" [*50] Id. (quoting Figgie Int'l, Inc.).

In this case Jackson, through GIS and with the assistance of Ortegon, misrepresented the central characteristic of the grant information packages. After reading the advertisements and hearing the telemarketing pitch, consumers were led to believe that their use of the materials GIS sold to them would make it highly likely that they would obtain a free government grant of at least

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

$ 25,000 within 90 days. Only after paying in full for the grant information package and receiving it through the mail did consumers realize that the promised benefits were illusory. Not one consumer ever reported receiving a government grant after using GIS materials. Consequently, a fair measure of the injury done by Jackson, GIS and Ortegon through their violations of Paragraph II.A of the Permanent Injunction is the total amount of sales to consumers made by GIS, less any amounts previously returned to the victims in refunds. See *Think Achievement Corp., 144 F. Supp.2d at 1019*; *FTC v. Wolf, 1996 U.S. Dist. LEXIS 1760, 1996 WL 812940 at *9 (S.D. Fla. 1996)*("The appropriate measure of restitution is the aggregate amount invested by customers, less refunds made [*51] by the defendants."); *FTC v. Renaissance Fine Arts, 1995 U.S. Dist. LEXIS 21040, 1995 WL 523619 at *2 (N.D. Ohio 1995)*("Generally, the appropriate amount of restitution in consumer redress cases is the full purchase price of the product, less refunds paid.").

Because the evidence shows that eleven percent of the gross sales of GIS were refunded, that amount will be deducted from total gross sales in determining the amount to be disgorged. Although Ortegon claims that she paid additional refunds from her personal bank account after GIS closed in early 2005, she did not provide any evidence of the amount of such refunds paid; therefore, the Court cannot include them in its calculations. Jackson, GIS and Ortegon are not entitled to a reduction in the amount ordered disgorged based on their other costs of doing business. See *Febre, 128 F.3d at 536*; *Slimamerica, 77 F.Supp.2d at 1276* ("Costs incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims.").

In 2004, GIS generated $ 2,363,731.58 in net sales (gross sales less consumer refunds). In 2005, GIS generated $ 417,619.68 in net sales. Total net [*52] sales were thus $ 2,781,351.26.

Jackson admitted he received the profits from GIS in 2004, which were at least equal to $ 367,000. The evidence also proves that he received an additional $ 4,506 as his share of the refund from Intelephones in 2005, making the total he received at least $ 371,506. Jackson is individually liable for disgorgement in the amount of $ 371,506, payable to the U.S. Treasury.

Ortegon received from GIS's proceeds a salary of $ 21,000 and a pay-off on her personal automobile of $ 15,494 from her share of the refund from Intelephones, for a total of $ 36,494. Ortegon is individually liable for disgorgement in the amount of $ 36,494, payable to the U.S. Treasury. Although the FTC contends Ortegon

additionally should be held personally liable for over $ 300,000 for the cash she obtained by writing checks on the GIS account while she served as president, the uncontradicted evidence shows that she gave the cash to Jackson, who paid her a salary. Jackson admitted he took the profits from GIS in 2004. The FTC did not present any evidence showing that Ortegon took profits from GIS.

Subtracted from GIS's total net sales ($ 2,781,351.26) for the contempt period are [*53] the amounts for which Jackson ($ 371,506) and Ortegon ($ 36,494) are held personally liable for disgorgement. This leaves a total of $ 2,373,351.26, for which GIS and Jackson are jointly and severally liable for restitution, payable to the U.S. Treasury. See *Think Achievement Corp., 144 F.Supp.2d at 1019.*

Ortegon became president of GIS on July 21, 2004, and worked at GIS until it closed in February 2005. GIS made 20.8% of its gross sales prior to the date Ortegon became president, and 79.2% thereafter. Thus, Ortegon is jointly and severally liable with GIS and Jackson for 79.2%, or $ 1,879,694.20, of the total restitution amount of $ 2,373,351.26, payable to the U.S. Treasury.

GIS, Jackson and Ortegon, jointly and severally, must pay the restitution as ordered, and Jackson and Ortegon individually must pay the disgorgement as ordered to purge their civil contempt.

### 2. Modification of the Permanent Injunction

The FTC seeks modification of the Permanent Injunction to permanently ban Jackson from participating in all aspects of telemarketing. In direct support of its request for a lifetime telemarketing ban, the FTC cites only *McGregor, 206 F.3d at 1386 n.9.* [*54] In that footnote, the Eleventh Circuit stated (emphasis added):

> Michael Chierico also appeals from Section III of the First Contempt Order which permanently enjoins him from "engaging or participating, whether directly or indirectly," in any capacity, in telemarketing as defined by the Final Judgment [.] . . . Contrary to Michael Chierico's contention, the permanent ban was not a contempt sanction, but a modification of Section II of the Final Judgment. Section II's bond requirement and injunctive provisions were intended to ensure Michael Chierico's compliance with the law and protect consumers from further injury. In light of Michael Chierico's continued fraudulent practices

Page 14

2006 U.S. Dist. LEXIS 82308, *; 2006-2 Trade Cas. (CCH) P75,520

after the entry of the Final Judgment, the district court did not abuse its discretion in modifying Section II of the Final Judgment.

Like Chierico, Jackson continued to engage in deceptive telemarketing activity following entry of a permanent injunction. To protect consumers from further harm the Court is tempted to impose on Jackson the lifetime ban on telemarketing the FTC requests, as such action appears to be warranted.

Unlike Chierico's Final Judgment, however, the Stipulated Final Judgment [*55] and Order for Permanent Injunction Against Defendants Vocational Guides, Inc., and Timothy Scott Jackson does not define "telemarketing," and the FTC has not provided the Court with any proposed language to adopt in modifying the Permanent Injunction previously entered by the Court.

As the FTC undoubtedly realizes, the definition of "telemarketing" can be very broad in scope, subject to litigation, and constantly changing. See e.g. *Nat'l Fed'n of the Blind v. FTC, 420 F.3d 331 (4th Cir. 2005)*(discussing definition of "telemarketing" in interpreting 1994 Telemarketing Consumer Fraud and Abuse Prevention Act and the FTC's Telemarketing Sales Rule promulgated thereunder); *Mainstream Marketing Servs., Inc. v. FTC, 358 F.3d 1228, 1235 (10th Cir. 2004)*("There has been some confusion throughout this litigation with respect to how to define the term 'telemarketing.' *Compare* Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994 . . . (defining 'telemarketing' as calls 'conducted to induce purchases of goods or services') *with Mainstream Mktg. Servs., Inc. v.*

*FTC, 283 F.Supp.2d 1151, 1154 (D.Colo. 2003)*(describing [*56] 'telemarketing' as the practice of 'soliciting sales and donations' conducted by businesses, charities, political organizations, and others."); *United States v. Schaefer, 291 F.3d 932, 935 (7th Cir. 2002)*(noting FTC Final Judgment and Order for Permanent Injunction broadly defined "telemarketing" as "any business that employed telephone presentations, 'either exclusively or in conjunction with the use of the mails or any commercial parcel delivery service.'").

While the Court may possess authority under *Federal Rule of Civil Procedure 60(b)(5)* to modify the terms of the Permanent Injunction in this case, the Court is not inclined to attempt to modify the Permanent Injunction, to which Jackson initially consented, to impose against Jackson a lifetime ban on "telemarketing" when the Court has been provided with no guidance from the parties in defining the term and the scope of its meaning in the context of this case. Consequently, the request to modify the Permanent Injunction will be denied.

## III. CONCLUSION

Based upon all of the foregoing Findings of Fact and Conclusions of Law, the Court holds that Timothy Scott [*57] Jackson, Dora Helena Ortegon and GIS, Inc., must be held in civil contempt for failure to comply with provisions of the Stipulated Final Judgment and Order for Permanent Injunction Against Defendants Vocational Guides, Inc., and Timothy Scott Jackson.

An appropriate Order will be entered.

ROBERT L. ECHOLS

UNITED STATES DISTRICT JUDGE