```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
                              EASTERN DIVISION


FEDERAL TRADE COMMISSION,       )
                                )    No. 03 C 3904
              Plaintiff,        )
                                )    Chicago, Illinois
       v.                       )    May 29, 2008
                                )    10:15 a.m.
KEVIN TRUDEAU,                  )
                                )
              Defendant.        )
                                )

                     TRANSCRIPT OF PROCEEDINGS

             BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiff:         FEDERAL TRADE COMMISSION
                           501 New Jersey Avenue, NW
                           Suite 2215
                           Washington, DC 20001
                           BY:  MS. LAUREEN KAPIN
                                MS. SANDHYA PRABHU


For the Defendant Trudeau: JENNER & BLOCK, LLC
                           One IBM Plaza
                           Chicago, Illinois 60611
                           BY:  MR. DAVID J. BRADFORD
                                MR. DANIEL J. HURTADO




                     Valarie M. Ramsey, CSR, RMR
                            P.O. Box 16
                      Hazel Crest, Illinois 60429
                           (708) 860-8482
```

1     THE CLERK:  03 C 3904, Federal Trade Commission
2 versus Kevin Trudeau.
3     MR. BRADFORD:  Good morning, Your Honor.  David
4 Bradford and Dan Hurtado for Mr. Trudeau.
5     MS. KAPIN:  Good morning, Your Honor.  Laureen Kapin
6 and Sandhya Prabhu for the Federal Trade Commission.
7     THE COURT:  Okay.  We're here today to talk about
8 where we're going tomorrow, I guess, so I've read the briefs
9 that you have filed in this case.  I have a couple of
10 questions before we go further.
11     A lot of these briefs were filed under -- at least
12 partly under seal.  I'm not sure why, to be honest with you.
13 We're not talking about Social Security numbers or consumer
14 information or anything like that.  We're talking about the
15 numbers that affect the public, the alleged public harm done
16 here, and I don't think they should be redacted at all, and I
17 think if Mr. Trudeau is going to plead poverty he has a right
18 to do that, but it's going to be in open court.  And I know
19 what our friends on the Seventh Circuit will say about this,
20 and I'm a little concerned.
21     I didn't see anything in here that was so sensitive
22 that it needed to be redacted or filed under seal.
23     MS. KAPIN:  Just to respond briefly from the FTC's
24 perspective, Your Honor, we would be in agreement except as to
25 personally identifiable information as to consumers such as

1  their address or phone number, which is in some of the
2  consumer --
3          THE COURT:  In the exhibits.
4          MS. KAPIN:  It might be in some of the exhibits.
5          THE COURT:  It's not in the briefs for sure.
6          MS. KAPIN:  Right, no, it is not in the briefs.
7          Other than that, under the protective order, once
8  defendants or third parties designate something as protected,
9  under the protective order we're obligated to file it under
10 seal.
11         THE COURT:  I'm not criticizing anybody.  I'm just
12 raising this because, you know, courts and parties have been
13 criticized by the court of appeals, and, frankly, I'm totally
14 on board with this, that doing things under seal causes more
15 problems unless there's a really legitimate reason for it.
16         MS. KAPIN:  Our preference would be to be able to
17 file published versions of these briefs in mostly their
18 entirety.
19         THE COURT:  I think the briefs could be unsealed
20 right now and just leave the exhibits the way they are at the
21 moment and we'll deal with that because there are some --
22 you're right, there are some personal names and this stuff of
23 consumers, and we may be talking about this, but I'll tell you
24 to the extent we talk about particular consumer complaints and
25 that sort of thing, it's going to be in open court.  Now,

1  we're not going to identify perhaps personal information about
2  those people other than their names, but --
3           MS. KAPIN:   Right, it's the information plus the name
4  which would be a concern.   Their names is -- would not be
5  personally identifiable information that we think should be
6  under seal.
7           THE COURT:   Why don't we do this.   I'll just in the
8  minute order today we're going to unseal the briefs, and we'll
9  go through the docket and do that by number, and just leave
10 the exhibits the way they are for now.
11          MS. KAPIN:   The only thing I would raise is that when
12 we were communicating with ITB, which is one of the entities
13 who has provided some of this information, they indicated to
14 us that they viewed this information as -- that they wanted
15 this information being kept under seal and I just --
16          THE COURT:   It's not going to be.   Even if they were
17 here to ask for it, I wouldn't do it.
18          MS. KAPIN:   I'm just letting you know, Your Honor.   I
19 don't agree with it but --
20          THE COURT:   The number of people who bought the
21 books, the gross number, the gross revenue from those books,
22 the alleged profit made by various people, that's all grist
23 for the mill, unfortunately for somebody's interest, but I
24 don't even know if it's unfortunate.   I mean, it's there.
25 We're going to have to talk about it at a hearing, and it

looks like we're going to need a hearing.

All right. We'll just put the unseal.

MR. BRADFORD: We agree with all you've said, Your Honor.

THE COURT: Thank you.

Okay. Now, there's a motion to extend the time for taking the depositions, which is fine with me. And you want to make that to June 20th. That's fine.

And then it seems to me that we could debate whether we need a hearing here or not, but I think that because of the seriousness of this matter, I think Mr. Trudeau should get his day in court and be able to explain himself, and whether his experts are -- you said there might be a Daubert motion or something like that. I think we could fold that into some sort of pre-hearing --

MS. KAPIN: Oral argument.

THE COURT: -- proceeding. Well, I mean, I'm going to hear from them anyway. It's a bench matter, so I'm going to hear from them. Whether I -- even if I were to agree that their testimony wasn't -- or didn't meet the Daubert standards or 702, I would still hear it. I could make that determination in the context of making any decision in this case.

You know, there are some things that you argue about here, and, of course, as always, the briefs are good and

1  interesting to read.  Just taking one example, just as an
2  example, there's a big disagreement about whether the retail
3  book sales are attributable to the infomercial or not.
4  Mr. Bradford and company here say, well, there's no evidence
5  that they are, and as I think I mused in open court, which is
6  always dangerous, I think it is something that we have to deal
7  with here.  Just having been exposed to bookstores, the books
8  there on the shelf, I mean, a lot of people may never have
9  heard of it on TV and picked it up and read it, and they had
10 every reason to -- they had every opportunity to see what was
11 in it at least at the bookstore if they hadn't seen the
12 infomercial, and then that person -- you know, that purchase
13 would have -- wouldn't be influenced by the infomercial at
14 all.
15         On the other hand, as FTC points out, in that big
16 gold seal, as seen on TV, kind of attracts the people who've
17 seen it on TV.  And we see that type of advertising all the
18 time, and I have no doubt that some portion of those people
19 who bought it retail probably had been influenced by the
20 infomercial.  Whether there's any way to make a reasonable
21 inference as to what that percentage is, is an open question
22 that might be the type of thing that, you know, some sort of
23 consumer product expert could enlighten the court about, at
24 least to, you know, on either side to tell me whether or not
25 there is a way to, based on traditional or historical surveys

1  of this type of product or some other way, to make a reasoned
2  inference. Or perhaps there's no way to make a reasoned
3  inference. I don't know. It seems to me that that's
4  something that might be helpful to the court, to any trier of
5  fact.
6        That is not a major part of this, but it is still --
7  it's real money in my book.
8        I have given some thought, though, and I think you've
9  given me everything I could possibly need on the issue of
10 whether disgorgement versus consumer redress is the
11 appropriate measure. And I'm leaning towards consumer redress
12 because I think that regardless of the arguments so ably put
13 by the defendant here, if you -- we're dealing with contempt.
14 We're not dealing with an original remedy. And when you're
15 dealing with contempt, I think the latitude is a lot greater,
16 and it's remedial, and it's not totally equivalent to
17 traditional remedies that we might be dealing with in a
18 one-on-one case involving equitable or legal relief. And if
19 somebody violates an order, whether they get a nickel from it,
20 if it hurt somebody, a proper remedy would be to make that
21 right. That's what I think the contempt power incorporates,
22 and it seems to me the FTC has the longer end of the stick on
23 that one.
24       You know, 800 and some odd thousand books were sold
25 here. There's a lot of money there. There were certain

1  things that -- I'm just -- I'm giving you some thoughts.  You
2  know how I do things with you folks.  And if we're going to
3  have a hearing, I'd like these addressed because they're
4  important to me.  And as I'm telling you what's on my mind,
5  you can tell me what's on your mind.
6  　　　　　To actually make people whole -- I mean there may be
7  people who bought this book who are absolutely perfectly happy
8  with it who actually injected themselves with this stuff, as
9  you say in your brief, which I find rather remarkable, but I
10 don't buy books like this.  Fortunately, I don't need to diet,
11 but maybe some people do and go to these lengths and consider
12 this to be easy.  I don't know.
13 　　　　　But one remedy you haven't talked about is some way
14 to inform the people who bought the books about my order, it's
15 not going to be very flattering to Mr. Trudeau, and to give
16 them an opportunity to return the books or seek full
17 compensation, including -- I think the FTC has a very good
18 point about the shipping charges here.  When you're paying 15
19 dollars for a book and the shipping charges -- I just mailed a
20 book.  I think it was about six bucks to mail a book
21 somewhere.  And this is a pretty big book too.
22 　　　　　MS. KAPIN:  It's a hardcover book.
23 　　　　　THE COURT:  Yeah.  The book I mailed was not as big
24 as this one, I don't think.  So, you know, to spend five or
25 six or seven dollars mailing back a 15-dollar book is not

1 exactly remedial in my view.  But maybe one way rather than
2 just, you know, slapping some sort of order on Mr. Trudeau
3 and having that money go nowhere or to the treasury would be to
4 give people an opportunity -- there would be expense,
5 obviously, in doing that.  It's just an idea I'm throwing out
6 because we're settling another huge nationwide class action as
7 we speak in which we are going to give consumers an
8 opportunity to seek individual relief.
9      MS. KAPIN:  Just as a brief response to that, Your
10 Honor.
11      THE COURT:  That was an FTC case too, actually.
12      MS. KAPIN:  Yes, the FTC does have some experience in
13 administering redress programs.  They are expensive for the
14 first point.  And for the second point, sometimes it's
15 difficult to reach all consumers.  And even when consumers are
16 reached, they don't necessarily go through the steps to
17 actually get their money back.  Historically the response
18 rates are low.  I mean, even when -- even when checks are
19 mailed to consumers lots of times they don't even cash the
20 checks.
21      THE COURT:  Because they throw it away with all the
22 other junk mail they get.
23      MS. KAPIN:  I'm just pointing out that if your intent
24 is to hope that you get the greatest number of consumers
25 getting money in their pockets, it's not necessarily going to

1  do that.
2      THE COURT: I understand. It's just something I
3  wanted to raise with you because, several factors. One is
4  these are motivated consumers who bought this book. And this
5  wasn't all that long ago. This wasn't like a blast fax. We
6  have a case like that too where, you know, how do you find
7  somebody in a blast fax who, you know, got some sort of junk
8  fax, tossed it away, forgot about it? You know, this is a
9  book somebody took the time and trouble to make a phone call
10 or go on an Internet site or do something about, so they
11 probably still have it sitting on a shelf somewhere. Maybe,
12 maybe not. I don't know. I'm just exploring something that
13 would be more of a direct benefit to the people who actually
14 want their money back, because I'm really buying your point
15 about, sure, you get a low return rate because they have to
16 pay the shipping and handling of sending a hardback book,
17 which you can't even get into a manila envelope. You probably
18 need to put it in a box.
19     MS. KAPIN: Yeah, it has to be in a box.
20     THE COURT: Unless you had the box. Or wrap it up or
21 something. I don't know.
22     MS. KAPIN: It comes in a box.
23     THE COURT: It comes in a box, but by the time you
24 read it the box is probably in the garbage.
25     What else do I want to share with you and then we're

1  going to set this for a hearing.  I think that may be all I
2  want to share with you at this point.
3       The motion to modify the order I think certainly goes
4  hand in hand with this other thing, and we'll deal with that
5  in due course because anything that I hear in connection with
6  the contempt is going to affect that as well.  So I think
7  that's probably all I want to say about that.
8       How many witnesses do you think -- you mentioned
9  about four or five witnesses that you had in mind,
10 Mr. Bradford.
11      MR. BRADFORD:  Yes, Your Honor.  We expect to call
12 Mr. Trudeau; the two experts, one from the Bureau of
13 Enforcement, former assistant director of the Bureau of
14 Enforcement from the FTC; the CEO of the book sellers
15 association relevant to the issue that Your Honor raised; and
16 then likely Mr. Trudeau's accountant, CPA, to address his
17 financial circumstances.  So that would be four.
18      THE COURT:  And then, you know, I know the FTC's
19 position is, well, we don't really need to present anything;
20 but if they present that, what will you anticipate?
21      MS. KAPIN:  Well, I did have one question for Your
22 Honor, and then I'll answer your question, if I may.
23      The FTC's position is that the presumption of
24 consumer -- that the case law supports a presumption of
25 consumer harm when the infomercials were widespread, and in

1 that regard we don't intend to present evidence by way of
2 consumers for the reasons that we set forth in our brief. On
3 the other hand, if a live consumer witness is something you
4 would be interested in, I would like to know that because I
5 can accommodate it. But our position is we don't think that
6 that's required under the case law.
7       THE COURT: I'm not going to make that decision for
8 you.
9       MS. KAPIN: It was more input.
10       THE COURT: I would not prohibit you from putting
11 that evidence on. I think your basic premise is correct, it's
12 correct enough to allow the defendant to go first because I
13 think there is a presumption here. I've already made
14 findings. I know there's a --
15       MS. KAPIN: Right.
16       THE COURT: There was a motion to reconsider that.
17       MS. KAPIN: Well, that's the thing. You've already
18 made findings that thousands have been harmed, and we have
19 evidence that there were more than 800,000 books sold, so that
20 is the way we see it.
21       THE COURT: Right, but there is a motion to
22 reconsider that finding.
23       MS. KAPIN: Right.
24       THE COURT: So that's not a final order.
25       MS. KAPIN: I understand.

1       THE COURT: But I think that is the way the case
2   stands right now, and so I think looking at it as a burden
3   shifting or however you wanted to, we could let Mr. Bradford
4   put on his evidence. I suppose we could do this in -- you
5   know, we don't have to do it all at one time, but I would like
6   to bring this to a conclusion. It's been a long time.
7       Is the book still being sold?
8       MR. BRADFORD: The book is being sold, but the
9   infomercial ceased as soon as Your Honor's order --
10      THE COURT: Right, I know that.
11      MR. BRADFORD: -- was entered.
12      MS. KAPIN: There is still an infomercial that
13  relates to the book. It doesn't make the claims that we
14  challenge, but there is still a Natural Cures infomercial that
15  also promotes the Weight Loss Cures book.
16      THE COURT: All right. So this is going to take at
17  least a day or more.
18      MS. KAPIN: Probably two. We hope to get it done in
19  a day, day and a half. Setting aside two days would be a
20  conservative estimate.
21      MR. BRADFORD: We agree with that. I know Your Honor
22  wants to get it done all at once, and the FTC doesn't want to
23  go and come back, so I would hope we could do it in a day, but
24  it might make sense to try to schedule two days in a row, if
25  we could, if your schedule permits it.

1     THE COURT:  I can schedule this for July 23 and 24.
2  I do have a 10:00 sentencing on the 24th, which shouldn't take
3  more than about 20 minutes.  Is that --
4     MS. KAPIN:  I have some long bought tickets for that
5  evening.
6     THE COURT:  Which evening?
7     MS. KAPIN:  The 24th.  The 23rd is fine.
8     THE COURT:  We have theater tickets actually, but
9  it's here in Chicago.
10    MS. KAPIN:  Mine, unfortunately, are in Washington,
11 D.C.  If we ended that afternoon, I think that would still be
12 fine.
13    THE COURT:  Are you sure?
14    MS. KAPIN:  Although if there were any other dates
15 that we have available to explore.
16    THE COURT:  Well, didn't you tell me that you were
17 going to be gone the first part of August?
18    MS. KAPIN:  I am.  Are there any other dates before
19 the 24th that are available by any chance?
20    THE COURT:  No.  The 30th and the 31st.  29th or
21 30th.  I have a family problem myself right now that I'm not
22 scheduling things on Mondays and Fridays, but -- so I'm trying
23 to do things between Tuesdays and Thursdays, so the 29th,
24 30th, 31st.
25    MS. KAPIN:  I thought those weren't good for you.

1     Is that July or --
2     THE COURT: July.
3     MR. HURTADO: That's fine for us.
4     MR. BRADFORD: I think those work fine.
5     MS. KAPIN: I think actually that that didn't work
6 for one of our witnesses, and that's probably why. I think we
7 should just keep it to the 23rd and 24th, and perhaps that
8 will motivate --
9     THE COURT: We could start -- if you wanted to, we
10 could start on the 22nd in the afternoon for a couple of --
11    MS. KAPIN: That would be great.
12    THE COURT: -- for a couple of hours.
13    MS. KAPIN: That would be terrific, Your Honor.
14    THE COURT: And adjourn around four.
15    MR. BRADFORD: I think that makes a great deal of
16 sense. And we can get any evidentiary issues resolved at that
17 time as well.
18    THE COURT: And then I'll set aside the whole day on
19 the 23rd beginning at ten to 3:30, 4 or something like that,
20 and maybe we can get it all done then.
21    MS. KAPIN: Um-hum.
22    THE COURT: And if we can't, we'll figure out
23 something else.
24    Now, do you think we need to do -- any exhibits I
25 would like marked, exchanged, indexed and put in a book for

1  me, that I don't already have.
2      MR. BRADFORD:  I think there will be a few, and we
3  will do that, Your Honor.
4      THE COURT:  And a witness list for both sides to the
5  extent possible.  And your deps will be done by then, so we
6  should be ready to go.
7      MR. HURTADO:  Is there a date upon which you wanted
8  the exhibits and the witness list?
9      THE COURT:  No.  Just a couple of days -- the week
10  before that anytime.
11      MR. BRADFORD:  All right.
12      MS. KAPIN:  Just revisiting our motions in limine, do
13  I understand --
14      THE COURT:  If you want to make a record --
15      MS. KAPIN:  Right.
16      THE COURT:  -- on filing a motion to exclude expert
17  testimony, you can go ahead and do that, but I'm telling you
18  right now I'll hear them out.
19      MS. KAPIN:  Right, okay, I just wanted to make sure.
20      THE COURT:  And that way your position on it will be
21  clear, because I'm not totally clear about the basis of the
22  objection.  So that's fine.
23      MS. KAPIN:  Okay.
24      THE COURT:  And you can respond or not.  It doesn't
25  really matter to me because I'm going to hear them out, and

1  you'll have a chance to argue that post-hearing anyway.
2          MR. BRADFORD: Certainly, certainly.
3          THE COURT: Because we'll probably have some sort of
4  post-hearing, an abbreviated post-hearing. I mean, I've got a
5  lot of material here, an abbreviated post-hearing schedule.
6          MS. KAPIN: All in 15 pages, Your Honor.
7          THE COURT: You did. You did have 15 pages, but you
8  filed multiple copies of it.
9          All right.
10         MR. BRADFORD: Your Honor, on that note, the status
11 report indicated that we might be seeking leave to file a
12 surreply, and we're not going to burden you with that.
13         THE COURT: Don't do that. Don't do that. That's
14 unnecessary because we have other work to do. You'll all have
15 a chance to weigh in one last time, I can assure you.
16         MS. KAPIN: So you anticipate, then, after the trial
17 at some point we will have a further discussion before the
18 court?
19         THE COURT: I suspect, given the history of this
20 case, that you'll have a chance and I'll have a chance and
21 we'll probably have some sort of argument either -- maybe even
22 that third day, you know, that Thursday morning or something.
23 Maybe that would be a good time to sort of sum up and see if
24 we even need any additional briefing.
25         MR. BRADFORD: Right.

1         THE COURT: We may not.

2         All right. See you then.

3         MR. BRADFORD: Thank you so much, Your Honor.

4         MS. KAPIN: Thank you, Your Honor.

5         THE CLERK: 2:00 on the 22nd.

6         THE COURT: Yeah, we'll start at 1:30 on the 22nd.

7         MR. BRADFORD: Very good. Thank you, Your Honor.

12         \*    \*    \*    \*    \*    \*    \*

13         C E R T I F I C A T E

16     I hereby certify that the foregoing is a true and

17 correct transcript of the above-entitled matter.

19      /s/ Valarie M Ramsey           06/25/2008
      Court Reporter                           Date