1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
     FEDERAL TRADE COMMISSION,        )
 4                                     )
                        Plaintiff,     )
 5                                     )  No. 03 C 3904
               vs.                     )  Chicago, Illinois
 6                                     )  July 22, 2008
     KEVIN TRUDEAU,                    )  10:00 a.m.
 7                                     )
                        Defendant.     )
 8

 9            TRANSCRIPT OF PROCEEDINGS - HEARING

10         BEFORE THE HONORABLE ROBERT W. GETTLEMAN

11   APPEARANCES:

12   For the Plaintiff:      FEDERAL TRADE COMMISSION
                             600 Pennsylvania Avenue, NW
13                           NJ-3212
                             Washington, DC 20580
14                           BY:  MS. LAUREEN KAPIN
                                  MS. SANDYA PRABHU
15                                MS. ELIZABETH TUCCI

16
     For the Defendant:      JENNER & BLOCK
17                           One IBM Plaza
                             Chicago, Illinois 60611
18                           BY:  MR. DAVID J. BRADFORD
                                  MR. DANIEL J. HURTADO
19

20

21

22   Official Reporter:      JENNIFER S. COSTALES, CRR, RMR
                             219 South Dearborn Street
23                           Room 1706
                             Chicago, Illinois 60604
24                           (312) 427-5351

25
</pre>

2

1          (Proceedings in open court.)

2          THE CLERK:  O3 C 3904, Federal Trade Commission versus

3     Kevin Trudeau; for hearing.

4          MR. BRADFORD:  Good afternoon.

5          David Bradford here together with Kevin Trudeau and Dan

6     Hurtado.

7          MS. KAPIN:  Good afternoon, Your Honor.

8          I'm here with my colleagues Sandy Prabhu, Elizabeth

9     Tucci, and Parrish Bergquist on behalf of the Federal Trade

10    Commission.  I'm Laureen Kapin.

11         THE COURT:  All right.  We're here for hearing on this

12    contempt order.  A couple of things to go over first.

13         First of all, Mr. Bradford, you filed a motion to

14    withdraw as counsel, but after these proceedings, is that

15    correct?

16         MR. BRADFORD:  That's correct, Your Honor.  We'd ask

17    that be put over until the end of the proceedings if the Court

18    would entertain that.

19         THE COURT:  I guess I'm curious as to why you filed it.

20         MR. BRADFORD:  Only to indicate to the Court that

21    because of financial circumstances we're obligated to do this.  I

22    did not want to proceed after the hearing and leave any

23    impression that anything Your Honor might or might not do during

24    the hearing was the precipitating cause of this motion.

25         THE COURT:  I would take your word for it whatever the

1   reason was.  But I think it's a premature motion if you are going

2   to be participating at this, unless it is there to emphasize

3   Mr. Trudeau's financial situation, which leads me to my next

4   question, and that is, I may have raised this before, and if I

5   did, maybe this is redundant, but I'm not sure why we have the

6   redactions that we have in this case.

7         I mean, you're relying on Mr. Trudeau's alleged

8   financial circumstances as part of your defense to the remedies

9   sought by the FTC.  I think it should all be in the public

10  record.  I can't base an opinion on something that's not in the

11  public record if I were to agree with you, even if I were to

12  disagree with you.

13        MR. BRADFORD:  We agree, Your Honor, and I thought

14  previously had indicated we did agree everything should be filed

15  in unredacted form.

16        THE COURT:  Okay.  So why don't we just unseal whatever

17  has been filed in the sealed form.  That way everything will be

18  in the public record.

19        There was also a motion by the FTC to strike the

20  testimony of your expert, of Mr. Trudeau's expert.  And I think

21  I'm just going to reserve on that until I hear what he has to

22  say.  I think I told you that before.

23        MR. BRADFORD:  You did, Your Honor.

24        THE COURT:  I'll listen to him.  It's a bench matter.

25  It doesn't really need that type of prophylactic remedy at this

1    point.  I certainly will rule on whether or not I think he's

2    qualified to testify.  I wanted to hear from him first obviously

3    before I did that.  So I have to hear from him anyway.

4         All right.  Now, with those things out of the way, are

5    there any other procedural matters that you want to address?  And

6    then I would like you both to tell me what you have -- I got an

7    awful lot of paper, and I see an awful lot of stuff in the

8    courtroom.  So tell me what you plan on doing.  Let's start with

9    the FTC.

10        MS. KAPIN:  Just in terms of one more housekeeping

11   matter, Your Honor.  I believe that Mr. Hurtado had raised the

12   issue of whether we could defer one of our witnesses.

13        THE COURT:  Right.  Yes, that's fine.

14        MS. KAPIN:  Okay.  Then if you wouldn't mind, I'm going

15   to permit one of my colleagues to whisk away out of the courtroom

16   to cancel a hotel room and allow Ms. Hippsley to also cancel her

17   flight.

18        THE COURT:  We can accommodate people.

19        I intend to go close to 5:00 o'clock today and tomorrow

20   to about 4:00 o'clock.  That's the time I've reserved for this.

21   And if we need to resume it at some other point, we'll do that.

22        MS. KAPIN:  Well, then moving on to your question, Your

23   Honor, despite the many books of exhibits and stuff in the

24   courtroom, the FTC as I think we previously indicated to you,

25   Your Honor, we believe that our briefs are the primary vehicle

1   regarding the remedy portion of this hearing.  We will be

2   engaging in cross-examination of Mr. Trudeau's witnesses.  But as

3   far as our views and the evidence on the proper remedy in this

4   matter, we are relying on the evidence that we have already

5   submitted to the Court as to the proper remedy to compensate

6   consumers and as to what we believe the proper modifications to

7   the injunctive relief should be.

8           Your Honor, if necessary, we may call Ms. Hippsley in to

9   rebut certain arguments.  And we will as we have informed

10  opposing counsel and with the Court's permission, we intend to

11  make our decision on that after we have heard Mr. Trudeau's

12  testimony.

13          THE COURT:  So you're basically standing on the record

14  since you've got a leg up anyway.  I guess that's a bad pun,

15  isn't it?  But you're putting, you're really turning it over to

16  Mr. Trudeau and Mr. Bradford at this point.

17          MS. KAPIN:  As far as Mr. Trudeau's, whether Mr. Trudeau

18  has been sufficiently diligent and energetic in complying with

19  the order, that is for defendant's to establish.

20          THE COURT:  We have two matters.  And I'll let

21  Mr. Bradford answer my question.  We have two matters.  One is,

22  Mr. Bradford wants to present whatever he's going to present to

23  try to convince me to modify my order of November -- it's a long

24  time ago.

25          MS. KAPIN:  21st, I believe.  Was it the 16th?

6

1          THE COURT:   November 16th.   Time flies.

2          And that I guess will be part of this whole thing.   And

3     the other is to address, if I don't change my mind radically, I

4     told him he had an uphill battle there, if I don't change my mind

5     radically, what the appropriate remedy would be here.

6          So that's the two issues that I see.   Do you agree?

7          MS. KAPIN:   Yes, Your Honor.

8          MR. BRADFORD:   Yes, Your Honor.

9          THE COURT:   Okay.   So Mr. Bradford, what do you have in

10    mind?

11         MR. BRADFORD:   Your Honor, we do have an opening

12    statement that we'd like to present.   We suggested to Ms. Kapin

13    and would like to ask the Court if we might proceed in a somewhat

14    unorthodox manner by calling our first witness, who is

15    Mr. Harris, only to ensure that he gets done today.   He's the

16    first of our experts and needs to return to Washington.

17         THE COURT:   The order of witnesses does not concern me.

18         MR. BRADFORD:   What I would ask is the ability to defer

19    the opening statement until after he testifies so that we don't

20    take the time with the opening statement that might cause him to

21    spill over into tomorrow, but that as soon as he concludes, we'd

22    be prepared to proceed with opening statements.

23         I would be glad at this point to give the Court some

24    overview as to what we intend to prove, or I could save that for

25    the opening statement.

1       THE COURT: Well, just give me a brief summary.

2       MR. BRADFORD: Sure.

3       THE COURT: And then we'll put your witness on.

4       MR. BRADFORD: Sure. We intend to call Mr. Harris, who

5 is a former assistant director of enforcement at the Federal

6 Trade Commission to give opinions about custom and practice and

7 interpretation of the language of this order.

8       We expect that he will testify that the language in this

9 order is commonly understood among attorneys who practice in the

10 field of FTC enforcement as incorporating the mirror image

11 doctrine, that mirror image doctrine is incorporated in other

12 orders with similar language, and that it would be reasonably

13 understood that the advertisements at issue in this case are

14 compliant with the mirror image doctrine and, therefore,

15 compliant with the order based upon common understandings of the

16 terms of this order.

17       He would be principally addressing our motion to

18 reconsider, although we would submit the fact that an established

19 practitioner with great expertise in this field would come to the

20 conclusion that these advertisements are, in fact, compliant with

21 the order speaks to the reasonableness of Mr. Trudeau's belief on

22 the topic.

23       We also intend to call the president of the American

24 Booksellers Association to present testimony on the relationship

25 between the infomercial and sales of books at retail stores.

1        We further intend to present limited testimony from
2   Mr. Trudeau regarding the basis for the book and the basis for
3   his belief at the time that the infomercial was concluded that he
4   was in compliance with this Court's order.

5        And then we expect to present some testimony related to
6   the financial circumstances of Mr. Trudeau that would come
7   principally through Mr. Marc Lane.

8        We also have a 1006 summary of comments that have been
9   made on the website related to this book about people's reactions
10  to the book.  And that may be presented, I understand that the
11  FTC wants to cross-examine the person who prepared the 1006
12  testimony, so that may involve a live witness at least subject to
13  cross-examination.

14       That principally covers our case, Your Honor.

15       MS. KAPIN:  And, Your Honor, just in terms of also
16  logistics, both sides have proffered many books full of exhibits.
17  Both sides have various objections to those exhibits.  Is that
18  something that it is your manner to take care of initially or as
19  we go along?

20       THE COURT:  As we go along or even afterwards.  I mean,
21  let's get the live witnesses on.  That's what I had contemplated
22  today anyway.

23       MS. KAPIN:  Well, in order to preserve our rights, we
24  would object as things go along.

25       THE COURT:  Sure, or you can just have a standing

9

1  objection to all their exhibits.

2          MS. KAPIN:  That might make for a lack of clarity.

3          THE COURT:  Well, whatever.  I'll leave that up to you.

4          MS. KAPIN:  Okay.

5          THE COURT:  The timing is up to you.

6          MR. BRADFORD:  We have a few objections to their

7  exhibits.  They have a number of objections to ours that as I

8  recall are principally relevance and hearsay.

9          MS. KAPIN:  That's correct.

10          MR. BRADFORD:  We would propose to take those up at the

11  end.  I don't think we have any serious foundational issues on

12  any.

13          THE COURT:  Again, this is a bench matter, so we can

14  deal with those in due course.  I would like to accommodate the

15  people who are here to testify first, and then we can determine

16  where we go from there.

17          So do you want to call Mr. Harris.

18          MR. BRADFORD:  I do, Your Honor.  At this time

19  Mr. Trudeau would call as his first witness Jeffrey Harris.

20          With the Court's permission, I have exhibit books, the

21  three volumes that have been submitted to chambers.  I'd like to

22  put those up on the witness stand.

23          THE COURT:  That's fine.

24          MR. BRADFORD:  Thank you, Your Honor.

25          THE COURT:  Mr. Harris, please raise your right hand.

1    (Witness duly sworn.)

2    THE COURT:  I got delivered to me today from your office

3    some, it looks like lists of exhibits, a declaration from Mary

4    Louise Cribbin.  It looks like some more exhibits.

5    MR. BRADFORD:  Those were intended to supplement the

6    books that should have been delivered previously.  We have extra

7    copies of those books if that would be convenient for the Court.

8    THE COURT:  The books are here.

9    MR. BRADFORD:  With the Court's permission, at a break

10   we'd be glad to update the Court's books to include those

11   additional exhibits.

12   THE COURT:  All right.  Okay.

13   MR. BRADFORD:  The exhibits of Mr. Trudeau are lettered

14   exhibits.  Exhibits of the FTC are numbered exhibits.  And I

15   think the examination of Mr. Harris will derive principally from

16   our exhibits, the lettered exhibits.

17   THE COURT:  I have two books.  Should I have three?

18   MR. BRADFORD:  There should be two from Mr. Trudeau with

19   letters in them and one from the FTC with numbers in them.

20   THE COURT:  Well, I have a whole bunch of FTC's.

21   MS. KAPIN:  Well, we actually have four with numbers on

22   them.

23   THE COURT:  But you have two?

24   MR. BRADFORD:  We do.

25   THE COURT:  Okay.  Just make sure I have everything.

1  Okay.

2       MR. BRADFORD:  Thank you, Your Honor.

3       THE COURT:  Please proceed.

4           JEFFREY HARRIS, DEFENDANT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6  BY MR. BRADFORD:

7  Q.  Mr. Harris, could you please state your full name?

8  A.  Jeffrey Harris.

9  Q.  Mr. Harris, could you briefly describe your educational

10 background?

11 A.  Sure.  I graduated undergraduate from New York University

12 with a major in business administration, a minor in economics,

13 and graduated with Juris Doctorate from Syracuse University

14 College of Law, where I wrote for the Law Review and was the

15 Harry A. Dunsmore Memorial Scholar.

16 Q.  What year were you admitted to practice law, sir?

17 A.  1969.

18 Q.  And if you would turn please to Exhibit Z in your binder.

19 When you get there, my question would be whether that exhibit is

20 your report in this matter inclusive of your curriculum vitae?

21 A.  Yes, yes, it is.

22 Q.  The curriculum vitae is set forth following your report?

23 A.  Yes, it is.

24 Q.  Does that curriculum vitae accurately set forth your

25 experience and credentials?

Harris - direct                    12

1    A.   Yes, it does.

2    Q.   Could you describe briefly what you did following your

3    graduation from Syracuse Law School?

4    A.   Sure.  I enlisted in the Navy, went to Officer Candidate

5    School.  Upon graduation from Officer Candidate School, I was

6    commissioned as an ensign in the Navy.  I thereafter went to

7    Judge Advocate Naval Justice School in Newport, Rhode Island and

8    was certified by the JAG.  So I was not a JAG officer, but I had

9    the dual designation as line officer and certified by the JAG.

10        I served, served as a legal officer for four different

11   admirals during two tours in Vietnam.  And I was, I guess the way

12   to describe it, the admirals had appellate jurisdiction, I served

13   much like a law clerk.

14        I also prosecuted and defended courts marshal.  And I

15   provided legal advice to sailors.  Additionally, I acted in Hong

16   Kong as a trial observer to trials of U.S. servicemen in courts

17   of the crown as a trial observer.  And I also advised Naval

18   personnel on status of forces agreements.

19   Q.   Following your service in the Navy, what was your next

20   position?

21   A.   I was an assistant United States Attorney in the Southern

22   District of New York.  I was in the criminal division.  And I was

23   a federal prosecutor prosecuting general crimes, then later

24   international narcotics conspiracies, and then the public

25   corruption unit prosecuting cases involving corruption by public

Harris - direct                    13

1  officials and other white-collar crimes.

2  Q.   Approximately how many years were you an assistant U.S.

3  Attorney?

4  A.   About five years.

5  Q.   And following your service in that capacity, what did you do

6  next?

7  A.   Attorney General Levy came into office shortly after

8  Watergate, and he asked me to come to Washington for a year to

9  review all the FBI's domestic intelligence investigations and

10  counter-intelligence investigations and to advise him which of

11  those investigations complied with guidelines that he issued to

12  the FBI for the prosecution of such investigations.

13  Q.   And following that service, what did you do next?

14  A.   I served as deputy chief counsel to the House Ethics

15  Committee, Koreagate Investigation, which investigated corruption

16  by members of Congress by a fellow named Tongsun Park.

17  Q.   And following the service for the House of Representatives,

18  what did you do next?

19       THE COURT:   You know, I have the CV.

20       MR. BRADFORD:   Certainly.  I'm coming right to the FTC

21  here, Your Honor.

22       THE COURT:   Okay.

23  BY THE WITNESS:

24  A.   After that assignment, I was appointed Assistant Director of

25  the Bureau of Consumer Protection at the Federal Trade

Harris - direct                                14

1  Commission, where I headed the division which was then known as

2  the Division of Marketing Abuses.

3  Q.   Could you describe briefly your responsibilities at the

4  Federal Trade Commission?

5  A.   Yeah.  I headed a division of approximately 20 people, most

6  of whom were lawyers, some of whom were paralegals.  And we were,

7  the areas that fell within our responsibility were false and

8  deceptive advertising; land sales; franchising; vocational

9  schools; point of sales practices, which means any economic fraud

10 that takes place at the point of a sale; and housing

11 construction.

12 Q.   And as part of your responsibilities, did you have

13 responsibility for cases or matters involving false and deceptive

14 advertising?

15 A.   Yes, I did.

16 Q.   And at any point in the course of your responsibilities at

17 the Federal Trade Commission, did you participate in any

18 discussions or determinations of the Federal Trade Commission's

19 policy with respect to or application of policy with respect to

20 what is sometimes referred to as the mirror image doctrine?

21 A.   Yes, I did.

22 Q.   Could you describe how you participated in such discussions?

23 A.   Sure.  Well, the mirror image doctrine is a moniker for an

24 enforcement policy on advertising in books.  And the commission

25 was always rightfully concerned with the intersection of its

Harris - direct                          15

1    enforcement, especially when it dealt with First Amendment

2    protected areas such as books and informational publications and

3    how the FTC's enforcement policy ought to, ought to be handled so

4    that it was consistent with First Amendment rights, didn't

5    infringe on First Amendment rights.

6            And as a result, the commission had an enforcement

7    policy called the enforcement in the advertising of books known

8    as the mirror image doctrine.

9            The purpose of this doctrine was to set up some ground

10   rules for the advertising of books so that the general public,

11   businesses, authors would understand that if they complied with

12   the requirements of this doctrine, that they would generally not

13   be subject to enforcement actions by the FTC in the advertisement

14   of books.

15   Q.   And with respect to your participation in discussions related

16   to the mirror image doctrine, in what form or manner would you

17   participate in such discussions?

18   A.   Well, generally there were several divisions under the Bureau

19   of Consumer Protection.  And the director of the bureau at that

20   time used to hold weekly meetings, the purpose of which was to

21   discuss pending actions or actions that were being contemplated

22   from each of the divisions.

23           During those discussions, whenever you get into

24   advertising, you inevitably are led to consider the First

25   Amendment.  And when the advertising involved informational

Harris - direct                                    16

1   things as opposed to products, the mirror image doctrine would

2   often come up in terms of trying to define the line between

3   enforcement and a healthy respect for the First Amendment.

4   Q.   And as a consequence of your experience at the FTC, do you

5   believe you came to have an understanding of FTC enforcement

6   policy related to the mirror image doctrine and its purpose?

7   A.   I certainly do.

8   Q.   And following your service at the FTC, did you ultimately

9   begin to practice law privately?

10  A.   Right.  After going back to the Department of Justice, where

11  I was the Deputy Associate Attorney General of the United States,

12  I went into private practice after a year as general counsel to a

13  bank.  And in that private practice, I have dealt with many

14  matters involving commercial speech as well as many matters with

15  the FTC.

16  Q.   What firm are you presently affiliated with?

17  A.   The name of the firm is Rubin, Winston, Diercks -- which is

18  D-i-e-r-c-k-s -- Harris & Cooke.

19  Q.   And how long have you been affiliated with that firm?

20  A.   Since 1990.

21  Q.   What is your position at that firm?

22  A.   I am the managing partner.  And I've been unable to get any

23  of my partners to accept the position.

24  Q.   Apart from yourself, does your firm have any expertise in FTC

25  matters or matters of commercial speech?

Harris - direct                    17

1   A.   Yes.   Actually my firm has, we have seven partners, three,

2   three of us are alumni of the FTC.   One of my partners was

3   director of the Division of Compliance, I was head of Marketing

4   Abuses, and the third partner was a senior staff attorney.

5   Q.   And approximately what portion of your own practice has been

6   devoted to issues of FTC compliance and related issues of

7   commercial speech?

8   A.   It's hard to say.   It varies over the years.   But probably on

9   the average there are one or two matters in the house at any

10  given time dealing with the FTC as an opponent.

11  Q.   And with respect to matters in the office to the extent that

12  any of your partners are primarily responsible for those matters,

13  have you had occasion to consult on those matters as well?

14  A.   Yeah.   The way we operate is, if we have an FTC matter, the

15  three, myself and my two partners are invariably fully engaged in

16  each of those matters.   We do it as a team approach.

17  Q.   And are the matters involving the FTC in which you have been

18  involved set forth in your curriculum vitae?

19  A.   It's an attachment to it.   Yes, it is.   It's the last page.

20  Q.   And similarly, are the commercial speech cases that you have

21  been involved with as to which there are published opinions also

22  identified in your curriculum vitae?

23  A.   Yes.   A couple of those dates, which have dates before 1990,

24  my firm was involved in, but I personally wasn't.

25  Q.   And with respect to your service in the firm, do you have

1  occasion to advise clients on matters that do not result in

2  cases?

3  A.    Absolutely.  Very often the FTC will make an inquiry of a

4  business person.  They will seek counsel, and the matter doesn't

5  ultimately end up in an administrative or a U.S. District Court

6  action.

7  Q.   In fact, in your experience, how frequently is it that you

8  have opportunities to discuss matters with the FTC prior to their

9  bringing any such action to court?

10 A.   Whenever we get approached by a client, it is always our

11 first phone call, frankly, to the FTC to try and engage them in

12 discussion.

13       I know from my days at the FTC that the FTC is

14 interested in voluntary compliance.  They really don't have the

15 resources to have a full-scale battle on every matter that comes

16 in their purview.

17       So discussion with the FTC to see if matters can be

18 resolved short of an administrative order is always our first

19 priority.  If we can't do that, we like to talk to them about

20 settling a matter via administrative order.  And then there is

21 some cases which end up in having to go to U.S. District Court.

22 Q.   Have there been any cases that have actually gone to court

23 that you've been personally involved in that involved the mirror

24 image doctrine?

25 A.    Yes.  One of the first major cases that involved the mirror

Harris - direct                    19

1   image doctrine involved a client of ours named Wayne Phillips.

2   And that involved an order with the FTC.  And it addressed the

3   mirror image doctrine.

4   Q.   In your opinion, was that case of any significance?

5   A.   Yes.  Frankly, that case has been and is always one of the

6   cases cited on the rather infrequent occasions in which people

7   write about the mirror image doctrine.

8   Q.   And with respect to your experience advising clients, with

9   what frequency have you had occasion to advise clients or discuss

10  with them the mirror image doctrine?

11  A.   The mirror image doctrine almost invariably comes up, and the

12  way it usually does is that the first thing a business person is

13  likely to say to you when the FTC is attacking some ad or

14  promotion that they have is:  What about my right, my First

15  Amendment right?  Isn't there a right of free speech?

16       And we generally go through the litany of explaining to

17  them that in the advertising -- that there are rules with regard

18  to the advertising of commercial products.

19       And then in the middle, there are those cases in which

20  you're advertising a third-party's product, and you're required

21  to have ad substantiation.

22       And on the other extreme where the mirror image doctrine

23  comes in, when you're advertising or promoting books or other

24  informational kind of products as opposed to what I would call a

25  hard product.

Harris - direct                                    20

1  Q.   So with what frequency then do you have occasion to discuss

2  the mirror image doctrine with clients?

3  A.   I go routinely when there is an advertising issue with a

4  client, I routinely go through that with every one of them, even

5  if their case does not involve a book or an informational

6  publication to try and place for them in some context a

7  commercial, how the First Amendment and commercial speech fit

8  together.

9  Q.   And in the course of your professional work, do you endeavor

10 to stay current on and read various articles that relate to the

11 mirror image doctrine?

12 A.   I do.

13 Q.   I'd like to draw your attention to Exhibit JJ.

14 A.   I have it.

15 Q.   Are you familiar with Exhibit JJ?

16 A.   Yes, I am.

17 Q.   What is that exhibit?

18 A.   It is a Law Review article that appeared in the spring 2008

19 edition of the West Virginia Law Review written by a senior staff

20 attorney at the FTC named Keith Fentonmiller, which deals with

21 the mirror image doctrine and his analysis of it.

22 Q.   Is this one of the articles that you've read in the course of

23 your professional work?

24 A.   Yes, it is.

25 Q.   Is it an article that you rely upon in forming opinions about

1    the mirror image doctrine?

2    A.   Yes, it is.  It's an excellent piece of work.

3    Q.   And does this article address the case that you handled that

4    you referred to previously, the Wayne Phillips case?

5    A.   Yes.  It goes through the Wayne Phillips case in some detail.

6    Q.   I'd like to further draw your attention to Exhibit AAA,

7    that's triple A, and I'd ask you, sir, when you get a chance to

8    get there what that document is?

9         THE COURT:  What was the year the West Virginia article

10   was published?

11        THE WITNESS:  Spring 2008.

12   BY THE WITNESS:

13   A.   You're asking me to look at AAA, did you say?

14   BY MR. BRADFORD:

15   Q.   Yes, please.

16   A.   I have it.

17   Q.   What is AAA?

18   A.   AAA is a reproduction of a page from the Federal Register of

19   July 21st, 1971 that contains the official publication of the

20   FTC's enforcement policy for advertising in books, which is

21   commonly known as the mirror image doctrine.

22   Q.   And do you have an understanding as to why this particular

23   enforcement policy is referred to as the mirror image doctrine?

24   A.   I do, because it basically, if you wanted to give it a

25   shorthand moniker, it provides a safe harbor from enforcement in

1  most cases in which the advertising for a book restates what's in

2  the book or states an opinion of the author.

3  Q.    And finally, I'd like to draw your attention to Exhibit RRR.

4  A.    I have it.

5  Q.    What is Exhibit RRR?

6  A.    RRR is a case that the FTC had in 1994 called Wyatt, in the

7  matter of Wyatt Marketing Corporation, Inc.

8  Q.    And is that a case that you became familiar with in the

9  course of your practice?

10  A.    Yes, I'm familiar with that case.

11  Q.    Why is it you became familiar with that case?

12  A.    Well, in the course of deciding the case, one of the FTC

13  commissioners, a fellow named Commissioner Roger Starek,

14  S-t-a-r-e-k, wrote about the mirror image doctrine in conjunction

15  with the order that the FTC was considering entering in this

16  case.

17        The FTC order was to contain language which prohibited

18  generally the misrepresentation of the contents of books.    Roger

19  Starek, Commissioner Starek wrote a concurring opinion and which

20  appears at page JH150, in which he basically explains what the

21  mirror image doctrine is, what its purpose is, and expresses the

22  view that in FTC orders, it would have been his preference to

23  actually quote or lift the mirror image doctrine language and put

24  it in the order rather than give it the shorthand of not

25  misrepresenting the contents of the book or language similar to

1  that.  He said he thought that that would be more appropriate.

2         He concurred in the result, but was in the minority on

3  the view that he expressed that the order contain the quoted

4  language from the mirror image doctrine.

5  Q.  And is the Wyatt decree a matter that you've relied upon in

6  your professional work?

7  A.  Yes.

8         MR. BRADFORD:  At this time, Your Honor, we would move

9  to qualify Mr. Harris as an expert in the field of custom and

10 practice with respect to the enforcement of FTC laws,

11 regulations, and orders related to advertising and commercial

12 speech.

13        MS. KAPIN:  Objection, Your Honor.  May I engage in voir

14 dire, or would you prefer me to do that as part of my

15 cross-examination?

16        THE COURT:  Why don't we just note your objection and

17 let Mr. Bradford finish, and then you can cross him.

18        MS. KAPIN:  That would be fine.  Just to be clear about

19 the basis of our objection, it's the FTC's view that Mr. Harris's

20 opinion is as a matter of fact actually a legal conclusion about

21 the Court's order and hence is irrelevant.  And we also dispute

22 whether Mr. Harris is qualified to opine on the matters he is

23 opining on.

24        THE COURT:  Well, he certainly has had a lot of

25 experience with the FTC and enforcement and that sort of thing.

1  Whether or not his testimony meets the Daubert standards or 702,

2  we'll see.

3          MS. KAPIN:   Thank you, Your Honor.

4          THE COURT:   Okay.

5  BY MR. BRADFORD:

6  Q.   Mr. Harris, do you have an opinion based on your years of

7  experience both at the FTC and in private practice as to what

8  role, if any, custom and practice plays in the field of FTC

9  enforcement?

10 A.   Yeah.   Custom and practice is extremely important in FTC

11 practice, and the reason is as follows.   I also, as I said, was a

12 federal prosecutor.   Federal criminal statutes are pretty

13 specific, if they're not, they may fail for vagueness.   So they

14 generally set a bright-line standard from which a person knows

15 what conduct he has to adhere to to avoid being in violation of a

16 criminal law.

17         The FTC enforces, has enforcement authority, which is

18 very generic and very broad such as the Section 5 fairness

19 requirement, the FTC, the standard for enforcement is:   Is the

20 action fair?

21         So in order to, in order to flesh out and give some

22 definition to a generic standard like fairness, the FTC has a

23 number of vehicles that they use to provide further information

24 and guidance to the public, the business community, the legal

25 community.   And those take the form of things like advisory

1    opinions, commission letters, staff letters.  And one of the most

2    formal of these various kinds of informational vehicles is

3    something called an enforcement policy.  And this is a policy

4    which the commission approves, and it is published in the Federal

5    Register.  And it sets standards for when the FTC will exercise

6    its enforcement policy in a specific field.  The one we're

7    dealing here today in is the enforcement policy related to

8    advertising in books.

9    Q.   And that enforcement policy --

10   A.   Let me state one other thing.  The reason the FTC does this

11   is the FTC, like the IRS, relies to a large extent on voluntary

12   compliance of the public to accomplish their mission.  They feel

13   and I know from being at the FTC, it was our view that we felt

14   that if we put that information out there, most businesses in the

15   United States want to comply with the law, and if you give them

16   guidance, they will do it.

17          One of the things I did often as an assistant director

18   was addressing industry groups, and I can recall one here at the

19   McCormick Center, to advise industry what the standards were and

20   then ask for their voluntary compliance.

21   Q.   And is the mirror image doctrine an FTC enforcement policy

22   that's been published in the Federal Register as you've referred

23   to?

24   A.   Yes.  And you just showed me a page in the exhibit book which

25   contained that.

1  Q.   And based on your experience and custom and practice in the

2  field of FTC enforcement, do you have an opinion as to whether it

3  is reasonable for a business to rely upon the mirror image

4  doctrine in determining what advertising it can publish?

5  A.   Yes, I do have an opinion, and the opinion is that businesses

6  do and are entitled to rely on FTC enforcement policies such as

7  the mirror image doctrine.

8  Q.   What is the basis for your opinion as it pertains to the

9  mirror image doctrine?

10  A.   Well, with regard to, generally with regard to all

11  enforcement policies at the FTC, one of the jobs of the assistant

12  directors was public outreach.  And we often would speak to

13  groups to promulgate enforcement policies that may be out there

14  but which were not known very well to members of the public or

15  businesses, to tell them that the FTC will engage in enforcement

16  pursuant to the following standards.

17       If you obey the following standards or are within the

18  following standards under the ordinary case, in most cases, you

19  will not be subject to enforcement action.

20       The other way that I know it is I've seen publications,

21  business publications in which general counsels of trade

22  associations and the like write to the members and inform them

23  about the mirror image doctrine specifically with the purpose of

24  telling them that if they adhere to the requirements of the

25  mirror image doctrine as to the advertising of books, they will

Harris - direct                              27

1   be -- have a safe harbor from FTC enforcement actions.

2   Q.   And in your report, have you identified some of those

3   industry publications that address the mirror image doctrine?

4   A.   Yes, I have.

5   Q.   If you could turn to your report, which is Exhibit Z, I'd

6   appreciate your identifying those articles.

7           MR. BRADFORD:   Your Honor, for the record, the complete

8   copy of the articles have been submitted as Exhibit UUU.   I

9   believe that may be one of the exhibits that was delivered to

10  chambers most recently and may not yet be contained in the binder

11  that Your Honor has.   But the relevant portions of those articles

12  are in his report.   And for convenience, I'm going to refer him

13  to his report rather than the actual articles.

14  BY THE WITNESS:

15  A.   Okay.   I have Exhibit Z.

16          MS. KAPIN:   Your Honor, just a standing objection to

17  Mr. Harris's report.   The report is hearsay.   Mr. Harris's

18  testimony is what is important.   We have no objection, of course,

19  to him referring to the report as a shorthand, but we just want

20  to make clear our objection to the report itself.

21          THE COURT:   The report will not be admitted into

22  evidence.   The CV can be admitted into evidence.

23          MS. KAPIN:   We have no objection to that.

24          THE COURT:   The report itself cannot be.

25  BY MR. BRADFORD:

1  Q.   Are the articles that are identified as Exhibit UUU from

2  which you have excerpted portions in your report articles that

3  you have relied upon in forming an opinion in this matter and

4  more generally in forming professional opinions about the mirror

5  image doctrine?

6  A.   Yes.

7  Q.   Do you believe that these articles are sufficiently reliable

8  for you to rely upon them for that purpose?

9  A.   Yes.

10  Q.   Could you identify the articles and portions of the article

11  that you've relied upon in forming your opinion that it is

12  reasonable for businesses to rely upon the mirror image doctrine?

13  A.   Sure.  I relied on three that I incorporated and I can speak

14  to.

15        The publication called the Direct Marketing News, which

16  is an industry publication to direct marketers, had an article in

17  August of 2000, the year 2000 written by, written by legal

18  counsel for the Direct Marketing News.  And it said, and it said

19  in relevant part that "Direct," and this is a quote, "Direct

20  marketers selling books or videotapes have long relied upon the

21  mirror image doctrine."  And it went on to say that "the policy

22  provides a safe haven afforded by the doctrine."  That was one

23  example.

24        Another was in a publication called Response, and it was

25  an article written by two attorneys, who I believe are at

Harris - direct                                    29

1   Venable, but I'm not a hundred percent certain of that, but I
2   believe that's where they --
3   Q.   But by "Venable," you're referring to the name of the law
4   firm?
5   A.   Yes, a law firm in Washington and Baltimore and other places.
6        The article contained the following, it said, "Selling a
7   controversial weight loss or healthcare product might result in
8   the demand for substantiation that supports your claims.   But
9   selling a book or tapes about the product should keep you out of
10  harms way if you comply with the requirements of the mirror image
11  doctrine."
12       The third example I've given is something from a
13  publication called The Electronic Retailer Magazine.   And it was
14  discussing a trade regulation rule of the Federal Trade
15  Commission called The Business Opportunity Trade Regulation Rule,
16  which was in my purview when I was at the commission.   And it was
17  addressing a book which was entitled, How to Earn Up to a Hundred
18  Thousand a Year Or More From Home By Mail, the Complete Guide to
19  Starting Your Own Home Based Mail Order Business.
20       And the article said that, and this was again counsel
21  for this organization, "I am confident that the FTC staff would
22  never bring a rule enforcement action against the author or
23  publisher of this book or a book store that advertises and sells
24  it.   Such an action would be inconsistent with the First
25  Amendment and the FTC enforcement policy."

1        So those are the three examples I've given, I gave in

2   this report.

3   Q.   Have you had an opportunity to review the Court order that

4   was entered in this case?

5   A.   Yes.

6   Q.   I believe for the record it is Exhibit 1.

7        And you're familiar with the provisions of that order

8   that effectively state that Mr. Trudeau may not misrepresent the

9   content of a book or informational publication?

10  A.   Yes, I've read it.

11  Q.   And do you have an opinion based upon your years of

12  experience, including your experience at the FTC, as to whether

13  there is a custom and practice in the field of FTC regulations

14  and orders as to whether the provisions of the order in this case

15  would reasonably be understood as coextensive with the mirror

16  image doctrine?

17  A.   I do have an opinion, and my opinion is that it would be

18  understood as coextensive with the mirror image doctrine.

19  Q.   And what is the basis for that opinion?

20  A.   Several.  One, I've seen it in other orders.  That language

21  that is intended to address the mirror image doctrine is often

22  expressed in language similar to the one entered by Judge

23  Gettleman here, namely, "not misrepresent the contents of the

24  book" to mean the compliance with the mirror image doctrine.

25       In other words, if you comply with the mirror image

1    doctrine, you ipso facto have not misrepresented the contents of

2    the book.  And the reason I say that is the mirror image doctrine

3    has been in existence and extant for 37 years.  The FTC has never

4    modified it, changed it, or revoked it.

5            And I can tell you that based upon having been in a

6    fairly high level of management at the FTC, the FTC would never,

7    would never promulgate an enforcement policy that in their view

8    allowed one to misrepresent the contents of a book.  That's --

9    Q.   I'm sorry.  That was one reason?

10   A.   That's another reason.  The other is if you look at

11   Mr. Fentonmiller's excellent article, which contains excellent

12   legal analysis, he goes through and interchangeably talks about

13   the mirror image doctrine and not misrepresenting the contents of

14   the book.

15           And it's clear from the context of reading that article

16   that he as an FTC staff member, and I recognize he's speaking for

17   himself, and the article contains the usual disclaimer you would

18   expect, but that it is reasonably understood by FTC staff, FTC

19   practitioners that that phrase or phrases like it refer to

20   compliance with the mirror image doctrine.

21   Q.   Are you familiar with any decrees that have language similar

22   to this that have been interpreted as inclusive of the mirror

23   image doctrine?

24   A.   Yes, I am.

25   Q.   Can you identify one such decree?

1  A.   Well, the Wayne Phillips case is one, and Mr. Fentonmiller's

2  article refers to a couple of others.

3  Q.   Do you have any understanding as to whether the Wyatt case

4  that you referred to previously is consistent?

5  A.   Yes, the Wyatt case is another example.  And that was

6  Commissioner Starek's, it was a concurring opinion, but he was

7  dissenting from that language.

8        Basically it contained language very similar to the "not

9  misrepresent the contents of the book."  And Commissioner Starek

10 said:  Since you're talking about the mirror image doctrine, I

11 would prefer to see you use the actual language of the doctrine.

12       But that, that position was not adopted by the

13 commission.  He was outvoted, and the Wyatt order was approved

14 with the language that was in it.

15 Q.   Which was a shorthand form of language as opposed to the

16 entire doctrine, is that correct?

17 A.   That's correct.

18 Q.   Could you please describe what you understand the mirror

19 image doctrine to be or to provide?

20 A.   Well, the mirror image doctrine is an enforcement policy in

21 which the FTC announces to the public that they will normally not

22 engage in an enforcement action in the advertising of books

23 where, and here are the requirements, the advertising contains

24 the opinions of the author or quotes from the contents of the

25 book and the source of the advertising is the author.

1  Q.   I'm sorry, you said that it's opinion or it quotes from the

2  content of the book.  Is that disjunctive?

3  A.   That is disjunctive.  If you hit either bench mark, you have

4  the safe harbor protection afforded by the mirror image doctrine.

5  Q.   So if a statement is a statement of fact, as you understand

6  the mirror image doctrine, can that qualify for protection?

7  A.   If the statement of fact is also a statement contained in the

8  book, the answer to your question is yes, it does qualify and

9  does provide a safe haven.

10  Q.   And in addition to the material you've identified, have you

11  had the opportunity to look at other publications of Mr. Trudeau

12  and other informercials of Mr. Trudeau other than the Weight Loss

13  infomerical and book?

14  A.   Yes.  I looked at the infomercial and the book called, and I

15  don't remember the full name, but Natural Cures.

16  Q.   And did you also look at the infomercial for the Natural

17  Cures book?

18  A.   Yes, I did.

19  Q.   And did you have an understanding as to whether prior to and

20  at the time of the entry of this order the FTC had approved and

21  identified that book and that infomercial as acceptable and

22  whether it was held up as an example of what Mr. Trudeau could do

23  in this case?

24  A.   Yes.

25  Q.   And based upon your review of the specific infomercial and

1   book that were identified in court as examples of what

2   Mr. Trudeau was permitted to do under the order, did that further

3   inform your opinion as to whether this order incorporated the

4   mirror image doctrine?

5   A.   Yes, it did.  To be very frank about it, the Natural Cures

6   book, when you read the book, which is about natural cures, when

7   you get to what you expect is the denouement where Mr. Trudeau is

8   finally to reveal to you the cures, lo and behold, he said:

9   Sorry, can't tell you what they are, because I've been prohibited

10  from doing so by the FTC and the FDA.

11          When you look at the infomercial for that book, I think

12  it is, it is undeniably clear that the advertising for the book

13  leads one to believe that if you buy the book, you're going to

14  find out what the cures are.

15          So I regard it, if the FTC didn't have a problem with

16  that, I regard that as far more on the edge than the book which

17  causes us to be in court today.

18  Q.   In your mind, is it possible to reconcile the FTC 's

19  agreement that Mr. Trudeau could proceed with the original

20  Natural Cures book and original Natural Cures infomercial with a

21  view the order does not contain the mirror image doctrine?

22  A.   Can you repeat that question?

23  Q.   Sure.  In your opinion, could the FTC have approved that

24  original book for Natural Cures and that original infomercial if

25  the order did not have the mirror image safe harbor?

1   A.   No, no, I don't think so.  And, you know, in my own mind's

2   eye when I think about that book and the other, I think of, say,

3   an archery target, and I'd say that Natural Cures book was

4   somewhere on the outer circle as compared to the book that brings

5   us to court today.

6   Q.   Did you have an opportunity to review the Weight Loss book

7   and the weight loss informercials that do bring us to court

8   today?

9   A.   Yes.  I read the book and reviewed the infomercials.

10  Q.   And based upon your years of experience, do you have an

11  opinion as to whether or not Mr. Trudeau's informercials for the

12  Weight Loss book are compliant or not with the mirror image

13  doctrine?

14  A.   Yes.  I believe that the informercials fall within the safe

15  harbor protection of the mirror image doctrine.

16  Q.   What's the basis for that opinion?

17  A.   Well, there are two bases.  As I said, there are two prongs

18  or two ways that you can fall within the protection of the mirror

19  image doctrine.  One is to express the opinion, where the author

20  expresses his opinion.

21       Now, I understand from having been deposed by Ms. Kapin

22  that the FTC does not -- is not of the view that what Mr. Trudeau

23  said are opinions.  I would disagree with her.  But let me deal

24  with opinions first and then go to facts.

25       If, in fact, what Mr. Trudeau said are opinions of the

Harris - direct                                          36

1    author, then they're absolutely protected under the mirror image

2    doctrine.   And if you're interested, I can tell you why I think

3    they're opinions.   But let me go on to the second prong.

4          Even if they are to be regarded as facts and not

5    opinions, if those facts are repeating facts that are in the

6    book, they are entitled to the safe harbor protection of the

7    mirror image doctrine under the second prong of the doctrine.

8    Q.   Did you have occasion to compare whether the various

9    statements that the FTC complained about in this case were, in

10   fact, contained in the book?

11   A.   Yes, I did.

12   Q.   And is that comparison set forth in your report?

13   A.   It is.   I gave, I gave a lot of examples of it in the report.

14   Q.   Could you -- and also I guess I'd like to draw your attention

15   at this time to Exhibit B?

16   A.   B as in boy?

17   Q.   B as in boy.

18   A.   Yes, I have it in front of me.

19   Q.   What is Exhibit B?

20   A.   Well, it appears to be a chart which compares, which compares

21   objections cited in the FTC's briefs or problems the FTC cited in

22   their brief with lists of references that appear in the Weight

23   Loss Cures or the Weight Loss book.

24   Q.   And did you form a conclusion as to whether, to start with

25   the assertions in the infomercial, that this weight loss cure or

1    regime was easy, was compliant with the mirror image doctrine?

2            MS. KAPIN:   Your Honor, we have an objection to this

3    exhibit under the best evidence rule.   The best evidence of a

4    comparison of the statements in the book or the infomercial would

5    be to look at the book and the infomercial, not to a selective

6    chart of such statements.

7            THE COURT:   Well, I mean, it is really a demonstrative

8    exhibit in aid of argument, if you would.   I don't have a problem

9    with it, unless there is something inaccurate about the excerpts

10   that are in it.   I haven't looked at it before, I must tell you.

11           MS. KAPIN:   Some of the excerpts are incomplete.   I

12   mean, it is referenced, there are ellipses in there.

13           THE COURT:   There is an objection to completeness.

14   Well, all right.   Let's let this go forward right now.

15           MR. BRADFORD:   We're using this as a demonstrative.

16           THE COURT:   I'll take that into account.   Go ahead.

17           MR. BRADFORD:   Thank you.

18   BY MR. BRADFORD:

19   Q.   Did you form an opinion, sir, as to whether the assertions in

20   the infomercial that this diet program was or diet protocol was

21   easy was compliant with the mirror image doctrine?

22   A.   Yes, I did.

23           And let me just state I looked at that exhibit that we

24   just talked about that Ms. Kapin objected to, and I also read the

25   Judge's order, and it seemed to me that the two major categories

1  of information were this question about is the program easy and

2  the second being, when you're in phase four, the life-long phase,

3  can you eat anything you want.  So I focused on those two general

4  areas.

5  Q.   What did you determine in your opinion with respect to

6  statements about the protocol being easy?

7  A.   As I said, it is my view that that's an opinion and not a

8  fact.  But even assuming that the FTC's position that it's

9  factual and not opinion is correct, I found that the book

10 contains numerous, numerous statements that the program is easy

11 to do, easy to follow, enjoyable and easy.  And I set some of

12 those out in my report.  I did not quote them, but I paraphrased,

13 and those are referenced in my report.

14         And from that I concluded that the statements in the

15 infomercial that the program was easy to follow, easy to do, easy

16 to stay on was repeating the same statements that were made in

17 the book and, therefore, was entitled to protection under prong

18 two of the mirror image doctrine.

19 Q.   How about with respect to statements that somebody using this

20 protocol can eat anything they want, mashed potatoes and ice

21 cream and so forth?

22 A.   Right.  The infomercial is replete with statements about

23 being able to eat pasta, pizza, mashed potatoes, apple pie, et

24 cetera, ice cream.  And when I read the book, and I cite in my

25 report, there many examples in which Mr. Trudeau says that

1    during phase four, the life-long phase, that both he and readers

2    of the book, and he talks about himself personally, what he eats,

3    but he also says that once you're in phase four, you can eat

4    anything you want.  He goes through the litany of just about

5    every high caloric food known to man and says that you can eat

6    those.

7    Q.   With respect to your opinion, does it affect your opinion

8    that in the book Mr. Trudeau states that those foods should be

9    organic, whereas that is not referred to in the infomercial?

10   A.   No, I don't think that's an issue here, because, I mean, let

11   me give you the example, Mr. Trudeau says you can eat mashed

12   potatoes.  I think it's of little moment for the purposes that

13   bring us together today whether that Idaho potato was grown by an

14   organic farmer who didn't use pesticides or the guy next door who

15   did.  I don't think that's relevant to this discussion.

16   Q.   And how about the fact that in the book there is a

17   requirement to take up to six weeks of injections as part of this

18   protocol, and that fact is not mentioned in the infomercial?

19   A.   Well, you know, one of the criticisms by people like

20   Mr. Fentonmiller of the FTC of the mirror image doctrine is he

21   doesn't think it really serves the FTC well.  But the fact is

22   that the enforcement policy promulgated by the FTC has two

23   prongs.  It protects opinions of the author, and it protects

24   statements made in advertising that are also contained in the

25   book.

1          There is no requirement that it have additional

2     disclosures or anything else.  You are protected.  And I would so

3     advise a client, I think it's understood by business people who

4     understand the doctrine, if the advertising repeats what's in the

5     book.  It doesn't have to obviously, if you have an advertisement

6     for a 400-page book, you certainly can't put the entire book in

7     the advertisement.  I mean, that --

8     Q.   What about where you have a book that makes certain

9     assertions, but also has other assertions that are contradictory

10    to the first set of assertions?

11    A.   Well, that's actually the exact question that Ms. Kapin asked

12    me during my deposition with regard to a book called The

13    Beardstown Ladies, which was an investment book.  And she said,

14    "Well, what about if they say you're going to earn 30 percent on

15    page 10, but on page 170 they say you're only going to earn 5

16    percent?  What if your advertisement only has the 30 percent in

17    it?"

18          And my opinion is that you are protected if you say 30

19    percent and that's what is contained in the book.

20          The question about whether that's good policy or whether

21    the rule is constructed in a way to properly balance enforcement

22    needs and First Amendment needs, that's beyond the scope of my

23    testimony.  But it's clear that the enforcement policy, which has

24    been in effect 37 years, the FTC has never modified it or changed

25    it, that what I can tell you is the policy says that if your

Harris - direct                              41

1  advertisement repeats something that is in the book, it is
2  protected.
3  Q.   Apart from your review of the book and the informercials at
4  issue in this case, did you rely upon any other facts or
5  documents in forming your opinion about whether these particular
6  informercials were in compliance with this order?
7  A.   Well, you know, as I said, I looked at the Natural Cures, the
8  other or the prior book that Mr. Trudeau wrote and promoted
9  through an infomercial, and I looked at Mr. Fentonmiller's
10 scholarly work in the West Virginia Law Review.
11 Q.   You mentioned the first book that Mr. Trudeau did related to
12 Natural Cures.  Are you familiar with the fact that he then
13 revised that book to actually include some 50 different cures for
14 different diseases?
15 A.   Yes.  I'm not sure if they're two editions of the same book
16 or revisions of it, but, yes, I've seen both, the original, the
17 original one, and I've seen the one that contains what appears to
18 be many pages of charts of diseases and cures.
19 Q.   And did the fact that the FTC had no objection to the second
20 book have any bearing on your opinion?
21 A.   Well, it did to the extent, because when I told you that the
22 original book I thought was closer to the edge because it didn't
23 contain the cures, and you were led to believe it would, the
24 second one does contain the cures and, therefore, I think fits
25 within the mirror image doctrine.

1          It also had a chapter dealing with dieting.  And it

2    contained many of the statements that appear in his later book

3    about what you can eat after you achieve your dietary objective.

4    Q.    If Mr. Trudeau had come to you with his order and with the

5    informercials at issue in this case and with his Weight Loss book

6    and asked you to advise him as to whether those informercials

7    were compliant with the order, what would you have told him?

8    A.    What I would have said, I would have explained the mirror

9    image doctrine to him and said that these are the benchmarks, and

10   if you stay within this conduct, namely, that when you advertise

11   your book, if you express an opinion, one, you identify yourself

12   as the author so there is no question as to the source of the

13   opinion, and that that opinion is protected; and, two, that if

14   you make a statement in the advertising that is also contained in

15   the book, it is protected even if the statement is blatantly

16   false.

17          And let me give you an example.  For example, if the

18   president of Iran, who believes that the Holocaust never took

19   place wrote a book that said the Holocaust never took place, and

20   he wanted to promote that book, the statements, even though we

21   all know that that statement is blatantly false, that statement

22   in advertising is protected, because it is repeated in the book.

23   Q.    Do you believe that Mr. Trudeau's informercials complied with

24   that doctrine and that order as you observed them?

25   A.    I do for two reasons, one, I believe that the statement, the

Harris - cross                              43

1   statements about easiness are opinions; but even if they aren't,

2   both the statements about easiness and the statements about what

3   you can eat, even if they're considered factual statements, they

4   are repeated in the book, and, therefore, they are permissible in

5   the advertising.

6          MR. BRADFORD:  I have no further questions at this time,

7   Your Honor.

8          THE COURT:  Thank you.

9          Your witness.

10         MS. KAPIN:  Your Honor, just as a housekeeping matter,

11  we may be putting some exhibits up on the screen, so if you have

12  no objection, I would like my paralegal, Ms. Bergquist, to be

13  able to handle that.

14         THE COURT:  Sure.

15                    CROSS-EXAMINATION

16  BY MS. KAPIN:

17  Q.   Good afternoon, Mr. Harris.

18  A.   Hello again, Ms. Kapin.

19  Q.   Mr. Harris, you've never testified as an expert before a

20  federal court?

21  A.   Or any other court.

22  Q.   My next question, you anticipated it.

23         You've never acted as a consulting expert before either,

24  have you?

25  A.   Well, we have in some commercial speech cases, we have

Harris - cross                                    44

1  consulted with counsel.  So I'm not sure if that would qualify as

2  an answer to the question.  But as an expert witness, no.

3  Q.   And my question is whether you've acted as an expert

4  consulting witness?

5  A.   And I think the answer to that is on commercial speech cases,

6  yes, not as a witness, as a consultant to other lawyers.

7  Q.   Mr. Harris, do you remember having your deposition taken in

8  this case?

9  A.   Sure.

10  Q.   And you swore to tell the truth in that deposition?

11  A.   Absolutely.

12  Q.   And you did tell the truth, in fact, is that right?

13  A.   I certainly did.

14        MS. KAPIN:  Counsel, I want to focus your attention on

15  page 48 of Mr. Harris's deposition.

16        Can you get that up here?

17  BY MS. KAPIN:

18  Q.   I'm going to focus, Mr. Harris, during your deposition I

19  asked you at line 12:

20        "Have you ever testified as an expert before?

21        "Answer:  No.

22        "Question:  Have you ever acted as a consulting witness

23  before?

24        "Mr. Hurtado:  Consulting expert, you mean?

25        "Ms. Kapin:  I'm sorry.  Yes, that's exactly what I

1    mean, Dan.

2         "Have you ever acted as a consulting expert before?

3         "The witness:  No."

4    A.   That's correct, that's what I said.

5         The only distinction I'm trying to make here is I have

6    provided consultation to other lawyers in commercial speech

7    cases.

8    Q.   Now, Mr. Harris, you worked at the FTC for approximately two

9    years, is that correct?

10   A.   Correct.

11   Q.   And that was back in 1979 through 1981?

12   A.   Yes.

13   Q.   Approximately 27 years ago?

14   A.   Yes.

15   Q.   At that time, only about 25 to 30 percent of your caseload at

16   the FTC involved advertising cases?

17   A.   That's correct.

18   Q.   During your time at the Federal Trade Commission, you weren't

19   personally involved with any matters involving the mirror image

20   doctrine, were you?

21   A.   No, other than as I described in meetings of the senior staff

22   discussing potential matters that might come before the FTC, I

23   was not involved in a mirror image doctrine case.  And, frankly,

24   I don't remember one being before the commission during that

25   period.

Harris - cross                                46

1  Q.   You've never written any articles that addressed commercial

2  speech, have you?

3  A.   No, no, I haven't written articles.

4  Q.   You've never written any articles on the mirror image

5  doctrine either?

6  A.   Correct.

7  Q.   Other than this matter, you only worked on one case that

8  involved the mirror image doctrine?

9  A.   That's right.  And I would say probably in the last 20 years

10  my guess is that nationally there probably haven't been more than

11  10 or 12 cases involving the doctrine.

12        MS. KAPIN:  Your Honor, even though I know your answer

13  in advance, I still at this time would move to exclude the

14  testimony of Mr. Harris because of his limited experience as a

15  Federal Trade Commission insider, so to speak, and his limited

16  experience with the mirror image doctrine in addition to the

17  reasons set forth in our motion in limine.

18        THE COURT:  All right.  I'll take it under advisement.

19  BY MS. KAPIN:

20  Q.   Mr. Harris, prior to writing your report, I'm going to put

21  down my pencil, because otherwise I'm going to have this terribly

22  irritating habit of pointing at you with it, prior to writing

23  your report, Mr. Harris, you never spoke with Mr. Trudeau, isn't

24  that correct?

25  A.   That is correct.

Harris - cross                                        47

1  Q.   At the time you wrote your report, you had no idea how

2  Mr. Trudeau attempted to comply with the order?

3  A.   That is also correct.

4  Q.   At the time you --

5  A.   Let me just say I watched the informercials.  So to the

6  extent you might consider what he said as attempting to comply, I

7  did watch the informercials.  But other than that qualification,

8  I gave you the answer I gave.

9  Q.   At the time you wrote your report, you didn't review

10 correspondence between the Federal Trade Commission and

11 Mr. Trudeau's attorneys about the order of compliance, did you?

12 A.   No.  I did not review any written correspondence at that time

13 between the FTC and the attorneys at Jenner & Block.

14 Q.   Mr. Trudeau is compensating you for your work on his behalf,

15 is that correct?

16 A.   He certainly is.

17 Q.   Earlier this year you received a $20,000 retainer from

18 Mr. Trudeau?

19 A.   That's correct.

20 Q.   And you're being paid $500 an hour for your testimony?

21 A.   That is what I am charging him, which is within the range of

22 what I charge clients.  In other words, I'm not charging any

23 premium.

24 Q.   I'm sure Mr. Trudeau is happy to hear that.

25           I want to draw your attention now to the language of our

1   order that is at issue in this case.  You're familiar with the

2   Court's 2004 injunction, is that correct?

3   A.   You're referring to the order in this case --

4   Q.   Yes.

5   A.   -- that Judge Gettleman entered?

6   Q.   Yes.

7   A.   Yes, I am familiar with it.

8          MS. KAPIN:  If we can get the language up on the screen,

9   this is in Exhibit 1, not the First Amendment language.  We're

10  going to focus on page 8 in section 1.

11     (Discussion off the record.)

12  BY MS. KAPIN:

13  Q.   Mr. Harris, I just want you to know that from time to time

14  I'll be referring to FTC exhibits.  And this exhibit, if it's

15  hard to read, although we'll zoom in on it, will be in Exhibit 1

16  of our exhibit book.

17  A.   Okay, because if this is an eye test, I would fail this one.

18  Q.   No eye tests.

19         THE COURT:  You're not the only one.

20         MS. KAPIN:  Can you zoom in, Ms. Bergquist, on the

21  "Additionally, the infomercial for any such book."  That's about

22  two-thirds of the way down, "additionally," keep going up, there

23  we go.  Okay.  "Must not move to misrepresent the content."

24  There we go, just zoom in on that.  There we go.

25  BY THE WITNESS:

Harris - cross                              49

1   A.   What page are we on, Ms. Kapin?

2   BY MS. KAPIN:

3   Q.   This is page 8 of Exhibit 1.

4   A.   Okay.

5   Q.   Okay.  Now, the language of part 1 that's highlighted, that

6   language does not set forth the mirror image doctrine verbatim,

7   does it, Mr. Harris?

8   A.   No, it doesn't.

9   Q.   Okay.  Your own, your own testimony referenced Commissioner

10  Starek's views from the Wyatt Marketing case, is that correct?

11  A.   Correct.

12  Q.   And Commissioner Starek in that case preferred that if safe

13  harbor, designed to incorporate or accommodate, accommodate the

14  mirror image doctrine or use in the future, Commissioner Starek

15  would prefer they incorporate all of the doctrine's clauses.  I

16  believe you referred to that portion of Commissioner Starek's

17  opinion in your direct testimony, is that correct?

18  A.   I did.

19  Q.   And you yourself agree with that view, isn't that correct?

20  A.   Agree with what view?

21  Q.   You agree with the view that if an order wants to

22  incorporate, it wants to include safe harbors designed to

23  accommodate the mirror image doctrine, that said orders should

24  incorporate all of the doctrine's clauses?

25  A.   Well, if you're asking me, I would have to say yes.  And the

Harris - cross                                    50

1  best example I could give you is that the more -- that we

2  probably wouldn't be here today if, in fact, this order was more

3  specific.

4       But I have not seen any order in my experience in which

5  the FTC -- and while Judge Gettleman signed this order, we know

6  how these orders are crafted.  The FTC sends a draft order to

7  respondent's counsel.  Counsel makes comments.  Eventually it

8  gets worked out, and if the Judge approves it, the Judge signs

9  it.

10       But this language is generally language that is

11  suggested by the FTC staff.  And this is the kind of language

12  that I have seen or variations of it in FTC orders that are

13  attempting to address the mirror image doctrine.  I can't recall

14  ever seeing one in which the mirror image doctrine is set out in

15  an order.

16  Q.  Well, in fact, there are other FTC orders that incorporate

17  the mirror image doctrine language, isn't that correct,

18  Mr. Harris?

19  A.  What I have said is I haven't seen one.  But I can tell you

20  that I have, you know, have not looked at every single FTC order

21  issued in the last 37 years.  That, I can assure you of.

22  Q.  Commissioner Starek in Wyatt cites to the National Credit

23  Savers case.

24       MS. KAPIN:  Can we see where that happens, Ms. Parrish?

25  BY MS. KAPIN:

Harris - cross                                51

1  Q.  This is the concurring statement of Commissioner Starek in a

2  brief, and if we go to the next to the last page.  There is a

3  footnote 2 that is cited with the language we had just discussed,

4  and that footnote refers to the National Credit Savers case.

5          Now, he does cite the National Credit Savers case.  Do

6  you see that, Mr. Harris?

7  A.  Right.  And I noted that in the Wyatt case, I did.

8  Q.  And, in fact, the National Credit case incorporates verbatim

9  the language of the mirror image doctrine.  Are you aware of

10  that, Mr. Harris?

11  A.  Well, I'm aware of Commissioner Starek's footnote.  But as I

12  said, I have not, I have not seen any cases in which it did.  And

13  I have no reason to doubt that Commissioner Starek accurately

14  reflected what the order says.

15  Q.  Well, just so we see for ourselves, this is the National

16  Credit Savers case that Commissioner Starek cites.  And we're

17  going to jump to the portion that here, we can take a look at

18  that.  That, in fact, incorporates language from the mirror image

19  doctrine, isn't that correct, Mr. Harris?

20  A.  Let me just read that.

21  Q.  Sure.

22  A.  If it's not verbatim, it's close to verbatim.

23  Q.  Close to verbatim from the mirror image doctrine?

24  A.  Yes.

25  Q.  Okay.  The better practice is to incorporate this language in

1  full if one intends the order to reference the mirror image

2  doctrine, isn't that correct?

3  A.   Is it the better practice?  I would say, I would say that to

4  the extent that it would avoid future litigation, it would be a

5  better practice.

6  Q.   As a lawyer, one of your jobs is to protect your clients?

7  A.   Absolutely.

8  Q.   You've suggested yourself adding language to FTC consent

9  decrees in order to protect your clients?

10 A.   Sure.

11 Q.   One of your jobs as a lawyer is if you expect protection for

12 your client in a settlement document, then you make sure it's in

13 the document explicitly?

14 A.   Not necessarily, because sometimes you cannot get the FTC to

15 agree to the language that you would like to see in the order.

16 Q.   But if you can do that, that would be the better practice,

17 isn't that correct, Mr. Harris?

18 A.   If you can get the FTC to agree, sure.

19 Q.   Mr. Harris, the FTC has discretion to bring an enforcement

20 action whenever they want, isn't that true?

21 A.   Yes, they do.  And the mirror image doctrine, Ms. Kapin, has

22 a specific -- what it says is that in the ordinary course or in

23 the normal course, that the FTC will not bring an enforcement

24 action if you comply with the mirror image doctrine.

25        But I might add that the key distinction here is that

Harris - cross                              53

1   this is not a question of whether you had a right to bring an
2   enforcement action even if the mirror image doctrine was complied
3   with.   The issue here is did Mr. Trudeau, if he was aware of the
4   mirror image doctrine, reasonably rely on the doctrine in
5   attempting to comply with the order?
6          So that -- so I don't believe that the issue about
7   whether you could have brought a de novo enforcement action is
8   what brings us here today.
9   Q.   But the FTC could bring an enforcement action even if there
10  has been compliance with the mirror image doctrine?
11  A.   What the policy says is that ordinarily the FTC will not.
12  And of all the FTC enforcement policies, and there are other
13  enforcement policies as you well know about, the contents of
14  labeling fur coats and such things, that I would, I would imagine
15  that an enforcement policy that touches on the First Amendment
16  would be dealt with with more care or more -- not "care" is the
17  wrong word -- but the FTC would be less likely to bring an
18  enforcement action where the First Amendment might be implicated.
19         But, yes, the FTC can bring it even, bring an
20  enforcement action even where the mirror image doctrine is
21  complied with.   And there are cases in which respondents have
22  gone to federal court and said, "Judge, they can't do this
23  because I complied with the doctrine," and the courts point out,
24  as your question suggested, the FTC does have that authority.
25  Q.   Of course, someone who misrepresents the content of a book

Harris - cross                                    54

1  isn't entitled to protection of the mirror image doctrine?

2  A.   That is because they are synonymous.  If you comply with the

3  mirror image doctrine, you have not misrepresented the contents

4  of the book as a legal matter.  That, that I think is one of the

5  points or one of the opinions I've suggested.

6          THE COURT:  Is that in any case?  Has any case ever held

7  that, any court ever held that?

8          THE WITNESS:  No, not as I've just expressed it, Your

9  Honor.

10 BY MS. KAPIN:

11 Q.   In deciding whether to bring an enforcement action,

12 defendant's recidivism would be a permissible factor for the FTC

13 to consider, wouldn't it, Mr. Harris?

14 A.   In terms of exercising its prosecutorial discretion, I think

15 there are very few limits that the agency has.

16 Q.   You stated in your direct examination, Mr. Harris, that in

17 your view, the Wyatt case contains a shorthand reference to the

18 mirror image doctrine.  Did I hear you correctly?

19 A.   I think what I said was that Commissioner Starek in his

20 concurring opinion about issuing the order contains a view, a

21 sentence or two about the purpose of the mirror image doctrine in

22 his own words.

23          MS. KAPIN:  Now, can we go to page 19 of the Wyatt

24 opinion, Ms. Bergquist?

25 BY THE WITNESS:

1  A.   What exhibit is that?

2  BY MS. KAPIN:

3  Q.   This is actually one of the defendant's exhibits.

4        MS. KAPIN:   David, may I ask for your number?

5        MR. HURTADO:   RRR.

6        MS. KAPIN:   RRR.   Thank you.   If we can go to page 19 of

7  RRR.

8  BY MS. KAPIN:

9  Q.   You can tell me when you're there and we'll also highlight.

10 A.   I'm looking for this reference at page 19.   I see the copy I

11 have has my --

12 Q.   Your copy is going to have different numbering than my copy.

13 Why don't we look on the screen together.   But this is from part

14 three of the order in Wyatt.   And I believe this is the language

15 here -- let me rephrase this.

16        The language here states, "Whenever respondent

17 represents that any book or other writing contains information

18 about a particular subject or topic, subpart B shall not be

19 construed to require respondent to possess and rely upon evidence

20 that such information in said book or other writing is true, but

21 only that it, only that it is present in said book or other

22 writing."

23 A.   Right.

24 Q.   Do you see where I'm referring to?

25 A.   Yeah, I do.

Harris - cross                                    56

1   Q.   And that's what Commissioner Starek was referring to as a

2   reference to "some but not all of the mirror image doctrine," is

3   that correct?

4   A.   Yes.

5   Q.   That language is distinct from the language that's at issue

6   in this case, isn't that true, Mr. Harris?

7   A.   If distinct, by "distinct" you mean it is not exactly the

8   same, that is correct.   But I think the language in both is

9   intended to incorporate the mirror image doctrine.

10          And the reason I say that, Ms. Kapin, is because if the

11  language in this case didn't include the mirror image doctrine,

12  the doctrine would have no meaning.   There is nothing in this

13  case that says that Mr. Trudeau is not entitled to rely on the

14  FTC enforcement policy to guide him in his attempt to comply with

15  the Court's order.

16          As a matter of fact, if you were looking for how do you

17  define diligently, you know, what steps do you need to take to

18  comply with what Judge Gettleman told him he had to do, the FTC

19  has an enforcement policy on this very subject that in my view if

20  he was aware of that policy would inform him as to the conduct

21  that he could engage in and the conduct that he was prohibited

22  from engaging in.

23  Q.   Mr. Harris, I want to move on to another topic.

24  A.   Are we done with, can I put Wyatt aside?

25  Q.   Yes, yes.   Mr. Harris, you would agree that commercial speech

1   is not protected by the First Amendment in the same way as

2   noncommercial speech?

3   A.   Yes.

4   Q.   It's often afforded less protection, isn't that correct?

5   A.   Yes.

6   Q.   And an ad for a book is commercial speech?

7   A.   You're now -- you've now drawn me into the nub of the issue.

8   And the issue is that if the book is protected, and you take

9   steps which chills the promotion of the book, haven't you then

10  invaded the First Amendment?

11         And Mr. Fentonmiller wrestles with this problem in his

12  law review article.  He and I, I come to a different conclusion

13  than he does.  He thinks, as your question suggests, that the

14  advertisement is commercial speech and, therefore, is entitled to

15  no greater protection than any other commercial speech.  I don't

16  believe that.

17  Q.   Mr. Harris, my question is:  An ad for a book is commercial

18  speech?

19  A.   Yes, it is commercial speech that is entitled to

20  noncommercial speech protection because of the fact that it is

21  promulgating a protected product, namely, a book.

22  Q.   The First Amendment doesn't give you a license to

23  misrepresent though, does it, Mr. Harris?

24  A.   It does.  If you wrote a book that contained

25  misrepresentations, you certainly do have a license to do that.

Harris - cross                                          58

1   I could write a book which says that UFOs landed in Chicago last

2   week.  And if we all agreed that that was absolutely not true, I

3   could publish that book today, and I'd be entitled to protections

4   of the First Amendment.

5   Q.   Mr. Harris, do you remember having your deposition taken in

6   this case?

7   A.   I do.

8   Q.   And you swore to tell the truth?

9   A.   I did.

10  Q.   And you did tell the truth, didn't you?

11  A.   To the best of my ability, I certainly did.

12       MS. KAPIN:   Counsel, I'm on page 75 of Mr. Harris's

13  deposition.

14       MR. BRADFORD:   Thanks.

15       MS. KAPIN:   And I am reading his answer starting at page

16  8.

17       "Answer:  Well, that's an example.  An order which said,

18  which prohibits you from selling in a line of business which is

19  otherwise lawful, you won't sell credit cards, you won't sell

20  telemarketing services since the selling implicates the First

21  Amendment, that would be a case.

22       "It does not -- I would not consider it to be an

23  infringement on the First Amendment where it said that you agree

24  not to lie, cheat, and misrepresent, because I don't believe the

25  First Amendment gives you a license to do that."

Harris - cross                          59

BY THE WITNESS:

A.   We were talking about selling products as I recall and not books.  To the extent that my answer there is clear, let me tell you, be clear here.  I believe that you can publish a book which contains lies, and that book is entitled to the First Amendment.

Now, of course, to the extent it might be regarded as defamatory, there are certain limits.  But generally if you're stating a statement of fact that is not true in a book, it is entitled to protection.

BY MS. KAPIN:

Q.   But you would agree that the First Amendment does not entitle you to lie about your book in an advertisement?

A.   I believe that -- well, there are two schools of thought. Let me repeat it.  There is one which thinks that because it is the promotion of a protected right, that the promotion enjoys the same protection as the book.

There are others, and I think Mr. Fentonmiller is an advocate for that, who would say that the advertisement of the book is no different ultimately than the advertisement of any commercial product and, therefore, is subject to the limitations that commercial speech for a product is subject to.

So what I'm saying to you is I don't think the answer is clear.  I think that the FTC, if you want my opinion, I'll tell you, I think the FTC promulgated this enforcement policy to try and walk the line between the kinds of questions you and I are

Harris - cross                                60

1   discussing, okay.

2          And by using this vehicle, they have avoided having

3   ultimately a test in which this question is answered definitively

4   by the Supreme Court.  But I think people look at it differently.

5          Now, we're beyond the scope of my opinion, but I'm

6   answering your questions, Ms. Kapin, as best I can.

7   Q.  Mr. Harris, at the time you wrote your report, you didn't

8   review any correspondence between the Federal Trade Commission

9   and Mr. Trudeau's attorneys about order compliance, did you?

10  A.  No.

11  Q.  At the time you wrote your report, you relied on

12  Mr. Hurtado's statement that the FTC basically cleared Natural

13  Cures informercials with the caveat that if consumer complaints

14  were received, they might need to revisit it, is that correct?

15  A.  Yes.

16  Q.  If you learned that the FTC hadn't cleared or approved

17  certain Natural Cures informercials, that would change your

18  opinion, isn't that correct?

19          MR. BRADFORD:  Objection, lack of foundation, except the

20  question is a hypothetical.

21          THE COURT:  You asked enough of those yourself.  I'll

22  let him answer if he can.

23  BY THE WITNESS:

24  A.  With regard to the natural -- the one that I rely on is the

25  Natural Cures, the approval of the Natural Cures book, Ms. Kapin,

Harris - cross                                    61

1   if it turned out that contrary to my understanding you had not

2   approved it, that certainly would lessen that prong of my

3   rationale for my opinion.

4   BY MS. KAPIN:

5   Q.   For example, if the FTC said, "We've got a problem," then

6   that would not permit Mr. Trudeau to say he thought it was okay

7   by the FTC?

8           MR. BRADFORD:   Objection, ambiguous.

9   BY THE WITNESS:

10  A.   I guess it would depend on what the problem you've then

11  described is.   But if you said, if you said it in a way which

12  implicated the point that I tried to make, namely, that with

13  regard to Natural Cures book, it was further out on the spectrum,

14  yeah, you're right, I mean, if the facts change, the conclusions

15  you draw from those facts necessarily would be altered.

16          MS. KAPIN:   Your Honor, may I have a moment to confer

17  with my co-counsel?

18     (Discussion off the record.)

19          MS. KAPIN:   Your Honor, at this time I would conclude.

20          THE COURT:   Thank you.

21          Any redirect, Mr. Bradford?

22          MR. BRADFORD:  Yes, Your Honor.  May I proceed?  Thank

23  you.

24          THE COURT:   I'd like to finish this witness, and then

25  we'll take a break.

1        MR. BRADFORD:  Yes, Your Honor.

2        THE COURT:  That's a hint, Mr. Bradford.

3        MR. BRADFORD:  I'm sorry, I missed that.

4        THE COURT:  I said, "That's a hint."

5        MR. BRADFORD:  I understand.

6                    REDIRECT EXAMINATION

7   BY MR. BRADFORD:

8   Q.   Mr. Harris, does the case cited in the footnote by

9   Commissioner Starek affect your opinion as to whether the order

10  in this case is coextensive with the mirror image doctrine?

11  A.   No.

12  Q.   Why not?

13  A.   Because in the practice, the term "not misrepresent the

14  contents of the book," and you can take a look at

15  Mr. Fentonmiller's article from the point of view of an FTC's

16  staff member, the terms are used interchangeably to refer to the

17  mirror image doctrine.

18  Q.   Ms. Kapin asked you if it was a better practice to

19  incorporate verbatim the mirror image doctrine.  Is it a common

20  practice in your experience to do so?

21  A.   It is not a common practice.

22  Q.   And Ms. Kapin asked you about methods that attorneys utilize

23  to protect their clients.  In your experience, is one of the

24  methods that's utilized obtaining an example and presenting in

25  open court an example of what is and isn't permitted under an

1  order?

2  A.   Can you say that again?

3  Q.   Sure.  Is one of the ways in which you protect your client

4  coming up with an exemplar of what is permitted advertising under

5  a particular order?

6  A.   Yes.  Often dealing with the FTC, what you want to do is say:

7  Look, here is what my client going forward would like to do.  Is

8  this going to cause you a problem?

9  Q.   Ms. Kapin asked you about the FTC's de novo enforcement

10 authority.  Does that enforcement authority affect your opinion

11 with respect to whether or not the FTC has legal authority to

12 proceed for contempt of an order that's coextensive with the

13 mirror image doctrine?

14 A.   No, because the question of contempt has to do with whether

15 Mr. Trudeau reasonably and diligently did what the Court told him

16 to do, not whether the FTC could in an appropriate case bring an

17 enforcement action.

18 Q.   One final area.  You were asked about the First Amendment.

19 Have you had an opportunity to review Article 11 of this consent

20 decree, which relates to the First Amendment?  I think it was put

21 up on the screen initially and then questions were asked about

22 it.  Do you recall that?

23          MS. KAPIN:  Objection, Your Honor.  This does not relate

24 to my cross-examination or Mr. Harris's direct testimony.

25          MR. BRADFORD:  There were many questions on the First

1   Amendment, Your Honor.

2              MS. KAPIN:  But not the particular issue --

3              THE COURT:  Well, I'll let him answer --

4              MS. KAPIN:  Okay.

5              THE COURT:  -- because, very frankly, I think it's up to

6   the Court to determine the scope of the First Amendment.

7              MS. KAPIN:  I will give you a heads up, Your Honor, then

8   I'm going to need to recross.

9              THE COURT:  Let's see what he says first.

10  BY MR. BRADFORD:

11  Q.   Are you familiar with that provision in the order?

12  A.   Yes.

13  Q.   Have you seen similar provisions in other orders?

14  A.   Yes.  As a matter of fact, I've written some of them myself.

15  Q.   And what is your general understanding based upon your own

16  experience and custom and practice in this field of the

17  significance of such a provision, if any?

18  A.   Other than the references to the specific prohibition, so

19  there is somewhere in that sentence I recall there is a comma,

20  after the comma, the reservation of rights is something in my

21  experience that I have never, ever in my 30 years of practice

22  seen the FTC suggest in a draft order.

23              It is always suggested by respondent's counsel to ensure

24  that, other than the specifics that have been agreed to, that

25  there is no waiver of First Amendment rights beyond that.

Harris - recross                                65

1          MR. BRADFORD:  I have no further questions, Your Honor.

2          MS. KAPIN:  Your Honor, may I?

3          THE COURT:  Sure.

4          MS. KAPIN:  I can wait until after the break.

5          THE COURT:  No.  Go ahead.

6                    RECROSS-EXAMINATION

7   BY MS. KAPIN:

8   Q.   Mr. Harris, you've drafted, I'm using your phrase now,

9   reservation of rights clauses yourself, isn't that a fact?

10  A.   Yes.

11  Q.   In fact, RRR and Salzano are two cases that you've worked on

12  that involved these types of clauses, isn't that correct?

13  A.   Yes.

14  Q.   Salzano and RRR, in fact, have the same retention of rights

15  language, isn't that true?  We can put them on the screen.

16  A.   I'll take your word for it.  They should be pretty close.

17  Q.   Okay.  In fact, I believe you testified in your deposition

18  that you typed out the language and question yourself, isn't that

19  true?

20  A.   In the RRR case, I certainly recall doing it.  I can recall

21  where I was.

22          MS. KAPIN:  Ms. Parrish, can we focus on the RRR case

23  and the retention of rights clause.  Can we pop that out.  Is

24  that RRR?  Okay, great.  Can we zoom in on the language that we

25  just read.  Terrific.

1  BY MS. KAPIN:

2  Q.   That provision is entitled "Retention of Rights," isn't that

3  true?

4  A.   Yes, it is.

5  Q.   And it states, "It is further ordered that nothing herein

6  shall constitute or be construed or applied as a waiver by any

7  defendant of all rights otherwise accorded under the United

8  States Constitution."

9        That's what it says, right, Mr. Harris?

10 A.   Yes, that's what it says.

11 Q.   Now, if we can go back to our Exhibit 1, which is the order

12 in this case.  If you want to look at it, you can save some

13 strain on your eyes.

14 A.   What page?

15 Q.   This is going to be page 14.

16       MS. KAPIN:  So this is the language you originally

17 brought up, Ms. Bergquist, Exhibit 1, page 14.

18 BY THE WITNESS:

19 A.   Yes, I'm there.

20 BY MS. KAPIN:

21 Q.   Are you there?  We're on the same page?

22       MS. KAPIN:  Okay.  If you can zoom in on, I think we

23 have, you can highlight it.  We have a highlight for that already

24 though.

25 BY MS. KAPIN:

Harris - recross                                      67

1  Q.   Now, the order language in the order that's at issue before

2  this Court is distinct from the language we just read, isn't that

3  true?

4  A.   Well, if we're talking about after the comma, if there

5  follows the word "herein," okay, so I'm starting from the

6  language that says "Nothing in this order."  Do you see that?

7  Q.   How about starting from "With the exception of."

8  A.   Well, the answer to your question is the language is

9  different.

10 Q.   In fact, this order states, "With the exception of any waiver

11 in connection with parts 1 through 10 herein, nothing in this

12 order shall constitute a waiver of the defendant's right to

13 engage in speech protected by the First Amendment."

14 A.   That's certainly what it says.

15 Q.   Now, this first clause of part 11 exempts or has an exception

16 if there is a waiver somewhere in parts 1 through 10 of this

17 order, isn't that true?

18 A.   That's the way I would read it.

19 Q.   And you agree that to the extent there has been a waiver in

20 parts 1 through 10 of First Amendment rights, that this

21 reservation of rights clause would not apply by its terms?

22 A.   That's the way I would read it.

23         MS. KAPIN:   No further questions, Your Honor.

24         THE COURT:   I have a couple.

25         No, we're done.  This is not a deposition, Mr. Bradford.

Harris                                        68

1          MR. BRADFORD:  I'm sorry.

2          THE COURT:  But I have a couple questions.  First of

3     all, Mr. Harris, do you have any knowledge of whether Mr. Trudeau

4     ever heard of the mirror image doctrine before doing these

5     informercials?

6          THE WITNESS:  No.  Frankly, until today, I've never met

7     Mr. Trudeau.

8          THE COURT:  Okay.  Do you have any knowledge as to

9     whether I've ever heard of the mirror image doctrine before I

10    signed that order?

11         THE WITNESS:  Do I have knowledge?

12         THE COURT:  Yes.

13         THE WITNESS:  No.  I have a suspicion.

14         THE COURT:  What's your suspicion?

15         THE WITNESS:  I would think -- I don't know too many

16    judges or practitioners who are familiar with it.

17         THE COURT:  Your suspicion is correct.

18         Do you have any knowledge as to whether the mirror image

19    doctrine was ever mentioned by either party or anybody in this

20    litigation before these contempt proceedings?

21         THE WITNESS:  I sort of come to this encapsulated with a

22    specific task.  So the answer is no.

23         THE COURT:  It wouldn't surprise you if the answer was

24    no?

25         THE WITNESS:  No.  And I can tell you also that,

Harris                                    69

1    strangely enough, if you look up the citation for the mirror

2    image doctrine on Lexis, you will not find it.  It's an error in

3    the Lexis system.

4              THE COURT:  Maybe, maybe not.

5              Now, the mirror image doctrine, this is Exhibit AAA,

6    which is enough to scare any judge, certainly enough to scare me,

7    UUU is downright frightening, but anyway, the mirror image

8    doctrine, the language that we're talking about in this

9    publication, that the advertising only purports to express the

10   opinion, and I know you have a view of that, but with all due

11   respect, it's my view I think that would govern on that one, or,

12   this is really where the rub comes here, quote the contents of

13   the publication.

14             So looking at this language, isn't "quote the contents

15   of the publication" quite different than the language of the

16   order that we're talking about, the 2004 order which says he must

17   not misrepresent the contents of the book?

18             Let me be a little more specific, because basically

19   you're giving another argument for counsel, and I enjoy that sort

20   of thing.  So, you know, I'm not taking, I'm not taking most of

21   what you say as expert opinion, because I think it really is a

22   lawyer's view of the case, and I'll take it for that.

23             But you can quote the contents of a publication and

24   maybe come within this doctrine.  But when you're talking about

25   misrepresenting the contents of the book, I've already held the

Harris                                    70

1  contents refers to the book, the entire book, aren't those

2  different concepts?

3          THE WITNESS:  Well, I think that one has to inform the

4  other.  And I guess what I'm saying is that as an FTC

5  practitioner, if I had a case like this, and someone said to me

6  "A judge has ordered me not to misrepresent the contents of the

7  book.  What can I say, what can't I say?"  I would say to him,

8  "Let's look at what the FTC's enforcement policy," because after

9  all, they're the complainant in this case, they bring it before

10 the Court, and that someone who follows the FTC's enforcement

11 policy would not be misrepresenting the contents of the book,

12 because the FTC would not promulgate a policy which permitted one

13 to misrepresent the contents of the book.  That is not what an

14 enforcement agency would do, would be to craft a policy which

15 they believed allowed you to misrepresent the contents of the

16 book.

17         So I think what the -- and the longevity with which this

18 policy has been in effect without any modifications indicates to

19 me that at least the FTC is at this point satisfied that that

20 policy is sufficient to protect against a charge that one has

21 misrepresented the contents of the book.

22         I don't know if that answers your question directly, but

23 it's the best I can do.

24         THE COURT:  Well, no, I appreciate that, because you're

25 an advocate here for your client.

Harris                                    71

1         But what I, what I -- I know, I know what you're going
2    to say.
3         But I guess what does come within your experience here
4    is when the language of the order differs from the language of
5    this doctrine, don't you think that before exercising the
6    presumption that you just made, you would want to clear that with
7    the FTC?  Wouldn't that be the prudent course?
8         THE WITNESS:  Sure.  And at least I understand, and
9    maybe this is an issue in contention between the parties that
10   that was done, but I would respectfully suggest to Your Honor
11   that if you look at Mr. Fentonmiller's article, you will see, you
12   will I think conclude that he uses the terms "not misrepresent
13   the contents of the book" and the FTC's mirror image requirements
14   as being the same.
15        THE COURT:  Well, I guess the problem I'm having with
16   this, and I don't know if this has anything to do with your
17   testimony or with my giving it weight is that I've never heard of
18   that article or this doctrine before these briefs.
19         And when I issue an order, even though you're right, of
20   course, you're experienced enough to know that, and your
21   experience and what happens in the course of dealings with the
22   FTC, I'll take it, I'll accept that testimony, but it would seem
23   to me that if I were to be looking at an order presented to me as
24   an agreed order by a party, an injunction that I know I'm going
25   to have to enforce, and it is incorporating something like this

Harris                                    72

1   doctrine, I would want to be told about it before I signed the

2   order.

3          In your experience, with that preface, do you know of

4   whether or not practitioners in this field generally bring to the

5   Judge's attention who is asked to sign such orders this doctrine

6   and their view of the doctrine?

7          THE WITNESS:  Well, again, with all due respect to Your

8   Honor and to federal judges, my experience has been that that

9   kind of discussion as to the scope of what's permitted and not

10  permitted generally is engaged in between counsel for a

11  respondent and counsel for the FTC, because after all, if the FTC

12  doesn't find it objectionable, it will never again come before

13  the Court.  It's only when the FTC feels that the order has been

14  violated that they would bring to the Court.

15         So I don't mean to be disrespectful to the role of the

16  Court, but I think as a practical matter in the world that these

17  discussions often occur between counsel for respondent and the

18  FTC and not with the Court.

19         If you're asking would it be a better practice?  You

20  know, based on the way you asked the question, the answer seems

21  to be obvious.

22         THE COURT:  Well, I think the next time you do write an

23  article about this, that will be a good subject for it.

24         All right.  Any questions of this witness based on my

25  questions and dialogue with him?

1          MR. BRADFORD:  No, Your Honor.

2                    RECROSS-EXAMINATION

3    BY MS. KAPIN:

4    Q.   Just one question just for clarification, Mr. Harris.  You do

5    acknowledge that Mr. Fentonmiller does not speak for the FTC in

6    his article, isn't that true?

7    A.   I think I said, the article contains the disclaimer and I

8    think I mentioned that.

9    Q.   You did, and I just wanted to clarify.  In fact, that article

10   was written years after this order was entered into, isn't that

11   true?

12   A.   That's right.  And the example he uses in his article, you

13   know, the set-up piece is remarkably similar.

14          THE COURT:  Thank you, sir.  You're excused.

15          THE WITNESS:  Thank you.

16          THE COURT:  You'll make your flight home.

17    (Witness excused.)

18          THE COURT:  All right.  Let's take a 10-minute break.

19          MR. BRADFORD:  Thank you, Your Honor.

20          MS. KAPIN:  Thank you, Your Honor.

21    (Recess.)

22          THE COURT:  Do you want to call your next witness,

23   Mr. Bradford?

24          MS. KAPIN:  Your Honor, at this time may we be allowed

25   to make our opening statements?

Prabhu - opening                                74

1       THE COURT:  Oh, sure.  Haven't you already?

2       MS. KAPIN:  We'd like to do it formally, Your Honor.

3       THE COURT:  Keep it short, because I have read all the

4   briefs and reviewed all the orders and everything.  But since

5   you're all raring to go --

6       MS. KAPIN:  We appreciate it.

7       MS. PRABHU:  I'm in a suit, Your Honor, and this is my

8   first time.

9       THE COURT:  Okay.  Mr. Bradford will keep that in

10  consideration too, I'm sure.  All right.

11          OPENING STATEMENT ON BEHALF OF THE FTC

12      MS. PRABHU:  We are here today because of Kevin

13  Trudeau's violations of a simple and direct order of this Court.

14  Mr. Trudeau's flagrant misrepresentations of his book, The Weight

15  Loss Cure "They" Don't Want You to Know About caused this Court

16  to find him in contempt.  So we focus now on a determination of

17  the proper remedy for his violations.

18          Notwithstanding the extensive testimony we've already

19  heard on the mirror image doctrine, briefly, Your Honor, I'll

20  first be addressing the two questions before the Court in this

21  remedy proceeding:  First, should consumers be fully compensated

22  for the harm caused by Mr. Trudeau's order violations?  And,

23  second, should the 2004 order be modified to protect consumers

24  going forward?

25          This is a straightforward case, and the answer to both

1    questions is yes.  To the first question before the Court, should

2    consumers be fully compensated for their losses, which total over

3    $46.9 million spent on the Weight Loss Cure book, here is why the

4    answer is yes.  The law is clear that the Court has inherent

5    authority to administer justice and enforce its own orders

6    through civil contempt proceedings, and as part of that

7    authority, the Court may compensate consumers for the harm caused

8    by the order violations.

9           Consumers here are entitled to compensation in the full

10   amount of their losses.  In fact, this is the proper measure of

11   monetary relief for contempt.  The informercials for the Weight

12   Loss Cure book blanketed the airwaves.  They were broadcast

13   nationwide over 32,000 times in roughly a one-year period.  And

14   the result, over 1.6 million copies sold.

15          Mr. Trudeau must be compelled to make those consumers

16   whole, and that means holding him liable for $46.9 million in

17   sales generated by his violative informercials.  This includes

18   compensating both the consumers who ordered the book directly by

19   calling the phone number provided in the informercials as well as

20   the consumers who bought the book through various other retail

21   channels.

22          Now, the defense seeks to avoid having Mr. Trudeau pay

23   any compensation whatsoever.  They do that first by attempting to

24   rebut the presumption of consumer harm by pointing to refund

25   policies, return rates, and purported evidence of satisfied

1  customers.  None of the proffered evidence rebuts the presumption

2  of consumer harm.

3       The law is clear that an offer of a money back guarantee

4  is no remedy for consumer injury.  Indeed, if it were, deceptive

5  advertising laws would be nullified, because anyone could falsely

6  advertise as long as they offered a refund.

7       Return rates are similarly irrelevant to the remedy

8  determination, because there are numerous reasons why consumers

9  fail to seek refunds.  Not only is the process often burdensome,

10 but in cases like this one, pursuing a return is simply not cost

11 effective.  Consumers have already incurred nonrefundable

12 shipping costs, and they would have to spend additional money to

13 ship the book back.

14      THE COURT:  Well, have you thought about a remedy that

15 would include offering the purchasers of these books a full

16 refund or returning the book and getting a full refund including

17 the shipping, making them whole that way, and seeing who actually

18 had a complaint about it?

19      MS. PRABHU:  Certainly, Your Honor.  And I know my

20 colleague Ms. Kapin intends to explore that fully with Your

21 Honor.

22      THE COURT:  You're doing your own here.

23      MS. PRABHU:  I understand.  And I think the key here,

24 Your Honor, is the difference between an opt-in and an opt-out.

25 Opt-ins put the burden on the victims.  And history has shown us

Prabhu - opening                                77

1  that consumers often don't actually have the opportunity to

2  opt-in or don't take advantage, not because they haven't been

3  harmed, but because the process of the opt-in similar to the

4  process of making a return is itself burdensome.

5          The onus here should not be on the consumers who have to

6  take the action.  It should be on Mr. Trudeau to make them whole.

7  If, in fact, they say they are satisfied, and no, no, they don't

8  want the money, then certainly, they can opt-out.  I hope that

9  answers Your Honor's question.

10          THE COURT:  Well, how do you envision that happening?

11          MS. PRABHU:  Your Honor, the FTC regularly implements

12  redress programs.  When we obtain judgments when there is

13  sufficient money to, in fact, implement a redress program,

14  because there is a certain amount of administrative costs also

15  involved, the FTC has mechanisms by which it actually identifies

16  the pool of victims and gets the money to them through a redress

17  program.

18          THE COURT:  And allows people to opt-out and say "I

19  don't want the money"?

20          MS. PRABHU:  Certainly.

21          THE COURT:  That doesn't happen too often probably.

22          MS. PRABHU:  Probably not very much.

23          THE COURT:  All right.

24          MS. PRABHU:  But I can't speak with certainty.

25          THE COURT:  All right.  Well, that's something I think

1   we should be -- that's something that occurred to me as at least

2   a possibility here.

3            MS. PRABHU:   Certainly.

4            THE COURT:   Go ahead.

5            MS. PRABHU:   As for the evidence of, quote,

6   "overwhelmingly satisfied customers," that evidence is

7   overwhelmingly deficient.  It consists of comments on a social

8   networking site run by ITV, the company which worked with

9   Mr. Trudeau to distribute the Weight Loss Cure informercials.

10           The comments themselves are unreliable hearsay.  On top

11  of that, they fail to support the contention that consumers were,

12  in fact, satisfied with the Weight Loss Cure book.  That's

13  because the comments on that site are not about the Weight Loss

14  Cure book.  They're about the Simeons protocol, a different

15  weight loss regimen.  Now, Mr. Trudeau discusses and incorporates

16  the Simeons protocol into his book.  But by no means are the two

17  protocols the same.

18           And the defense proffers no evidence to show that the

19  people making comments on that social networking site, in fact,

20  saw the Weight Loss Cure informercials or bought the Weight Loss

21  Cure book.

22           Next, the defense attempts to cut retail sales out of

23  the calculation.  They do so through an expert from the retail

24  book industry, Mr. Domnitz.  But Mr. Domnitz himself admits that

25  television marketing is a rare occurrence in the book industry.

Prabhu - opening                                    79

1   Consequently, he has no experience analyzing the impact of

2   widespread infomercial advertising on sales in retail bookstores.

3          Furthermore, Mr. Domnitz has not performed any case

4   specific analysis of the impact of the Weight Loss Cure

5   informercials on retail sales of the Weight Loss Cure book.

6   Therefore, his opinions fail to rebut the presumption that all

7   consumers were harmed by the widespread Weight Loss Cure

8   informercials.

9          And, finally, as a last ditch effort to avoid monetary

10  relief, the defense argues that Mr. Trudeau is too poor.  He

11  simply couldn't afford to pay a judgment.

12         Mr. Trudeau's financial condition does not spare him the

13  obligation to compensate consumers for the harm he caused.  And

14  his financial condition is not static.  At a minimum, he is owed

15  many, many millions of dollars from a contract with ITV.

16         Beyond that, there is no reason to think that

17  Mr. Trudeau, the consummate salesman, will not be earning an

18  income in the future.

19         As between consumers and Mr. Trudeau, consumers should

20  not get the short end of the stick.  Therefore, they should be

21  fully compensated for the $46.9 million in harm caused by

22  Mr. Trudeau's order violations.

23         Turning now to the second question before the Court,

24  should the 2004 order be modified to protect consumers going

25  forward?  Specifically, should it include a provision that would

1   require Mr. Trudeau to obtain a $10 million bond before

2   participating in any informercials in the future.

3          Here is why the answer is yes, the law provides that an

4   order may be modified if it has not achieved its purpose.  The

5   purpose of the 2004 order was to protect the public from

6   Mr. Trudeau's deceptive sales tactics.  So has the order actually

7   protected consumers from Mr. Trudeau's deceptive sales tactics?

8   The very violations of the order that bring us here today are

9   sufficient to demonstrate that it has not.

10         A bond is necessary here, because history has taught us

11  that mere prohibitions on paper will not work with Mr. Trudeau,

12  even if those prohibitions are federal court orders.

13         In 1998, ten years ago, the FTC filed its first

14  complaint against Mr. Trudeau for claims he made in informercials

15  touting various health-related products.  That action resulted in

16  the entry of a court order.  Five years later, the FTC initiated

17  another action against Mr. Trudeau for what it believed to be

18  serious violations of the 1998 order.  The Court at the time

19  entered a preliminary injunction against Mr. Trudeau.  What was

20  Mr. Trudeau's response to the preliminary injunction?  He

21  violated it.

22         So while in the midst of litigation over an order

23  violation, Mr. Trudeau engaged in yet another order violation.

24  For that the Court held him in contempt.  And in 2004, the Court

25  entered another order against Mr. Trudeau banning him from

Prabhu - opening                                    81

1    informercials in all but a very narrow set of circumstances.

2          But here we are today, because Mr. Trudeau has violated

3    the latest order entered against him.  Mr. Trudeau has truly

4    demonstrated his contempt for court orders.  So the only way to

5    protect consumers is to guarantee that a pool of money will be

6    available to compensate them in the event that Mr. Trudeau's

7    overzealous salesmanship oversteps the law again.

8          The defense has argued that a bond would be an

9    unconstitutional prior restraint and in violation of

10   Mr. Trudeau's First Amendment rights.  But applying the framework

11   laid out by the Supreme Court in Madsen v Women's Health Center

12   shows clearly that the bond would be constitutional.  And the FTC

13   has, in fact, obtained multimillion dollar bonds against

14   defendants in its prior cases, such as FTC v Capital Choice

15   Consumer Credit and FTC v Sloan America just to name two.

16         The 2004 order, therefore, can and must be modified to

17   include a bond provision that will protect consumers going

18   forward.

19         Now let me briefly address the defense motion for

20   reconsideration of the contempt finding and why it should be

21   denied.  In its memorandum opinion and order, this Court found

22   that Mr. Trudeau was, quote, "in flagrant violation," unquote, of

23   the 2004 order and that he made patently false claims in his

24   informercials.

25         As a preliminary matter, the defense has pointed to

1   neither manifest errors of law or fact nor to newly discovered

2   evidence as the law requires in support of a motion for

3   reconsideration.

4           But Mr. Trudeau now has his day in court, and he will

5   likely work hard to persuade the Court that he has been

6   reasonably diligent and energetic in his compliance efforts.  To

7   that end, the defense relies on communications from the FTC that

8   purportedly led Mr. Trudeau to believe that the Weight Loss Cure

9   infomercial were in compliance with the order.

10          Did these communications concern the Weight Loss Cure

11  book and informercials?  No.  These communications were about a

12  different book and different informercials.  The record simply

13  does not bear out Mr. Trudeau's characterization of those

14  communications.

15          The FTC repeatedly advised Mr. Trudeau of its concerns

16  regarding his past informercials.  And Mr. Trudeau never

17  communicated with the FTC directly himself or through his lawyers

18  about the Weight Loss Cure book and informercials before this

19  case.

20          Well, that leaves but one remaining avenue for

21  Mr. Trudeau, his assertion that he truly believed he was in

22  compliance with the order.  Of course, it's for the Court to

23  determine whether Mr. Trudeau is credible on that point, but it

24  does not affect the contempt determination, because subjective

25  good faith intent is not a defense to contempt.

Bradford - opening                          83

1          None of the evidence or testimony presented would alter

2    the clear, unavoidable fact that Mr. Trudeau flagrantly violated

3    this Court's simple and direct order.  Therefore, the Court's

4    well reasoned contempt finding should not be disturbed.

5          As the Court has noted, Kevin Trudeau is one heck of a

6    salesman.  But consumers should not be left holding the bag

7    because Mr. Trudeau's salesmanship has once again gone too far.

8    They should be fully compensated for their losses and have the

9    assurance that they will be protected in the event of his future

10   violations.

11         So the FTC asks this Court to enter a monetary judgment

12   in the amount of $46.9 million and modify the 2004 order to

13   include a $10 million bond.

14         THE COURT:  Thank you, counsel.

15         Mr. Badford?

16         MR. BRADFORD:  Thank you, Your Honor.

17          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

18         MR. BRADFORD:  Your Honor, we are here on a contempt

19   motion on which the government bears a burden of clear and

20   convincing evidence.  And contempt is appropriate only if the

21   order is clear and unequivocal.

22         I agree with the FTC, it's an objective standard.

23   Mr. Trudeau's subjective belief may be a relevant equitable

24   consideration, but at the end of the day the question is:  Was it

25   reasonable for anyone in his position to believe that this

Bradford - opening                                84

1    infomercial complied with the order?

2           If that was an objectively reasonable belief, there

3    cannot be contempt of this Court, whatever other enforcement

4    actions may be appropriate, and that belief was completely

5    objectively reasonable and we submit, in fact, the correct view

6    of the order and of the law.

7           And we go back to what led to the order, which was the

8    coral calcium infomercial.  And the resolution of that

9    circumstance was that Mr. Trudeau got out of the product business

10   altogether.  And to this day he has never put forward an

11   advertisement for a product, has never been involved in a sale of

12   a product.  He has respected completely the thrust of that order.

13          There was a specific agreement that he could write books

14   and that in those books he could effectively say what he

15   wanted -- and I will come back to the proof of that -- and that

16   he could do informercials for those books.  It was the last

17   opportunity for him.

18          And before we entered into that order, we had extensive

19   dialogue with the FTC about what Mr. Trudeau could and could not

20   do under that order.  And, in fact, at the September hearing

21   where the order was entered, and I'll read the passage, I

22   specifically stated to the Court that "We have agreed on things

23   that aren't specifically referenced in the order, but we've

24   agreed on them as examples.  I'm going to put them in the record

25   lest there ever be a dispute about what he can and cannot do

1  under the order."

2          And that's part of the September transcript, and I'll

3  read it.  But leading up to that, we submitted the original

4  Natural Cures book and the original Natural Cures infomercial to

5  the FTC.

6          In Exhibit HHH, which is a July 20, 2004 letter from

7  Daniel Kaufman, who was counsel of record, to Mr. Hurtado and

8  myself, they reviewed the book and they reviewed the infomercial.

9  And on the second page, I don't know if I could get, get this

10  working Elmo --

11          THE COURT:  July of '04, this was before the order was

12  entered.

13          MR. BRADFORD:  Before the order was entered.  This was

14  leading up to the order.

15          I don't know if I can -- I guess not.

16          But I'll read this to the Court.  It's Exhibit EEE --

17  I'm sorry -- HHH, July 20, 2004, page 2, the last large

18  paragraph:

19          "There is first concern that Mr. Trudeau's website not

20  mention branded products."  And that was something that he

21  complied with, that he got the branded products off of the

22  website that was referred to in the book.

23          Your Honor will recall that the whole concern at that

24  point was he not author books that were essentially

25  advertisements for other products and that he would use this book

1  exception as a way to hawk products.

2        And so there was agreement that if he referred to a

3  website or anything else in the book, there was going to be no

4  branded products, and that's what the first two-thirds of this

5  letter addresses.

6        But then on page 2 of the letter in the large paragraph,

7  the first full paragraph on that page, Mr. Kaufman writes, "In

8  addition, having compared the content of the book to the

9  representations made about the book in the infomercial, it also

10 appears there are a few statements in the infomercial that do not

11 accurately describe the content of the book."

12       So here is an example of what we're talking about.  And

13 he says, "Most notably, on page 25 of the transcript, consumers

14 are led to believe that the book will contain cures for multiple

15 sclerosis, muscular dystrophy, and other illnesses, and it

16 appears that these ailments are not even mentioned in the book."

17       And then he goes on to say I believe, "Several other

18 ailments are pictured in calls in the infomercial but not

19 referenced in the book.  Mr. Trudeau is responsible for the

20 express and implied representations describing the content of the

21 book he has marketed."

22       And then in Exhibit EEE, Mr. Hurtado writes back and

23 says, he did a search, and the book does mention every disease or

24 putative disease that's referenced in the Natural Cure show,

25 including, I'm sorry, multiple sclerosis, muscular dystrophy, and

Bradford - opening                    87

1   he references the page numbers, and he goes on to identify that

2   each of these are referred to in the book.

3          In response Mr. Kaufman writes on July 23rd, 2004,

4   "Based on Dan's representation, the website will not have any

5   content in it for several months.  We approve of the book, and we

6   approve of the infomercial as compliant."

7          THE COURT:  Where are you reading?

8          MR. BRADFORD:  Now this is, I'm sorry, this is Exhibit

9   O.  This is the e-mail back that indicates that, and it says, "If

10  the website is activated, the general rule under the final order,

11  specific branded products, should not be included."

12         When we appeared before you on September 2, 2004, the

13  best way that we knew how to set forth concretely what Trudeau

14  could do and not do was to have an actual book and an actual

15  infomercial that demonstrated what was permissible and what was

16  not permissible.  And I specifically referenced that, and

17  Ms. Hippsley actually referenced it during her presentation to

18  the Court.

19         So at page 3 of the transcript of September 2, 2004,

20  which is Defendant's Exhibit A, after speaking to the bans in

21  place at page 3, line 14, Ms. Hippsley says, "And there is an

22  exception to this, which is for what we both have agreed is an

23  area where he has more First Amendment protections in his

24  interest in putting forward advertisements that deal with

25  basically fully protected speech, which would be his ability to

Bradford - opening                          88

1  have a book or other informational publication that are not

2  related in a commercial setting to the sale of a product or

3  program or service, but merely provides his views and opinions on

4  various topics."

5        Your Honor then asked, "So if he writes a book about

6  coral calcium -- and I would submit the premise there was a book

7  that says coral calcium cures cancer, because that's why we were

8  here."

9        And Ms. Hippsley says:  "Correct."

10       Your Honor says:  "That would be an infomercial."

11       And Ms. Hippsley says:  "If he writes a book about coral

12  calcium, and it's not linked to the product sale or a branded

13  product, he would be able to do that, i.e., he could write a book

14  and say 'In my opinion coral calcium does this' as long as he's

15  not in the business of selling coral calcium."

16       We then come back to the specific book that's before the

17  Court.  And I state on page 8 at line 11, "Here are a number of

18  understandings that for good reason were not reflected in the

19  order but which we agreed we wanted to make of record just in

20  case we have different people involved in this somewhere down the

21  road.  I wanted to avoid all potential for misunderstanding to

22  the extent we could."

23       And then the specific example that I gave among others

24  of things we had agreed to, and this is at page 10, line 17,

25  "Then a further understanding was Mr. Trudeau did complete what's

1   referred to as the Natural Cures book.  He has developed an

2   infomercial for that Natural Cures book.  This has been provided

3   to the FTC, and they have no objection to the dissemination of

4   the infomercial -- I'm sorry -- of the book or the infomercial in

5   its current format."

6          I'm continuing my quote, "This I think falls within the

7   book exception that we had talked about previously.  So we have

8   the first tangible example of something that is acceptable under

9   that provision."

10          And the FTC never took issue with that.  They were in

11  open court.  Mr. Trudeau sat there and observed that.

12  Mr. Trudeau understood that that's what he could do.

13          Now, when we look at what that infomercial said, as

14  Mr. Harris testified, under the standard the FTC is now

15  advocating, that is so much farther off the mark than anything in

16  this Weight Loss infomercial, it is impossible to reconcile the

17  notion that he could do that infomercial and that book and not be

18  permitted to do what he did here.

19          Specifically, he promised in that infomercial that "In

20  the book, I will tell you that there is a cure for heart disease.

21  I will tell you that there is a cure for cancer.  I will tell you

22  that there is a cure for herpes."  And you know what you found

23  when you opened the book?  Mr. Trudeau said "There is a cure for

24  heart disease, there is a cure for herpes, there is a cure for

25  cancer, but I can't tell you what they are, because the FTC has

Bradford - opening                                    90

1  banned me from telling you.  I can't even say what the cures

2  are."

3           And the FTC approved that.  Why?  Because he said in the

4  infomercial "There is a cure for cancer, there is a cure for

5  herpes, and I tell you about it in the book."  And in the book he

6  said the same things.  Would a reasonable consumer have believed

7  they were going to actually get those cures in the book?

8  Absolutely that was a reasonable interpretation.  And could

9  consumers be disappointed on their 25 bucks, that they didn't get

10 what he was representing?  Absolutely.

11          The very same arguments that are being made here were

12 criticisms that could be leveled of that book.  And in fairness,

13 Your Honor, those criticisms were thereafter leveled by critics

14 and by certain consumers.  And, in fact, thereafter the FTC wrote

15 to Mr. Trudeau and they said:  You know, if you're getting a lot

16 of complaints that the cures aren't in the book, then that's a

17 concern insofar as you do short-form advertisements, that is, if

18 you are doing two-minute spots, and you're promising cures and

19 you're not delivering them, we could take action on that.

20          And when we pushed back and said, and this is all

21 contained in exhibits that I'll draw the Court's attention to,

22 when we pushed back and said "You've just approved this," the FTC

23 said, "We're drawing a distinction between the infomercial, which

24 is 30 minutes, and the short form.  In the infomercial it's not

25 as big a deal because it's 30 minutes.  We're not taking back our

1   position about what he can do in the infomercial, but we are

2   taking a different position on the short form."

3            And rather than have an issue with the FTC, Mr. Trudeau

4   republished the book.  And what did he do?  He put in the book 50

5   specific diseases and 50 specific cures for those diseases.

6            And an examination of the book demonstrates that those

7   cures were much like the diet regime.  In fact, as Mr. Harris

8   testified, there were statements about a diet regime that were

9   not very different from those made in this book.

10           He talked in that book about the cures being

11  intracellular injections of medications that were not available

12  in the United States by way of prescription or medical

13  prescription, precisely what he's doing here.

14           He talked about in certain cases you have to go through

15  this regimen of taking various medications or off-the-shelf types

16  of products that aren't available in the United States.  He

17  promised a cure for herpes when medical science says there is

18  none.

19           And the FTC not only blessed that approach and took no

20  action with that approach, but there was actually a court case,

21  not before this Court, but before another court on whether or not

22  that was permissible, because notwithstanding the FTC's agreement

23  with that, there was a consumer protection agency in New York

24  called the New York Consumer Protection Bureau.  And the New York

25  Consumer Protection Bureau started sending letters to television

Bradford - opening                    92

1   stations saying:  We urge you not to run the ads for the Natural

2   Cures revised book, because Trudeau is telling you in the

3   infomercial that he's giving you a cure for cancer and herpes and

4   heart disease, and we don't believe the cures in the book work,

5   and we think the cures in the book are preposterous, and this is

6   misleading.

7          And we went into federal court in upstate New York and

8   filed an action in Albany on this issue.  And the FTC was asked

9   publicly its position on this question.  And they are

10  specifically, they were specifically quoted, Ms. Hippsley was

11  quoted and the FTC was quoted as saying, "This is fully protected

12  speech.  This is not a violation of the order."

13         They were obviously under some pressure to take action

14  on this.  And Exhibit E is a press article in the Buffalo News.

15  And after discussing the FTC's role in prosecuting Trudeau, the

16  FTC attorney stated, quote, "Trudeau's current infomercial is

17  exempt from the settlement agreement, because it's expression of

18  an opinion protected by the First Amendment."  That's the FTC

19  talking on an infomercial that is indistinguishable from what we

20  have here on any substantive basis.

21         Ms. Hippsley was quoted on MSNBC, this attracted

22  national attention, this lawsuit, and MSNBC reports, quote, "FTC

23  Attorney Heather Hippsley said, 'The agency reviewed the book and

24  earlier versions of the infomercial hawking the book and found

25  them in compliance with the settlement.'  The article quotes

Bradford - opening                                    93

1   Ms. Hippsley as saying, quote, 'To ban advertising for fully

2   protected speech would be quite extraordinary and not something

3   you want your government to be doing.'"

4          So that's the framework that existed when Mr. Trudeau

5   set out to do the Weight Loss book.

6          But, further, the statement that he sought no advice

7   with respect to the Weight Loss issue is not entirely correct,

8   because in 2004, Mr. Trudeau submitted to the FTC a CD of a

9   weight loss program.  It was entitled How to Lose 30 Pounds in 30

10  Days, and he submitted that among other things to the FTC.

11         And I would note that this is part of years of

12  communication and correspondence with the FTC where every time

13  they told him not to do something or they had a problem, we

14  didn't come before this court to seek modification or

15  clarification of the order.  We just didn't do it.  We just

16  complied with whatever their interpretation of the order was so

17  there would be no dispute and no question about his compliance.

18         So he submitted this CD.  And Exhibit 31-M, this is an

19  FTC exhibit which goes through the correspondence, and in there

20  you'll see the correspondence where they complain about the

21  concern that the short-form advertisements might leave consumers

22  to expect actual cures.  In there that subject is addressed.

23         But they say, "We have looked at a copy of Trudeau's CD

24  entitled How to Lose 30 Pounds in 30 Days."  And they say that

25  the first issue with the CD is there are some passages that make

Bradford - opening                    94

1   references to branded products.  That's obviously all topic for
2   today's purposes.

3           But then they say, "Second, the second issue we have
4   with the weight loss CD is veering quite close to being a
5   prohibited program."

6           And then they say, "As you know, as of January 1, 2004,
7   under part one of the order, Mr. Trudeau cannot disseminate,
8   directly or indirectly, informercials for his Mega Memory
9   program.  Although there may be some uncertainty at the edges as
10  to whether a book or CD constitutes informational material or is
11  instead a prohibited program, such as the Mega Memory program, we
12  want to take this opportunity to describe our opinion."

13          And then it says, "In general, if books or CDs are
14  marketed as enabling a person to accomplish a specific goal, such
15  as losing 30 pounds in 30 days, making large sums of money
16  trading stocks, or substantially increasing their memory skill,
17  it's a program and is covered under parts one and two of the
18  order.  Part one prohibits informercials for programs.  Part two
19  prohibits health benefit claims for programs."

20          So the concern they expressed to us was not:  You can't
21  make these assertions because, in fact, there is no diet that's
22  going to cause you to lose those 30 pounds.  The concern is it
23  better be a real book.  This can't be a "Here is the 12 steps,
24  and there is nothing more to it," because that could be called a
25  program.

1        So when Mr. Trudeau wrote this book, he didn't write a

2    program, and they're not here today contending it's a program.

3    They're not contending that he did anything inconsistent with the

4    advice that they gave him on this topic.

5        He put in a bibliography.  He put in references.  He

6    puts in all kinds of history about this protocol.  He discusses

7    his views of the health industry and the drug industry.  There is

8    no question but that this is a real book.  And nobody has ever

9    suggested it's a mere program rather than a book.

10       They also took an issue with the title of the CD,

11   calling it How to Lose 30 Pounds in 30 Days, and they said that

12   that was problematic.  So he didn't use that title when he

13   published this book.  Once again, he complied with the advice

14   that they gave him, even though he disagreed with that, and I

15   disagreed with that as far as the title goes.  And we expressed

16   that disagreement, but we abided by it.

17       They went on to say that "There is the same issue we

18   have," it says, "It mirrors the issue we repeatedly stated with

19   Mr. Trudeau's Natural Cures book.  False claims cannot be made

20   about the content of the book, that the content of the book will

21   cure people of specific diseases.  Similarly, claims should not

22   be made that the content of the CD will enable consumers to lose

23   30 pounds or a specific amount of weight."

24       Well, again, he didn't violate that command.  He was

25   very careful not to say, "If you read this book, you will, in

Bradford - opening                          96

1    fact, lose 30 pounds."  There is no efficacy claim about the

2    book.  Rather, he was very careful to say:  In this book I give

3    you examples of people who have lost this kind of weight in this

4    book.  I tell you about the following.  And, in fact, everything

5    he says is in the book.

6          So guidance was sought on this topic.  A show was

7    produced that was compliant with the guidance that was given by

8    the FTC on the very issue of a how to lose weight type of

9    publication.  And every issue that they raised in that letter is

10   not an issue that they're raising in their complaint or their

11   memorandum, because he was responsive to each and every issue

12   that they raised.

13         And I would further note, Your Honor, we've submitted,

14   and I won't go into it at great length today, but we have

15   submitted extensive responses to requests to admit and

16   interrogatories that reference the fact that throughout the year

17   2007, in the beginning of the year, the FTC sent Mr. Trudeau a

18   draft complaint not related to this book or anything he was doing

19   on this book, even though this book was blown off the charts at

20   the newsstands, it was related to a Natural Cures newsletter.

21         And they expressed concern that the marketing of that

22   newsletter had not involved adequate disclosures.  There were at

23   least two dozen telephone calls between our office and the FTC

24   persuading them that that complaint lacked merit.  And ultimately

25   they agreed, and they never filed that complaint.

Bradford - opening                    97

1        But as the request to admit indicate, we were in weekly

2    dialogue with the FTC about whatever their concern of the week

3    was related to Mr. Trudeau, the whole time this show is the

4    biggest thing on television, this book is selling hundreds of

5    thousands of copies.

6        You've heard Mr. Harris say the FTC in his experience

7    doesn't sue without warning first.  The first we heard that they

8    had any question, concern, or problem with this book was the day

9    they filed that contempt proceeding before Your Honor.

10        We were talking to them days before and not a word was

11    said about this, not a "Would you please modify this" or "We've

12    got a concern" or "This veers close to the line.  Please get it

13    off the air."

14        And as soon as they did come forward and Your Honor

15    expressed concerns, Mr. Trudeau wrote ITV and said "Get it off

16    the air."  He would not have gone down this road if he believed

17    for a minute he was going to be held in contempt of court or he

18    was doing something wrong.  It would have been suicidal.  And his

19    entire basis of conduct from the day that order was entered

20    through the Natural Cures book, through everything else he

21    marketed was to assure compliance.

22        And he had every reason to believe based on what the FTC

23    stipulated to in open court as acceptable that this was, in fact,

24    acceptable, that the simple formula was if you say it in the

25    infomercial, it better be in the book.  And you better make it

Bradford - opening                    98

1  clear that what you are doing is saying it's in the book, but
2  that he did not have to worry about giving a hundred percent of
3  what's in the book or giving the limitations of what's in the
4  book or saying, "By the way, these cures I'm telling you about
5  may not work" or "These cures involve injections" or "These cures
6  involve products that you're not going to find in the United
7  States," the same criticisms that we have here.

8          And so with all respect, Your Honor, I urge the Court to
9  find at the conclusion of this hearing that Mr. Trudeau has not
10 by clear and convincing evidence violated a clear and unequivocal
11 command of this Court.  He did not intend to do that.  The
12 evidence shows it was very reasonable for him to believe he was
13 not and did not do that.

14         There was, in fact, financially, it would have been
15 completely crazy for him to do that.  He wasn't even making the
16 money off of these infomercial sales.  That had all been given to
17 ITV.  As the record shows, the only moneys he was receiving here
18 was from the retail sales of that book.  And I know we have an
19 issue with the relationship between the two.

20         But for Mr. Trudeau to expose himself to contempt of
21 court and that kind of risk for that kind of reward truly makes
22 no sense.  And on the record before him, before this Court, he
23 did nothing different in connection with the Weight Loss book
24 than he did with the very book that was given as an example of
25 what was permitted under that order.

Bradford - opening                                    99

1          And for those reasons we will urge Your Honor at the

2    conclusion of the hearing to reconsider the finding of contempt.

3    I would be happy to address the remedy issues that Your Honor has

4    raised at this point, or I could do that at the time of closing.

5          THE COURT:  We can do it then.

6          But let me just ask a question.  Did either you or

7    Mr. Trudeau consult this mirror image doctrine in connection with

8    the drafting of this order?

9          MR. BRADFORD:  Your Honor, I don't want to waive

10   privilege, but I'm happy to respond to the Court's question if I

11   can without waiving privilege.

12         THE COURT:  You're right, that really does get into a

13   privilege question.  But to the extent that you don't waive

14   privilege, can you answer that?

15         MR. BRADFORD:  Yes.  I can comment that I believe --

16         THE COURT:  Or will I be hearing evidence to that?

17         MR. BRADFORD:  Certainly.  I believe that in my

18   communications with the FTC, we were fully conscious of the

19   mirror image doctrine, that that is something that any

20   practitioner in this area knows about, that the FTC was cognizant

21   of the mirror image doctrine.  I'd love to be able to pull out a

22   piece of correspondence that used those words.  But I have every

23   confidence that that was discussed, that that is consistent with

24   what was said in that letter from Mr. Kaufman.  That's exactly

25   why we were approaching the issue the way that we did.

1        If he mentions six diseases in that show, they had to be

2   in the book.   But nobody cared about whether the cures really

3   worked.   Nobody cared about whether, in fact, he was leading

4   people to believe they would be cured and, in fact, these were

5   good or bad cures.

6        Ms. Hippsley specifically mentioned the First Amendment

7   protection still applying in this sphere of books before the

8   Court.   And I believe we had a very clear understanding with them

9   that this was permissible and that the mirror image doctrine as

10  it's known, that you can say something about what's in a book as

11  long as it's really in the book, is exactly what we were trying

12  to accomplish with this order.

13       This is I can represent to the Court not something we

14  thought about after the order was entered.   It was something we

15  were fully mindful of when the order was entered.   I know

16  Ms. Hippsley has been listed as a rebuttal witness.   They can

17  bring her in here and ask her if she was thinking about and

18  cognizant of the mirror image doctrine.

19       And I'm very confident there were no waivers of that or

20  any statements that "we're going to lose the traditional rights

21  afforded by that doctrine."

22       And I also submit that when you look to what can you and

23  what can you not say about a book, that it is a very different

24  set of rules on what you can say about a product, and that was

25  the field we were operating in; and that the first place you

Bradford - opening                                        101

1    would go to to find out what you can say about a book would be

2    this doctrine, the FTC's policy on what you can and can't say

3    about a book.  This has always been the guidelines.

4         There has always been a lot of controversy about would

5    they one day terminate that doctrine?  Would they one day

6    overrule it?  And that I could understand if there was some kind

7    of notice.  If the FTC came out and said "We're no longer going

8    to be bound by this doctrine," or "We've reconsidered it," there

9    have been people who have written about this doctrine as

10   affording some kind of, quote, "loophole" to put in certain

11   things and not other things that are in the book.  But that's

12   always been the so-called breathing room that the First Amendment

13   allows.  That's a very well understood doctrine.

14        I'm confident those at the FTC negotiating this were

15   cognizant of that and that that was intended by the very example

16   we gave to be a part of this order.

17        THE COURT:  Okay, great.  Thank you.

18        Would you like to call your first witness?

19        MR. BRADFORD:  Sure.  At this time, Your Honor, we'll

20   call Mr. Trudeau.

21        THE COURT:  We're going to go about another half hour

22   just to let you know.

23        MR. BRADFORD:  Certainly, Your Honor.

24        We have some exhibit books specifically for this

25   witness, if I might provide one to the witness and the Court.  I

Trudeau - direct                                    102

1    think it will make it easier.

2          THE COURT:  Okay.  That would be fine.

3          Would you please raise your right hand, sir.

4      (Defendant duly sworn.)

5          THE COURT:  Okay.  Mr. Bradford.

6          MR. BRADFORD:  I do have a copy for the Court if I might

7    approach with that, too?

8          THE COURT:  Sure.  If I could put these big ones away

9    for now?

10         MR. BRADFORD:  I think yes, Your Honor.  I hope so.

11         THE COURT:  Okay.

12         MR. BRADFORD:  Thank you.

13              KEVIN TRUDEAU, DEFENDANT HEREIN, SWORN

14                     DIRECT EXAMINATION

15   BY MR. BRADFORD:

16   Q.  Mr. Trudeau, could you explain how it is you came to focus on

17   the idea of writing a weight loss book?

18   A.  Well, I struggled with weight my whole life, so I've always

19   been interested in the subject and kind of searched the world for

20   something that would work for me.  And if it worked for me, my

21   pattern is if I get really excited about something, if I really

22   believe in something, if it's something that I, you know, want my

23   friends and family to have or benefit from, then I'll want to

24   kind of tell the world.

25              Since right now my scope is informational publications,

1   weight loss was a book that I was looking to write provided I

2   could find something that would work.

3   Q.   Did you at some point find something that, quote, worked for

4   you?

5   A.   Yes, I did.

6   Q.   What was that?

7   A.   It was the Simeons protocol.

8   Q.   What is the Simeons protocol as you refer to it?

9   A.   Dr. Simeons discovered in 1959 what he called the cure for

10  obesity, what I call the weight loss cure.  And it's a protocol

11  that involves injections or sublingual or other methods of

12  getting a substance called HCG into the system with a very

13  specific diet.

14  Q.   And how did you first come to learn about this protocol?

15  A.   At a clinic in Germany that I frequent, I frequented, a well

16  known anti-aging clinic.  Dr. Klaus Martin is the director.  And

17  I chatted with him about various anti-aging protocols.  And he's

18  using new things that he's developed or found around the world.

19  And the subject came about weight loss, and he said that this was

20  something that really worked.

21  Q.   And approximately when was this first communication with him?

22  A.   I believe the first communication where he told me about the

23  Simeons protocol was in the summer or fall of '05 I believe.

24  Q.   Was that in person?

25  A.   Yes, while I was in Germany.

1  Q.   What was your response when he told you about this protocol?

2  A.   Well, he gave me a manuscript that he had copies of called

3  Pounds and Inches by Dr. Simeons.   And I read that manuscript.

4  And my first impression was it seemed really scary to do, kind of

5  difficult to do.   It seemed like it would be a really hard thing

6  to do.   So I kind of put it off for about a year, but continued

7  communication with him, inquiring about the results and how

8  people did on the program, how much weight they lost, did they

9  find it easy, and afterwards did they gain the weight back.

10         So it took about a year before I got the courage to give

11 it a try myself.

12 Q.   And did you, in fact, give it a try yourself?

13 A.   Yes.

14 Q.   When was that?

15         THE COURT:   Who was the doctor in Germany?   What was his

16 name again?

17         THE WITNESS:   Dr. Klaus Martin.

18         THE COURT:   All right.

19 BY MR. BRADFORD:

20 Q.   Did you, in fact, give it a try?

21 A.   Yes, I did.

22 Q.   When was that approximately?

23 A.   I believe to the best of my recollection it was the late

24 summer or early fall of '06.

25 Q.   Where did you do that?

1  A.   I started the protocol, it's a six-week protocol for the

2  injections.  So I did three weeks while I was in Germany at the

3  clinic.

4  Q.   And did you continue the full six weeks?

5  A.   Yeah.  I did three weeks while I was at the clinic so I could

6  talk to other patients who were doing it and see how they were

7  reacting, review patient records, and make sure I was doing it

8  correctly so I could learn all about it.  So I would inquire with

9  the nurses and the doctors and the staff and the other patients

10 who were doing it.

11          And then for the next three weeks, I was traveling

12 around the U.S. on business.  So in my travels, I continued to do

13 the protocol.  I took my HCG with me and did the injections while

14 I was the road.

15 Q.   And did you follow the protocol as prescribed to you?

16 A.   Yes.  I did the Simeons protocol exactly as it was described

17 in the Pounds and Inches book.

18 Q.   What was your experience with this protocol?

19 A.   Well, I've been on numerous programs to lose weight over the

20 years, all the things that are sold on television, all the easy

21 programs that are on TV, the NutriSystems, Jenny Craigs,

22 Slimfast, the protein powders, the Hoodias, the ephedras, green

23 teas, you name it, if it has been sold, and I know most of the

24 guys who are selling a lot of this stuff, I've tried it over the

25 years.

1     I've had personal trainers in.  I've had chefs come in

2  to do raw food cooking.  High protein, Dr. Atkins I knew.  I did

3  an infomercial with him years ago, so I did the Atkins program,

4  which again was promoted as a very easy program to do.

5        So I've done all these programs, and I would lose some

6  weight, but it would always be challenging.  Even if I lost

7  weight on the program, I was hungry.  I was depriving myself.  I

8  felt like I wanted food.  So it was always a challenge to do the

9  program.  And even if I lost weight, when I stopped the program

10 and went back to normal, the weight always came back, and I

11 gained probably 10 or 15 pounds more, which is the general effect

12 that most people have globally when they kind of yo-yo diet.

13       So on this diet when I did it, I found it to be

14 incredibly effective.  I lost 45 pounds in 45 days.

15 Q.   And what has been your experience since you've completed the

16 six weeks of injections in that phase of the protocol?

17 A.   It's been a miraculous life-changing experience for me.  For

18 me personal doing the program, I was very nervous to start it, I

19 talked about this in the book, I was scared.  I thought it was

20 going to be challenging.  I was going to be hungry or tired or

21 grumpy, or I would fail, I would, you know, get off the program.

22       But amazingly from day one I wasn't hungry.  Day two, I

23 wasn't hungry.  Day three, I wasn't hungry, I wasn't tired.  And

24 all the other people that were at the clinic were experiencing

25 the same almost miraculous results with the protocol.  We just

1    weren't hungry.  We had a lot of energy and lost the weight, lost
2    about a pound a day.

3           And we would take photos in the mirrors.  And the other
4    thing that was interesting, not only would the weight come off,
5    it was about a pound a day depending on how big the person was
6    and what they needed to lose, and men and women were slightly
7    different, but it was about that, it was the average, I lost a
8    pound a day.

9           But there was also resculpting of the body, you know,
10   kind of the areas that had a lot of fat or have normal fat
11   reserves would seem to shrink.  So it really was a great
12   resculpting of the figure.  It looked really good.
13   Q.   What has been your experience in terms of your appetite and
14   food intake since then?
15   A.   Well, the thing that was really scary to me, I wasn't hungry.
16   And I thought when I stopped the protocol, and which was the
17   injection phase and I went to the last phase, there is one phase
18   before the last phase, so when I stopped the injections, then I
19   went on to eating, eating this, I just wasn't hungry.  I just
20   wasn't hungry afterwards.  It was an amazing surprise to me.
21   Q.   Now, before you wrote the book, did you read any medical
22   journal type of articles on this protocol?
23   A.    Yeah.  When I first heard about it from Dr. Klaus Martin, the
24   first document, of course, was Dr. Simeons manuscript, Pounds and
25   Inches.  And in Simeons manuscript, he listed a series of

Trudeau - direct                                    108

1  references, which I Google searched and read many of the

2  references and reports.  And there were a lot more since the

3  writing of that manuscript.  Many doctors around the world have

4  used this protocol.  So I read a whole series of reports before I

5  wrote the book.

6  Q.  For the Court's convenience, have you identified three of

7  those articles among the exhibits being presented to the Court in

8  this proceeding?

9  A.  Yes, I did, and they're in this book here.

10        MS. KAPIN:  Objection, Your Honor.  My objection is as

11  to relevance.  The FTC is not challenging the efficacy of this

12  protocol, whether it works or not.  This entire line of

13  questioning sounds to me like it is focusing on whether

14  Mr. Trudeau sincerely believes this protocol works or not, and

15  that is not why we're here, Your Honor.

16        MR. BRADFORD:  Your Honor, I believe this will also go

17  to the expression of opinion that this is an easy program to use

18  and also the expression of opinion that people will be able to

19  eat whatever they feel like and not gain weight and the bases for

20  his opinions or statements that that was, in fact, the case.

21        THE COURT:  I'll overrule the objection.

22        MR. BRADFORD:  Thank you.

23  BY MR. BRADFORD:

24  Q.  Mr. Trudeau, is the first of those articles that you

25  identified and read before you authored the book Exhibit FF?

1  A.   Yes, it is.

2  Q.   And have you for the Court's convenience on the cover page of

3  this notebook, where it says "Excerpts from exhibits" culled out

4  certain statements that were made in that article?

5  A.   Yes.

6  Q.   And was that article published in the American Journal of

7  Clinical Nutrition in 1973?

8  A.   Yes.

9  Q.   Could you please read the portions of the study that you

10  read?

11  A.   Well, I read the whole study.  But I think the relevant

12  sentence here is, "The HCG group," which is the substance taken

13  or, in other words, the group that were on the Simeons protocol,

14  "lost significantly greater mean weight loss per injection and

15  lost a significantly greater mean percentage of their starting

16  weight, the percentage of affirmative daily patient responses

17  indicating little or no hunger.  And feeling good to excellent

18  was significantly greater in the HCG group than in the placebo

19  group.  Additional investigation of the influence of HCG on

20  weight loss, hunger, and wellbeing seems indicated."

21  Q.   Is this a study that you specifically reference in the

22  annotations to the book?

23  A.   I believe so, yes.

24  Q.   That is, it's contained in the book itself or reference to it

25  exists in the book itself?

1  A.    Correct, yes.

2  Q.    And let's turn to the second of these documents.  Is this

3  Exhibit GG a study that you observed that was published in 1966

4  in the American -- I'm not sure if I can pronounce this right,

5  but the record will reflect it, I think it's Geriatrical Society?

6  A.    Yes, it is.  And this is a study that I've read also.

7  Q.    What are the salient parts of this study that you identified

8  here?

9  A.    Well, the key elements of this particular study say that we

10  found that by use of the Simeons technique, the patients lost

11  weight safely, rapidly, and effectively, and the key part here is

12  with little discomfort.

13        "Aside from the matter of the amount of weight loss by

14  this method of treatment as compared to other methods, we

15  confirmed Simeons' observation that there is a striking

16  redistribution of body fat.  Simeons' technique for reducing

17  weight in cases of obesity is a safe and effective procedure

18  without undue discomfort for the patient."

19  Q.    And, finally, the third study that you have referenced, is

20  that a 1961 study?

21  A.    Yes, it is.

22        MS. KAPIN:  Just objection, Your Honor, one further

23  ground, to the extent that these are being relied upon for the

24  truth of the matter asserted, I'm raising a standing hearsay

25  objection to them.

1        THE COURT:  Well, no, they're being offered for his

2   state of mind I believe, correct?

3        MR. BRADFORD:  Yes, they are.

4   BY MR. BRADFORD:

5   Q.   And what was the salient portion of that study that you have

6   identified?

7   A.   This particular study, again, the key element in relation to

8   what we're discussing here, "Is the technique as described by

9   Simeons and illustrated by the patient series is a satisfactory

10  and safe method of reducing-weight patients without hardship."

11  Q.   At the time that you wrote the book, what was your opinion or

12  belief as to whether, in fact, this protocol was difficult or

13  easy to use?

14  A.   When I wrote the book and when I shot the infomercial and to

15  this day, I categorically believe that this is absolutely an easy

16  way to lose weight.  I think it was easy for me out of my own

17  personal experience.  That's why I believed it to be easy.  I did

18  it myself.  I've done all these other programs that weren't easy

19  that claimed to be easy.  So I know the difference between what's

20  easy and what isn't.  And for me, this was easy.

21       All the patients I talked to at the clinic in Germany

22  and around the world that have used the protocol or were in the

23  process of using the protocol reported to me in huge, huge

24  percentages that it was the easiest thing they ever did to lose

25  weight.

1      And then the experts themselves in these studies claim

2  in effect that it's easy by using words like "undue hardship" or

3  what have you.

4      So I believed at that time that the program was

5  absolutely easy.  I still believe it today.  And I believe it is

6  the easiest way for anyone who wants to lose weight to lose

7  weight.

8  Q.  And with respect to your belief that people can eat whatever

9  they want after the first phases of the protocol and not gain

10  weight, what was your belief at the time that you wrote the book?

11  A.  When I wrote the book, again, I had done the protocol myself.

12  And when I stopped doing the protocol and after and went into

13  phase four eating pizza, pasta, ice cream, cheeseburgers, French

14  fries, virtually anything and everything you want is absolutely

15  true.

16      And the reason I believed it is, number one, I did it.

17  I drank beer.  I've got pictures of me in Germany with beer and

18  ice cream.  And I would weigh myself every day.  And the hunger

19  wasn't there.  So you ate less.  So you could virtually eat

20  anything you want, but the body metabolism seems to be so much

21  higher that the body seemed to just burn it off without massive

22  gaining of weight.

23      I also reviewed from Dr. Klaus Martin where he told me

24  that 80 percent or 85 percent of his patients five years later

25  still have not gained any significant amount of weight back, even

1   though they were eating pretty much anything they wanted and went

2   back to their natural routine before losing the weight.

3          So I believed when I wrote the book, and I say it in the

4   book, and I believe when I shot the infomercial, that once you do

5   this protocol, that your body has reset, that the hypothalamus

6   gland seems to be reset, and you can pretty much eat anything you

7   want.

8   Q.   You were party to a consent decree and court order in this

9   case, is that correct?

10  A.   Yes.

11  Q.   And is compliance with that order of importance to you?

12  A.   Compliance with that order is very important to me.   I

13  respect the Court.   I respect the order.   And being diligent and

14  prudent in doing everything that the order said is of prime

15  importance.

16         The amount of correspondence that I've had with the FTC

17  trying to cross every T, dot every I is really important.   And

18  everything that I've done since that order was signed -- that was

19  kind of:   Look, I can write books now.   I'm out of the

20  infomercial business.   They won.   I'm off the air.   I'm not

21  selling any more products.   Everything I've done since that order

22  was signed was to be 100 percent in compliance.

23  Q.   Have you been involved whatsoever in the sale of product

24  since you signed that order?

25  A.   Absolutely not.

1  Q.   What did you do with the businesses that you owned at the

2  time that you signed the order?

3  A.   Well, pretty much all the businesses which were in relation

4  to the informercials, I decided just to get out of and sell and

5  only focus on writing books and appearing in informercials and

6  making public appearances on radio shows and so forth and being a

7  citizen advocate and a whistle-blower and an author.  So I --

8  Q.   Now, on the day --

9  A.   So I sold those companies.

10  Q.   On the day that you signed the order, what was your

11  understanding of what you could and could not do with respect to

12  informercials for books?

13  A.   On the day I signed the order, as you know, we had massive

14  amounts of conversations back and forth with the FTC.  My fear

15  was the order would be vague and ambiguous, and we wouldn't have

16  any clear direction on what to do going forward, and that this

17  was just a set-up, so whatever I did the next day, they would

18  come after me.

19  Q.   Let me, if I can, ask the witness to be more responsive to

20  the question, which is simply:  What was your understanding of

21  your obligations under the order?

22  A.   My understandings under the order was I could produce, I

23  could write any book or informational publication, I could say

24  anything I wanted in those books or informational publications,

25  and I could produce any type of advertisement for those

1  informational publications provided I did one thing, anything I

2  said in the advertisement had to be an accurate description of

3  the contents of the book.  It had to be in the book.

4          It didn't mean I had to put everything in the book in

5  the infomercial or commercial.  But everything in the

6  advertisements had to be in the book.  And the standard that I

7  used, which was very clear, was the Natural Cures infomercial and

8  book.  That was the standard that the FTC gave me and said:  You

9  can do this going forward.

10 Q.   And you were in court in September when the statements that I

11 read in my opening statement were made?

12 A.   Yes, I was.

13 Q.   And at the time you signed the order, you were familiar with

14 what you had written in your book and what you had put in the

15 Natural Cures infomercial that was referenced in open court?

16 A.   I was intimately familiar with what was in the book, what was

17 in the infomercial, and why the FTC said that infomercial is

18 completely in compliant, because it accurately describes what's

19 in the book.  Even though we may disagree with what's in the

20 book, it's compliant.

21 Q.   And is Exhibit N a transcript of that infomercial?

22 A.   Let's take a look.  Yes, it is.

23 Q.   And did you select certain excerpts from that infomercial to

24 draw to the Court's attention today?

25 A.   Yes.

1  Q.   Could you identify what those excerpts are in that

2  infomercial that you relied upon in your understanding of what

3  you could and could not do?

4  A.   Yes.  I don't want to rush over this, because this is very

5  important, because this is the whole crux of what I understood,

6  that and knowing as the interviewer is talking to me doing the

7  infomercial.

8        This was the show that the FTC took apart, pulled apart,

9  looked under a microscope with my book.  And they told me that if

10  you do this, you've done this, this is in compliance with the

11  order.  This infomercial does not misrepresent the contents of

12  the book as described in the order.  So this was my template

13  going forward.

14        And so there were certain things that I said in here

15  very specifically when I made the show to see what I could and

16  couldn't do with the FTC.  And the FTC agreed that this is a

17  compliance show in relation to the order which states I can't

18  misrepresent the contents of the book.  So they claim that this

19  is not misrepresenting the contents of the book.

20        I say in the infomercial "There are cures for diabetes.

21  There are cures for chronic fatigue syndrome.  There are cures,

22  all natural cures for attention deficit disorder, migraine

23  headaches.  Absolutely, 100 percent, there are absolute natural

24  cures for all of these problems.  They don't cost a lot.

25        "For example, obesity, weight loss, there are natural

1  remedies for weight loss.  The drug companies and the food

2  industry don't want you to know about it.

3          "There are ways to cure migraine headaches forever so

4  they never come back.  And there is a natural remedy you can put

5  on the skin that will get rid of pain forever.  Arthritis pain

6  will go away.  There is a natural herbal supplement that the

7  Asian Diabetes Association has called the final cure for

8  diabetes.  It is an absolute cure.  It's an herbal remedy.  It's

9  taken for three months approximately.  And it will dramatically

10 reduce or eliminate the need for any insulin shots.  And it can

11 cure diabetes, Type I and Type II, in the majority of cases."

12 Q.   Now, just to be clear, you're reading from portions of the

13 transcript at Exhibit HH that you've highlighted in yellow.

14         For the record, we've taken the liberty of highlighting

15 everybody's copy of those particular segments in yellow as they

16 have been submitted, is that correct?

17         THE COURT:  Did you just say HH?

18         MR. BRADFORD:  I apologize, I'm missing an exhibit.

19 It's Exhibit N.  I apologize for the confusion.

20 BY MR. BRADFORD:

21 Q.   So this is Exhibit N?

22 A.   Correct.

23 Q.   And in Exhibit N, Mr. Trudeau has yellow highlighted certain

24 portions that he's reading from in the transcript.  I think the

25 last quotation came from page 7 of 25 from the transcript.

Trudeau - direct                                    118

1          These are, to be clear on the record, not the entirety

2   of the transcript, but certain excerpts that he's highlighting

3   for purposes of today's testimony.

4          Is that correct, Mr. Trudeau?

5   A.   That's correct.

6          MS. KAPIN:  Your Honor, for the record, we do have a

7   standing objection to testimony and evidence regarding the

8   Natural Cures book and infomercial as that is not the subject of

9   today's proceeding.  So I just want to for the record make a

10  relevance objection.

11         THE COURT:  Fine.  Thank you.

12  BY MR. BRADFORD:

13  Q.   I'm sorry, Mr. Trudeau, I think I interrupted you, but you

14  were on page 7.

15  A.   Yeah, now on page 8.  And, again, these are very relevant,

16  because this is what I relied on in terms of whether or not I was

17  in compliance with the order.

18         "And there is a cure for cancer.  Cancer, there are

19  cures for cancer.  There are ways to prevent cancer."

20         Page 10, "Now, this book, Natural Cures "They" Don't

21  Want You to Know About covers arthritis, migraines, pain,

22  headaches, cancer, heart disease, depression, stress, phobias,

23  fibromyalgia, herpes."

24         Page 12, "The book covers all these diseases and the

25  cures.  But there are so many new things that come out and I

1  find."

2          And I think those are the main relevant parts there.  I

3  think there may be one more, yeah, on page 21.  "And I took it,

4  some of your advice, and the particular product, which I can't

5  mention because the government prohibits me to, sort of changed

6  my life.

7          "My knee was in so much pain.  I couldn't walk.  I

8  started taking it, and within two days, the pain left.  And

9  within two weeks, I walked perfectly.  I'm giving this to all my

10  friends."  He was a professional soccer player in England.

11          "Now I can tell you the Federal government is forbidding

12  me to tell you these stories, because they claim they don't mean

13  anything."

14          Page 22, "Natural remedies are curing people of cancer,

15  curing people of diabetes, curing people of depression, curing

16  kids of attention deficit disorder within days."

17          24, "The rest of your life, herpes, there is a cure for

18  herpes.  And on television they say 'There is no cure for herpes.

19  You need to take our drug every day for the rest of your life.'

20  Well, there is a cure.  There could be simple cures.  They are

21  there.  There are natural cures.

22          "You'll never hear about them, because the manufacturers

23  can't tell you what they are.  Diabetes, migraines, cancer, heart

24  disease, acid reflux, attention deficit disorder, depression,

25  stress, phobias, fibromyalgia, pain of all sorts, arthritis, and

Trudeau - direct                                      120

1    the list goes on, lupus, multiple sclerosis, there are cures for

2    multiple sclerosis.  There are cures for muscular dystrophy that

3    are all natural, and people are not being allowed to tell the

4    truth."

5    Q.   And now if you turn, if you would, to Exhibit BBB, that's

6    three Bs, is that the Natural Cures book that was submitted to

7    the FTC in conjunction with the infomercial?

8    A.   Yes, it was.

9    Q.   And did you again identify certain passages or sections from

10   the book in highlighting to draw to the Court's attention?

11   A.   This is what's in the book in relation to everything I just

12   said in the infomercial.  If you listen to what's in the

13   infomercial, you'd think you'd draw some type of conclusion of

14   what was probably going to be in the book, but here is what is in

15   the book that the FTC made it compliant:

16         "There are natural non-drug and non-surgical cures for

17   virtually every disease, illness, and physical ailment.  These

18   cures are inexpensive and have virtually no negative side

19   effects."

20         On page 249, "I would like to give you the cures for

21   virtually every disease.  I would like to tell you the natural

22   treatments available that can eliminate your symptoms and at the

23   same time address the cause instead of simply suppressing the

24   symptom.

25         "However, as I began to write this book, the Federal

Trudeau - direct                                          121

1  Trade Commission and the Food and Drug Administration took

2  unprecedented action.  I am forbidden to give you specific cures

3  in this book.  The FTC has ordered me not to give you any

4  specific product recommendations or say where you can acquire the

5  cures and receive treatment.  This entire chapter has been

6  censored by the FTC."

7          THE COURT:  And with that, it's a good point to break.

8  I think we'll adjourn for the day.  We will begin right after my

9  call tomorrow.  We should certainly be able to start by 10:00.

10         MR. BRADFORD:  Certainly, Your Honor.  We'll be here a

11 little early.

12         THE COURT:  Why don't we say 10:00 o'clock.

13         All right.  Thank you, Mr. Bradford.

14         MR. BRADFORD:  Thank you very much, Your Honor.  Have a

15 good evening.

16         THE COURT:  Thank you.

17         I could give you these back, but I'm not sure there is

18 any need to do that right now.

19         MR. BRADFORD:  Sure.  We apologize for the

20 inconvenience.

21         THE COURT:  No, that's okay.  I've got a lot of other

22 junk up here, so I just as soon you don't do it up here.  Okay.

23         MR. BRADFORD:  Thank you, Your Honor.

24     (Adjournment 4:45 p.m. until 10:00 a.m., July 23, 2008.)

25