**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No. 03-C-3904 |
| | ) |
| v. | ) Hon. Robert W. Gettleman |
| | ) |
| KEVIN TRUDEAU, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**FEDERAL TRADE COMMISSION'S OPPOSITION TO PYRAMID SCHEME**
**PARTICIPANTS' MOTION TO INTERVENE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

I. INTRODUCTION. ................................................................................................1

II. BACKGROUND.. ...............................................................................................1

    A. GIN FDN and Its Extensive Role in This Litigation.. ............................................1

    B. The Court's Findings.. ..........................................................................................3

    C. The GIN Membership Agreement.. ......................................................................3

    D. The Pyramid Scheme Participants.. ......................................................................4

III. ARGUMENT...................................................................................................6

    A. Article III Bars Intervention Because the GIN Participants Lack Standing.. ..........6

        1. The GIN Participants Have Not Proven a Legally Cognizable Injury
            Because They Do Not Own GIN FDN.. .....................................................7

        2. The GIN Participants' Interest in GIN's Benefits Is Either Not
            Legally Cognizable or Too Speculative To Satisfy Article III ..................9

    B. The GIN Participants Fail To Satisfy Rule 24's Requirements.. ..........................11

        1. The Motion Is Untimely........................................................................11

            a. The GIN Participants Knew or Should Have Known
               About Any Interest in this Case Almost Two Years Ago..............12

            b. Intervention Would Prejudice the FTC and the Receiver..............12

            c. Denying the Motion Will Not Prejudice the GIN Participants......13

            d. Other Circumstances Militate Against Intervention.. ...................13

        2. The GIN Participants Fail To Establish a Right To Intervene
            Under Either FRCP 24(a) or (b)...............................................................14

            a. The GIN Participants Fail To Meet Their Burden Under
               FRCP 24(a).. ..............................................................................14

       b.      Intervention Under FRCP 24(b) Would Prejudice the FTC and Run Contrary to the Interests of Justice.. ...............................15

IV.     CONCLUSION..............................................................................................................15

CERTIFICATE OF SERVICE.. ................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Alcoa, Inc. v. Bonneville Power Administration*, 698 F.3d 774 (9th Cir. 2012)........................... 10

*Bond v. Uteras*, 585 F.3d 1061 (7th Cir. 2009) .............................................................. 6

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988)......................................... 8

*City of Chicago v. FEMA*, 660 F.3d 980 (7th Cir. 2011).................................................... 14

*DH2, Inc. v. SEC*, 422 F.3d 591 (7th Cir. 2005)............................................................ 6

*Edgewood Manor Apartment Homes, LLC v. RSUI Indemnity Co.*,
   733 F.3d 761 (7th Cir. 2013) ........................................................................... 9-10

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp.2d 502 (S.D.N.Y. 2000)................................... 4, 10

*FTC v. Med Resorts International, Inc.*, 199 F.R.D. 601 (N.D. Ill. 2001) ........................... 6, 14-15

*Gautreaux v. Kemp*, 132 F.R.D. 193 (N.D. Ill. 1990) ..................................................... 6, 9

*Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785 (7th Cir. 2013) ................ 11, 13

*Hanson v. Chicago, B. & Q. R. Co.*, 282 F.2d 758 (7th Cir. 1960) ................................... 11

*Heartwood, Inc. v. United States Forest Service*, 316 F.3d 684 (7th Cir. 2003)........................... 12

*Jaser v. New York Property Insurance Underwriting Association*,
   815 F.2d 240 (2nd Cir. 1987)........................................................................... 11

*Keith v. Daley*, 764 F.2d 1265 (7th Cir. 1985) .............................................................. 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 6, 10

*PAC for Middle America v. State Bd. of Elections*,
   No. 95 C 827, 1995 WL 571893 (N.D. Ill. Sept. 22, 1995).................................................... 12

*People Who Care v. Rockford Board of Education*, 179 F.R.D. 551 (N.D. Ill. 1998) ................ 12

*People Who Care v. Rockford Board of Education*, 68 F.3d 172 (7th Cir. 1995)....................... 13

*Raines v. Byrd*, 521 U.S. 811 (1997) ....................................................................... 9

*Reich v. ABC/York-Estes Corp.*, 64 F.3d 316 (7th Cir. 1995) ........................................... 9

*Reid L. v. Illinois State Board of Education*, 289 F.3d 1009 (7th Cir. 2002) .............................. 14

*Retired Chicago Police Association v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993) .................... 6

*Schultz v. Connery*, No. 84 C 5761, 1987 WL 28272 (N.D. Ill. Dec. 11, 1987) ........................... 8

*SEC v. Falor*, 270 F.R.D. 372 (N.D. Ill. 2010) .......................................................................... 6

*SEC v. Homa*, 17 Fed. App'x 441 (7th Cir. 2001) ........................................................................ 8

*Shea v. Angulo*, 19 F.3d 343 (7th Cir. 1994) ....................................................................... 11-12

*Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941 (7th Cir. 2000) ........................... 12-13

*Solid Waste Agency v. United States Army Corps of Engineers*,
    101 F.3d 503 (7th Cir. 1996) ...................................................................................... 14

*Standard Heating & Air Conditioning Co. v. City of Minneapolis*,
    137 F.3d 567 (8th Cir. 1998) ...................................................................................... 14

*Turner v. FTC*, 580 F.2d 701 (D.C. Cir. 1978) ......................................................................... 10

*United States v. American Institute of Real Estate Appraisers*,
    442 F. Supp. 1072 (N.D. Ill. 1977) ............................................................................. 15

*United States v. Board of Education of the City of Chicago*,
    102 F.R.D. 873 (N.D. Ill. 1984) .................................................................................. 15

*United States v. City of Chicago*, 908 F.2d 197 (7th Cir. 1990) ................................................ 11

*United States v. Dieckemper*, 604 F.3d 345 (7th Cir. 2010) ..................................................... 10

*United States v. Gold Unlimited, Inc.*, 177 F.3d 472 (6th Cir. 1999) ........................................ 10

*Washington Electric Cooperative, Inc. v. Massachusetts Municipal Wholesale Electric Co.*,
    922 F.2d 92 (2nd Cir. 1990) ....................................................................................... 14

*Webster v. Omnitron International*, 79 F.3d 776 (9th Cir. 1996) ............................................... 10

*Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485 (7th Cir. 2004) ..................................... 10

**<u>Rules</u>**

FRCP 24 ................................................................................................................... *passim*

**<u>Administrative Decisions</u>**

*In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975) .................................................. 15, 19

## I.     <u>INTRODUCTION</u>

In the latest obstacle to achieving consumer redress and concluding this matter, twenty-five participants in Kevin Trudeau's Global Information Network ("GIN") pyramid scheme (collectively, "the GIN Participants") seek to intervene—apparently because the Receiver halted their pyramid payments. For several reasons, however, their misguided motion is both legally meritless and factually baseless. First, because the GIN Participants neither own GIN nor have any right to unlawful pyramid payments, they lack a sufficient stake in this litigation to satisfy Article III standing requirements. Second, their motion is untimely because, through its attorneys, GIN knew about this litigation for nearly two years before anyone moved to intervene—after extensive litigation concluded, after the Court resolved the key factual issues, and after the Court created a receivership that the GIN Participants now seek to unravel.

Third, even if the motion were timely—and it is not—the GIN Participants still fail to satisfy the requirements of either Rule 24(a) or (b) because they lack any cognizable interest in this case, they raise no question of law or fact that has not already been litigated, and their intervention would prejudice the FTC substantially. If everyone involved with Trudeau's machinations were permitted to intervene, there will be thousands of parties before the Court. It makes no sense to spend public resources and the balance of the Receivership Estate sorting through the mess that intervention will precipitate. In short, the interests of justice demand that the Court deny the motion.

## II.    <u>BACKGROUND</u>

### A.     **GIN FDN and Its Extensive Role in This Litigation**

As the Court will recall, the Global Information Network FDN ("GIN FDN") is a Nevis-organized "multiform foundation" that owns GIN USA.[1] The FTC long suspected that Trudeau

---

[1] *See* Order (July 26, 2013) (DE729) (adopting FTC's proposed findings of fact); Proposed Findings of Fact ("Proposed FOF") at 3-4 (July 15, 2013) (DE713). The Proposed FOF contains numerous citations to hearing exhibits and testimony, *see id.* (identifying six transcript segments and eighteen exhibits related to the formation of GIN USA and GIN FDN), and the FTC will not include those references here.

used GIN FDN and GIN USA as asset protection vehicles. Therefore, the FTC subpoenaed their bank accounts almost two years ago. *See* PXA:1 (Feb. 10, 2012) (subpoena to First Merit Bank seeking both entities' account information); PXA:2 (Feb. 10, 2012) (similar subpoena to Fifth Third Bank). The GIN entities retained Faruki, Ireland & Cox ("Faruki") and moved to quash both subpoenas.

These motions establish that GIN knew about this litigation and the FTC's position that both entities held assets Trudeau controlled. *See* PXA:3, *FTC v. Trudeau*, GIN FDN's Mem., No. 1:12-mc-22 (S.D. Ohio Mar. 1, 2012) (DE1) at 1 ("After obtaining judgments against Trudeau in the underlying action in the United States District Court for the Northern District of Illinois, the FTC presumably seeks post-judgment discovery from Fifth Third Bancorp ('Fifth Third') regarding Trudeau's assets in order to satisfy the judgments."); PXA:4, *FTC v. Trudeau*, GIN USA's Mem., No. 5:12-mc-35 (N.D. Ohio Mar. 20, 2012) (DE1) at 1 (same language as the first motion, but substituting "First Merit" for "Fifth Third").[2] Writing in late 2012, both Ohio courts denied GIN's motions largely because GIN "'may have been created to evade the contempt sanction and conceal Trudeau's assets.'" *FTC v. Trudeau*, No. 5:12-mc-35, 2012 WL 6100472, *5 (S.D. Ohio Dec. 7, 2012) (quoting *FTC v. Trudeau*, No. 1:12-mc-22, 2012 WL 5463829, *5 (N.D. Ohio Nov. 8, 2012)). Significantly, neither GIN FDN nor any GIN Participants moved to intervene until twenty months after GIN knew that the FTC sought information about its assets to satisfy the judgment against Trudeau.

Additionally, GIN USA (GIN FDN's subsidiary) appeared in this action ten months ago, to fight another subpoena. The same lawyers—the Faruki firm—represented GIN USA again. *See* (Feb. 21, 2013) (DE562). Suffice it to say, because Faruki formally appeared on GIN's

---

[2] Significantly, neither GIN FDN nor its subsidiary (GIN USA) characterized themselves as "unincorporated associations" or any other sort of member-owned entity. *See* PXA:3-4.

behalf, the Faruki firm received electronic copies of every subsequent filing in this action, including the FTC's proposed findings of fact.

Furthermore, as the Court is aware, APC Trading ("APC") served as the sole member of GIN FDN's management board.[3] Nataliya Babenko owns APC,[4] and the same lawyers—the Faruki firm—represented Babenko in subpoena enforcement proceedings in New York, *see* PXA:5, and then represented her at her May, 2013 deposition, *see* PXA:6. There is no doubt that GIN FDN knew about this litigation, and the FTC's goals in this litigation, long before the Court's August 7, 2013 Receivership Order. *See* DE742 (Aug. 7, 2013).

**B.    The Court's Findings**

On July 26, 2013, following months of discovery and a comprehensive evidentiary hearing involving voluminous exhibits and testimony from Trudeau's asset protection advisor, Marc Lane, the Court found the following facts: (i) GIN FDN is a Nevis "multiform foundation"; (ii) Trudeau created GIN FDN; (iii) Lane organized GIN FDN; and (iv) Lane intentionally recommended the "multiform foundation" structure for protection of GIN FDN's assets.[5] Thorough evidence supported these findings—which Trudeau did not appeal.

**C.    The GIN Membership Agreement**

Significantly, the GIN Participants electronically signed a "Membership Agreement" with terms inconsistent with any notion that they somehow "own" GIN as an "unincorporated association."[6] Specifically, their agreement provides:

---

[3] *See* Order (July 26, 2013) (DE729); Proposed FOF at 4 (July 15, 2013) (DE713).

[4] *See* Order (July 26, 2013) (DE729); Proposed FOF at 4 (July 15, 2013) (DE713).

[5] *See* Order (July 26, 2013) (DE729); Proposed FOF at 4 (July 15, 2013) (DE713).

[6] K. Johnson Dec. ¶ 3. Two of the twenty-five GIN Participants had "family accounts" (Timothy and Cheryl Hampton are both GIN Participants, but apparently only Cheryl Hampton signed; likewise, proposed intervenor Yon Cole may not have signed, but family member Lisa Cole did). *See id.* at ¶ 4.

- ▪ "GIN makes no representations, warranties, or guarantees as to the amount of information that will be provided, when or how often that information will be provided, if or when requests from Members will be answered or by whom, if or when Members will receive mentoring or by whom, and if, when or where, webinars or other seminars or workshops will be offered."

- ▪ "All material on this website, including, but not limited to, text, graphics, logos, audio clips, video clips, links, digital downloads, and trademarks is owned, controlled by or licensed by GIN and is protected by copyright, trademark, and other intellectual property laws. As between you and GIN, **GIN exclusively owns** all rights, titles and interest in and to the site content. You agree not to do anything that might impair such rights, **nor will you assert an ownership claim** in any of the above-referenced intellectual property or in the site content."

PXA:7, Membership Agreement §§ 6.2, 10.1 (emphasis added). Furthermore, the GIN Participants agreed that "GIN reserves the right to cancel [their] membership at any time for any reason or no reason at all, in its sole discretion." *Id.* at § 9.1. These terms are impossible to reconcile with the new theory that the GIN Participants each "jointly own[s]" GIN. *See* Proposed Cmpl. ¶ 37 (Nov. 18, 2013) (DE793).

### D. The Pyramid Scheme Participants

Significantly, more than half of the twenty-five GIN Participants received payments from GIN for their "recruiting" efforts. K. Johnson Dec., PXB ¶ 2 (Dec. 19, 2013). In fact, their own alleged "expert," Thayer Lindauer, opines that GIN operated as an illegal pyramid scheme:

> My review of the current sales program of Global Information Network indicates that [it] was **almost certainly operating as a pyramid promotional scheme** as defined by various administrative decisions of the Federal Trade Commission under Section 5 of the Federal Trade Commission Act.

PXA:8, Letter from T. Lindauer to T. Shimko (Dec. 2, 2013) (emphasis added). The FTC's pyramid scheme expert concurs. Specifically, economist Peter Vander Nat—arguably the country's preeminent expert on pyramids—provides an expert report including thorough economic analysis.[7] Dr. Vander Nat "conclude[s] that GIN is a pyramid scheme." PXC:1 at 1,

---

[7] Dr. Vander Nat has been deposed or testified at trial as an expert witness in fourteen pyramid scheme cases brought by various public agencies, including the FTC, DOJ, and the Florida Attorney General's office. To date, no court has ever rejected his conclusion that an enterprise was a pyramid scheme. *See, e.g., FTC v. Five-Star Auto Club, Inc.,* 97 F. Supp.2d 502, 532 (S.D.N.Y. 2000) (finding defendants operated unlawful pyramid scheme based on Dr.

Expert Report of Dr. Vander Nat (Dec. 18, 2013).  Among other things, he opines that the overwhelming majority of GIN pyramid participants will lose money:

> GIN promotes its business opportunity as a "perpetual money-making machine." In reality, it is a perpetual recruitment scheme that **dooms the vast majority of the participants (well above 90%) to financial losses** by the very design of the compensation plan.

PXC:1 at 1 (emphasis added).  Dr. Vander Nat's conclusions are consistent with the Receiver's preliminary findings that almost everyone in the pyramid loses.  *See* Receiver's First Report (Sept. 6, 2013) (DE747) at 15 (finding that, on average, 98.47% of GIN members earn less than their $1800 annual membership dues).[8]

Although almost everyone loses,[9] a very few do not.  Perry Kiraly, the lead proposed intervenor, made almost $48,000, and would stand to make more if the Receiver had not dismantled Trudeau's pyramid.[10]  K. Johnson Dec., PXB at ¶ 5 (Dec. 19, 2013).  Several other GIN Participants who seek to intervene also made money, and stand to make more at the expense of lower-ranking members.  *See id.* at ¶ 6.  Many others have not yet recouped their pyramid payments, but apparently hope to do so if Trudeau's pyramid continues functioning, *see id.* at ¶ 7 (as Dr. Vander Nat explains, for this reason, it is typical for middle-level pyramid scheme

---

Vander Nat's expert analysis).

[8] Depending on the year, the percentage of members who earn more than their annual dues ranged from 6.74% in 2010 to .51% in 2013.  *See* Receiver's First Report (Sept. 6, 2013) (DE747) at 15.

[9] At its peak, GIN had more than 35,000 members.  *See id.* at 16 (reporting 35,938 active members in 2013).

[10] The Receiver terminated the GIN pyramid program effective December 1.  K. Johnson Dec., PXB ¶ 9.  In 2010, out of 32,123 then-active members, only 78 people (other than Trudeau and Babenko) made more than $20,000.  *See id.*  Two of those people, Perry Kiraly and Douglas Hine, seek to intervene here.  K. Johnson Dec., PXB ¶ 8.  Interestingly, Kiraly apparently obtained a donation used to help fund this motion from Ed Foreman, a former Congressman, Trudeau associate, and paid speaker at GIN events.  *See* PXA:10 (the reference to meeting at the "Washington, D.C. event" may be a reference to Trudeau's recent Washington, D.C. legal defense fundraiser).  After ABC News found Trudeau in Zurich, Trudeau instructed Neil Sant and Lee Kenny to "get ed forman" to "send letters" and "call" on his behalf.  *See* PXA:11.

participants to want the pyramid to continue—so they can recover their "investment" from lower-ranking members, *see* P. Vander Nat Dec., PXC at ¶ 3 (Dec. 19, 2013)). This is why the GIN Participants allege that they "benefit financially from their membership in [GIN] in the form of residual income paid to members for attracting new members," Proposed Cmpl. ¶ 44 (Nov. 18, 2013) (DE793), and why they complain that the Receiver deprived them of their purported "rights to income disbursements," *see id.* at ¶ 79.[11]

## III. ARGUMENT

### A. Article III Bars Intervention Because the GIN Participants Lack Standing.

Under Seventh Circuit law, "the proposed intervenor must have a stake in the litigation 'in order to satisfy Article III.'" *Bond v. Uteras*, 585 F.3d 1061, 1070 (7th Cir. 2009) (quotation omitted); *see also Gautreaux v. Kemp*, 132 F.R.D. 193, 195 (N.D. Ill. 1990) ("Obviously, before a party is permitted to intervene in a dispute, it must be evident that this party has standing under Article III of the Constitution."). Article III standing requires the GIN Participants to prove "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]"[12] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and quotations omitted). For two reasons, the GIN Participants cannot meet this test. First, any theory of injury that depends on

---

[11] Although FRCP 24(c) required the GIN Participants to serve the FTC with their motion to intervene "as provided in Rule 5," they failed to do so. PXA ¶¶ 2-9, J. Cohen Dec. (Dec. 20, 2013); *see also Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 595 (7th Cir. 1993) ("Whether to permit a procedurally defective motion to intervene is within the sound discretion of the district court."). Particularly given the costs to the receivership estate (and ultimately to consumers) if intervention is allowed, *see infra* at 12-13 and 15, the Court should not excuse the failure, and thus need not proceed further. *See Retired Chi. Police*, 7 F.3d at 595 (affirming denial of motion to intervene when proposed intervenors attempted to adopt existing pleadings in violation of FRCP 24(c); "In this instance, the district court refused to permit such a deviation from the requirement of the Rule."); *FTC v. Med Resorts Int'l, Inc.*, 199 F.R.D. 601, 606 (N.D. Ill. 2001) ("Some leniency is available under [FRCP 24(c)], but total dereliction of the Rule warrants dismissal of the motion.") (mag. op.).

[12] "The burden to establish standing is on the party invoking federal jurisdiction[.]" *DH2, Inc. v. SEC*, 422 F.3d 591, 596 (7th Cir. 2005) (citation omitted).

their purported ownership of GIN FDN runs contrary to this Court's well-founded findings (which the "law of the case" doctrine prevents them from relitigating). Second, any theory of injury that depends on their "rights" as participants fails because any purported right to pyramid payments is not legally cognizable, and their apparent fear that they will lose access to GIN seminars and social events is too speculative to satisfy Article III.

### 1. The GIN Participants Have Not Proven a Legally Cognizable Injury Because They Do Not Own GIN FDN.

The GIN Participants' motion includes no declarations, documents, or other evidence suggesting that they own GIN FDN, which is unsurprising given this Court's contrary finding that GIN FDN was an asset protection vehicle designed to shield Trudeau's wealth.[13] Notwithstanding this finding—which followed months of discovery and a full evidentiary hearing—the GIN Participants allege that GIN FDN "is not a Trudeau asset," *see* Proposed Complaint ¶ 77 (Nov. 18, 2013) (DE793), and is purportedly "owned by its current dues-paying members." *Id.* at ¶ 35. In reality, GIN FDN is a Nevis-organized "multiform foundation" that has no owners.[14] *See* PXD:1, M. Lane Aff. (July 2, 2012) (attaching Nevis multiform foundation ordinance). In fact, when deposed, Lane—who formed GIN FDN[15]—testified that it has "no owners":

| | |
|---|---|
| QUESTION: | Who owns GIN USA? |
| LANE: | GIN USA is owned by Global Information Network Foundation. |

---

[13] *See supra* at 3; *see also* Order (July 26, 2013) (DE729); Proposed FOF at 18-19 (July 15, 2013) (DE713) (discussing Trudeau's asset concealment efforts).

[14] The fact that a Nevis "multiform foundation" has no owners is one of the reasons it functions as an asset protection vehicle.

[15] *See* Order (July 26, 2013) (DE729); Proposed FOF at 4 (July 15, 2013) (DE713).

QUESTION:      Who owns GIN FDN?

LANE:        **Global Information Network Foundation has no owners**.

PXA:9, M. Lane Dep. 298:21-25 (May 16, 2013). Ultimately, the Proposed Complaint's *ipse dixit* suggesting that the GIN Participants somehow own GIN FDN is irrelevant because conclusory allegations cannot support a motion to intervene. *See, e.g.*, *SEC v. Falor*, 270 F.R.D. 372, 373 (N.D. Ill. 2010) ("In deciding a motion to intervene, the court must accept as true the **non-conclusory** allegations of the movant's motion and complaint.") (citation omitted) (emphasis added); *Schultz v. Connery*, No. 84 C 5761, 1987 WL 28272, *2 (N.D. Ill. Dec. 11, 1987) ("This court must take as true all **nonconclusory** allegations supporting a motion to intervene absent sham, frivolity or other objections.") (quotation omitted) (emphasis added).

Additionally, it is impossible to reconcile the Court's finding that Trudeau created GIN FDN as an asset protection vehicle with the GIN Participants' unsupported assertion that they actually own GIN FDN's assets, and the "law of the case" doctrine prevents GIN Participants from relitigating the finding that Trudeau created GIN FDN for asset protection purposes. Specifically, under the "law of the case" doctrine, courts "should be loathe" to reconsider prior findings "in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1986). The opposite is true here: the Court's decision was exactly right, and allowing the GIN Participants to relitigate the finding that GIN FDN functioned as an asset protection vehicle for Trudeau's wealth would work a manifest injustice against the more than 800,000 consumers Trudeau victimized through his *Weight Loss Cures* book.

Furthermore, the Membership Agreement underscores that the GIN Participants do not "own" GIN. As quoted above, the Agreement disclaims any promises regarding what club information GIN will provide members, states that GIN "exclusively owns" its web content, and ensures GIN the absolute right to terminate memberships "**at any time for any reason or no**

- 8 -

**reason at all**." PX:A7, Membership Agreement §§ 6.2, 9.1, 10.1 (emphasis added). This Agreement plainly establishes a commercial relationship, not a jointly-owned unincorporated association. In short, because the GIN Participants have not proven that they own GIN FDN, and because they cannot prove that, they lack a sufficient stake in this litigation to establish Article III standing. *See Gautreaux*, 132 F.R.D. at 195 (rejecting alleged injury based on violation of consent decree when proposed intervenor had produced no support that a violation occurred; "Therefore, **in the absence of any factual support for this contention**, the claimed violation of the consent decree is insufficient to create Article III standing.") (emphasis added).[16]

### 2. The GIN Participants' Interest in GIN's Benefits Is Either Not Legally Cognizable or Too Speculative To Satisfy Article III.

The GIN Participants assert two additional "interests" in this litigation: (1) the right to pyramid proceeds; and (2) their alleged interest in GIN seminars, training materials, and other undefined social benefits they apparently obtain as GIN Participants. Neither of these interests is sufficient to support Article III standing. First, standing requires a "legally protected interest." *See*, *e.g.*, *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (quotation omitted); *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013) (requiring

---

[16] The fact that the GIN Participants lack a legally cognizable interest in this action is also conclusive evidence that, even if the Court allowed them to intervene, they could not prevail. Put differently, both of their claims require that they establish their alleged ownership interest in GIN. *See* Proposed Cmpl. ¶¶ 75, 77, 79 (Nov. 18, 2013) (DE793) ("first claim for relief"; alleging, *inter alia*, that "GIN FDN was formed as a member-owned foundation," and that, "[a]s a member-owned foundation, GIN FDN is not a 'Trudeau Asset'"; thus, the Receiver acted improperly when it "seized control" of GIN FDN's assets that allegedly belong to the GIN Participants); *id.* at ¶¶ 82-86 ("second claim for relief"; alleging "conversion" and seeking damages stemming from "the Receiver's actions in seizing [GIN FDN's] assets"). Because it "appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint," *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995), the motion to intervene should be denied for this reason as well, *see also SEC v. Falor*, 270 F.R.D. 372, 373 (N.D. Ill. 2010) (acknowledging that a motion to intervene can be denied if it "appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint") (quotation omitted).

- 9 -

"legally protected interest"). Because pyramid schemes are unlawful,[17] any purported

entitlement to their proceeds is not a "legally protected interest" that can satisfy Article III.

Second, to satisfy Article III, the injury must be "actual or imminent, not conjectural."

*Lujan*, 504 U.S. at 561 (quotation omitted); *see also Wisconsin Right to Life, Inc. v. Schober*, 366

F.3d 485, 489 (7th Cir. 2004) ("Mere speculation is not enough to establish an injury in fact.").

Presently, the GIN Participants have access to GIN seminars, trainings, and other non-monetary

benefits in accordance with their Membership Agreement. K. Johnson Dec., PXB ¶ 10. The

Receiver does not intend to alter this arrangement imminently, and it may never be altered. *Id.*

If the Receiver ultimately sells GIN to a third party, the purchaser is unlikely to terminate GIN

Participants' access to non-monetary member benefits (no one would purchase GIN simply to

dissolve it). *Id.* at ¶ 11. In short, any possible lost access to membership benefits is neither

certain nor likely—and the GIN Participants have not proven otherwise. For this reason as well,

they lack Article III standing. *See*, *e.g.*, *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774,

793 (9th Cir. 2012) ("[I]f the contingent events do not occur, the plaintiff likely will not have

suffered an injury that is concrete and particularized enough to establish the [injury-in-fact]

element of standing."); *United States v. Diekemper*, 604 F.3d 345, 350 (7th Cir. 2010) ("[E]ach

element of standing must be supported by more than unadorned speculation.") (quotation and

Seventh Circuit's alterations omitted).[18]

---

[17] *See*, *e.g.*, *Webster v. Omnitrition Int'l*, 79 F.3d 776, 782 (9th Cir. 1996) ("We adopt the *Koscot* standard here and hold that the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes.") (citing *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), *aff'd mem. sub nom.*, *Turner v. FTC*, 580 F.2d 701 (D.C. Cir. 1978)); *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 480 (6th Cir. 1999) (following *Omnitron* and *Koscot* to affirm conviction for operating a pyramid scheme); *FTC v. Equinox Int'l, Corp.*, No. 990969, 1999 WL 1425373, *9 (D. Nev. Sept. 14, 1999) (imposing preliminary injunction; "Because Equinox satisfies the test of a pyramid scheme . . . the Equinox program will likely be found an unfair or deceptive practice in violation of the FTC Act."); *Five-Star*, 97 F. Supp.2d at 533 ("Defendants' failure to disclose that due to the structure of the Five Star scheme, the vast majority of consumers could not achieve the promised rewards of a free automobile lease and substantial income constituted a material omission in violation of the FTC Act.").

[18] The GIN Participants have also failed to demonstrate, and cannot demonstrate, that

- 10 -

**B.      The GIN Participants Fail To Satisfy Rule 24's Requirements.**

**1.      The Motion Is Untimely.**

Both FRCP 24(a) (intervention of right) and 24(b) (permissive intervention) mandate that

the motion to intervene be timely.  *See, e.g., United States v. City of Chi.*, 908 F.2d 197, 199 (7th

Cir. 1990) ("Both forms of intervention require that a motion to intervene be **timely**."; "[A]n

untimely motion will fail even if the other requirements of the Rule are satisfied.") (Seventh

Circuit's emphasis).[19]  In a well-established test the GIN Participants' brief conspicuously omits,

the Seventh Circuit considers four factors to determine whether a motion to intervene is timely:

"(1) the length of time the intervenor knew or should have known of his interest in the case; (2)

the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the

motion is denied; (4) any other unusual circumstances." *Grochocinski v. Mayer Brown Rowe &*

*Maw, LLP*, 719 F.3d 785, 797-98 (7th Cir. 2013) (quotation omitted).  All four factors weigh

heavily against intervention.[20]

---

they have a perpetual right to GIN's non-monetary benefits.  Assuming that they do not own
GIN (and they do not), there is no reason why GIN could not cease to collect monthly dues from
GIN members and terminate its relationship with them.  In fact, the Membership Agreement
makes clear that GIN can cancel memberships "**at any time for any reason or no reason at all,
in its sole discretion**."  PXA:7, Membership Agreement § 9.1 (emphasis added).  The GIN
Participants' unsustainable position is analogous to a satisfied customer suing an independent
company to enjoin it from declaring bankruptcy, dissolving, or otherwise ceasing operations.

[19] Timeliness only becomes an issue if—notwithstanding the facts—the GIN Participants
have a legally cognizable interest as "joint owners" of an "unincorporated association."
However, they face an insurmountable problem because, assuming *arguendo* that GIN is an
unincorporated association that the GIN Participants jointly own, then they had notice years ago
when (1) GIN's attorneys (Faruki) and (2) APC (the Babenko-owned sole member of GIN
FDN's management board) both knew the FTC sought to collect GIN FDN's assets to satisfy the
judgment against Trudeau.  *See supra* at 1-3.  Put differently, if GIN FDN is an unincorporated
association, then notice to its attorneys or its management board is notice to its members.  *Cf.
Jaser v. New York Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 244 (2d Cir. 1987) (noting that
service on the agent of an unincorporated association "constitutes service on all the individual
members"); *Hanson v. Chicago, B. & Q. R. Co.*, 282 F.2d 758, 760 (7th Cir. 1960) (holding that,
for purposes of diversity of citizenship, an unincorporated association is a deemed a citizen of all
states in which any member resides).  The GIN Participants cannot have it both ways:  they
cannot have an ownership interest sufficient to establish standing, yet so insufficient that notice
to their agent and management board was not notice to members.

[20] "Determining whether an application to intervene is timely is committed to the sound

- 11 -

### a. The GIN Participants Knew or Should Have Known About Any Interest in this Case Almost Two Years Ago.

The GIN Participants argue that they filed their motion only three months after the Court appointed the Receiver, *see* DE793-2 (Nov. 18, 2013) at 9,[21] but this is not the relevant time. Rather, the relevant time began when the GIN Participants knew or should have known that their "interests might be adversely affected by the outcome of the litigation." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 948 (7th Cir. 2000) (quotation omitted). GIN knew no later than March 2012 that the FTC claimed its assets belonged to Trudeau, *see supra* at 1-2 (discussing GIN's motions to quash FTC subpoenas), but the motion to intervene was not filed until November 2013. This twenty-month delay renders the motion untimely.[22]

### b. Intervention Would Prejudice the FTC and the Receiver.

Prejudice to the existing parties is "[t]he most important consideration," and the GIN Participants' delayed intervention would be prejudicial in at least two ways.[23] First, intervention will force the FTC to spend limited public resources relitigating issues the Court already resolved. Second, the Receiver will have to spend money that would otherwise go to compensate Trudeau's victims re-litigating issues with the GIN Participants. This relitigation

---

discretion of the district court." *Shea v. Angulo*, 19 F.3d 343, 348 (7th Cir. 1994).

[21] Or, at least, this is what the GIN Participants apparently mean to argue. Inexplicably, in their November 18 filing, they contend that "Intervenors' application should be deemed timely as the Order appointing the Receiver is less than 60 days old." DE793-2 at 9. Actually, the Court appointed the Receiver on August 7—101 days earlier. *See* DE749 (Aug. 7, 2013).

[22] *See, e.g., Heartwood, Inc. v. United States Forest Serv.*, 316 F.3d 694, 701 (7th Cir. 2003) (finding District Court's decision allowing intervention only two weeks after a settlement was "erroneous as a matter of law" when intervenors should have known about their interest in the case earlier; "The relevant inquiry in determining timeliness, however, is not on the time between the settlement and the motion to intervene, but instead is on the time between the [intervenors'] knowledge that the suit could impact their interests and the motion to intervene.").

[23] *See, e.g., People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 179 F.R.D. 551, 560 (N.D. Ill. 1998) ("The most important consideration in deciding whether a motion to intervene is untimely is whether the delay will prejudice the existing parties to the case."); *PAC for Middle Am. v. State Bd. of Elections*, No. 95 C 827, 1995 WL 571893, *3 (N.D. Ill. Sept. 22, 1995) ("The most important consideration in this regard is whether the delay will prejudice the original parties to the case.") (citation omitted).

- 12 -

would be unnecessary had the GIN Participants intervened earlier. Simply put, if the GIN Participants had intervened earlier, they would not now be seeking to force the FTC and the Receiver (and the Court) to undo, redo, or re-argue the complex series of motions and events that have occurred over the past twenty months. Accordingly, the Court should deny the GIN Participants' untimely motion.

### c. Denying the Motion Will Not Prejudice the GIN Participants.

There is no prejudice to the GIN Participants because: (1) they cannot prevail anyway, *see supra* at 9 n.17; (2) lost pyramid payments are not a cognizable form of "prejudice," *see id.* at 9-10; and (3) they currently have access to GIN's non-monetary benefits, *see id.* at 10; and (4) they likely will retain this access in the future, *see id*.

### d. Other Circumstances Militate Against Intervention.

The unique circumstances this case presents also counsel very strongly against intervention, which would be a remarkable step backward after moving toward consumer redress for nearly a decade. *See Sokaogon*, 214 F.3d at 949 ("The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal.") (quotation omitted). Furthermore, adding twenty-five new parties would unnecessarily complicate this action, and leave the door open to intervention by potentially thousands of others involved with Trudeau's schemes. *See People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 176 (7th Cir. 1995) (denying intervention in part because it "would be significantly disruptive"). In short, the Seventh Circuit's fourth consideration—the presence of unusual circumstances, *see Grochocinski*, 719 F.3d at 797-98, also counsels against intervention.

2.      **The GIN Participants Fail To Establish a Right To Intervene Under Either FRCP 24(a) or (b).**

a.      **The GIN Participants Fail To Meet Their Burden Under FRCP 24(a).**

Even assuming the GIN Participants had standing and acted timely, they still fail to meet FRCP 24(a)'s requirements.  Notably, the Seventh Circuit requires a proposed intervenor to "have a direct and **substantial** interest in the subject matter of the litigation," *see*, *e.g.*, *Keith v. Daley*, 764 F.2d 1265, 1268 (7th Cir. 1985) (emphasis added),[24] and this formulation demands an even greater interest than Article III requires, *City of Chicago v. FEMA*, 660 F.3d 980, 985 (7th Cir. 2011) (noting that, if no interest greater than Article III standing was required for intervention of right, then "intervention would be too easy and clutter too many lawsuits with too many parties," so "[m]ore must be required").[25]  Thus, even if the GIN Participants have an interest that barely scrapes past Article III—which it does not—they still have not satisfied Rule 24(a)'s requirement that the interest be "substantial."[26]

Additionally, under Rule 24(a), "the applicant's interest must not be represented adequately by one of the existing parties to the action."  *Keith*, 764 F.2d at 1268.  "[T]his requirement is taken seriously because intervention can impose substantial costs on the parties

---

[24] *See also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 101 F.3d 503, 506 (7th Cir. 1996) ("Our cases say that the prospective intervenor's interest must be direct, significant, and legally protectable.").  As with standing, the GIN Participants have the burden to prove this interest.  *See*, *e.g.*, *Reid L. v. Illinois State Bd. of Educ.*, 289 F.3d 1009, 1017 (7th Cir. 2002).

[25] Fifteen years earlier, the Seventh Circuit suggested that, although intervention would not require an interest greater than Article III demands, "the would-be intervenor will not be permitted to push out the already wide-boundaries of Article III standing."  *Solid Waste*, 101 F.3d at 507.  Not only is *City of Chicago* much more recent, it is better reasoned because the alternative approach renders Rule 24(a)'s "interest" requirement duplicative of Article III's standing requirement.

[26] *See*, *e.g.*, *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 571 (8th Cir.. 1998) ("'An interest that is remote from the subject matter of the proceeding, **or that is contingent upon the occurrence of a sequence of events before it becomes colorable**, will not satisfy [Rule 24(a).'") (quoting *Washington Elec. v. Massachusetts Mun. Wholesale Elec.*, 922 F.2d 92, 97 (2d Cir.1990)) (emphasis added).

and the judiciary." *Med Resorts*, 199 F.R.D. at 607. Here, Trudeau argued (through highly competent counsel) that he did not control GIN. The GIN Participants have not shown why Trudeau's failed effort to establish GIN's independence did not adequately represent that (mistaken) view. In brief, the GIN Participants have not satisfied Rule 24(a)'s requirements.

### b. Intervention Under FRCP 24(b) Would Prejudice the FTC and Run Contrary to the Interests of Justice.

The GIN Participants also have failed to show that permissive intervention is appropriate under FRCP 24(b), which requires the GIN Participants to prove that "(1) their claim and the main action have a common question of law or fact and (2) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *United States v. Board of Educ. of City of Chi.*, 102 F.R.D. 873, 876-77 (N.D. Ill. 1984).[27] Initially, there is no common question of law or fact (at least now) because Court already resolved the question that the GIN Participants seek to litigate. Furthermore, "[a]dditional parties always take additional time." *United States v. American Inst. of Real Estate Appraisers of Nat'l Ass'n of Realtors*, 442 F. Supp. 1072, 1083 (N.D. Ill. 1977). Forcing both the FTC and the Receiver to re-litigate matters the Court already resolved would lead to significant additional delay as the new parties potentially would seek discovery and undertake other efforts to undo the Court's findings. Worse still, allowing intervention would invite further parties to seek to intervene—exacerbating the delay and expense. Most important, allowing intervention would require the Receiver to spend limited Receivership Estate assets on litigation rather than consumer redress. Consequentially, permissive intervention would be substantially prejudicial.

### IV.    CONCLUSION

For the foregoing reasons, the FTC asks the Court to deny the motion to intervene.

---

[27] *SEC v. Homa*, 17 Fed. App'x 441, 447 (7th Cir. 2001) (noting District Court's "considerable discretion" under FRCP 24(b) and affirming denial of motion to intervene by creditor seeking to assert rights against receivership property; court created receivership to unravel ponzi scheme).

Dated: December 20, 2013

Respectfully Submitted,

David O'Toole (dotoole@ftc.gov)
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603-5001
Phone: (312) 960-5601
Fax: (312) 960-5600

/s/ Jonathan Cohen
Michael Mora (mmora@ftc.gov)
Jonathan Cohen (jcohen2@ftc.gov)
Amanda B. Kostner (akostner@ftc.gov)
Federal Trade Commission
600 Pennsylvania Ave., N.W. M-8102B
Washington, DC 20580
Phone: 202-326-3373; -2551; -2880
Fax: 202-326-2551

## <u>CERTIFICATE OF SERVICE</u>

        I, Jonathan Cohen, hereby certify that on December 20, 2013, I caused to be served true copies of the foregoing by electronic means, by filing such documents through the Court's Electronic Case Filing System, which will send notification of such filing to:

Kimball Richard Anderson
kanderson@winston.com

Thomas Lee Kirsch, II
tkirsch@winston.com

Katherine E. Rohlf
kcroswell@winston.com

Blair R. Zanzig
bzanzig@hwzlaw.com

Timothy A. Shimko
tashimko@gmail.com

Daniel Stephen Shimko
Dshimko05@gmail.com

Andrew Gordon
abg@gordonlawltd.com

Justin Scheid
debrabuettner@aol.com


                    /s/ Jonathan Cohen
                    Jonathan Cohen (jcohen2@ftc.gov)
                    Attorney for Plaintiff
                    Federal Trade Commission