# FTC
# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03-C-3904 |
| | ) | |
| v. | ) | Hon. Robert W. Gettleman |
| | ) | |
| KEVIN TRUDEAU, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF DR. PETER VANDER NAT**
**IN SUPPORT OF FEDERAL TRADE COMMISSION'S OPPOSITION TO PYRAMID**
**SCHEME PARTICIPANTS' MOTION TO INTERVENE**

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

(1)     I am an economist employed by the Federal Trade Commission. I have testified in federal court as an expert witness in six pyramid cases brought by the FTC, SEC, and DOJ. Further, I have been deposed as an expert witness in eight pyramid scheme matters. No Court has ever rejected my conclusion that a particular enterprise constituted a pyramid scheme.

(2)     Attached hereto as **Attachment 1** is a true and correct copy of my expert report in the above-captioned action.

(3)     In my experience, it is not unusual for middle-level pyramid scheme participants to want the pyramid to continue so they can recover their "investment" from lower-ranking members.

Peter Vander Nat, Ph. D.

Executed on December 18, 2013 in Washington, D.C.

# FTC PXC:1

# EXPERT REPORT OF PETER J. VANDER NAT, Ph.D.

1. My name is Dr. Peter J. Vander Nat. I have a doctoral degree in economics from the University of Notre Dame. I am an economist employed by the Federal Trade Commission (FTC) and for approximately twenty-five years I have advised the Commission on consumer protection matters. I have testified in federal district court as an expert witness in a number of previous pyramid scheme cases brought by various federal government agencies, including the FTC, Securities and Exchange Commission, and the Department of Justice. A true and correct copy of my resume is attached as **Vander Nat Attachment (Att.) A.**

2. In examining Global Information Network ("GIN"; "the company"), I have reviewed a variety of materials, including the Membership Agreement, the Affiliate Agreement, the Commission Structure, the first report from the receiver, and various postings at GIN's website (see below).

## Overview and Summary of Conclusions

3. GIN's program offers the participants an educational and business opportunity. By enrolling others in the firm's educational seminars on personal development, business acumen, and the like, a participant can obtain financial rewards; see *Commission Structure* (infra). The commissions are open to Affiliates and Members −the two forms of participation in GIN's program. A Member is a participant who undertakes a certain level of training via the firm's seminars, with fees ranging from $1,000 − $25,000. An Affiliate is a person who earns financial rewards by recruiting new Members (recruitment of Affiliates earns no rewards).[1] An Affiliate does not pay fees, unless the Affiliate becomes a Member. As explained below, GIN has structured the incentives so that it strongly behooves an Affiliate to become a Member. From inception in 2009 to August 2013 when the receiver took control, more than 90% of the commissions were paid to participants specifically as Members, reaching 98% by August 2013.

4. Each Member can qualify for financial rewards by progressively enrolling new Members. The *Commission Structure* pays rewards over 7 levels of recruitment, then adding a 4% commission on as many levels as a participant may accomplish; indeed "on potentially thousands of levels deep." GIN promotes its business opportunity as a "perpetual money-making machine." In reality, it is a perpetual recruitment scheme that dooms the vast majority of the participants (well above 90%) to financial losses by the very design of the compensation plan. GIN's "opportunity" pays rewards (only) for recruiting new Members; more specifically, recruitment rewards are tied to, and paid by, the continual recruitment of new Members. There are no sales of product or service to people outside GIN's network, so there cannot be any relation between retail (or external) sales and financial rewards paid in connection with recruitment. Using both the general economic character-ization of pyramid schemes and the deeper analysis under the Koscot test (see below), I conclude that GIN is a pyramid scheme. Over 2009−2013, GIN took in about $92 million in Membership revenue, while 90% of Members earned nothing at all. A most conservative estimate of harm comes to $83 million.[2]

---

[1] By GIN's rules, an Affiliate need not be a Member; however, any Member is an Affiliate and can automatically participate in the rewards under the GIN Compensation Plan.

[2] I estimate the harm that results from GIN's pyramid scheme, which is actively promoted as a business venture by which participants may obtain substantial income. Presently, I do not have data on individual payments to GIN, nor corresponding individual rewards received. Considering that 90% of Members earned nothing, a low-side estimate of harm is $83M = .90 x $92M. This calculation of economic harm excludes intangible, social, and educational benefits that a person might receive from membership. While certain people may appreciate these potential benefits, the latter are not relevant to an analysis of whether a program is a pyramid scheme.

**The Meaning of a Pyramid Scheme**

5. There are two closely related descriptions of a pyramid scheme. The first is a general economic characterization in use for many years: a pyramid scheme is a perpetual recruitment chain in which the design of the scheme's compensation plan dooms the vast majority of participants to financial failure.[3] The *Koscot test* –adopted by federal courts– applies this meaning to ongoing recruitment in the context of multilevel marketing (MLM), focusing on an MLM firm that sells a product or service and pays recruitment rewards that are unrelated to the sale of the product/service to people outside the MLM's network. The Koscot analysis moves from a general characterization to a specific application in a multilevel marketing context; as shown below, both exactly fit GIN.

6. In general economic terms, a pyramid scheme is an organization that hinges on the continual recruitment of new members, all of whom need to recruit others to recoup their own investment. The primary benefit –indeed, often the sole benefit– from ongoing recruitment is that the participants receive a certain portion of the monies paid by the set of subsequent recruits. The latter comprise a person's "downline," which refers to all direct and indirect recruits of a given person. In order for participants to recoup their own fees –and ostensibly much more as expected by the participants – they all need to generate further downline enrollment. The specific rules regarding recruitment and the related recoupment of fees vary from one scheme to another but the common thread is this: monetary returns are tied to an ongoing ability to recruit others into the same venture. Thereby, a situation is created in which the desired recoupment will not, and *cannot*, come true for the vast majority of participants. As recruitment continues, the number of people at or near the base of the recruitment structure grows very rapidly, often at an exponential rate for as long as a successful recruitment pattern is maintained. At whatever current enrollment level the program is considered (saturation or not; see below), the most recent recruitment layers typically do not qualify for financial rewards because their own downlines are either empty or do not have the sufficient numbers required by the compensation plan to secure rewards. In sum, a pyramid scheme is a money-transfer scheme in which the foreseen losses of the vast majority become winnings for a small minority at the top of the recruitment structure.

7. In broad outline, this same characterization applies to Ponzi schemes. It is equally true of Madoff's Ponzi scheme that it was a money-transfer scheme in which the foreseen losses of the vast majority became winnings for a few at the top. The two schemes may become differentiated in an MLM context, but for many MLM pyramids this essential characteristic remains the same. Below, I examine the growth of an organization in which each person is incentivized to recruit, respectively, 3 others, 6 others, and 10 others. These are programs that GIN promotes and they doom the vast majority to financial losses by the very design of the firm's compensation plan.

8. A pyramid scheme may seek to hide its real nature (essentially, a chain letter) by introducing a product or service to fool people into thinking that they are engaged in a business or income opportunity. The "Koscot test" (1975) addresses this version of the scheme.[4] The analysis

---

[3] As an example, see Att. B regarding a 1973 NYT press in connection with pyramid schemes.

[4] In re Koscot (1975), the Federal Trade Commission articulates its test for a pyramid scheme, specifically noting that the absence or paucity of retail sales dooms the MLM to be an endless chain that is "nothing more than an elaborate chain letter device…" (Koscot, 86 F.T.C. 1180). Further, it held that a pyramid scheme is an organization in which participants pay money to the company "in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users" (Koscot at 1106). Federal courts have adopted and elaborate upon the Koscot test, most notably in Omnitrition (1998), Gold (1999), Five Star (2000), and BurnLounge (2011). All of these federal

assumes a multilevel marketing context in which people pay fees and buy product to participate in the venture. If all purchases/sales were internal to the MLM (no sales of product or service to people outside this network), ongoing recruitment would doom the vast majority of participants to inevitable losses because, just as in the above analysis, monetary rewards would be critically tied to an ongoing ability to recruit others into the same venture; i.e., others who pay fees and buy product, who in turn recruit others who pay fees and buy product, and so forth, indefinitely. In considering the impending losses that such a recruitment chain would create, Koscot looks to income that would not depend on recruitment but rather on product sales to people outside the venture. Koscot thus looks to retail sales and addresses certain *factually based* questions about the MLM's program, namely (a) whether there are any retail sales (product sales to people outside the MLM) and (b) what relation exists, in practice, between such external sales and the rewards paid in connection with recruitment. If there is no relation between recruitment rewards and sales to the ultimate users outside the MLM's network, the organization is just a perpetual recruitment chain; indeed, in Koscot's words, "nothing more than an elaborate chain letter device." Such an MLM thereby dooms the vast majority of participants to financial failure. Concomitantly, Koscot renders the same organization to be an unlawful pyramid scheme.[5]

9. I underscore that the large-scale failure to obtain financial rewards in a pyramid scheme is *not* postponed until market saturation. Although the names of the most recent enrollees may quickly change as recruitment continues, the *percentage* of members comprising the most recent layers of recruits does not appreciably change for as long as a successful recruitment pattern is maintained. At whatever enrollment level the program may be considered, whether the total membership is large or small, saturation or not, the rules and implementation of the program ensure that the vast majority are not in a position to recoup their own investment. (Regarding GIN on this same point, see Tables 1 & 2 below.) Clearly, the losses are not accidental; they are determined by the design of a compensation plan that ties financial rewards to a continual ability to recruit others into the same venture – manifestly, a false premise. Most notably, the absolute number of people who hold losing positions in the scheme increases exponentially for as long as a successful recruitment pattern is maintained. And when recruitment begins to falter, many at the bottom just drop out. Recruitment then continues in an effort to replace the dropouts (a churning of the base), while a few fortunate people move higher on the recruitment ladder. In any event, the vast majority of participants do not recoup their investment.

## Analysis of Global Information Network (GIN)

10. In promotional materials, GIN represents that one of the primary benefits of participating in the company's program is the opportunity to build a business having the potential for substantial income. In a taped recording at the firm's main website (www.globalinformationnetwork.com/), Mr. Trudeau explains how to get started in GIN's Affiliate program, claiming it is "one of the best money-making opportunities of all time" and "people all over the world are making hundreds or even thousands of dollars every month in residual income month after month." He

court rulings concur that for purposes of pyramid analysis under Koscot, "ultimate users" are people who are not participants in the proposed venture (thus, consumers outside the MLM's network).

[5] Again, regarding GIN there is the added fact that there are no product sales at all outside this MLMs network. The rewards for recruitment are tied to, and paid by, the continual recruitment of new Members. For a further description of multilevel marketing and the similarities and differences with pyramid schemes, see Vander Nat, Peter J. and William W. Keep, "Marketing Fraud: An Approach for Differentiating Multilevel Marketing from Pyramid Schemes," *Journal of Public Policy & Marketing,* Vol21(1), Spring 2002, 139-151.

P a g e | 4

gives an example of an Affiliate who has made almost $4 million in 18 months. He explains that the way to make money with GIN is by selling Memberships and building a downline of participants who sell Memberships, generating income for everyone from all products sold by everyone in their downline. [6] Also at the website, in another taped presentation on "How to Build a Downline," Mr. Trudeau states that people have the potential to earn $10,000, $20,000, $30,000 or $40,000 or $50,000 per month. He goes on to say if a person spends a few hours a day for a year in company-sponsored training on how to operate a GIN business, they can be in a position to receive a $10,000 check every month. GIN offers a course to people who want to build their business, comprised basically of training on how to recruit others and create a large downline. This course comes in a three-part series with a total price tag of about $1,000 and is very notably called "How to Create a Perpetual Money-Making Machine."

<u>The Structure of GIN's Compensation Plan</u>

11. Regarding Members, there are 12 "Levels of Membership," where each level offers more extensive training on enhancing your personal development, business acumen, and the like. From the materials, this part of the program has been developed for Membership Levels I –VI; deeper levels are apparently pending. An initial $1,000 fee is paid for Level I, plus monthly dues of $150. Successive levels retain the monthly dues and require further *upgrade fees* as follows: Level II at $1,500; Level III at $1,500; Level IV at $3,000; Level V at $10,000; and Level VI at $25,000. These Membership levels are sequential; i.e., a Member cannot qualify for a higher level without first completing the lower levels –along with the related upgrade fees.

12. An Affiliate is a participant who receives commissions for recruiting Members. The rewards are a percentage of (a) the Member's initial fee, (b) the monthly dues, and (c) any upgrade fees. A general participant, John Doe Affiliate ("JDA") earns commissions for Members that JDA has directly or indirectly sponsored. As in all multilevel marketing, each participant has a *downline* that is comprised of the members whom the participant has directly or indirectly enrolled. Below, I provide an illustration of a downline and GIN's related commissions.

13. For clarity, I note GIN's "Membership Levels" are different from downline recruitment levels. At the website ([www.globalinformationnetwork.com/members/faqs](www.globalinformationnetwork.com/members/faqs)) the firm posts "Questions Regarding Commissions," stating that a participant may achieve any number of downline recruitment levels while remaining at a designated Membership Level. GIN states that in order for a person to receive *upgrade commissions* on any Member's upgrade fees, the person receiving this reward must have at least the same Membership Level as the person who pays the upgrade. The further import of this requirement is explained below. Although not strictly required to pay fees, John Doe Affiliate is strongly incentivized to be a Member (and thus pay fees). The overall *Commission Structure* is the following (from GIN's website, December 2, 2013):

---

[6] The reference to "products" is somewhat ambiguous. GIN's main "product" is comprised of seminars. Also, at the website there is a link to the GIN store where business tools are sold, such as various CD lecture series on wealth management and how to make your financial dreams come true, including books and tapes on the same topics.

**PX:C:1 at 4**

Welcome to the Global Information Network                                       Page 1 of 1

| Level # | Affiliate | Bronze Affiliate | Silver Affiliate | Gold Affiliate | Platinum Affiliate | One-Star Platinum Affiliate | Two-Star Platinum Affiliate | Three-Star Platinum Affiliate* | Four-Star Platinum Affiliate* | Five-Star Platinum Affiliate* | Presidential Platinum Affiliate* | Chairman Affiliate* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Level-1 | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 22% | 23% | 23% | 23% | 24% |
| Level-2 | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 22% | 23% | 23% | 23% | 24% |
| Level-3 | | 2% | 2% | 2% | 2% | 2% | 2% | 4% | 5% | 5% | 5% | 6% |
| Level-4 | | 2% | 2% | 2% | 2% | 2% | 2% | 4% | 5% | 5% | 5% | 6% |
| Level-5 | | 2% | 2% | 2% | 2% | 2% | 2% | 4% | 5% | 5% | 5% | 6% |
| Level-6 | | | 2% | 2% | 2% | 2% | 2% | 4% | 5% | 5% | 5% | 6% |
| Level-7 | | | | 2% | 3% | 4% | 5% | 7% | 8% | 8% | 8% | 9% |

\* This includes breakaway bonuses. Pays up to 4% on potentially thousands of levels deep. These commissions percentages are paid on all membership dues collected. Until you are a Platinum Affiliate, you must make at least one sale to qualify for commission in that month.

<u>Illustration of a Downline and Related Commissions</u>

14. I illustrate commissions by a scenario in which each person enrolls 3 Members –not just Affiliates since financial rewards are paid for enrolling Members (as in the *Get 3 Program*, which incentivizes participants to sponsor 3 new Members in their first 60 days; see below). As each person enrolls 3 Members, a progressive downline is created. At the head of this downline is John Doe Affiliate (JDA, or briefly "John") who, strictly speaking, need not be a Member, though very likely he would be, as affirmatively promoted and incentivized by GIN (see Para. 10, 13, 17, 18).



15. Upon meeting certain qualifiers (infra), the commissions are two-fold: (I) *direct commissions* paid to those who personally enroll new Members (a percentage of the membership fees), and (ii) *override commissions,* which are additional commissions paid to indirect sponsors of any parti-cipant who directly enrolls Members. In regard to the diagram, the rewards to JDA are: (a) for each Member personally enrolled by JDA (thus placements at his level 1), John receives a 20%

commission from the enrollment fee; (b) in turn, for Memberships enrolled by his level 1 (his indirect sponsorships placed at his level 2), he receives a 20% override commission; and (c) for Membership placements by his level 2 (thus creating John's level 3, which are also his indirect sponsorships), he receives a 2% override commission. GIN's commission chart presents further overrides for levels 4−7 with the highest override at level 7, namely a 9% override on each enrollee's membership fee, monthly dues, and any upgrade fees that occur at that level.

16. The key to a multilevel marketing structure is that, through progressive enrollment, various downlines are imbedded in each other. For example, when JDA enrolls Allan, and Allan then enrolls Bill, the member Bill is a level-1 recruit for Allan, who is his direct sponsor, and equally a level-2 recruit for JDA, his indirect sponsor. Thereafter, Bill's downline becomes a subset of Allan's downline and of JDA's downline. To illustrate specific rewards under this structure, say that Cathy is at John's 3rd level and enrolls a Member Dave, who pays a $1,000 membership fee. Dave is placed at Cathy's 1st level and simultaneously at John's 4th level. The rewards for this placement are the following. Cathy receives a $200 direct commission (20% of $1000) and the override commissions to her upline sponsors are: (1) Cathy's sponsor, Bill, also obtains $200 (as Cathy's enrollment of Dave is a level 2 recruit for Bill); then Bill's sponsor, Allan, receives $20 (as Dave is a level 3 recruit for Allan); and Allan's sponsor, who is JDM, receives $20 (Dave's placement by Cathy is a level 4 recruit for John). This recruitment generates collective rewards of $440 to the upline sponsors of Dave. It exemplifies the general principle that all *qualified upline sponsors* (see below) obtain multilevel rewards for recruiting new downline members.

17. JDA may also qualify for *upgrade commissions* when downline Members undertake and pay upgrade fees. Regarding the above sponsorships in which JDA enrolls Allan and Allan enrolls Bill, suppose Bill subsequently upgrades to Level II Membership and pays a $1,500 upgrade fee. For JDA to receive an override of 20% on Bill's fee ($300 reward), JDA also needs to have Level II Membership (see, www.globalinformationnetwork.com/members/faqs). Under the *Get 3 Program* in which each participant recruits 3 Members, this $300 upgrade commission would apply to as many as 12 people at JDA's enrollment levels 1−2; potentially, a total reward of $3,600 (= $300 x 12). This prospect warrants John's own upgrade to Level II. Better still, he need not pay the $1,500 fee out of pocket and could obtain Level II for free. By qualifying for the *Get 3 Program* (enrolling 3 Members in his first 60 days), part of John's reward is $1,500 in *upgrade credits* (see Para. 22 below). The requirement is that JDA has paid the initial $1,000 Membership fee and is current on his monthly dues. And there are further prospects for upgrade commissions since any of these same enrollees may upgrade to Level III or higher. Once JDA is a (paying) Member, he can become qualified for further commissions in regard to any of his downline Members who undertake an upgrade.[7]

18. For the business venture, override/upgrade commissions comprise an important potential source for long-term income. Regarding those who are interested in the business venture, the promotional materials underscore the prospect of "thousands of dollars every month in residual

---

[7] By GIN's rules, when a downline person upgrades to a higher level of Membership, any upline sponsor (direct or indirect) can qualify for upgrade commissions by achieving (paying for) the same Level of Membership in the same month that the enrollee pays the upgrade fee. Here are some illustrations. If JDA upgrades to Level III, he again qualifies for a reward of $300 per person for any of the referenced 12 enrollees who also upgrade to Level III. Ultimately, at Level VI the enrollment fee is $25,000 and renders a potential reward of $5,000 (= 20% of $25,000) to JDA for anyone of these 12 recruits who undertakes Level VI. If some Members in his downline do upgrade to Level VI, then JDA can assess potential rewards in commissions of up to 12 x $5,000 (= $60,000) over against his own upgrade payment of $25,000.

income, month after month" (Para. 10). Clearly, GIN has structured the financial incentives so that it behooves John Doe Affiliate to become a Member.

19. GIN pays commissions on a monthly basis for certain enrollment fees (initial fees, monthly dues, and upgrades) paid out in a prior month. To receive rewards, upline sponsors must meet certain qualifiers. For the Get 3 Program, the opening requirement is that each person enrolls 3 Members over their first 60 days. To obtain override commissions, a participant needs to sponsor some number of Members to reach a specific Affiliate status, such as Bronze, Silver, Gold, Platinum, etc. Each of these positions offers certain override commissions to ever-deeper levels. As an example, the status of Silver Affiliate entitles JDA to overrides for 6 levels in his downline and requires him to sell at least one new Membership in the current month and have personally enrolled at least *four active Members* (an "active Member" is a person who is current on paying Membership fees, monthly dues, and any upgrades). The highest Affiliate status is "Chairman Affiliate"; it pays an override of 9% for any level 7 recruit in this person's downline and there-after a residual reward of "up to 4% on potentially thousands of levels deep." Among the qualifiers for this status are: (i) this Affiliate has personally enrolled 100 active Members and (ii) has sponsored at least 5,000 Members over the first 7 levels of the Affiliate's downline.

20. From the materials, and specifically GIN's Compensation Plan, it is evident that all qualifiers for financial rewards stipulate particular recruitment levels that a participant needs to achieve. Equally, all the financial rewards *paid out* by GIN are tied to the recruitment of new Members. As analyzed below, GIN's income opportunity is a perpetual recruitment scheme in which most participants do not recoup their joining fees.

The Get 3 Program

21. The *Get 3 Program* incentivizes participants to "sponsor a minimum of 3 new Members at the $1,000 level in their first 60 days." In keeping, I track this program by a scenario in which each Member enrolls 3 others, each one of whom in turn enrolls 3 others, and so forth. In view of the stated terms, the scenario assumes each person can recruit 3 Members over a period of 60 days. Over the same period, any such Member pays an initial fee of $1,000 plus two months of dues at $150/ month, rendering $1,300 for the total payment. As a business venture, the question for participants is whether they can recoup their own payments and then make additional returns.

22. By recruiting 3 Members, a participant in the program initially obtains $600 (= 3 x $200). After the first 60 days, this participant is offered a choice between another $600 in cash (*double commission*) or $1,500 in upgrade credits for a higher level of Membership. In favor of the company, I assume that the participants believe in GIN's program and thus want the higher levels of Membership and the more extensive instruction. As a business proposition, it is beneficial to receive $1,500 in upgrade credits to a higher Membership Level by letting go of the second $600 (available in cash). For specificity, I assume that *qualified participant*s take their rewards as follows: an initial $600 in cash and $1,500 in upgrade credits.

23. By GIN's rules, this two-fold reward is limited to *direct sponsorships* achieved. As stated in the program's brochure (p. 4), beyond the level-1 enrollees, an upline sponsor receives regular commissions for further recruits That is, when the various participants sponsor their respective level-2 recruits, the reward for each such recruit is 20% of the $1,000 Membership fee (a $200 reward). So, participants will want at least 4 indirect recruits at their level 2 to recoup their own

payment of $1,300.[8] In the table below, I compute the percentage of participants who will not recoup their own payments in the Get 3 Program *under the best of circumstances* for the participants; i.e., they all meet the rules of the program and qualify for all rewards under the plan:

**Table 1. Proportion of Members who do not recoup their fees in the Get 3 Program**

| recruitment level n | Members at level n | total number of Members | Percent of Members at combined levels n-1 and n (bottom 2 levels); these do not recoup their fees. |
|---|---|---|---|
| n = 0 | JDA | 1 | |
| n = 1 | 3 | 4 | 100% |
| n = 2 | 9 | 13 | 92.3% |
| n = 3 | 27 | 40 | 90.0% |
| n = 4 | 81 | 121 | 89.3% |
| n = 5 | 243 | 364 | 89.0% |
| **n = 6** | **729** | **1093** | **88.9%** |
| | | | |
| n = 7 | 2,187 | 3,280 | 88.9% |
| n = 8 | 6,561 | 9,841 | 88.9% |
| n = 9 | 19,683 | 29,524 | 88.9% |
| n = 10 | 59,049 | 88,573 | 88.9% |
| n > 10 | | | 88.9% |

24. To understand how this table is constructed via ongoing recruitment, consider "n = 6" to be the most recent level of recruitment (deeper levels are not yet formed). In the recruitment of this 6th level, 729 Members enter the Get 3 Program and the total membership at that point is 1,093 individuals. The proportion of participants over the bottom two levels (using level 6 as the base and level 5 as one step above this base) thus comes to (243 + 729) / 1093 = 88.9 %. A similar calculation can be made by using any stated level (generically, level n) as the most recent level of recruitment. In each case, when one compares the bottom two levels (levels n-1 and n) to all Members who have joined by that point, the resulting ratio is at least 88.9%.

25. To convey the import of this mathematically provable result, I first note that by the terms of the Get 3 Program, a participant must have downline that is active at their own level 2 in order to recoup their own payment. As explained above, people who do not have any level-2 recruits are not in a position to recoup their own payment. So, people at the base of the recruitment structure (no matter where that base is considered) are certainly not in a position to recoup since they have no level beneath them. For people who are at one level above the base, they do not recoup either, since they have just one level beneath them (and not any level-2 recruits). And it is mathematically provable that the bottom two levels continually comprise at least 88.9% of the participants for as long as each member recruits 3 others.[9] Thus, at least 88.9% of the participants are not in a position to recoup their own payments.

---

[8] With just three recruits at their own level 2, the participant receives an additional cash reward of $600; thus a total reward of $1200 at that point. And even if the participant took the *double commission* in cash (i.e., $1,200 with no upgrade credits), they would still need at least one recruit at their own level 2 in order to recoup the $1,300 payment.

[9] Under the assumption that qualified participants take their rewards as $600 in cash and $1,500 in upgrade credits, the result is that at least 88.9% of the participants lose $700 per person. For those who take the double commission is cash (thus $1,200), they are still short $100.

26. Even not yet considering eventual market saturation for GIN's program, it will be difficult to maintain this recruitment and at some point it cannot be maintained in the way that the program envisions. As recruitment begins to falter (not necessarily stop) and the bottom begins to drop out, most participants are made *worse off* by not having the requisite downline. The empirical failure rate in recouping the $1,300 payment is thus bound to be greater than 88.9%; e.g., readily 90% or more.[10]

The Platinum Club

27. Among other requirements, GIN's Platinum program requires the following: (a) each participant must personally sponsor 10 Members, and (b) each of these Members must sponsor at least one new Member.[11] The table below displays the associated growth pattern under the best of circumstances for the participants (i.e., they meet the rules of the program):

**Table 2. The Growth of a Club in which each Member recruits 10 other Members**

| recruitment level n | Members at level n | total number of Members in the club | percent of Members at combined levels n-1 and n (bottom 2 levels) |
|---|---|---|---|
| n= 0 | JDA | 1 | |
| n = 1 | 10 | 11 | 100% |
| n = 2 | 100 | 111 | 99.1% |
| n = 3 | 1,000 | 1,111 | 99.0% |
| n = 4 | 10,000 | 11,111 | 99.0% |
| n ≥ 5 | | | 99.0% |

28. *Qualified participants* (i.e., those who meet conditions (a) & (b) just above) need to have some level-2 recruits, since each direct enrollee of a participant must sponsor someone else, thus having at least one recruit at the participant's 2nd level. Much of the prior analysis is applicable. No matter what level (generically level n) one may consider as the most recent recruitment level, the bottom two levels have no level-2 recruits of their own. As the table shows, these two levels comprise 99% of the participants. Consequently, for as long as a successful recruitment pattern is maintained, 99% of participants do not qualify for the rewards specific to the Platinum program.[12]

29. Of course, it will be exceedingly difficult to maintain recruitment in which each Member enrolls 10 others. But again, this difficulty only makes the general participant worse off upon failing to meet the qualifiers. As recruitment falters and many drop out, the vast majority will not have the requisite downline for two reasons: (a) even under the best of circumstances for the participants, 99% do not qualify, and (b) as recruitment falters, the failure to qualify can only get

[10] GIN also has a Get 6 Program, which incentivizes participants to enroll 6 Members in their first 60 days. The analysis is very similar. A participant will need a least one level-2 recruit to recoup the payment of $1,300 and the bottom two levels will not have any such recruits. For a pattern in which each person enrolls 6 Members, the bottom two levels comprise 97.2% of the participates for as long as a successful recruitment pattern is maintained. Using the same reasoning as above, the empirical failure rate in this program will thus be greater than 97.2%.

[11] GIN's Compensation Plan states all the requirements to reach the status of Platinum Affiliate.

[12] Platinum status has 7 positions: Platinum, One Star, Two Star, Three, Four, and Five Star, and Presidential Platinum. Each status grants progressively higher overrides for achieving recruits at the 7th level. In addition, qualified Members receive 2% of monthly revenues from initial Membership fees, any upgrades, and monthly dues.

worse. By these considerations alone, the empirical failure rate to achieve the rewards specific to the Platinum program is bound to be above 99%.

30. For the tiny minority that qualifies (less than 1%), the rewards are significant. For the period from January 2012 through July 2013, the receiver prepared a spreadsheet[13] of certain monthly rewards paid to qualified participants in the Platinum Club, reckoning only that portion of their reward that grants 2% of gross revenue received by GIN; further Platinum rewards are not given in the spreadsheet. There are 397 qualified participants in January 2012 and this dwindles down to 53 by July 2013. In all likelihood, the 53 are a subset of the 397. Considering only these 53 Members, I calculate that they obtained, at least, $11,238/person for this period, or an average of at least $591/month per person (again, based on just 2% of revenue). To understand the disparity between Members who qualify and those who do not, I compare this outcome to data for all Members over this same period (using p.15 of the receiver's report). First, 97.7% of all Members over all GIN's programs for the stated period received zero rewards. Further, 99.1% of all Members over all programs recouped less than their monthly dues of $150/ month (let alone any consideration of Membership payments of at least $1,000 per person). If initial Membership payments were factored into the calculations, the failure rate for recouping a participant's own payments would surely rise above 99.1%.

31.The Platinum Club and the Get 3 Program are illustrative of the general outcome for GIN's proposed business opportunity: by design of the program, the vast majority of participants will not be in a position to recoup their own payments.

Note:
- General Losses for GIN Participants

32. The receiver's report reviews data on Membership payments received, gross revenue to GIN, Commissions paid out, and much more. For purposes of this declaration, I focus mainly on the Membership payments received by GIN and the commissions that GIN paid out. The report indicates that as an annualized average for 2009 – 2013, close to 90% of Members obtained no commissions at all. Further, again on an annualized basis for this same total period, 98.5% of Members did not even recoup their payments for monthly dues (i.e., $1,800 = 12 x $150) – let alone any consideration of Membership fees of $1,000 or more per Member. These data comport well with the prediction derived from the structure of the Get 3 program that, at a minimum, 88.9%, of the participants would not recoup their own payments and that the empirical failure rate would thus be considerably higher than 88.9%. The data also indicate that less than 1% of Members received the majority of all commissions.

33. On a comparison basis, the report shows that the outcome became even worse for most Members in 2013. Regarding 8 months of data for 2013, which was a peak period for number of active Memberships,[14] approximately 98.3% of all commissions were paid to Members, while 97.4% of Members in the same period received zero commissions. Further, 99.5% of Members did not recoup even their monthly dues for the period. These data further support the analysis of the structure of GIN's programs, namely that the very terms of the compensation plan doom the vast majority of participants to financial failure. Contrary to GIN's claim that its business opportunity provides a Perpetual Money-Making Machine (Para. 10), the company's programs

---

[13] Receiver's spreadsheet, *Platinum club_2012—2013_payouts* (Att. C).

[14] See receiver's report, p. 15.

are better described as a Perpetual Money-Losing Machine for the vast majority of Members.[15]

<u>Conclusion</u>

34. A critical inquiry for determining whether a pyramid exists in an MLM context is given by the Koscot test, namely whether the firm pays recruitment rewards that are unrelated to the sale of product outside the MLM network. GIN's program fully meets this test for being a pyramid. The firm offers substantial rewards for recruiting members without any requirement for retail sales; i.e., product sales outside the network.[16] By the structure of this plan, and in practice, there are no retail sales and thus no relation between payment of recruitment rewards and retail sales. The ultimate consequences are predictable and exactly what one would expect of a classic pyramid scheme: the vast majority of the rewards go to the few at the top, while the vast majority of participants (well above 90%) lose money. This outcome is dictated by the very terms of GIN's compensation plan. And since there are no sales of product outside the network, the rewards for recruitment are paid by the continual recruitment of new Members -- a hallmark of a classic endless recruitment scheme. It is exactly such an MLM organization that Koscot declared to be an elaborate chain letter device.

35. While it is true that there is no charge to be an Affiliate and it is possible to receive rewards for recruitment without being a Member, and thus not meeting the element of "the payment of money" in the Koscot test *regarding Affiliates (only)*, this possibility does not alter my con-clusion that GIN's program is a pyramid scheme. In determining whether a pyramid exists, a further critical element to consider is how the program operates in practice. This emphasis is given throughout the court's review in Omnitrition (1996). As explained earlier, an Affiliate can receive commissions on people he directly or indirectly enrolls, *but only* if those enrolled people are Members who pay a $1,000 membership fee and monthly dues. Likewise, all of the recruited Members, in order to be entitled to commissions themselves, must equally recruit new Members, who again pay the initiation fees and monthly dues, and so forth. And as also explained above, an Affiliate is strongly incentivized to be a Member and thus pay fees. The totality of this incentive structure secures the inevitable outcome that, over time, more and more people would join GIN as Members; it equally secures the outcome that participation in GIN *via Memberships* would, in due course, comprise an ever-growing majority of the participants.

36. The data in the receiver's report verify that, over time, more and more people in fact join GIN's program as Members. Starting at 31% in 2009, by August 2013 when the receiver took control, 50% of the participants were Members. Of equal and perhaps greater importance is the fact that over 90% of the commissions paid by GIN were to Members, culminating at 98% by August 2013. Further, GIN's training materials stress the importance of becoming a Member if a person wants to participate in the business opportunity. In Mr. Trudeau's presentation regarding getting started (Para. 10), he highlights the importance of becoming a Member if a person is serious about the business opportunity and wants to build a downline. The argument made there, which is hard to refute, is that it is difficult to persuade someone to spend $1,000 for Member-

---

[15] For reference below, I take note of a particular summary page in the receiver's report, (p. 37 of 45; also called Exhibit 10). This exhibit shows that in 2009, approximately 31% of all participants in GIN's programs were Members. By August 2013 when the receiver took control, 50% of the participants were Members. Over this same period from 2009 – 2013, more than 90% of the commissions paid out by GIN were to Members, culminating at 98% in 2013.

[16] As explained earlier (Para. 8), when there are no product sales outside the network then there is no source of income beyond a reliance on continual recruitment.

P a g e | **12**

ship if you, the very promoter, decline this same Membership. The fact that some non-Member Affiliates can make commissions without paying money does not negate the reality that Global Information Network, as it operates in practice, is a pyramid. The "income opportunity" by which Members receive rewards for recruiting new Members –using ongoing recruitment as both the qualifier and the source for the payment of the rewards – describes the core of the operation and confirms GIN to be a classic pyramid scheme.[17]

37. I understand that this declaration may be used in a law enforcement proceeding.

Pursuant to 28 USC Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on December 18, 2013, at Washington, D.C.

Peter J. Vander Nat, Ph. D.

---

[17] The fact that GIN created a carve-out so that some people can receive rewards without paying money may go, at most, to the extent of harm that the scheme causes, not whether a pyramid scheme exists. As the Omnitrition court noted, that some portion of an MLM's program may not be a pyramid does not exempt the firm from liability when the rest of the program is a pyramid scheme.

# FTC PXC:1 ATTACHMENT A

# RESUME

Peter J. Vander Nat, Ph.D.

<u>Telephone:</u>  (202) 326-3518 [office]

## EMPLOYMENT  EXPERIENCE

September, 1988 to Present: Senior Economist, Bureau of Economics, Federal Trade Commission, Washington, D.C.  Nature of duties: analysis and evaluation of FTC consumer protection cases and trade rules pertaining to unfair or deceptive business practices, including the determination of consumer financial injury and civil penalties.  Expert witness regarding fraudulent business opportunities; have presented federal court testimony in a number of pyramid scheme cases (see below).

September, 1983 to May, l988 and Sept. 1978 to May 1981: Asst. Professor of Economics, Hope College, Holland, MI. Courses taught: Principles of Economics, Macroeconomics (Intermediate), International Economics.

September, 1976 to May, 1977: Instructor of Economics, Calvin College, Grand Rapids, MI. Courses taught: Principles of Economics, Intermediate Microeconomics, Seminar in Economics of Underdevelopment.

January, 1975 to May, 1975: Instructor of Mathematics, Calvin College, Grand Rapids, MI. Courses taught: Calculus I and II.

## EXPERT TESTIMONY, DEPOSITIONS, AND FORMAL DECLARATIONS

<u>Federal Court Testimony</u>

FTC v. BurnLounge, Inc., (2008) CV 07-3654 GW FOMx  (C.D. California, April 26).

United States v. James Ray Phipps (2007), No. 3:06-CR-00114-1 (Dallas, TX, Apr. 30).

United States v. Robert L. Hall, Jr. (2006), Civ. No. 05-0030 (HHK) (Wash., D.C.,  Feb. 24).

FTC v. SkyBiz.com (2001), 01-CV-396-K(E) (N.D. Oklahoma., May 30).

FTC v. Equinox International Corporation (1999), CV-S-99-0969 JBR-RLH (Nevada, August 3).

FTC v. Five Star Auto Club, Inc. (1999)., Civ. No. 99-1693 (CM) (S.D.N.Y., March 8).

Peter J. Vander Nat
page 2

Deposition Testimony

FTC v. BurnLounge, Inc., (2007) CV 07-3654 GW FOMx  (C.D. California, April 26).

State of Florida v. Larry B. Groover (Life Without Debt) (2006), Civ. No.03-CF-5603 (Pensacola, Fl., Jan. 25).

FTC v. Trek Alliance, Inc. (2003), CV-02-9270 DSF (AJWx) (C.D. California., March 4).

FTC v. SkyBiz.com (2001), 01-CV-396-K(E) (N.D. Oklahoma., May 30).

State of Florida v. Unique Gems Int'l, Corporation (2001), Civ. No. 97-4977 CA 11 (Florida, December 12)*

FTC v. Equinox International Corporation (1999) , CV-S-99-0969 JBR-RLH (Nevada, August 3).

FTC v. Future Net (1998), Civ. No. 98-1113 GHK (AIJx) (C.D. California., February 17).

FTC v. Fortuna Alliance, LLC (1996), Civ. No. C96-799M (W.D. Washington, May 23).

*Further referenced under: Lewis B. Freeman v. First Union (US District Court Case No. 00-2013-CIV-HUCK, S.D. Florida).

Formal Declarations Submitted to a Court

FTC, et al. v. Fortune Hi-Tech Marketing, Inc., et al., (2013), 13-cv-123-KSF-REW (E.D. KY).

FTC v. BurnLounge, Inc., (2007) CV 07-3654 GW FOMx  (C.D. California, April 26).
– submitted several supplemental declarations and final Rebuttal Declaration (Oct. 28, 2008).

FTC v. Trek Alliance, Inc. (2002), CV-02-9270 DSF (AJWx) (C.D. California, Nov. 27).

FTC v. SkyBiz.com (2001), 01-CV-396-K(E) (N.D. Oklahoma., May 30).

FTC v. Streamline International, Inc., (2001), Civ. No. 01-6885 (S.D. California, May 19).

FTC v. Bigsmart.com, LLC, (2001) Civ. No. 01-0466 (U.S.D.C., D. Arizona).

FTC v. 2Xtreme Performance International, LLC., (1999), JFM-99CV-3679  (N.D. Maryland, Dec. 9).

Peter J. Vander Nat
page 3

Formal Declarations Submitted to a Court (continued)

     FTC v. Equinox International Corporation, (1999), CV-S-99-0969 JBR-RLH  (Nevada, Aug. 3).

     FTC v. Five Star Auto Club, Inc. (1999), Civ. No. 99-1693 (CM) (S.D.N.Y., March 8).

     FTC v. Jewelway International Inc. (1997), Civ. No. 97-383 TUC JMR (D. Ariz., June 24). State of Florida v. Unique Gems Int'l, Corporation (1997), Civ. No. 97-4977 CA 11 (Florida, March 5)

     FTC v. World Class Network, Inc. (1997),  No. SACV-97-162 AHS (EEx) (C.D. California, February 28).

     FTC v. Global Assistance Network for Charities (1996), Civ. No. 96-2494 PHX RCB (D. Arizona Nov. 5).

     FTC v. Fortuna Alliance, LLC (1996), Civ. No. C96-799M (W.D. Washington, May 23).


## PUBLIC SPEAKING AND PROFESSIONAL CONFERENCES

– Television Interview, Fox 5 Evening News, July 2002, Washington, D.C.  I was interviewed regarding local and U.S. pyramid schemes.

– American Marketing Association, Annual Conference, June 2001, Washington, D.C. I spoke on the analysis of pyramid schemes and contrast with legitimate business activities, including multilevel marketing (MLMs).

– Sixth Annual Pyramid, Franchise & Business Opportunity Law Enforcement Summit Between Federal and State Agencies, March 2000, New Orleans, Louisiana.  I spoke on analysis of pyramid schemes and the likely impact of the proposed Direct Selling Association (DSA) legislation regarding multilevel marketing (MLMs) and pyramid schemes.

– National Law Enforcement Summit on Pyramid Schemes Between Federal and State Agencies, March 1998, Atlanta, Georgia.  I was a speaker on analysis of pyramid schemes and the role of an expert witness.

– United States Technical Assistance Mission to Albania, U.S.A.I.D., Department of State, January 1997.  I was appointed by the U.S. Department of Justice to confer with government officials about Albanian pyramid schemes.

Peter J. Vander Nat
Page 4

**PUBLICATION**

Vander Nat, Peter J. and William W. Keep, "Marketing Fraud: An Approach for Differentiating Multilevel Marketing from Pyramid Schemes," Journal of Public Policy & Marketing, Volume 21 (1), Spring 2002.

**ACADEMIC TRAINING AND DEGREES:**

Education:

September, 1981 to May, 1983: University of Notre Dame, IN.
Major Field: Public Policy Economics.
Degrees: Ph.D. [Economics], May 1987;  M.A. [Economics] 1985.

September, 1974 to September, l976: Michigan State University, East Lansing, MI.
Major: Economic Theory (M.A. Graduate Studies).

September, 1969 to September, 1973: Michigan State University, East Lansing, MI.
Major: Mathematics (Graduate Studies).
Degrees: M.A. [Mathematics], 1974;  A.B.D.*, 1974.

September, 1964 to May, 1968: Calvin College, Grand Rapids, MI.
Major: Mathematics.
Degree: B.A., 1968.

*beyond the Ph.D. in economics, I have completed all requirements for the doctoral degree in mathematics, except for dissertation.  Doctoral exams completed in mathematics in Topology and Real/Complex Analysis.

# FTC PXC:1
# ATTACHMENT B

# Pyramid Sales Are Now Chief Consumer Fraud Here

## City Studies Complaints

By GRACE LICHTENSTEIN

James Green is an energetic black civil servant in his 40's who signed on with a sales outfit called the P.R.I.C.E. Club in July, 1971. He had visions of finally making "big money." Today, James Green is $5,000 in debt and his life savings are gone. He is another victim of the pyramid sales scheme.

Pyramid sales — those get-rich-quick business propositions that work on the chain-letter principle, involving an everincreasing number of participants — are currently the number one consumer fraud in the metropolitan area.

Consumer protection officials in New York, New Jersey and Connecticut say that despite mounting adverse publicity in dozens of states, including a $3.5-million suit here against a company called Holiday Magic, the schemes are simply too alluring for hundreds of gullible investors to resist.

"We explain to people that it's a fraud, that they'll probably lose money, that they'll wind up cheating their friends, and when we get all through, they still say, 'I'm going to try it,'" says Howard J. Rubin, staff attorney for the New York City Consumers Affairs Department.

The department has identified at least 19 companies now allegedly involved in pyramiding here in the city. "There's a new name every week," declared Bruce C. Ratner, the department's law-enforcement chief. "Nearly a third of our staff is bogged down with this."

And, in Connecticut and New Jersey, officials also report a growing pyramiding problem. Last month New Jersey obtained $696,700 in restitution for residents who lost money in Glen W. Turner's "Dare to Be Great" program, a motivational course. Mr. Turner also created Koscot Interplanetary, a cosmetics company like Holiday Magic.

Furthermore, the experts say that the pyramiding companies, having been hurt among white middle-class potential investors by bad publicity, are now concentrating with great success on blue-collar and white-collar blacks and Puerto Ricans.

In several of the operations, investigations have turned up alleged frauds-within-frauds, involving, among other things multiple bank loans and planned bankruptcies.

The story of the P.R.I.C.E. Club is, in some ways, typical of many unpublicized pyramiding companies.

The club was formed in Massachusetts in 1970 as a discount buying club, offering $10 yearly memberships that supposedly would entitle consumers to fat discounts on merchandise in selected stores. Under this scheme, potential investors are told they can make huge sums of money for an initial investment of up to $5,000. They buy "distributorships"; to make back their investment, they must each sign up still lower-level distributors, and so on. At the bottom of this inflated pyramid are the salesmen selling membership cards in the club (or in the case of other pyramid schemes, cosmetics, gasoline additives, clothing, wigs, etc.).

The basic pyramid scheme has been labeled inherently fraudulent by almost every consumer protection official in the country. Virginia H. Knauer, the White House consumer adviser, explained why in a recent speech:

"The bubble bursts just like the old chain letter. The problem is that within a short period of time mathematically one runs out of people [to sign up]. Two [original distributors] carried to the 29th power equals the approximate population of the United States."

In Massachusetts, P.R.I.C.E. Club quickly came under surveillance by the Attorney General. But before any legal action could be taken, the club declared bankruptcy in March, 1971, and left the state.

That same summer, P.R.I.C.E. Club Inc., headed by a Long Island entrepreneur named Roy Jaeger, became active in New York, working in almost the same way as the Massachusetts club.

Potential investors like James Green were invited to "opportunity meetings" — sales sessions, usually held in respectable hotels, in which frantic pitchmen described the pot of gold awaiting distributors.

James Green (that is not his real name) said he was told he could make $4,000 in three months for an initial investment of $105 just for selling membership cards. Soon, he was lured into a bigger investment for a distributorship.

Mr. Green did not have the required $2,500 in his savings account. That was no problem, the club officers told him, because First National City Bank was writing personal loans for just such investments.

In fact, the August, 1971, club newsletter advertised such loans saying that "after thorough investigation" the bank had found the club to have "definite" status. Citibank loan applications were prominently displayed at "opportunity meetings."

Mr. Green and at least others got Citibank loans. Last week, a bank spokesman said that the bank "didn't know" the club was involved in pyramid sales. "We did not know it was a fraud. Should we investigate the proceeds of every loan? the spokesman asked. He added that the club had been recommended to the bank as a good outlet for loans by one of the bank's "good customers."

With his loan, and subsequent loans, Mr. Green and other distributors enthusiastically went about luring friends, relatives and colleagues into investment. They also tried to line up additional stores at which members could get discounts. They promised a cut of commissions paid by the stores to the club no member sales.

According to Mr. Green and other distributors, all whom asked to remain anonymous because of their embarrassing financial predicament, a black man named

Continued on Following Page

The New York City Department of Consumer Affairs is investigating complaints about the following companies allegedly using pyramid sales:

Action Industries (fuel additive), Alexander Taylor (clothes), Amperiprise (home cleaning products), Bestline (soap products), Bob Cummings Inc. (vitamins), Cash-chek (buying club), Computerco (buying club), Dare to Be Great (motivation course), Futuristic Foods, Galaxy Foods, Golden Products (household items), Guardante (fire and burglar alarms), Holiday Magic (cosmetics), Koscot (cosmetics), P.R.I.C.E. Club (buying club), Princess Club of America (hosiery and cosmetics), Regency Ltd., Sta-Power (fuel additive and Steel (fuel additive).

According to the department, one parent company, U. S. Universal Inc., owns Holiday Magic, Ameriprise, Sta-Power, Alexander Taylor and Bob Cummings. Koscot and Dare to Be Great are both Glen W. Turner enterprises.

Arthur Moore, the club's sa manager, played a major r in lining up investors, able 50 per cent of whom we black.

By January, 1972, the c was having difficulties. Members complained that the counts they were gett were tiny; distributors we not getting their commissio

In June, 1972, the club fi a Chapter XI petition in ba ruptcy court, a procedu that allows a debtor to ret possession of his compa

The New York City Department of Consumer Affairs is investigating complaints about the following companies allegedly using pyramid sales:

as this time, according to John Snyder, a Brooklyn man who is president of the distributors' association, there were about 700 major and minor investors in the scheme.

At the same time, Mr. Jaeger's lawyer, William J. Henry, negotiated a deal turning over operations of the old club to a new, separate one. P.R.I.C.E. Club Ltd., headed by William J. Peters.

Thus, the new club was able to continue to solicit without paying renewals and collect commissions from stores without paying anything to the distributors, whose contracts were with the old club. The old club was finally adjudicated bankrupt last November.

The distributors attempted to get help from the bankruptcy referee, Edward J. Ryan, and from consumer agencies by charging in person and in letters that the bankruptcy had been planned all along, just as it had been in Massachusetts, that Mr. Jaeger and others had somehow made $600,000 in funds disappear, that the new P.R.I.C.E. Club was swindling them out of commissions and that the old club had used a false business address.

The letters to Mr. Ryan were never answered, according to Mr. Snyder.

### Question of Jurisdiction

Consumer protection agencies offered the distributors little relief, saying they were not sure they had jurisdiction over the case. When the distributors complained to Attorney General Louis J. Lefkowitz, they were told to try District Attorney Frank S. Hogan. Mr. Hogan's office told them to try United States Attorney Whitney North Seymour Jr. Mr. Seymour's office told them to try the Federal Bureau of Investigation. The F.B.I. is now looking into the case.

The city's Consumer Affairs Department sent form-letter replies to two letters. Mr. Ratner, the law-enforcement chief, explained that the department felt it would have only a slim chance of getting refunds from a bankrupt company.

"Our strategy was to get the biggest [pyramider] and make an example of it," he said, referring to the city's suit against Holiday Magic.

Roy Jaeger, the old club's president, now lives in Florida. Attempts to find him there were unsuccessful and his lawyer, Mr. Henry, was unavailable.

The old club apparently did list a false address on its court papers—320 East 23d Street. Neither Mr. Jaeger nor the club is listed as a tenant in the modern highrise apartment building now, and the managing agent, Goodstein Building Corporation, said the building has never had such tenants.

### New Club's Stand

Mr. Peters, head of the new club, says multilevel distributorships are no longer being sold. He says the old club's distributors could start selling memberships again if they wanted to, but have instead made an attempt in the bankruptcy court to get their money back. The distributors say Mr. Peters will not honor their cards unless they sign a new agreement with him.

"I have no legal obligation to them," Mr. Peters said in a telephone interview.

Mr. Moore, the old club's sales manager, is now president and a major stockholder in a new discount buying outfit, the Diamond Club, that says it does not use multilevel sales. Mr. Moore says he personally lost $18,000 in the P.R.I.C.E. Club. But he added, "It's a tax loss." He has $60,000 invested in the Diamond Club.

As for James Green, there no longer seems a pot of gold at the end of the pyramid rainbow. "We thought it would work," he says now. "We were so naive. We were so gullible."

Alexander H. Rockmore, lawyer for the bankruptcy trustee, summed up the entire bankruptcy case by saying. "The whole thing smells."

Mr. Rockmore said that the bankruptcy court could have done hardly anything to help the distributors because, along with other conducts, "under the Bankruptcy Act, they're all equally stuck." The court "should have gone deeper" in investigating the deal that turned operations from the old club over to Mr. Peter's new club, he said.

Of the victims, Mr. Rockmore concluded sorrowfully: "Unfortunately, the world is full of saps."

PXC:1; Attachment B

# FTC PXC:1
# ATTACHMENT C

Platinum club_2012--2013_payouts  (from Receiver)

| Month Earned | Quantity Eligible | Per Person | Total Payout 2% of revenue | Indicated Revenue |
|---|---|---|---|---|
| 1/1/2012 | 397 | $ 200.37 | $ 79,546.89 | 3,977,344.50 |
| 2/1/2012 | 319 | $ 200.10 | $ 63,831.90 | 3,191,595.00 |
| 3/1/2012 | 238 | $ 264.18 | $ 62,874.84 | 3,143,742.00 |
| 4/1/2012 | 153 | $ 418.75 | $ 64,068.75 | 3,203,437.50 |
| 5/1/2012 | 117 | $ 505.77 | $ 59,175.09 | 2,958,754.50 |
| 6/1/2012 | 148 | $ 351.22 | $ 51,980.56 | 2,599,028.00 |
| 7/1/2012 | 99 | $ 494.72 | $ 48,977.28 | 2,448,864.00 |
| 8/1/2012 | 87 | $ 953.49 | $ 82,593.63 | 4,129,681.50 |
| 9/1/2012 | 78 | $ 774.58 | $ 60,417.24 | 3,020,862.00 |
| 10/1/2012 | 84 | $ 1,159.90 | $ 97,431.60 | 4,871,580.00 |
| 11/1/2012 | 73 | $ 812.21 | $ 59,291.33 | 2,964,566.50 |
| 12/1/2012 | 80 | $ 752.50 | $ 60,200.00 | 3,010,000.00 |
| 1/1/2013 | 78 | $ 787.61 | $ 61,433.58 | 3,071,679.00 |
| 2/1/2013 | 74 | $ 607.38 | $ 44,946.12 | 2,247,306.00 |
| 3/1/2013 | 74 | $ 525.36 | $ 38,876.64 | 1,943,832.00 |
| 4/1/2013 | 70 | $ 604.92 | $ 42,344.40 | 2,117,220.00 |
| 5/1/2013 | 58 | $ 592.97 | $ 34,392.26 | 1,719,613.00 |
| 6/1/2013 | 53 | $ 647.06 | $ 34,294.18 | 1,714,709.00 |
| 7/1/2013 | 53 | $ 584.76 | $ 30,992.28 | 1,549,614.00 |
| | avg --> | $ 591.47 | $ 1,077,668.57 | |
| | months = | 19.00 | | |
| | total = | $ 11,237.85 | | |