## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No. 03-C-3904 |
| | ) |
| v. | ) Hon. Robert W. Gettleman |
| | ) |
| KEVIN TRUDEAU, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER DECLARING THAT CERTAIN DOCUMENTS ARE NOT PRIVILEGED OR, IN THE ALTERNATIVE, FOR *IN CAMERA* REVIEW OF CERTAIN DOCUMENTS TO DETERMINE WHETHER THEY ARE PRIVILEGED

### I.       Introduction

In connection with the FTC's ongoing effort to collect assets that Defendant Kevin Trudeau still owes his victims, Trudeau's now-estranged wife, Natasha Babenko, provided the FTC with a box of documents. Based on her recent testimony, the FTC has reason to believe these documents may assist in its efforts to locate assets Trudeau secreted overseas, rather than pay the Court's $37,616,161 judgment.[1] To assist these collection efforts, the FTC has scheduled Trudeau's deposition for December 9, 2022. Reviewing the documents at issue is essential to fully and meaningfully conducting this deposition.

---

[1] This Court ordered Trudeau to pay $37,616,161 "forthwith" and ordered the FTC to use the funds to redress injured consumers. Trudeau has not voluntarily turned over any funds. Nonetheless, redress is being conducted with assets the Receiver recovered, and thus far the FTC has returned $5,384,036.35 to consumers.

The documents might also assist the FTC in responding to an order from Judge Guzman, in *United States v. Trudeau*, No. 10-cr-886 (N.D. Ill.). Trudeau recently (and falsely) asserted to Judge Guzman that redress in the instant case has been completed and Trudeau is owed a refund. *United States v. Trudeau*, ECF No. 233. Judge Guzman invited the FTC to respond to Trudeau's claim and advise on our collection efforts. *United States v. Trudeau*, ECF No. 235.

As discussed below, Trudeau waived any potential privilege that may have applied to the documents at issue in this motion. Nonetheless, given how the agency received them, out of an abundance of caution, the FTC requests the Court issue an Order deeming the documents not privileged, or alternatively, that the Court conduct an *in camera* review of the documents to determine that no privilege applies, or where applicable, that the crime-fraud exception vitiates any potentially applicable privilege.

## II. Background

### a. Trudeau repeatedly refused to comply with this Court's orders.

As the Court may recall, Trudeau sold products he claimed would "cure numerous diseases, such as multiple sclerosis, cancer, substance abuse addictions, and arthritis (among many others); reverse hair loss; improve memory; and . . . cause dramatic and permanent weight loss." ECF No. 93 at 1. Following protracted litigation with the FTC over claims like these, the Court held Trudeau in contempt five times and ordered him to pay a $37 million judgment.

Based on Trudeau's penchant for lying, the Court has developed a healthy skepticism for his representations. *See, e.g.*, *FTC v. Trudeau*, No. 03 C 3904, 2012 WL 3580673, at *1 (N.D. Ill. Aug. 17, 2012) ("Trudeau has little to no credibility with the court, and his criticism of the FTC's collection efforts for the benefit of the consumers on whose behalf the FTC has successfully prosecuted this action is totally misplaced."); *FTC v. Trudeau*, 708 F. Supp. 2d 711,

716 (N.D. Ill. 2010) ("Trudeau has little credibility with this court."), aff'd, 662 F.3d 947 (7th Cir. 2011).  When Trudeau repeatedly refused to pay or disclose his assets to the FTC and the Court-appointed Receiver, the Court coercively incarcerated Trudeau to secure his compliance. *See, e.g.*, ECF No. 751.  He did not comply, and still has not.

This Court initially released Trudeau after one day of coercive incarceration. ECF Nos. 752 and 753.  However, when Trudeau refused—as he always has—to disclose and turn over the money he took from consumers, the Court again coercively incarcerated him.  ECF No. 780; *see also* ECF No. 772, *as amended* ECF No. 773.  This Court only released him so he could assist with his criminal defense.  *See* ECF No. 788; *see also* ECF No. 801.

On November 12, 2013, a jury found Trudeau guilty of criminal contempt. *United States v. Trudeau*, ECF No. 114.  Thereafter, this Court resumed Trudeau's (civil) coercive incarceration while the criminal proceedings entered the sentencing phase.  *FTC v. Trudeau*, ECF No. 801.  Judge Guzman imposed a ten-year sentence on March 17, 2014.  Two days later, this court suspended Trudeau's civil incarceration during the pendency of his prison term and ordered him to report to the Court upon his release.  ECF No. 844.   The Bureau of Prisons ("BOP") recently released Trudeau, yet he never reported to the court as ordered.  The FTC has noticed his deposition for December 9 as part of our ongoing efforts to enforce the Court's order that Trudeau reimburse his victims.

### b.    Trudeau used Babenko to hide entity ownership and assets.

Trudeau used his wife Natasha Babenko's name to shield his assets from collection.  Ex. 1 at 26-27.  Specifically, Trudeau and accomplice Marc Lane forged

power of attorney forms and retainer agreements in Babenko's name.  *Id.* at 27.

Furthermore, Trudeau named Babenko as a bank signatory, corporate officer, owner of

offshore trusts, and nominee for transactions acquiring casino chips and gold bars.  ECF

No. 713 at 8 (proposed finding); see also ECF No. 742 (adopting findings); Ex. 1 at 312.

Unsurprisingly, Babenko was shocked to see a list "of the business entities that [she]

allegedly managed and controlled, which [she] had never seen before and knew nothing

about." Ex. 1 at 26.

      To bolster his claims that Babenko controlled substantial assets, Trudeau claimed

she was a "successful businesswoman in her own right."  ECF No. 508 at 5.  Trudeau's

claims – like most of Trudeau's statements – are false.  In fact, the Court ultimately found

"no evidence" to support Trudeau's claim that Babenko was a successful businesswoman,

ECF No. 713 at 8 (proposed finding); *see also* ECF No. 742 (adopting finding).  To the

contrary, the Court found that Trudeau was in control of the assets he claimed were

Babenko's.

      Prior to the Court's decision, the FTC took Babenko's 2013 deposition to probe

the veracity of Trudeau's contention.  At that deposition, Trudeau arranged for counsel to

nominally represent Babenko.  She had not ever met "her" attorney before arriving at the

deposition, and he told her he was no longer her lawyer immediately following the

deposition. Ex. 1 at 35-36.  At the lawyer's behest, Babenko asserted her Fifth

Amendment privilege in response to almost every question in her deposition, including

numerous questions related to Trudeau's assets.  Exhibit 1 at 149-303; *see also* ECF No.

713 at 3 (proposed finding); ECF No. 742 (adopting findings).[2]  However, the Trudeau-

---

[2] Exhibit 1 at 233-234. "Q. You possess gold bars? A. I take the Fifth.  Q. You received these gold

arranged lawyer did not explain, nor did Babenko understand, what it meant to "take the Fifth." Ex. 1 at 35.

Trudeau and Natasha Babenko have lived apart since 2012. Ex. 1 at 16. In May 2021, Babenko filed for annulment, alleging Trudeau obtained her consent to marry by fraud. *Id.* Trudeau stipulated to this petition on May 25, 2022. Ex. 1 at 17. The uncontested annulment proceeding is scheduled for November 11, 2022.

### c. Trudeau has moved considerable assets to Zurich and otherwise hidden assets rather than pay his judgment.

As this Court has already found, Trudeau has gone to great lengths to hide his assets. For example, he hired Marc Lane to provide asset protection advice. When the FTC sought discovery of this advice, Mr. Lane refused to comply, asserting attorney/client privilege. The Court disagreed, finding the FTC had "established prima facie evidence sustaining the crime/fraud exception to the attorney/client and work product privilege." ECF No. 661.

Trudeau also communicated with an offshore asset protection adviser during the midst of mounting civil and criminal contempt proceedings, asking for both a bank with a safety deposit box and "a place in Switzerland where [he] can buy gold." Exhibit 1 at 305. In 2008 alone, Trudeau purchased $100,000 in gold bars. ECF No. 713 at 20 (proposed finding); *see also* ECF No. 742 (adopting finding). Significantly, in Babenko's recent deposition taken in furtherance of the FTC's collection efforts, Babenko confirmed that she saw Trudeau with gold bars in his Zurich apartment. Ex. 1 at 47, 49.

---

bars from Golden Lion Mint? A. I take the Fifth. Q. Although you received the gold bars from Golden Lion Mint, the gold bars are actually the property of Kevin Trudeau? A. I take the Fifth. Q. Although you received the gold bars from Golden Lion Mint, the gold bars are actually controlled by Kevin Trudeau? A. I take the Fifth. Q. Neil Sant went to Asheville to swap gold bars at Golden Lion Mint because Trudeau instructed him to? A. I take the Fifth. Q. You never instructed Neil Sant to go to Asheville and swap gold bars? A. I take the Fifth."

Moreover, Trudeau spent tens of thousands on jewelry. ECF No. 713 at 20 (proposed finding); *see also* ECF No. 742 (adopting finding). In fact, Trudeau bought so much expensive jewelry that Babenko joked, "are you going to open a jewelry store?" Ex. 1 at 48. For example, as Babenko recently testified, Trudeau had approximately a dozen "customized diamond rings." *Id*. In addition, Babenko described "[w]atches, yes, a lot of watches. Diamond watches. . . . all encrusted in diamonds[,]. . . . [all] famous brands." *Id*.

These assets are likely all stored in Zurich. Indeed, Babenko recently testified that Trudeau moved so many of his belongings to Switzerland, she felt he "recreated his life in the United States." Ex. 1 at 59.[3] Babenko further testified that when she initially went to Trudeau's Zurich apartment, it "was the first time like I realized, well, he's really rich." Ex. 1 at 75. Babenko described Trudeau's apartment in Zurich as "[o]verwhelming luxury." *Id*. Babenko noted the presence of expensive furnishings including artwork, antiques, and even gold or diamond-encrusted smaller items like cutlery. *See* Ex. 1 at 76.

To ascertain exactly what Trudeau has moved to Zurich, and to fully question Trudeau about his assets, the FTC must look at the documents from Babenko. The documents Babenko provided to the FTC come from two places: (1) Trudeau's house in Oak Brook, Illinois, and (2) a storage facility in Zurich, Switzerland.

### d. Trudeau employees turned over the documents to Babenko.

In the summer of 2013, Babenko went to the Oak Brook, Illinois residence she shared with Trudeau, to look for her personal documents. Ex. 1 at 84. At the time, she told Trudeau that she was looking for her personal documents in the house. Ex. 1 at 102. He did not try to

---

[3]"I showed up in Zurich and I looked at this and I was like, whoa, he like moved a lot of stuff." Ex. 1 at 74; "Q. Okay. So when you were in Zurich in January 2013, did you see any assets in the apartment? A. Yes. Q. What did you see? A. Gold, silver, jewelry, stones." Ex. 1 at 47.

help or hinder her search.[4]  Babenko asked an employee of Trudeau's for help searching for her documents.  The employee narrowed down for Babenko which boxes to look in.  Ex. 1 at 137.  The employee left the room and never returned to check on Babenko.  Ex. 1 at 138.  Babenko left the house with a box of documents. Ex. 1 at 137.  No one tried to prevent Babenko from taking documents.  No one asked Babenko what documents she took.  No one asked Babenko to bring any documents back.  Ex. 1 at 128-129.  Babenko shipped the documents from the Oak Brook, Illinois residence to her apartment in New York City.  Ex. 1 at 125.

After the Court incarcerated Trudeau, Babenko returned to Zurich, hoping to retrieve some personal belongings.  Ex. 1 at 90-91.  When she arrived at Trudeau's apartment, the locks had been changed.  Ex. 1 at 91.  Babenko called Trudeau's employee, Lee Kenny, who met her at a storage facility.[5]  Lee Kenny signed them both in and gave Babenko access to the unit.  Kenny allowed Babenko fifteen minutes to look through the storage unit and take whatever she wanted.  Ex. 1 at 92, 98.  Babenko testified that Lee Kenny oversaw the storage facility:

> QUESTION:     Did [Kenny] indicate in any way that he didn't have the authority to let you into that facility?
>
> BABENKO:      No, no.  He indicated to me that he is the only one who has the authority . . . .
>
> QUESTION:     But he never said . . . I shouldn't be letting you in here?
>
> BABENKO:      No, no.  No, no, no.  It felt very – I mean, it felt very organic.  Like he should – he should and he is the only one who could do this. . . .  Like there is no other person that

---

[4] "Q. …So you told him you were looking for your documents in the house? A. Yes. Yes, yes, yes. Well, I mean, I'm going to look for my stuff and that's it." Ex. 1 at 102:21-24. "A. I'm going to look for it, you know? He didn't say anything. He preferred not to talk to me at all."  Ex. 1 at 131-132.

[5] Lee Kenny moved to Zurich to work with Trudeau.  Ex. 1 at 83.  When asked about their relationship, Babenko testified unequivocally that Trudeau was Lee Kenny's boss, "But one thing I will tell you . . . [is] that the power dynamic between Lee Kenny and Kevin never changed, never once.  It was always Kevin who was the boss." Ex. 1 at 123.

> could possibly do [this]. . . .  There was no [one else] who
> worked with Kevin like he did.

Ex. 1 at 117-18.  During the fifteen minutes Lee allotted her to search the storage facility,

Babenko loaded a cart of documents – seven suitcases' worth – and went to Ukraine.  Ex. 1 at

100.  She subsequently brought a portion of those documents from Ukraine to the United States.

Ex. 1 at 100-101.

Lee Kenny did not inventory what Babenko took from the facility.  Ex. 1 at 120.  He did

not inquire about what documents she took.  Ex. 1 at 120-121.  He never asked her to return any

of the documents.  Ex. 1 at 98.  No other employee of Trudeau's asked her about the documents.

Ex. 1 at 108.  Nor did Trudeau himself.  In fact, when he did reach out to Babenko, he only asked

her about his cufflinks.[6]  Ex. 1 at 112.

Babenko sent a box of these documents to FTC Investigator Adam Rottner in October

2020.  Ex. 1 at 11-12.  Once Mr. Rottner received the documents, he began to categorize them

into broad groups.  Ex. 1 at 12.  During that process, he noticed potentially privileged documents

and immediately stopped the review.  *Id.*  Subsequently, Mr. Rottner arranged a filter review by a

person separate from the Trudeau case team.  *Id.*

The filter review enabled the FTC to separate the materials into three groups:  (1)

potentially privileged documents, (2) non-privileged documents, and (3) foreign language

documents.  *Id.*  Due to resource constraints, no one reviewed any of the three groups of

documents following the filter process, including the set of nonprivileged, English materials.  *Id.*

---

[6] Additionally, as relevant to a potential marital privilege claim, Trudeau never described these
documents to Babenko, he never showed them to her, and he never asked her to read them.  Ex. 1 at 110.

The FTC, out of an abundance of caution, now seeks judicial review to determine that each set of documents is non-privileged.

## III.    Argument

To assess any potential privilege claim, federal common law applies.  Fed. R. Evid. 501; *see also EEOC v. Ill. Dep't of Emp't Sec.*, 995 F.2d 106, 107 (7th Cir. 1993)("When federal law governs, as it does here, only privileges recognized by the national government matter."). Critically, "[t]he party seeking to invoke the privilege has the burden of establishing all of its essential elements."  *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (citing *United States v. First State Bank*, 691 F.2d 332, 335 (7th Cir. 1982)).

As demonstrated below, Trudeau cannot meet his burden for either of the two potentially applicable privileges:  attorney-client and marital confidential communications.  Moreover, even if he could, the evidence establishes that Trudeau waived any applicable privilege.  If the Court determines that it cannot assess whether Trudeau waived any potential privileges without conducting an *in camera* review, the FTC requests that the Court also consider whether the crime-fraud exception vitiates any potential privilege.

### a.    The documents provided by Babenko are not protected by the attorney-client privilege.

Disclosure of privileged material by the holder of that privilege waives the privilege. *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 477 (N.D. Ill. 2002); *Powers v. Chi. Transit Authority*, 890 F.2d 1355, 1359 (7th Cir. 1989)("Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the attorney-client confidential relationship and thus waives the privilege.")(citing *United States v. Buljubasic*, 808 F.2d 1260,

1268 (7th Cir. 1987); 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2016 (1971)).

Trudeau necessarily effectuated such a waiver, either when he gave the documents to his employees or when those employees subsequently gave them to Babenko. He cannot have it both ways. First, Trudeau waived the privilege when he handed the documents over to his employees' care. These employees are strangers to his personal attorney-client relationship, and typically "privilege is waived when the documents are disclosed to an agent for a purpose unrelated to the rendition of legal advice or protection of a legal interest." *Flagstar Bank, FSB v. Freestar Bank, N.A.*, No. 09 C 1941, 2009 U.S. Dist. LEXIS 76842, at *14 (N.D. Ill. Aug. 25, 2009)(internal cites omitted); *see also United States v. Brown*, 478 F.2d 1038, 1040 (7th Cir. 1973) ("[A]lthough the attorney-client privilege may in some instances extend to communications to accountants providing assistance to an attorney, '[w]hat is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting service, . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.")(quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).

Conversely, even if these employees were agents who were somehow aligned with Trudeau's personal legal interests, waiver occurred when those agents disclosed the material to to Babenko. "Agents" can waive attorney-client privilege if they have the authority to do so. *Hobley v. Burge*, No. 03 C 3678, 2004 U.S. Dist. LEXIS 14323, at *7 (N.D. Ill. July 23, 2004)(citing McCormick on Evidence §§ 92-93 (2d ed. 1972)). Moreover, where the agent "disclaims the authority to waive the privilege, it cannot claim the authority to assert it." *ARTRA 524(g) Asbestos Tr. v. Transp. Ins. Co.*, No. 09 C 458, 2011 U.S. Dist. LEXIS 110272, at *27

10

(N.D. Ill. Sep. 28, 2011) (citation omitted); *see also CFTC v. Weintraub*, 471 U.S. 343, 348-49 (1985) (noting that if an agent has authority to assert a corporation's attorney-client privilege, the agent also has authority to waive it).

In *Powers v. Chicago Transit Authority*, 890 F.2d 1355 (7th Cir. 1989), the Seventh Circuit summed up these mutually exclusive positions:

> If Powers obtained the memo from someone who could not maintain the privilege but who the CTA allowed to have access to the memo, or if Powers obtained the memo from someone who had authority to waive the privilege, the memorandum was not entitled to the protection of the attorney-client privilege. If, however, Powers obtained the memo from someone who was not supposed to have access to the memo or who did not have authority to waive the attorney-client privilege, the district court could find that the memo was protected by the privilege.

*Id.* at 1359. Thus, when Trudeau gave custody of his documents to his employees, he either voluntarily waived any privilege, or the employees necessarily had the authority to waive it on his behalf.

Put differently, at the Oak Brook residence, and at the storage facility in Zurich, Trudeau handed custody of all the documents to an employee. Subsequently, these employees turned over the documents to Babenko without reserve. Therefore, waiver occurred either when Trudeau disclosed to his employees or when the employees disclosed to Babenko, and it is Trudeau's burden to explain which.

        **b.**    **The documents provided by Babenko are not subject to the marital confidential communications privilege.[7]**

None of the documents are covered by the marital communications privilege. "The marital communications privilege covers 'information privately disclosed between husband and

---

[7] The other spousal privilege – testimonial privilege is not at issue here, as "the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." *Trammel v. United States*, 445 U.S. 40, 53 (1980).

11

wife in the confidence of the marital relationship . . .'" *United States v. Brock*, 724 F.3d 817, 820 (7th Cir. 2013) (quoting *Trammel*, 445 U.S. at 51).

The confidential communications privilege, however, only protects "what one spouse communicates to the other, not what one spouse learns about the other in other ways, such as by observing the other's actions." *United States v. Brock*, 724 F.3d 817, 820-21 (7th Cir. 2013) (citing *United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992)); *see also Abbott v. Kidder, Peabody & Co.*, No. 97 C 3251, 1997 U.S. Dist. LEXIS 8500, at *13 (N.D. Ill. June 12, 1997) (citing *United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992).[8] Here, there is no marital confidential communications privilege for three reasons.

First, there was no communication between Trudeau and Babenko – let alone a confidential communication. Babenko testified that Trudeau never showed her these documents, never asked her to read them, and never called her attention to these documents in any way. There can be no confidential communication without a communication. *See* Ex. 1 at 110.

Second, even if there were such communications, there was no valid marriage. The "cases make clear that [the Courts] 'interpret[] strictly the valid marriage' requirement in the testimonial privilege context. . . [and] are not inclined to extend the privilege to cases in which a valid marriage does not exist." *United States v. Hamilton*, 19 F.3d 350, 354 (7th Cir. 1994) (internal cites omitted).

Here, although the annulment has not yet been finalized, Trudeau has stipulated to the facts and the petition stating that the marriage was not valid. Specifically, he stipulated that a

---

[8] Like the attorney-client privilege, the marital confidential communication privilege can be waived through disclosure to a third party. *Cornerstone Assurance Grp., Inc. v. Harrison*, No. 17 CV 4718, 2017 U.S. Dist. LEXIS 165735, at *14 (N.D. Ill. Oct. 5, 2017)(citing *United States v. Hamilton*, 701 F.3d 404, 407 (4th Cir. 2012)).

valid marriage never existed.  In so stipulating, Trudeau necessarily admits that none of his communications with Babenko were ever subject to the privilege because a necessary element for its assertion, a valid marriage, was never present.[9]  Trudeau certainly understood the ramifications of an annulment.  Indeed, he had two other marriages annulled based on fraudulent inducement.  Ex. 1 at 25.

Third, Trudeau and Babenko have been separated since 2012, before she took the first batch of documents from the Oak Brook residence, and "communications made during a permanent separation are not privileged."  *United States v. Byrd*, 750 F.2d 585, 594 (7th Cir. 1984).  As the Seventh Circuit observed, "there is little societal interest in protecting the confidential relationship of permanently separated couples."  *Id.* at 593.  Any communications made after 2012, therefore, are not privileged confidential communications.  Thus, the disclosures at issue here are not privileged.

c.      **Alternatively, the Court should conduct an *in camera* review of the documents in question.**

If the Court were not to find sufficient basis to determine Trudeau has waived attorney-client privilege and no marital communications privilege exists, an *in camera* review would be appropriate to determine:  (i) first, if any of the documents are, in fact, covered by the attorney-client or marital communications privileges, and (ii) second, if any are whether the crime-fraud exception applies because they involve efforts to violate the Court's order to pay.

In the highly unlikely event the Court were to find any documents privileged and that privilege was not waived, the Court needs to determine whether those documents are subject to

---

[9] This stipulation precludes Trudeau from meeting his burden to establish the privilege, regardless of the outcome of the annulment proceeding.

the crime-fraud exception.  The court has the discretion to conduct such a review once the FTC "show[s] a 'factual basis adequate to support a good faith belief by a reasonable person' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Heriot v. Byrne*, 257 F.R.D. 645, 657 (N.D. Ill. 2009) (internal cites omitted).

Attorney-client "privilege is [] forfeited if the attorney is assisting his client to commit a crime or a fraud." *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007) (quoting *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 769 (7th Cir. 2006)). Pursuant to 18 U.S.C. § 401(3), "criminal contempt is a crime, like all other crimes."  *In re Troutt*, 460 F.3d 887, 893 (7th Cir. 2006) (citing *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)). The elements of criminal contempt under Section 401(3) are "(1) a lawful and reasonably specific order that (2) the defendant has violated (3) willfully." *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1242 (11th Cir. 2007) (citation omitted); *see also United States v. NYNEX Corp.*, 8 F.3d 52, 54 (D.C. Cir. 1993) (same).

Therefore, any communication discussing or advising Trudeau how to violate his order to pay – by hiding or moving assets – would be in furtherance of a crime.  If that communication were from an attorney, any attorney-client privilege would be vitiated by the crime-fraud exception.

The FTC must "present prima facie evidence that gives color to the charge by showing some foundation in fact. Such evidence then allows the district court to require the defendant to come forward with an explanation for the evidence offered against the privilege. The district court then exercises its discretion in accepting or rejecting the proffered explanation." *United*

*States v. Boender*, 649 F.3d 650, 655-56 (7th Cir. 2011) (citations, alterations, and quotations omitted).

The FTC has not reviewed the documents at issue but has otherwise presented evidence demonstrating a wealth of factual support for the charge. First, Trudeau has repeatedly sought advice from "asset protection" professionals to avoid complying with his order to pay. In fact, this Court previously found that the FTC established prima facie evidence that Marc Lane advised Trudeau on how to defraud the government. ECF Nos. 626 and 661 ("The court . . . finds that plaintiff FTC has established prima facie evidence sustaining the crime/fraud exception to the attorney/client and work product privilege. *See United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007))." Second, Trudeau has moved significant assets to Zurich. Ex. 1 at X. Third, Trudeau has still not complied with his order to pay. As such, an *in camera* review would be appropriate, and any documents involving efforts to hide assets would be subject to the crime-fraud exception.

**IV.    Relief Requested**

For all the reasons noted above, the FTC requests the Court to issue an order deeming the documents from Babenko not privileged. Alternatively, the FTC requests an *in camera* review of the documents so the Court can make a document by document determination that no privilege applies, or that the crime-fraud exception negates any potential privilege.

Dated: November 4, 2022                            Respectfully Submitted,


_____/s/_____
Jonathan Cohen (jcohen2@ftc.gov)
Crystal Ostrum (costrum@ftc.gov) (pro hac vice pending)
Federal Trade Commission
600 Pennsylvania Ave., N.W. CC-6316
Washington, DC 20580
Phone: 202-326-2551; -3405

## <u>Certificate of Compliance with Local Rule 37.2</u>

Counsel for the parties, Jonathan Cohen for the FTC and Kimball Anderson for defendant Trudeau, held a meet and confer on November 3, 2022.  After consulting by telephone and making good faith attempts to resolve differences, the parties were unable to reach an accord.


_____/s/_____
Jonathan Cohen
(202) 326-2551; jcohen2@ftc.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan Cohen, hereby certify that on November 4, 2022, I caused to be served true copies of the foregoing by electronic means, by filing such documents through the Court's Electronic Case Filing System, which will send notification of such filing to:

Kimball Richard Anderson
kanderson@winston.com

I will also cause an electronic copy to be served on:

Giel Stein, Esq.
GStein@clarkhill.com

/s/
Jonathan Cohen
(202) 326-2551; jcohen2@ftc.gov

18