**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | CASE NO. 03-C-3904 |
| vs. | |
| KEVIN TRUDEAU, | HON. ROBERT W. GETTLEMAN |
| Defendant. | |

**KEVIN TRUDEAU'S MOTION TO CONTINUE**
**COERCIVE INCARCERATION HEARING**

Kevin Trudeau respectfully moves this Court to continue for 30 days the portion of the December 15, 2022, hearing that is intended to address whether to resume his coercive incarceration because that inquiry is no longer needed. Trudeau is willing and able to pay whatever amount that the Court determines he owes, if any, pursuant to the Consumer Redress Plan. As explained below, however, uncertainty exists regarding the amount owed by Trudeau under the Consumer Redress Plan. Contrary to the FTC's apparent misunderstanding, there is no outstanding $37 million fine that Trudeau must satisfy by turning over every dollar he earns from now until that debt is satisfied. Moreover, no need exists to coerce Trudeau to do anything; he simply needs to know what, if anything, he still owes before commencing his payments. That is all Trudeau has been trying to determine since even before his release from prison, as he wrote to this Court in January 2020: "I wish to obey all your orders without hesitation going forward." Doc. #970 at 1.

**Background**

Following remand by the United States Court of Appeals for the Seventh Circuit directing this Court to explain the monetary sanction imposed after this Court found Trudeau in contempt of court, this Court entered a Memorandum Opinion and Order (Doc. #335) addressing the issues

raised by the court of appeals. The Court explained that the sanction awarded against Trudeau in the amount of $37,616,161 reflected a reasonable estimate of loss suffered by consumers who purchased Trudeau's *Weight Loss Cure* book. The Court accepted the FTC's calculation that $37,616,171 represented direct customer sales revenues less returns. The Court rejected Trudeau's argument that any sanction should be limited to disgorgement of the lesser amount he actually received.[1] The Court, however, confirmed its earlier rulings that the $37,616,161 sanction was not a fine payable to the FTC, stating that the FTC:

> is confident that it can distribute the $37.6 million to most all of the victims of Trudeau's fraudulent conduct. To the extent that any of these consumers cannot be found or reimbursed, the FTC has proposed to refund the excess left over after deducting Trudeau's profits and costs of administration to Trudeau. In the exercise of its discretion the court declines to reduce any refund to Trudeau by the amount of his profits from the sale of Weight Loss Cure book, because those profits might be subsumed in the award of consumer loss. Given the history of this case and his willful misconduct, Trudeau can ask for no more.

*Id.* at 12.

As an attachment to its Memorandum Opinion and Order dated April 16, 2010, the Court entered a Supplemental Order Modifying the Stipulated Final Order for Permanent Injunction and Awarding Monetary Relief as to Defendant Kevin Trudeau. *Id.* at 19. Among other things, this Supplemental Order directed Trudeau to pay $37,616,161 to the FTC to fund consumer redress. The Supplemental Order provided that:

---

[1] Trudeau sold the right to market his *Weight Loss Cure* book to an entity, not affiliated with Trudeau, known as ITV Global, Inc. ("ITV"). Although Trudeau was entitled to receive a royalty on the sales, he did not receive the expected royalty because the FTC obtained a separate judgment in the amount of $37,616,116 against ITV and its affiliated entities on November 16, 2012. *See FTC v. Direct Marketing Concepts Inc.*, Civ. No. 07-11870 (D. Mass.), Doc. #62. The Massachusetts district court directed the defendants in that case to pay $37,616,161 to the FTC for the purpose of administering a plan to redress consumers who purchased Trudeau's *Weight Loss Cure* book. To our knowledge, the FTC has not provided an accounting to this Court or to the Massachusetts court regarding the redress plan ordered by the Massachusetts court.

> [t]he FTC shall use its best efforts to use this fund to reimburse all consumers who bought the Weight Loss Cure book over the 800-telephone number displayed in the infomercials for the cost of the book along with shipping and handling charges associated with that book. *Any funds remaining after such reimbursement to consumers, less taxable costs and other costs of disbursement approved by the court, shall be returned to Trudeau within 30 days of final court approval.*

*Id.* at 32 (emphasis added).

The Court then again explained:

> Moreover, the FTC's motion to hold Trudeau in contempt in no way seeks to protect its own pecuniary interests. In the event that Trudeau is ultimately forced to pay the sanction, the FTC receives that money solely to effect a remedial plan to repay the consumers Trudeau willfully defrauded. *Any money not repaid to consumers reverts back to Trudeau.* Thus, the FTC has no pecuniary interest at stake.

Doc. #649 at 6 (emphasis added).

On August 7, 2013, this Court entered an Order Appointing Receiver and Implementing Ancillary Relief. *See* Doc. #742. The Court explained that it was creating a receivership "to offer Trudeau a final opportunity to avoid coercive incarceration as a contempt sanction." *Id.* at 1. The Court appointed Robb Evans & Associates LLC as the Receiver over Trudeau's assets. The Court directed Trudeau and any "Trudeau Entity" to turn over all assets to the Receiver. *Id.* at 11.

On July 2015, the FTC submitted a Memorandum in Support of Its Motion for Approval of Partial Victim Redress Plan. *See* Doc. 892-1. Exhibit C to the Motion described the Partial Victim Redress Plan (the "Plan"). *See* Doc. 892-2 at 68. The Plan proposed that each consumer receive a "full refund" of $29.42, representing the purchase price of the *Weight Loss Cure* book. The Plan specifically called for two distributions to consumers who purchased the book. Each such distribution is followed by a "final account reconciliation" prepared by Analytics Consulting LLC (the "Administrator"), the firm retained by the FTC to administer the Plan. *Id.* at 74.

Under the Plan, consumers who do not cash their distribution checks within sixty (60) days are deemed to have "forfeited" their shares of the redress fund. *Id.* Any remaining non-forfeiting

3

consumers are entitled to receive a second distribution. *Id.* The Plan required the Administrator to prepare an account reconciliation report showing the amount of funds remaining in the account and to hold the remaining funds in an interest-bearing account. *Id.* at 75. The Court approved the FTC's Plan.

On February 11, 2016, the FTC filed a Status Report Regarding Redress. *See* Doc. #949. The FTC reported that there were 1,269,570 purchasers of the *Weight Loss Cure* book and promised that "in 30 days, the FTC will redress these victims." *Id.* On February 23, 2016, after the Receiver reported that it had conducted a forensic accounting of Trudeau's assets and a global asset search, this Court entered an Order granting the Receiver's motion for a final accounting, authorizing the Receiver to make a final distribution to the FTC, and discharging the Receiver. *See* Doc. #952.

Following Trudeau's release from a federal penitentiary in January 2022, he asked the FTC to provide him with a status of the Remediation Plan and the balance of any undistributed funds. *See* Doc. #977 at Ex. B. Eight months later, in September 2022, the FTC finally gave Trudeau an accounting that shows $417,912 remains in the Consumer Redress Fund. *Id.* at Ex. C. Because the remaining 514,306 eligible consumers would only net 32¢ each from another round of distributions, Trudeau suggested that any further distribution is "likely futile." *Id.* at 13. On the other hand, recognizing that the eligible consumers would not be fully refunded unless they each receive an additional $20.29, Trudeau acknowledged that this remaining redress obligation could be as high as $10,435,268. *Id.* at 14.

Accordingly, on November 8, 2022, Trudeau moved the Court "for a determination of whether the FTC should return the undistributed current balance of $417,912 to Mr. Trudeau pursuant to this Court's order that '[a]ny funds remaining after such reimbursement to consumers,

less taxable costs and other costs of disbursement approved by the court, shall be returned to Trudeau within 30 days of final court approval'" or, in the alternative, determine "the remaining amount owed and [a] repayment plan that allows him to earn a living." *Id.* at ¶ 15 (quoting Doc. #335, at 32). Trudeau emphatically reiterated to the FTC during his recent December 9 deposition that he wants to and can immediately begin paying down any redress debt that he is found to owe. *See* Ex. A at 33:4-6, 11-13; 66:8-9; 81:18-20; 82:1-3; 132:9; 220:2-6; 221:18; 222:19; 236:1-2; 237:10-12. To date, however, neither the Court nor the FTC have told Trudeau what, if anything, he still owes under the Remediation Plan.

## Argument

The purpose of coercive confinement is to force an individual to comply with a court's orders. *See United States v. Lippitt*, 180 F.3d 873, 876 (7th Cir. 1999) (affirming order that held defendant "in contempt of Court until he makes good faith efforts to assign that real estate [to the government]"). Civil contempt sanctions are "penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827, 838 (1994) (vacating contempt conviction). Civil contempt cannot be applied to punish the alleged contemnor. Civil contempt can only be imposed when the contemnor "carr[ies] the keys to his prison in his own pocket." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911) (vacating criminal contempt findings in a civil case where the proceeding "ended with the settlement of the main cause of which it is a part" and "the only remedial relief possible was a fine, payable to the complainant"); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("[T]he justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order."). Against this legal background, coercive incarceration is not proper here.

Trudeau never received $37 million from the offending infomercial and he does not presently have sufficient assets to satisfy the FTC's financial demands. A significant portion, if not the majority, of the Consumer Redress Plan has been satisfied. Moreover, Trudeau has substantial earning power that can satisfy any remaining debt owed under the Consumer Redress Plan in a relatively short amount of time. Trudeau is ready and able to employ his earning power to satisfy any remaining consumer redress debt he may be found to owe. No need exists to coerce Trudeau to do anything. Coercive confinement will only interfere with his ability to satisfy any remaining amount owed under the Consumer Redress Plan.

The purpose of the consumer redress Order is to reimburse eligible consumers, not to punish Trudeau. If a third round of consumer refund payments is futile, given how little each remaining eligible consumer will net (32¢ each), then there are no more consumers to reimburse, Trudeau has fulfilled his obligations, and the undistributed balance "shall be returned to Mr. Trudeau within 30 days of final court approval." Doc. #335 at 32. But if the Court finds that Trudeau's redress obligation is unsatisfied, then he will begin paying it forthwith. What the Court should not countenance, however, is the FTC's continued cries for Trudeau's coercive incarceration while it also rejects Trudeau's efforts to pay whatever he may owe and refuses to state how much he owes. This "Catch 22" pattern, which dates back to the FTC's refusal to cash two checks from Trudeau totaling $53,951.41, impermissibly denies Trudeau the chance to "purge" himself of any purported contempt. *See* Ex. B.

Because Trudeau is out of jail and gainfully employed, he is not only willing but also able to immediately begin paying down whatever redress debt the Court may determine that he owes. In fact, using only legitimate sources of funds (e.g., employment earnings, donations from supporters, loans from friends and business colleagues), Trudeau can commit to paying down even

as high a debt as $10 million within two years. To further demonstrate his determination to comply with any finding that he still carries a redress obligation, Trudeau will begin paying down that obligation by depositing a $50,000 check into the Court's Registry as soon as the Court permits him to do so. *See* Ex. C; *see also* LR 67.1. Moreover, Trudeau will work with the FTC to submit a plan for the Court's approval, inclusive as necessary of third-party monitoring and auditing, that will assure the legitimacy of (a) the funds Trudeau raises to pay down whatever redress debt he may be found to still owe; and (b) the resources that Trudeau uses to support himself while he pays any remaining redress obligation.

## Conclusion

There is no legal justification for coercively incarcerating Trudeau to do what he is ready, willing, and able to do voluntarily. Nor does it make good sense to incarcerate Trudeau because his fundraising and earning capacities are far greater if he remains free to work off any debt he may be found to still owe the relevant consumers. And so, for all the foregoing reasons, the Court should enter an Order that (a) determines what consumer redress amount, if any, Trudeau still owes; (b) continues for 30 days the portion of the December 15, 2022, hearing that is intended to address whether to resume Trudeau's coercive incarceration so that the parties can prepare as necessary a repayment plan with appropriate monitoring and verification procedures for the Court's approval; (c) grants Trudeau's request to use the Court's Registry as a repository into which he can pay whatever sum he may be found to owe the remaining eligible consumers; and (d) grants Trudeau any further relief that the Court deems proper.

Dated: December 12, 2022

Respectfully submitted,
KEVIN TRUDEAU


By: */s/ Giel Stein*

Giel Stein
Nicole Prefontaine
Clark Hill PLC
130 E. Randolph Street, Suite 3900
Chicago, Illinois 60601
Telephone: (312) 985-5900
Facsimile:  (312) 985-5999
gstein@clarkhill.com
nprefontaine@clarkill.com


Kimball R. Anderson
Winston & Strawn LLP
35 W. Wacker Drive
Suite 4100
Chicago, IL 60601
(312) 558-5858
kanderson@winston.com

## CERTIFICATE OF SERVICE

I, Jonathan Lippner, an attorney, certify that I served the foregoing KEVIN TRUDEAU'S MOTION TO CONTINUE COERCIVE INCARCERATION HEARING on all parties of record via the Court's CM/ECF filing system.

*/s/ Jonathan Lippner*
Jonathan Lippner

# Exhibit A

```
 1                    UNCERTIFIED ROUGH DRAFT
           UNCERTIFIED TRANSCRIPT DISCLAIMER IN THE MATTER OF
 2

 3     FEDERAL TRADE COMMISSION,              )
                   Plaintiff,                 )
 4         vs.                                ) 03-CV-3904
       KEVIN TRUDEAU,                         )
 5             Defendant.                     )

 6              _____

 7

 8              The following transcript of proceedings,
       or any portion thereof, in the above-entitled matter
       is being delivered UNEDITED and UNCERTIFIED by the
 9     official court reporter at the request of Counsel.

10              The purchaser agrees not to disclose this
       uncertified and unedited transcript in any form
11     (written or electronic) to anyone who has no
       connection to this case.
12
                This is an unofficial transcript, which
13     should NOT be relied upon for purposes of verbatim
       citation of testimony.  The transcript has not been
14     checked, proofread, or corrected.  It is a draft
       transcript, NOT a certified transcript.  As such, it
15     may contain computer-generated mistranslations or
       stenotype code or electronic transmission errors,
16     resulting in inaccurate or nonsensical word
       combinations, or untranslated stenotype symbols which
17     cannot be deciphered by non-stenotypists.

18              Corrections will be made in the preparation
       of the certified transcript, resulting in differences
19     in content, page and line numbers, punctuation, and
       formatting.
20
                This uncertified and unedited transcript
21     contains no title page, appearance page, certificate
       page, index, or certification.
22

23

24
```

1    turned it over towards your order to pay?

2        A.    Because I have been asking the Federal Trade

3    Commission and the court since 2019, do I owe any

4    money and if so exactly how much because I want to

5    pay.  I have been wanting to pay.  I sent two checks

6    of $50,000.  They didn't even cash it.

7        Q.    I mean, do you think you still owe money?

8        A.    My lawyer doesn't think so.  I don't know.

9    We asked for the accounting.

10       Q.    Okay.

11       A.    But I want to start paying and I will start

12   paying today.  If I still owe money, I can pay it

13   very quickly.  I have access now that I didn't have

14   in 2013.

15       Q.    Okay.

16       A.    I'm ready to go.

17       Q.    All right.  Where did you send the check,

18   these $50,000 checks?

19       A.    It was previous to 2013 and I am not exactly

20   sure but it is in the record.

21       Q.    It's in the record, okay.  Sorry I wasn't

22   around in 2013.

23       A.    Yeah.

24       Q.    So the Fan Club gives you -- do they give

```
 1              MR. STEIN:  Objection vague.
 2     BY THE WITNESS:
 3         A.   I do not know right now if I owe any money
 4     to the Court and if I do so I don't know how much.
 5     BY MS. OSTRUM:
 6         Q.   But if you do owe the Court, can you pay
 7     them?
 8         A.   I will start paying immediately.  I am ready
 9     to start paying immediately.  I'm earning money.
10         Q.   So why haven't you paid?
11         A.   I don't know if I owe any money.  The last
12     time we tried to pay the FTC refused to accept
13     payments and I am following the advice of counsel.
14         Q.   Do you think that you have satisfied the
15     order to pay?
16         A.   I don't know the answer to that.
17         Q.   Okay.  So if you had to pay, how much could
18     you pay today?
19         A.   I don't know the answer to that either.  I
20     would have to look at the numbers.
21         Q.   10,000?
22         A.   I could pay 10,000, yes.
23         Q.   Could you pay 50,000?
24         A.   Maybe.
```

1    A.   These are purchases.  What you are talking

2  about here is cash.

3    Q.   I am recapping the last few minutes.

4    A.   Yes.

5    Q.   47,000 in Wells Fargo?

6    A.   Uh-huh, not today but on the date of the --

7    Q.   Sure.

8    A.   That was a year ago.

9    Q.   So all of this amount you never thought you

10  should turn over to the FTC?

11    A.   I was ready to turn over 100 percent of it

12  and I am ready today.  I just need to know, do I

13  still owe money to the FTC or does the FTC owe me

14  money?  I don't know the answer.  Do you?  Please,

15  tell me.  If you know the answer, tell me.  If I owe

16  money, exactly what is the number?  Down the answer?

17  Mr. Cohen, do you know the answer?  If so, tell me.

18  I am here ready to go.  I am ready to start paying

19  everything.  You want everything.  You've got it all.

20  I'm going to pay.

21    Q.   I think the answer is on the record.

22    A.   Okay.  It isn't.  To the best of my

23  recollection, that answer to those questions are not

24  on the record, and no one knows and no one has

1    answered those questions.  I don't need to be coerced

2    to do anything.  Just tell me how much I owe, and I

3    will start paying.

4           MS. OSTRUM:  Could we go off the record for

5    a second?

6                     (WHEREUPON, a discussion was had

7                      off the record.)

8           MS. OSTRUM:  Okay.  We can go back on the

9    record.

10          This portion of the transcript for the

11   deposition will be potentially sealed due to the

12   Court's attorneys' eyes only order.

13          The FTC doesn't necessarily agree

14   that all of these documents are privileged or

15   should be sealed, but we are going along with this

16   procedure.

17          MR. STEIN:  May I add one thing?

18          For purposes of protecting the

19   attorneys' eyes only order in this case, you will

20   not show Mr. Trudeau documents from the Babenko

21   production that he did not author or send or receive

22   or otherwise see himself and that strictly come from

23   third parties that he has no involvement with.  Is

24   that correct?  Because that would not be an

1    A.   I think it's under a million, but I'd be

2    guessing.

3    Q.   Is it close?

4    A.   I don't know.  You are asking me to guess.

5    I can't guess.  I want to give you the exact amount,

6    and I'm proud of it because I can show you that I can

7    earn money.  There are supporters that are willing to

8    help me, and I can pay the debt if there is one, and

9    I want to pay.

10   Q.   Sure.

11        So this year you've made a fair amount

12   of money and you could pay if the court said next

13   week?

14   A.   Write a check.

15   Q.   Write a check?

16   A.   I'm ready.

17   Q.   You are ready to write a check?

18   A.   And more than one check.  I am ready to pay

19   what I am owe and I want to.  I want to.

20   Q.   So at some point you decided that you didn't

21   have to pay?

22   A.   No.

23   Q.   Right?

24   A.   No.

```
 1    anything that I am told to do so that I don't have to
 2    spend an hour if prison.  I want to pay the judgment
 3    if I still owe money and I still don't know if I owe
 4    any money and if I do how much, and I want to pay.  I
 5    want to start paying today.  I have been saying this
 6    since 2019.  If I owe money, I want to start paying.
 7    Somebody please tell me what to do.  Nobody told me
 8    about this money with the Court thing.  I wish
 9    somebody did.
10        Q.   So some of these entities did earn money?
11        A.   I don't know if they earned money.  Again
12    we're talking 2013.  That's a long time ago.
13        Q.   Uh-huh.
14        A.   I don't know if any of them actually earned
15    a profit.  Some of them generated revenue.  Obviously
16    the Global Information Network we know generated
17    revenue, but that never earned a profit, and the
18    financial statements prove that and the tax returns
19    prove that as well.
20        Q.   So Global Information Network foundation
21    earned money than would APC Trading limit have some
22    value?
23        A.   I don't know.  I am not an accountant.
24        Q.   Okay.  And were all of these your entities?
```

1    A.   Well, the Court ruled that they were all my

2    entities so that's what the court ruling is.  I would

3    disagree but I obviously was involved in the set up.

4    I was involved in the management.  There is no secret

5    of this at all and this wasn't set up to hide money

6    or put money in and not pay the judgment.  That's

7    ludicrous.  You have a judgment for the rest of your

8    life.  It's insanity.  Figure out away to pay it off

9    when you don't have the money that's sane.  So you

10   get a 37 million dollar judgment.  You don't have 37

11   million.  All your companies are upside down.  They

12   are operating at cash flow losses even though they

13   may be doing some decent revenue and you are pulling

14   your hair out going, How do I pay?  You work with the

15   FTC and say, Can we come up with a payment plan?

16   They give me the finger.  That's what happened.

17       Q.   Figuratively?

18       A.   Yeah.  I said, I want to pay.  Here are two

19   checks.  We're not going to cash it.  Can we work out

20   a payment plan?  We're not even interested in talking

21   to you.

22       Q.   But then why did you set up this?

23       A.   So I could make money.

24       Q.   To protect it separately?

1          A.    These are all companies that didn't exist

2     before the judgment.

3          Q.    But you said you set it up so that your

4     personal judgment was overhear and these entities

5     were overhear?

6          A.    So they could operate and earn money to help

7     me payoff the judgment.  This was under the advice of

8     counsel.  I mean, obviously this came from Marc Lane

9     but not to hide current assets.  That's the critical

10    point.  It wasn't I'm going to set this structure up

11    so I have 30 million dollar in assets that I don't

12    want to give to the FTC which makes no sense.

13    Listen, I will pay the bill.  I can earn money.  Even

14    though, you know, it is a tough bill to pay, that

15    happens sometimes.  The International Pool Tour lost

16    ten million dollars.  I mean, that's in the public

17    record.  I didn't like that, but sometimes things

18    fail.  You move forward.

19               So I want to pay the judgment.  I wanted

20    to pay it then.  Maybe I took a bad route to figure

21    out the best way to payment, and Kimball said it in

22    open court that I tried desperately to use money to

23    pay my legal expenses to keep me out of prison and

24    try to figure out a way to earn money to pay the

1    It is completely irrelevant.  I want to pay the debt

2    if I owe it today.

3        Q.   Okay.

4        A.   Okay.  Maybe mistakes were made back then.

5    Maybe not.  We don't have to relitigate that.  What

6    do I owe, if anything, tell me and I will start

7    paying it today.  Let me just get it paid.  I can pay

8    it -- I will get it paid very quickly.  Let's just

9    start there.  Let me just pay it.  If you are really

10   concerned about the consumers, let me just pay the

11   debt if there is one.

12       Q.   Why haven't you paid it?

13       A.   Busy don't know if there is one.  Maybe you

14   owe me money.

15       Q.   Why do you doubt that you owe it?

16       A.   Because the accounting shows that

17   potentially the Consumer Redress Plan potentially

18   shows that I could be owed expenses of $400,000.  I

19   don't know.

20       Q.   Did you read the Redress Plan?

21       A.   Yes.

22       Q.   And that was your take?

23       A.   I am not a lawyer.

24       Q.   How did you come up with the take?  How did

1    you come up with this idea?

2        A.   I'm asking the Court and asking the FTC on

3    multiple occasions do I owe any money and if so how

4    much.  Why won't anyone answer that question?  Why do

5    I have to answer it?  I am not the one who makes the

6    decision.  Judge Gettleman is the only person that

7    can decide if I owe money and if so how much.  I just

8    need to know that so then I know if I need to pay.

9    I'm ready to pay.  I was ready to pay when I started,

10   you know, getting money from the Fan Club.  I am

11   ready to pay.  I want to pay.  Please, tell me where

12   and how much to pay.

13       Q.   Where did you get the idea that you don't

14   have to pay?

15       A.   If I don't owe any money I don't have to

16   pay, correct.

17       Q.   Where did you get the idea that you don't

18   owe money?

19       A.   Because the remediation plan may have

20   determined that full remediation has been made.  This

21   was a consumer redress plan.  I don't know the

22   results of that.  I waited -- the FTC was supposed to

23   report that but we hadn't seen a report since 2016.

24   So I didn't know what the final numbers were on that.

```
 1    the position.  So we might contact you again.
 2            THE WITNESS:  Certainly.  Always available.
 3    I want to be as cooperative as possible and give you
 4    everything you want.  And if I owe any money to the
 5    Court, I want to start paying immediately.  I'm
 6    ready to pay and we'll get it totaled and paid very,
 7    very quickly.  I just need to know if I owe money;
 8    and if so, how much.  I'm willing to start paying
 9    today.
10            MR. STEIN:  No question pending.
11            THE COURT REPORTER:  Signature?
12            MR. STEIN:  We will reserve signature,
13    please.
14            THE COURT REPORTER:  And do you want this
15    typed up, Counsel?
16            MR. COHEN:  Yes.
17            THE COURT REPORTER:  E-tran okay?
18            MR. COHEN:  Yes.  We definitely want an
19    E-Transcript.  I don't know if whether For the Record
20    has procedures or something that they change or do
21    something.  Whatever they send is fine.
22            THE COURT REPORTER:  And a rough draft?
23            MR. COHEN:  Yes, please.  Definitely.
24            THE COURT REPORTER:  Would you like a copy,
```

1    Counsel?

2         MR. STEIN:  Expedited and a dirty, or

3    whatever the phrase is these days, copy and a

4    regular, full, clean copy as soon as possible.  If

5    there is an extra charge for an expedited final copy,

6    we will pay that.  We will take the expedited on the

7    final.  And in the mean time, you can generate a

8    rough draft tonight or tomorrow.

9

10        AND FURTHER DEPONENT SAITH NAUGHT . . .

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# Exhibit B

The Law Offices of
## MARC J. LANE
A PROFESSIONAL CORPORATION

180 North LaSalle Street
Chicago, IL 60601-2701
(312) 372-1040
(800) 372-1040
Fax (312) 346-1040
www.MarcJLane.com

October 19, 2012

<u>Via UPS Delivery and E-mail:</u> mmora@ftc.gov and DEBrief@ftc.gov

Associate Director, Division of Enforcement
Federal Trade Commission
601 New Jersey Avenue, N.W., Suite NJ-2122
Washington, DC 20001

Attention: Mr. Michael Mora

RE: *FTC v. Kevin Trudeau*, **Civil Action No. 03-C-3904**

Dear Mr. Mora:

I am writing to follow up on the payments that Kevin Trudeau has made toward the monetary sanction that was imposed in the above-styled matter (the "Judgment").

On Mr. Trudeau's behalf, we tendered a payment of $35,105 on September 21, 2012, and a payment of $18,846.41 on October 10, 2012. As clearly indicated in my letters of transmittal, the payments are to be applied against the Judgment. Mr. Trudeau never indicated, nor did he ever intend, that his payments are to be contingent on the FTC's acceptance of his proposal to reduce the amount held in the escrow account.

The FTC is obligated under the Order to use its best efforts to use the funds to reimburse consumers. Please describe the FTC's plan and procedure for reimbursing consumers, including when the FTC intends to distribute the funds, which consumers will be reimbursed first, and the amount of administrative costs that are to be incurred.

Thank you for your immediate attention to these matters.

Very truly yours,

MARC J. LANE

MJL:eap

MARC J. LANE | WEALTH GROUP
PROTECTING TODAY'S WEALTH. BUILDING TOMORROW'S.

**Marc J. Lane Wealth Group** describes separate, but affiliated firms including The Law Offices of Marc J. Lane, a Professional Corporation, a professional service corporation registered to practice law in the state of Illinois; Marc J. Lane Investment Management, Inc., an SEC-registered investment advisor; Marc J. Lane & Company, a registered broker-dealer and SIPC member; and Marc J. Lane Risk Management, Inc., an Illinois licensed insurance agency.

# Exhibit C



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**219 SOUTH DEARBORN STREET**
**CHICAGO, ILLINOIS 60604**

## REGISTRY DEPOSIT INFORMATION FORM

Instructions:  Complete this form and e-file it as an exhibit to your motion for leave to deposit money in the court.

1.  **Case Number:** 03-C-3904

2.  **Case Title:** FTC V. TRUDEAU

3.  **Judge:** ROBERT W. GETTLEMAN

4.  **Moving Party:** KEVIN TRUDEAU

5.  **Amount of Deposit:** $50,000

6.  **Are the funds being deposited as interpleader funds pursuant to 28 U.S.C. § 1335?**    Yes ☐    No ☑
    *(Funds deposited as interpleader funds pursuant to 28 U.S.C. § 1335 are subject to mandatory management fees and mandatory tax withholdings. Failure to properly identify interpleader funds prior to depositing them with the Clerk's Office will result in delayed disbursement.)*

I declare under penalty of perjury that the above information is true and correct. Under 28 U.S.C. § 1335, this statement under perjury has the same force and effect as a sworn statement made under oath.

Kevin Trudeau                                        December 13, 2022
_____          _____
Attorney or Litigant                                  Date

Rev. 0330017