**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FEDERAL TRADE COMMISSION,

       Plaintiff,

    vs.

KEVIN TRUDEAU,

       Defendant.

CASE NO. 03-C-3904

HON. ROBERT W. GETTLEMAN

**KEVIN TRUDEAU'S MOTION FOR AN ORDER DIRECTING THE
DEPARTMENT OF HOMELAND SECURITY TO PRODUCE
<u>NATALIYA BABENKO'S IMMIGRATION FILE</u>**

When the Court unexpectedly allowed the FTC to call Nataliya Babenko as a witness during the January 26, 2023, hearing, Babenko leveraged the occasion to provide solicited and frequently volunteered negative testimony about her former husband, Kevin Trudeau. Over Trudeau's objections, the FTC led Babenko beyond what was supposed to be a fifteen-minute circumscribed examination of her observations of Trudeau's handling of "gold bars" and into foundationless allegations about Trudeau's allegedly untruthful and even threatening comments during the couple's marriage. When the Court asked the FTC if it foresaw the need for future testimony by Babenko, the FTC kept its options open. Those options may include eliciting future testimony based on a bevy of other negative statements that Babenko made about Trudeau in her May 27, 2021, annulment declaration, upon which the FTC relied when it deposed Trudeau on January 9, 2022. *See* Ex. A.

Like her testimony in Court, Babenko's declaration is rich with aspersions against Trudeau that evidence a collaboration between Babenko and the FTC. For example, Babenko accuses Trudeau of telling her about "the dark side of the government at large," its efforts "to stop him

from telling the public the 'truth' and conspiracy theories involving Big Pharma and other corporations," that the government was "not to be trusted" and should be considered "the 'enemy'," that "she would go to jail if [she] spoke to anyone about him," and that Trudeau said he was "framed by the government and that I was the next one on their list." Ex. A at ¶¶ 8, 11, 13. Babenko admitted that she underwent a naturalization interview during which she was asked "many questions solely about Kevin and my involvement in his businesses." *Id.* at ¶ 15. Babenko added that while her citizenship application is still "on hold," she has been "reviewing documents" given to her "from the government" and "learned that Kevin claimed I was in control of many of his business entities and their assets." *Id.* at ¶¶ 16-17. Further demonstrating the extent to which the FTC coached her testimony, Babenko accurately quoted from Trudeau's communications with counsel, she recited court findings and the bases of several of Trudeau's convictions, and she noted the details of financial judgments perfected against Trudeau over the years, all under the guise of sharing things "Kevin never told me." *Id.* at ¶¶ 20-21.

Recognizing even before the January 26 hearing the potential for contradictions between the statements in Babenko's annulment declaration and what she may have told immigration authorities, Trudeau subpoenaed one of Babenko's immigration files (her I-130 File) on January 4, 2023.[1] DHS responded on January 11, explaining that without Babenko's authorization, DHS would only provide her immigration file "pursuant to the order of a court of competent jurisdiction * * * issued by a U.S. district federal court judge." Ex. B at 2 (cleaned up), quoting 5 U.S.C. §

---

[1] Trudeau seeks herein an order for the production of Babenko's complete immigration file because he has reason to believe that her I-130 File may only contain information that Trudeau provided about Babenko and not what she has told immigration authorities over time. Rather than run the risk of having to present a later request seeking additional portions of Babenko's immigration file, Trudeau now seeks her complete file.

552a(b)(11) ("[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be . . . pursuant to the order of a court of competent jurisdiction.").

Now that Babenko's adverse testimony has been heard in Court, and with the possibility that the FTC will seek to introduce additional testimony from Babenko, Trudeau's need to discover Babenko's immigration file is crystalized. *See* Fed. R. Civ. P. 26(b)(1) (permitting discovery "regarding any nonprivileged matter that is relevant o any party's claim or defense"); *see also In re Aircrash Disaster Near Roselawn, Ind. Oct. 31, 1994*, 172 F.R.D. 295, 303 (N.D. Ill. 1997) (granting motion to compel document production); *N. Shore Gas Co. v. Elgin, Joliet & E. Ry. Co.*, 164 F.R.D. 59, 60 (N.D. Ill. 1995) (granting motion to compel document production and reminding that "[t]he scope of discovery should be broad to aid the search for truth"). Babenko's file may contain information about her experiences with Trudeau that is relevant to Trudeau's attempt to cope with Babenko's past and future testimony at her upcoming deposition and this matter's next hearing in March.

For all the foregoing reasons, Trudeau moves this Court to enter an Order that (a) directs DHS to produce Babenko's complete immigration file to Trudeau's counsel by February 13, 2023, including any records of interviews with Ms. Babenko and those of her records that are found in DHS's system of records known as the DHS Alien File and Central Index System; and (b) grants Trudeau any further relief that the Court deems proper. A proposed Order is attached hereto as Exhibit C.

Dated: January 27, 2023

Respectfully submitted,
KEVIN TRUDEAU


By: */s/ Giel Stein*

Giel Stein
Nicole Prefontaine
Jonathan Lippner
Clark Hill PLC
130 E. Randolph Street, Suite 3900
Chicago, Illinois 60601
Telephone: (312) 985-5900
Facsimile: (312) 985-5999
gstein@clarkhill.com
nprefontaine@clarkill.com
jlippner@clarkhill.com

Kimball R. Anderson
Winston & Strawn LLP
35 W. Wacker Drive
Suite 4100
Chicago, IL 60601
(312) 558-5858
kanderson@winston.com

## CERTIFICATE OF SERVICE

I, Jonathan Lippner, an attorney, certify that I served the foregoing KEVIN TRUDEAU'S MOTION FOR AN ORDER DIRECTING THE  DEPARTMENT OF HOMELAND SECURITY TO PRODUCE NATALIYA BABENKO'S IMMIGRATION FILE on all parties of record via the Court's CM/ECF filing system.

*/s/ Jonathan Lippner*
Jonathan Lippner

# Exhibit A

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

**COPY**

TALITHA DAVIES WEGNER (SBN 265489)
CHLOE S. WOLMAN, ESQ. (SBN 280808)
DAVIES WEGNER LAW CORPORATION
11661 San Vicente Blvd., Suite 710
Los Angeles, California 90049

Telephone: 310-481-0300
Facsimile: 310-510-6885

Attorneys for Petitioner

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 27 2021

Sherri R. Carter, Executive Officer/Clerk of Court
By: Cindy Cabada, Deputy

**BY FAX**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

In Re Marriage of

Petitioner,

    Nataliya Babenko Trudeau
and

Respondent,

    Kevin A. Trudeau

Case No. 21STFL01559

[Judge Steven A. Ellis – Dept. 2C]

**DECLARATION OF NATALIYA BABENKO TRUDEAU RE FACTS IN SUPPORT OF JUDGMENT FOR NULLITY OF MARRAIAGE BASED ON FRAUD PURSUANT TO FAMILY CODE SECTION 2210(d)**

**DATE: TBD**
**TIME: TBD**
**DEPT.: 2C**

RECEIVED
s/ MAY 27 2021
FILING WINDOW

DaviesWegner | DECLARATION OF NATALIYA BABENKO TRUDEAU RE FACTS IN SUPPORT OF JUDGMENT FOR NULLITY OF MARRAIAGE BASED ON FRAUD PURSUANT TO FAMILY CODE SECTION 2210(d)

Case No.21STFL01559

Ex. 1 at 19

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

**DECLARATION OF NATALIYA BABENKO**

I, NATALIYA BABENKO, declare as follows:

1.      I am the Petitioner in the within action.

2.      I make and submit this Declaration in connection with my Petition for Nullity of Marriage filed on February 16, 2021.  Each exhibit referred to below is a true and correct copy of the identified document, incorporated by reference at the place indicated by the exhibit letter and offered as evidence in this matter.

### FACTS IN SUPPORT OF NULLITY OF MARRIAGE BASED ON FRAUD

3.      Respondent, Kevin M. Trudeau, ("Kevin") and I were married in Beverly, Massachusetts, on June 27, 2008.  At the time of our marriage, I was 22 years old, and Kevin was 45 years old.  I first met Kevin through a mutual friend while visiting Los Angeles in 2005.  I was 20 when I met Kevin.  At the time, I lived in Kyiv, Ukraine which is where I was raised.  We exchanged our contact information and I never heard from Kevin again after I returned home to Kyiv until he sent me an email sometime in 2007, saying he wanted to get together.  We arranged to meet in Prague for lunch because I was with my family on holiday staying at a resort about 2 hours away from Prague.  Later that year, Kevin invited me to spend 2 weeks with him in Germany where he said he was working on a new project. I told Kevin about my eating disorder, and he surprised me by showing me tremendous empathy without any judgment. Around this time, we began a romantic relationship.

4.      Later that year, Kevin invited me to spend time with him in Hawaii.  I accepted his invitation.  In Spring 2008, Kevin visited my family in Kyiv, and he proposed to me in my home in front of numerous family members and friends. He assured my relatives that he was looking for someone like me his whole life which is why he had never been married before. Even though there was substantial resistance from my mother and aunts, the fact that for both of us this marriage would be our first marriage persuaded my family that Kevin had very serious and sincere intentions toward me. We left my hometown two days after his proposal and flew to Boston to meet his family.

5.      Before marriage, Kevin listened to me for hours about my life struggles which really softened my heart. I told him my last relationship ended because my boyfriend wasn't able to cope

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

with my eating disorder and that I felt terrible about myself and my life. Kevin assured me he loved me for exactly whom I was and said he saw a very bright future for both of us. I fell in love with him.

6. When I began living with Kevin in 2008, he told me he was a very successful author who had published self-help books called "Natural Cures "They" Don't Want You to Know About," "More Natural Cures Revealed: Previously Censored Brand Name Products That Cure Disease," and "The Weight Loss Cure "They" Don't Want You to Know About" in 2004, 2006 and 2007, respectively. Kevin also told me he was sought out by thousands of followers interested in his "truths" about the government and Big Pharma.

7. On June 27, 2008, we signed the marriage papers at the Beverly City Hall in Massachusetts and became husband and wife.

8. Not long after marriage, Kevin told me that the government was after him because he was the only person in the country who was brave to speak the "truth" and educate people about the dark side of the government at large. He told me multiple times that the government was harassing him about his books and trying to stop him from telling the public about the "truth" and conspiracy theories involving Big Pharma and other corporations. As a young and impressionable Ukrainian citizen, not knowing how the United States' legal system worked, Kevin told me that the US government was not to be trusted and I should consider them to be the "enemy" as he did. I had no reason not to believe Kevin. I was young and completely trusted Kevin.

9. From 2008 - 2012, Kevin would tell me from time to time that he had to go to court, but I never knew why. Kevin always told me that if he had to face the government, he would win, while instilling in me a new mantra for my life - to never speak about Kevin with legal representatives or the government who might question me down the road. When I asked "why?" Kevin would always reply the same: to avoid trouble because "they" would go after me just because I was his wife. Around this time, I wasn't sure what "truth" he was fighting for. To me, his everyday life looked like a life of a businessperson who had numerous meetings, calls, negotiations and public appearances.

10. During this time, Kevin told me one of his lawyers was Marc Lane. Kevin never told

2

Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

me the nature of Marc Lane's involvement in Kevin's legal matters.

11. In 2012, I moved to New York City from Chicago, Illinois, to begin my graduate studies at NYU, Tisch School of the Arts. Kevin relocated to his residence to Zurich, Switzerland, while I attended school. On one occasion, after learning that Kevin had some sort of an emergency and had to fly from Zurich back to Chicago, I decided to visit him at his Oak Brook residence near Chicago to learn firsthand the nature of the emergency. Kevin was reluctant to answer any of my questions. Kevin told me I would go to jail if I spoke to anyone about him. Shortly after my arrival, he presented me with a one-way ticket to Kyiv, Ukraine, and demanded that I leave the country immediately, scaring me with jail time and threatening he wouldn't pay for any lawyers to help me out. Kevin also mentioned that I was too weak mentally to understand the complexity of his case. He told me that my eating disorder made me dumb over the years. I felt scared and completely controlled by Kevin. I followed Kevin's demands and went back to Kyiv, Ukraine, taking a leave of absence from my graduate studies.

12. Around February 2013, Kevin told me he had been sentenced to a 10-year prison term and was scheduled to be released in May 2022.

13. After Kevin was sent to prison, I began corresponding with him via Corrlinks asking him questions about why he was sent to prison. The more I tried to learn about his case from him, the more agitated he became with me. His work partners kept telling me that I would go to jail too if I continued to ask questions about his businesses. Kevin told me he was framed by the government and that I was the next one on their list. I was terrified and lost. On October 20, 2013, Kevin sent me a handwritten note by fax saying, "as soon as my case is over & closed, which I hope will be very soon, you will be able to come back to the USA without fear of the government causing you any problems." (See **Exhibit "1"** attached hereto for copy of fax letter from Kevin). After reading his note I started believing that there was a conspiracy against me. In 2015, I was no longer able to correspond with Kevin because he disconnected from me and removed me from the jail list. In the fall of 2015, I resumed my graduate studies at NYU, Tisch School of the Arts while praying every night that the US government not arrest me for the reason I had no clue about. I heard nothing from Kevin until around the time I filed for an annulment of marriage on February 16, 2021. [I completed

3　　　　　　　Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

my graduate program at NYU in 2019. I resided in New York until 2019, when I moved to Los Angeles, California where I currently live.]

14.     It is my understanding that Kevin remained in a federal prison in Montgomery, Alabama, until January 2021 when he was released to a halfway house as part of the residential reentry program for federal prisoners. However, due to the Covid-19 pandemic, he was subsequently released to a private residence where he is serving his remaining prison sentence until May 2022. I am informed that Kevin wears an electronic monitoring ankle bracelet and is regularly in touch with his probation officer/sponsor.

### FRAUD DISCOVERED AFTER 2018

15.     Around June 2018, I received a notice from the U.S. Citizenship and Immigration Services ("USCIS") informing me that an interview on my application for Naturalization, which I had applied for in 2017, was scheduled to take place on July 24, 2018, at the Federal Plaza building in New York City. At the time, I was still a graduate student at NYU and living in New York City. My application for citizenship was not based upon my marriage to Kevin or his citizenship status. I personally qualified for naturalization (citizenship) because I had lived in the United States for 5 years as a green card holder and thus met the residency requirements. I believed the interview would be routine and my application for citizenship would be granted shortly thereafter. However, on the day of the interview, the officer told me she had an instruction to depose me after I passed the civic test and was asked a couple of formal questions. I chose to have it conducted on the same time as my interview. She asked her colleagues to be witnesses. She asked me many questions solely about Kevin and my involvement in his businesses. The officer's questions caused me to become very concerned as I never knew anything about Kevin's legal issues or his business dealings.

16.     I never received any notifications from USCIS following my interview/deposition. I made multiple attempts to follow up with my case. Over the course of 3 years (2018-2021), the response from USCIS was always the same - that my case was "on hold due to the security check." As a result, I began researching into Kevin's legal proceedings and his personal background to see if there could be a reason why my request for citizenship was being held up. To this day, my application for US citizenship remains "on hold."

4                                    Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

17.     Since my interview with the USCIS in 2018, I have been researching and reviewing documents provided to me pursuant to information requests from the government.  I learned very disturbing information regarding Kevin's legal proceedings.  In particular, I learned that Kevin claimed I was in control of many of his business entities and their assets.  This is absolutely false.  I never knew anything about Kevin's business dealings or legal troubles with the FTC.

18.     Based upon the many documents I have reviewed, I am certain that Kevin chose me to be his wife because I was very young (22 years old), naïve and from Ukraine, having no ties to the United States.

19.     I have now learned that Kevin withheld from me very important information about himself before we were married.  Kevin was very deceptive about himself, and I believe he committed fraud in inducing me to marry him in June 2008.  Had I known all of the facts about Kevin at the time of our marriage, I would have never married Kevin:

A.     When I met Kevin in Prague in 2007, Kevin did not inform me that he had recently been married on March 31, 2006 (in California) to another woman from Ukraine, named Oleksandra Polozhentseva, who was also in her 20s. Kevin told me he was single.  (See **Exhibit "2"** for a copy of Kevin's Marriage Certificate to Oleksandra.)

B.     In 2007, after meeting Kevin in Prague, and we began our "long distance relationship," Kevin never told me that he was seeking a divorce from Oleksandra Polozhentseva from the Dominican Republic and that such a divorce was granted on October 31, 2007.  (See **Exhibit "3"** for a copy of Kevin's Dominican Republic Divorce document.)  Kevin never told me that he then married another woman named Kristine Dorow (who was a student from Norway) on November 16, 2007; two weeks (and two days) after his divorce became final from Ms. Polozhentseva.  (See **Exhibit "4"** for a copy of the annulment between Kevin and Kristine Dorow).  I have now learned that the romantic cruise trip Kevin and I had in Hawaii in December 2007 was supposed to be his honeymoon with Kristine Dorow. I had no clue about the existence of another woman. It is now clear to me that Kevin intentionally withheld the fact that he was married while we were dating.  I now understand why when we embarked on our cruise ship, a staff member greeted me as Mrs. Trudeau. At that time, we were not married. I laughed and asked Kevin why the

5                                              Case No. 21STFL01559
**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

staff was calling me Mrs. Trudeau. Kevin told me: "It is because soon you will become Mrs. Trudeau."

C. Kevin also never told me that his marriage to Kristine Dorow was annulled by the Los Angeles Superior Court based on fraud on May 27, 2008, or that his first marriage to Christine Sheldon on November 10, 2000, was also annulled based upon fraud on August 9, 2002, by the Los Angeles Superior Court. (See **Exhibits "4" and "5,"** respectively for said Annulments.) It is clear that Kevin lied to me and my family about his past relationships and marriages and never once mentioned his prior divorce or annulments.

20. I have also learned that during 1990-1991, Kevin pleaded guilty to larceny and was convicted of credit card fraud, spending 2 years in federal prison because of his conviction. In 1998, he was ordered by the FTC to pay $500,000 as a result of his deceptive infomercials. Kevin did not tell me any of this during the time we dated and just prior to our marriage. I only found out about his criminal history after my interview with USCIS in 2018.

21. Kevin never told me that in November 2007, during the time we were having a "long-distance relationship," he was held in contempt of a 2004 Court Order and Judgment resulting from an action brought against him by the Federal Trade Commission ("FTC") for airing deceptive and false infomercials about his diet book and that Kevin was ordered to pay a restitution amount of $5,173,000 to his victims, which was based upon the FTC's estimate of the monies he received from millions of people who bought his deceptive weight loss book. Kevin also never told me that the 2004 Court Order was the result of a $2 million settlement he negotiated with the government (FTC) regarding his false claims that his coral calcium products could cure cancer and other serious diseases.

A. Kevin never informed that in November 2008, about five (5) months after our June 27, 2008, marriage, the Judge in his legal battles with the FTC amended the Judgment amount he owed the government to $37,616,161, which represented the estimated amount consumers paid to Kevin.

B. In 2012, Kevin never told me (around the time he was taken into custody because he was a high risk of fleeing the jurisdiction), that on July 13, 2012, the FTC moved to hold

6            Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

Kevin in contempt for the third time and that on August 17, 2012, the Court held that "Trudeau [Kevin] has little to no credibility with the court, and his criticism of the FTC's collection efforts for the benefit of the consumers on whose behalf the FTC has successfully prosecuted this action is totally misplaced." (See **Exhibit "6"** for summary page of matter FTC v. Kevin Trudeau dated August 17, 2012.)

C.     I also found out after my 2018 interview with the US immigration office, that the Court ordered in the FTC action against Kevin that the Law Offices of Marc J. Lane (Kevin's attorney) produce documents concerning Kevin's asset protection efforts noting that the crime/fraud exception to the attorney-client and work-product privilege applied in the FTC case against Kevin.

D.     Based upon the documents received from my requests for information from the government, including the exhibits used at the deposition of Marc Lane, I learned that on December 19, 2008, Marc Lane sent Kevin an email stating: "We didn't talk about ownership of KT [Kevin Trudeau] Radio Network or GIN [Global Information Network, Fdn]. Once you identify the nationality of the owner or owners, I'll be in a better position to see what's involved in designating the optimal business/tax/asset protection structure. . . ." In response to Marc Lane's email, I discovered Kevin wrote Marc Lane an email also on December 19, 2008, stating "will give you potential owners next week for radio and gin . . . no need to tell ftc about gin." (See **Exhibit "7"** attached hereto for a copy of this email conversation between Kevin's and Marc Lane.) As part of this email conversation, Kevin sent an email to Marc Lane dated January 30, 2009, stating, "why need to file anything in the USA? My wife is a Ukraine citizen.....and she is the only beneficiary." (See **Exhibit "8"** for a copy of Kevin's January 30, 2009, email to Marc Lane.)

E.     I discovered an Organizational Chart used as an exhibit during Marc Lane's deposition which listed all of the business entities that I allegedly managed and controlled, which I had never seen before and knew nothing about.  Included in the business entities are the KT Radio Network Inc. and Global Information Network (aka "GIN") entities referenced by Kevin in his email to Marc Lane on December 19, 2008. The Organizational Chart shows some of the entities listed had been incorporated in Seychelles, Hong Kong, Belize, Switzerland and Panama.  (See **Exhibit "9"** for a copy of the Organizational Chart.)

7                                                    Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

F.  I discovered a May 6, 2009, forged Retainer Agreement from Marc Lane to me and another forged June 17, 2009, Retainer Agreement from Marc Lane to me as the President of APC Trading Limited (a Belize Corporation), stating that I retained Marc Lane to personally represent me and to represent APC Trading Limited.  I had no knowledge of this ever taking place and never signed these documents, nor did I ever pay him a retainer in any amount to represent me.  (See **Exhibits "10" and "11"** for copies of said Retainer Agreements.)

G.  I also learned that Marc Lane received a forged Power of Attorney from me and reviewed multiple Demand Notes bearing my forged signature from the entities that I allegedly managed and controlled from 2011 to 2012.  I was shocked to see these documents bearing my name and signature as I never saw them before and certainly never signed any of them either.

22.  After reviewing the above-mentioned documents and many others, I now know that Kevin picked me to further his true agenda - to use my name and foreign status in his business transactions to avoid compliance with the government and FTC and to hide his assets from the US government.  Had Kevin told me before marriage that he had been married 3 times before, had 2 annulments based upon fraud, was a convicted felon who spent 2 years in jail in the early 1990s, had a $5,173,000 Restitution Judgment (subsequently modified to a $37,616,161 Restitution Judgment) against him and was involved in ongoing legal proceedings with the FTC, I would have never agreed to marry Kevin.  Kevin deceived me about who he was in order to induce me into marrying him.

23.  I have not lived with Kevin since 2012 when I moved to New York from Oak Brook, Illinois, to begin my graduate studies at NYU.  Kevin has been incarcerated since 2012/2013 and is still serving his remaining sentence under "home confinement" in Arlington Heights, Illinois, until May 2022.  I am fearful that when Kevin is released from prison, he will harass me and interfere with the new life I have made for myself in the Los Angeles area.  Being involved with Kevin has caused me tremendous emotional, physical and financial devastation, something I struggle with to this day.  I would like protections from this Court as part of the annulment judgment.

24.  On March 4, 2021, Kevin was personally served in Arlington Heights, Illinois, with a copy of my Petition for Annulment, Summons and related documents filed on

8                                Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

DocuSign Envelope ID: 2391869B-6FC7-4EDE-AC02-7B5493E9F48E

February 16, 2021. Kevin has communicated to my attorney that he does not oppose or object to the Court granting my request for an annulment. (See **Exhibit "12"** for a copy of the email from Kevin to my counsel stating he will cooperate with my request for annulment.)

25. Based upon the foregoing, I request that the Court forthwith grant my request for annulment of marriage from Kevin Trudeau and reinstate my maiden name, Nataliya Babenko.

26. The hereinabove set forth facts are true and correct and are known to me by reason of my personal involvement in the activity, my personal observation of the event.

I declare, under penalty of perjury pursuant to the laws of the State of California, that the foregoing is true and correct.

Executed this 5/27/2021 \_\_\_\_ day of May, 2021.

DocuSigned by:

DC7DF81762004E3...

NATALIYA BABENKO, PETITIONER

9        Case No. 21STFL01559

**DECLARATION OF PETITIONER NATALIYA BABENKO**

Ex. 1 at 28

# Exhibit B

U.S. Department of Homeland Security
*Office of the Chief Counsel*
*24000 Avila Road, Suite 3250*
*Laguna Niguel, CA 92677*



**U.S. Citizenship and Immigration Services**

January 11, 2023

**Giel Stein, Esq.**
**130 E. Randolph St. Suite 3900**
**Chicago, IL 60601**
**(312) 985-5900**

## Subpoena Regarding: Federal Trade Commission v. Kevin Trudeau; 03-C-3904

Dear Mr. Stein:

This letter is in reference to your subpoena duces tecum in the above-referenced matter. I received the subpoena on January 9, 2023, as an attorney with the U.S. Citizenship and Immigration Services ("USCIS") within the Department of Homeland Security. In this subpoena you are requesting that USCIS produce documents that relate to a "Form I-130 petition and supporting documents filed by Kevin Trudeau for the benefit of his then wife, Natalia Babenko."

In accordance with established federal law, DHS/USCIS declines to provide any documentation in response to this subpoena.

Federal law and corresponding federal regulations set for the procedures to be followed with respect to the disclosure of such material. *See* 5 U.S.C. §552a(b)(Privacy Act); *see also* 6 CFR Part 5. The Federal Courts have validated these rules and procedures. *See e.g.*, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 474-75 (1951); *Swett v. Schenk*, 792 F.2d 1447, 1451-52 (9th Cir. 1986); *Edwards v. U.S Dept of Justice*, 43 F.3d 313 (7th Cir. 1994); *Environmental Enterprises Inc. v. U.S. EPA*, 644 F. Supp. 585, 586 (D.D.C. 1987). The subpoena fails to meet the requirements of these rules and procedures.

The purpose of this letter is to inform you of the procedural prerequisites for obtaining information, either through the use of documents or testimony, from the Department of Homeland Security (DHS). The DHS regulations bar all DHS employees from providing oral or written testimony concerning information acquired while such person is or was an employee of DHS unless authorized to do so by the DHS Office of General Counsel or its designees. *See* 6 C.F.R. § 5.44. The DHS regulations require the party seeking testimony or documents to first set forth in writing, with as much specificity as possible, the nature and relevance of the information sought. *See* 6 C.F.R. § 5.45. You have failed to state with specificity the nature of the information that you are seeking and how these documents would be relevant to the matter cited in the subpoena.



**U.S. Citizenship and Immigration Services**

Moreover, the records you have demanded, to the extent that they exist, would be maintained in this Agency's system of records known as "The Department of Homeland Security (DHS), Alien File (A-File – hardcopy or digitized copy) and Central Index System (CIS)." *See* 72 Fed. Reg. 1755 (Tuesday, January 16, 2007). This system of records is protected from indiscriminate disclosures pursuant to the Privacy Act of 1974, as amended, 5 U.S.C. §552a. If the records you are seeking relate to either a lawful permanent resident or United States citizen, then the Privacy Act, 5 U.S.C. § 552a, prevents the release of this information without the subject's consent unless USCIS is authorized by one of the Privacy Act's exceptions.

Subsection (b)(11) of the Privacy Act sanctions agency disclosures made "pursuant to the order of a court of competent jurisdiction." 5 U.S.C. §552a(b)(11) The U.S. Court of Appeals for the District of Columbia has taken the position that this provision must be interpreted literally. That is, to be an "order of a court" recognized under subsection (b)(11), the order directing disclosure must specifically have been issued by a U.S. district federal court judge. *See John Doe v. Joseph DiGenova*, et al., 250 U.S. App. D.C. 274, 779 F.2d 74 (D.C. Cir. 1985); *see also Stiles v Atlanta Gas Light Company*, 453 F.Supp 798 (N.D. Ga. 1978); *U.S. v. Brown*, 562 F.2d 1144 (9th Cir. 1978).

As a result of the foregoing, USCIS respectfully declines to comply with the subject subpoena in the absence of a demonstration that the release of the information is authorized under the Privacy Act. Further, even if the Privacy Act were to authorize release, you have not provided the requisite writing, which sets forth with as much specificity as possible, the nature and relevance of the information sought.

If you provide me with a written summary of the documents you expect USCIS to provide as well as a description of the documents' relevance to the pending proceeding, I will consult with the appropriate officials to determine if UCIS can provide you the documents requested. In addition, if the documents are covered by the Privacy Act then you must provide me with a justification for their release. You may send the requisite information to my attention at the above listed address.



**U.S. Citizenship
and Immigration
Services**

If you do not withdraw your subpoena, this office will request that the U.S. Attorney move to quash the subpoena.

Sincerely,

Michael Ammerman, Esq.
Associate Counsel
U.S. Citizenship and Immigration Services

cc: Kimball Anderson, Esq.

# Exhibit C

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FEDERAL TRADE COMMISSION,

      Plaintiff,

    vs.

KEVIN TRUDEAU,

      Defendant.

CASE NO. 03-C-3904

HON. ROBERT W. GETTLEMAN

## [PROPOSED] ORDER

After consideration of Defendant Kevin Trudeau's Motion for an Order Directing the Department of Homeland Security ("DHS") to Produce Nataliya Babenko's Immigration File [1017], the Court hereby Orders DHS to produce Ms. Babenko's complete immigration file to Mr. Trudeau's counsel - Giel Stein, Clark Hill PLC, 130 E. Randolph Street, Suite 3900, Chicago, Illinois 60601 - by February 13, 2023, including any records of interviews with Ms. Babenko and those of her records that are found in DHS's system of records known as the DHS Alien File and Central Index System.

Dated: January 27, 2023

_____

HON. ROBERT W. GETTLEMAN