UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION,           )
                                    )
                Plaintiff,          )
                                    )
        vs.                         ) No. 03 C 3904
                                    )
KEVIN TRUDEAU,                      ) Chicago, Illinois
                                    ) January 26, 2023
                Defendant.          ) 10:00 a.m.

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiff:     UNITED STATES FEDERAL TRADE COMMISSION
                       BY:  MR. JONATHAN COHEN
                            MS. CRYSTAL DAWN OSTRUM
                       600 Pennsylvania Avenue N.W.
                       Mailstop CC-9528
                       Washington, D.C.   20580
                       (202) 326-2551


For the Defendant:     CLARK HILL
                       BY:  MR. GIEL STEIN
                            MS. NICOLE PREFONTAINE
                            MR. KIMBALL R. ANDERSON
                       130 East Randolph Street, Suite 3900
                       Chicago, Illinois  60601
                       (312) 517-7520




Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                          219 South Dearborn Street, Room 1706
                          Chicago, Illinois 60604
                          (312) 435-7626
                          *nancy_bistany@ilnd.uscourts.gov*

I N D E X

WITNESS                                                    PAGE

NATALIYA BABENKO

    DIRECT EXAMINATION BY MR. COHEN                        62

(Proceedings heard in open court:)

THE CLERK:  03 C 3904, FTC versus Kevin Trudeau.

Counsel will approach.

MR. COHEN:  Good morning, Your Honor.

Jonathan Cohen for the Federal Trade Commission.

MR. STEIN:  Good morning, Your Honor.

Giel Stein for Kevin Trudeau.

THE COURT:  Good morning, everybody.

All right.  We are here today to deal with a number of outstanding issues, and I want to begin with dealing with the nonappearance issue.  And I'm ready to rule on most of these today.  We do have some things that are left over, and I will get to those in a moment.

So, first of all, as you all know, back in March of 2014 I directed Mr. Trudeau to report to the Court when he was released from the Bureau of Prisons.  I issued a rule to show cause on November 17th of last year for failure to report.

I have received numerous pleadings from both sides about this issue, more than I needed, to be honest with you; and I just want to tell you what my ruling is going to be on this, for today anyway.

First of all, there are no contested facts about this at all.  Supervised release began when he was released on January 18th of last year, and supervision by the probation office began on that date.  If we look at the documents from

the criminal file, including the report we got or the report to Judge Guzman, which is document 237 in his case, that confirms when supervised release began.

There was no question that at that point Mr. Trudeau had an obligation to report to the Court or ask his lawyer to report to the Court.

In response to my rule to show cause, he has asserted advice of counsel as a defense. As the FTC has pointed out and as the Seventh Circuit has held -- I've got so many papers here, it's hard to find anything, to be honest with you; oh, here it is -- following Supreme Court precedent in *SEC versus McNamee*, I guess it is, which is 481 F.3d 451, Judge Easterbrook noted that advice of counsel may show lack of culpable intent for criminal purposes but not for civil contempt. *Scienter* is not required. Reliance on the -- this is a quote. "Reliance on the advice of counsel...is not a defense." And in any event, you would have to show what advice you relied on.

I have read Mr. Anderson's deposition. Frankly, if we had gotten to this research maybe before we started this, you might not have had to take Mr. Anderson's deposition. You know, taking counsel of record's deposition is always fraught with problems, and that deposition showed me what type of problems you could have.

But Mr. Anderson never said he gave him that advice.

He said he asked a question -- it's kind of late, but he asked a question: Are you still under supervision of the Bureau of Prisons?

He's not under supervision of the Bureau of Prisons. Mr. Trudeau knew that. And whatever he said to Mr. Anderson that he thought he was is just a lie, like many of the lies Mr. Trudeau has made to this Court and probably to counsel as well, but that's none of my business.

So there is no question that he was under a valid court order back in 2014. He disobeyed that order. He did not appear when he was released. And he is, therefore, in contempt of Court, and I am so holding he is in contempt of Court for not appearing.

I have not decided on what type of sanction to impose at this point, because I think that, like any other defendant, Mr. Trudeau has -- should have an opportunity to argue mitigation or whatever else he might. It could be incarceration. It could be a fine. It could be something else. I don't know, because we have other things to deal with.

So that is my finding on my rule to show cause for not reporting. I am finding him in contempt, and I am reserving the decision on an appropriate sanction.

Okay. So we have a bunch of motions pending. I am going to rule on them right now.

Mr. Trudeau filed a motion for miscellaneous relief

in which he asked for either a refund or an accounting. I am denying that motion. That's 927.

First of all, the distribution plan that we approved many years ago after the receiver's final report presupposed that we'd have enough money to pay everybody. We didn't. Not only did we not collect anything close to the $37.6 million judgment that I found Mr. Trudeau in contempt for not paying, there wasn't enough money to pay even the people who cashed the checks. And the checks were so tiny anyway that I could understand why people didn't -- why some people didn't cash them. It may not have been because they liked the book or whatever. It might be. But they didn't.

So, first of all, there's no money due to Mr. Trudeau until he pays the judgment. And then we make a distribution, and we see what's left. And the FTC had agreed back when that if there was money left over, it would go to Mr. Trudeau. But, again, that presupposes paying the judgment.

In that motion, Mr. Trudeau also asked for an accounting by the FTC. They have already gotten the accounting in the status report, so that's moot. So that motion is denied.

There is a -- Mr. Trudeau filed a motion for a rule to show cause, which is document 992, because of the use of attorneys' eyes only documents from the Babenko documents, we will call them. I think you know what we are talking about

here.  That's denied as well.

I think that Mr. Trudeau does have a point that maybe the FTC should have asked permission to use -- to disclose those documents in open court, but those documents are clearly not privileged, so there's no prejudice to Mr. Trudeau at all. There's no reason to have a contempt order against the FTC.

You know, it appears to me -- this is just an observation -- that Mr. Trudeau's counsel, who I admire and have known on a personal level as well as a professional level and I respect, but I think they have decided that the best defense here is a good offense.  It's not.  It's not.

We are not starting from scratch here.  You are coming in the fourth act of a long four-act play, and we have got so much that's already been done in this case and is finalized in this case that we are just not starting from a new position.  We are starting from pretty much an old position.

There is also a motion by Mr. Trudeau to compel the FTC to disclose what it knows about Mr. Trudeau's assets and subpoenas for documents.  It's document No. 1009.

As the FTC points out, Mr. Trudeau never had permission to issue discovery.  I'm not sure what discovery would even be appropriate at this point in the case.  The contempt order was issued -- well, I think the first one was back in 2010 and then another one in 2012.  Again, Mr. Trudeau failed to appear when he was supposed to.  We might have been

able to have a more orderly process if that had happened.

I have already found several times, frankly, but particularly in the order appointing the receiver, I adopted the findings proposed by the FTC that he had hidden assets, that he had lied to the Court, that he was in contempt again, and that required the appointment of the receiver.

And through very little effort on Mr. Trudeau's part, the receiver was able to locate some assets. And it cost pretty much half of the assets that he did locate in order to do so, which reduced the amount of funds available to pay down the judgment at that point. So the net amount of assets that were located was pretty much cut in half. And the receiver also found that there was $30 million dollars that he had identified that he couldn't locate.

In that order I found that Mr. Trudeau was hiding those assets, and that's why I ordered the coercive incarceration back then, back in 2014. And I suspended that -- I didn't vacate that. And that order was never appealed, by the way. It's a final order. And that order was -- is still in place, and I have been putting off reimposing coercive incarceration even though all of the findings that I have made over the decades are still in place. They are final, and they are enforceable.

But in any event, I am denying the motion to compel -- there is nothing to compel; that's document 1009 --

for those reasons.

Now, one positive thing that's happened since the last time we were together is that Mr. Trudeau has been able to raise and give to the FTC in partial payment of the judgment $1,850,000. He claims that these were gifts from his fans. Maybe they were; maybe they weren't. And I think this is one of the things we have hanging out there still.

That's a lot of money, but it does indicate to me that if it was legitimately raised and not just part of assets that he otherwise controls, which would be a serious problem for Mr. Trudeau, that he has the ability to contribute towards the judgment.

And the judgment is the judgment. I mean, you asked the FTC to account for what they think he owes, and they came up with two different methods. But the judgment is for $37.6 million.

From that you would deduct whatever has been recovered by the receiver, the net amount. You would deduct the $1,850,000 that Mr. Trudeau just gave to the FTC and perhaps that four-hundred-and-some-odd-thousand that was left over after the distribution.

To that you would add interest. Your claim that interest doesn't apply -- the interest statute doesn't apply to contempt findings, that might be correct if this had been a fine or something like that. This was a remedial judgment, and

the interest statute does apply. So the FTC's calculation of interest is definitely part of the calculation.

So the FTC's calculation, first alternative calculation -- I know they have got several here; let me see if I can find it -- I think is a correct one at this point. I think it comes to 33 million 476.

I don't know if that is exactly the number, but the way you get to it is by taking that judgment that he still owes, the 37.6 million less the amounts I just mentioned and adding interest, like any other -- I mean, this is a collection action in a sense. Any judgment creditor has the right to recover not only the judgment amount but also interest and also the cost of collection. So you would have to factor those in. And those numbers, it's probably a moving target at this point, but it will be close to that amount.

That's what -- Mr. Trudeau has said to me through counsel -- and actually, I think he wanted to say it to me directly -- that he would pay what I just determined he owed, that he has the ability to do that.

And I will hold him to that promise, not that I have any real faith in him. I have already found that he's not a credible person, that he's deceived the Court, that he's hidden assets. And it's time for him to get maybe one last chance to see if he can actually raise this kind of money.

And that's why I am reluctant at this moment to

incarcerate -- to coercively incarcerate him, because if he can raise almost $2 million in a couple of weeks, maybe he'd be able to pay it off.

And my chief concern -- I have said this to you before, Mr. Cohen. My chief concern is to get the money paid and the people who were defrauded redressed.

MR. COHEN: Your Honor, if I may, on that point.

That is also the commissions's chief concern, but there are -- there are two issues here. First of all, although Mr. Trudeau did raise money from other sources for approximately $1.85 million, Mr. Trudeau did not, as he is absolutely obligated to do, pay everything that he reasonably could.

So the record is clear -- and I can talk about this, but we can put on evidence to this effect if it is helpful -- that he had about $1,000,000 in earnings last year, none of which he paid to us, and about $150,000 at various points last year in cash on hand, none of which he paid to us.

He's simply paying other people's money to us. And while that is good in the sense of being able to return money to victims, that is what he is -- not what he is obligated to do. For him to purge the contempt, he has to pay all that he reasonably can. And the record is completely clear that he has not done so.

Furthermore, Your Honor, setting aside the Court's

factual findings and even setting aside the receiver's report from 2015, Mr. Trudeau has not been honest with us. In fact, he has lied to us under oath over the past several weeks in both depositions. And we are prepared to put on evidence to that effect today as well.

It simply cannot be the case that he has a million or more asset -- dollars in assets that he was supposed to pay to us or at least most of which should have gone to us and then, you know, didn't and that he's been dishonest with us not in the past but recently, and still there is no cause for coercive incarceration.

What's been established and I think what additional evidence today can show, if the Court is willing to hear it, is that coercive incarceration is the only option left to vindicate the rights of the victims in the authority of the Court.

MR. STEIN: Your Honor, if I may. I was going to wait until the Court was done speaking, but as long as Mr. Cohen is jumping in, if the floor is open, I have a couple things to say as well.

THE COURT: Well, Mr. Cohen did jump in there before I was -- before I was finished, because I was going to observe that we do have left several items. And I had not contemplated an evidentiary hearing today, because ordinarily I would have asked for certain prehearing submissions to help me prepare and

help both sides prepare.

And that is why when I got the calls, you know, about opening statements and closing arguments and everything else, I just didn't think it was necessary. We can do that, and we probably will do that.

But I agree with Mr. Cohen about this. And I'll let you respond, obviously, Mr. Stein. But, you know, the order appointing the receiver was not just adopting the findings that I mentioned earlier; it was also directing Mr. Trudeau to disclose all of his assets. It also directed him not to dispose of any assets until the judgment was satisfied.

I mean, you have to read that order. And so far I haven't seen any -- you know, he went to jail for eight-and-a-half years, so obviously that interrupted whatever proceedings we might have had during that period of time. I get that. That's why I suspended the coercive incarceration to begin with.

I am also -- I would also want to know -- and I haven't seen anything yet because maybe you haven't had a chance to actually get into this -- where that money came from, that 1 million 850. Where did it come from? Did it actually come from gifts, from third parties, at $50,000 apiece or whatever it happened to be? I read his deposition, and I know what he said about that. Or did it come from some other source, indirectly or directly, that Mr. Trudeau had control

over?

I think the bank account, you should probably cite the bank in, you know, a citation to discover assets against any of those banks, and you would be able to get the bank statements and that.  That should tell you an awful lot about where that money came in.  Did it come in in dribs and drabs, or was it one deposit?  I don't know.

He also said he would be happy to give you a list of the donors.  For some reason Mr. Trudeau, as smart as he apparently thinks he is, was unable to even recall the names of people who gave him as much as $50,000.

Mr. Stein, you really expect me to believe that?

So I think some inquiry -- I don't know if you have done any inquiry into that or not or if you intend to.  I'm asking Mr. Cohen.

MR. COHEN:  Some has been done.  A little has been done and more could be done.

But I also want to just reemphasis the related point; that even if it is true that every single penny of that $1.85 million came from a donor, that does not discharge Mr. Trudeau of his obligations to pay everything that he recently --

THE COURT:  You don't have to say.  I understand that.  I understand that point.

But there's another point.  There's another side to that; and that is, if it didn't come from third-party donors,

then it must have come from assets that Mr. Trudeau controlled, which would indicate, once again, that there are assets out there that we haven't yet discovered and might be able to.

So, all right, Mr. Stein, I'll turn the floor over to you. I know you want to talk.

MR. STEIN: Thank you, Your Honor.

I will start with the last topic that we were just discussing. How much does Mr. Trudeau still owe? There are some problems with the FTC's math, and it overlooks, we believe, some critical components that would determine the final balance. Let me just give the Court a couple of examples.

The first problem with the FTC's number -- and I'm not -- I'm talking about the adjusted number, the 21,225,740 that they landed on. Clearly Mr. Trudeau -- the debt has been reduced by more than just $4 million since the initial number down to 33.

But some of these problems also plague the 33 or what they call their method one problem. And the most obvious is, they don't eliminate any of consumers who have already received a first-round distribution but didn't cash it.

As the FTC reads the order to pay --

THE COURT: Wait. They deducted the net amount recovered.

MR. STEIN: No, that's not -- that's not apparent,

because the number of remaining consumers that they say are still left is 653,150. And if you take out those who did not cash the checks when they received them, you are down to 514,306. That affects, then, the multiplier of how much is owed to each consumer, which is also a problem.

THE COURT: No, I think you are jumping way ahead of where you should be starting.

There's a judgment, a final judgment of $37.6 million. Okay? That is a judgment.

What they agreed to, what the FTC agreed to and what I approved -- this wasn't part of the judgment; this wasn't an alteration of the judgment -- was a method to distribute the amount of money that the receiver was able to get in those two distributions.

The judgment is still the judgment. There's been no 60(b) motion or any other kind of motion to alter that judgment. That's what he owes. And from that you would deduct any type of any money that has been paid towards that judgment just like you would any other judgment.

MR. STEIN: And I'm not quarreling with that at all, Your Honor.

What I -- what Mr. Trudeau is saying is that the judgment being what it is is to be paid pursuant to the Court's redress plan. And under that plan, its plain terms are that any consumer who doesn't cash their first-round check doesn't

move to the second-round check. That's the Court's plan.

Mr. Trudeau is not asking to modify anything. That is the language of the consumer redress plan. And when you factor in people who drop out because they are just not interested in cashing the check, then you are left with a very different number of remaining eligible consumers to whom a subsequent round could go out, and that affects the math.

Another problem with the FTC's analysis is it still wants to pay every one of the remaining consumers the full $29.42 price of the book. But some consumers -- the remaining consumers have already received each $9.12 of redress, so they can't still be owed the full purchase price of the book. They've been partially compensated.

THE COURT: I don't think that's what they've suggested.

MR. STEIN: That's what their numbers show.

THE COURT: They've suggested paying them the difference.

MR. STEIN: That is what their numbers show in their narrative explanation of it. I'm just doing -- I just -- we just poured over the math and tried to figure out how are we so different on these numbers.

And their own explanation shows they believe every remaining consumer, which they think is anybody who bought the book regardless of whether they cashed the first-round check or

not, is entitled to the full 29.42. And that's how you get to their number. When you do that math, their calculation seems to match up, so we know that that's what they are assuming.

They also have another problem, though, in that $21 million fine that's left. They have a 7 million -- $7.1 million future administrative fee cost built into that that they say is due now.

It can't be due now if it hasn't yet been incurred. Maybe -- maybe the administration fees, much as it pains me to say, because they are very high, and they are not going to the consumers; they're enriching the administrator -- but maybe they will come to 7.1 million down the line.

That also assumes that nobody will drop out on any of the subsequent rounds. And so all those consumers will have to be redressed in every subsequent round; thereby, raising the administration fee.

But one thing is for sure, Your Honor, a fee hasn't been paid yet. You can't add in a projected future $7.1 million fee into a number when the issue is what does he currently owe now. And as the Court pointed out, that will change based on who drops out, who cashes their checks, and how many people are left each time.

THE COURT: After he pays.

MR. STEIN: Yes.

THE COURT: After he pays.

MR. STEIN: He's paying.

THE COURT: And if the administrative costs are less than the FTC is predicting right now, that money will go back to Mr. Trudeau, because the FTC has agreed to that provision.

MR. STEIN: So here --

THE COURT: They didn't have to, by the way. They did that as a -- you know, during the receivership in order to just get it -- get that money out the door and see if it -- you know, if that was sufficient. But we didn't get the money that we thought we would get.

MR. STEIN: If I may, Your Honor.

I think the fundamental problem on this payment issue is this: As the FTC sees it, Mr. Trudeau needs to come up with $37 million or $21 million, whatever they think the amount owed now is, now. He has to come with it now, and then we will distribute it under the plan, and we will see if there's anything else. And at the end of everything, if there's anything left, it goes to Mr. Trudeau.

But that assumes that the Court has already bought into the premise that Mr. Trudeau can cut that check for $21 million or $33 million now. He cannot. And we can fight over whether he can or can't and if he's hiding assets that would enable him to do that or not. But the point is Mr. Trudeau's position is he cannot.

What he can do is pay over time, as best he can, as

the law calls it, reasonable and energetic efforts to purge his contempt. He can do that. And the Court has on -- now 1.85 million reasons to show why he is able to do that. He will continue.

But as long as the premise is he hasn't purged his contempt until he's paid whatever the entirety of the number is that they say he owes, we are stuck in this battle of why hasn't he paid this entire number.

Answer from Mr. Cohen, he's hiding assets; he doesn't want to pay it.

Answer from Mr. Trudeau, he can't. He can pay over time at a pretty reasonable clip in order to redress the consumers.

MR. COHEN: Your Honor, if I may.

I don't want to spend a lot of time on the math, but to the extent the Court is interesting [sic], we strongly disagree that the math is wrong. I think that the -- our math is correct. I'll set that aside unless the Court wants to hear about it further.

It was entirely appropriate to put the administrative expenses in the order. This is a restitution order, and that's routinely done. And regardless, it is in the order.

Likewise, the requirement that Mr. Trudeau pay that sum forthwith is in the order. There has been no request under Rule 60(b) to modify the order, and we're prepared to argue

such an oral request now. There's no basis under Rule 60(b) to ever permit such an order in the context we are currently in.

But I don't want to lose sight of the fact that -- that while Mr. Trudeau has at least assertedly been able to raise 1.85 million, the issue before the Court is what to do about the fact that he has still been dishonest with us over the past six weeks regarding other assets and still hasn't paid assets that he currently has.

The obligation under -- under the law here -- and this is the law, by the way, that the Court accepted in its proposed -- in 2013 -- is to make all reasonable efforts, not just reasonable efforts. And that means pay all that he can.

Mr. Trudeau is admittedly sitting on -- he had a million dollars in salary last year at various forms of compensation. He had about $150,000 in cash. Why are we not getting that money? The question --

THE COURT: Stop there. Mr. --

MR. STEIN: I have an answer for that --

THE COURT: Okay.

MR. STEIN: -- Your Honor, as you may suspect. And it's prepared to come out of Mr. Trudeau's mouth but -- if we are taking testimony. But here's the answer.

Mr. Trudeau has an income from his current employer. He has had -- he's only been out of prison for a fairly short time --

THE COURT: His current employer is GIN, right?

MR. STEIN: Yes, his current employer --

THE COURT: Which I found that he controlled, and that was one of the Trudeau assets that I found back in 2013, I believe, or maybe even earlier than that.

MR. STEIN: He is not in control of the GIN entity that he works for now, as he swore to the FTC at his deposition. That is in the hands of other people.

Mr. Trudeau, obviously, is the feature attraction of the GIN operation, which, as he would tell you, he goes around the country; he goes around internationally if can he can, although these days he is not doing either because of the restriction. But he puts on events for GIN at which he speaks, and he is the main speaker. And he draws people, and they pay good money to belong to this organization and hear Mr. Trudeau speak about various topics.

My point is, the only reason he has some money in his disposal right now is because he's earned it from GIN, and that money is doing two important things that the FTC did not ask him about for some reason.

Number one, he's paying his legal defense costs with that money, which are substantial. Number two, Mr. Trudeau is using that money to save up to honor his commitments to people who donated money to him in order to help pay the redress. He didn't get that for free, so to speak, with no strings

attached. He made promises to people that he will give them his time in private meetings. He will put on events as best he can as his way of giving back for the donations that they gave.

He has to pay those expenses out of pocket. Let me say that again. No one is covering that expense. That is going to come out of Mr. Trudeau's pocket to honor his commitments to the donors. GIN is not covering that.

And that is expensive, because these donors are all over the country, and some of them are international. And he has to travel to them, put on an event for them and come back. And that has a cost. That is the only reason Mr. Trudeau is sitting on some amount of money.

THE COURT: He has a prior obligation to pay the judgment. You are just forgetting about that.

MR. STEIN: Yes, but there is a -- he has to do and earn his keep in order to generate money to pay the redress plan.

Mr. Trudeau -- see, this is what happened the last time. The FTC wants this paid so badly that they got a receiver who liquidated all the Trudeau entities. Okay. But those were the means by which Mr. Trudeau could have raised money to pay the redress, so that was a lost opportunity.

Now we're in the same position again. They want to throw Mr. Trudeau in jail and incarcerate him just when he's getting back up on his feet and has a demonstrated ability to

pay the redress that remains, quite nicely, I might add.  I think that's a very impressive number that he's put in, but he has business expenses associated with that.

THE COURT:  Excuse me.

(Telephone interruption.)

THE COURT:  Sorry about that.

MR. STEIN:  Mr. Trudeau's ability to generate money costs money.  This is not a novel thing.  You got to spend money to make money.  He has to travel.  He has to entertain. He has to also buy clothing and his costumes and what it takes to be Kevin Trudeau and sell the Kevin Trudeau image and brand. And that comes with some expenses that he is paying.

That is why he has some money.  That is why he has not a heck of a lot, but he has about 140-something-thousand in a few minor investments that he's been able to save.

And I just explained to the Court, as he would tell you, and we can explore this further.  Don't take my word for it, obviously.

But that 140,000, the money he's earning from GIN he's using to pay legal fees and his obligations to donors. But do not hear me saying that he will not dip into his earnings to satisfy redress.  Not at all.

Mr. Trudeau will pay whatever reasonable portion of his personal earnings as well as fund-raising.  And he's prepared to tell you about a whole plan that he has to raise

money. It's not just fund-raising. Mr. Trudeau has other options. He is a New York Times best selling author. He has a documentary ready to go. He has a speaking tour that he can go on. He's done it before. He's toured with General Schwarzkopf and Mikhail Gorbachev. People pay a lot of money to hear Kevin Trudeau speak alone or with other people.

Mr. Cohen may think this is funny, but this is not funny. I don't understand. There's no humor here. There's a lot on the line for my client, Your Honor, and he wants to pay his redress. He has had -- I understand the track record in front of this Court. That much I'm familiar with. Okay? I don't pretend to know all the weeds and ins and out, but I do understand the track record.

But one thing is for sure. Mr. Trudeau is out of prison a chastened man after eight years in jail, and he is trying to demonstrate that fact by showing that he raised a million 85 toward redress. He's going to have to spend some money to continue doing that. He has to be allowed to earn something in order to keep his business going. That's all he's asking for.

And he will submit to transparency measures. We propose third-party verification of the source of any funds that Mr. Trudeau puts towards redress. We propose third-party verification of Mr. Trudeau's keeping to whatever schedule of payments that we may come to. And we propose third-party

verification of the source of any other income that Mr. Trudeau is using to live off of while he's paying down the full redress sanction so that the Court can be satisfied that he's not spending money that he should be spending on redress to live lavishly and do the things that the FTC is saying.

He will subject himself to all these measures. Let's come to a reasonable arrangement.

MR. COHEN: Your Honor, if I may.

We would also like to hear from Mr. Trudeau today, because the FTC wants, through the cross-examination of Mr. Trudeau, to bring to light some of the, frankly, ridiculous answers that he provided under oath over the past six weeks.

In terms of the money that he has, we don't credit the story that he is giving us about how he needs money to earn money. That is not what he said. He said that he had no obligation to those individuals, just sort of maybe that he would do some future thing with them, no guarantees.

The point is that there is clearly assets that are available to Mr. Trudeau right now or that have been available to him over the past year -- we are not talking about 2013; we are not talking about 2015; we are not even talking about gold bars -- that he hasn't paid over.

He simply does not understand that he is obligated under the Court's order to make all reasonable efforts, which means pay over everything he is able to pay. We'd ask that he

be held at least until he make the payment of 140-some-thousand dollars that Mr. Stein just said he's able to pay. That is not a big ask.

MR. STEIN: Wait a minute. Your Honor, with all due respect to opposing counsel, the word "reasonable" is a fluid term.

If you are making $50,000 a year and you have to disgorge 25,000 of that, half of that income is arguably not reasonable under those circumstances.

If you are making a million dollars a year and you have to disgorge half of your income, that may be reasonable.

Mr. Trudeau is not objecting to a reasonable payment plan. He is not objecting to contributing from his income with GIN and any other source of money that he raises, and he's committed to doing it in various ways that I can -- that I've outlined and touched on generally. But he is committed to making payments out of whatever source of funds he can bring in to satisfy redress.

We just need to decide what is reasonable in light of the very real fact that at least two things -- three things. It takes money to raise money. Mr. Trudeau can raise money by doing the Mr. Trudeau presentations and talks and being Mr. Trudeau, because that is what people like and support and want to pay for. And that doesn't come cheap.

The second thing is, he has legal expenses. That's

not a surprise.

And the third thing is, he does have commitments to people who are giving him money that he wants to try to keep. These aren't written contracts. These are not --

THE COURT: If I remember his deposition, he said he might or might not actually --

MR. STEIN: And he said --

THE COURT: -- do that seminar.

MR. STEIN: That is correct. And he intend --

THE COURT: That's hardly a commitment.

MR. STEIN: No. But in Mr. Trudeau's mind, when he tells donors: If I can, I will come give you a one-on-one consultation in England or California, or wherever they may be living, in Canada and Mexico. I will host an event for you. I will do this. I will go to dinner. I will bring you and your other members.

He wants to keep that obligation. It doesn't need to be in writing in order for Mr. Trudeau to want to honor that promise to his fans and his supporters.

THE COURT: Do you dispute Mr. Cohen's statement that he had income of a million dollars in the last year?

MR. STEIN: No. He made all in -- and I think they are also counting, though, business expenses that were paid for him by the fan club, which is not income. Okay?

THE COURT: Well, it's money available.

MR. STEIN: But those are business expenses that Mr. Trudeau is paying, and the fan club paying --

THE COURT: That he doesn't have to pay. So he has the available money.

MR. STEIN: He has available money but --

THE COURT: Why didn't he contribute any of that?

MR. STEIN: Let me answer that question squarely, Your Honor.

I understand the Court's reaction to the motion for miscellaneous relief, and we understand that the Court did not accept any suggestion that Mr. Trudeau may be owed money. I understand that.

But up until the Court reacted to the motion for miscellaneous relief, Mr. Trudeau and his counsel were under the understanding that, number one, he may not owe any more; and if he owes, it's not clear how much.

So when the Court expressed its skepticism a couple months ago late last year about the motion for miscellaneous relief, that is what prompted Mr. Trudeau -- in case you are asking why didn't this 1.85 million not come in sooner, that is what prompted Mr. Trudeau to say, "I obviously owe something. The Court does not accept the premise that I do not owe anything, much less that I am owed a refund."

And so that is what prompted him to start going out and preparing to raise this money. And he will continue to do

it.  But that's the answer to why he hasn't done it up until now.

MR. COHEN:  Your Honor, if I may.

There's a simple approach here that -- that I think can move the ball forward in a really important way and establish the right way to do this going forward.

He could be held today until he turns over just the 2012 -- 2022 money, just what is in those accounts.  He could do it by the end of the day.  He could do it by the end of the day.

We have issues with the gold bars that we would like to talk about today, Your Honor.  We have issues with the receiver's report that we would like to talk about.  We have issues with Marc Lane and the asset protection situation.  But there are assets right now that he is obligated under this Court's order to turn over.  He's been obligated; he's had that obligation for the entire past year.  He's known about that obligation; and he has, once again, thumbed his nose at the Court.

We previously had -- the Court previously had coercively incarcerated Mr. Trudeau until he came forth with a thorough, sufficient explanation of where his assets had gone and had paid everything he could.  We are in the same spot right now except for we know he has more money sitting right there that can add to the -- to the money that will go back to

the victims.

THE COURT: Where is the money sitting?

MR. COHEN: We -- our understanding is the money is sitting in three accounts. I believe it's Fidelity, a cryptocurrency account that I have written here, but I can look up. It's a crypto wallet. And then something called -- I think it's My Savings Account. But basically a savings account, a Fidelity investment account, and then a cryptocurrency account that adds up to somewhere between 140 and 150.

That is a little bit dated, because that was information that was given to us a couple of months ago. But at bare minimum, the Court can hold him until he turns that money over. It could be a couple of hours. We could be talking -- or we could come back in a couple of hours, and that money could be turned over to us; or if the money is gone, he can say, well, okay, I moved it to this other account. And then we will at least have an answer to this question. All right.

But he was in 2013 coercively incarcerated. That was -- that was stayed, not vacated. We have all sorts of questions about other assets. But what makes this situation, I think, notable is here we have particular assets that he can turn over in hours. He could turn them over in hours. And it will both establish that this is a -- get the message through,

frankly, to Mr. Trudeau that this is real.

One of the concerns that the commission has had for a long time is that Mr. Trudeau, in effect, thinks that he can do whatever he wants. He didn't show up because he thinks he can do whatever he wants. He didn't pay over the money that he knew he was obligated to pay because he was assuming there might be some hearing some day, and then he would get a second chance or a third chance or whatever.

But here we have established what we need to establish legally. We have specific assets that could be turned over within hours, and there's a clear right, if not an obligation, for the Court to hold him until he pays that over. He can pay it over again, Your Honor, in hours.

MR. STEIN: Your Honor, the representation that Mr. Trudeau is still playing games with this Court and disrespecting its authority is categorically false.

Mr. Trudeau is doing everything he possibly can, not to mention the standard reasonable and energetic efforts, in order to meet his obligations. You don't need to coercively incarcerate Mr. Trudeau to tell him to pay whatever portion of his current savings that the Court believes is necessary.

Coercively incarcerating Mr. Trudeau may satisfy Mr. Cohen and may be a badge or a notch on his belt back at the FTC, but it will do one thing for sure. It will seriously hamper Mr. Trudeau's ability to continue paying and marshaling

the resources to pay the redress plan.

And let me make clear. Mr. Trudeau is very aware of his supervised release conditions, Your Honor. If he violates -- one of those conditions on page 5 of his supervised release conditions is obeyance with every order of this Court in this case.

If he is found -- and I will touch on this in a moment. If he is found in contempt, if he's coercively incarcerated, that puts him in a very difficult spot with Judge Guzman, and he is keenly aware of that. He could serve the rest of his supervised release period, which is some four years, in prison just on that. Even if this Court wants to coercively incarcerate him for a day or a week or whatever short period of time the Court finds necessary, that triggers a very serious problem for Mr. Trudeau in front of Guzman.

And at the end of the day, Your Honor, the consumers are going to suffer, because it will take that much more time to get them the redress that they want. If the Court wants to order Mr. Trudeau to pay any money out of his savings, if it's not persuaded that he should have at least some of that money available to pay legal fees and marshal obligations to donors so he can continue to raise funds from them in future rounds, then so be it; Mr. Trudeau will pay it.

THE COURT: What is the total of those three sources that you just mentioned?

MR. COHEN: It's approximately, I believe, 142. And I can get the exact total. If the Court would indulge me, I can get the exact total.

THE COURT: That's close enough.

MR. STEIN: It's about -- I thought it was 146, but the number is --

MR. COHEN: It's between 140 --

MR. STEIN: -- about right --

THE COURT REPORTER: I'm sorry. One at a time.

THE COURT: One at a time.

MR. STEIN: I apologize. I agree with that number. It's about -- I think it was 146.

THE COURT: Would you be willing to commit to paying that right now?

MR. STEIN: I would like --

THE COURT: Your client is nodding yes.

THE DEFENDANT: I guess what percentage --

THE COURT: Why don't you -- hold on. I don't want you to say anything, Mr. Trudeau, without consulting your counsel.

MR. STEIN: Thank you. I would want to consult.

THE COURT: Why don't you go back and consult with him right now?

THE CLERK: Hang on. I'm going to turn off the mics.

(Discussion off the record between Mr. Stein and

Mr. Trudeau.)

MR. STEIN: May I, Your Honor?

Mr. Trudeau is prepared to disgorge 100 percent of the 142, 46, whatever those accounts come to. I think it's a Trezor account, a Fidelity account, and there's a Wells Fargo account. There's three accounts totaling about 140-something. He's prepared to disgorge 100 percent of that amount.

What Mr. Trudeau is asking to make clear, though, is -- he just reminded me -- he also has a tax bill coming up. He needs some money, a way to pay his tax commitments to the government as well. He needs money to pay his legal fees.

He wants to know going forward, out of his income, how much -- what percentage of his income going forward should he be disgorging. And that should be a reasonable amount. I submit we cited cases to the Court that say at times, depending on the amount of income that a person makes, up to 50 percent can be a reasonable amount.

I don't believe that this is -- that we are in the world of a garnishment, so I don't think the 15 percent cap applies. But Mr. Trudeau wants to understand going forward what percentage of his income should he disgorge.

He also wants to know what percentage of any other streams of income that he may generate, other than income from GIN, should he disgorge.

And I want to stress something, Your Honor. Again,

Mr. Trudeau is a businessman who needs to travel in order to generate the income that he can use to pay the redress fund. His ability to generate that money is hampered when he's constricted.  Right now he can't travel internationally; and, of course, Your Honor limited him to the Northern District of Illinois.

We would ask the Court to consider the logical implication of wanting Mr. Trudeau to pay as much as he can as quickly as he can forthwith, the connection between that and letting this man do what he does best, and that requires travel.

He's not going to be very effective raising this kind of money that we are talking about until the redress sanction is paid if he's stuck in Chicago and can't go anywhere.

MR. COHEN:  Your Honor, if I may.

Essentially what they are asking for -- and I'll be brief -- is a payment plan.  The order that is before the Court, the order that was issued in 2010 that is a final order does not contemplate a payment plan.

They could file a motion under Rule 60(b) if they want.  We will strenuously oppose it.  It would essentially be frivolous, and I'm happy to talk about why.

Mr. Trudeau simply cannot be placed on a payment plan.

MR. STEIN:  There is no need for a payment plan.

That's not what we are asking for. We did not bring a Rule 60(b) motion. I know how to file one. We did not file one.

THE COURT: It's a little late.

MR. STEIN: Absolutely. So my point is, we did not seek that remedy. We are -- we think that the current plan that the Court set up, which is, rounds of redress as money accumulates to the consumers. Those who cash the check move on to eligibility for the next round when there's more money to distribute. That is the plan that we believe we should be following.

But, again, you can hear in Mr. Cohen's comments that fundamental difference of views that we have. The FTC's position is, pay the entire $21 million judgment now, and then we will talk about what's left later after the plan runs its course.

Our -- that assumes that he has that money laying around --

THE COURT: That brings us to, perhaps, the most difficult issue that I wanted to talk about today; and that is, where do we go -- and I know that maybe you had some evidence that you were planning to produce in open court. And, of course, I'm more than happy to hear such evidence. I just wasn't prepared to do it today. But we still have findings that are as valid today as they were back in 2013, that there's $30 million missing. And there were assets that the receiver

identified. It's in his report. You have got the report, Mr. Stein. It's in the report that he was able to locate assets -- no, I should say that he was able to identify assets that he was unable to get his hands on, and that came to about $30 million.

These were offshore assets. These were the gold bars. These were all kinds of different types of deposits and that sort of thing, companies. If you go back and read the report, which I did a few days ago, you know, it brought back a lot of memories. Let me put it that way.

So the question is: Are we going to get to the bottom of that? Are those assets still available?

MR. STEIN: Your Honor --

THE COURT: You say no. Mr. Trudeau in his deposition says, "No, I don't have those assets." They are gone. I never -- I didn't have gold bars. I gave them to my wife or I bought -- she bought them or I bought them."

There are all kinds of different explanations for the gold bars. I don't think that they amount to -- I don't know what they amounted to, but I don't think it was enough to pay the judgment. But there are other assets, and I think we have to get to the bottom of that --

MR. STEIN: Your Honor, if I may.

THE COURT: -- before we can conclude this and before I allow Mr. Trudeau to leave the Northern District.

And I'm sure Judge Guzman will agree with me that -- I appreciate your point about his ability to earn money. We have to get to the bottom of that.

MR. STEIN: Your Honor, if I may.

If we are to have this hearing, which we welcome that opportunity, we want to be heard on this point thoroughly beyond just my presentation here at the podium today. But if we're to have that hearing, Your Honor -- and I understand you made a ruling on the discovery that we're seeking -- but I would ask the Court to consider this.

The discovery that we're seeking goes to this issue of Mr. Trudeau's -- the FTC's supposed current evidence, the Babenko documents, the smoking gun that they came running in here with that shows that Mr. Trudeau supposedly is still hiding assets as he was back in the day.

The discovery that we are seeking, Your Honor, is not meant at just targeting some of the main conclusions of the receiver's report on which he's already been mentioned several times today. You can see that there's no way around this elephant in the room.

The receiver's findings are at stake here. And we -- if we're to have this hearing, we are going to question some of those findings. But we also have a right to question the new evidence that the FTC says it has, and we ask for some discovery into that new evidence.

For example, we asked for all the communications between Miss Babenko and the FTC. We have -- there's -- we have reason to believe there's been quite a bit of collaboration there, and we don't know what else she may have said to them. They've cherry picked some of the best presentation of their experience with the documents from Miss Babenko, fine. But we have a right to discover what else was said. There's no privilege there.

We also asked for the communications between the FTC and the receiver. We want to see what else was going on there. The receiver is pretty much an agent of the FTC, and Mr. Cohen even submitted a --

THE COURT: The receiver was an agent of the Court.

MR. STEIN: But Mr. Cohen submitted a declaration supporting the legitimacy of the receiver's work, which is very unusual, in my experience, possibly making himself a fact witness in this case even.

I'm not calling Mr. Cohen to the stand, and I'm not asking to do that. I'm just making this point. If we're to get into an exploration of whether Mr. Trudeau is hiding assets, the discovery that we're seeking is important for him to make his case on that point.

And so far the discovery has been very one sided. I understand the Court gave an order Mr. Trudeau is to cooperate with the FTC, and he has been doing that, as best he can.

Let me just point out, though, just a couple of things for the Court to consider about the numbers that have been thrown around.

Yes, the receiver found that there's $30 million unaccounted for; but importantly, 13.6 million of that number, Your Honor, the receiver says is revenue from offshore entities. Well, revenue is not profit, Your Honor, because the receiver does not account for any of the expenses to determine net profit that could have been used for the redress.

Everybody knows that revenue is not profit. There's operating costs. There's expenses. And when you back all of that out, you are left with a number that arguably is net-net, and that may be able to go to some other reason like the redress. But the receiver never did that math. We don't know. But it's not correct to say that there's a full $30 million pot of gold out there that Mr. Trudeau is sitting on.

As for the remaining $17 million balance off of that, well, the FTC's reliance on the receiver's report for that ignores the requirement that Mr. Trudeau hold that proverbial key to his cell if he's to be coercively incarcerated. And under the *Gompers* and *Bagwell* decisions of the U.S. Supreme Court, the Court knows that Mr. Trudeau has to have that chance to purge his contempt by turning over some identifiable property in his possession or control for the benefit of the eligible consumers.

But aside from the $200,000 or so in gold -- and it is about 200 grand when you add it up -- this missing gold that they keep saying Mr. Trudeau has -- and I'll address that if the Court wants to -- the receiver didn't identify -- other than that 200 K in gold, he didn't identify a single asset that Mr. Trudeau could surrender for the benefit of redress.

Sure, he said that he found that he can't account for 17 million, but that doesn't mean that Mr. Trudeau has that 17 million. They hired one of the best receivers in the world, supposedly, to go and find Mr. Trudeau's assets.

There's two options for an outcome when the receiver says he can't account for something. Option A is Mr. Trudeau must be hiding it. Well, he must be really good at hiding it if the receiver couldn't find it. That's the FTC's position.

But you have to understand that there is a second choice. And Mr. Trudeau just doesn't have it, and the evidence for why he doesn't have it is not insignificant. If you look at what Michael Dow testified to in his deposition, which the FTC does not like to cite to Dow's deposition, he did an accounting, a proper accounting, not a compilation like the receiver did, of the 10 Trudeau entities. And he explained what he found. And this all goes to that remaining $17 million that is out there; and therefore, Mr. Trudeau supposedly has it.

Well, for example, 911,000 of it Mr. Dow explained is

unpaid commissions to Mr. Trudeau from GIN; 2.6 million was unpaid to Mr. Trudeau in Alliance Publishing book royalties; 400,000 was unpaid to Mr. Trudeau from the KT Radio Network.

The receiver admitted in his report that he did not audit Mr. Trudeau's existing assets. He didn't. And the receiver also conceded that accounting records were missing, that they were incomplete, and they were erroneous.

Now, that's not surprising in itself because Mr. Trudeau's books and records were actually not maintained or audited by an accounting firm. They were -- appear to have been created by a lawyer and some other non-CPAs who were using QuickBooks.

The receiver found that Mr. Trudeau only actually got $1.1 million in revenue from the sale of his infomercial business, including the weight loss cure infomercial. But the Trudeau entities, Your Honor, booked $120 million of revenue, revenue reflecting the face value of that uncollectible ITV promissory note. The Court may recall what the ITV entity is.

That recorded unrealized gains on the Trudeau entities' books, after he adjusted for his overstatement, the receiver then concluded that almost all of the Trudeau entities suffered operating losses. They had nothing that they could hide, therefore, from Mr. Trudeau. They weren't holding it because they lost that money, because they never got what they were supposed to get out of the ITV purchase of GIN.

FTC argues that some of those operating losses reflected expenses that were paid to Trudeau. Okay. But that doesn't necessarily mean, Your Honor, that Mr. Trudeau kept those payments.

On the contrary, the receiver said that the payments were partly used for ordinary business expenses and to maintain Mr. Trudeau's lifestyle.

The FTC may take issue with Mr. Trudeau's lifestyle, but that money is gone. If it was spent on Mr. Trudeau's lifestyle, it's gone; he doesn't have it anymore.

Now, some money was also used to buy the house in Ojai, California; but Mr. Trudeau gave that property over to the receiver, and he sold it.

The final word, then, on the receiver's report -- and there's much more that could be said, and I'm not here to litigate the entire case on the receiver -- is that it's a partial compilation of Mr. Trudeau's receipts and expenses that was not prepared according to generally accepted accounting and auditing standards.

And I'll end with this, Your Honor, which the Court can take judicial notice, of course, of the AICPA statement on standards for accounting and review services, No. 19.

Here's what they say about a compilation like the receiver prepared, and I quote. I have a copy for the Court as well. May I hand this up, Your Honor?

THE COURT: What is it?

MR. STEIN: This is the AICPA compilation of financial statements, and I'm going to point the Court to standard No. 19, which talks about the reliability of compilations.

THE COURT: And why are you doing this?

MR. STEIN: Because, Your Honor, I think it goes to the Court's assessment of -- and just to give you a flavor of our view of the evidence that is the receiver's report since we are all talking about what it means about Mr. Trudeau's hidden assets -- alleged hidden assets.

I would submit, Your Honor, that according to this very authoritative organization, there's a comment about the kind of work that the receiver did. And they say, and I quote: "A compilation differs significantly from a review of an audit or financial statements. A compilation does not contemplate performing inquiry, analytical procedures, or other procedures performed in a review. Additionally, a compilation does not contemplate obtaining an understanding of the entity's internal control; assessing fraud risk; testing accounting records by obtaining sufficient appropriate audit evidence through inspection, observation, confirmation, or the examination of source documents; for example, canceled checks or bank images; or other procedures ordinarily performed in an audit. Accordingly, the accountant will not express an opinion or

provide any assurance regarding the financial statements."

My point is this, Your Honor. If we are to have an inquiry into the receiver and what weight and role his report plays in determining if Mr. Trudeau is hiding assets today, that's another aspect that we want to dive into; but we have reason to question those findings which have never been questioned. If we're going to have a hearing on it, we have something to say about that as well.

THE COURT: Isn't it a bit late? Isn't it a bit late?

MR. STEIN: Well, if we're going to have a hearing, though, now about Mr. Trudeau's currently hiding assets, during which the FTC is going to stress the receiver says he's hiding assets, and here is why, because there's $30 million unaccounted for, Mr. Trudeau has a right to put on a defense and say, well, that 30 million consists of parts that he never got; that 30 million consists of a compilation that was never properly done to the level that would support using as evidence that he is actually hiding assets. And here are some other problems with the report.

That is what they're putting in front of the Court now as evidence that Mr. Trudeau is still hiding assets.

THE COURT: Okay.

MR. COHEN: Your Honor, if I may, just briefly.

THE COURT: Let me just -- okay.

What I want to know is what the FTC would propose presenting as evidence --

MR. COHEN: Let me give you one --

THE COURT REPORTER: I'm sorry, I didn't hear the end of what you said, Judge.

MR. COHEN: I apologize.

THE COURT REPORTER: He was still speaking.

Go ahead.

THE COURT: I forget.

THE COURT REPORTER: "...presenting as evidence" -- then you got stepped on.

"What I want to know is what the FTC would propose presenting as evidence" --

THE COURT: -- of what assets there are that have not been accounted for.

MR. COHEN: Your Honor, I will give you one example.

Mr. Stein glossed over just briefly, and he sort of said there's these only $200,000 worth of gold bars.

For the better part of a decade, Mr. Trudeau has blamed Miss Babenko for everything. If the Court will recall, he has said that she was a successful businessperson who was really running all these companies, and now more recently over the past -- in two sworn depositions he said, I think approximately a dozen times, that he gave the gold bars to her.

Your Honor, Miss Babenko is across the street right

now.  She is across the street right now.  We're willing to have her over.  We will put her up for 15 minutes, and she will tell the Court beyond any doubt that she didn't demand any gold bars; she doesn't have any gold bars; they were always the defendant's; and it's much more than $200,000 worth.  That is the sort of evidence that we can put on.

Now, grant it, that evidence is consistent with what the Court already found, but it tells the Court something even more important, which is that he's not chastened.  The defendant is not reformed in terms of his integrity.  Rather, he is continuing to lie.

We would ask that the Court allow us a short recess. We will walk her across the street, and we will put on 10, 12 minutes of testimony.

MR. STEIN:  We have been trying to perfect discovery on a subpoena on Miss Babenko now for several weeks.  She has been successfully evading our ability to do so.

THE COURT:  All right.  Let's bring her over.

MR. COHEN:  Thank you, Your Honor.

THE COURT:  Let's bring her over.

MR. STEIN:  Well, we don't -- but I am not -- I have not deposed this woman.  I do not have the documents that I asked the Court to provide me about her.  That discovery was denied.

To put her on the stand now for as weighty an issue

as this and ask us to confront her on the fly like that, Your Honor, is not fair to Mr. Trudeau.

I submit that if the Court is going to have -- and the Court said we're not having witness testimony.

THE COURT: You have her declaration -- what I consider a declaration. You have had that for a long time. I realize that wasn't a deposition and isn't admissible as a deposition.

And they are proposing a very limited examination about a very limited topic.

MR. STEIN: I would ask the Court for leave for us to take a deposition of Miss Babenko like we've been -- to give us some discovery into what her claims are.

They have relied on a declaration from her regarding her relationship with Mr. Trudeau, for example, in which she dragged him through the mud and portrayed him as a rather unfriendly spouse, let's say. But we have reason to believe that in her immigration records when she was trying to establish what a loving relationship they have so that she could get U.S. citizenship status a very different story exists. We submitted a FOIA request for those records. We are trying to get them.

We have to have some discovery before a witness gets up on the stand on as weighty an issue as this and we are able to cross-examine her effectively. We're entitled to that.

And our understanding was very clearly that there's no witness testimony to be put on today. Now the hearing is -- this is morphing into a very -- a very different situation.

We welcome the opportunity to confront Miss Babenko, but we -- the Court denied us the discovery requested to prepare for that moment.

MR. COHEN: Your Honor, if I may, a couple things.

First of all, they have had a decade to prepare for this. They have been saying for a decade that this is all about Miss Babenko. She's a successful businesswoman who ran all the companies and now more recently that he gave her all the gold bars. It was obviously foreseeable that the government's response would be exactly what it is.

To the best of my knowledge, Your Honor, they have not requested Miss Babenko's deposition. I'm not -- and I apologize. Mr. Stein will certainly correct me if I'm mistaken. I'm not aware that they have done so, and they had ample ability to cross-examine Miss Babenko.

We are talking about very brief -- if the Court wants to absolutely cap me at 15 minutes, that is all it will take for me to put her up there -- for the government to put her up there and to have her simply explain that she didn't demand the gold bars, as Trudeau swears she did; that she didn't take the gold bars, as Trudeau swears she did; that she doesn't know where the gold bars are, as Trudeau says she does.

MR. STEIN: I am not prepared to cross-examine this witness. I have not been given any discovery. We were told that there will be no witness testimony today, so this would be a complete surprise to us.

And we haven't had 10 years to prepare for today. This hearing and who is going to participate in it, we were gearing up for one version of it; but then the Court clarified that it was going to be a different situation, and so we changed our gears and have prepared for that.

MR. COHEN: Your Honor, she's right here right now across the street. To the extent that further proceedings might be necessary for some reason or another, those could be addressed. The Court can take into consideration the fact that -- and, again, we don't accept this -- but that Mr. Stein is not -- is not fully ready for this.

It's going to be on a narrow issue of the things that Mr. Trudeau said in his deposition related to her.

MR. STEIN: Yes.

THE COURT: We have been talking about this particular issue for decades, literally. I'm prepared to hear her today, and I will decide whether or not to give you an opportunity to cross-examine her at a later date if you choose to do that. But we might as well do it. Why not? Let's do it.

MR. STEIN: May I make a comment, Your Honor?

THE COURT: No. Wait a minute. Wait a minute.

What other evidence would you be prepared to present on the asset issue?

MR. COHEN: Well, I think basically it breaks down into sort of four categories. The gold bars are the first category.

We will present the receiver's report. We disagree with a number of the assertions that counsel has made with respect to the receiver's report, so we're going to present the receiver's report as well.

The third category that we would do would be -- we want to present is the offshore asset structure, because that was something the Court previously found. And when we've asked Mr. Trudeau more recently for some sort of explanation as to what was going on, our ex -- the explanation that's been provided is simply not plausible.

And then the last category of evidence, part of which may have been addressed, but included 2022 finances.

So there's one issue having to do with the money, which we now understand the Court is ordering Mr. Trudeau to turn over, the 142 or $146,000. But there's a second issue having to do with what happened to the million or so dollars in earnings that he kept and did not turn over to the FTC.

MR. STEIN: Wait a minute. We were going to call two witnesses to establish chain of custody over that storage

locker that they represented, based on the Babenko documents, might contain hidden assets for Mr. Trudeau, possibly gold, in Zurich.

The Court may recall that storage locker that Miss Babenko says she visited and walked out with seven suitcases. The balance of that locker the FTC has suggested may contain hidden assets for Mr. Trudeau.

We were prepared to come here today with two witnesses who were going to testify about what happened to the contents of that locker and establish that there's no hidden assets in there. We waived them after the Court made clear that there will be no testimony.

I don't know what Miss Babenko is going to talk about. I am completely unprepared, because we were denied the ability to prepare to confront her testimony like that. And I don't want her testimony to leave a bad taste in the Court's mouth, and then maybe we reconvene at a later date, and we come back ready to confront her.

Are we going to recall her so that I can cross-examine her again?

THE COURT: Yes. Where does she live?

MR. COHEN: I don't want to say specifically, but in Los Angeles.

THE COURT: And she's prepared to come back?

MR. COHEN: That I don't know. I'd have to inquire.

THE COURT: Well, I think maybe you should inquire before we bring her in.

MR. COHEN: Will do, Your Honor.

THE COURT: So why don't we take a break to do two things.

One is, have Mr. Trudeau help you get the exact number of those accounts that he's willing to turn over, okay, so that could be in the order today; by agreement, that he's going to turn them over by the end of the day tomorrow or something like that.

Two, whether Miss Babenko would come back at a later date.

I was going to talk about the -- there was one other issue that was outstanding that I just wanted to mention to you.

There was a motion -- the FTC's motion to declare certain documents not privileged, we really haven't resolved that. The response mentioned 12 documents that they claimed were privileged. The motion is document 973.

Is that still an issue at this point? Do you care about those 12 documents, Mr. Cohen?

MR. COHEN: Oh, do we care about the 12 documents?

I have to take a look --

THE COURT: Because I've never seen them.

MR. COHEN: Sorry.

THE COURT: Ordinarily, if they are claiming privilege, I would want to see the documents.

MR. COHEN: We would ask that they -- they submit the 12 documents to the Court. I'm a little bit doing this off the top of my head.

My recollection is that we disagree with those privilege assertions or at least most of those privilege assertions. I think that the bulk of those privilege assertions were basically legal bill references to general subjects of legal work that shouldn't be considered privilege, but the burden is on the party seeking to have them, you know, basically --

THE COURT: All right. All right. You have answered my question.

If you would just get me just *in camera* the documents that you -- I've got so many pleadings here it's ridiculous. Let me see if I can find it.

MR. STEIN: We detailed those documents by file number in the summary that the Court ordered both sides --

THE COURT: Right. It was document 987.

MR. STEIN: So is the FTC going to be using that attorneys' eyes only evidence now in its examination of Miss Babenko today in open court?

MR. COHEN: Your Honor, a couple things with respect to that issue.

THE COURT:  Well, if you are not claiming a privilege, there's no reason not to.

MR. STEIN:  We are.  We claim that they are privileged, and we --

THE COURT:  No.  Are you going to use any of those 12 documents?

MR. COHEN:  I don't anticipate that we are.

I do want to raise another -- actually, I actually don't believe that there's any -- any portion of what we anticipate.

Again, the anticipated examination of Ms. Babenko is 10 to 15 minutes.  It's very brief, just to make a couple of particular points.  But I don't anticipate there will be any documents covered where we understand the defendant has asserted any type of privileged or attorneys' eyes only status.

I will confirm that before we begin, though, Your Honor.

MR. STEIN:  Your Honor, I just --

THE COURT:  It's on page 2 of document 987.  They were invoices -- I don't know if they contain privileged information -- by Mr. Anderson, Mr. Boyd, Dahlstrom, Cupurro -- I don't even know who that is -- and law firms that I don't know who they are either.  I think they are foreign law firms.

So I would want to see those documents, obviously, to see whether they are privileged or not.  We can talk about that

some other time.  As long as they are not going to be used during any of these proceedings, I don't think there's any need to --

MR. STEIN:  So we don't need to get you those documents before we reconvene today?

THE COURT:  Yes.

MR. STEIN:  Correct?

THE COURT:  Correct.  Okay.

MR. STEIN:  Okay.  Your Honor, I would just, for the record --

THE COURT:  I know --

MR. STEIN:  -- I object.  I object.

THE COURT:  I know what your position is.

MR. STEIN:  I object.

THE COURT:  We might as well -- if she's across the street, let's put her on.  If you decide that you are unprepared to cross-examine her, then the only way I would let her testify today is if she's willing to come back.

MR. COHEN:  We will inquire.

THE COURT:  And I was going to get to this before we adjourn today, the Babenko declaration, because it wasn't -- did you notice that deposition?

MR. COHEN:  Did we notice the -- the FTC notice --

THE COURT:  Yes.

MR. COHEN:  The FTC did notice the deposition,

correct.

THE COURT: You served a notice of deposition on Mr. Trudeau's counsel --

MR. COHEN: We did not, because we are not obligated to under Rule 69, because this is a post-judgment proceeding.

MR. STEIN: We disagree with that characterization.

THE COURT: Well, before I could accept that as substantive evidence, I would obviously want to give Mr. Trudeau's counsel an opportunity to depose her as well or to follow up on your deposition, which was quite thorough.

So I think they are entitled to do that, but since she's here today and has something to say, it's not going to influence me unduly, Mr. Stein, I can tell you, because I will give you an opportunity. But I want to make sure she would be willing to come back before I do that.

So let's take about a 10-minute break and --

MR. COHEN: Your Honor, if I could ask for a slightly longer break, because I may need to walk across the street.

THE COURT: When you say "across the street" --

MR. COHEN: I mean quite literally across the street. And I think -- my apologies if I mispronounce it but the Kleszynski building.

THE COURT: Okay. You didn't mispronounce it. We'll take a 15-minute break then.

THE CLERK: All rise.

(Short recess.)

MR. STEIN: Your Honor, if I may, Giel Stein for Kevin Trudeau again.

I do want to reiterate Mr. Trudeau's objection to having Miss Babenko testify. It does not seem at all plausible to us that this is the way to proceed, given that if Miss Babenko is here to just give 10, 15 minutes of testimony now, only to be recalled at a later date, we can just do it properly at that point in time where she comes in at a later when we are ready to deal with her testimony.

We have asked the Court several times about the possibility of witness testimony today, and we were told in no uncertain terms that there will be no witness testimony.

The FTC's comment on it was that they have no objection to opening and closing statements, leading us further to believe that their view is there's going to be no witness testimony. Clearly they've bean preparing for a different outcome, as we can tell.

And we have asked for specific discovery into Miss Babenko's communications about this case with FTC and with others. That is targeted discovery that is now proving to be extremely on point and relevant to what may likely come out of this witness's mouth, and we were denied that discovery.

I object to having to hear this witness's testimony. I understand the Court is very experienced, but having her

words, which no doubt will try to hurt Mr. Trudeau, sit on the
Court's mind until we can reconvene at a later date just
doesn't make any sense.

Let's reconvene at that later date. She can put on
her testimony at that point, and I can cross-examine her
properly. We object.

MR. COHEN: Your Honor, if I may.

THE COURT: Yes.

MR. COHEN: Go ahead.

THE COURT: Go ahead.

MR. COHEN: No, Your Honor. Nothing further.

THE COURT: Miss Babenko lives in California. I knew
that before, I think, from her deposition or her declaration,
whatever you want to call it.

So the fact that she was here I thought we might as
well start it in person. At least I'll have a chance and
you'll have a chance to see her in person.

Mr. Cohen has informed us that she can then appear
virtually at a later date, and you'll have a chance to prepare
and cross-examine her then. You could ask her about her
communications with counsel and everything else at that point,
and we will get it over with.

I realize this is unusual, and I didn't expect this
to happen today, but the fact that she is -- has come here from
California with the expectation of testifying and the testimony

is going to be limited, as Mr. Cohen said, I see no prejudice to you because I'm not going to -- I'm not going to be unduly influenced by it, Mr. Stein.

I have been doing this going on 29 years now, and I am not going to be unduly influenced by a short bit of in-person testimony, followed by a virtual -- by virtual testimony. Apparently we are going to have to get into evidentiary -- an evidentiary hearing of some sort, from what I can tell.

MR. STEIN: I would ask that the Court order her to reappear when the time comes in person so that I may confront her in person on the stand as opposed to virtually, Your Honor.

MR. COHEN: Your Honor, if I may.

The understanding that we provided to the Court and Miss Babenko's agreement was conditioned on the fact that for personal reasons she would only be able to reappear by Zoom.

MR. STEIN: With all due respect to Miss Babenko's preference, Mr. Trudeau has a right to cross-examine the witness in the most effective way possible. And I am more effective in person with a significant witness like this than I am over Zoom.

THE COURT: I'll bet you are. But, you know, this is a civil proceeding, and I think I have the discretion to do it the way I'm suggesting.

So I will hear her testimony. And if you want to do

some cross-examination, that's up to you today. If you don't, I will honor that, and we will do it by virtual testimony at a later date.

MR. COHEN: Thank you, Your Honor.

THE COURT: Please call your witness.

MR. STEIN: I want to ask a question then as long -- I'm sorry. Thank you for indulging me.

As long as we are on the virtual testimony topic, can Mr. Trudeau call witnesses virtually?

THE COURT: Yes.

MR. STEIN: Okay.

THE COURT: I assume -- in fact, I know that you have a witness that you wanted to depose overseas.

MR. STEIN: We do, and it would be --

THE COURT: And we talked about that awhile back, and I didn't foreclose you from doing that, you know, at a later date if you think it's relevant and material to your defense here. And I would absolutely allow you to do that, but it has to be done by the rules. That's one of the problems.

You know, swearing -- let's not get into that right now. Let's get Miss Babenko on and off, and we will see what happens.

MR. COHEN: Thank you, Your Honor. The commission calls Natasha (phonetic) Babenko.

And, Your Honor, we are going to distribute to

counsel and the Court some binders.  But in the interest of keeping this extremely brief -- I believe I indicated we were going to try 10 to 15 minutes -- we will be using no more than three and possibly as few as one of the documents that are in the binders.

THE COURT:  Over here.  Raise your right hand, please.

(Witness duly sworn.)

MR. COHEN:  If I may, Your Honor.

THE COURT:  Please.

NATALIYA BABENKO, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. COHEN:

Q.  Good morning, ma'am.  My name is Jonathan Cohen.  I'm an attorney with the Federal Trade Commission.

If you could please state your full name for the record.

A.  Nataliya Babenko.

Q.  Where were you born, Miss Babenko?

A.  In Ukraine.

Q.  At -- and where do you currently reside, just the city?

A.  Los Angeles.

Q.  When did you first begin to reside in the United States?

A.  2008.

Q.  What brought you to the United States in 2008?

**A.** I married Kevin Trudeau.

**Q.** At the time you first met Mr. Trudeau, how old were you?

**A.** I believe I was -- that was awhile ago -- 21 or 22.

**Q.** And, ma'am, how old were you in 2008 when you came to the United States to reside with Mr. Trudeau?

**A.** 22 or 23. Sorry. I'm not good at math.

**Q.** And we will get in in a moment to sort of the circumstances surrounding the dissolution of that marriage, but approximately how long did the marriage last?

**A.** Approximately 14 years.

**Q.** Is there anything at all that prevents you from testifying honestly before Judge Gettleman today?

**A.** No.

**Q.** Is there anything at all that prevents you from clearly remembering your experiences during the marriage to Mr. Trudeau?

**A.** No.

**Q.** To what extent, if at all, did you see Mr. Trudeau with gold?

**A.** I -- well, not in the beginning of the marriage, but I would say starting from the moments of when we were stopped by a TSA agent at -- I believe, in O'Hare Airport, because we used to live in Chicago for a little bit downtown. And I remember that TSA agent asked Mr. Trudeau to open his -- like he was carrying this medium-sized Tumi bag, like a carryon. And he

said, what is that?

And he took out some gold bars, and that was my first ever time seeing gold bars in, like, life.

And then he just said it's gold bars, and I think the TSA agent said okay. That's it.

Q. To what extent --

A. Also, and then that was first time, yes.

Q. To what extent, if at all, did you see -- were there other instances in which you saw Mr. Trudeau with gold bars?

A. Yes, I saw many times. I feel like it was, like, almost the theme of -- theme of his life. I mean, I saw him a lot of times in Oak Brook home and in Zurich home.

Q. And let me stop just for a moment, and let's -- let's focus on Oak Brook for a moment.

Can you tell me a bit more about the gold bars that you saw at the Oak Brook residence?

A. I mean, they were in the boxes. They were just sometimes -- we had, like, two separate closets. And he had his side of the closet, and I would see it next to the jewelry shelf that he had, like, where he would put his rings and watches and stuff. And then sometimes there would be gold bars. Sometimes I would see him taking it in and out from the home safe, yeah.

Q. And approximately how many of these boxes -- just approximately how many of these boxes of gold bars did you see

Mr. Trudeau with at the Oak Brook residence?

MR. STEIN:  Objection, foundation.

MR. COHEN:  Your Honor, she just laid the --

THE COURT:  I think you could put a time.

BY MR. COHEN:

Q.  Oh.  During the period of time that you resided at Oak Brook --

THE COURT:  When was that?

BY MR. COHEN:

Q.  -- when was it when you saw Mr. Trudeau with gold bars at the Oak Brook residence?

A.  Well, so Mr. Trudeau had multiple homes in around America -- in the United States and overseas, right.  So we resided a little bit in every home.

So every time I would come to Oak Brook, I would see it.  So I can't say, like, you know, like, six months I was just seeing the gold, you know.

So I know he was dealing with it, and I know that that was something that was very common thing to see.  Like him smoking a cigar every day, you know, like, you know, he's my husband.  So, like, I know his things, like, what he does.

MR. STEIN:  Objection, move to strike as speculation.

THE COURT:  Overruled.

BY MR. COHEN:

Q.  And so --

THE COURT: But try to get a better --

MR. COHEN: Point --

THE COURT: -- idea of the time.

BY MR. COHEN:

Q. Point in time.

So let's narrow down, Miss Babenko, the point in time when you would have seen gold bars at the Oak Brook residence.

During what period of time did you reside in the Oak Brook residence?

A. I think sometime starting from 2010 and then up until 2012, yes. So in that period of time, I definitely saw, yeah, in 2010 to 2012.

And then when I came to confront Kevin about what has happened -- unfortunately, like, when I was deposed in May 2012, I came to confront him in the Oak Brook home, and I was trying to get to what was happening. And that's the time when I saw, you know, boxes of gold --

Q. Let's --

A. -- like, a lot.

Q. Let's focus on that. So can you approximate -- you just said a lot. Can you approximate the number of boxes of gold bars? Was it -- was it more than five?

MR. STEIN: Objection, foundation. At what point in time is this now?

MR. COHEN: We now have a point in time.

THE COURT:  Overruled.

BY THE WITNESS:

A.  It was 2012.  I believe it was June 2012, June -- June, July.

BY MR. COHEN:

Q.  Approximately how many different boxes of gold bars did you see?

A.  Well, multiple.  Maybe more than 10.

Q.  And did you witness Mr. Gold -- Mr. Trudeau working through and sort of opening the boxes and examining the gold bars?

A.  Yes.

MR. STEIN:  Objection, leading.

THE COURT:  Overruled.

BY MR. COHEN:

Q.  Approximately -- during the experience that you have just explained, approximately how many gold bars were in the boxes that you saw Mr. Trudeau manipulate?

A.  15.  I don't know.  I mean, I haven't gone to, like -- you know, maybe 15, maybe 20.

Q.  To what extent, if at all, did you see gold bars at any other residences?

A.  In Zurich.

Q.  Can you tell me just briefly about when you saw -- when did you see gold bars in the Zurich residence?

A.  So I -- well, Kevin established a Zurich home as his new

home base, so I was very new to it.  I only flew when I had time off from, you know, my studies at New York University.

So one time I flew in for a very short period of time, like, two weeks.  And I saw him dealing with it in his home office.  He had home office and safe in there as well, so I saw it then.

THE COURT:  Can you give us a date, approximately?

THE WITNESS:  That was -- just a second.  2012, January.

BY MR. COHEN:

**Q.**  Approximately how -- when you saw the gold bars at this point in time, how were they stored?

**A.**  In the boxes.

**Q.**  To what extent, if at all, were these boxes similar to the ones you had seen in Oak Brook?

**A.**  I mean, I don't know if it's, like, exactly the same boxes, but, yeah, I guess the same.

**Q.**  Did you -- to what extent, if at all, did you see Mr. Trudeau manipulate or handle gold that was within the gold -- the boxes?

MR. STEIN:  Objection.  Counsel is leading the witness.

BY THE WITNESS:

**A.**  I --

THE COURT:  Overruled.  Hold on.  Overruled.

BY THE WITNESS:

**A.** I saw him --

THE COURT: You can answer.

THE WITNESS: Oh, sorry.

THE COURT: Go ahead. No, that's fine.

BY THE WITNESS:

**A.** I saw him dealing with it in his home office maybe, like, on regular basis.

He also had, you know, the staff -- staff members who worked outside -- inside his home office, so they also saw it. I feel like it was --

MR. STEIN: Move to strike.

THE COURT: Overruled.

MR. STEIN: The part about what other people may have seen.

MR. COHEN: Your Honor, if the witness could continue her answer, I'm not sure that that's -- I'm interpreting the answer the same way as Mr. Stein is.

THE COURT: You could just tell us what you observed --

THE WITNESS: Okay.

THE COURT: -- not what somebody else observed.

BY THE WITNESS:

**A.** Okay. Now, all right.

So, yes, so I saw him dealing with the gold bars,

putting them inside the safe, outside of safe.  Also was jewelry -- with all the jewelry that he had.

I think I was making maybe some sort of weird jokes about, like, what is he preparing for, like, to do with it.  I don't know.

BY MR. COHEN:

Q.  Approximately -- during this point in time, approximately how many different boxes of gold bars did you see?

A.  Maybe more than 10.

Q.  And approximately how many gold bars -- when you saw Mr. Trudeau manipulating or touching the gold bars in the boxes, approximately how many bars were there in the box?

A.  I mean, I didn't look, like, inside inside.  Maybe 10, 15.

MR. STEIN:  Objection, foundation.

BY THE WITNESS:

A.  15 to 20, something like that.

BY MR. COHEN:

Q.  Was there another point in time --

THE COURT:  Hold on.  Hold on.  There's an objection.

MR. STEIN:  Move to strike as speculation as well based on the witness's testimony that she didn't see it.

MR. COHEN:  Why don't I just -- I can ask.  I'll withdraw the question.

THE WITNESS:  Yeah.

BY MR. COHEN:

Q. Did you -- at any point in time that we're discussing when you were in Zurich were you able to observe Mr. Trudeau taking gold bars in and out of the boxes?

A. Yes, yes.

Q. And based on that observation, to what extent are -- are you able to approximate the number of gold bars that you observed him manipulating in the course of that conduct?

A. Sorry. Can you clarify the question, like --

Q. Sure. That might have been a tough question.

So when you saw this, approximately how many gold bars was Mr. Trudeau handling of -- with respect to a particular box?

A. Like maybe, as I said, around between 10 and 20.

Q. Was there another point in time -- to what extent was there another point in time -- one thing about the Zurich apartment, ma'am, before I forget, you testified a moment ago that there was a safe deposit box there?

A. It's like a -- yeah, a safe, a home safe.

Q. Excuse me. A home safe?

A. Uh-huh.

Q. Did you have access to that home safe?

A. Never.

Q. Were there any other -- was there a point in time -- to what extent, if at all, was there a point in time when you went with Mr. Trudeau to a financial institution in the Chicago

area?

A.  Yes.

MR. STEIN:  Objection, leading.

BY MR. COHEN:

Q.  Can you just explain --

THE COURT:  Overruled.

BY MR. COHEN:

Q.  Can you explain that?  Just give a very brief explanation of what transpired.

A.  So one day, like, Kevin told me that we're going downtown. I said okay -- well, okay.

We came downtown.  We went to the place somewhere here which is called Northern Trust.

MR. STEIN:  Your Honor, I object.  We don't have foundation.  We have no idea what time period this testimony refers to.

MR. COHEN:  I can get a time period.

BY MR. COHEN:

Q.  Approximately when did you visit Northern Trust for the first time?

A.  I think it was 2009, 2000 -- or 2009, 2010.

Q.  What happened when you arrived at Northern Trust for the first time with Mr. Trudeau?

A.  He told me we're going to the basement.  So we took a -- we went to the basement.  There was a gentleman there who was

working there.  He asked me to give my Ukrainian passport.  I gave my passport.  He gave his ID.

He asked for both of us to open the safety deposit boxes.  That was my first time ever seeing safety deposit box in my life, so --

Q.  To what extent, if at all, was one of them yours or was one of them Kevin's?  Can you explain sort of how the safe deposit boxes were broken down?

A.  Well, he said, it's for me and my wife.

I really did not need a safety deposit box.  I mean, I didn't know what is it for.

He said we were going to -- he just talked to the person who worked there.  And then he said, I would really need one big one, one smaller one.

Then he explained, okay, the big one is for my wife; the smaller is for me.

Then we were assigned the boxes.  We were -- you know, he took the keys.  We went inside the safety deposit box room.  He opened the boxes.  He took out the large bin.

He said, stay here.  I'm going to a private room inside the safety deposit boxes.

So he went to private room, and whatever he brought with him at that moment in time, he said, okay, I'm going to put this inside.  And then he was dealing with that.

Then he came out.  It was full, full and heavy.  And

then he put it back into --

Q. Did you have access, ma'am, to that safe deposit box?

A. No, but it was under my name.

Q. And just if you could approximate, how large was the safe deposit box that had been placed in your name?

A. I believe it was the largest one that there was, I believe. I don't know.

Q. And it --

A. I know it's definitely bigger than his.

Q. Would it be fair to characterize it as about a foot wide or -- I'm looking for a measurement, to the extent you're able to provide that?

A. I mean, I can't say the exact measurement. I know it could fit, let's say, maybe volumes of books.

Q. Ma'am, was there ever any other point in time -- you had indicated about the TSA agents.

        Was there ever any other point in time where you saw Mr. Trudeau to prepare to travel with gold bars?

A. Yes. In the Oak Brook home, I saw him preparing -- you know, putting into the bags. And I saw, you know -- well, I can't talk about other people, right? Okay. Like, you know, somebody helping. You told me not to talk about other people.

Q. You can go -- I'm not sure if the -- and the Court can clarify the instruction.

        You can talk about what you observed other people

doing.

**A.** Ah, okay.  Okay.  I guess other people helping him --

MR. STEIN:  Objection, foundation.

THE COURT REPORTER:  I'm sorry?

MR. STEIN:  Foundation.

BY MR. COHEN:

**Q.** Miss Babenko, if you could explain approximately when this was.

**A.** That was in 2011, 2012 as well.  So I believe that -- well, not -- I know that -- so Kevin always wanted me to travel with him everywhere, which was fun in the beginning; but then, you know, I started getting a little exhausted from all the traveling, and I also started my studies.

So he told me once if I would want to go on a trip with him to Guatemala.  I said, no, because it seemed very random.  And he said, well, it's a short trip, like, for three days only, you know.

And I said, no, I don't want to do that.

And, yeah, and then I just saw him preparing for the trip and, you know, and he went to Guatemala.

**Q.** And to what extent, if at all, did you witness Mr. Trudeau or Mr. Trudeau's assistants pack gold for the trip to Guatemala?

**A.** They were packing -- yeah, they packed or he packed -- I think he packed, and then they just handled it.

Q. And was it packed in, like -- in what way was it packed? Was it in a bag, in a case, in --

A. Just in a bag, a duffle bag.

Q. A couple of quick additional questions.

To what extent, if at all, do you know where any of this gold is now?

A. I have no idea.

Q. To what extent, if at all, did Mr. Trudeau give you gold to keep?

A. Never.

Q. To what extent, if at all, did Mr. Trudeau -- strike that.

To what extent, if at all, did you ever demand that Mr. Trudeau buy you gold?

A. Never.

Q. A few brief questions on some other issues.

Do you have a familiarity -- do you just have an understanding that you can explain to the Court of what KT Radio Network is?

A. It's Kevin -- Kevin's show that he was running out of -- from his Hinsdale office.

Q. To what extent, if at all, did you manage that KT Radio Network?

A. Never.

Q. To what extent, if at all, did you operate the KT Radio Network?

**A.** Never.

**Q.** To what extent, if at all, did you demand that Kevin Trudeau make you the owner of KT Radio Network?

**A.** Never.

**Q.** To what extent, if at all, did you Kevin -- did you demand that Kevin Trudeau make you the owner of any business with which he was affiliated?

**A.** Never, never.

**Q.** Let's move briefly -- just briefly to the resolution of the marriage.

How did the marriage conclude, ma'am?

MR. STEIN: Objection, relevance.

BY THE WITNESS:

**A.** My marriage ended in annulment.

MR. STEIN: Objection, relevance.

THE COURT: Excuse me.

BY THE WITNESS:

**A.** My marriage ended --

THE COURT: Excuse me. Excuse me.

THE WITNESS: Oh, sorry.

THE COURT: There's an objection.

We've already established that the marriage was annuled, have we not?

MR. COHEN: We have established the marriage was annulled, but the relevance is twofold.

The relevance is that, first of all, the basis for the annulment was fraud, in particular Mr. Trudeau's fraud.

And second -- this is very important -- the specific allegations that Mr. Trudeau chose not to contest, so --

THE COURT:  Don't we have those documents?

MR. COHEN:  True, but there's one in particular that we want -- and I can -- I can go directly to the relevant document --

THE COURT:  Please.

MR. COHEN:  -- if that's helpful.

THE COURT:  All right.  Try that.

BY MR. COHEN:

**Q.**  So if we could -- ma'am, in your binder, if you could -- and let's just -- if it's all right, Your Honor, just to have the record reflect, what was the basis for the annulment, ma'am?

**A.**  Fraud.

**Q.**  Now, if you could turn to your -- your binder, on tab 1 there's a little yellow flag, and there's a document there that is a letter of engagement, May 6, 2009.

And that's an engagement with The Law Offices of Marc J. Lane.  And if you --

MR. STEIN:  Your Honor, I object to this.  This was supposed to be 10 minutes on gold.

MR. COHEN:  We're almost -- we're almost finished.

MR. STEIN:  And this is --

THE COURT REPORTER:  I'm sorry.  One at a time, please.  I'm sorry?

MR. STEIN:  -- on a marriage that's been annuled indisputably.

MR. COHEN:  Your Honor, if I may.

This is actually not about -- we have moved beyond the annulment for fraud.  And I want to point the Court to one particular thing that is very important to the story that Mr. Trudeau continues to provide regarding Miss Babenko's alleged involvement with these companies.  We are going to spend one minute on this.

THE COURT:  Go ahead.  Go ahead.

BY MR. COHEN:

Q.  Ma'am, if you could go to the -- let me know -- if you could just look up when you've reached the tabbed -- there's a yellow tabbed document, which is a May 6, 2009, engagement agreement with Miss -- with The Law Offices of Marc J. Lane?

A.  Yes.

Q.  With respect to The Law Offices of Marc J. Lane, there is a signature on the third page.  If you could look up at me when you see that.

A.  Uh-huh.

Q.  Okay.  Is that your signature?

A.  This looks like my signature.  It is not.  I never signed

it.

Q. Did you ever authorize anyone to sign on your behalf?

A. No.

Q. Okay. Just a few final questions.

Are you close --

MR. STEIN: Your Honor, I object to that testimony about this document. It does not relate to any relevant issue that counsel represented this exam would cover.

THE COURT: We'll make that determination later. Go ahead.

MR. COHEN: And we are down to the last three minutes, Your Honor.

THE COURT: It's been a little longer than 15 minutes.

MR. COHEN: That's fair. Okay. We're going to just do one last substantive point.

BY MR. COHEN:

Q. Just for context, ma'am -- Miss Babenko, are you close with your -- with your father?

A. No.

Q. How many times did your father meet Mr. Trudeau?

A. Twice.

Q. To what extent, if at all, is your father fluent in English?

A. Not fluent.

MR. STEIN:  Objection, foundation.

THE COURT:  She would know.  She would know that.

MR. STEIN:  On the meetings, not the question about the English fluency.

MR. COHEN:  The final question, Your Honor.  We have one question left.

THE COURT:  Well, I think he would like a date about these meetings, whatever --

BY MR. COHEN:

Q.  When -- when did the two meetings between your father and Mr. Trudeau occur?

A.  First, once when we visited -- me and Kevin visited Kiev.  It was very brief meeting.  Again, I don't have relationship with my father, period.  So it was a lunch meeting.

And then the other time, my father came to Chicago home, to Oak Brook home.  He stayed briefly there, had zero to none -- almost none interaction with Kevin.

MR. STEIN:  Same objection.  Can we get some time periods for each of those meetings and where this witness was at that meeting?

BY MR. COHEN:

Q.  Miss Babenko, are you able to --

MR. COHEN:  I mean, I think there were some time periods provided.  If that's not adequate to the Court, we can try to drill down a bit further.

BY MR. COHEN:

**Q.** Can you give a little bit more framework on the timing of those two meetings?

**A.** I think that the meeting in Kiev was sometime in 2000 -- between 2009 and 2010. And then Chicago, probably 2011, 2000 -- yeah, 2011.

MR. COHEN: And, Your Honor, we will explain the relevance of this final question.

BY MR. COHEN:

**Q.** But, ma'am, to what extent in any way, shape, or form did you ever witness your father threaten to kill Mr. Trudeau?

**A.** Never.

MR. STEIN: Objection, leading.

BY THE WITNESS:

**A.** This is outrageous.

MR. COHEN: Nothing further, Your Honor.

THE COURT: Mr. Cohen, I think you should be the one to ask this question.

Well, I have one question to ask. You are talking about these gold bars, Miss Babenko. How big were these gold bars?

THE WITNESS: How big, like -- well, I can't give you --

THE COURT: What was their size?

THE WITNESS: Like this (indicating).

THE COURT:  Six inches?

THE WITNESS:  Yeah, I'm not, like, very good at American metrics but --

THE COURT:  And about how thick were they?

THE WITNESS:  This (indicating).

THE COURT:  About an inch?

THE WITNESS:  Not very thick.

THE COURT:  Not very thick.  Okay.  Thank you.

I think you should ask her about her agreement to appear.

BY MR. COHEN:

Q.  Yes.  On the record, Miss Babenko, you have agreed that you will appear at a future proceeding via Zoom, correct?

A.  Yes, which is going to be extremely hard for me, because I will appear, but I just wanted to let everybody know here that this is excruciating.  I've been through so much abuse, so much just suppression and that --

MR. STEIN:  Objection, Your Honor.  Move to strike.

MR. COHEN:  Your Honor, she stated --

THE COURT:  I'll let her explain what she's feeling about this.  But the important thing is, will she agree to appear at a time set by the Court?

BY MR. COHEN:

Q.  And assuming that the Court is willing to make reasonable accommodations for whatever scheduling constraints the parties

and the witness may have, I believe you testified that you will agree to appear, but you have agreed to appear by Zoom, correct?

A.  Yes.  Can I just say one more thing?

THE COURT:  Yes, it actually won't be Zoom.  It will be WebEx, but it's the same thing.

MR. COHEN:  We won't raise that technicality, Your Honor.

THE COURT:  Okay.  All right.  What else do you want to say, Miss Babenko?

THE WITNESS:  I am very scared of Kevin, and I'm very scared for my --

MR. STEIN:  Your Honor -- Your Honor, I object.

THE WITNESS:  I'm very scared of Kevin, and I'm very scared for my life, and I was very scared since the day that he has thrown me into this -- in his false narrative.

MR. STEIN:  I object, Your Honor.

THE WITNESS:  Still very scared.

MR. STEIN:  Move to strike that last entire response.

THE COURT:  We will take it for what it's worth, Mr. Stein.

MR. COHEN:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  Miss Babenko, you are excused for now, but we will be asking you to give a video -- some video testimony --

THE WITNESS:  Okay.

THE COURT:  -- unless you want to ask her any questions now, Mr. Stein.

MR. STEIN:  No, Your Honor, for all the reasons we stated about our objection to this witness's testimony.

THE COURT:  Sure.  All right.  Thank you.

It's 12:20.  We still have some things to talk about and some scheduling to do.  So let's come back at 1:30, and we will do that.  Okay?

MR. COHEN:  Thank you, Your Honor.

(Recess from 12:21 p.m. until 1:30 p.m.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　vs.　　　　　　　　　　　　) No. 03 C 3904
　　　　　　　　　　　　　　　　　　　　)
KEVIN TRUDEAU,　　　　　　　　　　　　) Chicago, Illinois
　　　　　　　　　　　　　　　　　　　　) January 26, 2023
　　　　　　　　Defendant.　　　　　　　) 1:43 p.m.

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiff:　　　　　UNITED STATES FEDERAL TRADE COMMISSION
　　　　　　　　　　　　　　BY:　MR. JONATHAN COHEN
　　　　　　　　　　　　　　　　MS. CRYSTAL DAWN OSTRUM
　　　　　　　　　　　　　　600 Pennsylvania Avenue N.W.
　　　　　　　　　　　　　　Mailstop CC-9528
　　　　　　　　　　　　　　Washington, D.C.　20580
　　　　　　　　　　　　　　(202) 326-2551


For the Defendant:　　　　　CLARK HILL
　　　　　　　　　　　　　　BY:　MR. GIEL STEIN
　　　　　　　　　　　　　　　　MS. NICOLE PREFONTAINE
　　　　　　　　　　　　　　　　MR. KIMBALL R. ANDERSON
　　　　　　　　　　　　　　130 East Randolph Street, Suite 3900
　　　　　　　　　　　　　　Chicago, Illinois　60601
　　　　　　　　　　　　　　(312) 517-7520


Official Court Reporter:　 NANCY L. BISTANY, CSR, RPR, FCRR
　　　　　　　　　　　　　　219 South Dearborn Street, Room 1706
　　　　　　　　　　　　　　Chicago, Illinois 60604
　　　　　　　　　　　　　　(312) 435-7626
　　　　　　　　　　　　　　*nancy_bistany@ilnd.uscourts.gov*

(Proceedings heard in open court:)

MR. STEIN: Your Honor, if I may. I wanted to bring something to the Court's attention.

THE COURT: Okay.

MR. STEIN: Good afternoon, Your Honor. Giel Stein for Kevin Trudeau.

During the lunch break I wanted to inform the Court that we served Miss Babenko with a subpoena for production of documents. This is the same subpoena we have been trying to serve her for quite some time and also a deposition notice.

We set it for February 9th, but I'm happy to work with counsel to arrange a more convenient date if that doesn't work for Miss Babenko.

I just wanted to make the Court aware that that discovery has been issued.

MR. COHEN: Your Honor, if I may.

We conceptually have no objection, but we have, I guess, a couple of observations.

First of all, as I was present, my understanding was that Miss Babenko was not served with a deposition notice. Production, testify under oath. Okay. So you don't have the -- you're using -- it's a different -- it's the document form, but it's the -- they are asking for testimony as well.

The -- because this is not the -- the form for testimony, it does not specify the means of recording. And

we'd ask that the means of recording be Zoom. That's particularly true given that they are asking Miss Babenko to report -- the deposition take place by Zoom. They are asking Miss Babenko to report for some reason in New York.

MR. STEIN: Which is where we thought she lived and had been trying to serve her according to our best process server's guess. But she didn't state her address.

Mr. Cohen asked her to state the state where she lives. She said California. It would be helpful if we could get an address.

THE COURT: I think she's reluctant to do that for the reasons she articulated, which I'm taking as the reason she is not giving her address. And you don't need her actual address to take her deposition.

MR. STEIN: No, and we can do Zoom. We have no problem with that.

MR. COHEN: And I can --

THE COURT: So let's keep her personal identification --

MR. COHEN: And in terms of the --

THE COURT: Hold on. Let me -- stop. Don't interrupt me.

Let's keep her personal identification information out of the record. Okay?

MR. STEIN: Will do, Your Honor.

THE COURT: And confidential. Okay.

MR. COHEN: Just in terms of the scheduling of this, we will coordinate with both Miss Babenko and Mr. Stein to make appropriate arrangements.

THE COURT: Okay.

MR. COHEN: With respect to her future appearance here by Zoom, it's Miss Babenko's wish that it be done as soon as it reasonably can. She would like to have it over with and, in particular, within the next 60 days, which from our perspective we think is very reasonable.

THE COURT: Well, if you are able to take her deposition by video and you are able to also participate in that deposition, maybe that would suffice.

MR. COHEN: From our perspective, we believe it would. And we'd have no objection to having that deposition then be admitted.

THE COURT: Well, it would be admissible because it would be a regular deposition. So it would be admissible for at least some purposes, but I'm just suggesting that you consider that to be usable rather than having it repeated in the courtroom.

MR. STEIN: I can best make that call once I've deposed her to see how the testimony comes out, but we will definitely keep that in mind.

THE COURT: I mean, you already have a preview from

her earlier statement that was taken by Mr. Cohen, so you ought to be able to zero in. I'm sure you will be able to be more directed now that you have that information, and you have today's.

MR. STEIN: About that point, Your Honor, we want to get Miss Babenko's comments to immigration, which we believe will contradict a good part of her representations about Mr. Trudeau and what he -- what she says that he's done.

We have inquired and tried to issue -- we issued a FOIA request to DHS. They responded to us ultimately saying that if the request comes from Miss Babenko herself or a court order, those are the only two situations that they will allow to release the file.

We -- I don't believe we are going to get Miss Babenko's cooperation on that, but the file that we are seeking to get is the I-130 immigration file for Miss Babenko. It contains representations that she's made in support of her application to be here in the United States, and that all hinged on her representations of her relationship with Mr. Trudeau. And we believe those are all positive and positive details, positive experiences, information that we believe undermines the declaration that she, in part, testified off of today. But there's a lot more in that declaration as well, and this, of course, all goes to the witness's veracity.

So we would request a court order for the I-130

immigration file for Miss Babenko, so we don't have any more problems with DHS getting it.

THE COURT: What is her immigration status, do you know?

MR. COHEN: My understanding is that she's currently -- is that she has become a United States citizen.

And, you know, in terms of the -- you know, what the defendant is seeking here, I suppose that the -- the government doesn't really have any objection to that information being produced.

The problem I have is that it's really not the FTC's sort of prerogative to weigh in on that, and it does strike me as potentially containing information that may genuinely be nonpublic. And, you know, so I'll -- I'll leave it at that.

I mean, it may need to be treated in either under seal or with some other restrictions. I just don't know what is in there --

THE COURT: I don't know what DHS --

MR. COHEN: Yeah, I think --

MR. STEIN: I don't know what's in there either.

MR. COHEN: Yeah. I mean, this is a little bit of a fishing expedition in that nobody seems to know what is in there, and I also don't know -- I mean, it might be helpful, at least from the commission's perspective, if Mr. Stein would sort of articulate a basis for the belief that he feels this

information contradicts information that she has stated -- or Miss Babenko stated regarding Mr. Trudeau in that declaration.

I don't even know, for instance, what sorts of information that paperwork calls for. It might be better to -- rather than decide this on the spot, to ask -- it certainly would be the commission's request that the defendant submit something very brief explaining sort of the basis for the request, the legal authority for the request, so that we have an opportunity to respond.

And we may not necessarily be opposed to it. Just we're in a difficult position here, since I'm unfamiliar with the regulations that govern the release of that material, what rights she may have, and so forth.

THE COURT: I think Mr. Stein can look into those regulations and --

MR. STEIN: Yes. And --

THE COURT: -- articulate them in a request.

MR. STEIN: I can do that. I can also show the letter that we got back from DHS, which does a good explanation of what it will take to get the file.

And I would just add, the declaration --

THE COURT: But also the other issue that Mr. Cohen just addressed is how is that information treated?

MR. STEIN: Yes. And I was just about to make a comment about that point.

The declaration that we are talking about is the declaration that counsel marked as an exhibit and questioned Mr. Trudeau on at his deposition. It's the declaration of Nataliya Babenko dated -- let's see. Well, it's stamped May 27, 2021, and I believe they marked it as Exhibit either 22 or 29. There's two sets of numbers on here. But this is the declaration we want to explore the veracity of.

And I have spoken with my immigration attorneys in -- at our firm. They have suggested to me that she would have to make representations about various matters covered by this declaration to secure her citizenship and that that would be a file that I would be interested in seeing.

THE COURT: And the purpose you are doing this for is to attack her credibility?

MR. STEIN: Among other things, but also the substance of what she testified to.

THE COURT: All right. Because you have got a 608(b) problem.

MR. STEIN: I understand. I believe I can overcome that.

THE COURT: Okay.

MR. COHEN: This is another reason why--

THE COURT: We will deal with that as far as its admissibility is concerned, obviously.

MR. STEIN: Well, if I want to get it in, that's

right.  That would be a different story.

Presumably if I confront her with information, she would not lie, and I wouldn't have to introduce extraneous evidence.  We'll see.

THE COURT:  We'll see.

MR. COHEN:  We'll have to see how this unfolds, but I think this again --

THE COURT:  It's a good trial ad question, don't you think?

MR. STEIN:  We should work that in.

THE COURT:  Okay.

MR. COHEN:  Well, I was just going to say, this is another reason I think it would be helpful from the commission's perspective and perhaps also from the Court to under -- to understand sort of the legal authority for the request, what -- what kind of circumstances surround that material, and also what the purpose of -- of this is, because I think that will be germane to how this information might potentially be -- be used.

It's been unclear, you know, and Mr. Trudeau did state in his deposition in a very general way that there were these immigration documents that he at least alluded to having seen that kind of would give lie to everything Miss Babenko says.

We're very skeptical of that, but it's not clear to

us how he is aware of that or -- or what they anticipate more specifically this information is likely to be shown -- likely to show.

THE COURT: Well, I was going to ask you -- one of my first questions was going to be: Do you intend to present Miss Babenko to testify about anything in addition to what she's testified to today?

MR. COHEN: We'd like to reserve judgment on that. As Your Honor I think was aware, we were curtailing this very considerably. There are significant additional things that we would like to bring forth about -- about her experience, specifically related to assets and gold bars.

The primary thing that we were seeking to accomplish here, Your Honor, in addition to sort of introducing her to the Court personally, is that a number of the questions, as I believe the Court, I think, likely appreciated were -- you know, were based on things that Mr. Trudeau has stated to the FTC under oath within the past six weeks.

So, for instance, he stated to us under oath that with respect to the gold from Golden Lion Mint, that was Natasha's gold, and it was always in her possession. He stated with respect to the Roseland Capital Gold, Natasha demanded the purchase of it.

And I could go on for another dozen instances where there's direct conflict and then circumstantial evidence in

addition to that direct conflict. And I think this is a frightened person, Ms. Babenko, but very credible. She doesn't have the gold. And what Mr. Trudeau has been saying about her for a decade simply isn't true.

And it really puts into stark relief the notion that it's not just that he was dishonest before 2013. He's being dishonest now.

THE COURT: I hear you.

I'm just a little curious about whether any of those subjects would be part of her immigration file. Certainly she might have said that she had a happy marriage. She was happily married, legitimately married, and all the rest of that in order to become a citizen and that sort of thing. But that's not the purpose of any of the testimony that I have seen from her. And we might get into a 608(b) problem, but we will deal with that down the road.

I know you're familiar with that rule.

Okay. So what I wanted to do is this. I certainly agree that it would be good to just have this part of the saga completed as soon as possible. I would like you to be able to take her deposition within the next couple weeks while it's fresh with everybody and then set this for an evidentiary hearing.

And it is being tried to the bench. It is a civil proceeding, remember. And I'll set aside a day or so to hear

testimony.

Now, I'm just looking at my calendar here. I'm going to be leaving the country the week of the 13th of March for the rest of the month, so I'd like to get this done before then.

MR. STEIN: Will Your Honor consider just building in enough time so that we can explain why we need this order that would give us access to the file?

THE COURT: You could probably file a motion right away.

MR. STEIN: Yeah, we will.

THE COURT: And you should respond to it right away. You are not objecting categorically to them taking a deposition?

MR. COHEN: No.

MR. STEIN: And I just want to have that file before I depose her, if possible, and I --

THE COURT: How long does DHS take?

MR. STEIN: Well, you know how that goes. I do not know how long they will take.

I'm much more confident in getting the Court's order as quickly as Your Honor wants to issue it, but I will present it immediately to DHS.

THE COURT: When we say "DHS," that's a big organization.

MR. STEIN: Yes. We got the letter communication

back to our FOIA from a specific agent and office, so we will forward the Court's order to that office immediately. I just don't want --

THE COURT: Okay. I'll tell you what. File something right away with me with a proposed order.

MR. STEIN: Okay.

THE COURT: Send it to Mr. Cohen first. And in your motion, you can say whether or not they object to the proposed order.

MR. STEIN: Okay.

THE COURT: And if they don't, I'll sign it right away, and you'll have it right away.

MR. STEIN: We will do that.

THE COURT: So just get it to me -- you can get it to me today, tomorrow.

MR. STEIN: Okay.

THE COURT: Okay? You have already done the homework, so I think you'll be able to put that together.

And, Mr. Cohen, you know, I'd like you to respond within a day or so, too.

MR. COHEN: Depending on --

THE COURT: I'm on trial next week, but I'll get to this.

MR. STEIN: So does it make sense --

THE COURT: So if you could take her deposition, you

know, sometime in the first few weeks of February, if you can get that information.

If the information looks like it's going to take a lot of time to get, because when you contact this agent and say, you know, the Judge is anxious for you to disclose the information as soon as possible so that you can have it for the deposition, great. If you can't, maybe we will just have to work around that somehow. But I'm just looking at my own calendar and seeing when we could do this before I leave.

So I could set it for an evidentiary hearing March 9th and 10th. And what I want from counsel is what I usually get for any type of bench trial or evidentiary hearing to the bench.

I would like a list of witnesses from each of you, a very brief description of the subject matter of their testimony and a guesstimate about how long their testimony would take.

I would like a list of exhibits -- I have got so many pieces of paper here; I keep getting the same exhibits over and over again -- but a list of exhibits for each witness.

I don't need trial briefs because I know where you guys are coming from. And then we could spend those two days getting this -- getting the evidence in.

And the issue is very simple, like the one that I've been talking about all day; and that is, are there assets that Mr. Trudeau controls or owns that he hasn't disclosed, either

currently -- I know you're talking about recent as well as past? Because the findings that I made are still as valid as they were at the time I made them.

And I went back and looked at the report. I approved that report back in 2013, I believe.

MR. COHEN: Your Honor, it may have been 2015. But I apologize. I could be mistaken.

THE COURT: No, I was just doing that -- that's why I was a little late today. It's so hard for me to go through this --

MR. COHEN: I very vaguely --

THE COURT: I think I have 45 pages of notes on this thing.

Well, actually, I may have approved it in February of 2016. That's what it looks like. There's a motion for final approval of accounting.

So I know, Mr. Stein, you have taken a look at that, and you want to attack it, but I think it's too late. I think that that order was entered, you know, six years ago.

MR. STEIN: I --

THE COURT: So I don't see the timeliness of attacking the accuracy or anything else.

You can certainly interpret the accounting that the receiver gave us and argue from it for sure. But to attack it as anything but a final accounting, I just think it's too late.

MR. STEIN:  Your Honor, may I ask a point of clarification?

Does that mean we cannot point out things that the receiver did not do --

THE COURT:  No, you can do that.

MR. STEIN:  They are just not in the report.  And the inferences that are or are not drawn based on that information or, for example, the fact that he classifies revenue, the difference between revenue and asset --

THE COURT:  I heard you before.  I heard you before.

MR. STEIN:  Okay.

THE COURT:  And I'll take that into consideration, obviously.  But you can't undo -- you can't unring that bell in a way.  It's been -- it's been a final order now for a long time.

And so rather than go through your witness list today, Mr. Cohen or Mr. Stein, I would like you to give me a report on -- we can call it a prehearing order or a pre-prehearing status report.  It's like a pretrial order kind of, but it gives me a heads-up about what you plan to do.

And if you could get that to me -- you don't need her deposition to actually put that together, but you could get that to me -- and if you are going to take a video deposition that you may want to use in evidence; is that correct?

MR. STEIN:  We are willing to depose her over Zoom if

that's --

THE COURT:  No, no, just not her, but you had other witnesses you mentioned.

MR. STEIN:  We do.  Now, that was because the witness indicated he would not be available, and that's an international witness.

There's also another witness domestically who is older, prefers not to travel, may not be -- wasn't available today.  So we were thinking we'll take her deposition and then be able to use that.

But I don't know about the availability of either witness for this next hearing date.

THE COURT:  Well, you know, I'm happy to look at a video deposition of any witness to make it as convenient as possible.

MR. STEIN:  Can they testify via Zoom, or whatever the platform is that the Court uses, during the hearing so they don't have to travel to here?

THE COURT:  That's fine with me.

MR. STEIN:  Okay.

MR. COHEN:  Your Honor, if I may.

There is a potential issue with the international witness that I believe we raised earlier, which is that we were informed by our counsel with specialty and international -- international affairs and sort of international legal process

that it is not necessarily -- it is probably still unlawful to -- if it is unlawful to take a deposition in a particular jurisdiction, that unlawfulness is not resolved by doing it by Zoom if the person is physically in the jurisdiction.

So, for instance, if someone is in Great Britain and it's unlawful under the Hague Convention to take that deposition in Great Britain, there's no way to sort of circumvent that by having that individual -- individual appear by Zoom. And I can go into greater detail about this, but it may be necessary to have some small amount of further briefing on this issue, because we're unable to participate in a situation where it would be unlawful to take the deposition.

The solution is often have the person come voluntarily.

MR. STEIN: Wait a minute.

THE COURT: Let me stop you.

It's interesting that you use that as an example, because when I was in practice, I took a number of depositions in Great Britain by agreement of the parties.

MR. STEIN: I was just going to say that. This is not a coerced deposition. It's voluntarily given.

THE COURT: Right. And we agreed that the witness could be -- could just state that their testimony would be under penalty of perjury, and that would suffice for us. We went over to Liverpool and London and Manchester and took a

bunch of depositions, and it went very smoothly.  We had a court reporter there from England, who also swore the witness in, as I recall.  And it was all done by agreement because our rules, just like the state -- this is a state court case -- our rules allow depositions to be taken outside the ordinary rules if the parties and the Court agree.

And I'd be more than happy to agree, I can just tell you, if that's what would move the ball forward.

MR. STEIN:  This witness will appear by agreement. We are not contemplating --

THE COURT:  No, no, no, but Mr. Cohen has to agree, too.  And I don't know what the FTC protocols are about this sort of thing, but I would hope that they wouldn't get in the way of getting something like that done.

MR. COHEN:  Your Honor, let me explain what the potential issue is.  And I don't know that we won't agree.

The potential issue is that while that, I think, individual witness, the name of which hasn't been disclosed to us -- we are inferring that individual is Lee Kenny.

To the extent that that individual is, in fact, Mr. Kenny, that person is an agent of Mr. Trudeau, which calls into question whether this is truly voluntary, whether the individual as a real practical matter has an -- has an option to say, "No, I don't want to do this," without any type of consequence on Mr. Trudeau.

I have -- the Court has articulated a legal principle correctly, that if it's voluntary, it's no problem. It's voluntary; it's no problem to go to Great Britain and do it.

But this may be a situation where there's a problem with the determination that it is, in fact, voluntary. We just haven't sufficient information at this time to be able to tell whether that's an issue at all and if it is issue, how serious of an issue it is.

MR. STEIN: It's not an issue, and that's an assumption that's unwarranted. As Mr. Kenny will explain, he's not Mr. Trudeau's agent.

THE COURT: Isn't that the purpose of the deposition?

MR. STEIN: It is one of the purposes of the deposition, to dispel that theory of the FTC that Mr. Trudeau is pulling Mr. Kenny's strings.

THE COURT: Well, I mean, you'll have a chance to cross-examine him, obviously.

MR. COHEN: The problem is is that there may already be the record evidence or evidence that isn't in the record but that is available to the FTC that he is, in fact, an agent.

So it sort of puts the cart before the horse to say that we're going to be able to question him during the deposition to determine whether the definition -- the deposition can be lawfully taken.

THE COURT: Does this have to do with the documents

that Miss Babenko gave you?

MR. STEIN: Yes, it has to do with the chain of custody of what the FTC thinks as being, as they say, hidden in the storage locker in Zurich where the couple's belongings were at one point housed while Mr. Trudeau was incarcerated.

MR. COHEN: Just to clarify one point, I don't know that we have alleged -- we talked about the providence of those materials, and we did identify the storage unit as existing. But I don't know that we're alleging that somehow we know for sure that there are gold bars in that particular storage unit.

MR. STEIN: They haven't alleged whether gold bars are anywhere on planet earth. They have strongly suggested that there's this unknown storage locker, of which only some of the contents were removed. And they have argued in writing -- I don't remember the exact words, but it was in one of their briefs on the Babenko documents -- that there's stuff in that storage locker that could be hidden assets of Mr. Trudeau, and that's what prompted us to go and run a trace on how things moved from the locker ultimately to the United States and who can testify as to what was in those boxes.

MR. COHEN: Again, Your Honor --

THE COURT: I'm not in a position to do anything other than to say that I'm happy to entertain a video deposition or testimony by somebody like Mr. Kenny on these issues. I don't know whether he's an agent or not. You seem

to think he is, and that's what we would explore at the time, I guess, if it's relevant. But it almost seems collateral to some of the more important issues here, but maybe it isn't. Maybe it has something to do with these assets that we are talking about.

So work that out. If you can't work that out, let me know, you know, next month -- we are almost there -- whether or not we need to get back together and deal with that.

So it isn't so much the foreign deposition issue. It's whether or not he is voluntarily --

MR. COHEN: Correct, correct. We have absolutely no problem. The Court is exactly right that as long as it's voluntary, we have no objection. I mean, I think we agree that the potentially probative value of this -- of this testimony is extremely low, but we can establish that through cross and through argument, so it's not -- you know, that's not it. We're not objecting on those grounds.

We do need to analyze -- and, again, I think a short submission on this to which we would respond promptly would be useful where we go through some of the evidence that indicates that Mr. Kenny is, in fact, Mr. Trudeau's agent, because we may be unable to participate in this if, in fact, the result of that evidence is that there's a really good reason to believe that it's an agency relationship.

You know, that may be mistaken, and I didn't study

that particular sort of batch of evidence in anticipation of today's proceedings, but I am aware of it from 2013. And, again, there may even be findings on that in the 2013 findings related to the transactions that took place between Mr. Trudeau and Mr. -- Mr. Kenny.

A number of assets were transferred to Mr. Kenny in the period leading up to the 2013 proceedings for little to no money. And there, I believe, was other testimony, although I don't know if there were other facts the Court found, but other testimony in that larger record indicating that Mr. Kenny was the agent of Mr. Trudeau.

MR. STEIN: Well, let's have Mr. Kenny explain whether he's an agent of Mr. Trudeau, in particular, from the time that Mr. Trudeau was incarcerated, and after that point Mr. Kenny was involved in the storage locker in Zurich and those arrangements.

MR. COHEN: Well, if I might propose a suggestion. The one thing that could be done is that -- is that other evidence, such as a declaration for Mr. Kenny, could be attached to the defendant's filing, and we could respond to that.

What we want to avoid -- what the commission wants to avoid is the situation where we don't know whether he's an agent or not. The Court has not found that one way or the other; and nevertheless, we have to take a deposition that,

depending on what the answers to the questions are, turns out to be -- have been illegal.

So we need to reach a resolution first on whether there's an agency relationship, and then once that's been established or not established, just that there's no -- it's been established that there is not an agency relationship, then we, again, have no objection.

And more broadly, Your Honor, I mean, I think from the government's perspective, we are not concerned about anything that Mr. Kenny will say. We think that that -- the testimony, as we understand it from Mr. Stein, that Mr. Kenny is likely to give is orthogonal, at best, to the key issues before the Court. But, you know, to the extent that they can take it legally, we don't have any problem with it.

MR. STEIN: This --

THE COURT: Is Mr. Kenny working for any of these companies that we dealt with back in 2013?

MR. STEIN: Website Solutions is a company that Mr. Kenny works for --

THE DEFENDANT: All gone.

MR. STEIN: Gone. Yeah, they are gone as well.

MR. COHEN: Mr. Kennedy did, in fact, work for Website Solutions Switzerland and was the sort of point person coordinating the kind of setting up of Mr. Trudeau in Switzerland in the 2013 period, and he's had a long-standing

relationship with Mr. Trudeau dating back well into even earlier stages of this multi-act play or some of the earlier acts in which he received transfers from Mr. Trudeau under suspicious circumstances.

MR. STEIN: Well, wait a minute. That's not the subject of his deposition, and he has nothing to do with Mr. Trudeau as an agent since Mr. Trudeau went into prison.

The subject of the deposition is to establish -- from our point of view, to rebut the suggestion that the FTC has made that there's hidden assets in this Zurich storage locker, which is about as close as they've ever come to identifying a specific storage locker anywhere. And so that's why we are focusing attention on that.

As you know, Your Honor, they have pointed to a piece of paper with three handwritten addresses on it and then promptly told the Court that a Google search revealed that there's storage lockers in those neighborhoods in Switzerland, so that's evidence that Trudeau is hiding gold in those lockers. I can't take a deposition on that.

THE COURT: All right. Enough, enough. Let's just leave it at that.

I see no problem in allowing that deposition to be taken, because if you establish that he is an agent through cross-examination or other evidence, then we might not consider the testimony. I don't know. But I don't see any harm.

I think we are just delaying things by putting off these types of examinations when counsel is ready to do it.

I just want to go through what we have to do now. I want you to get me that prehearing submission, let's say, by February 13th. Okay. And hopefully by then you'll have arranged or taken Miss Babenko's deposition.

Get me your motion and proposed order for the DHS documents by when?

MR. STEIN: Tomorrow.

THE COURT: Tomorrow. Okay.

MR. COHEN: Your Honor, how long will we have to respond to that?

THE COURT: If you are objecting to it --

MR. COHEN: We'd ask for just three business days.

THE COURT: Okay. By the 1st of February.

MR. COHEN: Yes, Your Honor.

THE COURT: Okay.

MR. COHEN: And --

THE COURT: Now, I also -- it's hard to keep track of everything that we have been talking about today.

You are to get me -- did you get the number of the assets in those three accounts that Mr. Trudeau has agreed to?

MR. STEIN: Yes, Your Honor. So I have an update on that for you.

Okay. The Wells Fargo account, which is a savings

account, there is -- and this is as of now.  Some of these are tied to the market, so by the time you place an order and it's liquidated, it may be a little bit different.  But as of now, Mr. Trudeau reports that there's $190,012.88 in the Wells Fargo savings account.

There's a Fidelity penny stock account.  This fluctuates quite a bit.  Just a couple days ago it was 22,000 and change.  Today it's 29,206 --

THE COURT:  The market must be up.

MR. STEIN:  Yeah.

(Continuing) -- 206.11.

And Mr. Trudeau has this Trezor, I believe it's pronounced, or Trezor account.  That's a cryptocurrency account, well beyond my understanding of how to liquidate or sell those, but he does not know the precise value of that crypto account right now.  He needs to -- he wasn't able to access that on the break, but we can certainly find out.

THE COURT:  Well, what I'd like to put in the order is this:  That by agreement, Mr. Trudeau is to liquidate and turn over to the FTC the proceeds from, and then go ahead and describe each of those accounts.

MR. STEIN:  Okay.  And what I would like to ask the Court is this:  Mr. Trudeau does have a tax bill coming up pretty soon.  He needs some money to pay the taxes.  He also has legal expenses that he is incurring.

Can we come to some kind of an understanding of what percentage of these accounts specifically but more generally as well going forward of Mr. Trudeau's income, what percentage of his income is he to turn over, understanding that the man needs to live, and he hopefully is going to be allowed to continue making a living in such a way as that he can make money and pay off the redress debt?

We are really unsure about what those parameters are.

MR. COHEN: Your Honor, if I may.

I believe we are rehashing what we covered in the morning. The -- we haven't even gotten to the million dollars he earned last year that none of which has been turned over.

He's been able to raise legal expenses -- money for legal expenses at incredible rates by making appeals to donors, and nobody is stopping him from continuing to doing that -- to do that. So it's not going to affect his ability to put on a defense.

The commitment we had earlier this morning was that those accounts would be turned over, and we'd ask that -- that the Court maintain that commitment.

THE COURT: That was the commitment he made this morning, and I'm going to hold him to it.

MR. STEIN: Okay.

THE COURT: And so if he can raise some other money to pay these other expenses -- I'm not saying I want him to

starve to death or getting in trouble with the IRS -- but, you know, I think you guys can have a conversation about that and try to see if there is any income coming in, how much he needs to live on, and how much he needs to meet his tax obligations. That's part of his supervised -- no doubt part of his supervised release.  I haven't looked at all of the conditions, but --

MR. STEIN:  May I propose --

THE COURT:  -- a normal condition of supervised release is that you have to pay your taxes on time.

MR. STEIN:  Will the Court entertain a proposal, to which the FTC can, of course, respond, where we lay out what Mr. Trudeau is able to pay and what he hopes to be able to keep in terms of living expenses and to pay for travel, which is a point I wanted to discuss as well?  And then we have some kind of a finite plan.

And we also want to know, what is the number?  Can we leave this room today with a final number?  We've got competing numbers from both sides.  They are wildly different based on different assumptions.

THE COURT:  Which numbers are you talking about?

MR. STEIN:  The total amount of redress still owed.

THE COURT:  Well, whether or not it's 21 million or 12 million or 30 million, we are not even close to it.

So, you know, I just don't see where that is

something I can make a decision on today.

MR. STEIN: Okay. Can we propose a plan as to what percentage of his earnings going forward is reasonable --

THE COURT: Go propose -- propose whatever -- propose whatever you want.

MR. STEIN: Okay.

THE COURT: And I want to be reasonable about this, too. You know, it's not that I have forgotten the coercive incarceration order that's still out there. I think I have made myself clear that I am not ready to pull that trigger as of yet. I would like to hear the evidence that you have.

And in the meantime, there's no reason why we can't have some wiggle room with respect to his income, but I don't know what income you are talking about.

And as far as travel goes, I am very reluctant to allow him to travel. He's already raised a million eight without --

MR. STEIN: Well --

THE COURT: -- without leaving Chicago. So I'm just very reluctant to do that.

MR. STEIN: May I --

THE COURT: Certainly I'm not going to let him go international. That is not happening. I don't think Judge Guzman will entertain that either. I haven't talked to Judge Guzman about it. But while these proceedings are going on, I

don't think that's going to happen.

MR. STEIN: Your Honor, may I --

THE COURT: Maybe there's -- and, you know, you guys can talk about this. Maybe there's a particular event that he can raise a certain amount of money from that is going to take place in Las Vegas or someplace like that that you might propose; but it would have to be, you know, one at a time.

I just don't have the confidence that Mr. Trudeau is reliable enough to allow him the free reign that you would like me to do.

MR. STEIN: Your Honor, just -- there's been no evidence in the record that Mr. Trudeau is a flight risk. Quite the contrary, he's never missed a court appointment other than the one we've been arguing about whether he met the 2014 order.

He's flown in from overseas to make court appointments when he was already out of the country and come in as he should have.

There was a recent event in San Diego, I believe it was --

THE DEFENDANT: Puerto Rico.

MR. STEIN: Oh, sorry.

(Continuing) -- Puerto Rico where there was a GIN activity where Mr. Trudeau could have been the featured speaker. Because of the Court's order limiting him to the

Northern District, he couldn't attend. And that event was not nearly as successful as it would have been had he been there.

There's -- GIN wants to plan more events, but their main attraction is grounded. And that's hampering Mr. Trudeau's ability to earn a living, and it's hampering his ability to earn redress money.

He's not -- there's no -- again, no evidence that he's a flight risk. No one has alleged that he's a flight risk. There have been a lot of other allegations, but that's not been one of them.

And he's never tried to escape and abscond, and I have no reason to believe that he will, but he does -- he is trying to make a living. And because of the business that he's in, these events are around the country and internationally.

I understand the international part, but will the Court at least consider allowing Mr. Trudeau to remain within the United States, as he was doing for some time since he was released from prison until the Court restricted him?

MR. COHEN: Your Honor, if I may, on a few points, and I'll be brief.

It's not the case that nobody has ever alleged that Trudeau is -- Mr. Trudeau is a flight risk. As the Court is aware, there have been multiple allegations, and the Court actually took his passport back in either late 2012 or in 2013 precisely because of the evidence that -- that was part of the

Court's findings that, you know, that he might leave and not come back.

In terms of -- of kind of where we go next, Mr. Stein mentioned the notion of what I understand will be finally what I think is going to be a problematic 60(b) motion proposing some sort of payment plan. We would ask that the Court set a briefing schedule so that the argument on that can be heard contemporaneously with the proceedings on the 9th and the 10th of March.

And then the final point that I want to make is that -- and I'm sorry to keep coming back to this, but I'm concerned it presents an evidentiary problem that I want to make sure the Court fully appreciates.

If Mr. Stein advances evidence that it's just sort of colorable on its face that this is a voluntary proceeding, a voluntary deposition or video deposition of Mr. Kenny, then we can participate. But the problem we have is that we can't participate with -- when there is at least some evidence, unrebutted evidence at the moment -- and maybe it's able to be rebutted -- unrebutted evidence that he is not appearing voluntarily.

So if we are directed, because I will be told I cannot break the law of Great Britain, the result will be that we won't have had an opportunity to examine Mr. Kenny; and then the admissibility of that examination will be, I think, subject

to a very serious question.

So, again, it may -- it maybe makes sense to sort of not put the cart before the horse --

THE COURT:  Where is Mr. Kenny?

MR. STEIN:  Great Britain.

MR. COHEN:  And, again, we would like the opportunity to question Mr. Kenny.

THE COURT:  But what you're saying, with all due respect, it's kind of circular.  You want to test whether or not he's voluntarily appearing.  And I guess this is some internal rule at the FTC?

MR. COHEN:  It's that we're required through our -- the agency is required to comply with just -- I believe it's the Hague Convention, but whatever international treaties govern this.

And so when I say we want to test it, we want to test it based on information that is already available to us.  We don't want to get new information.

So if the Court were to determine -- and, again, we would like this to go forward.

THE COURT:  Why can't you just ask him?

MR. COHEN:  That would be something.  I have suggested that Mr. -- that Mr. Stein put forth a declaration in which -- and the declaration could say, I am not an agent.  I'm appearing totally voluntarily.  I have the -- I mean, I can't

absolutely say for certain that we could rely on that, but that sounds plausible.

All I'm asking is that the cart not be put before the horse and so that we establish that we have a basis to attend the deposition before we actually have to attend the deposition.

THE COURT: Why don't you try that first. Okay? Mr. Stein is nodding his head when I just said, why don't you just get a declaration.

Can you get a declaration from Mr. Kenny that says, "I'm not an agent. I'm appearing for this deposition voluntarily"?

MR. STEIN: I believe we can.

THE COURT: And --

MR. COHEN: I mean --

THE COURT: You can test it. I'm not saying you can't test that.

MR. COHEN: That would give us, I believe -- and, again, I would need to consult with our office of international affairs, but I believe that that would give us a good-faith basis to then participate, and then we move forward.

All I'm asking is that we have some -- something to work with in advance rather than having to simply participate or not participate without any ability -- any assurance that it is, in fact, voluntary.

I know that, you know, sometimes these sort of technicalities are tricky and problematic and get in the way, but the commission must comply with the Hague Convention. And so, therefore, we do need to do it in this order.

THE COURT: No, I understand what you are saying. I appreciate that.

Are you -- Mr. Stein, are you anticipating taking a deposition of Mr. Kenny, let's say, virtually and then presenting that deposition here in court or submitting it to me to consider?

MR. STEIN: Well --

THE COURT: Or are you anticipating having Mr. Kenny appear virtually at the hearing?

MR. STEIN: If Mr. Kenny is available at the hearing and the Court allows him to appear virtually, that would be my preference.

The only reason this deposition business came up was because I knew he couldn't make it today. And when we still thought that there would be witnesses, I then realized I have an unavailable witness. I need to take a deposition that I can use at the hearing under the rules of evidence.

THE COURT: Why don't you try to get that declaration done as quickly as possible and see if that solves the problem. And then if he's going to be one of the people who testifies virtually at that hearing, fine.

I want to make sure that there's enough time, because I am leaving the country for Great Britain, as it turns out. Maybe we could do it while I'm over in London. I'll be babysitting a little bit, I think, over there, so maybe that would be a good diversion.

THE CLERK: What time do you want to set it?

THE COURT: Do we have anything else set?

THE CLERK: No, because that was blocked out.

THE COURT: Oh, that week was blocked out.

We could start probably -- why don't we say 9:30 and go as late as 4:30.

MR. STEIN: Your Honor envisions -- you are setting aside two days, right, March 9 and March 10?

THE COURT: Two days, yes. So when you give me that report about that prehearing submission, you could also -- I would also like you to include whether or not any of the witnesses are going to appear virtually or whether or not their depositions have been scheduled.

If you have a problem with Mr. Kenny, bring that to my attention right away, and we could probably talk about it over the phone.

MR. COHEN: We will do it immediately.

THE COURT: Okay.

MR. STEIN: Your Honor, there's --

THE COURT: Have I forgotten anything?

MR. STEIN:  There's a couple --

MR. COHEN:  You go first.

MR. STEIN:  There's a couple things on my list still.

THE COURT:  I hate to ask that question.

MR. STEIN:  Sorry.  We have the issue of the donors who participated in this recent round of fund-raising.

THE COURT:  Right.  I did forget something.

MR. STEIN:  We -- Mr. Trudeau has informed us -- and he's told the FTC this -- that those donors would prefer not to have their name in the public record.  If we can --

THE COURT:  You could file it under seal.

MR. STEIN:  Okay.

MR. COHEN:  Your Honor, we would like the opportunity to brief that.  Under the Seventh Circuit's rules regarding what can and cannot be filed under seal, which are very limited, there are -- we don't think that's appropriate at all.

We are not talking about public -- personal information about the donors.  What we are talking about is people who have made contributions that is not to a not-for-profit organization, basically be giving money to Mr. Trudeau for whatever purposes.  There is a very strong public interest in seeing what's going on in this proceeding.

Additionally, that public interest, as the Court I'm sure is aware, is even heightened when the government is a party.  And what those materials are or are likely to become

are judicial records that, again, as the Court is aware -- and I can go back there and I think cite some specific authority, although I suspect the Court is well aware -- the burden to seal judicial records is enormous.

It may be the case that ultimately we want to cross-examine or take discovery from these people. They're going to be involved with the proceeding or potentially could be involved with the proceeding.

We have no objection to, for instance, their personal information -- so, for instance, phone numbers, addresses, and things like that -- being removed from the public record, as I think is entirely appropriate, both in terms of the commission's policy and my understanding of the Court's policy as well. But their names are simply not a secret, and we shouldn't be doing the March 9th or March 10th proceeding in secret really in any way.

MR. STEIN: I was going to file a brief on this issue, because I disagree with Mr. Cohen's understanding of the law. I understand --

THE COURT: Go ahead and file a brief.

MR. STEIN: Well, I was trying to save Your Honor that pleasure.

THE COURT: I would like to save it, too, but if there's an objection to doing it that way -- I mean, I can see why people who did this might not want their names to be in the

public record.

You know, we handle a lot of things under seal, at least initially, in order to determine whether or not we keep them under seal. We very often remove the seal, depending on whether or not we determine there's a reason to keep it out of the public record. But I can see both sides of the point. So why don't you file a motion on that.

In the meantime, you can go ahead and get information from these banks. You said you've already started the process, so you know where the money went -- came from, so you know where it went into. And you could easily see, you know, how it was deposited. And you can't, obviously, see who deposited it, but at least that's a start.

MR. STEIN: And Mr. Trudeau has offered to disclose all of this information. He described the process already under oath. He will provide whatever the FTC wants to assure that the source of these moneys are appropriate.

It goes to that transparency plan that I kind of outlined for the Court generally, which he's willing to participate in, of course. All he was asking for is don't chill the donors' willingness to give money. And word gets out that their names are out there, and maybe the next round of donors isn't as expansive. And that's really what we are talking about at the end of the day, all these things to cut off our nose to spite the face. It may make Mr. Trudeau look

bad.  It may make the FTC happy that he's in prison or he's having struggles to raise money --

THE COURT:  Let's not get into that.

MR. STEIN:  Okay.  But my point is this:  We should be working together to help Mr. Trudeau do what it takes to satisfy the redress sanction.  And these obstacles that are coming up of objecting to his ability to work and travel, to raise the money, objecting on something as minor as the names of the donors when it's clearly in the interest of the consumers to be able to get the money just does not make a lot of sense, and it's wasting a lot of resources.

MR. COHEN:  Your Honor, if I may.

The argument the FTC anticipates making with respect to the donors is going to be well-rounded and binding Seventh Circuit precedent.  If the Court doesn't find it persuasive, then that will be the end of the matter.

Additionally, Mr. Stein has indicated that -- that there's all this information that can be made available to us.  Mr. Stein took the position that -- or the defendant, excuse me, took the position that the last information we request -- request that we made pursuant to the outstanding -- the order which enables us to make such information request, that he was simply not -- the defendant was not going to respond.

We would ask that -- that there be a response to that last request, which covers some of the information that the

Court has raised here.

MR. STEIN: That's not entirely accurate.

THE COURT: What request is that?

MR. STEIN: After Mr. Trudeau's deposition, the FTC served another round of document requests based on information that was conveyed during the deposition. And they cited as authority for that request an order entered in the *Coral Calcium* matter, which is not this matter.

And we pointed out to them saying, I don't see anything in this order that requires us to answer this additional discovery that you were trying to seek. And that was our position.

MR. COHEN: If I may, Your Honor.

THE COURT: And what was the additional discovery? What was it?

MR. COHEN: The initial discovery involved discovery that was emanated from the testimony that Mr. Trudeau gave during -- on January 9th which related, among other things, to these donors.

Counsel is mistaken, though, that the December -- that the 2004 *Coral Calcium* order is actual -- is not relevant. I know there's a long history here, but it is that what was -- that is the order that was violated in 2000 -- in the 2007 contempt proceedings that gave rise to where we were today.

So what we are attempting to do is collect money for

a violation of that 2004 order. The Court will note the docket number -- and I haven't seen one like this in a while -- starts 03, something like that. We do go back that far; and therefore, locating information or ascertaining information that is relevant to remedial efforts designed to remediate a violation of the 2004 order is very much connected to that 2004 order. And we'd ask that the defendant respond to that.

THE COURT: Which case was that entered into, the 3904 case?

MR. COHEN: My understanding, Your Honor, is, yes, it was 3904. But please don't quote me on that. I don't have that in front of me.

I believe the 2004 order followed the 03-3904, 03 being the year. I don't believe it was the '99 one -- '99 action or '98 action.

THE COURT: '98. Well, it's the 3904 case that we are dealing with right now. So any orders that were entered in that case that are still valid, haven't been changed, I would assume would still be subject to enforcement.

MR. COHEN: The defendant's response to that written request, which was not made prior to this hearing, I think will help move the FTC forward in terms of developing out the record of, among other things, who the donors are.

MR. STEIN: There are things in that request that are no longer necessary.

There was also a request to go to the issue of whether Mr. Trudeau had certain communications with Mr. Anderson on the issue of his appearance. I don't believe that those requests are necessary anymore, including Mr. Anderson's billing records.

MR. COHEN: We agree that the issues that were related to the advice of counsel, since Mr. Trudeau has been found to have violated that order, they're -- the next step -- and I want to talk about that -- we'll be briefing on sort of what is the contempt remedy. But we agree that requests -- and I'm happy to have an offline, out-of-court meet-and-confer with Mr. Stein about this, but I anticipate we'll be able to reach an agreement about which requests are withdrawn or mooted in light of the Court's order.

THE COURT: Okay. Are you talking about the consent decree from back in 2003?

MR. COHEN: I believe it's --

THE COURT: Before your time, Mr. Cohen, and certainly before yours, Mr. Stein.

MR. COHEN: I was still -- I was practicing law. Maybe I'm older than --

THE COURT: No, I didn't mean that. I don't think you were in the case.

MR. COHEN: Oh, yeah, that's correct, I was not in the case. That's not completely before my time.

But, yes, we do believe that that is the correct order pursuant to which we should be issuing those requests, because the 2004 order is what was determined to be violated in 2007. And it's that violation for which we are still here 15 years later attempting to compensate consumers.

So we think the request is entirely proper. That said, counsel makes a fair point, which is, to the extent that some of those requests which were made prior to today's hearing, of course, to the extent that some of those requests bear upon advice-of-counsel issues, we are glad to withdraw them. And I think it will be an easy meet-and-confer to figure out which ones those are.

THE COURT: I'm just looking through my notes on this case. How many times do you think I've held Mr. Trudeau in contempt?

MR. COHEN: We believe it is five -- six counting this morning.

THE CLERK: I think document 62.

(Discussion off the record.)

MR. COHEN: And in fairness, that was a sort of rough count from memory. I may be off by one or something like that.

THE COURT: Well, I don't know what you want me to do with this discovery issue.

MR. COHEN: We would simply ask that the Court direct that once we reach an accommodation that is, I think, entirely

appropriate with counsel to remove the issues that are no longer relevant, that the Court make clear that they are -- are required to respond to requests that are issued pursuant to the monitoring provisions under that order.  And that includes written requests of the nature that the one that we provided.

THE COURT:  This is at the end of the deposition?

MR. STEIN:  No.  They sent a follow-up email.

MR. COHEN:  Yes.  If I recall, there was a discussion at the end of the deposition about the nature of those requests.  Counsel requested that we follow up by email or by writing, and we did do so.

MR. STEIN:  Why don't we try to work this out, Your Honor.

THE COURT:  Try to work it out.

But you're going to file a motion on the donors?

MR. STEIN:  The names, yes.

THE COURT:  Okay.  When do you want to do that?

MR. STEIN:  By Tuesday.

MR. COHEN:  Your Honor, could we have maybe a week to respond to that?

THE COURT:  That's fine.

MR. COHEN:  And then as I mentioned earlier, just in terms of how we kind of wrap up, we understand a few things have been resolved; that the Court's order will specify that I think it's 192 K actually will need to be turned over

immediately by, I think it was, tomorrow, is what the Court had indicated.

And then again we request -- and I'm not sure if the Court addressed this already --

THE COURT: Well, I think we were going to say the proceeds of those three accounts.

MR. COHEN: Correct, whatever they are, whatever the proceeds of those accounts are.

THE COURT: Can you just give Claire the numbers of those accounts and where they are?

MR. STEIN: Yes.

THE COURT: We could put that in the order today.

MR. STEIN: Yes. And the only one I don't know how quickly Mr. Trudeau can get is the crypto account.

THE COURT: Okay.

MR. COHEN: And we have no problem if that takes another day or something like that.

MR. STEIN: Yeah.

MR. COHEN: The -- what I understand to be the forthcoming 60(b) motion, that there will be a briefing schedule --

THE COURT: And the 60(b) -- wait. Let me just stop you.

You're saying a 60(b) motion to alter the judgment to provide for a payment schedule?

MR. COHEN: That's my understanding of what counsel is proposing.

THE COURT: Is that correct?

MR. STEIN: No, no. Because they want to move this into a 60(b) box because they feel strong that it's overdue -- that there's no way we can classify the motion that way, and they may be right.

THE COURT: They are right.

MR. STEIN: Okay. Well, that's settled. That's not what we are looking to do.

As we understand the existing order, it does not require Mr. Trudeau in one fell swoop to hand over $21 million. He's required to pay all reasonable and energetic efforts to the best of his ability.

What we are arguing about -- this is the point that I made at the beginning of the day. What we are arguing about is what does that mean? Does that mean immediately -- anything short of $21 million on an allegation that he's hiding whatever he doesn't hand over puts him in jail? Or does it mean we are not going to fight anymore about -- we are not going to let that stop him from paying whatever he can within reason? He still has to live and eat, but he will pay the rest as best he can.

And that's why I keep asking the Court, what does he owe? And that depends on also the math that Your Honor saw on

the two versions of the joint status report. How many consumers are really left? Are we knocking out people who didn't cash the first round, because that's what we think the order says? The FTC may disagree. How much --

THE COURT: Do you disagree?

MR. COHEN: Strongly disagree. In fact, I'm prepared to walk through the numbers and illustrate quite quickly to the Court that we did not -- that we have, in effect, altered the amount of payment that consumers received based on whether they have already received one check or two checks.

Just to be direct, counsel is incorrect.

MR. STEIN: If I'm incorrect and they can show that we are not reading that right, so be it. But we've done the math based on their numbers, and it doesn't add up any other way nor does the premise that every remaining eligible consumer, however many they are, is still owed the full $29 and change price, because some of these people already got $9 and change. And so that brings it down to $20-and-some-odd money. They --

THE COURT: Do you agree with that?

MR. COHEN: No. And, Your Honor, I have an unusual proposal. If the Court will indulge me, if there's an opportunity to take a 5- to 10-minute recess, I believe that if I could just meet and confer one on one with Mr. Stein, it will be -- maybe it will be me -- it will be apparent to one of us

who has the math wrong.

THE COURT: All right. But --

MR. COHEN: It's also --

THE COURT: -- the issue that Mr. Stein has raised is that you have consumer A. Consumer A got $9 in two checks and cashed them both.

The point of the remediation is to make sure that they got the $29 that they paid for the book.

MR. STEIN: That's right.

THE COURT: So wouldn't that consumer be entitled to $20?

MR. COHEN: Yes. And so --

THE COURT: So that's all I wanted. I'll give you 10 minutes to work something out.

MR. COHEN: I'm sorry?

THE COURT: I said, I'll give you your 10 minutes.

MR. COHEN: Yeah, if we could get 10 minutes. But before we -- before we take that 10 minutes, because I think that either -- you never know, but I think there's a chance I'll persuade Mr. Stein or a chance he'll persuade me that -- about how we're counting -- I do want to make two additional points.

As the Court has already said, what we are providing here in that number is not his obligation to pay. That's established by the order, as the Court said this morning, but

sort of for the convenience of Mr. Trudeau, what is reasonably likely to occur before he would start -- he would receive a refund, and the process would conclude. So that's the purpose of the second number.

But whatever their motion is -- and our understanding of that motion is that it -- is that to accomplish the relief that they have said they want to accomplish, that requires modifying and striking the word "forthwith" from that order.

Therefore, it's an order -- a motion to modify the order. Therefore, it's under 60(b), and we'd ask that it be heard contemporaneously with the proceedings on the 9th and the 10th.

THE COURT: We could certainly do that. But 60(b) has come and gone. It's got to be filed within a year.

MR. STEIN: That's why we're not -- we don't believe this is a motion to modify anything.

The plan is clear. We're just not reading the plan the same way.

THE COURT: Well, the plan was a distribution plan. It presumed that there was money to distribute.

And now we are talking about how much money are we going to put in that pot? And then we'll go back to how we distribute it.

So I don't understand there being a fight about that sort of thing.

MR. STEIN: And knowing the balance is important. Because if Mr. Trudeau is engaged in fund-raising, for example, to pay the balance, he needs to know how many events does he need to plan based on how much can he realistically raise at every event.

THE COURT: All right. Let me talk --

MR. STEIN: That's why I keep stressing that.

THE COURT: Let me talk about that.

You have argued vigorously that he should be allowed to travel to these events to generate money that would be used to pay the judgment, correct?

MR. STEIN: Yes, Your Honor.

THE COURT: Okay. And I have told you that I am very reluctant to give him a blank check on that one, so to speak, or a blanket permission to do that.

I would be willing to look at a particular proposal for a particular event and a projection of how much income could be raised and how much of that income would go towards restitution here.

So I think we could do that event by event and see if it works. And if we are actually making progress that way, maybe I would be a little more liberal in allowing that type of travel.

MR. STEIN: And he does, of course, report to a probation officer --

THE COURT:  I understand.

MR. STEIN:  -- every time he travels.  It's not like he's just going out like anybody else.

THE COURT:  Mr. Trudeau is the kind of defendant that probation officers love because they are not out there doing drugs or committing robberies or domestic violence or anything like that.

So I understand the probation officer didn't object to his international travel, but she or he -- I can't remember -- wasn't as familiar with what's going on here as we are.

MR. STEIN:  Until Your Honor limited him to the Northern District, then they amended their position on that.

THE COURT:  No, I understand.  But they had really no knowledge of this proceeding.

Take your 10 minutes.  We'll be back at 3:00.

MR. COHEN:  I'm sorry, Your Honor.  Just two brief additional points in terms of what the order will ultimately say.

I've mentioned the amounts or the counts and our desire to have the 60(b), or whatever the motion is, be on the -- argued on the 9th and the 10th; that we want to assure that the order finding Mr. Trudeau in contempt of the failure to appear also, as the Court indicates, gives us an opportunity and of course an opportunity for counsel to respond with

respect to what the appropriate scope of relief is.

THE COURT: I'm deferring the -- I'm deferring deciding on the sanction, because I'm going to -- I think a lot of this is overlapping, if you will.

MR. COHEN: Okay. And then the --

THE COURT: And that will be in the order, too.

MR. COHEN: And that there -- I think that's all I have for now. We'll talk with them. We'll talk -- I'd be happy to talk with Mr. Stein now for 10 minutes.

THE COURT: Okay. Come back at 3:00.

MR. STEIN: Thank you.

THE CLERK: All rise.

(Recess.)

MR. COHEN: Your Honor, we have some -- some progress to report. That's good. So -- and Mr. Stein will surely let me know if I'm -- if I'm not fairly characterizing it.

But I believe that -- that from a mathematical methodology perspective only, from a mathematical methodology perspective only, the defendant agrees that the methodology we employed for our second number is -- is correct.

However, the defendant has noted, as has been their position all day and really for the past three or four months, that it relies on certain assumptions that we've talked about already again this morning and that if those assumptions are wrong, then, of course, that makes the math wrong.

The key assumption that I think the parties dispute is the fact that the original partial redress plan which was intended, as the Court said again this morning, only to deal with the money that we had in the most efficient way possible, did not resend checks to people who hadn't cashed their first check. But our duty under the order -- our duty under the order and the unmodified order is to redress everyone it is reasonably possible to redress.

That means not only the people who cashed both checks but the people who relatively recently had cashed one check as well.

Certainly on March 9th we would have no objection to the defendant putting on testimony saying that consumers in that circumstance are not reasonably possible to be redressed. We would put on our own evidence contrary to that. But that does seem to be the core remaining issue, and so I'll leave it there.

The sort of mathematical structure that the commission outlined, the numbers part is right, but where the parties disagree is the assumptions and, in particular, the assumption that someone who cashed only one check can no longer receive any redress under the Court's 2010 order to pay.

MR. STEIN: That's almost entirely accurate.

It's -- the question is -- centers around this language in the Court's -- the Court's plan. And I quote from

ECF 892 at page 6.

"If there are sufficient funds for a second distribution, every victim who cashed his or her first check will receive a second one, and the cycle will repeat until every victim the FTC can locate has received a full refund."

We believe that methodology is the methodology that controls. Whether we've got a little bit of money up-front that we knew about or if another pot of gold is discovered later on, the method of distributing the money to satisfy the order is clearly laid out in the Court's plan. We are not asking to modify it one iota.

As we read that, though, people who receive a check and don't cash it -- not people who receive it and cash it, as Mr. Cohen was talking about; I think he was just misspeaking -- it's the folks who receive a check and don't cash it, under the language I just read from the plan, we believe they're out, because they've -- you can't get into these people's heads and know really why they didn't cash it. But the assumption has to be at some point they are out; they're not going to cash this check. Maybe they're not interested; maybe they don't know how to cash a check. Who knows? But at some point they are no longer eligible consumers who need to be redressed.

We believe that that method is clearly spelled out, doesn't need to be modified, and that applies. And so you have over time a dwindling pool of eligible consumers who remain to

be redressed.

Our number of those people are the ones who have cashed check number one and check number two. And only two checks have gone out so far. And that number is 514,306 remaining eligible consumers for another third round to come.

That's how we read the order. And if that assumption is incorrect, then it affects -- it affects the math.

And our other point is -- and I think FTC is going to check its numbers -- but they may have made a calculation error as to those people who did receive in cash both checks. They have already been redressed then to a certain amount. And we believe that number from the FTC's accounting is $9.13.

They have a slightly different number, and it's a little bit less than that, so the remaining redress is higher.

We think for those consumers, $20.93 multiplied by 514,306 is what gets you to $10,444,011.80 before the administrative costs. And I understand that the Court thinks that interest needs to be applied as well. I would just point out on that, that's not in the order. Your Honor's order does not call for interest.

So if we're modifying the order --

THE COURT: Judgments automatically accrue interest under the statute.

MR. STEIN: This isn't a --

THE COURT: It's a judgment.

MR. STEIN: Well, okay. If that's the Court's ruling, we obviously live with it.

Our argument was this is an equitable disgorgement sanction. It's not a judgment. But if that's the Court's ruling, fine.

But our number does not include -- this is another important point. Their remaining redress number includes the projected cost of 7.1 million and change in administrative fees. We don't know what that's going to be, and we don't know, therefore, if -- again, if we read the plan correctly and people drop out, there's not going to be a need to redress as many people each round. So the administrative costs will go down commensurately.

But in any event, it's not right to count unknown administrative costs that have yet to be incurred when determining right now how much is still left, how much is still owed.

MR. COHEN: Your Honor, if I may address a couple of those points.

The -- just briefly, because the Court I believe already ruled on this this morning, that that was a partial redress plan intended to deal with the amount of money that we had at that point in time.

It was not a statement that those would be all the consumers who it could re -- who the FTC could reasonably

possibly -- for whom it was reasonably possible we could redress.

The standard under the order to pay, the 2010 order, which is what is important and what it not -- has not been modified, is that we are entitled to redress everyone for whom it is reasonably possible that we can redress.

And so, therefore, it is appropriate to approach the calculation the way that we have.

MR. STEIN: And that number is 1,278,559 eligible consumers at the get-go. That's how many people were determined to have bought this book.

That pool is shrinking over time as people get money and don't cash it.

THE COURT: Your method two, which is the one you're going with, right, method two? I'm looking at page 14 of the joint status report.

You have 653,150 eligible consumers, correct? So if you are going -- so you have reduced the number of consumers by those who did not cash either check, correct?

I'm looking at you, Mr. Cohen.

MR. COHEN: You're looking at me. I'm sorry. I thought you were -- we have reduced the number of consumers by the -- let me say it more broadly -- by the number of checks that they have cashed.

So consumers who have cashed both checks are owed in

the ballpark of -- there may be an issue with the specific number we use -- but they're owed in the ballpark of $20. And then the another hundred-and-so-thousand consumers who only cashed one check are owed another 25 rather than 20.

So we have taken this into account. There could be arithmetic error --

THE COURT: Let me just stop you. I want to make sure I understand this.

MR. COHEN: Yeah.

THE COURT: You have eliminated from the pool of eligible consumers those who didn't cash either check?

MR. COHEN: Correct, although I want to add to that, Your Honor, that is because the Court has asked us, I think for Mr. Trudeau's benefit, to come up with an approximation of -- of when realistically this might end.

We agree that it is not going to be possible to redress every consumer for all sorts of reasons, including reasons that are his fault because he went to jail for eight-and-a-half years, and that's his fault, and so there's been a significant lapse of time.

But we can't go further than the number of consumers that it's reasonably possible to redress. And so what we anticipate would happen -- and I'm using this as a round number -- I think it was 19-ish million or something was our estimate once you include the most recent payment.

It would certainly be our expectation that if Trudeau were to pay us a check tomorrow for $20 million, what we would probably have to do is refund him $1 million a little ways down the road, and that would conclude the proceeding.

All right. We can't guarantee that because any number of things could happen, but we were asked to sort of come up with the number that we think is reasonably likely the number that would be necessary to redress those consumers we can probably find and redress. And so that's the second number.

The first number, though, is the binding number, because that is the number in the order.

MR. STEIN: How many checks does a person have to not cash before they are out of the pool?

Now I'm hearing --

THE COURT: Two.

MR. STEIN: Now I'm hearing it's two.

THE COURT: It's two.

MR. STEIN: In the plan it says one.

MR. COHEN: Your Honor, the reason that it says one in the plan is we were dealing with a very small amount of money, and it's inefficient in that context to try to send another check to a person who hasn't cashed the first check.

That's a different question, though, from whether it's reasonably possible that that individual can be located

and will cash that -- cash that check.  There are a lot of reasons -- this is an area where the commission has considerable expertise -- as to why consumers don't cash checks.

The Court is correct that the size of the check is a very large variable.  But if the Court will recall, about 50 percent of the checks were cashed here even though they were very small, and that is because the commission took additional measures to try to make sure the consumers understood what they were receiving, understood that these were legitimate checks, not some fraud or scam, and did other things that consumer communications experts tell us are necessary to get this done.

Just because it has been a long time, just because it's a small check, those things make it more difficult; but it doesn't mean that it's not reasonably possible for us to get money to everyone that we can -- we can locate who deserves this money.

MR. STEIN:  And I don't see anything in the Court's order or the plan that says consumers are out after they fail to cash two checks.

The only written comment on that point is the language I just read that states that you're out after one.

MR. COHEN:  We are back, then, to the core issue of whether the partial redress plan sub silentio modified the 2010 final order, and it did not.

MR. STEIN: And we don't -- we don't say that it modified it.

Our point is it set up a methodology that should be applied no matter how much money is available.

THE COURT: No, it set up a methodology to distribute the rather meager amount that we had to distribute. I don't think it was a final order or anything like that.

It was a proposal to distribute the $8 million, or whatever it was, that was left over from the receivership. And that's how I viewed it.

MR. STEIN: So modifying that --

THE COURT: I think -- I think by cutting it down to 653,000, the FTC is in a way conceding a point which they might succeed on if they were to argue that we should just at least try to distribute a much bigger check, a $20 check or a $29 check to the people who didn't cash it at all.

But they've basically backed from that for purposes of getting this resolved. And, frankly, I'm not sure I'd want to pick that fight, Mr. Stein, obviously.

But I'll deal with that if I have to, but right now I think that we're about as far along today as we are going to get. So you have some things to do.

You have to get those account numbers to Claire. So we will just say account at Wells Fargo ending in --

MR. STEIN: The last four digits.

THE COURT: -- 345 or whatever, that sort of thing.

MR. STEIN: Okay. Your Honor, before we --

THE COURT: So we can get that order entered today and move on, and you've got work to do.

MR. STEIN: Before we walk out of the room, Your Honor -- and I don't want to sound like a broken record -- but Mr. Trudeau is getting a salary from GIN. He gets his next paycheck, let's say, whether it's biweekly or once a month -- I'm not sure -- how much of that check is he supposed to hand over?

We don't want to be accused of holding back money that we should have turned over, but he also obviously has to --

THE COURT: It's a little late for that, but go ahead.

MR. STEIN: Well, okay, maybe so. But we certainly don't want to face that again then.

He has expenses. He is out living and eating, and he is trying to work. What is he supposed to do? I still don't have a clear sense to tell my client 50 percent, 25 percent, 60 percent of every check that comes in your way you need to hand over FTC promptly.

I don't know what to tell him. And it clearly can't be 100 percent, because he has to have something to live off of, and he does have business expenses.

THE COURT:  What do you say, Mr. Cohen?

MR. COHEN:  So there -- and this is also something -- unfortunately, I know we are creating -- there's a lot of work that's involved in this proceeding that can be, I think, addressed better through writing.

He is entitled to basic living expenses, but he is only entitled to basic living expenses.  The people who he took money from, they have living expenses -- living expense obligations, too, and these checks will be meaningful to them.

So he is earning currently something in the range of --

THE COURT:  Buy a couple carton of eggs.

MR. COHEN:  But I didn't take Your Honor as being light hearted at all.  That's important to people.

THE COURT:  I was just now.

MR. COHEN:  Oh, well, I mean, that's important to people.  It's important to commission -- the commission that those people have that money.

We are not talking about a circumstance where, you know, Mr. Trudeau is going to be impoverished.  Again, he's getting all sorts of gifts from people, gifts to pay lawyers, gifts to pay the FTC, gifts of other sorts that were discussed at his deposition.

While we agree that he cannot be reduced to sort of abject poverty, a million dollars a year is not an appropriate

salary for somebody to be earning and living off of when they have an order to pay.

I'm doing this from memory, but I believe that some time ago back in 2013 or 2014, we recommended that the Court use the relevant IRS information in terms of what is necessary to live in the Chicagoland area. They used that -- the Court may be familiar with that, but they use that in lots of different contexts.

So we don't mean to suggest that Mr. Trudeau can have no money and literally every penny in his pocket has to be turned over. But a million dollars a year is so far from what is acceptable. That puts him comfortably in the top 1 percent of earners here even though he's under an order to pay millions of dollars to victims.

That's an intolerable state of affairs from the commission's perspective, and we would hope that it would be an intolerable state of affairs from the Court's perspective.

MR. STEIN: And I am not asking that Mr. Trudeau keep his entire earnings. That's not our position.

I just don't see why we cannot set a percentage going forward of any earnings Mr. Trudeau makes that go to the FTC so he's -- so there's nothing to argue about.

I don't -- Mr. Cohen's sense of what's a reasonable amount to live on may not be the same as mine or another person's. Let's just set a percentage, for example, which is a

clear, bright line for Mr. Trudeau to follow and easy for the FTC to monitor. And he'll avail himself to transparency to make sure that he is meeting that obligation and not keeping more than 50 percent or 40 percent or 60 percent or whatever that number is.

MR. COHEN: Your Honor, that's a modification of the order. The order says pay it all forthwith. That was the right thing to do. But setting aside their objections to it, that's what the order says.

MR. STEIN: Implicit in that is some rational, everyday common sense understanding that that means -- it could mean 100 hundred percent. If Mr. Cohen is right, his logic is why not 100 percent? Why not every single penny?

There's built-in realities into that order to pay. Maybe they do need to be spelled out. So I'm asking for a percentage so Mr. Trudeau doesn't run afoul of another single obligation.

MR. COHEN: If the Court -- you know, if Mr. Stein wants to submit something that proposes a percentage, I believe, again, because this came up in 2013 -- and my memory is a little hazy -- the percentage that we proposed or possibly the receiver proposed was to use IRS guidelines for living in -- you know, in the Chicagoland area, which we think is reasonable. A lot of people are able to live on those amounts.

There are certainly due process considerations. The

order to pay cannot be interpreted constitutionally in a way that makes it impossible for Trudeau to eat or to receive medical care, and so forth. And we are not proposing that. But there is a very, very, very great difference between that level of lifestyle and a million dollars a year or more.

And so the order says "forthwith." And until the order is modified -- and as the Court knows, we believe it cannot be modified -- there can be no cause for making any other type of change.

MR. STEIN: Well, the order doesn't spell out the IRS guidelines. Is it the 15 percent garnishment limit? Do we need to modify the order for that?

My point is, there's common sense reading of the order. And this large expanse I fear is going to cause us to land back here with an accusation that Mr. Trudeau is not turning over as much as he should, practically no matter what he turns over.

I don't want him -- I don't want him to face that. I want some certainty for my client.

THE COURT: Well, why doesn't he start by turning over what he thinks is reasonable, allowing him to have a decent lifestyle, I mean, to live like an ordinary person, not high on the hog.

I assume that if I do allow him to travel to Puerto Rico or Las Vegas or whatever for some event to make money,

those travel expenses are reimbursed, right?  Is that correct?

MR. STEIN:  Yes.  Mr. Trudeau is nodding in the affirmative.

THE COURT:  Okay.  So he doesn't need money for that.

So why don't you -- I mean, I'm not going to pull a number out of the air here, say 90 percent, 80 percent, 65 percent.  I mean, that's -- I don't have any context to make a judgment like that, as I sit here right now.

Why doesn't Mr. Trudeau go ahead and start making payments from his income and see whether or not Mr. Cohen -- Mr. Cohen agrees that that's enough.  And maybe you could write a letter to him and say, "Mr. Trudeau just got a $40,000 check from GIN.  Here's $30,000."  And see where we go from there.

But I think the ball is in your court, Mr. Stein, or Mr. Trudeau's court; and otherwise, I can pull a number out of the air.  You probably won't like it, but I can pull one out of the air, but I'll let you do that first.

MR. STEIN:  Okay.

MR. COHEN:  And to -- to conclude, Your Honor, if the Court would again specify --

THE COURT:  Do you really mean that?

MR. COHEN:  I'm sorry?

THE COURT:  Do you mean that?

MR. COHEN:  You know, I'd like to mean it.

That I do want to make sure that -- that the contempt

order on the -- on the nonappearance will make clear that we can submit something as to what the remedy for that contempt should be and that the pending proceeding, even though it may have other issues involved in March, that that will be to evaluate the order to pay defense?

Part of the reason I'm asking that, Your Honor, is that we believe we've made our prima facie case, and I want to make sure that we have an understanding of sort of the structure of that proceeding.

THE COURT:  When you say, "the order to pay defense," you mean --

MR. COHEN:  Excuse me.  Inability to pay defense.  I misspoke.

THE COURT:  The inability to pay defense.  Yes, we'll be talking about all that at that time.  Nothing is --

MR. COHEN:  Thank you, Your Honor.

THE COURT:  I wish I could say -- well, I did dispose of some of the motions today, so I can get rid of some of the paper.

But do you want this book that you gave me for Miss Babenko's testimony?

MR. COHEN:  I don't believe we need that back.  I'm happy to take it back and recycle it if the Court would prefer or shred it.

THE COURT:  Please.

MR. COHEN:  Thank you.

THE COURT:  All right.  I'll be getting stuff from you soon, and we may have to get back together over the phone for some of that.  And we will be preparing for two days of hearing in March.

MR. STEIN:  And for any travel requests, Your Honor, submit that by motion?

THE COURT:  I would submit it, yes, by motion and give me all the details that you think I would need.  Obviously give Mr. Cohen, you know, time to respond to that.  But I think we have to take this one step at a time, and that's the first step.

MR. STEIN:  Okay.

THE COURT:  Okay?

MR. COHEN:  Thank you, Your Honor.

MR. STEIN:  Thank you, Your Honor.

THE COURT:  Thank you, folks.

(Proceedings concluded.)

C E R T I F I C A T E

I, Nancy L. Bistany, certify that the foregoing is a complete, true, and accurate transcript from the record of proceedings on January 26, 2023, before the HON. ROBERT W. GETTLEMAN in the above-entitled matter.


/s/ Nancy L. Bistany, CSR, RPR, FCRR          January 31, 2023

    Official Court Reporter                    Date
    United States District Court
    Northern District of Illinois
    Eastern Division